Our File No.: 57911
Stephen A. Rudolph, Esq.
RUDOLPH & KAYAL
Counselors at Law, P.A.
800 The Plaza
P.O. Box 255
Sea Girt, NJ  08750
TEL # (732) 449-0190 • FAX # (732) 974-9252
Attorneys for defendants STIHL Incorporated and ANDREAS STIHL AG & Co.
KG

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| ROBERT McGEE and TIFFANY McGEE, his wife | : | CIVIL ACTION NO.: 08-cv-00520 (MLC) |
| Plaintiffs, | : | |
| v. | : | |
| STIHL INCORPORATED; STIHL GROUP; ANDREAS STIHL AG & CO., KG; STIHL SAW COMPANY; NORTHEAST STIHL; OLDHAM COMPANY; BLACK & DECKER CORPORATION; SANDER POWER EQUIPMENT COMPANY; JOHN DOE I (BEING A FICTITIOUS NAME); JOHN DOE II (BEING A FICTITIOUS NAME); JOHN DOE III (BEING A FICTITIOUS NAME); JOHN DOE IV (BEING A FICTITIOUS NAME) | : | Honorable Mary L. Cooper<br><br>CIVIL ACTION |
| Defendants | : | |

---

**STIHL DEFENDANTS' BRIEF IN SUPPORT OF MOTION TO EXCLUDE
THE TESTIMONY OF PLAINTIFFS' EXPERT NEAL GROWNEY**

---

On the Brief,
Stephen A. Rudolph, Esq.

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................... ii

INTRODUCTION.................................................................................... 1

PRELIMINARY STATEMENT............................................................... 1

ARGUMENT ......................................................................................... 1

LEGAL ARGUMENT

I.      LEGAL STANDARD FOR ADMISSIBILITY OF
        EXPERT TESTIMONY……………………………………….……...14

II.     PLAINTIFF'S EXPERT NEAL GROWNEY, P.E., IS NOT QUALIFIED TO
        SERVE AS AN EXPERT WITNESS ON THE DESIGN OF OR
        WARNINGS FOR HANDHELD GASOLINE-POWERED CUT-OFF
        MACHINES …………….……………….…………….……………...…..17

III.    GROWNEY'S OPINIONS ARE NOT THE PRODUCT OF ANY
        METHODOLOGY, SCIENTIFIC OR OTHERWISE………………...…28

CONCLUSION ..................................................................................... 39

# TABLE OF AUTHORITIES

**Page(s)**

FEDERAL CASES

*Calhoun v. Yamaha Motor Corp., U.S.A.,*
350 F.3d 316 (3d Cir. 2003) ........................................................ 25, 36

*Crowley v. Chait,*
322 F. Supp. 2d 530 (D.N.J. 2004) ................................................. 15

*Daubert v. Merrell Dow Pharms., Inc.,*
509 U.S. 579 (1993) ............................................. 14, 15, 16, 18, 28, 29, 35, 38, 39

*Diaz v. Johnson Matthey, Inc.,*
893 F. Supp. 358 (D.N.J. 1995) ..................................................... 20

*Ebenhoech v. Koppers Indus., Inc.,*
239 F. Supp. 2d 455 (D.N.J. 2002) ................................................. 37

*Elcock v. Kmart Corp.,*
233 F.3d 734 (3d Cir. 2000) ...................................................... 15, 25

*Fabrizi v. Rexall Sundown, Inc.,*
2004 U.S. Dist. LEXIS 9859 (W.D. Pa. June 2, 2004) ...................................... 16

*Globe Indem. Co. v. Highland Tank & Mfg. Co.,*
345 F. Supp. 1290 (E.D. Pa. 1972), *aff'd mem.* (without opinion) ................... 20

*Heller v. Shaw Indus., Inc.,*
167 F.3d 146 (3d Cir. 1999) ....................................................... 16

*In Re Diet Drugs Prods. Liab. Litig.,*
2000 U.S. Dist. LEXIS 9661 (E.D. Pa. June 28, 2000) .................................... 16

*In re Human Tissue Prods. Liab. Litig.,*
582 F. Supp. 2d 644 (D.N.J. 2008) ................................................. 16

*In re Paoli R.R. Yard PCB Litig.,*
35 F.3d 717 (3d Cir. 1994) ..................................................... 15, 16, 28, 29

*Jones v. Synthes USA Sales, LLC*,
    2010 U.S. Dist. LEXIS 85744 (D.N.J. Aug. 19, 2010) ......................... 25, 26, 29

*Kolokowski v. Crown Equip. Corp.*,
    2009 U.S. Dist. LEXIS 77474 (D.N.J. Aug. 27, 2009) ..................................... 38

*Kumho Tire Co., Ltd. v. Carmichael*,
    526 U.S. 137 (1999)................................................................................................. 38

*Magistrini v. One Hour Martinizing Dry Cleaning*,
    180 F. Supp. 2d 584 (D.N.J. 2002), *aff'd.* 68 Fed.Appx 356 (3rd Cir.
    2003) ........................................................................................................................ 28

*Milanowicz v. Raymond Corp.*,
    148 F. Supp. 2d 525 (D.N.J. 2001)............................................................. 36, 38

*Oddi v. Ford Motor Co.*,
    234 F.3d 136 (3d Cir. 2000), *cert denied*, 532 U.S. 921 (2001) ..................... 29

*Ortiz v. Yale Materials Handling Corp.*,
    2005 U.S. Dist. LEXIS 18424 (D.N.J. Aug. 24, 2005)...................21, 28, 29

*Poland v. Beaird-Poulan*,
    483 F. Supp. 1256 (W.D. La. 1980) ................................................................. 17

*Quintanilla v. Komori Am. Corp.*,
    2007 U.S. Dist. LEXIS 33126 (E.D.N.Y. May 4, 2007)................................. 26

*Schneider v. Fried*,
    320 F.3d 396 (3d Cir. 2003) ............................................................................ 16

*Smith v. Hobart Mfg. Co.*,
    185 F. Supp. 751 (E.D. Pa. 1960)................................................................... 20

*United States v. Zhou*,
    2008 U.S. Dist. LEXIS 65168 (D.N.J. Aug. 25, 2008) ................................... 20

*Wartsila NSD N. Am., Inc. v. Hill Int'l, Inc.*,
    299 F. Supp. 2d 400 (D.N.J. 2003) *vacated, remanded on other grounds*,
    530 F.3d 269 (3d Cir. 2008) ............................................................................ 36

*Yarchak v. Trek Bicycle Corp.,*
  208 F. Supp. 2d 470 (D.N.J. 2002) .................................................................. 38

**STATE CASES**

*Buckelew v. Grossbard,*
  87 N.J. 512 (1981) ............................................................................ 19

*Jakubowski v. Minnesota Mining & Mfg. Co.,*
  42 N.J. 177 (1964) ............................................................................ 19

*Newman v. Great American Ins. Co.,*
  86 N.J. Super. 391 (App. Div. 1965) .................................................... 19

*Thompson v. Merrell Dow Pharms. Inc.,*
  229 N.J. Super. 230 (App. Div. 1988)..18, 19, 26

**STATE STATUTES**

*N.J.S.A.* 2A:58C-4 ................................................................................ 11

**RULES**

*Fed. R. Evid.* 702 .............................................................. 1, 14, 5, 16, 25, 28, 36, 38

## INTRODUCTION

Defendants ANDREAS STIHL AG & Co. KG and STIHL Incorporated (collectively, the "STIHL Defendants") submit this Memorandum of Law in support of their motion to bar Plaintiffs' proposed expert Neal Growney from testifying in this case. Growney's testimony must be excluded because he lacks the appropriate qualifications to testify as a design or warnings expert in this case, and his opinions, unsupported by any scientific methodology or the facts of this case, cannot pass muster under Rule 702.

## PRELIMINARY STATEMENT

The STIHL Defendants refer the Court to the Statement of Undisputed Material Facts submitted with their Motion for Summary Judgment and incorporate each of those facts by reference. The STIHL Defendants also respectfully refer the Court to the Statement of Facts included in the Brief in Support of the Motion to Exclude the Testimony of Wilson C. Hayes, which provides the essential factual background for this litigation. For the sake of brevity, that Statement of Facts will not be repeated here, but we recommend that the Court first read the Hayes brief so that the arguments presented here can be placed in the proper factual context.

## ARGUMENT

Plaintiffs' proffered mechanical engineering expert, Neal Growney, P.E., authored a rambling report dated November 12, 2009, thirty-one pages in length.

(*See* Nov. 12, 2009 Report of Neal Growney, attached as Ex. A.)  In that report, Growney opines variously that:  the extensive warnings in the STIHL Instruction Manual for the TS-400 are "defective," apparently because the manual is not permanently attached to the handheld TS-400 in a "hollow storage sleeve in the machine's handle," or some other manner (*see* Ex. A ¶¶ 6.115, 6.116); the STIHL TS-400 is defectively designed because it did not include provisions "to preclude the installation, and operation, of toothed saw blades" on it, such as a shaped or enlarged arbor or dowel pin arrangement" (*see* Ex. A ¶¶ 6.41, 6.51, 6.58), and because it lacked a "lower guard," "emergency blade brake" or "de-clutching device" (*see* Ex. A ¶¶ 6.37, 6.44; *see* Deposition of Neal Growney, Aug. 23, 2010, at 175, 181, 194, attached as Ex. D); McGee was using the machine in a "safe manner" and did not lose his balance at the time of the accident (*see* Ex. A ¶¶ 6.166, 6.167); and the STIHL TS-400 warning label on the machine warning against the use of carbide-tipped saw blades is inadequate because it is in text, it does not include a "pictogram" or "symbol" warning and the letter size "was too small." (*See* Ex. A ¶¶ 6.84, 6.88, 6.98, 6.101, 6.105, 6.107.)  He also criticizes the use of the term "reactive forces" as too scholarly. (*See* Ex. A ¶ 6.121, 6.122.)

Growney is the classic "courtroom engineer," willing to offer virtually any opinion about almost anything for a fee.  He operates out of his home (*see* Deposition of Neal Growney, June 14, 2010, attached as Ex. B, at 7-8), has no

employees, and spends 100% of his time and generates 100% of his income consulting for lawyers in litigation. (*See* Ex. B at 9, 15.) He has been a "litigation consultant" for the past thirteen years. (*See* Ex. B at 11.) Before writing his report, Growney did not interview any of McGee's co-workers or visit the accident site. (*See* Ex. B at 81.) His billing records reflect that the only depositions he read were those of McGee and Peter Linsbauer of ANDREAS STIHL; he "skimmed" other depositions for information that he "might be looking for at that moment at that time." (*See* Deposition of Neal Growney, June 15, 2010, attached as Ex. C, at 66-67.) When read the names of witnesses in the case, however, he could "not recall" whether he had "skimmed" their depositions or not. (*See* Ex. C at 68-74.)

Like plaintiffs' other "experts," Michael Kalsher and Wilson C. "Toby" Hayes, Growney's first real "exposure" to handheld, gasoline-powered cut-off machines was when he was retained by plaintiffs' counsel Barry Packin in the *Stout*[1]

---

[1] Growney claims that he briefly consulted several years ago in two or three cases involving models of Homelite cut-off machines he could not identify regarding issues unrelated to reactive forces or injury from contact with a cutting attachment. Growney could not produce a report or deposition transcript from these cases but "believes" they involved issues with a broken "pull cord" and a fuel leak. (*See* Ex. B at 26-28.) The *Stout* litigation, as the Court knows, was another case filed by Barry Packin against essentially the same defendants – only the retail dealer was different – also involving a STIHL TS-400 cut-off machine, an Oldham 24 tooth carbide-tipped saw blade and claims of "kickback" injury by a construction foreman attempting to cut wood hanging over the closed tailgate of a pickup truck, essentially over his head.

litigation. *Stout* clearly was the first time Growney ever saw a TS-400, although his only "evaluation" of the TS-400 in that case was to look at it, photograph it and watch it be started and run for a few minutes. (*See* Deposition of Neal Growney, July 30, 2008, *Stout v. STIHL Incorporated, et al.*, attached as Ex. E, at 178-79; *See* Deposition of Neal Growney, Aug. 21, 2008, *Stout v. STIHL Incorporated, et al.*, attached as Ex. K, at 32, 46-49.)  His complete unfamiliarity with the machine is evident from his deposition testimony in *Stout*:

> Q.   Have you ever operated a gas powered cutoff machine?
>
> A.   No.
>
> Q.   Before you began to work with lawyers in accident cases, did you have any professional involvement with gas powered cutoff machines?
>
> A.   No.

(*See* Ex. E at 30.)

> Q.   Where is the choke?
>
> A.   I think it's on the back of the machine.  I'm not sure.
>
> Q.   Where is the on off switch?  Does it have one?
>
> A.   I think it does, yeah.
>
> Q.   Do you know where it is?
>
> A.   Not off the top of my head.

(*See* Ex. E at 180.)

4

> Q.   Have you ever worked for anyone in the business of designing or manufacturing hand held gasoline powered cutoff machines?
>
> A.   No.
>
> Q.   Have you ever worked for anybody in the business of designing warnings for handheld gasoline powered cutoff machines?
>
> A.   No. Well, that's a -- no.
>
> Q.   Have you ever worked for anybody in the business of designing or preparing instruction or owner's manuals for hand held gasoline powered cutoff machines?
>
> A.   Table saws but not cutoff machines.

(*See* Ex. K at 75.) Growney later purchased a used TS-400 on the internet (*see* Ex. B at 22-23), but had difficulty starting the machine and has run it only for a "couple, three minutes." (*See* Ex. B at 24.) Other than that, Growney never has operated a TS-400 or seen one operated, with the possible exception of occasionally glimpsing someone using one when passing construction sites. (*See* Ex. B at 25.)

More importantly, Growney never has designed a handheld gasoline-powered cut-off machine (*see* Ex. B at 103), a chain saw (*see* Ex. B at 119), any handheld gasoline-powered equipment (*see* Ex. B at 119), any lawn and garden equipment (*see* Ex. B at 121), any type of electrically-powered-handheld tool (*see* Ex. B at 121), not even a component part for any of this equipment. (*See* Ex. B. at 108-09.) He certainly never has designed a guarding system or braking system for a handheld, gasoline-powered cut-off machine or any type of handheld power tool

(*see* Ex. B at 109, 120) and never has worked or consulted for anyone in the business of designing, manufacturing or using this type of equipment. (*See* Ex. B at 101, 118-19.)   Nor has he ever tested for kickback or other reactive forces with a cut-off machine or any other handheld gasoline-powered tool (*see* Ex. B at 54-55), or seen the results of such testing. (*See* Ex. B at 55.)

Growney is just as unfamiliar with cutting attachments for handheld power tools. He never has designed a saw blade (*see* Ex. B at 118), or any kind of cutting attachment, either a diamond or composite wheel, for a cut-off machine or any other handheld power tool. *See id.*

Growney has no formal training of any sort with regard to warnings. He has never tested warnings, nor has he ever seen anyone test warnings. (*See* Ex. E at 40.) He has performed no independent research to determine how people react to warnings. (*See* Ex. E at 158-59.) He has never designed a warning that is used on any machine, tool or product sold commercially, including any type of handheld power equipment, and he never has worked for anyone who has. (*See* Ex. E at 26, 119, 243.) Aside from working for lawyers in litigation, in fact, Growney never has been retained as a warnings consultant by anyone. (*See* Ex. E at 26, 119.) In his work for lawyers in litigation, Growney cannot recall any case in which he opined that any warning was adequate. (*See* Ex. E at 120.)

Growney's "experience" with owner's or instruction manuals is just as thin – his only contribution to any manual for any product were two sentences in a lengthy manual for a Bridgewood table saw, published sometime in 1998. (*See* Ex. B at 130-34.) Despite its innocuous nature and brevity, Growney lists his "work" on the Bridgewood Manual on his CV. The two warnings he allegedly prepared were textual, contained no pictorials or other illustrations and simply said:

> Do not operate the saw without the guard and splitter in place in operating correctly.
>
> &#42;              &#42;              &#42;
>
> Cuts that require removing the blade guard can be made with this machine. Always devise a suitable blade guard or purchase and install an appropriate after-market guard.

(*See* Ex. B at 132-34.) He has never published an article about the design, use or safety of a cut-off machine or one of its component parts, a chain saw, any lawn and garden equipment or any handheld gasoline-powered equipment, peer reviewed or otherwise. (*See* Ex. B at 128-29.) He has never published an article about reactive forces from cut-off machines or any product. (*See* Ex. B at 59-60; Ex. F at 161.) He never has lectured or spoken to any organization about the design, use or safety of any type of handheld gasoline powered equipment. (*See* Ex. B at 134-35.)

While Growney served as an alternate member of the ANSI 01.1 Committee, which promulgates standards for certain types of woodworking machinery, he never

has served on any ANSI Committee or other organization that enacts safety standards for gasoline powered cut-off machines, chain saws, lawn and garden equipment or any type of handheld power tool. (*See* Ex. B at 101; Ex. D at 236-37; Ex. F at 110.) He did not even own the applicable ANSI standards for handheld, gasoline-powered cut-off machines prior to being hired in *Stout*. (*See* Ex. E at 182-85.) He never before had read these standards, other than perhaps "a page or two." (*See* Ex. E at 184-85.)

Growney readily admits that he has done nothing to support any of his opinions relating to the TS-400's design or warnings other than "think about them." For example, he has not documented any of the "safety devices" he advocates, developed prototypes, performed any testing, or published his ideas for peer review. (*See* Ex. B at 197-98; Ex. C at 85-86, 96-99; Ex. D at 102-03, 159-60, 163-64, 178-82; Ex. E at 24-25, 40, 158-59.) He knows of no support in the literature or applicable standards for any of the design or warning changes he claims should be made to the TS-400 (*see* Ex. C at 112; Ex. D at 159-60, 161-63, 179-80, 185-86), and he knows of no cut-off machine sold anywhere in the world that incorporates any of these "concepts." (*See* Ex B. at 201-02; Ex. C at 84, 110-11; Ex. D at 155-56, 176-77, 184-85, 199-200.)

Growney did create a crude "prototype" of a "hollow handle" in connection with his theory that all handheld tools with "enough space," including the TS-400,

should have a compartment for permanently attaching the Manual.  Essentially he had a scrap aluminum tube welded to the front handle of his used TS-400, rolled up the manual and positioned it inside the welded tube (*See* Ex. C at 79.)  He has done no engineering drawings of the concept (*see* Ex. C at 85-86), is not aware of any handheld cutting-off machine, or any other handheld power tool for that matter, sold anywhere in the world that stores an instruction manual on the product, (*see* Ex. C at 85) and has done no testing to determine what handling, operational or safety problems a design change of this nature would introduce to the TS-400.  (*See* Ex. C at 86-87.)  He also can identify no factual support for the notion that McGee, who testified he knew manuals were available at Jingoli but did not feel the need to read one because he knew how to use a cut-off machine safely, would have been more likely to read a manual located inside the TS-400's handle than the manuals otherwise available to him at Jingoli.   (*See* Ex. C at 114-15.)   Growney acknowledges, moreover, that the logical extension of his "opinion" means that every handheld tool in the world -- certainly every cut-off machine -- is "defective," and concedes that even the ANSI 01.1 standard, which applies to equipment much larger than the TS-400 and is promulgated by a committee on which he sits as an "alternate," does not require Instruction Manuals to be "permanently attached." (*See* Ex. C at 102-03, 108-09.)

Growney's "warnings" opinions are equally unconnected to reality, the facts of this case or scientific principles.  Essentially, he maintains that a variant of a saw blade pictorial that STIHL uses in its manual, but not on the TS-400 itself, should have been displayed on the guard of the TS-400.  (*See* Ex. A at ¶ 6.106.)  As the record unqualifiedly establishes, however, STIHL does not use that symbol on the TS-400 because there is no universal symbol for saw blades, which come in dozens of different profiles and tooth configurations, and using the symbol on the TS-400 would seriously mislead users, not inform them, as testing pursuant to the ANSI Z535.4 protocol for testing pictorials has shown.  (*See* Deposition of Peter Linsbauer, attached as Ex. L, at 40, 83-85; Report of Vince Morabit, attached as Ex. M, at 40; Report of Peter Linsbauer, attached as Ex. N, at 29; Report of Dorris & Associates, attached as Ex. O.)  In the STIHL Manual, the symbol is used because it can be and is explained by text.  Undeterred, Growney produced his own version of the saw blade pictorial, simply declaring that the pictorial, which he drafted in only ten minutes, should be displayed on the TS-400.  (*See* Ex. E at 247-48.)  The pictorial has not been tested, either alone or to compare its effectiveness to the effectiveness of warnings already on the TS-400, and he can identify no standards or professional writings that support his claim that this pictorial would be a safe or useful addition to the warning system for the TS-400.  (*See* Deposition of Neal Growney, Sept. 2, 2008, *Stout v. STIHL Incorporated, et al.*, attached as Ex. F, at

70-71, 113, 225-27.)   He concedes that no cut-off machine sold anywhere in the world uses the pictorial he created.  (*See* Ex. F at 168-69.)

Like Kalsher, with his warning opinions Growney simply ignores the New Jersey Product Liability Act, which defines "adequate warning" as one a reasonable person in the same or similar circumstances would have given.  *N.J.S.A.* 2A:58C-4. He has no idea what warnings were being used by other cut-off machine manufacturers in 2003, the date the machine McGee was using at the time of his accident was manufactured (*see* Ex. D at 196-98), has not reviewed instruction manuals used by other cut-off machine manufacturers in 2003 (*see* Ex. D at 198-99), and cannot say whether any other cut-off machine manufacturer or power tool manufacturer had a better warning system than STIHL in 2003.  (*See* Ex. D at 200.)

In forming his "opinions" about how McGee and the machine were positioned at the time of the accident, Growney, who has no biomechanical or medical training or expertise (*see* Ex. B at 13; Ex. K at 21) did not try to replicate Mr. McGee's accident with a surrogate study or any exemplar pipe or cut-off machine, (*see* Ex. B at 77-78) nor did he do any scaling or modeling of the pipes or the cut-off machine.  (*See* Ex. C at 40.)  He admits there are "inaccuracies" with his calculation of the spacing between the pipes.  (*See* Ex. B at 37-38; Ex. C at 36-37.) Apparently, he reached his opinion by simply accepting McGee's testimony, even

though that description contradicts the conclusions of Wilson C. "Toby" Hayes, plaintiff's biomechanical "expert," since that is the only information he had.

Growney's opinions border on quackery. Effectively, he has declared every handheld, gasoline-powered cut-off machine, and virtually every handheld power tool sold anywhere in the world, "defective." His opinions find no support anywhere – not in the facts of this case, not in the design of other cut-off machines, not in the applicable standards, not in the professional and engineering literature, and certainly not in anything he has done; he has done nothing – no prototypes, no testing, nothing other than unsupported claims that devices and designs that no safety standard calls for and no cut-off machine manufacturer uses, claims that have not been offered for peer review, should be included in the TS-400's design. Legitimate engineers design, document, and develop prototypes, test and substantiate their claims. All Growney has done, as he admits for the most part, is "think about" concepts and write a report:

> Q:     Have you done anything with regard to your ideas about a brake except think about it?
> MR. PACKIN: Object to the form.
> THE WITNESS: Have not.

(*See* Ex. F at 138-39.)

> Q:     Is there anything that you have done concerning a brake on a cut off machine, other than think about it?

A: No.

(*See* Deposition of Neal Growney, Nov. 17, 2008, *Stout v. STIHL Incorporated, et al.*, attached as Ex. H, at 158.)

> Q:   Okay. Other than whatever sketches may be in your exhibits, buying these two wheels, and thinking about it, have you done anything with regard to the arbor concept?
>
> MR. PACKIN: Object to the form.
>
> THE WITNESS:   Well, I told you before, I researched the grinding wheel standard, I've looked at different diameters of arbors that are available, what historically has been done or available on the market.
>
> BY MR. WALSH:
> Q:   But no testing of any sort -- of any kind of 12 or 14-inch wheel with those concepts adapted to it?
>
> MR. PACKIN: Asked and answered multiple times.
>
> BY MR. WALSH:
> Q:   Correct?
>
> MR. PACKIN: 2:30 on day three.
>
> THE WITNESS: That's correct.

(*See* Ex. F at 139.)   A serious engineer might hesitate if only to consider why his concepts are not used by machine manufacturers or required by standards, or at least addressed in engineering literature.   But Growney is not a serious engineer, he is a courtroom engineer, shameless and reckless, and his opinions should be excluded.

13

## LEGAL ARGUMENT

Growney's testimony should be barred in the first instance because he plainly lacks the required qualifications to render expert opinions pertaining to handheld gasoline-powered cut-off machines. Even if that were not the case, his opinions are not the product of a reliable, scientific methodology; they are not the product of any methodology at all, scientific or otherwise. Growney's "throw it against the wall and see if anything sticks" approach does not even begin to approach the scientific rigor required by Federal Rule of Evidence 702 and *Daubert*.

## I.  LEGAL STANDARD FOR ADMISSIBILITY OF EXPERT TESTIMONY.

Testimony by expert witnesses is governed by Rule 702 of the Federal Rules of Evidence, which provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

As the Supreme Court made clear in *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993), the trial judge has a "gatekeeper" function under Rule 702 and must ensure that any and all expert testimony is not just relevant, but also

reliable before it can be heard by a jury. "Rule 702 embodies three distinct substantive restrictions on the admission of expert testimony: qualifications, reliability, and fit." *Elcock v. Kmart Corp.*, 233 F.3d 734, 741 (3d Cir. 2000). *Daubert* requires that the expert opinion be reliable and based on good grounds, i.e., based on the methods and principles of science rather than on subjective belief or unsupported speculation. *See* 509 U.S. at 589; *see also In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 742 (3d Cir. 1994); *Crowley v. Chait*, 322 F. Supp. 2d 530, 535, 547 (D.N.J. 2004) ("By reviewing only those depositions provided to him by Plaintiff's counsel, and by reviewing what appears to be for the most part only preselected excerpts of those depositions, [the expert] relied upon information that is too unreliable to be trusted") (internal citations omitted).

Courts in this Circuit have been rigorous in protecting the jury from subjective, speculative expert opinions. The testimony of even a qualified expert is inadmissible if not based upon sufficient facts or data, if not the product of reliable principles and methods, or if otherwise reliable principles and methods have not been applied reliably to the case's facts. The Third Circuit has explained the "trilogy of restriction" as follows:

> Qualification refers to the requirement that the witness possess specialized expertise. We have interpreted this requirement liberally, holding that "a broad range of knowledge, skills, and training qualify an expert." Secondly, the testimony must be reliable; "it must be

> based on the 'methods and procedures of science' rather than on subjective belief or unsupported speculation;" the expert must have "good grounds" for his or her belief. In sum, *Daubert* holds that an inquiry into the reliability of scientific evidence under Rule 702 requires a determination as to its scientific validity. Finally, *Rule 702* requires that the expert testimony must fit the issues in the case. In other words, the expert's testimony must be relevant for the purposes of the case and must assist the trier of fact. . . "Rule 702's 'helpfulness' standard requires a valid scientific connection to the pertinent inquiry as a precondition to admissibility."

*Schneider v. Fried*, 320 F.3d 396, 404 (3d Cir. 2003) (quoting *In re Paoli*, 35 F.3d at 742 (quoting *Daubert*, 509 U.S. at 590-592)); *see also Fabrizi v. Rexall Sundown, Inc.*, 2004 U.S. Dist. LEXIS 9859 (W.D. Pa. June 2, 2004) (granting motion to exclude plaintiff's expert witness and explaining that Federal Rule 702 does not permit expert testimony based on subjective belief or unsupported speculation). A court, in other words, "must examine an expert's methodology and conclusions in order to ensure reliability," not just his qualifications. *In Re Diet Drugs Prods. Liab. Litig.*, 2000 U.S. Dist. LEXIS 9661, *9 (E.D. Pa. June 28, 2000) (citing *Heller v. Shaw Indus., Inc.*, 167 F.3d 146, 153 (3d Cir. 1999)) ("a district court must examine the expert's conclusions in order to determine whether they could reliably follow from the facts known to the expert and the methodology used."); *see also In re Human Tissue Prods. Liab. Litig.*, 582 F. Supp. 2d 644 (D.N.J. 2008) ("the

courtroom is not the place for scientific guesswork, even of the inspired sort. Law lags science; it does not lead it.") (internal citations omitted).

## II.   PLAINTIFFS' EXPERT NEAL GROWNEY, P.E., IS NOT QUALIFIED TO SERVE AS AN EXPERT WITNESS ON THE DESIGN OF OR WARNINGS FOR HANDHELD GASOLINE-POWERED CUT-OFF MACHINES.

Growney plainly does not possess the skill, experience, training, background or education to assist the jury in understanding the design, use or safety of a handheld gasoline-powered cut-off machine, such as the STIHL TS-400. The TS-400 is a highly specialized handheld tool with unique characteristics, specifically designed to cut masonry materials, stone, asphalt, certain metals and similar materials, using an abrasive wheel. As the ANSI B7.5 standard provides, "Gasoline-powered, hand-held, portable, abrasive cutting-off machines are a *unique tool requiring specific safety specifications to protect the user.*" (*See* Foreword, ANSI B7.5-1990 (attached as Ex. G) (emphasis added).

As many courts have found, without actual, hands-on experience with a product, even the most heavily credentialed engineer is a little more than a layman testifying under the guise of "expert." For example, in *Poland v. Beaird-Poulan*, 483 F. Supp. 1256 (W.D. La. 1980), the court excluded plaintiff's expert, a Ph.D. in mechanical engineering, in a chain saw kickback case because the expert had only marginal experience with chain saws:

This court jealously guards the title of "expert witness". All lawyers, when they present an expert witness, qualify him by questions: "Have you ever testified in court as an expert witness; if so, where?" How many judges without intending it have launched the first, the second, the third or the fourth missile, allowing a man to go to the fifth court and say, "Yes, sir, I have been qualified as an expert in court by four other judges."? Therefore, it is clearly the duty of every court and each judge to limit the launching of experts to those who are truly able to testify with the necessary expertise. *One cannot testify as an expert in regard to a mechanism if he has not had ample opportunity to practically apply his field of expertise to the mechanism at issue. In this case, a gasoline-powered, industrial chain saw is the mechanism at issue.*

*Id.* at 1259 (emphasis added). An expert's experience also must match up with facts of the case even under less stringent standards than those imposed by *Daubert*. Thus, in *Thompson v. Merrell Dow Pharms. Inc.,* 229 N.J. Super. 230 (App. Div. 1988), plaintiff claimed that her son suffered birth defects as a result of a drug, Bendectin, she ingested during pregnancy. Plaintiff's expert had a Bachelor of Science degree in Chemistry, a Master of Science degree in Pharmacology, and a Ph.D. in Pharmacology. He taught Pharmacology and Toxicology for 12 years and became the director of Basic Science Research at the United States Public Service Hospital. He also had done substantial research and written 22 articles dealing with the effects of drugs on animals, although those articles were in the cardiovascular field, and he had never done any drug screening, drug evaluation or experimental or laboratory work on Bendectin. The trial court refused to permit him to testify as an

expert, finding that the underlying bases for his conclusions were not demonstrated to be of sufficient reliability to allow the witness to testify. *Thompson,* 229 N.J. Super. at 239.

The New Jersey Appellate Division affirmed, stating that one of the requirements for expert testimony is that the witness "must have sufficient expertise to offer the intended testimony" and "must possess the minimal technical training and knowledge essential to the expression of a meaningful and reliable opinion." *Id.* at 240-41, 183. As the Appellate Division stated:

> We are satisfied that Aldinger [plaintiff's expert] sadly lacked the credentials necessary to support this testimony as being reliable enough to aid the jury in its deliberations. He never performed research concerning Bendectin, never studied developing embryos, never ventured outside the cardiovascular field and never examined the infant plaintiff and was not qualified to do so. Aldinger ventured a net opinion without any past medical history of plaintiff and without any knowledge of the facts and circumstances concerning the dosage prescribed for plaintiff and the number of times that plaintiff ingested Bendectin. The superficial "research" conducted by Aldinger cannot reasonably be considered a proper foundation for his opinion. An expert's opinion which lacks a proper foundation is "not worthy of consideration."

*Id.* at 242-43 (citing *Jakubowski v. Minnesota Mining & Mfg. Co.,* 42 N.J. 177, 187, (1964)); *see also Buckelew v. Grossbard,* 87 N.J. 512, 524 (1981) ('[A]n expert's bare conclusions, unsupported by factual evidence, is inadmissible."); *Newman v. Great American Ins. Co.,* 86 N.J. Super. 391, 399 (App. Div. 1965) ("[t]he mere fact

that a witness is an expert in a wide general field, like engineering, does not make everything he says admissible.  It must appear that he knows what he is talking about with reference to the fact of the particular case.").

Stated differently, any witness, regardless of credentials, is essentially "a lay witness rendering his own opinion under the guise and prestige of an expert," *Smith v. Hobart Mfg. Co.,* 185 F. Supp. 751, 754 (E.D. Pa. 1960), *rev'd on other grounds,* 302 F.2d 570 (3d Cir. 1962), unless he can claim some realistic experience with the subject matter about which he proposes to testify.  *See also Globe Indem. Co. v. Highland Tank & Mfg. Co.,* 345 F. Supp. 1290, 1291 (E.D. Pa. 1972), *aff'd mem.* (without opinion), 478 F.2d 1398 (3d Cir. 1973) (emphasis added). Because an expert's opinion not based upon developed expertise is no evidence at all, this Court has excluded the testimony of proffered experts when they lack the requisite qualifications to testify on a specialized topic.  *See United States v. Zhou,* 2008 U.S. Dist. LEXIS 65168, *11-13 (D.N.J. Aug. 25, 2008) (certified Fire and Explosion Investigator unqualified to testify about fire investigation because he lacked the "specialized expertise" in investigating fire causation on marine vessels or heater fires and was not qualified to review investigations performed by others); *Diaz v. Johnson Matthey, Inc.,* 893 F. Supp. 358, 372-73 (D.N.J. 1995) (physician not qualified to testify that plaintiff had platinum salt allergy because his experience with such patients was limited and he had only limited familiarity with literature

regarding the illness); *see also Ortiz v. Yale Materials Handling Corp.*, 2005 U.S. Dist. LEXIS 18424 (D.N.J. Aug. 24, 2005) (forklift manufacturer's motion to bar testimony of expert witness granted where he was not qualified to testify as to the accident dynamics or forces on the forklift operator during the accident).

During his deposition, Growney testified at length about his lack of professional, practical or theoretical experience with the design, safety, and engineering features of handheld gasoline-powered tools in general:

> Q: Have you designed any type of composite or diamond wheel for mounting on a cut-off machine or other hand-held power tool?
>
> A: No.
>
> Q: Have you ever worked for anybody that's been in the business of designing, manufacturing, or selling chainsaws?
>
> A: Design, manufactured, or sold chainsaws?
>
> Q: Selling chainsaws, yeah.
>
> A: No.
>
> Q: Have you ever designed a chainsaw?
>
> A: No.
>
> Q: Have you ever designed a cutting attachment for a chainsaw?
>
> A: No.
>
>          *             *             *
>
> Q: Have you ever designed any type of hand-held gasoline-powered equipment?
>
> A: No.

Q:      Component part for any type of hand-held gasoline-powered equipment?

A:      No.

Q:      Guarding system for any kind of hand-held gasoline-powered equipment?

A:      No.

Q:      Brake system for any kind of hand-held gasoline-powered equipment?

A:      No.


            *                    *                    *


Q:      Have you ever done any type of design of a -- of any kind of lawn and garden equipment for any commercial application?

A:      No.

Q:      Other than the leaf catcher, have you done -- even for your own use, have you done --designed any kind of lawn and garden equipment?

A:      No.

Q:      Have you designed any type of hand-held electrically-powered equipment?

A:      I have utilized a number of hand-held, and I have repaired    hand-held    electrically-powered equipment in my work.

Q:      Have you designed any?

A:      No, I don't think so.


            *                    *                    *


Q:      All right.   Have you ever published an article concerning the design, use, or safety of a cut-off machine?

22

A:     No.

Q:     Component for a cut-off machine?

A:     No.

Q:     How about a chain saw?

A:     No.

Q:     How about any type of hand-held gasoline-powered equipment?

A:     No.

Q:     How about any type of hand-held power equipment, whether gasoline-powered or not?

A:     No.

Q:     How about any type of lawn and garden equipment?

A:     No.

              *                    *                    *

Q:     Have you ever given a presentation to any group regarding the design, manufacture, use, or safety of a hand-held gasoline-powered cut-off machine?

A:     No.

Q:     Have you ever given a presentation to any group regarding the design, manufacture, use, or safety of a chain saw?

A:     No.

Q:     Have you ever given a presentation to any group concerning design, manufacture, use, or safety of any type of hand-held gasoline-powered tool or equipment?

A:     No.

              *                    *                    *

Q:    All right. Do you know of anything in the professional literature that has looked at, tested, or published the results of testing of a brake or a guard like you've described for a cut-off machine?

A:    I don't.

(*See* Ex. B at 118-21, 128-29, 134-35, 199).  Growney is equally unfamiliar with reactive forces and handheld gasoline-powered tools, and did nothing to educate himself about them prior to rendering his opinions:

Q:    Have you ever had the opportunity to test for kickback reactions with a hand-held gasoline-powered cut-off machine?

A:    No.

Q:    A chain saw?  How about a chain saw?

A:    No.

Q:    How about any type of hand-held gasoline-powered tool?

A:    No.

Q:    Have you ever seen the results of testing of kickback reactions from a hand-held gasoline-powered cut-off machine?

A:    Well, the only ones I saw was [sic] the electric ones that I told you.[2]

Q:    Okay.  Just bear with me.  You've not seen them with a hand-held gasoline-powered cut-off machine, correct?

A:    Right.

Q:    Not seen it with a chain saw?

---

[2] Only moments before providing this testimony during his deposition, Growney testified that he was "pretty sure I've had some circular [electric] saws jam in the wood, but I don't remember kickback." (*See* Ex. B at 53-54).

24

> A:   Right.
>
> Q:   Not seen any test results of kickback reactions with any type of hand-held gasoline-powered tool, correct?
>
> A:   Correct.

(*See* Ex. B at 54-55).  "Before an expert witness may offer an opinion pursuant to Rule 702, he must first be qualified by virtue of specialized expertise." *Elcock*, 233 F.3d at 741.  Even though he might possess a broad range of knowledge, skills and training, "[a]n expert may be generally qualified but may lack qualifications to testify outside his area of expertise." *Calhoun v. Yamaha Motor Corp.*, *U.S.A.*, 350 F.3d 316, 322 (3d Cir. 2003) (prohibiting psychologist's opinion that proper age for jet ski use was 16 or above because it required more specific knowledge than his general knowledge in psychology and human factors engineering).

In *Jones v. Synthes USA Sales, LLC*, 2010 U.S. Dist. LEXIS 85744 (D.N.J. Aug. 19, 2010), this Court recently held that an expert witness, offered to show an alternative design to defendants' surgical screws for a medical device, did not have the requisite qualifications to testify.  Plaintiffs' expert had a Bachelor of Science in Metallurgical Engineering, a Master of Science degree in Engineering Science and spent thirty-four years as a metallurgical engineer for Boeing Company responsible for aircraft design, failure analysis and accident investigation.  *Id.* at *15.  However, he never studied biomechanics in terms of implantable surgical devices, never

pursued a medical degree, had no experience with respect to medical device manufacturing and never conducted research or published papers with respect to medical devices. *Id.* He failed to review any medical textbooks or journals and did not have any discussions with experts on medicine or biomechanics. *Id.* at *16. The Court noted that his "lack of specific expertise on the subject matter of the case was shown numerous times throughout [his] deposition." *Id.* at *22-23.

Similarly, in *Quintanilla v. Komori Am. Corp.*, 2007 U.S. Dist. LEXIS 33126 (E.D.N.Y. May 4, 2007), plaintiff claimed a printing press was defectively designed because it was operational even when the guard that prevented contact with the rollers was open. *Id.* at *4. The expert held a master's degree in mechanical engineering, was employed as a senior mechanical engineer for a company that designed and built electronic power systems for the computer and telecommunications industry, owned an engineering consulting practice for many years, and had consulted in numerous engineering capacities. *Id.* at *10-11. Nevertheless, the court refused to permit him to testify because he lacked the requisite qualifications as an expert on printing presses and because the underlying bases for his conclusions were unreliable. *Id.* at *13-20.

Growney is far less qualified than the proffered experts disqualified in *Jones* and *Quintanilla.* Even to say, in the words of the *Thompson* court, that he "sadly lacks" the credentials to support his opinions understates his complete lack of

qualifications.  To illustrate that point, the STIHL defendants have attached a CD-Rom that contains a number of excerpts from the videotaped depositions of Growney in both *Stout* and *McGee*, attached as Exhibit P.  Even a brief perusal of that CD-Rom will confirm just how "miserably lacking" Growney's credentials actually are.

Nevertheless, despite his lack of familiarity with cut-off machines -- more likely because of it -- Growney did nothing to try to bolster his "credentials" regarding cut-off machines specifically, or handheld power tools generally.  He made no effort to try to educate himself about cut-off machines.  No research has been done.  No consultation has been asked for.  Growney has done nothing more than conjure up "ideas" he believes might work, even though he cannot identify any cut-off machine sold anywhere in the world that uses any of them, and he acknowledges that nothing he suggests is called for or even recommended by the comprehensive ANSI standards that govern the design of cut-off machines.

Because Growney has no *developed* expertise with respect to handheld cut-off machines or any even remotely similar tool, he lacks the qualifications necessary to testify as an expert regarding any aspect of the design of a TS-400 or its warnings.

### III.   GROWNEY'S OPINIONS ARE NOT THE PRODUCT OF ANY METHODOLOGY, SCIENTIFIC OR OTHERWISE.

Even when properly qualified, experts must have a sufficient basis for the opinions they express.  At a minimum, *Daubert's* gatekeeper function requires a court to assure that the scientific methodology upon which the expert's opinion is based is well-founded in facts and the product of reliable methods and principles of science, rather than subjective belief or unsupported speculation.  *See, e.g., Ortiz,* 2005 U.S. Dist. LEXIS 18424 at *12 (the Court must determine "whether the expert has properly applied those principles and methods to the facts of the case.") (citing *Magistrini v. One Hour Martinizing Dry Cleaning,* 180 F. Supp. 2d 584, 595 (D.N.J. 2002) *aff'd.* 68 Fed.Appx 356 (3rd Cir. 2003) (*citing Fed. R. Evid.* 702)).  To be reliable, "the expert's opinion must be based on the 'methods and procedures of science' rather than on 'subjective belief or unsupported speculation'; the expert must have 'good grounds' for his or her belief." *In re Paoli,* 35 F.3d at 742 (quoting *Daubert,* 509 U.S. at 590).  "In certain fields, experience is the predominant, if not sole, basis for a great deal of reliable expert testimony." *Fed. R. Evid.* 702, Advisory Committee Note (2000).

The Supreme Court in *Daubert* and the Third Circuit recognize a non-exclusive list of factors to examine when determining whether an expert's particular theory or techniques rests upon a reliable scientific foundation.  These factors

include:  (1) whether a method consists of a testable hypothesis; (2) whether the method has been subject to peer review; (3) the known or potential rate of error; (4) the existence of maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods that have been established to be reliable; (7) the qualifications of the expert witness testifying based on the methodology; and (8) the non-judicial uses to which the method has been put.  *See Daubert*, 509 U.S. at 593-94; *In re Paoli*, 35 F.3d at 742 n.8; *see also Oddi v. Ford Motor Co.*, 234 F.3d 136 (3d Cir. 2000), *cert. denied*, 532 U.S. 921 (2001) (the test of admissibility "is whether the particular opinion is based on valid reasoning and reliable methodology.") (internal quotations and citation omitted); *Ortiz*, 2005 U.S. Dist. LEXIS 18424, at *13.

An expert, of course, must have a methodology before it can be tested. Growney admits that he has none; he has done nothing other than "think about" concepts. (*See* Ex. F at 138-39; Ex. H at 158).  Any of his "concepts" could have been developed and either proven or disproven by testing; he just did not do so, even though none of them find support in standards, in the professional literature, in the design of other cut-off machines or in anything else.  His purely conjectural theories plainly are not "generally accepted" in the engineering community.  *See Jones,* 2010 U.S. Dist. at *24-25.  No conclusion was tested, researched, published

or peer reviewed.  Rather, Growney is the sole known advocate in the engineering world for his design and warning recommendations.

We turn to a more detailed analysis of Growney's untested design "recommendations" for the TS-400: a "hollow handle" for storing the machine's instruction manual; "proprietary arbors" (shaped or enlarged arbors, or a dowel pin configuration); a braking device; a de-clutching mechanism; and a lower guard.

Growney claims that the TS-400 should have incorporated a "hollow handle" into its design that would house the instruction manual.  The sum of his work on this concept consisted of welding scrap aluminum conduit to the top handle of a used TS-400, which he admitted was only a "crude attempt" and not indicative of how the "hollow handle" should be designed:

> Q:   Is this the machine that we talked about earlier in your deposition as having been purchased on the Internet?
>
> A:   Yes, it is, except that it has this compartment that I added to demonstrate the feasibility of a storage compartment in the handle.  This is just a crude attempt made with material that was pulled out of a scrap heap, actually.
>
>     *             *             *
>
> Q:   All right.  And show me how that's envisioned to operate.  You just unscrew the ends of it, or what do you do?

> A:     Well, in my envisioning of it, being it's designed as a part of the saw, you would not have this configuration at all. . ..Of course, when you make this thing in a production setting, such as one [sic] you're going to make thousands of these, you don't make it this way.  Somebody sits down and designs it so that it blends right in, and as an engineer we would make that visualization…

(*See* Ex. C at 78-79).  Growney did no engineering drawings of his "hollow handle" concept; he did not even attempt to develop a design that he could say would be appropriate for use in the field.  With nothing more, that would leave the concept unproven and speculative, but there is more.  For example, he has not published anything in the professional literature advocating this theory, nor is he aware of any writings or other professional literature supporting the concept.  (*See* Ex. C at 85-86, 99, 101, 112).  He is not aware of any handheld cut-off machine, or any other handheld power tool for that matter, sold anywhere in the world that stores an instruction manual on the product.  (*See* Ex. C at 84-85).  And, he can point to no support in the record for the notion that a manual inside the handle of the TS-400 was more likely to be read than the manuals McGee acknowledged were available to him at Jingoli, but which he chose not to read.  (*See* Ex. C at 64, 114-15).

Another "design" opinion of Growney is that the TS-400 should have incorporated some sort of "proprietary arbor" design, i.e. either an oversized, non-standard arbor size, a "shaped" arbor or an arbor and dowel pin arrangement, that he

opines would have prevented the mounting of a saw blade with a one-inch arbor hole.  Again, however, he has not designed or tested any of the concepts, or seen any of them used on any handheld cut-off machine, required or recommended by any cut-off machine standards or endorsed in professional engineering literature.  (*See* Ex. D at 102-03, 150-56, 159-60, 163-64).

During depositions Growney also backed away from the theory that STIHL could have used a shaped arbor or dowel pin arrangement to prevent mounting of saw blades on cut-off machines and shifted his theory to the notion that a "larger" than "standard" size arbor could have been used instead.  (*See* Ex. D at 115).  The underlying premise of this theory was that since most 12" and 14" saw blades use either 1 inch or 20 mm round arbor holes, by making the arbor of the TS-400 larger than 1 inch, STIHL could prevent saw blades from being mounted on the machine.

Once again, however, Growney's complete unfamiliarity with the products he is attempting to re-design lays waste to his theory.  His basic premise, that 12" and 14" saw blades have 1-inch or 20-mm arbor holes, is completely wrong, as a ten-minute session on the Internet would have shown.  12" and 14" saw blades come in many different arbor sizes, up to 4 inches, and blade manufacturers commonly offer "custom" boring services that will deliver blades with arbor holes cut to any size or

shape a customer may order.[3] (*See* Ex. L at 99; Ex. M at 39-40; Ex. N at 45-46). The Oldham saw blade that was on the TS-400 used by McGee on the day of the accident, in fact, did not "fit" the arbor of the TS-400.  The TS-400 has a 20 mm arbor; the Oldham blade a larger 1-inch arbor hole.  Consequently, the arbor hole of the Oldham blade was modified, "reduced" in size, by using a bushing.  Reducing bushings not only are freely available commercially, and were in 2003, but are easily made in a construction company's tool shop, meaning, of course, that enlarging the arbor size on the TS-400 would do nothing to enhance safety because a bushing can be used to reduce any size arbor hole to fit any size arbor.  Put only slightly differently, regardless of the arbor size used on the TS-400, a carbide-tipped saw blade could be mounted simply by buying a blade with an arbor hole larger than the arbor of the TS 400 and "reducing" it to fit the arbor.

---

[3] Growney acknowledges that custom boring services were available:

> Q.    In 2003, were major saw manufacturers custom boring arbors?  Did they have service available to custom bore arbors to any size, or shape, or keyhole or pinhole that a customer wanted?
>
> MR. PACKIN:  Saw manufacturers?
>
> BY MR. WALSH:
>
> Q.    Yes.  Saw blade manufacturers.
>
> A.    It would not surprise me.  Sure.

(*See* Ex. D at 130-31.)

As STIHL's experts also have testified, "shaped" and dowel and pin arrangements cannot be used safely on high speed, gasoline-powered cut-off machines – they cause catastrophic wheel failure, particularly with composite abrasive wheels, creating an extreme hazard for the operator and bystanders. (*See* Ex. L at 93-94; Ex. M at 42). For that reason, the ANSI standards specify round arbors on cut-off machines, and the ANSI standards governing the design of 12 and 14 inch abrasive wheels require round arbor holes. (*See* Ex. M at 41-42; Ex. N at 41.) If Growney had the slightest background in the design, use or safety of cut-off machines or cutting attachments for cut-off machines – or even if he had made rudimentary inquiry or conducted basic tests – this is something that would have become immediately apparent, but, of course, he did not.

Because Growney does not know the diameters of saw blade and abrasive wheel arbor holes that are available in the United States -- although he admits it would "not surprise him" if saw blades were available in 2003 and currently with as large as 4-inch arbor holes, (*see* Ex. D at 128-29) -- he cannot even say what the diameter of his hypothetical "enlarged arbor" for the TS-400 should be. (*See* Ex. D at 116-17). And he has done nothing to evaluate how an enlarged arbor would affect the machine's utility or safety. (*See* Ex. D at 116-17, 120).

Growney's other untested "concepts," a brake de-clutching device or a lower guard, are no better supported than his other ideas. For example, he does not know

the energy values that would have to be braked in a cut-off machine and cannot say how much braking power would be necessary to brake a carbide-tipped blade such as the one Mr. McGee was using on the TS-400 in a reactive forces scenario. (*See* Ex. C at 53-54, 76-77; Ex. D at 190-91). He has not developed prototypes and has not tested any of the concepts.[4] He could point to no handheld, gasoline-powered cut-off machine manufactured or sold anywhere in the world that incorporates either a brake, a de-clutching mechanism or a lower guard into its design, any standard that recommends or requires any of them or any professional writings that suggest that they would be practicable, feasible, or safe additions to a cut-off machine. (*See* Ex. B at 197-99, 201-03; Ex. C at 57-58; Ex. D at 176-82, 185-87).

That leaves Growney's warning opinions.[5] Expert opinions on warnings are subject to the same scrutiny under *Daubert* as design-defect claims, and the trial

---

[4] Again, the testimony of STIHL's experts shows how off base Growney actually is. Brakes are not used on cut-off machines for a variety of practical and safety reasons. A brake small enough to be used on a cut-off machine with sufficient braking power to stop the rotating mass of a 14" wheel simply does not exist. (*See* Ex. L at 88-89; Ex. N at 39-41). If it did, the braking action and sudden deceleration of the wheel would thrust the exposed wheel into the operator's body. (*See* Ex. N at 39-41; Ex. M at 42-45). The extreme conditions in which cut-off machines are used – concrete grit, dirt, water, etc. – would make maintenance and reliability impossible.

[5] The record, moreover, flatly contradicts any notion that the warnings associated with the TS-400 were in any way inadequate or that any different warnings would have made a difference. No additional pictogram in the manual would have made any difference, since McGee never read or felt the need to read the manual. (*See* Deposition of Robert McGee, October 27, 2008, attached as Exhibit I, at 64, 67,

court's role as gatekeeper is no less significant in the warning context. *See, e.g.,* *Calhoun,* 350 F.3d at 323 (excluding opinions on adequacy of warnings because witness "offered no support for his beliefs [and] [h]is proffered opinions on these matters were unreliable"). Judge Irenas has explained that "an expert's failure to design *and test* a proposed warning and inability to point to contrary industry practice renders the reliability of his testimony extremely questionable," and excluded plaintiffs' proffered expert's opinion, finding that the testimony "falls short of the reliability standards of Rule 702." *Milanowicz v. Raymond Corp.,* 148 F. Supp. 2d 525, 541 (D.N.J. 2001) (citation and internal quotation marks omitted) (emphasis added). General experience or application of general principles plainly are not enough. *See Wartsila NSD N. Am., Inc. v. Hill Int'l, Inc.,* 299 F. Supp. 2d 400, 407 (D.N.J. 2003), *vacated, remanded on other grounds,* 530 F.3d 269 (3d Cir. 2008) ("[T]he Court may not abdicate its gatekeeping role merely because an expert relies on general experience or principles.").

Growney admits he knows of no tool manufacturer that has ever used the warnings he suggests, and knows of no standards or professional literature that call

---

108-109). McGee also clearly knew the risks associated with reactive forces and "kickback," having experienced them before while using cut-off machines. (*See* Ex. I at 174). Further, he knew and understood the importance of supporting a pipe prior to cutting it to reduce the risk of pinching and reactive forces (*see* Ex. I at 182-83), but did nothing to support the pipe he was cutting at the time of his accident. (*See* Deposition of R. McGee, May 11, 2009, attached as Ex. J, at 202).

for them.  (*See* Ex. F at 70-71, 113, 168-69, 225-27).   He also admits that his

pictograms have not been tested, subjected to peer review, or circulated to standards

groups, manufacturers or warning experts for review, comment an analysis.  (*See*

Ex. B at 148-49; Ex. F at 225-27).   Growney's recommendation for alternative

warnings, although purportedly based on the frequency of injuries resulting from the

use of saw blades on cut-off machines and kickback, is entirely unsupported by any

type of facts or statistical data relating to injuries with cut-off machines – he is

completely unaware of any information regarding the frequency of accidents

involving kickback and unauthorized saw blades mounted on cut-off machines.

(*See* Ex. D at 52, 55, 108-09, 143-44).

It would be an extreme stretch in the first instance to find Growney qualified

to provide opinions on warnings – his only warning "experience" is consulting

about warnings in litigation.   Whether or not deemed qualified to give warning

opinions, however, Growney's unsupported and untested warnings opinions are

precisely the type of testimony that has been rejected consistently by courts and

should be excluded here.  *See, e.g., Ebenhoech v. Koppers Indus., Inc.*, 239 F. Supp.

2d 455 (D.N.J. 2002) (excluding opinion that railroad car should contain warning

against walking on roof as unreliable because "the expert has not created or even

designed a warning device which would have been more appropriate [or] tested its

effectiveness" and "has not pointed to other manufacturers using better warnings"

(internal quotation marks omitted) (alteration in original) (citing *Jaurequi v. Carter Mfg. Co*; 173 F.3d 1076, 1084 (3d Cir. 1999)); *accord Milanowicz*, 148 F. Supp. 2d at 541 (excluding expert's opinion because he failed to conduct testing to determine whether conceptualized warnings would convey appropriate information).

"[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137, 157 (1999*) (*citation and internal quotation marks omitted.)  Proffered expert testimony must "in fact assist the jury, by providing it with relevant information, necessary for a reasoned decision of the case." *Kolokowski v. Crown Equip. Corp.*, 2009 U.S. Dist. LEXIS 77474, *15 (D.N.J. Aug. 27, 2009) (quoting *Yarchak v. Trek Bicycle Corp.*, 208 F. Supp. 2d 470, 496 (D.N.J. 2002)).  With respect to Growney, the critical *Daubert* question is this:  On what conceivable basis could a proffered expert so unfamiliar with the product about which he is opining that he cannot say with certainty whether or not it has an on/off switch (*see* Ex. E at 180) be deemed to meet the requirements of Fed. R. Evid. 702 and *Daubert* and its progeny when he offers opinions about safety devices and warnings:  without developing or testing any of them; without being able to identify any similar machine ever sold anywhere in the world that employs any of them; without finding any support for his opinions in standards or the professional literature; and offers and opinions that would make

every cut-off machine sold anywhere in the world, and virtually every handheld tool sold anywhere in the world, "defective?"  There is none, and it makes a mockery of the judicial process when compliant "consultants" are allowed to masquerade as experts in a field well beyond their competency and provide opinions that are little more than untested hypothesis.  Real experts study, research and test, and then apply relevant experience and training to what they learn; they do not simply speculate about possibilities.  Growney, by contrast, must trade in conjecture because has no practical, professional or even theoretical experience or knowledge of cut-off machines, or their design, use, safety, or warnings.

## CONCLUSION

*Daubert* does not allow an "expert" to "fake it," and that essentially is what Growney and all of Plaintiff's proffered experts are attempting to do.  It is not enough that an expert be credentialed in a broad discipline like engineering or psychology, and it certainly is not enough for an expert with generalized credentials to offer opinions on subjects outside of their core experiences and without the degree of "scientific rigor" that is the hallmark of "reliability."

Growney has no experience of any sort with handheld, gasoline-powered cut-off machines or any remotely similar tool.  Despite that unfamiliarity, he has done nothing to support any of his opinions--no testing, research, or consultation.  He has read almost none of the depositions in the case.  If *Daubert* and its progeny stand for

anything, it is that science, not the *ipse dixit* of hired gun "experts," should be controlling in the courtroom.  Growney is a "professional" testifier, nothing more, with opinions that are for hire, and he has no business presenting to a jury under the imprimatur of "expert."  Defendants STIHL Incorporated and ANDREAS STIHL AG & Co. KG respectfully request that this Honorable Court grant their motion to exclude Neal Growney from testifying in Court.

Respectfully submitted,

RUDOLPH & KAYAL
Counsellors at Law, P.A.
Attorneys for defendants,
STIHL Incorporated and ANDREAS
STIHL AG & Co. KG

_____
STEPHEN A. RUDOLPH

Dated: January 28, 2011