# EXHIBIT B

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
DOCKET NO. 08-CV-00520 (MLC)

ROBERT MCGEE and TIFFANY MCGEE, his wife,

        Plaintiffs,

  -vs-

STIHL INCORPORATED; STIHL GROUP; ANDREAS STIHL AG&CO.,
KG; STIHL SAW COMPANY; NORTHEAST STIHL; OLDHAM
COMPANY; BLACK & DECKER CORPORATION; SANDER POWER
EQUIPMENT COMPANY; JOHN DOE I (being a fictitious
name); JOHN DOE II (being a fictitious name); JOHN DOE
III (being a fictitious name), JOHN DOE IV (being a
fictitious name),

        Defendants.


- - -
June 14, 2010
- - -


     Continued sworn video deposition of NEAL A.

GROWNEY, P.E., 265 Steves Lane, Franklin Lakes, New

Jersey, taken in the offices of Nagel Rice, LLP, 103

Eisenhower Parkway, Roseland, New Jersey, before Cindy

Pineiro, C.M., CSR #XIO1815, and Notary Public of the

State of New Jersey, on the above date, commencing at

10:30 a.m., there being present:

db2aa797-bf2c-44d4-b545-ffd826d2ee60

Page 2

```
 1
 2    NAGEL RICE, LLP, ESQUIRES,
        BY: BARRY M. PACKIN, ESQUIRE,
 3      Attorneys for the Plaintiffs.
 4
 5    MCGUIRE WOODS, LLP, ESQUIRES,
        BY: JAMES WALSH, ESQUIRE,
 6      Attorneys for the Defendants Stihl Incorporated,
        Stihl Group, Andreas Stihl AG & Co., KG, Stihl
 7      Saw Company, and Northeast Stihl.
 8
 9    RUDOLPH & KAYAL, ESQUIRES,
        BY: STEPHEN A. RUDOLPH, ESQUIRE,
10      Attorneys for the Defendants Stihl Incorporated,
        Stihl Group, Andreas Stihl AG & Co., KG, Stihl
11      Saw Company, and Northeast Stihl.
12
13    MCCARTER & ENGLISH, ESQUIRES,
        BY: DAVID R. KOTT, ESQUIRE,
14      Attorneys for the Defendants Oldham Company and
        Black & Decker Corporation.
15
16
17
18    ALSO PRESENT:
        James Bateman, Video Technician.
19
20
21
22
23
24
25
```

Page 3

```
 1        (By agreement of counsel, the signing,
        sealing and certification of the deposition were
 2      waived, and all objections, except as to the
        form of the questions, were reserved to the time
 3      of trial.)
 4
 5              I N D E X
 6    Witness                    Page
 7    Neal A. Growney, P.E.
 8      By Mr. Walsh               7
 9
10          E X H I B I T S
11    MARKED FOR I.D.            PAGE
12    Growney-1 - Pad             18
13    Growney-2 - Article         61
14    Growney-3 - Notes           79
15    Growney-4 - Photograph      90
16    Growney-5 - Photograph      90
17    Growney-6 - Manual         131
18    Growney-7 - Copy of ANSI 01.1 2004 safety requirements
19    for woodworking machinery  142
20    Growney-8 - Copy of the Saw Stop manual   155
21    Growney-9 - Packet of documents   205
22    Growney-9a - Photograph    205
23    Growney-9b - Photograph    205
24    Growney-9c - Photograph    205
25    Growney-9d - Photograph    205
```

Page 4

```
 1         E X H I B I T S (Continued)
 2    MARKED FOR I.D.            PAGE
 3    Growney-9e - Photograph    205
 4    Growney-9f - Photograph    205
 5    Growney-9g - Photograph    205
 6    Growney-9h - Photograph    205
 7    Growney-9i - Photograph    205
 8    Growney-9j - Photograph    205
 9    Growney-9k - Photograph    205
10    Growney-9l - Photograph    205
11    Growney-9m - Photograph    205
12    Growney-9n - Photograph    205
13    Growney-9o - Photograph    205
14    Growney-9p - Photograph    205
15    Growney-9q - Photograph    205
16    Growney-9r - Photograph    205
17    Growney-9s - Photograph    205
18    Growney-9t - Photograph    205
19    Growney-9u - Photograph    205
20    Growney-9v - Photograph    205
21    Growney-9w - Photograph    205
22    Growney-9x - Photograph    205
23    Growney-9y - Photograph    205
24    Growney-9z - Photograph    205
25    Growney-9aa - Photograph   205
```

Page 5

```
 1         E X H I B I T S (Continued)
 2    MARKED FOR I.D.            PAGE
 3    Growney-9bb - Photograph   205
 4    Growney-9cc - Photograph   205
 5    Growney-9dd - Photograph   205
 6    Growney-9ee - Photograph   205
 7    Growney-9ff - Photograph   205
 8    Growney-9gg - Photograph   205
 9    Growney-9hh - Photograph   205
10    Growney-9ii - Photograph   205
11    Growney-10 - Photograph    206
12    Growney-11 - Photograph    206
13    Growney-12 - Photograph    206
14    Growney-13 - Photograph    206
15    Growney-14 - Photograph    206
16    Growney-15 - Photograph    206
17    Growney-16 - Photograph    206
18    Growney-17 - Photograph    206
19    Growney-18 - Photograph    206
20    Growney-19 - Photograph    206
21    Growney-20 - Photograph    206
22    Growney-21 - Photograph    206
23    Growney-22 - Photograph    206
24    Growney-23 - Photograph    206
25    Growney-24 - Photograph    206
```

2 (Pages 2 to 5)

DEGNAN & BATEMAN
(856) 232-7400

db2aa797-bf2c-44d4-b545-ffd826d2ee60

| 1 | E X H I B I T S (Continued) | |
|---|---|---|
| 2 | MARKED FOR I.D. | PAGE |
| 3 | Growney-25 - Photograph | 206 |
| 4 | Growney-26 - Photograph | 206 |
| 5 | Growney-27 - Photograph | 206 |
| 6 | Growney-28 - Photograph | 206 |
| 7 | Growney-29 - Photograph | 206 |
| 8 | Growney-30 - Photograph | 206 |
| 9 | Growney-31 - Photograph | 206 |
| 10 | Growney-32 - Photograph | 206 |
| 11 | Growney-33 - Photograph | 206 |
| 12 | Growney-34 - Photograph | 206 |
| 13 | Growney-35 - Photograph | 206 |

14
15
16
17
18
19          (Exhibits retained by counsel.)
20
21
22
23
24
25

1          VIDEO TECHNICIAN: The time is now 10:34,
2   and we're on the video record.
3          Will the court reporter please swear in
4   the witness?
5          NEAL A. GROWNEY, P.E., having been duly
6          sworn, was examined and testified as follows:
7   BY MR. WALSH:
8     Q    Good morning, Mr. Growney.
9     A    Good morning, Mr. Walsh.
10    Q    Would you, for the record, give us your
11   full name and your current home and business
12   addresses, please?
13    A    Yes. My full name is Neal Anthony
14   Growney. My home address is 265 Steves Lane, Franklin
15   Lakes, New Jersey 07417. That also happens to be my
16   business address.
17    Q    Okay. You work out of your house?
18    A    Yes, I do.
19    Q    By whom are you employed?
20    A    Neal A. Growney & Associates, LLC.
21    Q    Okay. Neal L. Growney?
22    A    A; I'm sorry.
23    Q    I'm sorry. Neal A. Growney & Associates
24   is an LLC?
25    A    Yes, it is.

1     Q    Owned by you, I take it?
2     A    Yes.
3     Q    How many employees does it have?
4     A    One.
5     Q    And who is that -- who is that employee?
6     A    Myself.
7     Q    And how long has Neal A. Growney existed?
8          MR. PACKIN: I assume you mean the
9   entity?
10         MR. WALSH: The entity.
11         THE WITNESS: About nine and a half
12   years.
13   BY MR. WALSH:
14    Q    And during the nine and a half years of
15   its existence, have there been times when there have
16   been other employees of the company?
17    A    Well, part-time contractors, if you want
18   to call them employees.
19    Q    Contractors in what areas?
20    A    Like other engineers or persons that have
21   done work in the forensics field and may have assisted
22   me -- and did assist me on case work.
23    Q    Okay. Were those employees that you paid
24   that you made withholding -- paid withholding on, or
25   were they independent contractors that you contracted

1   with for specific tasks?
2     A    They were independent contractors for
3   specific tasks.
4     Q    Did you have anybody work with you on
5   this case? When I say "this case," I'm talking about
6   the case filed by Robert McGee.
7     A    No, I have not.
8     Q    During the time -- all right. Does Neal
9   Growney & Associates -- do you have even a secretary
10   or some assistant that does typing, filing,
11   administrative work for you?
12    A    No. I wish I did.
13    Q    The prior -- what is the business of Neal
14   A. Growney & Associates?
15    A    I provide engineering assistance for the
16   resolution of disputes.
17    Q    Legal disputes?
18    A    Yes.
19    Q    What percentage of the work of Neal A.
20   Growney is related to consulting in connection with
21   litigation?
22    A    100 percent or approximately 100 percent.
23    Q    Has that been true, approximately 100
24   percent, since Neal A. Growney & Associates came into
25   existence approximately nine and a half years ago?

3   (Pages 6 to 9)

db2aa797-bf2c-44d4-b545-ffd826d2ee60

Page 10

```
 1     A    Yes.
 2     Q    Prior to forming Neal A. Growney &
 3   Associates, were you engaged in the business of
 4   consulting for litigation?
 5     A    Yes, I was.
 6     Q    Who did you work for prior to Neal A.
 7   Growney?
 8     A    I worked for Robson LaPina. I'm trying
 9   to remember if their full name was & Associates or --
10   I don't remember what the full name was.
11     Q    And was that firm in the business of
12   consulting in connection with litigation?
13     A    Yes, it was.
14     Q    Was 100 percent of that firm's work in --
15   related to consulting in connection with litigation?
16     A    Yes.
17     Q    Was -- and I take it it follows -- I
18   think this follows that 100 percent of your work for
19   Robson LaPina was related to consulting for
20   litigation?
21     A    Yes.
22     Q    How long did you work for Robinson
23   LaPina?
24     A    It's Robson.
25     Q    Robson? I'm sorry.
```

Page 11

```
 1     A    That's okay.
 2          About four years.
 3     Q    So for at least the last approximately 13
 4   and a half years you have been engaged 100 percent, or
 5   virtually 100 percent, in consulting in connection
 6   with litigation; is that correct?
 7     A    Yes.
 8     Q    Were you engaged in consulting for
 9   litigation prior to joining Robson LaPina?
10     A    No.
11     Q    What were you doing immediately before
12   joining Robson LaPina?
13     A    I had worked for Tri-State Quickcrete.
14   I'm sorry. Immediately before I was unemployed.
15     Q    Okay. And how long had you been
16   unemployed before joining Robson LaPina?
17     A    Approximately a half a year, I think.
18     Q    And what was the circumstances leading to
19   your unemployment?
20     A    I was working for Tri-State Quickcrete,
21   which was a partnership of a number of corporations,
22   and one of the corporation members who had previously
23   held my position decided he wanted to resume in that
24   position, so I was maneuvered out of my position.
25     Q    What was the business of Tri-State
```

Page 12

```
 1   Quickcrete?
 2     A    Manufacturer of dry -- dry packaged
 3   concrete mixes.
 4     Q    And what -- how long did you work for
 5   Tri-State Quickcrete before you were maneuvered out of
 6   your position?
 7     A    About a year, year and a half.
 8     Q    What was your position with Tri-State
 9   Quickcrete?
10     A    I was general manager.
11     Q    And what were your duties and
12   responsibilities as general manager?
13     A    I had responsibility for the entire
14   planet.
15     Q    Meaning what? Was it a profit and loss
16   responsibility, or what were your actual duties and
17   responsibilities?
18     A    I had the responsibilities for the proper
19   operation of the plant on a day-to-day basis. Profit
20   and loss responsibilities, directing the work force,
21   hiring and firing, running the safety program,
22   evaluating the machinery and equipment for repairs,
23   replacement, new installations.
24     Q    All right. Now, you are an engineer by
25   education?
```

Page 13

```
 1     A    Yes.
 2     Q    Mechanical engineer?
 3     A    Yes.
 4     Q    Do you have any medical experience?
 5     A    What do you mean, medical experience?
 6     Q    Have you studied medicine?
 7     A    No.
 8     Q    Are you a physician?
 9     A    No.
10     Q    And when -- the way you answered that
11   suggests to me that there may be something there that
12   you think might fall into the realm of medical
13   expertise. Do you have medical expertise?
14     A    No. No.
15          When you said medical experience --
16          MR. PACKIN: Object to the form. Object
17   to the form.
18          THE WITNESS: I --
19   BY MR. WALSH:
20     Q    I understand. I understand it was a
21   confusing question.
22          You're not here claiming any medical
23   expertise, I take it?
24     A    That's correct.
25     Q    All right. How about training in
```

4  (Pages 10 to 13)

DEGNAN & BATEMAN
(856) 232-7400

db2aa797-bf2c-44d4-b545-ffd826d2ee60

Page 14

1   psychology?  Do you have any training in psychology?
2       A    Well, yes, I do.
3           MR. PACKIN:  Object to the form.
4           Go ahead.
5           THE WITNESS:  I took a graduate degree
6   program which then continued on as a Master's Degree
7   program for business administration at William
8   Paterson University, and there was some Master's
9   Degree level of courses that I took.  One of them was
10  -- excuse me.  It escapes me at the moment --
11  organizational behavior.  It was related to the
12  behavior of employees and workers within
13  organizations.
14  BY MR. WALSH:
15      Q    Is that the only experience in psychology
16  that you have?
17      A    Well, that's the formal experience that I
18  have.  I've done extensive amount of reading.
19      Q    All right.  Is it fair for me to surmise
20  that for at least the last 13 and a half years 100
21  percent of your earned income has come from lawyers?
22          MR. PACKIN:  Object to the form.
23          You can answer it.
24          THE WITNESS:  No.
25  BY MR. WALSH:

Page 15

1       Q    What portion of your income has -- earned
2   income has not come from lawyers?
3           MR. PACKIN:  Object to the form.
4           THE WITNESS:  Twenty, 25 percent maybe.
5   BY MR. WALSH:
6       Q    And what did you -- what is the source of
7   that income?
8       A    Insurance companies.
9       Q    Okay.  Insurance companies that hired you
10  in connection with litigation as opposed to lawyers
11  hiring you in connection with litigation?
12      A    Yes.
13      Q    All right.  It is true then, though, that
14  100 percent --
15      A    Excuse me.  Or the lawyers paid the bill.
16      Q    It is true that 100 percent of your
17  income has come from consulting in connection with
18  litigation, I take it?
19      A    Yes.
20      Q    Do you advertise your services to
21  lawyers?
22      A    I have a listing in a publication that is
23  distributed to lawyers.
24      Q    And what publication is that?
25      A    Seek.

Page 16

1       Q    And does that advertise the availability
2   of your services to lawyers?
3       A    I guess that's, ostensibly, the purpose
4   of it.
5       Q    Is there other places where you advertise
6   the availability of your services to consulting in
7   connection with litigation?
8       A    There was one time when I did use a New
9   Jersey publication.  I'm trying to remember what it
10  is.  Lawyers Desk Reference, or something of that
11  nature.  I used that, but I don't anymore.
12      Q    Do you have a recollection of what period
13  of time that might have been?
14      A    For about three years.  I think I ended
15  it maybe two, three years ago.
16      Q    Do you recall when you were retained in
17  this case?  That is, the case filed on behalf of Mr.
18  Robert McGee.
19      A    I can't remember whether it was 2007 or
20  2008.
21      Q    Do you have documents with you that might
22  indicate that?
23      A    Yes.  Yes.
24      Q    Okay.  Could you tell me what those
25  documents are?

Page 17

1       A    Well, I use a code for my case numbers,
2   and the first digit in the code would indicate the
3   year in which I was retained.
4       Q    Do you have that with you?  Please refer
5   to it and refresh your recollection as to when you may
6   have been retained.
7       A    Sure.
8           It would be 2007.
9       Q    Okay.  What document did you refer to?
10      A    Well, this is a file folder.
11      Q    All right.  What you've handed me is a
12  file folder that's got some handwriting.  I take it
13  that's your handwriting on the front of it?
14      A    Yes, it is.
15      Q    It, basically, says Packin/McGee, Barry
16  Packin, and has some telephone numbers, and it has a
17  number in the upper right-hand corner which, if I'm
18  reading this correctly, is 7PJ18; is that correct?
19      A    That's correct.
20      Q    Is that your file number for this?
21      A    Yes, it is.
22      Q    And the 7 would indicate that you were
23  retained in 2007?
24      A    Yes.
25      Q    Do you recall when in 2007?

5  (Pages 14 to 17)

DEGNAN & BATEMAN
(856)  232-7400

db2aa797-bf2c-44d4-b545-ffd826d2ee60

Page 18

1       MR. WALSH:  Let's get this -- go ahead
2  and mark this as 1.
3       THE WITNESS:  I don't recall exactly.  I
4  would have to look a little further, but it seems to
5  me it was at least halfway through 2007, just by the
6  number.
7  BY MR. WALSH:
8       Q    I'm not trying to -- I have a retainer
9  letter that we'll get to in a little bit that's
10  attached to your report, and I think that will tell us
11  precisely what the date was.
12       A    Yes.  Yes.  Right.
13          (Pad was marked as Growney-1 for
14       identification by the court reporter.)
15  BY MR. WALSH:
16       Q    The folder we marked as Growney-1, it has
17  some -- a pad with a few -- a couple of sketches in
18  it.  Can you tell me what this represents?
19       A    Yes.  This sketch on the first page of
20  four, five-page pad is a sketch of the retaining
21  flange for a Stihl TS 400.  And it has some dimensions
22  on it.
23       Q    Put that aside for the moment.
24          What's your billing rate for your work in
25  this case?

Page 19

1       A    Currently it's $250 an hour.
2       Q    And have you submitted bills in
3  connection with the case?
4       A    Yes, I have.
5       Q    Do you know how many bills you have
6  submitted in connection with the case?
7       A    I don't know.
8       Q    Do you have those bills with you?
9       A    I believe I do.
10       Q    Could you get those for us, please?
11       A    Sure.
12          I may have not brought them with me
13  today.  I thought they were in this file.  I'm
14  scheduled to be back here tomorrow.  I'll bring it.  I
15  thought that information was here with the file.
16       Q    That's fine.  If you would bring it with
17  you tomorrow --
18       A    I certainly will.
19       Q    -- I would appreciate it.
20          Now, when you were retained in this case,
21  was this the first time you had been retained by Mr.
22  Packin or his law firm to consult in connection with
23  litigation?
24       A    No.
25       Q    Do you know how many prior cases you had

Page 20

1  been retained by Mr. Packin or his law firm to consult
2  about a litigated matter?
3       A    I believe three others.
4       Q    Okay.  Can you tell me what those three
5  other cases were?
6       A    It was Stout versus Stihl.
7       Q    Okay.  That was another case involving
8  the company named Stihl?
9       A    Yes, Stihl.  I'm sorry I mispronounce it.
10       Q    Well, we -- I pronounce it Stihl.  I
11  think that's the correct pronunciation.  But
12  whatever's comfortable for you is fine.
13       A    I'll -- I'll be happy to adopt the
14  correct pronunciation.  My inclination is to say
15  Stihl, but --
16       Q    What -- and the Stout case; did that --
17  what kind of equipment did that involve?
18       A    The same kind of equipment, the Stihl TS
19  400 and an Oldham 14-toothed carbide -- 14-inch
20  diameter 24-toothed carbide saw blade.
21       Q    And was Mr. Stout involved in an accident
22  with that equipment?
23       A    Yes, he was.
24       Q    What was he cutting at the time the
25  accident occurred?

Page 21

1       A    He was cutting wood.
2       Q    Now, what other cases had you been
3  retained by Mr. Packin?
4       A    I was retained on a case that involved a
5  palletizing-type machine that packaged -- or handled
6  and packaged cinderblock.
7       Q    And was that -- were you consulting --
8  was Mr. Packin representing a plaintiff in that case
9  also?
10       A    Yes.
11       Q    Okay.  What other case for Mr. Packin or
12  his law firm?
13       A    I did one that involved a fireplace
14  glass-type screen.
15       Q    And was Mr. Packin or his law firm
16  representing a plaintiff in that case also?
17       A    Yes.
18       Q    Any other cases that you can recall
19  consulting with Mr. Packin or his law firm in
20  connection with a case in litigation or potentially in
21  litigation?
22       A    Yes.  One that -- involving a treadmill.
23       Q    Was that also on behalf of a plaintiff?
24       A    Yes.
25       Q    Any others that you can think of?

6  (Pages 18 to 21)

db2aa797-bf2c-44d4-b545-ffd826d2ee60

Page 22

1    A    No.
2    Q    Stout and McGee, those two cases, do you
3 recall whether you were retained first in Stout or
4 first in McGee?
5    A    I believe it was first in Stout.
6    Q    And do you recall how long it was after
7 being retained in Stout that you were retained in
8 McGee?
9    A    Probably approximately a year.
10    Q    All right.  Now, at the time -- do you
11 currently -- have you ever owned a piece of
12 Stihl-branded equipment?
13    A    Yes.
14    Q    What Stihl-branded equipment have you
15 owned?
16    A    A TS 400.
17    Q    And is that one you bought off the
18 Internet?
19    A    Yes.
20    Q    Did you buy that machine off the Internet
21 in connection with the McGee case, the Stout case, or
22 unrelated to either case?
23    A    I bought it related to the Stout.
24    Q    Okay.  And what was your purpose of
25 buying the machine on the Internet?

Page 23

1    A    To have a machine -- to have it available
2 to me so that when I was evaluating I could have a
3 hands-on type of exhibit.
4    Q    Was the machine you purchased new when
5 you purchased it on the Internet?
6    A    No.  It was used.
7    Q    Okay.  Was it in operational condition
8 when you purchased it?
9    A    Well, it was -- it was operational.  It
10 was some things missing, but it could operate.
11    Q    Okay.  Is it still operational?
12    A    I haven't attempted to operate it in
13 quite some time.
14    Q    Have you ever operated it?
15    A    I did, yes.
16    Q    What did you do to operate it?
17    A    Well, I started it up and it ran and ran
18 for a little while, and then it -- I can't remember
19 what happened, but it stopped, and I attempted to
20 restart it, and then I found -- and I couldn't get it
21 restarted, and found that it had some old, again, fuel
22 in it that may have jelled or something.  Something
23 wasn't quite right.
24    Q    Did you ever get the machine operational
25 after that one start?

Page 24

1    A    No, I did not.
2    Q    Do you know how long the machine ran
3 during that one start?
4    A    When I say one start, it may have been
5 start, stop, start, stop a number of times and then it
6 ran.  So I might have had it a total of couple, three
7 minutes.
8    Q    Okay.  And did you have a cutting
9 attachment on it at the time?
10    A    Yes.
11    Q    What kind of cutting attachment was on
12 it?
13    A    That was an abrasive grinding wheel.
14    Q    Was it what I would call -- refer to as a
15 diamond wheel?  Was it a composite wheel?  What type
16 of abrasive wheel was on it?
17    A    It was a composite wheel.
18    Q    And did you cut anything with the machine
19 after you started it?
20    A    No, I did not.
21    Q    The -- was that the first time that you
22 had ever started a Stihl TS 400?
23    A    Yes.
24    Q    Was it the first time that you ever held
25 a Stihl TS 400 in your hands?

Page 25

1    A    No.
2    Q    What was the first time you ever held a
3 Stihl TS 400 in your hands?
4    A    When I examined the Stihl TS 400 involved
5 in the Stout matter.
6    Q    Okay.  So you physically inspected the
7 machine that Mr. Stout was using at the time of his
8 injury?
9    A    Yes.
10    Q    That was the first time you had ever seen
11 a Stihl TS 400?
12    A    It's possible I may have seen it before.
13    Q    Seen them in what capacity?
14    A    Just seen them -- you know, seen.
15    Q    Seen them in stores or seen them in use?
16    A    Something like that, yeah.  Probably in
17 use.
18    Q    All right.  Have you ever, when you say
19 you've seen them in use, seen them while you were
20 passing by or actually when you were on site at some
21 place for the specific purpose of watching them being
22 used?
23        MR. PACKIN:  Object to the form.
24    You can answer.
25        THE WITNESS:  Probably passing by.

7  (Pages 22 to 25)

DEGNAN & BATEMAN
(856)  232-7400

db2aa797-bf2c-44d4-b545-ffd826d2ee60

Page 26

1  BY MR. WALSH:
2      Q    Okay.  If I broaden the question, Mr.
3  Growney, to ask about any hand-held gasoline-powered
4  cut-off machine, have you -- was the Stihl TS 400 the
5  first gasoline-powered cut-off machine you had ever
6  held in your hands?
7      A    I think so.
8      Q    All right.  And other than -- have you
9  inspected --
10     A    I'm sorry, no.  No.  That's entirely
11 wrong.  No, it was not -- Stihl was not the first one.
12 The name escapes me at this second.  You have to
13 forgive me, I'm -- I can't --
14     Q    All right.  Take your time.  Take your
15 time.
16     A    I had done a case on a -- what they call
17 a demo saw.  And I should know the name of it.  I
18 can't -- I can't come out.  They manufacture -- I had
19 a chainsaw, the same manufacturer.
20     Q    Was it something other than a Stihl?
21     A    Yes.  Yes.  I had -- and that -- I did
22 that some time between -- probably around 1997.
23     Q    All right.
24     A    In that range.
25     Q    And what was --

Page 27

1      A    And subsequent to that I had held one in
2  my hand or did one in the year 2000 or 2001.  Same
3  manufacturer.
4      Q    Was that in connection with a case or --
5      A    Yes.  Yes.  Two different cases.
6      Q    Two different cases?
7      A    That's correct.
8      Q    Same manufacturer that at the moment you
9  can't identify?
10     A    Yeah.  I'm sorry.  I don't know why it
11 can't come to me.
12     Q    If it comes to you, just let us know.
13     A    Yeah.  I know I have something in my file
14 or in my Stout file about it.
15     Q    All right.  And the nature of the issue
16 with those two, you referred to them as demo machines,
17 what was the nature of the reason you were looking at
18 those machines?
19     A    One was the -- a fireman was injured and
20 -- because the pull cord broke.
21     MR. KOTT:  I'm sorry.  I didn't hear you.
22     THE WITNESS:  The pull cord broke.  And
23 that was in Yonkers.  And the structure of the laws in
24 New York was that the fireman had to sue the City to
25 get workers' comp, so that's why I was involved in

Page 28

1  that.
2          The other one was Homelite.  It's
3  Homelite.  All right.
4  BY MR. WALSH:
5      Q    Do you recall which model Homelite?
6      A    Not off the top of my head.  I probably
7  can find something out.
8          The other one was the fuel leaked out of
9  the gas container, and I think it was a plumber or
10 something like that, mechanical trades, on his pants
11 and he struck an arc.  He was using a welding machine
12 and the sparks went into his pants and had a fire.
13     Q    Okay.  So one was a fuel leak, one was a
14 broken starter rope or pull cord, I think you referred
15 to it?
16     A    Yes.
17     Q    Did either case involve any claim of any
18 type of kickback or reactive force?
19     A    No.  No.
20          I have done work on another concrete saw.
21 Not a hand-held, but a carriage-type used to cut
22 concrete, and somebody was injured on that.
23     Q    Okay.  What kind -- what was the model or
24 make of that concrete saw?
25     A    It come from Tennessee.  I believe it's

Page 29

1  Tennessee.  And I'm trying to remember the name.  That
2  doesn't come to me either.
3      Q    All right.  Do you recall what the
4  allegations in that suit were?  How was the plaintiff
5  allegedly injured using a non-hand-held
6  carriage-driven concrete saw?
7      A    Yes.  It was improper machine guarding,
8  and he got his hands caught in a belt drive.
9      Q    Any allegation of reactive forces or
10 kickback in that case?
11     A    No.
12     Q    Is it fair for me to surmise, from what
13 you've told me, that the Stout case was the first time
14 you had ever dealt with any type of hand-held
15 gasoline-powered cut-off machine where there were
16 allegations of a kickback or some other reactive
17 force?
18     A    I believe so.
19     Q    And McGee was the second?
20     A    Yes.
21     Q    Have there been any other cases since
22 McGee that you have become involved in involved in
23 allegations of kickback with a hand-held
24 gasoline-powered cut-off machine?
25     A    Not that I've been involved in.

8  (Pages 26 to 29)

db2aa797-bf2c-44d4-b545-ffd826d2ee60

Page 30

1    Q.    Okay. Have you -- other than the Stihl
2  cut-off machine that you bought on the Internet and
3  you told us started and ran for a period of time, have
4  you ever had another occasion to start or use a
5  cut-off machine?
6    A.    No.
7    Q.    Have you ever had -- either the machine
8  you owned or any of the machines you may have examined
9  in McGee, Stout, or otherwise, have you ever had the
10 occasion to disassemble in any respect a cut-off
11 machine?
12   A.    Could you repeat the question? I'm
13 sorry. I didn't catch it.
14   Q.    Have you ever had occasion to disassemble
15 a handheld gasoline-powered cut-off machine?
16   A.    Yes.
17   Q.    Which one have you disassembled or which
18 ones?
19   A.    The one that I own.
20   Q.    Okay. When did you disassemble that?
21   A.    On more than one occasion while it was in
22 my possession.
23   Q.    Okay. What was the purpose of
24 disassembling it?
25   A.    Well, I wanted to get it back into

Page 31

1  running shape, so I pulled the spark plug out, pulled
2  the fuel filter out, changed the fuel filter. I may
3  have re-gaped the spark plug; I'm not sure. I can't
4  remember. I usually check it. I've replaced the air
5  filter. I -- this machine was missing a cover over
6  the belt drive, so I secured another belt drive and
7  installed it.
8         I also got the -- in attempting to start
9  the machine when I had it after it ran for a few
10 times, the pull cord broke, so I got a replacement.
11 Actually, got two replacements for pull cords. One
12 was wrong. And I installed that on the machine.
13        I removed and replaced the cutting wheel,
14 the abrasive wheel. I have removed the handle, the
15 forward handle of which you hold it, and altered it to
16 accommodate a storage sleeve for the manual. And
17 that's all that comes to mind at this point.
18   Q.    Do you have that machine with you?
19   A.    It's here, yes.
20   Q.    Could we -- could we -- we have to break.
21 Why don't we get that brought into the room where we
22 can look at it a little more?
23        Internally -- any of the internal engine
24 components have you taken apart on that machine or any
25 other cut-off machine any of the internal engine

Page 32

1  components, cylinders, pistons, crank shafts; anything
2  of that nature?
3    A.    No.
4    Q.    Are you familiar -- let me ask you: Are
5  you familiar with the workings of a -- of a cut-off
6  machine in terms of, for example, how many cylinders
7  does it have?
8    A.    Yes. I believe it has one.
9    Q.    Is it -- does it use valves? Does it --
10 what does it use to deliver fuel and air mixtures to
11 the cylinder and the piston?
12   A.    Well, it's a two-cycle machine, so it
13 doesn't have the valves.
14   Q.    Okay. What does it use?
15   A.    I have looked at exploded -- as a matter
16 of fact, I have a copy of the parts manual and it --
17 it has a carburetor. And it just uses a common
18 arrangement on two cycles that has intake ports that
19 are exposed by the piston.
20   Q.    All right. And how many ports are in,
21 for example, a Stihl TS 400; do you know?
22   A.    Well, I think you have two; an intake and
23 exhaust.
24   Q.    Okay. But the two ports on one cylinder?
25   A.    Yeah.

Page 33

1    Q.    How many does it use? Does it have a
2  crank shaft?
3    A.    Yes.
4    Q.    How many -- does it have more than one
5  crank shaft?
6    A.    No.
7    Q.    What type -- have you seen -- actually
8  seen the crank shaft on the machine?
9    A.    Of my machine?
10   Q.    Or any cut-off machine.
11   A.    I've seen a number of pictures. I'm well
12 familiar with crank shafts. I've had experience with
13 internal combustion engines for probably close to 60
14 years, 55 years.
15   Q.    How many lobes does the crank shaft have
16 on it on the TS 400, for example?
17   A.    Well, I wouldn't call it a lobe; I'd call
18 it a throw. A lobe would be on a camshaft. But a
19 throw would be on a crank shaft.
20   Q.    So how many --
21   A.    Single one.
22   Q.    Single one? And is it -- what's the
23 design of that; do you recall?
24   A.    Well, my recollection is is that it has
25 counterweights on the opposite end. In other words,

9 (Pages 30 to 33)

DEGNAN & BATEMAN
(856) 232-7400

Page 34

1  when I say the end, I mean the throw that would stick
2  out on the right, the counterweight would be on the
3  left. I got it backwards. I'm sorry. This is my
4  right hand. The throw would be on the right hand. It
5  would be -- it would have a journal that would be
6  bored. I'm sorry. I'm trying to -- it would be
7  ground to a good finish, and it would have other two
8  journals on it on the center -- center line to
9  accommodate the bearing. That's my recollection.
10     Q      All right. Does it -- well, strike that.
11            Does it have an on/off switch?
12     A      Yes.
13     Q      Where is that located?
14     A      That's up on top on the handle.
15     Q      Up on top?
16     A      It's on the handle.
17     Q      On the front handle or rear handle?
18     A      The rear.
19     Q      Rear handle?
20     A      Right.
21     Q      So the on/off is on the rear handle?
22     A      You know, if I had the machine I could
23  point it out to you.
24     Q      Have you done an accident reconstruction
25  in this case, McGee?

Page 35

1     A      Well, I've done certain portions of
2  accident reconstruction.
3     Q      Have you done a complete accident
4  reconstruction?
5            MR. PACKIN: Objection to the form.
6            THE WITNESS: What do you mean by
7  "complete"?
8  BY MR. WALSH:
9     Q      Well, does accident reconstruction --
10  what does that term mean to you? Does it have a
11  meaning to you?
12     A      Yes.
13     Q      What does it mean to you?
14     A      It means you take and evaluate the --
15  look at an accident, after it's occurred, and you
16  attempt to reconstruct the events that were associated
17  with it that may have influenced it.
18     Q      Have you done that in this case?
19     A      Well, I've done certain portions.
20     Q      All right. And what portions have you
21  done?
22     A      Well, the portions related to the
23  machinery, the equipment.
24     Q      Okay. Well, tell me exactly what that
25  means. What have you done of the portions that relate

Page 36

1  to the machinery?
2     A      Well, I've looked -- reviewed the
3  description of the events, the positioning of where
4  the machine was at the time of the accident, where it
5  was just immediately before, where it was, how it was
6  used.
7     Q      Anything else?
8     A      That's all I could think of at this
9  moment.
10     Q      All right. Did you make a determination,
11  for example, of how far apart the pipes were that Mr.
12  McGee was cutting between when the accident occurred?
13     A      Well, I took a look at that, and the only
14  thing I had to show that to base -- make a
15  determination were the photographs. And of course I
16  know that that's a very, very difficult thing to do,
17  to take photographs and accurately determine lengths,
18  based on my prior experience.
19            I can get a range on an approximation of
20  how far the pipes were, but I cannot -- in fact, you
21  know, I don't think anybody, without some knowledge of
22  some specific factors, could tell you from those
23  photographs exactly how far apart they were.
24     Q      Tell me exactly what you did to try to
25  come up with a range of figures.

Page 37

1            MR. PACKIN: Object to the form.
2            THE WITNESS: Well, I took a look at all
3  the photographs within the -- that was available to
4  me, and took a look at all the different angles, and I
5  was looking for one photograph, a photograph or more
6  than one photograph in which the pipes passed through
7  as close to the center of the photograph as possible.
8            And then I scribed or proximated the
9  distance between what I considered to be the pipes
10  from the photographs, and of course some of it was
11  obscured. You couldn't do that because you didn't
12  really have the downward shot.
13            So I had to take some -- some
14  measurement, some length of these same points on each
15  pipe top to top, side to side, top of one pipe to the
16  top of the other pipe, or the side of one pipe to the
17  side of the other pipe. And then take that and then
18  compare it to, hopefully, a known length that is
19  depicted in the picture.
20            And then if I got the length of the known
21  length, then I'd form a ratio. In other words, the
22  pipe, 10-inch diameter, and maybe it shows in the
23  picture three-quarters of an inch. So I have 10
24  inches to three-quarters, and then I go back to the
25  length that I measured that represents to me the

10  (Pages 34 to 37)

DEGNAN & BATEMAN
(856)  232-7400

db2aa797-bf2c-44d4-b545-ffd826d2ee60

Page 38

1   spacing of the pipe and apply that ratio to that
2   measured length, and that comes up with a figure.
3          Now, the problem with that is that that's
4   inaccurate. I can't rely upon it. The best you can
5   do is it's going to give me a range. The reason you
6   can't rely upon it is because, in addition to those
7   distances, you need to know the angle at which -- or
8   angles, plural, which the camera is pointed picking up
9   those points.
10         But now you can have -- you have three
11  dimensions; left, right, and above. Well, let's just
12  say if the pipes are running straight like this and
13  you're over here, well, then, you know, whatever
14  figure that you're figuring on you got to kind of
15  adjust for that angle. You have to adjust for that
16  angle.
17         Now, in addition to that, you might have
18  me shooting down here from above, so you have to
19  adjust for that angle too.
20         Now, there's another factor here that
21  adjusts -- that affects this, and I mentioned to you
22  before that I was picking out the center. I was
23  trying to go for the center. There is a figure --
24  there's a science called photoptometrics that you do
25  this. And in order to be accurate, there's a figure,

Page 39

1   and I forget the name of it, that describes certain
2   coverages within a lens system. And you need to know
3   that to apply your calculations to make sure they're
4   correct. And of course I don't have that, whatever
5   camera that was. I don't know what that is. So the
6   best I could do is get a range.
7      Q    All right. Do you have work sheets where
8   you've went through these calculations in an effort to
9   come up with a range?
10     A    I probably do.
11     Q    Would you look for those for me, please?
12     A    Sure. My files have been cross filed.
13  So maybe what you asked me before is over in the Stout
14  file. So let's see.
15         THE WITNESS: Excuse me. That's my Stout
16  file, isn't it, Barry?
17         MR. PACKIN: I don't know. This is mine,
18  right?
19         THE WITNESS: No. That's mine. My Stout
20  file is still here someplace.
21         MR. PACKIN: I don't know.
22  BY MR. WALSH:
23     Q    Would you have been calculating ranges in
24  the distances of pipes that Mr. McGee was cutting in
25  the Stout file?

Page 40

1      A    No. No. I brought my files here for
2   file inspection which I -- it's my understanding that
3   you people did inspect it, and, apparently, in
4   repackaging the file I've got some of it's been
5   crossed.
6      Q    All right. Have you been able to locate
7   any work sheets where you attempted to -- to determine
8   any type of measurement on the pipes Mr. McGee was
9   cutting at the time of his accident in the file you've
10  brought with you today?
11     A    Well, no, not yet.
12     Q    All right.
13     A    You know, look, maybe in the other stuff.
14     Q    Let me ask you this: Do you know what
15  any of those ranges were? Do you know what any of the
16  ranges you came up with as, in terms of the pipes, how
17  long a distance it was between, for example, the
18  position where the pipes exited the trench and reached
19  the spoils pile? How far apart the pipes were? How
20  off the ground they were? Any particular dimension
21  relating to the pipes? Do you recall what any of
22  those were?
23     A    The only -- the only ones that I remember
24  was the distance between the pipe. I don't think I
25  was attempting to calculate the length of the pipe

Page 41

1   that came out of the trench. I felt that that was a
2   futile exercise from the photographs.
3          My recollection is that it would be a
4   range approximately somewheres between 18 inches and
5   24 inches. That's my best guesstimate.
6      Q    Between the pipes?
7      A    Between the pipes.
8      Q    Okay. Did you try to make any estimate
9   of how high either of the two pipes was off the ground
10  at the point where he was trying to cut it?
11     A    I don't believe I did.
12     Q    So the estimate you tried to do was how
13  much space there was between the two pipes at the
14  point where he was standing when cutting; is that
15  correct?
16     A    Yes.
17     Q    And your estimate was 18 to 24 inches?
18     A    Approximately. I mean, that's a best
19  guess type estimate.
20     Q    I understand.
21         Have you -- have you ever seen a piece of
22  HDPE pipe?
23     A    I may have.
24     Q    And do you have a recollection of ever
25  seeing a piece of HDPE pipe?

DEGNAN & BATEMAN
(856) 232-7400

db2aa797-bf2c-44d4-b545-ffd826d2ee60

Page 42

1      A      Well, I have extensive experience with
2  PVC pipe and a lot of plastic pipe, and so I may have
3  seen HD, and I wasn't -- I wasn't aware that it was.
4      Q      All right. My question really is: Do
5  you have a recollection -- I understand you may have
6  seen it. Do you have a recollection actually of
7  seeing what you recognized to be HDPE pipe?
8      A      No.
9      Q      And I take it it follows from that that
10  you don't have a recollection of ever cutting a piece
11  of HDPE pipe?
12      A      I have recollection of cutting a lot of
13  plastic pipe.
14      Q      HDPE pipe?
15      A      I couldn't swear to it that I know that
16  it was HDPE pipe.
17      Q      And what would be the occasions when you
18  were cutting pipe? What were the occasions for you to
19  cut pipe?
20      A      During my tenure as engineering and
21  manufacturing facilities plant engineering we oversaw
22  the maintenance on the site where that -- where
23  fabrication of plastic pipe was taking place. I may
24  have tried it myself. I know I have done it myself
25  for my own personal use. I have cut plenty of plastic

Page 43

1  pipe myself for my personal use.
2      Q      For -- what would be the occasion for
3  doing that? What would you use plastic pipe for?
4      A      Well, one of the things I have in my
5  toolbox that I -- I have some -- I have a -- a scale
6  that I use to weigh objects, and it has a -- spring
7  scale, and it has a pointer that slides up and down.
8          So I have cut plastic pipe to make a
9  ring, and I split it and put it on there so that when
10  the spring goes down when I weigh something and the
11  pointer goes down, the pointer -- the pipe stays at
12  the pointer. The pointer comes to -- then when you
13  take the weight off, you have the pointer and you can
14  read, that's one of the things.
15      Q      What size plastic pipe is that?
16      A      That may have been one to one and a half
17  inch.
18      Q      One to one and a half inch? And do you
19  know what wall thickness?
20      A      Approximately eighth to a quarter;
21  somewheres in there. I don't think it was a quarter
22  inch.
23      Q      And how big a piece of pipe were you
24  cutting? Was this a short piece of pipe?
25      A      No. I had a larger piece and I cut it

Page 44

1  off. I have cut plastic pipe in a lot of instances.
2      Q      What did you use to cut it with?
3      A      Hacksaw.
4      Q      Okay. Is that what you've always used to
5  cut plastic pipe, a hacksaw?
6      A      That's what I have, yes.
7      Q      Have you cut -- ever cut plastic pipe
8  with anything but a hacksaw?
9      A      No.
10      Q      Hacksaw being a metal-cutting handsaw,
11  right? Not powered. Not a power tool.
12      A      Hand tool.
13      Q      Hand tool?
14          And what is the biggest diameter of
15  plastic pipe that you can recall cutting with a
16  hacksaw?
17      A      Maybe four inch.
18      Q      All right. And what would you have been
19  using? And do you recall what kind of plastic pipe
20  that was?
21      A      That was probably PVC for some exhaust
22  ducting four or six. It might have been six-inch;
23  somewheres in that range.
24      Q      Have you ever used any type of power tool
25  to cut any type of plastic pipe?

Page 45

1      A      I probably have used a horizontal
2  hacksaw, a powered horizontal hacksaw.
3      Q      A horizontal hacksaw?
4      A      Yeah.
5      Q      Is that electrically-powered saw? What
6  is that?
7      A      Yes.
8      Q      Hand-held?
9      A      No. No. A machine.
10      Q      Machine?
11          Okay. Stationary saw of some type?
12      A      Yes.
13      Q      Okay. Can you have -- you have a
14  specific recollection of using that stationary saw to
15  cut plastic pipe at some point?
16      A      Yes. Yes.
17      Q      What kind of -- what size and type of
18  plastic pipe did you cut with it?
19      A      Probably was something like a six-inch.
20      Q      More than one occasion? One occasion?
21  How often?
22      A      Probably more than once or maybe multiple
23  times on one occasion; something of that nature.
24      Q      Saw you owned or somebody else's?
25      A      No. No. It was where I worked.

12  (Pages 42 to 45)

DEGNAN & BATEMAN
(856)   232-7400

db2aa797-bf2c-44d4-b545-ffd826d2ee60

Page 46

1    Q    All right.  Now, you mentioned earlier
2  cutting plastic pipe at some of the places that you've
3  worked in your career.  Did you actually -- put your
4  personal cutting aside for personal use at home or for
5  something you were doing for one of your own projects.
6  Work project.  Have you actually cut plastic pipe in
7  the scope of your employment some time during your
8  career?
9    A    Well, yes, when I was talking about the
10  -- cutting the six-inch pipe with a powered hacksaw,
11  that was at work.
12    Q    All right.  What -- so you cut a six-inch
13  pipe with a hacksaw at work on how many occasions?
14    A    I don't remember; it's been some time.
15    Q    All right.  Have you ever cut a pipe --
16  any other kind of pipe other than a plastic pipe?
17    A    Yes.
18    Q    What other kind of pipe have you cut?
19    A    Black iron pipe, galvanized pipe.
20    Q    Galvanized, or are those two different
21  kinds?
22    A    Two different kinds.
23    Q    Okay.  Galvanized pipe and black iron?
24  Is that cast iron or ductal iron?
25    A    Well, it would be black iron pipe that

Page 47

1  had been galvanized, so --
2    Q    And so what size pipe have you cut of
3  that nature?
4    A    One inch on up to six inch, maybe larger.
5  Maybe eight inch, ten inch.
6    Q    What did you use to cut it?
7    A    Well, different things.  One would be a
8  pipe fitter's cutting tool.  Actually, I've cut --
9  yes.  Pipe fitting cutter's tool.  It's a little bit
10  of a wheel fitting, and you have another screw that
11  you would tighten it down and apply it to the pipe and
12  you cut that.
13    Q    Manual, non-powered tool?
14    A    Yes.  I've done -- I've used a powered
15  hacksaw -- a powered hacksaw to cut steel pipe, black
16  iron pipe, galvanized pipe.
17    Q    That was the stationary saw you talked
18  about?
19    A    Right.  And I've used an acetylene torch.
20    Q    An acetylene torch?
21    A    Yes.
22    Q    All right.  Anything else that you can
23  recall using?
24    A    That's it, I guess.
25    Q    Have you ever used a hand-held

Page 48

1  gasoline-powered cut-off machine to cut any type of
2  pipe?
3    A    No.
4    Q    Have you ever been present when anybody
5  was using a hand-held gasoline-powered cut-off machine
6  to cut any type of pipe?
7    A    No.
8    Q    Have you -- have you ever -- have you
9  ever worked in the construction industry?
10    A    Yes.
11    Q    When did you work in the construction
12  industry?
13    A    I worked as a heavy construction --
14    Q    I'm sorry.
15    A    I worked as a heavy construction
16  machinery mechanic back in my 20s.
17    Q    Okay.  Where was that?
18    A    It was Bell Eastern, Yonkers, New York.
19      In addition to that I worked as an
20  engineer on the construction of a power plant for
21  Orange & Rockland Utilities.
22      In addition to that I have worked as an
23  engineer on a construction site of a number of
24  buildings, and construction of facilities at
25  QuickCrete, which I mentioned.

Page 49

1      In addition to that I worked as an
2  assistant on layout of -- layout work in building
3  construction.
4    Q    You ever worked on --
5    A    And in addition to that I've built my own
6  home.
7    Q    Have you ever worked on a construction
8  site where you were using -- actually using
9  construction tools or equipment?
10    A    Yes.
11    Q    Tell me about that.  Where have you
12  worked on a construction site that you were using
13  construction tools or equipment?
14    A    Well, I mentioned to you that I was a
15  heavy construction machinery mechanic, and in that
16  capacity I used acetylene torches, I used cranes,
17  backhoes, cable backhoes, hydraulic backhoes.  I used
18  generators, hoists, wrenches, pneumatic wrenches,
19  electric wrenches.  Saws, hand-held saws.
20    Q    What type of hand-held saws?
21    A    Electric.  And also a gasoline-powered.
22    Q    What type of gasoline-powered saw?
23    A    It was a -- it wasn't around too long
24  because it wasn't too good.  It was, I think,
25  something called a tiger.  It was an equivalent of

13  (Pages 46 to 49)

DEGNAN & BATEMAN
(856)  232-7400

db2aa797-bf2c-44d4-b545-ffd826d2ee60

1   what the carpenter's -- the hand-held carpenter's
2   electric saw, circular saw, is, but it was powered by
3   a small gasoline engine, and it had a seven or
4   eight-inch blade on it.
5       Q    It was used for wood cutting?
6       A    Yeah. That's what we used it for, yes.
7       Q    In terms -- what year -- the years you're
8   talking about that you were a mechanic in the heavy
9   equipment, were you working for a manufacturer of
10  equipment, or were you working in the field as a
11  mechanic for a construction company?
12      A    I was working in the field for a
13  construction machinery dealer.
14      Q    Okay. And what --
15      A    Actually, I would work in the shop and
16  also in the field, but spent a lot of time in the
17  field.
18      Q    What years was that?
19      A    That would be '60s. Bear with me for a
20  second. '64 through '68 approximately; somewhere
21  around that time.
22      Q    All right. And on any of the
23  construction sites that you were working were gas --
24  hand-held gasoline-powered cut-off machines being
25  used?

1       A    No.
2       Q    Have you ever worked on a construction
3   site where a hand-held gasoline-powered cut-off
4   machine was being used?
5       A    I don't think so.
6       Q    Have you --
7       A    It's possible I just may have not been
8   aware of it.
9       Q    You said you owned some power tools
10  yourself, I take it?
11      A    Yes.
12      Q    What power tools do you own?
13      A    I own a handsaw, I did own a lathe at one
14  time. Two lathes, actually. I own lawnmower, string
15  trimmer, chainsaws, stationary grinder, hand-held
16  grinder, electric grinder, drills, power drills.
17  Stationary drill. That's all that comes to mind. You
18  know, I have a list probably someplace.
19      Q    Chainsaws. What chainsaws do you own or
20  have you owned?
21      A    I have a Homelite and a McCullough.
22      Q    And do you know approximately how old
23  those machines are?
24      A    The Homelite is very old. The Homelite
25  is probably 30 some years old, and I was going to

1   throw it out, but I decided not to. I just decided to
2   keep it. I took the chain off it and so I just keep
3   it as -- for something that was what was available 30,
4   35 years ago. It predates the application of the
5   brakes.
6           The McCullough is probably around 10
7   years or so old.
8       Q    You have a McCullough that's 10 years
9   old?
10      A    Approximately, I think.
11      Q    Do you know what model it is?
12      A    Not on the top of my head.
13      Q    Do you know where you bought it?
14      A    Yes.
15      Q    Where did you buy it?
16      A    Home Depot.
17      Q    And what do you use the McCullough for?
18      A    My lot where I'm at is wooded, and I have
19  a fireplace, and so as the trees fall down I cut them
20  up and then split them for firewood.
21      Q    Do you have a -- do you know what size --
22  well, first of all, what model McCullough is?
23      A    Not off the top of my head, no.
24      Q    What size bar has on it?
25      A    It has a shorter bar than the Homelite

1   did. It must be, you know, approximately something
2   like that (indicating).
3       Q    Seem to be indicating 16, 18 inches
4   maybe, maybe 20?
5       A    I don't think it's 20. It's got a
6   carrying case. I mean, I use it once or twice a year.
7   Two, three -- well, something like that, you know,
8   maybe more.
9       Q    All right. And the -- with either your
10  Homelite or your McCullough have you ever experienced
11  a kickback reaction while using those machines?
12      A    No.
13      Q    Have you ever experienced a kickback
14  reaction using any chainsaw?
15      A    No. I have used other chainsaws, but --
16      Q    What other chainsaws have you used?
17      A    I know a Poulan.
18          MR. KOTT: Poulan?
19          THE WITNESS: Poulan. Excuse me.
20  BY MR. WALSH:
21      Q    Anything else?
22      A    The other brands I don't have a
23  recollection of.
24      Q    Have you ever -- have you ever
25  experienced a kickback reaction using any type of

DEGNAN & BATEMAN
(856)   232-7400

Page 54

1  handheld power tool?
2       A    I may have used a circular saw, electric,
3  that jammed in the wood and began to -- felt like a
4  kickback, but I -- but it didn't.  Well, yeah, I can't
5  recall clearly.
6            I'm pretty sure I've had some circular
7  saws jam in the wood, but I don't remember kickback.
8       Q    All right.  Have you ever had -- in your
9  professional career have you ever had the opportunity
10 to engage in the testing of kickback or other reactive
11 forces with a cut-off machine, hand-held
12 gasoline-powered cut-off machine?
13      A    No, but I have read of the Power Tool
14 Institute.  In fact, I have it their reports on their
15 investigations of kickbacks of circular hand-held
16 saws.
17      Q    With wood-cutting saws?
18      A    Yes.
19      Q    Okay.  I'm talking about hand-held
20 gasoline-powered cut-off machines, the type which is
21 the way I identify the type of equipment that Mr.
22 McGee was using.  So I'm not talking about circular
23 electrically-powered wood-cutting saws.
24      A    Uh-huh.
25      Q    Have you ever had the opportunity to test

Page 55

1  for kickback reactions with a hand-held
2  gasoline-powered cut-off machine?
3       A    No.
4       Q    A chainsaw?  How about a chainsaw?
5       A    No.
6       Q    How about any type of hand-held
7  gasoline-powered tool?
8       A    No.
9       Q    Have you ever seen the results of testing
10 of kickback reactions from a hand-held
11 gasoline-powered cut-off machine?
12      A    Well, the only ones I saw was the
13 electric ones that I told you.
14      Q    Okay.  Just bear with me.  You've not
15 seen them with a hand-held gasoline-powered cut-off
16 machine, correct?
17      A    Right.
18      Q    Not seen it with a chainsaw?
19      A    Right.
20      Q    Not seen any test results of kickback
21 reactions with any type of hand-held gasoline-powered
22 tool, correct?
23      A    Correct.
24      Q    All right.  Can you get for me -- do you
25 have with you in your file the Power Tool Institute

Page 56

1  material you're talking about relating to
2  electrically-powered circular saws?
3       A    I have it.  It's home.  It's not in my
4  file.
5       Q    You don't have it here?
6       A    I have it home.  I have it in my office.
7       Q    Is that something you can bring tomorrow
8  also?
9       A    Sure.
10      Q    Would you do that?
11      A    Yes, I will.
12      Q    And do you know what year that material
13 is from and what it shows?
14      A    I just want to make a note of that so I
15 don't forget it.
16      Q    You need a piece of paper?
17      A    I think I have a piece.
18           MR. PACKIN:  Here you go.
19           THE WITNESS:  Thank you.
20           Okay.  I'm sorry.
21 BY MR. WALSH:
22      Q    Can you tell me generally what you
23 recollect from the Power Tool Institute's information
24 on electrically-powered circular saws, what it shows?
25      A    Well, it showed the mechanism by which

Page 57

1  they had devised to do the testing.  There's an
2  extensive writeup as to how -- what parameters they
3  use to develop this testing, and then they -- and then
4  the second one is the testing.
5       Q    What was -- what were they testing for?
6       A    What -- my recollection is what it takes
7  to kick back.  And also, if I remember correctly,
8  because I've read a number of things, the speed
9  necessary for the guard to close.
10      Q    Is it --
11      A    Or the time -- time frame.  I really
12 think it was the time frame.
13      Q    The guard -- the reciprocating guard on
14 the circular saw or the retractable guard on the
15 circular saw?
16      A    Yes.  Yes.
17           MR. KOTT:  The lower blade guard.
18           THE WITNESS:  The lower blade guard, yes.
19 BY MR. WALSH:
20      Q    Now, were they -- is it your
21 understanding that kickback with a wood-cutting saw,
22 circular saw, is the same phenomena as kickback with a
23 hand-held gasoline-powered cut-off machine?
24           MR. PACKIN:  Object to the form.
25           You can answer.

15  (Pages 54 to 57)

db2aa797-bf2c-44d4-b545-ffd826d2ee60

Page 58

1    THE WITNESS: Well, it's similar. You
2  know, there might be some differences in quantities.
3  BY MR. WALSH:
4    Q    All right. And from a standpoint of the
5  testing that was done by the Power Tool Institute, do
6  you have any information about what the test equipment
7  they were doing these tests on, what test equipment
8  were they using to observe or look at kickback with an
9  electrically-powered wood-cutting saw?
10    A    Yes. Well, that's in the writeup.
11    Q    Okay. Do you have a recollection as we
12  sit here as to what that was?
13    A    No. They had devised some kind of a
14  swing mechanism. It was -- I think it was a hanging
15  and a pivoting point up on top. They attached the
16  machine to it, and they used some kind of electronic
17  gear to measure the timing that was involved.
18    Q    Is there anything in the study of the
19  Power Tool Institute that you relied on for purposes
20  of your opinions in this case?
21    A    I don't recall at this moment.
22    Q    Is the -- is that Power Tool Institute
23  information cited, in your opinion, to the best of
24  your recollection, your written opinion you've
25  provided in the case?

Page 59

1    A    I don't think I cited it.
2    Q    Did you have it at the time you wrote
3  your opinion, or is it something you've acquired since
4  then?
5    A    No. I've had it for a number of years.
6    Q    And you're not able to tell me whether
7  it's something that you relied on for any of your
8  opinions?
9    MR. PACKIN: Asked and answered.
10    THE WITNESS: Well, it -- my reading of
11  it probably bolsters my background in kickbacks. I
12  was interested in kickbacks, and that was something
13  that I used to broaden my knowledge of kickbacks.
14  BY MR. WALSH:
15    Q    Have you -- do you know of anything --
16  any writings, any research, any publications that you
17  consider authoritative in the area of the causes of
18  kickback with a hand-held gasoline-powered cut-off
19  machine?
20    MR. PACKIN: Object to the form.
21  You can answer.
22    THE WITNESS: Well, I would imagine that
23  the manufacturer's literature or manuals, et cetera,
24  that go in to describe kickbacks, since the
25  manufacturer manufactures the machine in their writing

Page 60

1  refers to their machines that have a certain amount of
2  authority.
3  BY MR. WALSH:
4    Q    Anything else you can think of?
5    A    I recall there was a study done by a
6  couple gentlemen, one whose name was Moore, that did
7  investigate carpenters' understandings of what a
8  kickback was.
9    Q    And when was this? Was this with a
10  hand-held gasoline-powered cut-off machine, or was
11  this with other types of equipment?
12    A    Hand-held. I'm sorry. It was with a
13  hand-held circular saw, electric circular saws
14  predominant.
15    Q    And when was this published?
16    A    Probably in the early '90s.
17    Q    And do you have a copy of that also?
18    A    Someplace I do, yes.
19    Q    You don't have it with you today, I take
20  it?
21    A    It might be in my file.
22    Q    All right. Would you take a look?
23    A    Here it is. I'm sorry. Let me just --
24    MR. WALSH: Have the court reporter mark
25  that, please.

Page 61

1    (Article was marked as Growney-2 for
2    identification by the court reporter.)
3  BY MR. WALSH:
4    Q    All right. Would you confirm for me that
5  Growney-2 is the article that you were referring to?
6    A    Yes, that is.
7    Q    All right. Could I have it back, please?
8    A    (Witness complies.)
9    Q    Now, did you -- did this article -- did
10  you rely on this article in forming any of the
11  opinions or conclusions you reached in the case?
12    MR. PACKIN: Object to the form.
13  You can answer it.
14    THE WITNESS: Yes. I think I referenced
15  it in my report.
16  BY MR. WALSH:
17    Q    Okay. And what -- what -- how did this
18  influence any of the opinions or discussions,
19  opinions, or conclusions you reached?
20    MR. PACKIN: Object to the form.
21  You can answer it.
22    THE WITNESS: In that there is a good
23  understanding in the field, in the construction field,
24  of the term "kickback" as opposed to reactive forces.
25    In other words, there would be -- that

16  (Pages 58 to 61)

DEGNAN & BATEMAN
(856) 232-7400

db2aa797-bf2c-44d4-b545-ffd826d2ee60

Page 62

1    bolsters my opinion that there is a preference to use
2    the term "kickback" rather than "reactive forces" in
3    attempting to warn users of these demo saws,
4    demolition saws.
5    BY MR. WALSH:
6        Q    This was -- this was a survey among
7    carpenters; is that correct?
8        A    Yes.
9        Q    Were there any other -- to your knowledge
10   was there any kind of construction trades surveyed in
11   connection with this or any other study that you're
12   aware of that looked at other types of construction
13   workers or construction workers who use hand-held
14   gasoline-powered cut-off machines?
15       A    Could you repeat that question?
16       Q    Yeah. Was there -- to your knowledge
17   were there any construction workers included in this
18   survey other than carpenters? Were there any other
19   articles like this that you're aware of that looked at
20   the understanding of people in the construction trades
21   who actually use cut-off machines as opposed to
22   circular saws?
23       MR. PACKIN:  Object to the form.
24       You can answer.
25       THE WITNESS:  Not that I know of.

Page 63

1    BY MR. WALSH:
2        Q    All right. The -- I want to go back for
3    a moment to your -- the kickback testing. And if you
4    answered this, I apologize. But I'm not sure that I
5    asked the question, so I'm going to repeat it if I
6    have.
7            Have you ever seen anyone actually
8    conduct a test for -- of kickback with either a
9    cut-off machine, chainsaw, or any type of hand-held
10   gasoline-powered tool?
11       A    I think you did ask me that before. My
12   answer, I believe, was no.
13       Q    Okay. Have you ever seen the results of
14   any of that kind of testing?
15       A    It seems to me in the chainsaw standard
16   there's references to it. Now, I don't remember
17   specifically what it is right now, but it seems to me
18   there's some reference in there.
19       Q    There's reference to testing of
20   chainsaws?
21       A    Yes, I think so.
22       Q    Is there any reference to testing of
23   cut-off machines or other hand-held gasoline-powered
24   tools, as far as you know, in the ANSI chainsaw
25   standard?

Page 64

1        A    I don't recall any.
2        Q    In the ANSI standards pertaining to
3    cut-off machines, is there any reference to kickback
4    testing in that standard?
5        A    I don't remember any.
6        Q    And have you ever seen any comparison of
7    the results of kickback testing between a chainsaw or
8    -- I'm sorry. Between a cut-off machine and any of
9    those other machines I just mentioned, chainsaw or any
10   type of hand-held gasoline-powered tool?
11       A    You mean to say that comparison exists?
12       Q    I'm asking if you've ever seen anything
13   that makes that comparison.
14       A    I have not seen anything that makes that
15   comparison, no.
16       Q    Have you ever seen anything that makes a
17   comparison between reactive --
18       A    Well -- where somebody has written this
19   way?
20       Q    Or whatever -- whatever you think you may
21   have seen, whether written, published.
22       A    In other words, if I've read case
23   documents, say, regarding kickbacks of a chainsaw
24   versus case documents of kickbacks of hand-held
25   gasoline-powered demolition saws, yeah, I've done

Page 65

1    that, you know.
2        Q    Well, let me ask you this:  Have you ever
3    -- you told me, I thought earlier, what you're calling
4    hand-held gasoline-powered demolition saws, I think is
5    the same thing I'm referring to as a hand-held
6    gasoline-powered cut-off machine; is that correct?
7        MR. PACKIN:  Object to the form.
8        You can answer.
9        THE WITNESS:  You are using the lawyer's
10   terminology. I am using the -- the layman's
11   terminology, so I'm comfortable in using the layman's
12   terminology.
13       This is a saw. You know, they all use
14   it, they all know it as a saw. I'm comfortable with
15   that terminology because it's prevalent in the
16   construction industry. If you like that terminology,
17   even if it's the precise terminology, the actual
18   terminology, fine, go ahead and use it; I have no
19   problem using the terminology that's accepted in the
20   trades.
21   BY MR. WALSH:
22       Q    And I don't have any problem with you
23   using whatever terminology you want. I'm just trying
24   to confirm that when you use the term "demolition
25   saw," you are referring to the same piece of equipment

17 (Pages 62 to 65)

DEGNAN & BATEMAN
(856)   232-7400

db2aa797-bf2c-44d4-b545-ffd826d2ee60

Page 66

1  that I've been referring to as a gasoline-powered
2  cut-off machine, the type of equipment Mr. McGee was
3  using when injured, correct?
4      A     That's correct.
5      Q     All right.  So whether you call it a demo
6  saw or I call it a cut-off machine, we're talking
7  about the same piece of equipment?
8      A     Yes.  I also may refer to it as a
9  concrete cut-off saw because that is another term that
10  is widely accepted in the trades.
11     Q     Okay.
12         MR. PACKIN: Can we take a five-minute
13  men's room break?  Maybe less?
14         MR. WALSH: Off the record.
15         (Short recess was held.)
16         MR. WALSH: Would you just read back to
17  me -- I lost my question here -- what the last
18  question and answer was?
19         (Above-mentioned question and answer were
20     read back by the court reporter as follows:)
21         "QUESTION: All right.  So whether you
22     call it a demo saw or I call it a cut-off
23     machine, we're talking about the same piece of
24     equipment?
25         "ANSWER: Yes.  I also may refer to it

Page 67

1      as a concrete cut-off saw because that is
2      another that is widely accepted in the
3      trades."
4  BY MR. WALSH:
5      Q     All right.  Now, you told me earlier that
6  with regard to gasoline-powered cut-off machines,
7  other than Stout and McGee, that you had not had any
8  cases involving kickback or other reactive forces,
9  correct?
10     A     With regard to demo saws?
11     Q     Yes.
12     A     Yeah.  All right.
13     Q     How about chainsaws?  Have you had any
14  cases involving chainsaws involving allegations of
15  kickback?
16     A     No.
17     Q     So when you're talking about comparing
18  cases where -- cut-off machine cases to other cases,
19  what other cases are you talking about where there may
20  have been allegations of reactive forces?  Are there
21  any?
22     A     Yes.  There are a number of cases
23  involving hand-held demo saws.  Concrete cut-off saws
24  that have kickback and have resulted in serious
25  injury, such as death.  Dale Erb comes to mind right

Page 68

1  now.  He was down in Florida, a 21-year-old young
2  worker, a Stihl TS 400 kickback cut an artery in his
3  neck.  He bled out.  Fifteen minutes he was dead.
4      Q     Did you participate in that case in any
5  way?
6      A     I was questioned as to whether or not I
7  would be available for it.
8      Q     Did you participate in it?
9      A     Well, that was the participation.
10     Q     Okay.
11     A     And I talked at length with the lawyer
12  that was involved, and I believe it was settled.
13     Q     Do you know what cutting attachment was
14  on the machine Mr. Erb was using?
15     A     Yes.
16     Q     What was it?
17     A     An abrasive wheel.
18     Q     Do you know what he was cutting?
19     A     Yes.
20     Q     What was he cutting?
21     A     Green concrete.
22     Q     And do you know what the circumstances of
23  the cutting were?  Do you know -- did you ever see --
24  for example, did you see -- ever see the machine or
25  the cutting attachment?

Page 69

1      A     No, I did not.
2      Q     Did you ever see the accident site?
3      A     No.
4      Q     Did you ever interview any of the
5  witnesses to the accident?
6      A     No.
7      Q     Did you ever see depositions or other
8  materials from any of the witnesses to the accident?
9      A     When you say "other materials," what do
10  you mean, "other materials"?
11     Q     Statements, depositions, anything from --
12  that may have constituted somebody describing -- other
13  than lawyers, somebody describing actually what
14  happened?
15     A     No.
16     Q     Any -- now, so is that what you're --
17  have you -- have you been approached in other cut-off
18  machine cases like that?
19     A     Yes.
20     Q     Okay.  What other cases have you been
21  approached in?
22     A     Husqvarna.
23     Q     Okay.
24     A     And I believe that had a toothed cut-off
25  saw blade on it.

18  (Pages 66 to 69)

DEGNAN & BATEMAN
(856)  232-7400

db2aa797-bf2c-44d4-b545-ffd826d2ee60

| | |
|---|---|
| Page 70 | Page 72 |

**Page 70**

1    Q    And when was that case?
2    A    About a year and a half ago.
3    Q    Did you ever become involved with the
4 case?
5    A    Not yet, no.
6    Q    And any other case?
7        MR. KOTT:  Where was that case located?
8 BY MR. WALSH:
9    Q    Was that case here in New Jersey?
10    A    No.
11    Q    Where was it?
12    A    I think it was Maine.
13    Q    And do you know what model Husqvarna was
14 involved in?
15    A    No.
16    Q    Do you know what kind of cutting
17 attachment?  You said a toothed blade.  Was it a saw
18 blade?
19    A    That's my understanding, yes.
20    Q    Do you know the make of the blade?
21    A    No.
22    Q    Do you know any of the circumstances of
23 the accident?
24    A    Not much more than that.  Nothing I can
25 think of right now.

**Page 71**

1    Q    Any other cases that you have had some
2 degree of contact participation with involving a
3 cut-off machine?
4    A    Yes.
5    Q    What are they?
6    A    There was one in New York.  It was four,
7 five years ago; around that time.  Somebody was using
8 a cut-off machine, I think stone, and kicked back and
9 were injured.  And that's about all I know about it.
10 I don't know the name.
11    Q    Do you know what model the cut-off
12 machine was?
13    A    No.  No, I don't.
14    Q    Do you know what brand?
15    A    No.
16    Q    Do you know what cutting attachment was
17 on it?
18    A    No.
19    Q    Do you know any of the circumstances of
20 the case?
21    A    No.
22    Q    Anything else?
23    A    That's all.
24    Q    All right.
25    A    Well, I'm sorry.  What are you asking me?

**Page 72**

1 That I was personally involved in?
2    Q    Yes.
3    A    Okay.  No.
4    Q    All right.  Now, have you -- are you
5 aware of any data, information, or research that
6 provides injury or accident statistics regarding
7 hand-held gasoline-powered cut-off machines?
8    A    Well, the Labor Department compiles data
9 and the Consumer Product Safety Commission compiles
10 data like that.  Both of them do.  But, unfortunately,
11 I can't find the breakouts for the demolition saws or
12 concrete cut-off saws.
13    Q    Have you -- do you have any information
14 at all that would allow you to compare accident or
15 injury rates with cut-off machines to other power
16 tools, whether it be chainsaws, circular saws, or any
17 type of powered cutting tool?
18        MR. PACKIN:  Object to the form.
19        THE WITNESS:  Well, I wouldn't do that
20 because you'd be comparing apples and oranges.  In
21 other words, the design and structure of the machine
22 one is something -- and its applications is something
23 completely different than, say, one of the other
24 machines.
25        The population of the machinery available

**Page 73**

1 -- of the machines -- the number of machines
2 available, the amount of people who use it, the
3 incidents, the reporting of the incidents or the lack
4 of the recording of the incidents, I have found
5 through over the years that a lot of people get
6 injured or get near misses and never report it or it
7 never gets written down as a report.  It may be
8 reported in their local community, but may not extend
9 all the way up to a government agency.  So I don't see
10 the value in that.
11 BY MR. WALSH:
12    Q    Aren't accident statistics for most
13 pieces of machinery and most products reported in
14 terms of accidents per thousand or accidents per
15 hundred or accidents per a certain number machines,
16 users, products?
17        MR. PACKIN:  Object to the form.
18        You can answer.
19        THE WITNESS:  Well, like, the Labor
20 Department would use it in per manhours worked.  So
21 that's where they -- but then the Labor Department
22 breaks them down into a lot of different categories.
23 So I'm not sure if I know what you're talking -- what
24 you're asking me.
25 BY MR. WALSH:

19  (Pages 70 to 73)

DEGNAN & BATEMAN
(856) 232-7400

db2aa797-bf2c-44d4-b545-ffd826d2ee60

Page 74

1  Q    Well, the Labor Department, for example,
2  would give you accident statistics broken out for
3  exactly -- for purposes of comparing between
4  categories of products; do they not?
5       MR. PACKIN:  Object to the form.
6       THE WITNESS:  Well, I don't know what the
7  purpose of the Labor Department doing that, but like I
8  said, you know, if, you know, you may have -- there
9  are a number of things which are -- which are -- there
10  are some things which are critical in doing an
11  analysis, such as the frequency of an accident or the
12  severity of an accident.  And so, you know, these
13  things get mixed in together and you may not have a
14  good base.
15       In other words, you may not be able to
16  separate it out and say, well, listen, this thing -- a
17  lot of accidents happen here with this type of
18  machine.  Well, look at this machine.  It doesn't have
19  a lot of accidents, but the few accidents that it had
20  may be very severe.
21       So if it's recorded as accidents per
22  manhours, then it can be misleading.  So it's not a
23  good basis to make a comparison.  You have to go and
24  you have to look at the machine itself and the
25  applications to which it's intended to be used.

Page 75

1  BY MR. WALSH:
2  Q    All of those government statistics
3  reported in terms of accidents requiring emergency
4  room or medical care; are they not?
5       MR. PACKIN:  Object to the form.
6       THE WITNESS:  I'm not sure if that's the
7  entire basis for which it comes from.
8       So what I was saying is that if you don't
9  get reported accidents or if you have near misses --
10  in other words, if you have, say, one of these
11  concrete cut-off machines and it kicks back and the
12  guy is fortunate enough to have his head -- move his
13  head just slightly and all it does is bang him on the
14  head rather than cut his -- cut his throat, well, you
15  know, you're not liable to get that thing recorded.
16  He was just lucky, you know.  Had he been one inch one
17  way or another way, he could be dead.
18  BY MR. WALSH:
19  Q    Is it your understanding that most
20  hand-held gasoline-powered cut-off machines are used
21  on OSHA-regulated work sites?
22       MR. PACKIN:  Object to the form.
23       THE WITNESS:  I don't have an
24  understanding.
25  BY MR. WALSH:

Page 76

1  Q    You don't have an understanding one way
2  or the other?
3       MR. PACKIN:  You interrupted him.
4       You don't have an understanding what?
5       THE WITNESS:  I don't have an
6  understanding in that area as to whether or not these
7  machines are used on OSHA-regulated sites.
8  BY MR. WALSH:
9  Q    Do you know -- do you have any indication
10  -- do you have any breakdown -- any data that would
11  tell you what percentage of hand-held gasoline-powered
12  cut-off machines are used by professionals as opposed
13  to nonprofessional users?
14       MR. PACKIN:  Object to the form.
15       THE WITNESS:  Professionals?  What do you
16  mean, professionals?
17  BY MR. WALSH:
18  Q    People who earn their living using tools,
19  including hand-held gasoline-powered cut-off machines.
20  A    Well --
21       MR. PACKIN:  Object to the form.
22       THE WITNESS:  Then what constitutes a
23  profession is being able to get paid for what you're
24  doing.  So there might be amateurs that use these
25  things for their own personal use, or there might be

Page 77

1  "professionals," in other words, people who are paid
2  to use these machines, but might use them on their own
3  projects.
4       I mean, I've known plenty of construction
5  workers that bring home tools from the job site and do
6  work on their -- in their houses.
7  BY MR. WALSH:
8  Q    My question was:  Do you have -- do you
9  have any source of data that would let you know what
10  percentage of cut-off machines are used by
11  professionals as opposed to non-professionals?
12       MR. PACKIN:  Object to the form.
13       THE WITNESS:  Do I have any source?  No.
14  But my guess is that most people who use a concrete
15  cut-off saw get paid to use it, as I said, except with
16  the exceptions for the amateurs or the paid workers
17  who use them in their homes.  And so probably the
18  majority of them are professionals, under that
19  definition of a professional.
20  BY MR. WALSH:
21  Q    Did you take -- have you at any point in
22  your analysis of this case have you gone out and
23  purchased some HDPE pipe?
24  A    No, I have not.
25  Q    So I take it you have not taken a couple

20  (Pages 74 to 77)

DEGNAN & BATEMAN
(856)  232-7400

Page 78

1  of pieces of pipe and set them up in various
2  positions, and taken the Stihl TS 400 machine that you
3  bought off the Internet and tried to see -- and tried
4  to replicate as best as you could estimate what Mr.
5  McGee was doing when the accident occurred?
6      A    No. But I didn't think that it was
7  necessary for me to do that because, you know, I have
8  the machine myself, I know what pipe is, I know what
9  HDPE pipe is. I probably have handled HDPE pipe in
10  other instances. I have the photographs. So I don't
11  -- I didn't think it was necessary for me to do that.
12     Q    The -- have you actually spoken with Mr.
13  McGee?
14     A    I'm trying to remember if Mr. McGee was
15  at the inspection, and I can't remember whether he
16  was.
17     Q    Have you inspected the machine Mr. McGee
18  was using at the time of the accident?
19     A    Yes.
20     Q    When did you inspect the machine?
21     A    It was, I think, in August. It's on my
22  report. August.
23         MR. PACKIN: Look at the report if you
24  need to refer to it.
25         THE WITNESS: Yeah. Okay.

Page 79

1  BY MR. WALSH:
2      Q    And if you have -- while you're looking
3  through your -- while you're looking through your file
4  if you have notes from that inspection, if you would
5  get those also, please.
6      A    Okay.
7         MR. WALSH: Go ahead and mark that,
8  please.
9         (Notes were marked as Growney-3 for
10  identification by the court reporter.)
11  BY MR. WALSH:
12     Q    Mr. Growney, first of all, tell me what
13  Growney-3 is, please.
14     A    These are my notes from my inspection of
15  the incident Stihl TS 400 demo saw that I made on
16  August 9, 2007, that was involved in Mr. McGee's
17  injuries.
18     Q    Okay. I -- could I see them, please?
19     A    (Witness complies.)
20     Q    Where did the inspection take place?
21     A    It took place in the office of Jingoli &
22  Sons' in office -- in office in Lawrenceville, New
23  Jersey.
24     Q    All right. And do you recall who was
25  present?

Page 80

1      A    Mr. Packin, a person from Jingoli, an
2  office personnel. If memory serves me correctly, I
3  think Mr. McGee was there.
4      Q    You have a recollection if he was or
5  wasn't?
6      A    It's not too clear.
7      Q    All right. If assuming he was there,
8  would that be the only time you have met Mr. McGee?
9         MR. PACKIN: Object to the form.
10         You can answer.
11         THE WITNESS: Yes.
12  BY MR. WALSH:
13     Q    Have you otherwise, assuming that he was
14  there, would that have been the only communication you
15  had with Mr. McGee?
16         MR. PACKIN: Same objection, but you can
17  answer.
18         THE WITNESS: Yes.
19  BY MR. WALSH:
20     Q    Can you -- looking at Exhibit Number 3 is
21  there any portion of those notes that you made that
22  you can recollect being information provided to you by
23  Mr. McGee?
24     A    Let me take a look.
25         No, there's no information in my notes

Page 81

1  that Mr. McGee provided to me.
2      Q    In your file, to the extent you know, do
3  you know of any notes you have from anything told to
4  you about the accident by Mr. McGee?
5         MR. PACKIN: Object to the form.
6         You can answer.
7         THE WITNESS: This would be it.
8  BY MR. WALSH:
9      Q    Okay. And have you ever had an
10  opportunity to speak to any of the people who were
11  working with Mr. McGee on the day of the accident?
12     A    No.
13     Q    Have you ever had the opportunity to
14  visit the accident site?
15     A    No, I did not.
16     Q    Okay. On the day of your inspection how
17  long did the inspection last?
18     A    Hour, hour and a half.
19     Q    Did you take photographs?
20     A    Yes, I did.
21     Q    And do you have those photographs with
22  you?
23     A    Yes, I do.
24     Q    Could you give -- let me see those,
25  please?

21  (Pages 78 to 81)

DEGNAN & BATEMAN
(856)  232-7400

db2aa797-bf2c-44d4-b545-ffd826d2ee60

Page 82

1       A    Okay.
2       Q    On the day of your -- and you've handed
3   me what looks to be three --
4       MR. PACKIN:  Can I see them?
5   BY MR. WALSH:
6       Q    Three different packets of photographs.
7       MR. WALSH:  Barry, these are all
8   materials from his files, correct?  I mean, they were
9   produced -- I'm assuming they were produced to us for
10  inspection, so I'm not sure what the ritual of going
11  through and re-examining.  Surely you have looked
12  through these.  You didn't just produce them to us not
13  having looked at them.
14      MR. PACKIN:  Correct.
15      MR. WALSH:  Okay.  So I think we're -- my
16  objection -- I'll make it short.  My objection is
17  we're wasting time going through and spending time
18  looking at exhibits that, presumably, you know what
19  they are, they've already been looked at, and they've
20  been produced here for purposes of letting us see
21  them.
22      MR. PACKIN:  I'm going to look at
23  anything the witness produces for a number of reasons,
24  none of which I necessarily have to inform you of, but
25  one of which is this file wasn't here for the last

Page 83

1   four, five days, I think.  Three or four days.
2       THE WITNESS:  That's correct.
3       MR. WALSH:  Well, my objection is noted
4   for -- and we'll argue about it a different day.
5       Can I question him while you're looking
6   at those?
7       MR. PACKIN:  Just give me a second.
8   BY MR. WALSH:
9       Q    Now, during -- in addition to the
10  photographs -- and what I'm going to do, Mr. Growney,
11  I'm going to ask, when we break for lunch before we
12  come back, I'll ask the court reporter to mark those
13  photographs, and then you can look at them and we can
14  make sure they've been properly identified.
15      MR. PACKIN:  Each one individually?
16      MR. WALSH:  That's probably the easiest
17  way to do it.
18      MR. PACKIN:  This poor young lady is not
19  going to get a lunch hour.  There must be close to 100
20  photographs there.
21      THE WITNESS:  Well, 75, yeah.
22      MR. WALSH:  Well, we can talk about the
23  logistics of how we mark them.
24  BY MR. WALSH:
25      Q    Did you take any videos while you were

Page 84

1   there?
2       A    No.
3       Q    Did you have a video camera with you?
4       A    Yes.
5       Q    Is there -- is there any particular
6   reason why no videos were taken of the inspection?
7       A    No.
8       Q    Did the inspection take place totally
9   inside?
10      A    Yes, I believe so.
11      Q    Was any part of the machine dismantled
12  during the inspection?
13      A    No.
14      Q    Was the machine started?
15      A    I don't recall it being started.
16      Q    And I take it you would have no
17  recollection -- you recall if it was started, you have
18  no recollection of whether it was used for anything
19  while you were there, correct?
20      A    It was not.
21      MR. PACKIN:  Can you repeat that again?
22  Can we just hear that question back?
23      (Above-mentioned question was read back
24      by the court reporter.)
25  BY MR. WALSH:

Page 85

1       Q    Let me restate it; it's pretty confusing.
2       I take it, since you don't recall whether
3   it was started, you also do not recall whether it was
4   used for anything while you were there?
5       MR. PACKIN:  Used for anything
6   operationally?
7       MR. WALSH:  Operationally.
8       THE WITNESS:  It was not used for
9   anything operationally.
10  BY MR. WALSH:
11      Q    Okay.  You do have a recollection?
12      A    That's right.
13      Q    When the machine was -- when you saw it,
14  did it have a cutting attachment on it?
15      A    Yes.
16      Q    Do you know what kind of cutting
17  attachment it had?
18      A    It was a 12-inch blade.  I believe I have
19  a picture of it someplace.
20      Q    Was it a saw blade or was it an abrasive
21  wheel of some type, diamond or composite?
22      A    Bear with me for a minute.  You said --
23  I'm sorry.  I have to correct one of my answers.
24      I'm sorry.  There was -- my recollection
25  is there was a 12-inch blade on the saw and it was

22  (Pages 82 to 85)

DEGNAN & BATEMAN
(856)  232-7400

db2aa797-bf2c-44d4-b545-ffd826d2ee60

Page 86

1  removed, and I took photographs of the blade without
2  -- the saw without the blade on it.  Perhaps you can
3  give me those.
4       Q     We have --
5            MR. RUDOLPH:  He's got the blade photos.
6            MR. KOTT:  I have the blade photos here.
7  BY MR. WALSH:
8       Q     All right.  Now, what you've been handed
9  is one of the three packets of photos that you handed
10 me a few moments ago.  We haven't marked any of those
11 yet, but it's been represented by counsel around the
12 table that at least some of those photographs in that
13 packet relate to a cutting attachment for the machine
14 that, apparently, was present at the time of the
15 inspection.
16           MR. KOTT:  Excuse me.  I object to that.
17 I'm not making that representation.
18           MR. PACKIN:  Me either.
19           MR. KOTT:  The reason I say this, I don't
20 think those were on the machine.
21           MR. PACKIN:  No.  They were just -- my
22 understanding from his testimony -- well --
23 BY MR. WALSH:
24      Q     What --
25      A     Let me correct.

Page 87

1       Q     Okay.
2       A     I have --
3       Q     See if we can clear it up.
4       A     Now that I've looked at my photographs,
5  they've -- I recall that there was no blade on the
6  machine when I -- when I inspected it.  There was,
7  however, at the time -- at the scene of the inspection
8  was a 12-inch Oldham blade which was in a package and
9  it was not on the machine.
10      Q     Okay.  Was it ever put on the machine
11 during the course of the inspection?
12      A     No.
13      Q     Okay.  And do you know what the purpose
14 of having a 12-inch Oldham blade was?  Why that was at
15 the inspection?
16      A     It was an example of the brand.
17      Q     Have you ever -- to your knowledge have
18 you ever seen the saw blade that was on the machine at
19 the time of Mr. McGee's accident, the actual blade
20 itself?
21           MR. PACKIN:  In person?
22           MR. WALSH:  Yes.
23           THE WITNESS:  Other than the photographs?
24 No.
25 BY MR. WALSH:

Page 88

1       Q     And do you know why that blade was not
2  available as of the time of the inspection?
3       A     I think -- I believe, if I remember
4  correctly from deposition, it was discarded.
5       Q     An hour, hour and a half.  Tell me what
6  you can recall taking place during the hour, hour and
7  a half you looked at the machine.  Obviously you took
8  a number of photographs?
9       A     Yes.
10      Q     Was that the main thing that was
11 accomplished during that inspection?
12      A     Well, also --
13           MR. PACKIN:  Object to the form.
14           Go ahead.
15 BY MR. WALSH:
16      Q     Let me ask you this:  Did taking the
17 photographs take the bulk of the hour, hour and a half
18 that you were there?
19           MR. PACKIN:  Can you read that back
20 again, please?
21           (Above-mentioned question was read back
22     by the court reporter.)
23           MR. PACKIN:  Object to the form, but you
24 can answer.
25           THE WITNESS:  Taking the photographs is

Page 89

1  just a common occurrence during inspection such as
2  this.  It did not dominate the inspection.  I took a
3  lot of information, I examined the saw.
4  BY MR. WALSH:
5       Q     Okay.  Tell me exactly what you examined.
6  You told me you didn't -- you didn't disassemble
7  anything.  So what was it that you examined?
8       A     I looked closely -- the blade -- I'm
9  sorry, the saw, and I recorded the writings of labels
10 -- of various labels that were on the saw.  I made
11 sketches.  It seems to me -- let's see.  Yes, I made a
12 sketch, a measurement of the auger, and there was a
13 ring on it, so I made measurements of that.
14      Q     There was a what on it?
15      A     A bushing.  I said a ring, I'm sorry.  A
16 reducer bushing.
17      Q     There was a bushing on the arbor itself?
18      A     I have a notation of it here, yeah.  Kind
19 of like a standard reducer bushing that you would use
20 to put a one-inch wheel on a 20-millimeter arbor.
21      Q     Was that attached to the arbor in some
22 way?
23           MR. PACKIN:  Object to the form.
24           You can answer.
25           THE WITNESS:  Can I have my photographs?

23  (Pages 86 to 89)

db2aa797-bf2c-44d4-b545-ffd826d2ee60

Page 90

1   MR. RUDOLPH:  Those are the machine ones.
2   THE WITNESS:  Machine would be fine.
3   MR. RUDOLPH:  That's the blade.
4   THE WITNESS:  You had asked me before
5   whether or not anything was disassembled.  The answer
6   to that -- I should correct my answer.  The answer to
7   that is yes.
8   BY MR. WALSH:
9   Q    What was disassembled?
10  A    The retaining flange, and I did
11  photograph it.  And the reducer bushing that I just
12  made reference to was on it.
13  Q    Can you --
14  MR. KOTT:  Was on the arbor, do you mean?
15  THE WITNESS:  It wound up, when I removed
16  it, when I removed the outer flange, the reducer
17  bushing came off with the flange.
18  BY MR. WALSH:
19  Q    Do you have a picture of that?
20  MR. WALSH:  Let's get these photographs
21  marked as the next two exhibits, please.
22  (Photographs were marked as Growney-4 and
23  Growney-5 for identification by the court
24  reporter.)
25  BY MR. WALSH:

Page 91

1   Q    We've now marked the two photographs that
2   you pulled out of one of the packets, Mr. Growney, as
3   Exhibits 4 and 5.  And can you just confirm for me
4   that these are the two photographs that you're
5   indicating show the reducing bushing that was on the
6   flange or the arbor of the machine?
7   A    Yes, they are.  They are my photographs,
8   number P-22 and P-23.
9   Q    Can you mark -- can you take my pen and
10  just mark on there where the reducing bushing is on
11  the photograph?
12  A    (Witness complies.)
13  Q    Okay.  Now, other than taking the flange
14  of the -- flange that holds the wheel on and drives
15  the wheel, was there anything else that was
16  disassembled from the machine?
17  A    No, there was not.
18  Q    Who took the flange off?  Did you do that
19  or did somebody else do that?
20  A    My recollection, I think it was finger
21  tight.  I didn't need a wrench.
22  Q    So you believe you took it off and did
23  not need a wrench to do that?
24  A    Right.
25  Q    Okay.  What did -- now, at any point

Page 92

1   during the inspection did you try to fit the Oldham
2   blade that was in the room onto the machine that you
3   were inspecting?
4   A    No.
5   Q    In terms of your investigation, the
6   Oldham blade that was on the machine at the time of
7   the accident, could that be fitted to the Stihl TS 400
8   without the use of a reducing bushing?
9   A    Well, it would fit, but it wouldn't be
10  centered.  So you need the reducer bushing to center
11  the blade onto the arbor.
12  Q    All right.  Let's go back to a discussion
13  we were having a few minutes ago about accident rates
14  on cut-off machines.  Do you have any information
15  about what the most frequent and most severe accidents
16  with a cut-off machine are?  Do you have any
17  information that provides that data?
18  MR. PACKIN:  Object to the form.
19  THE WITNESS:  Well, I certainly have some
20  information regarding the most severe.  The one I made
21  reference to you before, Dale Erb, that was the
22  fatality.  I have some court cases -- some documents
23  from some court cases that indicate there have been
24  some fatalities.
25  Frequency -- I don't have any court case

Page 93

1   that I can recall that points out the frequency, but
2   of course, as I said -- as I testified to earlier, the
3   fact that you have -- you have a couple of factors
4   here.  You have frequency of an accident, severity of
5   the accident, and the other one is latency, you know.
6   MR. KOTT:  What was the other one?
7   THE WITNESS:  Latency.
8   MR. KOTT:  Latency?  Okay.
9   THE WITNESS:  The not obvious hazard.
10  And if either -- any of them are a latent issue,
11  well, then that's cause enough to do something about
12  it.
13  So, you know, you might say, well, death
14  doesn't happen too often.  Yeah.  Well, you know,
15  that's not an excuse not to do something about it.  I
16  mean, if it happened to you, you know, that would be
17  the only time you'd need it.
18  So the fact that these machines can
19  produce fatalities certainly is a reason to alert the
20  potential users of this possibility.
21  BY MR. WALSH:
22  Q    What is your understanding of the hazards
23  associated with a cut-off machine that can result in a
24  fatality?
25  A    Well, one of them is kickback; I know

24  (Pages 90 to 93)

DEGNAN & BATEMAN
(856)  232-7400

Page 94

1   that. I know that there has been a number of fires
2   associated with the machines. I made mention of them
3   -- to one of them earlier on the Homelite.
4           I've also been involved in an
5   investigation of a fire-related injury on a Stihl
6   cut-off saw for which -- I'm sorry. Those are the
7   injuries that come to my mind at this time.
8       Q    Fire and kickback?
9       A    Kickback. There could be other
10  inadvertent contact with the spinning blade so you'd
11  have an abrasion, but that wouldn't be the result of
12  -- or a laceration. That wouldn't necessarily be the
13  result of kickback.
14      Q    How about something like a
15  electrically-powered wood-cutting circular saw? What
16  are the hazards you're familiar with with that type of
17  equipment that could result in a fatal injury?
18      A    Well, one of them might be shock.
19  Another one could be a kickback where the operator
20  losses control and the spinning blade cuts a vital
21  part of him that causes him to die.
22      Q    Any other you can think of?
23      A    Well, once again, also inadvertent
24  contact with the spinning blade that's not related to
25  kickback.

Page 95

1       Q    All right. And -- strike that.
2           Have you made any effort to try to
3   compare the number of injuries that occur with cut-off
4   machines from the different hazards that may be
5   associated with use of a machine?
6           MR. PACKIN: Could you read that back,
7   please?
8           MR. WALSH: I'll repeat it.
9   BY MR. WALSH:
10      Q    Have you made any attempt to compare the
11  frequency or severity of injuries that occur from the
12  various hazards with a cut-off machine that are
13  discussed in the warning labels, either on the machine
14  or in its manual?
15          MR. PACKIN: Object to the form.
16          You can answer.
17          THE WITNESS: Well, I've taken notice of
18  them, and, of course, as I mention in my report, there
19  is -- you know, you want to put those that are the
20  greatest concern in the beginning of your warnings of
21  hazards.
22          In other words, if -- if a hazard can
23  result in death, well, you certainly want -- you need
24  to alert the user to that. So that should be dominant
25  in your warnings. And then as the severity or

Page 96

1   frequency degrades, lowers, minimizes from that point,
2   well, you might -- you would go down the line, put the
3   least hazardous in the rear.
4   BY MR. WALSH:
5       Q    My question was: Have you made any
6   attempt to compare which accidents -- which hazards
7   produce the most frequent and most severe accidents,
8   injuries with a cut-off machine?
9           MR. PACKIN: Object to the form.
10          THE WITNESS: Well, I certainly have done
11  that in my review of the case documents from court
12  cases that are available. I mean, I take a look and
13  see what it is. I can infer from that that if people
14  were injured and didn't get severe injuries, there
15  would be an absence of court documents because they
16  wouldn't warrant litigation.
17          So, in other words, it's like -- it's
18  kind of a futile thing to do because it's -- in other
19  words, I've got positive things here. There are
20  documents where people have been severely injured or
21  fatalities. But I don't have documents for what you
22  might call minor injuries.
23  BY MR. WALSH:
24      Q    Is your sole source of knowledge about
25  the frequency, severity of injuries with a cut-off

Page 97

1   machine, what it is you have learned from looking at
2   litigation cases?
3           MR. PACKIN: Object to the form.
4           THE WITNESS: Well, that's one of the
5   sources that I've used.
6   BY MR. WALSH:
7       Q    What are the other sources?
8       A    Well, you have the standards. You know,
9   obviously the standards are written to indicate
10  there's severe hazards.
11      Q    What do the standards tell you about the
12  relative severity or frequency of accidents occurring
13  with cut-off machines?
14      A    I don't recall at this moment that they
15  address that, you know.
16      Q    Are you familiar with the 2006 ANSI
17  standard for cut-off machines?
18      A    I have a copy of it, yes. I've looked at
19  it, yes.
20      Q    And in the priority of warnings for
21  cut-off machines, where does that standard place
22  kickback warnings?
23          MR. PACKIN: Object to the form.
24          THE WITNESS: I'm trying to recall at
25  this moment. I can't.

25 (Pages 94 to 97)

DEGNAN & BATEMAN
(856) 232-7400

Page 98

BY MR. WALSH:
2    Q    Do you have it with you?
3    A    Yes, I do.
4    Q    Would you pull it out, please?
5    A    Sure.
6         MR. KOTT: Mr. Growney, what is it you're
7    referring to?
8         THE WITNESS: This is ANSI B 175.4-2006,
9    American National Standard for outdoor power
10   equipment, portable hand-held internal combustion
11   engine-driven cut-off machines safety requirements.
12        MR. KOTT: Thank you for identifying
13   that.
14   BY MR. WALSH:
15        Q    And I will direct your attention. You
16   can read whatever you want, but I will direct your
17   attention to Section 8.2 which defines whatever -- how
18   every machine will be marked.
19        MR. PACKIN: Hold on a second.
20   BY MR. WALSH:
21        Q    You have Section 8.2 in front of you, Mr.
22   Growney?
23   A    Yes, I do.
24        MR. PACKIN: Give me one second, please.
25   BY MR. WALSH:

Page 99

1    Q    You're beyond the normative section, I
2    take it?
3         MR. PACKIN: Nope. Okay.
4    BY MR. WALSH:
5         Q    Okay. 8.2 says, "Basic markings. Every
6    machine shall be marked with at least the following
7    wording or by symbols."
8         And does it -- does it require a warning
9    about reactive forces?
10   A    Yes, it does.
11   Q    Does it use the term "kickback" or does
12   it use the term "reactive forces"?
13   A    It uses the term "reactive forces."
14   Q    Okay. Does it require a warning not to
15   use circular saw blades?
16   A    Yes, it does.
17   Q    In the hierarchy of the warnings that are
18   required, where do the reactive force and circular saw
19   blade warnings come, according to the standards?
20        MR. PACKIN: Object to the form.
21        Where do you see the hierarchy?
22        MR. WALSH: Well, they're listed.
23        MR. PACKIN: They're listed, yes.
24   BY MR. WALSH:
25   Q    Where in the list of the one, two, three,

Page 100

1    four, five, six, seven, eight, nine, ten, eleven,
2    twelve things that must be marked on a cut-off
3    machine, according to the safety standards, where do
4    reactive forces and circular saw blade warnings fall?
5         MR. PACKIN: Object to the form.
6         THE WITNESS: In the listing these
7    warnings of reactive forces are last. And next -- I'm
8    sorry. Reactive forces is next to last, and not to
9    use circular saw blades is last. That is one of the
10   -- that demonstrates the concept that ANSI standards
11   are minimum standards. This standard does not direct
12   anybody to put these standards -- these warnings last,
13   nor does it say to put them first, but in -- in
14   consideration to. And, in fact, that's the defect of
15   the standard. It should be that this should be
16   dominant. However, it's not.
17   BY MR. WALSH:
18   Q    Okay. Have you ever participated in any
19   standards organization that had responsibility for
20   promulgating safety standards for hand-held
21   gasoline-powered cut-off machines?
22   A    I've participated in three standards that
23   have had responsibility for promulgating safety
24   standards for dangerous hazardous machinery. And
25   those standards also included requirements for

Page 101

1    warnings. So I have participated in the writing of
2    the standards.
3         MR. PACKIN: Be a good point for a break?
4    We're a little beyond one.
5         MR. WALSH: Let me just finish this up.
6    BY MR. WALSH:
7    Q    My question is: Have you participated in
8    a standards organization with a responsibility for
9    promulgating safety standards for a hand-held
10   gasoline-powered cut-off machine?
11   A    No, I have not.
12   Q    All right. Let's break for lunch.
13        (Lunch recess was held.)
14        VIDEO TECHNICIAN: Back on.
15   BY MR. WALSH:
16   Q    Mr. Growney, before we broke for lunch --
17   well, strike that.
18        Let me ask you this: Have you ever
19   consulted for any company that has been in the
20   business of designing, manufacturing, or selling
21   hand-held gasoline-powered cut-off machines?
22   A    No, I have not.
23   Q    How about cutting attachments for
24   hand-held gasoline-powered cut-off machines?
25   A    I did do some work for an abrasive

26 (Pages 98 to 101)

DEGNAN & BATEMAN
(856) 232-7400

db2aa797-bf2c-44d4-b545-ffd826d2ee60

Page 102

1   manufacturer, and they may have made wheels.
2        Q        Who is the abrasive manufacturer; do you
3   recall?
4        A        Buckeye Abrasives.
5        Q        And did the work you did for Buckeye
6   Abrasive have anything to do with the design,
7   manufacture, use, or safety of cutting attachments for
8   hand-held gasoline-powered cut-off machines?
9        A        No.
10       Q        Have you ever been in a factory or
11  manufacturing facility where hand-held
12  gasoline-powered cut-off machines are made?
13       A        No.
14       Q        Have you ever been in a facility where
15  the cutting attachments for hand-held gasoline-powered
16  cut-off machines are made?
17       A        I may have seen that on the History
18  Channel on TV. I believe I did.
19       Q        You recall what facility or what
20  manufacturer it may have focused on?
21       A        Yes. It was -- it was one in -- I've got
22  something from them. I think it was in Europe, but I
23  can't remember.
24       Q        All right. And was it specifically a
25  program focused on the manufacture or design, use, or

Page 103

1   safety of cut-off machine attachments, or was it
2   cutting attachments for power tools, saws, generally?
3        A        Power tools and saws.
4        Q        Okay. Was any component of that -- did
5   it have -- did it have to do with attachments for
6   cut-off machines, or do you recall?
7        A        I can't recall specifically.
8        Q        From a standpoint of your professional
9   career have you ever designed a hand-held
10  gasoline-powered cut-off machine?
11       A        I haven't designed a hand-held powered
12  cut-off machine, but I've designed a lot of the
13  components that are used in the machinery, such as the
14  V belt drives; I've done that. I have had
15  considerable amount of experience with engines.
16       Q        Have you designed a V belt drive for a
17  hand-held --
18       A        And, excuse me. Actually, I did design a
19  -- an abrasive cut-off apparatus to be used on a
20  roll-forming line that involved the cut-off -- a
21  cut-off wheel, which that would be the same thing.
22       Q        You added a cut-off wheel to a
23  manufacturing line of some type?
24       A        Yes.
25       Q        Tell me what that was.

Page 104

1        A        Well, that was a roll-forming line that
2   was commonly utilizing carbon steel or galvanized
3   steel products, and we decided to manufacture
4   stainless steel products, and we did not want to send
5   the stainless steel product through the cut-off dies
6   in the cut-off press, because we were fearful that it
7   would break the dies, break the press.
8        So I developed an abrasive -- an
9   apparatus to utilize an abrasive cut-off machine on
10  the roll-forming line.
11       Q        What was -- what was the power source of
12  that cut-off machine?
13       A        That was a -- an abrasive cut-off saw, a
14  stationary cut-off saw. And I mounted it on a
15  carriage whereby we could slide it out and then
16  operate it.
17       Q        Okay. So let me make sure I understand
18  what you're saying. Are you saying that you purchased
19  the stationary cut-off machine and mounted it -- and
20  then mounted it on a carriage to be mounted to the
21  line?
22       A        I didn't purchase it. It was in
23  existence. It was what the company had, yes.
24       Q        Okay. So you had an existing stationary
25  electrically-powered or pneumatically powered?

Page 105

1        A        Electrically-powered cut-off machine.
2        Q        Electrically-powered?
3        A        Cut-off saw.
4        Q        Cut-off saw?
5        A        Cut-off saw.
6        Q        And you -- it was not -- this was not a
7   hand-held machine?
8        A        That's correct.
9        Q        And then you mounted that to the line so
10  that it would be an alternative source of cutting the
11  stainless material?
12       A        Well --
13       MR. PACKIN: Object to the form.
14       Go ahead.
15       THE WITNESS: This was the system that we
16  were going to use. If we were going to manufacture
17  this, the stainless steel product, this is what we had
18  to use, what I had developed.
19  BY MR. WALSH:
20       Q        And do you recall the brand or the model
21  of the existing cut-off machine that you mounted to
22  the line?
23       A        Not off the top of my head, but it was a
24  common one that I used to see, but I don't recall the
25  name right now.

27 (Pages 102 to 105)

DEGNAN & BATEMAN
(856)  232-7400

Page 106

1    Q    Do you recall the size of the cutting
2  wheels on that stationary cut-off machine?  Were they
3  12-inch, 14-inch?  Larger?  Smaller?
4    A    They were probably around 12-inch.  It
5  may have been 14-inch, because the dimensions -- that
6  was one of the things to be considered.  Because the
7  dimensions of the blade to cut through the material.
8    Q    And the -- and was it designed for use
9  with composite abrasive wheels or some other type of
10  cutting attachment?
11    A    I used composite abrasive wheels.
12    Q    And was it -- did it use a round arbor on
13  it?
14    A    I think it did.
15    Q    So there wasn't any change made to the
16  arbor that the machine came with?
17    A    No.
18    Q    Do you recall what size arbor it was?
19  Was it one inch?  Twenty millimeters?  Something
20  different?
21    A    I don't know.  I don't recall.
22    Q    And was the machine designed for use
23  solely with composite wheels, or could you safely
24  mount other wheels on it for the application you were
25  using it for?

Page 107

1    MR. PACKIN:  Objection to the form.
2    You can answer.
3    THE WITNESS:  You could mount other
4  wheels on it.  There was nothing that precluded
5  something other than an abrasive -- than a composite
6  wheel.
7  BY MR. WALSH:
8    Q    And what other kind of wheels could you
9  mount on it?
10    A    Whatever fit the hole.
11    Q    And did you --
12    A    Whatever hole fit the arbor.
13    Q    Did you ever do -- did you ever mount
14  other kinds of wheels on that?
15    A    No.
16    Q    Or just --
17    A    Never did, no.
18    Q    Did you have any warnings on the machine?
19  Were there any warnings on the machine about not
20  mounting wheels other than composite wheels on it?
21    A    I don't recollect any warnings being on
22  the machine.
23    Q    None at all?
24    A    I don't recollect any warnings on the
25  machine.

Page 108

1    Q    All right.  Now, you said you have done
2  components, and you mentioned the drive arm.  Have you
3  ever designed the pulley mechanism, the drive arm,
4  whatever term you want to apply to it, specifically
5  for a hand-held gasoline-powered cut-off machine?
6    A    No.  But I've designed the pulley and
7  belt drive apparatus on quite a number of machines.
8  That was -- that's a common mechanical engineering
9  task.
10    Q    Okay.  Tell me the kind of machines
11  you've done a pulley belt drive mechanism on.
12    A    Well, I used to work for Hewitt Robins
13  Conveyors, and that was more or less the standard
14  drive system.  So I did that with that.
15    I also did drives for fans, for power
16  presses, for other types of conveyor belts.  I did
17  forge hammers, fans, V belt drives for forge hammers,
18  for press brakes, for -- did a lot of conveyors, lot
19  of different types of conveyors.
20    Q    Have you ever done one for any type of
21  hand-held power tool?
22    A    No.
23    Q    Any other component other than the belt
24  mechanism that you have designed that you believe has
25  been transferable to a hand-held gasoline-powered

Page 109

1  cut-off machine or any other hand-held power tool?
2    MR. PACKIN:  Object to the form.
3    You can answer it.
4    THE WITNESS:  Well, yes.  Guarding.
5  Plenty of guards that, you know, I designed a lot of
6  guards.
7  BY MR. WALSH:
8    Q    Have you designed any guard -- any type
9  of guard for any type of hand-held power tool?
10    A    No.
11    Q    What type of guards have you designed for
12  what type of machines?
13    A    Guards for grinders, guards for a lot --
14  lot of point of operation guarding for a lot of
15  machinery that required point of operation guarding
16  such as saws, power presses.  I also did a lot of
17  guards for a lot of miscellaneous machinery.  V belt
18  drives.
19    Q    Have you done -- do you hold any patents
20  on any guarding mechanism for any kind of machine?
21    A    No.
22    Q    Have you ever applied for any type of
23  patent on any type of guarding mechanism for any type
24  of machinery?
25    A    No.

28  (Pages 106 to 109)

db2aa797-bf2c-44d4-b545-ffd826d2ee60

Page 110

```
1        Q    Have you done any guarding -- have you
2   ever designed a guard for any type of machinery that
3   was going to be sold commercially?
4        A    Oh, yes. Yes. Yes. Conveyors.
5        Q    Okay. Tell me what kind of guards you
6   developed for conveyors and which ones were sold
7   commercially.
8        A    V belt drives, and they were sold --
9        Q    We're talking about guarding?
10       A    Yes.
11       Q    Guarding for the V belt drive?
12       A    That's correct.
13       Q    So that's some type of barrier or guard
14  over the V belt drive to cover it up?
15            MR. PACKIN: Object to the form.
16       You can answer.
17            THE WITNESS: Yes.
18  BY MR. WALSH:
19       Q    Can you tell me when that was and what
20  model conveyors were involved?
21       A    That would have been, let's see, around
22  1970, and it would be a number of conveyor models.
23       Q    Can you -- what make and model of
24  conveyor?
25       A    Hewitt Robins.
```

Page 111

```
1        Q    Since 1970 or approximate to 1970 have
2   you designed any type of guarding for a conveyor or
3   any other piece of equipment?
4        A    Oh, yeah. Yeah. Sure.
5        Q    Tell me about it.
6        A    I believe I designed some guarding that
7   was utilized in QuickCrete. Also in Jay Wist & Son's
8   company I did a lot of guarding work in there.
9        Q    On machines to be sold commercially?
10       A    I'm sorry. No. No. I can't think of an
11  answer at this moment.
12       Q    All right. Jay Wist?
13       A    Wist.
14       Q    Wist. When was it you worked for them?
15  What period of time?
16       A    In the '70s.
17       Q    Okay. And then QuickCrete. What kind of
18  guarding did you do for QuickCrete?
19       A    There was a -- it was female-drive
20  guarding predominantly.
21       Q    And were these machines that were being
22  used in the manufacturing process that were coming
23  without guarding on the V belt, or were you simply
24  replacing guarding? What were you doing?
25            MR. PACKIN: Object to the form.
```

Page 112

```
1            THE WITNESS: They were existing
2   machines. Some of them never had guards, some of them
3   may have had guards and gotten lost.
4   BY MR. WALSH:
5        Q    All right. So -- and were you
6   redesigning guards or were you simply copying what was
7   on there when you were replacing them?
8        A    Well, guards are a series of -- you know,
9   you have some basic things that you deal with in a
10  guard. And you make them bigger, smaller, larger, or
11  smaller. You know, stretch them out, bring them in,
12  enclose them. It's kind of like you take the basic
13  concept and work your dimensions.
14       Q    Okay. So the basic type of guard we're
15  talking about is a cover for a V belt assembly?
16       A    Yes.
17       Q    Any other type of guard other than covers
18  for V belt assemblies that you had experience with?
19       A    Well, I told you, I did a lot of point of
20  operation guarding and I did guarding for grinders.
21       Q    Can I stop you there for just a second?
22  I'll let you come back.
23       A    Yeah.
24       Q    When -- what period of time are we
25  talking about? Just give me a reference point.
```

Page 113

```
1        A    In the 1970s.
2        Q    Okay. All right. Go on. I didn't mean
3   to interrupt you.
4        A    I've done it for buffering machines,
5   grinding machines.
6        Q    This is still in the '70s we're talking
7   about?
8        A    Yes.
9        Q    Okay.
10       A    These were a number of different kinds of
11  grinding machines. Pedestal grinders, machine
12  grinders. I was the resident guarding expert at Jay
13  Wist & Sons' Company.
14       Q    All right. This was -- this was not for
15  machines that Jay Wist & Sons were selling, but for
16  the things that Jay Wist & Sons was using in the
17  manufacturing process; is that right?
18       A    Correct.
19       Q    So -- and were these machines that were
20  being -- the machines designed by somebody else and
21  you were either replacing a guard or putting a guard
22  on some other piece that you thought needed it?
23       A    Yeah. These were guards that I knew we
24  needed in-house because the machines didn't have it.
25  Sometimes you could buy a guard, and because the
```

29 (Pages 110 to 113)

DEGNAN & BATEMAN
(856)   232-7400

db2aa797-bf2c-44d4-b545-ffd826d2ee60

## Page 114

1  manufacturer was available, they supplied them.
2          But what I designed was the same kind of
3  stuff that any machine manufacturer would put on a
4  guard if they were selling it to industry, to the
5  public, to consumers, or whatever. There is a
6  commonality amongst these types of guards.
7      Q      Was there any of these guards -- these
8  were all on non-hand-held equipment, correct?
9      A      They were -- most of them were on
10 non-hand-held equipment. I'm just trying to remember.
11 Seems to me I did something on hand-held equipment.
12 I'm trying to remember what it is. Whatever, I'll
13 remember it.
14     Q      All right. I want to focus you on --
15 let's -- after -- after the 1970s, even on the kind of
16 guards you've been talking about here, point of
17 operation guards -- I take it were most of those
18 barrier guards of some type?
19     A      Yeah, but not exclusively. I mean, I
20 also did devices, you know. In other words, something
21 whereby you would safeguard an operation by, say, a
22 light beam. I did that also.
23     Q      All right. And what kind of -- what kind
24 of equipment did you do that for?
25     A      Power press.

## Page 115

1      Q      Stationary piece of equipment?
2      A      Yes.
3      Q      Any hand-held equipment?
4      A      No. No. No. But the technology is
5  transferable.
6      Q      After the 1970s what guards have you done
7  -- been involved in the design of any type of guarding
8  since the 1970s?
9      A      Lower blade guards for band saw.
10     Q      For a handsaw?
11     A      Band.
12     Q      Band saw?
13     A      Band saw.
14     Q      Who did you do that for?
15     A      Versabar.
16     Q      That was a machine they were selling or a
17 machine they were using?
18     A      Machine they were using. Point of
19 operation guarding for Versabar. I mentioned
20 QuickCrete before. I believe I did some guarding work
21 when I worked for Panasote also.
22     Q      What type of work?
23     A      Well, that was where I designed machinery
24 for handling plastic material that was being
25 processed, and so we started from scratch, and this

## Page 116

1  was custom-made machinery so it -- make the machine
2  and design the guards.
3      Q      Was the machine sold commercially?
4      A      No. It was utilized interiorly.
5      Q      Have you ever done any type of guard on a
6  machine that was sold commercially?
7      A      Yes. Well, you say -- I mentioned Hewitt
8  Robins before.
9      Q      Okay. Which -- those are the conveyors?
10     A      Yes.
11     Q      Okay. Other than that, other than the
12 conveyors, any -- any machine that's ever been sold
13 commercially?
14     A      No. But like I had said before, the
15 principles that were involved in designing and
16 fabricating, manufacturing, installing, maintaining,
17 upkeeping the guards that I was associated with for
18 the various places that I worked, those same
19 principles transferable to commercially -- to machines
20 sold commercially that contain guarding.
21        I -- they sit side-by-side, you know. I
22 would see one that I made and one that we obtained
23 from a manufacturer, but yet they had functionally the
24 same guarding.
25     Q      Okay. Now, have you had -- have you had

## Page 117

1  any recollection that you were thinking about a minute
2  ago, any point in your career, any guarding mechanism
3  for a hand-held gasoline-powered product --
4      A      No. Can't remember.
5      Q      -- for any type of hand-held power
6  product?
7      A      I can't at this time.
8      Q      All right. Now, have you -- have you
9  ever designed a cutting attachment for a cut-off
10 machine?
11     A      Yeah. Yeah.
12     Q      What have you designed? What cutting
13 attachment for a cut-off machine have you designed?
14     A      Dies for roll-forming cut-off presses.
15     Q      All right. When was this?
16     A      From in the '80s through early '90s.
17     Q      And this -- now, tell me what the dies
18 were. This was a stationary machine?
19     A      The cut-off press was stationary, yes.
20     Q      And the dies, what did they look like and
21 what was the function?
22     A      Well, they were -- most of them were
23 blocks of steel that were mounted on and sat on a
24 carriage, and they cut the moving material as it
25 passed, as it came out of the roll form. And in order

30  (Pages 114 to 117)

db2aa797-bf2c-44d4-b545-ffd826d2ee60

Page 118

1  for them to cut the moving material, they had to be
2  able to move also.  So that was the reason for sitting
3  on a carriage.
4      Q    Have you ever designed any type of saw
5  blade?
6      A    No.
7      Q    Any type of --
8      A    Well, no.  I've applied saw blades.  I've
9  taken the characteristics or qualities of saw blades
10 and applied them to the particular application.  Same
11 thing with grinding wheels.
12     Q    Applied them to what?  For example, tell
13 me something you've applied a saw blade to.
14     A    Well, certain wood-cutting saw blades,
15 you know, whether this one's appropriate, that's
16 appropriate, the type of cut you want, the type of
17 material, the finish you want.
18     Q    Have you designed any type of composite
19 or diamond wheel for mounting on a cut-off machine or
20 other hand-held power tool?
21     A    No.
22     Q    Have you ever worked for anybody that's
23 been in the business of designing, manufacturing, or
24 selling chainsaws?
25     A    Design, manufactured, or sold chainsaws?

Page 119

1      Q    Selling chainsaws, yeah.
2      A    No.
3      Q    Have you ever designed a chainsaw?
4      A    No.
5      Q    Have you ever designed a cutting
6  attachment for a chainsaw?
7      A    No.
8      Q    Have you ever designed a bar for a
9  chainsaw?
10     A    No, but I've taken all these points into
11 consideration when I would make a selection to
12 purchase a chainsaw.
13     Q    And how many chainsaws have you
14 purchased?
15     A    Two.
16     Q    And one was the 30-year-old Homelite and
17 one was what you believe to be a 10-year-old
18 McCullough?
19     A    That's approximate age.
20     Q    Have you ever been --
21     A    No.  Maybe it's a little more than 10
22 years; I can't recall.
23     Q    Okay.  Have you ever designed any type of
24 hand-held gasoline-powered equipment?
25     A    No.

Page 120

1      Q    Component part for any type of hand-held
2  gasoline-powered equipment?
3      A    No.
4      Q    Guarding system for any kind of hand-held
5  gasoline-powered equipment?
6      A    No.
7      Q    Brake system for any kind of hand-held
8  gasoline-powered equipment?
9      A    No.
10     Q    Have you done --
11          MR. PACKIN:  You're talking about for
12 compensation as part of his work?
13          MR. WALSH:  Whether he's done it or ever
14 done it.
15 BY MR. WALSH:
16     Q    Have you ever worked -- have you ever
17 done -- have you ever designed any type of lawn and
18 garden equipment?
19     A    Well, I've designed and installed
20 attachments to some lawnmowers, yeah.
21     Q    Okay.  What have you designed for
22 attachments to lawnmowers?
23     A    Catcher -- catcher attachments, leaf,
24 grass catchers.
25     Q    Grass catchers?

Page 121

1      A    Right.
2      Q    Who did you do that for?
3      A    Well, that was for machines that I had.
4  I had some machines that didn't have them.
5      Q    Okay.  So you made ones for your own
6  use --
7      A    Yeah.
8      Q    -- on your lawnmowers?
9      A    Yeah.
10     Q    Have you ever done any type of design of
11 a -- of any kind of lawn and garden equipment for any
12 commercial application?
13     A    No.
14     Q    Other than the leaf catcher, have you
15 done -- even for your own use, have you done --
16 designed any kind of lawn and garden equipment?
17     A    No.
18     Q    Have you designed any type of hand-held
19 electrically-powered equipment?
20     A    I have utilized a number of hand-held,
21 and I have repaired hand-held electrically-powered
22 equipment in my work.
23     Q    Have you designed any?
24     A    No, I don't think so.
25     Q    Have you designed any type of cutting

31  (Pages 118 to 121)

DEGNAN & BATEMAN
(856)  232-7400

db2aa797-bf2c-44d4-b545-ffd826d2ee60

Page 122

1   attachment for any kind of electrically-powered
2   hand-held equipment?
3       A     Well, yes. Yes, I think I have adapted
4   some cutters, right, for some hand-held
5   electrically-powered.
6       Q     When you say you adapted some cutters,
7   tell me what you're talking about and what equipment
8   it was for.
9       A     Yeah. An electric die grinder. Had to
10  adapt some carbide cutters.
11      Q     Were these existing products that you
12  adapted?
13      A     Yes.
14      Q     What --
15      A     Yes.
16          In other words, I took
17  commercially-available cutters and had them ground to
18  fit the machine.
19      Q     Okay. So you made an alteration to
20  existing cutters to fit a machine for which they were
21  not originally designed?
22          MR. PACKIN: Object to the form.
23          THE WITNESS: That's correct.
24  BY MR. WALSH:
25      Q     How many times did you do that?

Page 123

1       A     I don't remember; a handful.
2       Q     And what kind of machines were you
3   adapting these cutters to?
4       A     Die grinders. Electric die grinders.
5       Q     Okay. Stationary machine?
6       A     No; hand-held.
7       Q     And the cutters, what was it -- what
8   portion of them needed to be modified in order to fit?
9       A     Shank.
10      Q     So, basically, what we might refer to as
11  the arbor or the arbor of the cutter?
12      A     Shank.
13      Q     Did you have to -- and you had to make it
14  smaller in order to fit?
15      A     Yeah.
16      Q     Why weren't there commercially-available
17  cutters available for that die grinder?
18          MR. PACKIN: Object to the form.
19  BY MR. WALSH:
20      Q     Or were there?
21      A     I don't remember.
22          MR. PACKIN: Same objection.
23          You can answer.
24  BY MR. WALSH:
25      Q     Before you did that, did you check with

Page 124

1   the manufacturer of the die grinder to determine
2   whether that was an appropriate modification to fit to
3   reduce the -- I guess the diameter of the shank of the
4   dies in order to fit a die grinder they were not
5   originally intended to be used with?
6           MR. PACKIN: Object to the form.
7           THE WITNESS: No. I made an engineering
8   evaluation and a decision.
9   BY MR. WALSH:
10      Q     All right. Any -- have you done any
11  other kind of design work on a -- on cutters for a
12  hand-held electrically powered piece of equipment?
13      A     That's all I can recall.
14      Q     Have you designed any type of
15  gasoline-powered equipment, whether hand-held or not?
16      A     Well, yeah.
17      Q     Tell me what you've designed,
18  gasoline-powered equipment you've designed.
19      A     Go carts.
20      Q     Was that for commercial sale or your own
21  use?
22      A     No. That was for own use, and small --
23  small automobile -- small car racing.
24      Q     Small what?
25      A     Car racing.

Page 125

1       Q     Okay. That was, again, for personal use?
2       A     Yes.
3       Q     Anything for commercial use? Have you
4   designed any kind of gasoline-powered equipment for
5   commercial use?
6       A     I may have. I just have to reflect back
7   over my years of experience. It seems to me I may
8   have made -- was involved in a number of adaptations
9   of engines to existing equipment in order to be able
10  to use it -- utilize it, whatever.
11      Q     Okay. So putting using an engine and
12  adapting it to a different use?
13      A     Yes.
14      Q     Can you give me an example of that?
15      A     Pumps and -- mostly pumps, I guess is
16  what I had.
17      Q     When was that?
18      A     Some time in my 20s, 30s. 30s maybe.
19      Q     Any time since then?
20      A     Not that I can recall.
21      Q     Was there any type of
22  electrically-powered equipment, hand-held or not, that
23  you have ever designed?
24      A     Well, once again, I told you about the
25  conveyors and -- and I had designed a lot of -- oh,

32 (Pages 122 to 125)

DEGNAN & BATEMAN
(856)   232-7400

db2aa797-bf2c-44d4-b545-ffd826d2ee60



Page 126

1  yeah. We had, you know, converted -- I converted
2  quite a number of forge hammers from flat belt drive
3  into individually motorized forge hammers and designed
4  the V belt drives for them. I also designed some
5  replacement -- did the replacement -- design for
6  replacements of obsolete motors, electric motors, on a
7  number of machines.
8      Q     All right. And when was this?
9      A     This would have been in the '70s.
10     Q     And any machine sold commercially?
11     A     No.
12     Q     Was it, in effect, making --
13     A     Well, once again, conveyors were sold
14  commercially.
15     Q     All right. Were these modifications to
16  an existing machine?
17     A     I did a lot of that, yes. And of course
18  with the conveyors that was new machinery.
19     Q     And the modifications to the existing
20  machinery, not the new machinery, but modifications to
21  the new machinery --
22     A     Which --
23     Q     I'm sorry.
24     A     Your questions seem to be inherently
25  contradictory.

Page 127

1      Q     They may be. I apologize if they are.
2            You told me there's -- in the '70s you
3  did some work on conveyors. Let's put that aside for
4  the moment. I'm assuming those were new machineries
5  working for your employer at the time, correct?
6      A     Yes.
7      Q     You also said you did some modifications
8  to existing machinery that I understood, and maybe I'm
9  wrong, and please correct me if I was, I understood
10  that to be not machines being sold commercially.
11     A     Correct.
12     Q     Those machines that were not being sold
13  commercially, those were, in effect, modifications of
14  machines on the floor of the manufacturing plant of
15  your employer?
16     A     Yes. Yes. Yes. Plus, also new
17  installations of machinery whereby I would take the
18  components and put them together. In other words, gas
19  pump needed a motor to drive it, needed mounting,
20  needed guarding to cover the drive, whatever type of
21  drive it was.
22     Q     And --
23     A     And existing machinery that had certain
24  kinds of drives that weren't working out or
25  replacement pumps that weren't working out. In other

Page 128

1  words, the existing pumps weren't working, so we
2  decided to install replacement pumps, and so I had to
3  do all the engineering design work involved in that.
4      Q     And was any of the modifications you were
5  making to existing machinery, was any of that
6  coordinated with the manufacturer of the machinery?
7      A     Sometimes it was, especially if it was --
8  if it was a new -- totally new application. That
9  certainly would be coordinated. Sometimes even in the
10  replacement. Replacing one type of a motor pump for
11  another type, that would be coordinated with the
12  manufacturer.
13     Q     What portion of the work that you did
14  like that would you say was coordinated with the
15  manufacturer and what portion was not?
16     A     Oh, I don't know. You know, it's a guess
17  on my part, but, you know, 25 percent; something like
18  that.
19     Q     Twenty-five percent coordinated or not
20  coordinated?
21     A     Well, that would have been -- I couldn't
22  say. You know, I really couldn't say.
23     Q     All right. Have you ever published an
24  article concerning the design, use, or safety of a
25  cut-off machine?

Page 129

1      A     No.
2      Q     Component for a cut-off machine?
3      A     No.
4      Q     How about a chainsaw?
5      A     No.
6      Q     How about any type of hand-held
7  gasoline-powered equipment?
8      A     No.
9      Q     How about any type of hand-held power
10  equipment, whether gasoline-powered or not?
11     A     No.
12     Q     How about any type of lawn and garden
13  equipment?
14     A     No.
15     Q     How about any type of construction
16  equipment?
17     A     Well, yeah. Saws that are used in
18  construction. And I did do an article on safety,
19  actually, or co-authored an article.
20     Q     What article was that?
21     A     Safety introduction to a book called The
22  Accurate Table Saw.
23     Q     Do you have a copy of that?
24     A     Yes, I do.
25     Q     With you? Do you have it with you?

33  (Pages 126 to 129)

DEGNAN & BATEMAN
(856)  232-7400

db2aa797-bf2c-44d4-b545-ffd826d2ee60

Page 130

```
1       A    No.
2       Q    And when you say the introduction, what
3   did it cover?
4       A    A variety of safety points in utilization
5   of table saws.
6       Q    And who co-authored it with you?
7       A    Les Winter and Ian Kirby.
8       Q    And when was it published?
9       A    Around '98, and it's been reprinted
10  couple, three times.  The last time I was at a shelf I
11  saw a second or third printing.
12      Q    And how long is the introduction?
13      A    Well, maybe ten pages.
14      Q    These were -- these are wood-cutting
15  saws?
16      A    Yes.
17      Q    Did it cover any hand-held saws or just
18  stationary-type saws?
19      A    This was stationary.
20      Q    And -- okay.  The -- other than that, any
21  publications of any type of power equipment, hand-held
22  or not?
23      A    Well, yes.  I contributed to, along with
24  Les Winter, to the operator's manual for -- what the
25  heck is the name of that?  A table saw.  Tell you in a
```

Page 131

```
1   second.
2       Q    I'll get it for you here in just a
3   second.
4            Bridgewood?
5       A    Bridgewood, that's correct.
6            MR. WALSH:  Let's get this marked as the
7   next deposition exhibit, please.
8            (Manual was marked as Growney-6 for
9            identification by the court reporter.)
10  BY MR. WALSH:
11      Q    Take a look at Exhibit 6 and tell me if
12  you can identify that as the Bridgewood owner's manual
13  that you contributed to?
14      A    That looks like it.
15      Q    Okay.  Can you point out to me the
16  portions -- your contributions to this owner's manual?
17      A    Yes.  It may take a little bit of time
18  here.
19      Q    Take your time.
20      A    Well, it's been a while since I have
21  looked at this, but there is something someplace in
22  here which talks about using the guard.
23      Q    There is -- if you look on page 14 there
24  is a list there of table saw safety rules, and there
25  is a reference to a number 10.  There's a reference to
```

Page 132

```
1   a guard.  I don't know if that's what you're referring
2   to or not.  Or number six also refers in that list.
3            MR. PACKIN:  You can look at those if you
4   want, Mr. Growney.  But take whatever time you need to
5   look through this manual if you need to answer the
6   questions.
7            THE WITNESS:  Well, on page 9, 3.0, blade
8   guard and splitter, the last sentence says, "Do not
9   operate this saw without the guard or splitter in
10  place in operating correctly."
11  BY MR. WALSH:
12      Q    You think that last sentence is what you
13  wrote?
14      A    I believe that is, yes.
15      Q    Is there any other portion?
16      A    Yes, there is.
17      Q    Okay.  What other portions?
18      A    Does this one have a year?  1998.
19           Someplace there is in this manual
20  something that says to the effect that you got to take
21  the guard off the saw, cut the piece.
22           MR. KOTT:  I can find it if someone will
23  give me a copy.
24           THE WITNESS:  Then get another saw and
25  don't use this saw.  Get another saw.
```

Page 133

```
1   BY MR. WALSH:
2       Q    Is that not number 10, perhaps, on that
3   list of safety tips, or six or 10?
4       A    That could be part of it, yeah.  Yeah.
5   Right.  That's part of it.
6            But I thought we had in here also that if
7   you want to cut something but you can't do it, then
8   get another saw.
9            Yes, that would be it.  I guess it's been
10  quite a while since I looked at this.
11      Q    Okay.  So let me be sure I understand
12  what you're saying.  You've identified two things in
13  this manual.  One falls under -- on page nine under
14  3.0, and I think you said the last sentence in that
15  paragraph, you believe, is something that you added
16  which says, "Do not operate the saw without the guard
17  and splitter in place in operating correctly."
18           Correct?
19      A    Yes.
20      Q    And then the other thing is, under -- on
21  page 14 under the "Table Saw Safety Rules," paragraph
22  10, "Cuts that require removing the blade guard cannot
23  be made with this machine.  Always devise a
24  suitable blade guard or purchase and install an
25  appropriate after-market guard."
```

34  (Pages 130 to 133)

DEGNAN & BATEMAN
(856)   232-7400

db2aa797-bf2c-44d4-b545-ffd826d2ee60

Page 134

```
1        Is that the other piece that your input
2  -- you and your co-authors input to this manual?
3       A    Yeah, I guess it is.  I haven't looked at
4  this in quite a long time, so I don't -- it's not
5  fresh in my mind.
6       Q    Is there anything else in this manual
7  that you believe you and your co-author contributed to
8  other than those two sentences?
9       A    No.
10       MR. PACKIN:  Give me 30 seconds just to
11  run to the men's room.  We don't need to stop as long
12  as you let me run.
13       (Short recess was held.)
14  BY MR. WALSH:
15       Q    All right.  With the two exceptions that
16  you have noted, have you participated in any other
17  kind of publications for the design, use, or safety of
18  any type of power product?
19       MR. PACKIN:  Object to the form.
20       You can answer.
21       THE WITNESS:  No.
22  BY MR. WALSH:
23       Q    Have you ever given a presentation to any
24  group regarding the design, manufacture, use, or
25  safety of a hand-held gasoline-powered cut-off
```

Page 135

```
1  machine?
2       A    No.
3       Q    Have you ever given a presentation to any
4  group regarding the design, manufacture, use, or
5  safety of a chainsaw?
6       A    No.
7       Q    Have you ever given a presentation to any
8  group concerning design, manufacture, use, or safety
9  of any type of hand-held gasoline-powered tool or
10  equipment?
11       A    No.
12       Q    Have you ever given any presentation to
13  any group on the design, manufacture, use, or safety
14  of any type of hand-held electrically -- hand-held
15  power product, whether gasoline-powered or not?
16       A    Actually, I may have in relation to my
17  safety work at QuickCrete, but I'm trying to remember
18  what it would have been, because we did have some of
19  that trying to educate the people.  But I can't
20  remember at this point.
21       Q    All right.  That would have been to an
22  employee group or something working for QuickCrete
23  while you were there?
24       A    Yes.
25       MR. PACKIN:  Object to the form.
```

Page 136

```
1  BY MR. WALSH:
2       Q    Do you have -- have you ever given a
3  presentation to any group on the manufacture, design,
4  use, or safety of any kind of power equipment, whether
5  hand-held or not?
6       A    To who?
7       Q    To any group.
8       A    Oh, yeah.  Yeah.
9       Q    Who have you given presentations to and
10  what did it involve?
11       A    Well, when I worked at Jay Wist & Sons,
12  when I worked for Versabar, when I worked for
13  QuickCrete, I gave presentations to employees
14  regarding safety of a multitude of power equipment
15  that we had.
16       In addition to that, I did give a talk,
17  presentation, to the ANSI 01.1 committee meeting about
18  the -- about the Saw Stop technology and the
19  applicability of it to the -- the machinery covered by
20  that standard, and the arrival on the scene of this
21  technology and how this was new.  And then with the
22  intention of the committee assessing the technology
23  and how to handle it in the standard.
24       Q    Okay.  The ANSI 01.1 standard is a
25  standard that applies to woodworking machines?
```

Page 137

```
1       A    Machinery, yes.
2       Q    It does not apply to hand-held
3  gasoline-powered cut-off machines?
4       MR. PACKIN:  Object to the form.
5       THE WITNESS:  No.
6       And as a matter of fact, I gave a -- I
7  offered a requirement regulation to the committee that
8  they adopt that would have required a warning on saw
9  blades -- 12 and 14-inch saw blades about their
10  nonapplicability to hand-held gasoline-powered
11  cutting-off saws or demo saws.
12  BY MR. WALSH:
13       Q    Did the committee accept the comment or
14  change?
15       A    We discussed it at length, and the
16  committee did not accept it because the committee --
17  although the committee had jurisdiction over the
18  cutting attachments, the committee felt that that was
19  a misuse.  That was not applicable to the machinery,
20  although we had -- like I said, the cutting
21  attachments were used on the machines covered by the
22  standard.  But the misuse was on a machine outside the
23  standard.  So they felt that they didn't have
24  jurisdiction to cover it.
25       Q    So they recognized it as a misuse, but
```

35  (Pages 134 to 137)

DEGNAN & BATEMAN
(856)  232-7400

db2aa797-bf2c-44d4-b545-ffd826d2ee60

Page 138

```
 1   simply decided they didn't have jurisdiction over the
 2   machine on which the misuse was occurring?
 3            MR. PACKIN:  Object to the form.
 4            THE WITNESS:  Well, they ruled that they
 5   would not -- that it was on the side of the
 6   jurisdiction, so they wouldn't deal with it.
 7   BY MR. WALSH:
 8       Q    You have served as an alternate to the
 9   01.1 committee?
10       A    Yes.
11       Q    How many meetings have you attended?
12       A    Oh, at least -- at least 10, maybe 12.
13       Q    Over what period of time?
14       A    About seven years.
15       Q    And how often does the committee meet?
16       A    Twice a year.
17       Q    In terms of suggestions, you've talked
18   about the suggestion you made about labeling saw
19   blades.  Have you also made a suggestion to the
20   committee that -- that there be a permanently affixed
21   owner's manual on the machinery subject to the
22   committee's jurisdiction?
23       A    Yes, I have.
24       Q    Has that been accepted?
25       A    We're in the revision of the standard
```

Page 139

```
 1   now, and it's -- I'm trying to think.  So that's
 2   subject to committee action.
 3       Q    Do you know what the -- has the committee
 4   voted on that?
 5       A    I cannot recall at this point.
 6       Q    You made that submission to the committee
 7   after you voiced that opinion that a cut-off machine
 8   should have a permanently affixed or attached manual
 9   in some way in the Stout case; did you not?
10            MR. PACKIN:  Object to the form.
11            THE WITNESS:  No.
12   BY MR. WALSH:
13       Q    When did you make it?
14       A    I don't remember the date, but we were
15   having the discussion about manuals, and I pointed out
16   to the membership that if they went back to their
17   businesses, those who had businesses that had
18   machinery, and if they looked -- went into any one of
19   their forklifts, provided the forklift had been made
20   since around 1990, they'll find an owner's manual on
21   the forklift, and most likely it will be tethered to
22   the forklift.  Some of the members it was news to
23   them.  That's the first time they heard it.  But --
24       Q    Do you have any recollection of during --
25   while being deposed in the Stout case and being asked
```

Page 140

```
 1   the question whether you had brought that suggestion,
 2   a suggestion like that, to the committee saying no,
 3   but it's a good idea, and let me make a note of it,
 4   and a note being attached to the deposition as an
 5   exhibit?
 6       A    Yes, I had that specific recollection.
 7   And I was talking about the warning on the saw blades.
 8   Because Mr. Kott had suggested or had brought up, and
 9   I had made that suggestion to the committee after Mr.
10   Kott's suggestion at my deposition, and I did
11   acknowledge that it was -- that I was prompted by an
12   attorney for Black & Decker.
13       Q    Do you have a recollection of the
14   questions being asked about permanently attached
15   owner's manual during the Stout deposition?
16       A    I don't.
17            MR. KOTT:  Can we find out what he's
18   reviewed in preparation for today's deposition?  Has
19   he reviewed the Stout deposition?
20   BY MR. WALSH:
21       Q    Have you reviewed your Stout deposition
22   in preparation for today's deposition?
23       A    No, I have not.
24       Q    When is the last time you read the Stout
25   deposition?
```

Page 141

```
 1       A    Couple of years ago.
 2       Q    01.1 on the committee, does that standard
 3   requires an owner's manual to be provided with every
 4   machine subject to its jurisdiction; does it not?
 5       A    Yes.
 6            MR. PACKIN:  Object to the form.
 7            THE WITNESS:  Yes, it does.
 8   BY MR. WALSH:
 9       Q    Are the machines subject to the
10   jurisdiction of that standard?  Are they all -- is
11   there any hand-held equipment or are they all
12   stationary saws of one type or another?
13       A    Well, they would be -- there's no
14   hand-held equipment in that that I know of.
15       Q    They're all wood-cutting saws?
16       A    Wood -- wood products.  They can also cut
17   plastics.  Some of them can actually cut metal.
18       Q    Is there any requirement in the 01.1
19   standard that there be on-machine warnings?
20       A    I have to admit, I can't think of whether
21   -- it's been so -- discussed so many times that I
22   can't remember whether it's in the standard now or
23   we're considering it now, because I've been through
24   one revision of the standard, and we're on the second
25   revision of the standard.  I'm sorry.  I've been
```

36  (Pages 138 to 141)

DEGNAN  &  BATEMAN
(856)   232-7400

db2aa797-bf2c-44d4-b545-ffd826d2ee60

Page 142

1 through two revisions of the standard. We're going on
2 to a third revision, so I can't recall.
3    Q    What is the current standard? What is
4 the -- the year of the current standard; do you
5 recall?
6    A    Yes. It's 2004 or five.
7    Q    And what are the revisions to the
8 standard that you participated in?
9    A    2000 -- that particular one.
10    Q    2004?
11    A    Right. And now there's one which has, I
12 believe, been improved, but I don't know if it's been
13 published. There's some detail about it being
14 published, and now we're into another one.
15        MR. WALSH: Let's get this marked as the
16 next exhibit, please.
17        (Copy of the ANSI 01.1 2004 safety
18        requirements for woodworking machinery was
19        marked as Growney-7 for identification by the
20        court reporter.)
21        (Short recess was held.)
22        VIDEO TECHNICIAN: Okay. We're back on.
23 BY MR. WALSH:
24    Q    Mr. Growney, what we've marked as Exhibit
25 7 is a copy of the ANSI 01.1 2004 safety requirements

Page 143

1 for woodworking machinery. Do you recognize it as
2 such?
3    A    Yes, I do.
4    Q    Now, one of the questions I asked you is
5 whether or not the 2004 standard required the use of
6 on-machine warnings as part of that standard. And
7 that's what started this process of getting these
8 copied and getting everybody a copy of it.
9    A    Okay.
10        MR. PACKIN: There's no question. Is
11 there a question?
12 BY MR. WALSH:
13    Q    The question is: Does it require
14 on-machine warnings?
15    A    There is a section 4.19.
16    Q    What page is that on?
17    A    That's on page 49.
18        And the section 4.19.4 entitled
19 "On-Product Warnings," says that the design of
20 on-product warnings instructions shall comply with Z
21 535.4 product safety signs and labels.
22    Q    Is there a requirement, though, in the
23 standard that there be on-product warnings?
24        MR. PACKIN: Object to the form.
25        THE WITNESS: No.

Page 144

1 BY MR. WALSH:
2    Q    Is there a standard -- does the standard
3 require the use of pictorials with warnings?
4        MR. PACKIN: Which one are we talking
5 about now?
6        MR. WALSH: The 01.1 2004.
7        THE WITNESS: The -- actually, it
8 requires that the safety symbols comply with the Z
9 535.3.
10 BY MR. WALSH:
11    Q    Where are you reading?
12    A    On 4.19.3, safety symbols.
13    Q    On page --
14    A    49.
15    Q    Okay. Now, is there -- does that require
16 that pictorials be used or simply govern what the
17 pictorials will look like if used?
18        MR. PACKIN: Object to the form.
19        THE WITNESS: Yes. It does require that
20 -- that the -- the design of the pictorials shall
21 comply with this particular ANSI standard. It doesn't
22 require them, but it doesn't forbid them. And it is
23 the custom and practice within the industry to put
24 warning signs and symbols on machines, on products.
25 It is such a prevalent practice, it's even practiced

Page 145

1 by Stihl. And here --
2 BY MR. WALSH:
3    Q    When you say Stihl, you're referring to
4 S-T-I-H-L, the company?
5    A    Yes. Yes. This is such a common
6 practice it is practically standard. I shouldn't say
7 standard, but it is custom and practice to put them
8 on. It does not prevent them. It does not dictate to
9 the product manufacturer how -- any particular order
10 or what to put it on. It's up to the individual
11 manufacturer, as it is in all industries, such as the
12 concrete cut-off saw, demo saw industry, for them to
13 decide what their -- what they should put on their
14 machines.
15    Q    Okay.
16    A    So that they can protect their users from
17 the dangers, hazards associated with using their
18 machines.
19    Q    This standard has both mandatory and
20 nonmandatory provisions in it; does it not?
21        MR. PACKIN: Object to the form.
22        THE WITNESS: Well, the standard is not
23 mandatory. The standard is voluntary. And there's
24 nothing that compels any manufacturer to do what the
25 standard calls for or do more than what the standard

37  (Pages 142 to 145)

db2aa797-bf2c-44d4-b545-ffd826d2ee60

Page 146

1   calls for. The manufacturers are free to exceed these
2   requirements. These requirements are strictly minimum
3   requirements.
4   BY MR. WALSH:
5       Q    Is there someplace where it says on the
6   standard that these are minimum requirements?
7       A    It is through my participation on the
8   committee that writes this standard that this
9   represents the consensus of a lowest level of
10  agreement for -- on safety measures to be taken by
11  such -- on such machinery.
12      Q    Is there anyplace in the standard where
13  it says it's a minimum safety standard?
14      A    No. Just as there is no place in the
15  standard where it says that if you comply with the
16  standard you have a safe machine. Nor is there any
17  place -- but there is a place in the standard where it
18  says the manufacturer can do more than what's required
19  by the standard.
20      Q    Is the -- now, is there any portion of
21  the standard that directs the manufacturer of
22  woodworking machines to use pictorials on the machine?
23      MR. PACKIN: Object to the form.
24      You can answer.
25      THE WITNESS: Well, I think I had

Page 147

1   answered that already in my previous answer, where it
2   said that no manufacturer is compelled to adhere to
3   this standard, nor is any manufacturer prevented from
4   doing more than what's called for in the machine. The
5   standard does recognize inherently that pictorials are
6   used on warning signs, so it does give guidance in
7   that it says that the warning -- the pictorials shall
8   conform to a particular ANSI standard.
9   BY MR. WALSH:
10      Q    Can you comply with the 01.1 2004
11  standard without using either on-machine warnings or
12  pictorials on the machine?
13      MR. PACKIN: Object to the form.
14      THE WITNESS: Yeah, you could comply with
15  it. Compliance in that manner is referred to as
16  hiding behind the standard. See, that means that if
17  the standard doesn't specifically require you to do
18  that, well, then, you don't do it.
19      There are a lot of designers in industry
20  who rely upon explicit direction to do something. I
21  think Elsner was particularly -- he was the one, I
22  think in his previous deposition, that said, well,
23  we're not required to do it, or this isn't required by
24  the standard.
25      That, in common terminology, is referred

Page 148

1   to as hiding behind the standard. In other words, you
2   don't do it. You only do what you're compelled to do.
3   And of course that's not in the best interest of the
4   general public, nor is it in conformance with the
5   engineering -- engineer's code to protect -- have
6   their work protected, the general public's health,
7   education -- health -- I'm sorry. Health and welfare.
8   BY MR. WALSH:
9       Q    Why doesn't the committee, the 01.1
10  committee, simply -- if it believes it's good practice
11  to do so, why doesn't it simply require the use of
12  on-machine warnings or pictorials?
13      MR. PACKIN: Object to the form and asks
14  for speculation.
15      THE WITNESS: Well, I don't remember
16  specifically, but I know that all these items are put
17  up to vote, and maybe that wasn't voted.
18  BY MR. WALSH:
19      Q    Well, have you suggested to the committee
20  that it require the use of -- the standard require the
21  use of pictorials and on-machine warnings in order to
22  comply with the standard?
23      A    Well, I know I have participated in
24  discussions of that nature. I have a particular
25  recollection of one conversation in another standard

Page 149

1   that I sit on. I don't have a recollection on this
2   particular one at the moment.
3       Q    What is the other standard?
4       A    That's the ANSI B 65.177-1 and -2.
5       Q    Which applies to what?
6       A    One applies to three roll mixers in the
7   printing ink industry, and the other one applies to
8   vertical shaft mixers in the printing roll ink
9   industry. I'm sorry. In the printing ink industry.
10      Q    Is there any requirement in ANSI 01.1
11  2004 for a permanently -- for a -- an owner's manual
12  to be permanently attached in some fashion to the
13  machinery?
14      MR. PACKIN: We're talking about this
15  one?
16      MR. WALSH: Yes, sir.
17      THE WITNESS: In this particular one?
18  BY MR. WALSH:
19      Q    Yes, sir.
20      A    I don't think so, but there's nothing to
21  preclude -- this standard does not preclude the
22  manufacturer from permanently attaching his owner's
23  manual to the machine. Which, to most manufacturers,
24  would be known of the -- of the benefit of doing that.
25      Many manufacturers of machinery in this

38 (Pages 146 to 149)

DEGNAN & BATEMAN
(856) 232-7400

db2aa797-bf2c-44d4-b545-ffd826d2ee60

Page 150

1   standard have storage sleeves or compartments for
2   their manuals on the machine itself.
3       Q    Do you know of any hand-held piece of
4   power equipment that has a permanently attached
5   owner's manual?
6           MR. PACKIN: Object to the form.
7           THE WITNESS: Hand-held?
8   BY MR. WALSH:
9       Q    Yes, sir.
10      A    Well, I know ladder lifts do, but they're
11  not hand-held. I guess I don't.
12      Q    Is there anything in the 01.1 standard
13  that requires that the machines, the woodworking
14  machines, be designed to prohibit the mounting of
15  blades for which the machines are not intended or
16  designed?
17          MR. PACKIN: Object to the form.
18          THE WITNESS: Discussions were made in
19  that area, because there are a number of machines
20  covered by the standard. But that's possible. And
21  the great variety, there was never any agreement on
22  how to establish it. So nothing was adopted into the
23  standard other than requirements about marking
24  cutters, speeds of cutters, and the speeds on the
25  machine.

Page 151

1           Now, that conversation took place when we
2   were discussing other machinery. Machinery other than
3   saws which have cutters. And so it isn't here, and so
4   there was a discussion whether or not it covered
5   blades. Covers cutting attachments that took place
6   under that.
7           And so we had a discussion, and I
8   suggested that we include the word "blade," which has
9   been adopted in one of these versions.
10  BY MR. WALSH:
11      Q    Okay. You lost me a little bit there.
12          Is there or is there not a requirement in
13  ANSI 01.1 2004 that machines be designed to -- so that
14  blades, saw blades, that are not intended for use on
15  those machines cannot be mounted on the machines?
16      A    No.
17      Q    Okay.
18      A    That was what I had discussed before. In
19  other words, I had discussed before about this
20  desirability to put that.
21      Q    Was that something raised by you?
22      A    Yeah. I had -- yeah. Yeah.
23      Q    And was it rejected by the committee?
24      A    Yes.
25          MR. PACKIN: Object to the form.

Page 152

1           THE WITNESS: The committee ruled that it
2   didn't have jurisdiction.
3   BY MR. WALSH:
4       Q    No. No. I'm not talking about --
5           MR. KOTT: Not talking about the blade.
6           MR. PACKIN: One at a time.
7   BY MR. WALSH:
8       Q    I'm talking about -- I think we may be
9   misunderstanding each other. Let me try it.
10          The ANSI 01.1 standard --
11      A    Yes.
12      Q    -- for purposes of the woodworking
13  machinery for which it is responsible, the stationary
14  saws and other types of saws that are covered by this
15  standard --
16      A    Right.
17      Q    -- is there a requirement that those saws
18  be designed such that blades not intended for use on a
19  specific saw cannot be mounted on the saw?
20      A    No.
21      Q    Okay. You own -- you own a stationary
22  saw; do you not?
23      A    I own two.
24      Q    Okay. What two saws do you own?
25      A    I have a Delta Homelite -- Home --

Page 153

1   whatever -- whatever. I have a Delta eight-inch table
2   saw and I have a Sawsall. I'm sorry. A Saw Stop.
3       Q    Saw Stop?
4       A    Right.
5       Q    And Saw Stop is a technology you were
6   talking about a little earlier? We didn't talk about
7   it; you mentioned it?
8       A    Right.
9       Q    And we pressed on, so I want to come back
10  to the Saw Stop that you just mentioned.
11          But first I want to ask you a follow-up
12  question to this 01.1 2004 standard.
13          Is it -- are there machines covered by
14  that standard on which blades, saw blades, could be
15  mounted that are not intended for use on a specific
16  machine, and that if used could be dangerous?
17          MR. PACKIN: Object to the form.
18          THE WITNESS: Could you repeat that
19  question?
20  BY MR. WALSH:
21      Q    Yeah. The 01.1 standard covers a variety
22  of different woodworking machines. Are there saws,
23  and covered by that standard on which there are saw
24  blades not intended for use on those saws, but which
25  could be mounted on them, and if mounted would be

39  (Pages 150 to 153)

DEGNAN & BATEMAN
(856)  232-7400

db2aa797-bf2c-44d4-b545-ffd826d2ee60

Page 154

1 dangerous?
2          MR. PACKIN: Object to the form.
3          THE WITNESS: I believe so, yes.
4 BY MR. WALSH:
5     Q    Okay. Let's go to the Saw Stop for just
6 a moment. The last time we had a chance to talk in a
7 setting like this in connection with Stout, you had
8 purchased the Saw Stop but had not fully assembled it.
9 Has the machine now been fully assembled?
10    A    Unfortunately, no. I got further on the
11 assembly, and household duties --
12    Q    Have you ever -- I'm sorry. Go ahead.
13    A    Household chores and workload prevented
14 me from finishing it.
15    Q    So how long have you owned the saw now?
16 It's two or three years?
17    A    No, not two or three years. About a
18 year.
19    Q    All right.
20    A    No. It has to be longer than that.
21    Q    You've owned it for a while?
22    A    Yeah.
23    Q    It's a 10-inch saw?
24    A    Yes.
25    Q    And it's -- I take it you have not yet

Page 155

1 ever used it?
2     A    Correct.
3     Q    Is the owner's manual permanently
4 attached to it?
5     A    I haven't permanently attached it to it
6 yet.
7     Q    Does it come from the --
8     A    Actually, I got two manuals. I got a
9 temporary manual that came with the saw, and then I
10 got a permanent manual. And if it was going to be
11 permanently attached, I'm going to permanently attach
12 it to it.
13    Q    It doesn't come from the manufacturer
14 permanently attached?
15    A    No, it's not attached.
16         MR. WALSH: All right. Let's get this
17 marked as the next exhibit.
18         (Copy of the Saw Stop manual was marked
19    as Growney-8 for identification by the court
20    reporter.)
21 BY MR. WALSH:
22    Q    Can you -- do you recognize that as being
23 a copy of the manual for the Saw Stop saw that you
24 have?
25    A    I don't know if this is the manual that I

Page 156

1 have. Like I said, I have two of them. One was a
2 temporary and the second one was a permanent, and I'm
3 not sure if this is --
4     Q    If this is the type of Saw Stop saw you
5 had? A 10-inch contractor's saw?
6     A    Yes.
7     Q    All right. I want to --
8          MR. PACKIN: Any questioning about the
9 manual I -- instead of interrupting the record I will
10 object to because of his statement that he can't
11 identify it as being the manual he has, but it may be,
12 it may not be.
13         Just, you know, there's no foundation for
14 the question, but go ahead.
15 BY MR. WALSH:
16    Q    Have you read the manual for your Saw
17 Stop saw?
18    A    Parts of it.
19    Q    All right. And let's see. If -- if
20 based on at least your partial reading you're able
21 to --
22    A    Actually, I haven't read much of it
23 because I didn't get past the assembly instructions.
24         MR. KOTT: I'm sorry. I didn't hear you.
25         MR. PACKIN: Didn't get past the assembly

Page 157

1 instructions.
2 BY MR. WALSH:
3     Q    Well, let me ask you a little bit about
4 what you know about the saw. Is it possible to mount
5 on the Saw Stop saw blades that should not be mounted
6 on it? And that if mounted could be dangerous to use?
7          MR. PACKIN: Object to the form.
8          You can answer it.
9          THE WITNESS: That's possible.
10 BY MR. WALSH:
11    Q    Are there any warnings, to your
12 knowledge, on the saw itself to that effect?
13    A    I can't recall.
14    Q    Take a look over on page eight of this
15 manual which, I think, purports to be the labels which
16 are on the saw, and tell me if you're able to confirm
17 for me or not whether those are the labels that are on
18 your Saw Stop?
19    A    They look similar.
20    Q    All right. If you would look over and
21 tell me if there's any place on any of those -- on any
22 of those warnings where it tells you not to mount
23 certain blades on the machine.
24         MR. PACKIN: Same foundation. Objection
25 based on what he just testified to.

40  (Pages 154 to 157)

db2aa797-bf2c-44d4-b545-ffd826d2ee60

Page 158

1     THE WITNESS: It seems to me that Saw
2 Stop has some kind of a device to accommodate dado
3 blades and which would be different than the -- the
4 normal blade that you'd expect on a saw. And I don't
5 know if this addresses this or not.
6 BY MR. WALSH:
7     Q    All right. Well, first of all, see if --
8 I mean, my pending question, really, is: And I
9 understand Mr. Packin's objection, but on page eight
10 if, in fact, these are representative of the warnings
11 on your saw, is there anything there that would
12 indicate there are certain blades that should not, for
13 safety reasons, be used on the Saw Stop?
14     A    No, I don't see it here.
15     Q    Okay. And turn over to page 10, if you
16 would.
17     A    (Witness complies.)
18     Q    All right. And I'm going to direct your
19 attention first to paragraph three on page 10. It
20 says, "Do not use non-conductive blades, including
21 abrasive blades, blades with plastic hooks, or blades
22 that have non-conductive teeth. The safety system
23 cannot induce the electrical signal onto a
24 non-conductive blade. And blades with non-conductive
25 teeth may prevent the system from detecting contact.

Page 159

1 Only standard Stihl blades with either Stihl or
2 carbide teeth should be used."
3     Do you know whether that information is
4 in your manual for your Saw Stop?
5     A    I believe I have read this before. I'm
6 not sure if it's in my manual.
7     Q    Okay. And from a standpoint -- does that
8 suggest that -- the fact that warning is there
9 suggests that those blades can, in fact, be mounted on
10 the Saw Stop? There's nothing to prevent the mounting
11 of them?
12     MR. PACKIN: Objection to form and lack
13 of foundation.
14     THE WITNESS: Yes. The fact that -- I'm
15 sorry. That's all I have to say.
16 BY MR. WALSH:
17     Q    All right. Then in four, the next
18 paragraph, "Do not use saw blades or dado sets that
19 have a lacquer or other coating on the teeth. These
20 coatings are non-conductive and, therefore, can reduce
21 the speed at which the system detects contact. In
22 other words, a coated tooth must cut slightly deeper
23 into the skin for contact to be detected resulting in
24 somewhat more serious injury. Using blades that
25 originally" --

Page 160

1     A    No; "used."
2     Q    "Used blades." I'm sorry.
3     "Used blades that originally had a
4 coating are okay to use, since the coating is worn
5 away within a few uses. However, Saw Stop recommends
6 that you examine each tooth on such blades to confirm
7 that no coating remains. If you decide to use a new
8 blade that has lacquer or other coating on the teeth,
9 be especially careful during the first few uses --
10 first several uses."
11     Again, to your knowledge have you seen
12 that in your owner's manual?
13     A    I don't -- I don't recall it right at
14 this moment.
15     Q    All right. Looking down at seven, "Never
16 attempt to use blades other than a single."
17     MR. PACKIN: "Any way other than a
18 single."
19     MR. WALSH: I'm sorry. What did I say?
20     MR. PACKIN: "Blades."
21 BY MR. WALSH:
22     Q    "Never attempt to use a blade other than
23 a single 10-inch blade with the standard Saw Stop
24 brake cartridge. Never attempt to use a dado set or
25 blade other than an eight-inch dado set with a Saw

Page 161

1 Stop dado cartridge. The use of smaller diameter
2 blades with a brake cartridge designed for larger
3 blades could result in serious injury because the
4 brake cannot be positioned correctly to stop the
5 smaller blades."
6     Are you able to confirm for me whether or
7 not that warning is in your manual?
8     A    I don't know whether that warning is in
9 my manual, but I know I have read, in essence, this,
10 and I believe that had developed something -- right.
11 For the eight-inch dado set with the dado cartridge,
12 right. That's right.
13     Q    And I take it from this that it's
14 possible to mount an eight-inch diameter saw blade on
15 this saw, this 10-inch saw, correct?
16     A    Yes. Yes.
17     Q    There's nothing to prevent the mounting
18 of an eight-inch saw blade?
19     MR. PACKIN: Object to the form.
20     THE WITNESS: That's correct.
21 BY MR. WALSH:
22     Q    All right. Number eight is, "Do not use
23 molding heads. The use of molding heads could result
24 in a serious injury because neither the standard brake
25 cartridge nor the dado brake cartridge is designed to

41  (Pages 158 to 161)

DEGNAN & BATEMAN
(856)  232-7400

Page 162

```
 1   stop a molding head."
 2         See that?
 3   A    Yes.
 4   Q    And is there anything to your knowledge
 5   on the machine to prevent the mounting of a molding
 6   head?
 7   A    No. The mounting of the molding head --
 8   nothing -- the mounting, even of a dado set, other
 9   than the eight-inch with the Saw Stop cartridge,
10   nothing.
11         But the Consumer Product -- Consumer
12   Product Safety Commission has studied table saws
13   extensively. The bulk of the table saw use is not
14   these. These are ANSI -- these are something that,
15   yeah, they're done, but they're way out to the side.
16   They're not the bulk of it.
17         The bulk of it is ripping and cross
18   cutting. And that's what this thing protects against.
19   I would not get rid of this protection for the sake
20   that possibly somebody may use one of these items that
21   are forbidden, because the usage of those is such a
22   small percentage of the total use.
23   Q    What percentage of the total use -- what
24   is the percentage of total use of these things they're
25   warning against?
```

Page 163

```
 1   A    Less than 10 percent.
 2   Q    And what do you rely on for that figure?
 3   A    Consumer Product Safety Commission study
 4   on the table saws which was done, I think, in 2007.
 5   Q    Okay. And it's your belief that that
 6   study looks at the use of molding heads, undersized
 7   blades, or blades that are not appropriate size; that
 8   type of thing?
 9         MR. PACKIN: Object to the form.
10         You can answer.
11         THE WITNESS: It looked on the use of
12   dado heads and molding -- molding cutters, molders. I
13   don't remember the undersize. Although an undersized
14   blade can be used, in other words, an eight-inch blade
15   being undersized with 10-inch. That is not a common
16   use. You know, it's not -- even if it's used on a
17   normal table saw, it doesn't have this protection.
18   It's even considered misuse. It's just less desire --
19   desirable use. But it is not something that is a
20   significant practice on these.
21   BY MR. WALSH:
22   Q    What is the basis for your belief that
23   it's not a significant practice?
24   A    Consumer Product Safety Commission's
25   report, study, plus over the years all the literature
```

Page 164

```
 1   that I have read, the articles that I've read.
 2   Q    Now, you going -- you've told me about
 3   the CPSC, but articles. What articles have you read
 4   that say using an undersized blade on a table saw is
 5   not a common use?
 6   A    Well, by that I have seen articles
 7   written that discuss it. You might have somebody
 8   that's writing in that says, how come I don't get this
 9   or that performance? And the person writing the
10   commentary will say that that's why, you know, people
11   who have a 10-inch saw use a 10-inch blade rather than
12   an eight-inch blade, because you don't get the
13   performance.
14   Q    So the articles you're referring to are
15   people writing in to manufacturers or tool people and
16   saying, how come I'm not getting as good a performance
17   when I use my eight-inch blade on my 10-inch saw?
18         MR. PACKIN: Object to the form.
19         THE WITNESS: Well, that's one of the
20   type of articles you see from time to time. You know,
21   other ones are recommended uses of blades on saws and
22   commentaries on uses of saw blades. I mean, I repeat
23   them over and over and over again.
24   BY MR. WALSH:
25   Q    Yeah. But I'm curious as to where you're
```

Page 165

```
 1   getting the numbers from. There may be, as you're
 2   pointing out, there are some articles that say these
 3   things, but where is that translating, and how many
 4   people are doing it? Obviously it's worth writing an
 5   article about, people must be doing it.
 6         MR. PACKIN: Object to the form.
 7   BY MR. WALSH:
 8   Q    So where are you getting your numbers
 9   from?
10         MR. PACKIN: Object to the form. Asked
11   and answered.
12         THE WITNESS: What do you mean, my
13   numbers?
14   BY MR. WALSH:
15   Q    Well, you're giving me numbers like 10
16   percent, and it's not a common thing.
17   A    Yeah.
18   Q    And I'm just trying to figure out how
19   you're trying to extrapolate articles where people
20   reference doing it into numbers like 10 percent are
21   uncommon.
22         MR. PACKIN: Object to the form. Asked
23   and answered, but you can answer it again.
24         THE WITNESS: I don't believe I said 10
25   percent for the usage of undersized blades.
```

42 (Pages 162 to 165)

DEGNAN & BATEMAN
(856) 232-7400

Page 166

BY MR. WALSH:

1   Q   I agree with you; you did not. I think
2   you used molding heads and dado sets.
3   A   Right. Okay. What I'm saying is it is
4   my knowledge of the industry's practice, custom and
5   practice, table saws of this size, that it is not a
6   common practice to use -- is not an overwhelming
7   common practice to use undersized saw blades.
8           It is possible people do that because
9   maybe because of a lathe section they don't have a
10  tooth form that they want on a 10-inch blade and they
11  have it on an eight-inch blade, and they use that
12  blade. That may be. That's usually the reason for
13  it.
14  Q   Why do you think Saw Stop warns about it?
15          MR. PACKIN: Object to the form and asks
16  for speculation.
17          THE WITNESS: Saw Stop said it wouldn't
18  work.
19  BY MR. WALSH:
20  Q   Why -- they're providing a warning, do
21  not use -- well, let's see. Where was it? "Never
22  attempt to use a blade other than a single 10-inch
23  blade with the standard Saw Stop brake cartridge.
24  Never attempt to use a dado set or blade other than an

Page 167

1   eight-inch dado set. The use of smaller diameter
2   blades with a brake cartridge designed for larger
3   blades could result in a serious injury because the
4   brake cannot be positioned correctly to stop the
5   smaller blades."
6           MR. PACKIN: Is there a question?
7           THE WITNESS: So what is your question?
8   BY MR. WALSH:
9   Q   Do you have any idea -- well, does this
10  -- do you have any idea why they warn against it if
11  this is not a problem?
12          MR. PACKIN: Object to the form. Asked
13  and answered and calls for speculation, but you can
14  answer if you can.
15          THE WITNESS: Okay. I'll give you my
16  answer. I know that this system went through a lot of
17  development, design and development, and I know it is
18  -- it is unique.
19          In fact, I don't run across this type of
20  a safeguarding system in other industries. And I've
21  done machine guarding in lots of industries. The
22  closest thing I come to is light curtains, and that's
23  not the same. This is not a safeguarding system, per
24  se. This is an injury amelioration system. It
25  doesn't protect the operator from the blade. It only

Page 168

1   ameliorates the injury once he contacts the blade.
2   The protection of the operator from the blade is the
3   guard. If he happens to get past the guard and his
4   flesh contacts the blade, the saw's protection system
5   senses that and protects him from a further severe --
6   further severity of his injury.
7           So in this system there was a lot of
8   development went into it, which is costly, I know
9   that. And so in order to do so, they had to consider
10  a lot of potentials, possibilities.
11          It appears to me as though they've
12  considered all these possibilities, and now they have
13  that knowledge and they're passing that knowledge on
14  to their consumers 'cause they know their consumers
15  should have this knowledge so as to protect them
16  against being injured, protect them from inadvertent
17  injury, protect them from something that might
18  intuitively seem safe to them.
19          And yet they have the knowledge, the
20  superior knowledge, that it's not. Just like Stihl
21  had the superior knowledge that people will put
22  toothed saw blades on demo saws thinking that they can
23  cut soft material such as plastic pipe, and know that
24  that's a dangerous hazard. So they have to -- they
25  have the same obligation to transfer to their

Page 169

1   consumers that Saw Stop did. Saw Stop's transferring
2   this knowledge to these consumers. They're warning
3   them not to do this.
4   Q   They're warning them in an owner's
5   manual, correct?
6   A   That's correct.
7   Q   All right. On the top of the next page,
8   number nine, this is page 11, Mr. Growney, paragraph
9   nine, "Never install the blade backwards. The brake
10  might not stop a blade that is installed backwards."
11          You see that?
12  A   Yes.
13  Q   And is it -- I take it on your Saw Stop
14  it is possible to mount the blade backwards?
15          MR. PACKIN: Note the foundation question
16  as to whether he's seen that.
17  BY MR. WALSH:
18  Q   Do you know whether it's possible to
19  mount a blade backwards?
20          MR. PACKIN: Object to the form and lack
21  of foundation.
22          Go ahead.
23          THE WITNESS: Yes, I know it's possible
24  to mount a blade backwards, just as it is possible to
25  mount a blade backwards on other saws.

43 (Pages 166 to 169)

db2aa797-bf2c-44d4-b545-ffd826d2ee60

Page 170

BY MR. WALSH:

Q    Right.  And there's nothing on the Saw Stop designed to prevent somebody from mounting a saw backwards, a design element?

A    No.  Just as there's nothing on a demo saw, a Stihl demo saw, to prevent you from mounting a saw blade backwards on that.

Q    Do you know of any saw of any kind where there is some device that prevents you from mounting a saw blade backwards?

A    No, I don't.

Q    Okay.  Number 10, "Never install two or more 10-inch blades together.  The safety system is not designed to stop multiple stacked 10-inch blades."

Do you know whether you're -- on your Saw Stop you can mount two or more 10-inch blades together if you want to do so?

MR. PACKIN:  Object to form and lack of foundation.

THE WITNESS:  I haven't investigated the saw for that.

BY MR. WALSH:

Q    Would it suggest to you from this warning that it is possible to do?

MR. PACKIN:  Object to form.  Lack of

Page 171

foundation.  Calls for speculation.

Go ahead.

THE WITNESS:  I would think that it was -- it might be possible.

BY MR. WALSH:

Q    All right.  And do you know of anything on the Saw Stop that would prevent somebody from mounting two or more 10-inch blades together if they're not supposed to do so?  Some design element?

A    No, I do not.  But just as before in the design of the system, I know this is a very elaborate system, they had to consider a lot of potentials, a lot of possibilities.

A system of this type doesn't exist anyplace else.  So, once again, they considered -- apparently they have considered the double mounting of saw blades and have advised consumers so.

Q    Number 11 says, "Never stack dado blades thicker than 13/16ths of an inch.  The eight-inch dado blade cartridge is not designed to stop dado stacks thicker than 13/16ths of an inch."

Do you know whether it's possible on the Saw Stop to stack dado blades thicker than 13/16ths of an inch?

MR. PACKIN:  Object to form and lack of

Page 172

foundation.

THE WITNESS:  I have not investigated the Saw Stop for any mounting of dado blades.

BY MR. WALSH:

Q    The warning would suggest, however, it could be done; is that not right?

MR. PACKIN:  Object to form.  Lack of foundation.  Calls for speculation.

THE WITNESS:  The warning suggests to me that they have investigated this.

BY MR. WALSH:

Q    And does the warning further suggest that there's no design element to prevent that from happening?

A    Yes.

MR. PACKIN:  Object to form.  Lack of foundation and calls for speculation.

THE WITNESS:  But, once again, this is a practice that they know of, or this is a practice that they've expected, so want the consumer to be aware of it.

BY MR. WALSH:

Q    And they presented it in an owner's manual as item number 11 in a list of 21 on pages 10 and 11 of the owner's manual in order to present that

Page 173

information, correct?

MR. PACKIN:  Object to the form.

THE WITNESS:  As I had said before, the proportion of the population that uses dado blades and molder heads is very small.  This is a situation where you might not have a lot of frequency.

BY MR. WALSH:

Q    Do you know how the use of dado heads and molder heads in the wood-cutting world compares to the use of carbide-tipped saw blades in the cut-off machine world?

MR. PACKIN:  Object to the form.  Calls for speculation as well.

THE WITNESS:  I don't understand your question.

BY MR. WALSH:

Q    Yeah.  Do you know how the percentage of wood -- people using wood-cutting saws that use molder heads or dado sets compares to the percentage of users of hand-held gasoline-powered cut-off machines that use carbide-tipped saw blades on them?

MR. PACKIN:  Object to the form.

THE WITNESS:  You know something?  I still don't understand your question.

BY MR. WALSH:

44  (Pages 170 to 173)

DEGNAN & BATEMAN
(856)  232-7400

db2aa797-bf2c-44d4-b545-ffd826d2ee60

Page 174

1   Q   Then I'm not doing a very good job. Let
2   me try it again.
3       You said the people in the saw --
4   woodworking world, the people that use table saws and
5   other woodworking saws, that the percentage of them
6   who use dado sets and molder heads are relatively low.
7   I think you used 10 percent; somewhere in that
8   vicinity, correct?
9   A   Yes.
10  Q   Do you know how that percentage compares
11  to the percentage of people using cut-off machines who
12  mount wood-cutting saw blades on them?
13      MR. PACKIN: Object to the form.
14      THE WITNESS: Even if I knew that
15  percentage, that comparison, it would be meaningless
16  because there's no comparison machine-to-machine. The
17  danger with the machines is very different. I mean, I
18  don't think a table saw -- there aren't too many table
19  saws that can jump up and strike you in the head and
20  kill you. There are table saws that can kill you,
21  yes, but they don't have that facility as hand-held
22  cut-off demo saws do.
23      MR. PACKIN: Just pick any good spot for
24  a two-minute men's room break.
25  BY MR. WALSH:

Page 175

1   Q   And I just need to know the basis for
2   that statement. What statistics, injury statistics,
3   are you relying on, if any, to compare the fatalities
4   with table saws to the fatalities with cut-off
5   machines?
6       MR. PACKIN: Object to the form.
7       THE WITNESS: You've mixed your
8   questions.
9   BY MR. WALSH:
10  Q   I may have.
11  A   Yes, you did. You did. You asked me
12  about dado blades on table saws comparing to
13  wood-cutting tooth blades on cut-off machines, cut-off
14  saws. So even if I knew, it would be meaningless.
15  Q   Well, suppose -- suppose there was --
16  A   The hazard is not the same.
17  Q   Suppose with dado -- using dado blades
18  and molder heads accident statistics showed that there
19  were -- per thousand users there were 15 fatalities
20  and 150 serious injuries compared to one fatality and
21  three serious injuries with a cut-off machine. Would
22  that be significant to you?
23      MR. PACKIN: Object to the form.
24      THE WITNESS: No. It wouldn't be
25  significant because --

Page 176

1   MR. PACKIN: Would or wouldn't?
2   THE WITNESS: I'm sorry. It wouldn't be
3   meaningful because you have people and machine versus
4   people and machine. So you're taking the people out,
5   okay? So you're trying to compare machine to machine.
6   And the problem is there is no comparison. In other
7   words, the machines don't compare in this context.
8       MR. WALSH: All right. Let's take a
9   break.
10      (Short recess was held.)
11      VIDEO TECHNICIAN: We're back on.
12  BY MR. WALSH:
13  Q   Mr. Growney, have you ever designed a
14  brake for a chainsaw?
15  A   No, I never designed a brake for a
16  chainsaw, but I understand the engineering principles
17  involved.
18  Q   Have you ever worked -- I'm sorry.
19  A   And I've evaluated braking systems.
20  Q   Okay. Have you ever evaluated a braking
21  system on any hand-held power tool?
22      MR. PACKIN: Objection. Just asked and
23  answered.
24  BY MR. WALSH:
25  Q   Have you ever evaluated -- you say you

Page 177

1   evaluated braking systems. Have you ever evaluated a
2   braking system on a hand-held power tool?
3       MR. PACKIN: I thought he just said on a
4   chainsaw.
5       MR. WALSH: I don't think that's what he
6   was suggesting.
7       THE WITNESS: You asked chainsaw, right?
8       MR. PACKIN: No.
9   BY MR. WALSH:
10  Q   All right. Let me go back. Have you --
11  tell me what you've done to evaluate a chain brake on
12  a chainsaw. Have you done that?
13  A   I believe I have, yeah.
14  Q   Okay. What brake on what saw?
15  A   Well, I evaluated the principles, the
16  mechanism, the -- the principles, the lock on the
17  McCullough. In other words, the actuation, what it
18  takes to trip, what it takes to overcome it.
19  Q   Okay. Have you done -- have you done any
20  stop time tests on a chain brake on a chainsaw?
21  A   No. No. But I am guided by the figures
22  that are in the standard.
23  Q   And have you -- and in -- and what are
24  the figures in the standard?
25  A   I believe it has to stop within

45 (Pages 174 to 177)

DEGNAN & BATEMAN
(856) 232-7400

db2aa797-bf2c-44d4-b545-ffd826d2ee60

Page 178

1  seven-tenths of a second.  I think that's what it is.
2      Q      Seven-tenths?  And is that from
3  actuation?  Is that from initiation of kickback?
4  What is that from?
5      A      That's from actuation.
6      Q      Actuation of the brake?
7      A      Yeah.
8      Q      How fast does -- do you have any -- do
9  you have any statistics on the speed of rotation of
10 kickback?
11         MR. PACKIN:  For what tool?
12         MR. WALSH:  Let's start with a chainsaw.
13         MR. PACKIN:  Object to the form.
14         You can answer.
15         THE WITNESS:  I don't believe I have, but
16 I've taken that, the standard, as representing the
17 industry-accepted figure for the speed of rotation.
18 BY MR. WALSH:
19     Q      Have you --
20     A      In other words, the brake -- the machine
21 has to stop within the time.  That time stops -- the
22 rotation is such that the machine has to stop it
23 within that time.
24     Q      Have you done any -- any type of tests on
25 a chain brake for a chainsaw other than evaluate the

Page 179

1  activation mode of a McCullough brake?
2         MR. PACKIN:  Object to the form.
3         You can answer it.
4         THE WITNESS:  No, I have not.
5  BY MR. WALSH:
6      Q      Have you --
7      A      But I don't think that I have to test,
8  because the industry has established a standard, so I
9  -- I take a look at the standard, and that's my start.
10     Q      Okay.  The McCullough brake you examined,
11 was it in-board or outboard brake?
12     A      I believe it's in-board.
13     Q      And where in-board was it mounted?
14     A      Between the chain sprocket and the
15 machine.
16     Q      Between the chain sprocket and the
17 machine?
18     A      The body of the machine, the housing.
19     Q      What is the brake mechanism itself?  What
20 is it?
21     A      It's a band that -- it's a band brake
22 that wraps around the -- a round surface.
23     Q      Round surface.  What is that round
24 surface?
25     A      I think that's the clutch.

Page 180

1      Q      The clutch?
2      A      Clutch housing.
3      Q      Okay.  And you believe that the
4  McCullough brake is mounted in-board, not in the
5  sprocket cover?
6      A      Well, I'm sorry.  You know, maybe when
7  you say in-board, not in the sprocket cover.
8      Q      Is it -- do you know what the sprocket --
9         MR. PACKIN:  I think -- were you finished
10 speaking?
11         THE WITNESS:  No.
12         I know that when I get it off it's
13 exposed.
14         So when you say the sprocket cover, I'm
15 talking about the chain sprocket.  In other words, the
16 sprocket that drives the chain, the brake, is from
17 that point inward towards the body.
18 BY MR. WALSH:
19     Q      Okay.  Do you know what the sprocket
20 cover is on a chainsaw?
21     A      Well, that's the little cast.  Usually
22 it's casting.  I've seen them as die casting.  Casting
23 or plastics, whatever, that cover the sprocket where
24 the chain goes around the sprocket.
25     Q      Okay.  On your McCullough can you remove

Page 181

1  the sprocket cover?
2      A      Yes.
3      Q      And when you remove the sprocket cover,
4  is the chain brake mechanism in the sprocket cover or
5  is it in the body of the saw?
6      A      Well, it's -- would be in the body of the
7  saw.
8      Q      And you say you believe you can see it.
9  When you take the sprocket cover off, you can actually
10 see the chain brake?
11     A      Yeah.
12     Q      Now, have you -- do you have to -- do you
13 have to take the -- remove the sprocket in order to
14 see it, or is the sprocket still in place?
15     A      Sprocket's in place.
16     Q      Have you ever taken the sprocket off of
17 the McCullough saw?
18     A      No.
19     Q      Have you ever removed the chain brake
20 from the McCullough saw?
21     A      No.
22     Q      Now, have you -- have you ever observed
23 any type of kickback testing with a chainsaw?
24     A      No.
25     Q      Have you ever seen the results of any

46  (Pages 178 to 181)

DEGNAN & BATEMAN
(856)   232-7400

db2aa797-bf2c-44d4-b545-ffd826d2ee60

Page 182

1  kickback testing with a chainsaw?
2        MR. PACKIN:  You say "the results."
3  BY MR. WALSH:
4        Q     The data.
5        MR. PACKIN:  Thanks.
6        THE WITNESS:  No.  But I -- it seems to
7  me there's something in the standard.  I'm trying to
8  remember.  I may have, yeah, because I remember I
9  looked for it.  I did see it someplace.  Maybe it's in
10 the standard.
11 BY MR. WALSH:
12       Q     What data did you find in the standard or
13 elsewhere about results of kickback testing?
14       A     I think there's something in the appendix
15 that is standard.
16       Q     Do you know what it was?  Do you know
17 what it told you, what information it provided?
18       A     No.  But, once again, as I described
19 earlier, I have the results of the Power Tool
20 Institute's kickback study, and so we have -- in a
21 sense there's a similarity, because we have a circular
22 cutter.
23       Q     You're referring to the hand-held
24 circular saw study you were talking about earlier?
25       A     Yes.

Page 183

1        Q     Okay.  Do you still have ANSI 01.1
2  standard in front of you, Exhibit Number 7?
3        A     Yes, I do.
4        Q     Take a look at that for a moment, and
5  look at -- on page 14, three -- section 311.2, and
6  read to me how the woodworking machinery safety
7  standards define kickback.
8        MR. PACKIN:  Read to you or explain it?
9        MR. WALSH:  Read to me.
10       MR. PACKIN:  Object to the form.
11 Go ahead.
12       THE WITNESS:  "A particular form of
13 ejection describing the unexpected movement of the
14 work piece or parts of the work piece opposite to the
15 direction of the feed during processing."
16 BY MR. WALSH:
17       Q     All right.  Now, what does -- when the
18 standard uses the term, "work piece" there, what's it
19 referring to?
20       A     Well, that would be the piece of the --
21 that you're cutting, molding, planing, and you're
22 feeding it into the saw.
23       So in a stationary machine the machine
24 doesn't move, but the piece is thrown back.  But in a
25 hand-held machine, the kickback is an opposite

Page 184

1  reaction in the sense that the work piece stays
2  stationary and the machine throws back.
3        So kickback for one is kickback for the
4  other.  Either way something comes back to the
5  operator.  Something is kicked back to the operator.
6        Q     In the way that kickback is defined in
7  the standards relating to woodworking equipment, it's
8  the movement of the wood being cut or the piece of
9  material being cut, correct?
10       A     Yes.
11       MR. PACKIN:  Object to the form.
12       MR. WALSH:  Okay.  All right.
13       MR. PACKIN:  Got to pause a little bit so
14 we don't talk over each other.
15       THE WITNESS:  I'm sorry.
16 BY MR. WALSH:
17       Q     Let's go back then to brakes.
18       A     But the important part -- important point
19 is that the engineering consideration is that
20 something is thrown back to the operator --
21       Q     Let --
22       A     -- in both types of kickback.
23       Q     Do you have any information that would
24 suggest to you within the construction industry,
25 generally, what the most common usage of the term

Page 185

1  "kickback" is among construction workers?
2        MR. PACKIN:  Object to the form and asked
3  and answered earlier today.
4        THE WITNESS:  Well, I had that
5  carpenter's article about -- I'm sorry.  Moore's
6  article written about the carpenters, and that, of
7  course, referred to kickback.
8        In my readings from time to time over the
9  years I have come across the term kickback, and it is
10 generally accepted to mean something is thrown back
11 towards the operator.
12 BY MR. WALSH:
13       Q     Could be the work piece or it could be
14 the machine?
15       MR. PACKIN:  Object to the form.
16       THE WITNESS:  Depending upon the type of
17 machinery that you're working on, yes.
18 BY MR. WALSH:
19       Q     Now, in terms of brakes, have you ever
20 had -- well, let me ask you this:  Do you know whether
21 accidents, kickback injuries, continue to happen with
22 chainsaws equipped with chain brakes?
23       A     I haven't investigated that.
24       Q     Do you know -- you told me you looked at
25 the CPSC injury statistics.  Did it have a category of

47  (Pages 182 to 185)

db2aa797-bf2c-44d4-b545-ffd826d2ee60

Page 186

1  injuries with chainsaws?
2      A    I didn't look at that one if they had
3  one.
4      Q    Do you know today what percentage of
5  chainsaws are equipped with chain brakes?
6          MR. PACKIN:  Percentage currently being
7  manufactured as opposed to --
8  BY MR. WALSH:
9      Q    Well, let's do currently manufactured,
10 and then we'll move to currently in use.
11         Do you know what the figures are for the
12 number of chainsaws being currently manufactured --
13 percentage being manufactured with chain brakes?
14     A    I don't know the percentage, but every
15 time I see a chainsaw they all have chain brakes.  And
16 I'm in and out of machinery suppliers all the time,
17 you know.  There may be some chainsaws on the market
18 that don't have chain brakes.
19     Q    Is there any requirement in the ANSI
20 chainsaw standards that a chainsaw be equipped with a
21 chain brake?
22     A    No.  The ANSI requirement is the amount
23 of stopping time.
24     Q    And have you ever seen a Craftsman
25 chainsaw?

Page 187

1      A    I may have.
2      Q    Did it have a chain brake?
3          MR. PACKIN:  Object to the form.  He said
4  he may have.  You're asking him to speculate.
5  BY MR. WALSH:
6      Q    May -- do you know whether you've seen a
7  Craftsman chainsaw?
8      A    I don't know for certain that I have seen
9  a Craftsman chainsaw.
10     Q    How about a Poulan?
11     A    I know I have seen a Poulan.
12     Q    Do you know whether the Poulan you saw
13 had a chain brake?
14     A    Well, the Poulan I saw was the same
15 vintage as my Homelite, so there's a good chance that
16 it didn't have one.
17     Q    How long do you think chain brakes have
18 been -- do you know when chain brakes became available
19 for chainsaws?
20         MR. PACKIN:  Object to the form.
21         THE WITNESS:  Some time in the '80s they
22 did.
23 BY MR. WALSH:
24     Q    Would it surprise you to know that there
25 have been chainsaws equipped with chain brakes for 40

Page 188

1  years?
2          MR. PACKIN:  Object to the form.
3          THE WITNESS:  No.  That would be
4  representative of a lot of things in industry.  In
5  other words, the safety device is developed and
6  applied to a machine, but the industry drags its feet
7  to adopting it.  There always seems to be -- in the
8  pecking order, safety is way down on the line.
9  BY MR. WALSH:
10     Q    Do you know what company invented chain
11 brakes for chainsaws?
12     A    No, I don't.
13     Q    Would it surprise you if it was Stihl?
14         MR. PACKIN:  Object to the form.
15         THE WITNESS:  Would it surprise me?  No,
16 it would not surprise me.
17         Excuse me.  Stihl had -- I'm sorry.  Go
18 ahead.
19 BY MR. WALSH:
20     Q    Do you know -- do you know whether the
21 introduction of chain brakes on chainsaws has reduced
22 the number of injuries from kickback with chainsaws?
23         MR. PACKIN:  That was asked and answered
24 about a half an hour ago.
25         Go ahead.

Page 189

1          THE WITNESS:  Yes.  My understanding is
2  there's been significant reduction.  And you mentioned
3  Consumer Product Safety Commission.  It seems to me I
4  did see those figures at one time or another.  I don't
5  have them currently.
6  BY MR. WALSH:
7      Q    Do you know -- do you know whether the
8  injury statistics with chainsaws are in the hundreds,
9  the thousands, the hundreds of thousands?  Do you have
10 any order of magnitude of how many serious injuries
11 occur with chainsaws in a year?
12         MR. PACKIN:  Object to the form.
13         THE WITNESS:  I haven't looked at the
14 statistics in the long-term.  I'm sorry.  Go ahead.
15 BY MR. WALSH:
16     Q    Do you know how the number of chainsaws
17 compares to the number in use -- compares to the
18 number of cut-off machines in use?
19         MR. PACKIN:  Object to the form.
20         THE WITNESS:  Do I know?  No, I don't
21 know.  I could speculate, but I recognize that it
22 would be speculation.
23 BY MR. WALSH:
24     Q    Have you -- have you ever evaluated a
25 brake for a cut-off machine?

48  (Pages 186 to 189)

db2aa797-bf2c-44d4-b545-ffd826d2ee60

Page 190

1    A    Yes.
2    Q    What brake did you evaluate for the
3  cut-off machine?
4    A    I'm sorry. I did brake evaluation. I
5  didn't do a particular brand name. I did brake
6  evaluation.
7    Q    Okay. What did you evaluate with regard
8  to a cut-off machine?
9    A    Well, the horsepower of the machine, the
10  speed of the machine, stopping time; things of that
11  nature.
12    Q    All right. For example, what -- do you
13  know what the chain speed of a chainsaw is?
14    MR. PACKIN: Object to the form.
15    You can answer.
16    THE WITNESS: I may have looked at it. I
17  don't know off the top of my head.
18  BY MR. WALSH:
19    Q    Do you know what the mass of the chainsaw
20  chain is?
21    A    I have --
22    MR. PACKIN: Object to the form.
23    You can answer. You got to give a
24  second, Mr. Growney.
25    THE WITNESS: I'm sorry. I'm sorry.

Page 191

1  BY MR. WALSH:
2    Q    Do you know what the mass of the chainsaw
3  chain is?
4    MR. PACKIN: Object to the form.
5    THE WITNESS: I have -- I'm sure I have
6  looked that up at one time or another. I do not know
7  what it is.
8  BY MR. WALSH:
9    Q    Do you know what the speed of a rotating
10  blade or wheel on a cut-off machine like a TS 400 is?
11    MR. PACKIN: Object to the form.
12    THE WITNESS: Yes, I do.
13  BY MR. WALSH:
14    Q    What is that?
15    A    It's 5400 RPM.
16    Q    Where are you measuring that speed?
17    A    Oh, you mean the peripheral speed? Is
18  that what you're asking?
19    Q    Yes.
20    A    What are you asking?
21    Q    Peripheral speed of the wheel.
22    A    I -- yes, I do. And I'm trying to
23  remember what it is, because it exceeds the industry
24  accepted limitation for carbide tips adhering to the
25  base of the blade, carbide-tipped saw blades, which it

Page 192

1  seems to me it's 7300. I forget what that is.
2    Q    Do you have any of this written down
3  anywhere in your files in terms of the materials that
4  you've looked at and relied upon for purposes of your
5  opinion?
6    A    I may have some of them right here. I
7  know I do have blades speed sheets -- I'm sorry. Saw
8  blade manufacturers' sheets that address blade speed,
9  and I know I have looked some of these things up.
10    Q    Do you know -- do you know what the
11  engine speed is on a TS 400?
12    MR. PACKIN: Object to the form.
13    THE WITNESS: I did look that up, and I
14  don't know what it is off the top of my head.
15  BY MR. WALSH:
16    Q    What --
17    A    It was hard to find.
18    Q    It was hard to find?
19    A    Yeah.
20    Q    What was the calculation you did to
21  compare a chainsaw and the energies developed during
22  kickback with a chainsaw -- with a cut-off machine?
23  Tell me -- describe for me the calculations you made.
24    MR. PACKIN: Object to the form.
25    THE WITNESS: Well, I took -- I did a

Page 193

1  number of comparisons. One of them was evaluate the
2  speed. You asked about the speed of the machine.
3  That's the speed of the engine.
4    And I decided that there would be a
5  couple of ways to do this, but one of them would be to
6  disengage the clutch when an actuation mechanism was
7  going and cause ground out the spark on the engine.
8  So we shut the engine off, and it doesn't -- and a
9  disengagement doesn't propel the wheel forward while
10  you're trying to brake it.
11    So, in other words, then you're only
12  dealing with the moment of inertia of the wheel. And
13  I did look at the moment inertia of the wheel.
14  BY MR. WALSH:
15    Q    What was it?
16    A    Well, that depends on which one. And I
17  think what I decided to do was to use a steel,
18  S-T-E-E-L, such as a diamond blade, because that would
19  be representative of a saw blade. I don't remember
20  what it was. That's a standard engineering formula
21  that's found in most engineering handbooks or
22  textbooks.
23    MR. PACKIN: Let him finish his answer.
24    MR. WALSH: I thought he had.
25    MR. PACKIN: No. He's been interrupted,

49 (Pages 190 to 193)

DEGNAN & BATEMAN
(856) 232-7400

db2aa797-bf2c-44d4-b545-ffd826d2ee60

Page 194

1  so listen to what he did with his calculations.
2          THE WITNESS:  So then I considered the
3  energy.  One of the things was to consider how much
4  energy the engine was putting out at its maximum, and
5  decide that that's the amount of energy that the --
6  that was the maximum amount of energy in a system.
7  And the blade doesn't contain all that.  But I'll just
8  say, that's the maximum amount of energy that's
9  possible to have in a system.  The engine just roaring
10 away.
11         So then when the blade brake is actuated,
12 you disconnect the engine through the clutch to the
13 blade, you shut the engine off so that's out of the
14 way.  So then the maximum amount of energy you have to
15 dissipate is what the engine produced.  So that goes
16 into a brake.  So that's what the brake capacity has
17 to be.
18         I looked at that, and after looking at
19 this a number of times I decided that, you know, maybe
20 there's another way around this thing; there's an
21 alternative or an area.  And that would be -- that
22 may be -- instead of trying to stop the blade, what we
23 do is we go through this when it's tripped and
24 disengage the blade.  But instead of trying to stop
25 the blade we could fire the blade guard, the type of

Page 195

1  which exists on the hand-held circular carpenter's
2  electric saw.  I mean, that would be two ways to
3  achieve the same thing.
4  BY MR. WALSH:
5      Q     You're firing what?  I'm sorry?
6      A     Well, on the hand-held carpenter's
7  electric saw, the lower blade guard, you know, if --
8  if you had a kickback on a demo saw and it came back
9  and hit the man, the hazard is the rotating blade
10 hitting the man.
11         So you do two things.  You could stop the
12 blade or you could guard the blade -- guard the man
13 from contacting the saw, the rotating blade.  So that
14 is an option in this blade brake design.  And I
15 realize that that's probably a simpler thing to do.
16 That's an easier thing to do, because you put the same
17 type of blade on a cut-off saw as the lower blade
18 guard on a hand-held carpenter's electric saw.  And
19 when you trip it, you know, you only need a wound-up
20 spring like a clock spring that you wind up.  And when
21 the trip goes, you can find that blade, that thing
22 will slap right out.
23         And what you'll do is that will then
24 become protection, guarding protection, that becomes a
25 physical barrier between the man's face or neck or

Page 196

1  shoulder, or whatever it is, and the spinning blade.
2  And of course you can disengage the blade at the same
3  time.
4          So you have two ways to use this brake
5  theory.  One is to stop the blade from spinning, and
6  the other one is to fire a blade guard.
7      Q     Okay.  What's the mechanism that you use
8  to disengage the blade?
9      A     The clutch.
10     Q     And, I mean, what is it -- what exactly
11 -- describe for me what it is you do.
12     A     Well, you arrange the clutch so that --
13 the clutches are a centrifugal clutch.  So you have
14 linkage connected to the -- the paddle, the wheel, the
15 flag, similar as you have on a chainsaw.
16         The operator strikes the flag, the flag
17 strikes the operator.  Doesn't make any difference,
18 whichever way it goes.  That's the reaction to the
19 kickback.  You position it so the operator hits it.
20 Okay.  When that happens, the extra linkage that you
21 have from that flag is connected to the clutch, and it
22 trips the clutch.
23     Q     That's a mechanical connection?
24     A     Yes.
25     Q     And this, the flag you're referring to,

Page 197

1  front hand guard on a chainsaw?
2          MR. PACKIN:  I didn't hear that.
3          MR. WALSH:  Front hand guard.
4          MR. PACKIN:  I heard that word, but the
5  connector -- can you read that back?
6          (Above-mentioned question was read back
7          by the court reporter.)
8  BY MR. WALSH:
9      Q     What you're calling a flag, are you
10 referring to the front hand guard on a chainsaw?
11     A     Yes.  In all the models it had a flag
12 shape or whatever, yes, that's correct.
13     Q     All right.  Now, have you -- have you
14 drawn up your proposals for guarding for a brake or
15 guarding system that you just described on a cut-off
16 machine?
17         MR. PACKIN:  Talking did schematically?
18         MR. WALSH:  Yeah.
19         THE WITNESS:  No, I haven't.
20 BY MR. WALSH:
21     Q     Have you -- have you done any testing or
22 have you developed a prototype of any sort of that
23 guarding system or brake?
24     A     No, I haven't.  But these components are
25 in the market, all the hand-held carpenter electric

50  (Pages 194 to 197)

DEGNAN & BATEMAN
(856)  232-7400

db2aa797-bf2c-44d4-b545-ffd826d2ee60

Page 198

1   saws, they all have that lower blade guard.
2   Q    Have you done any testing on either the
3   guard or a brake for a cut-off machine, as you've just
4   described it?
5   A    No, I haven't. But then, again, I've
6   looked at the Power Tool Institute study.
7   Q    And what does that tell you about the
8   guard or brake, the testing of the guard or brake that
9   you've proposed?
10  A    That it's certainly a physical
11  possibility without a doubt. You know, it's a
12  realistic possibility.
13  Q    What was it in the study that even
14  addressed a guard or a brake for a cut-off machine?
15      MR. PACKIN: Object to the form.
16      You can answer.
17  BY MR. WALSH:
18  Q    What was it in the study that even
19  addressed the concept of a brake or a guard for a
20  cut-off machine?
21      MR. PACKIN: Object to the form.
22      THE WITNESS: You mean in the Power Tool
23  Institute?
24      MR. PACKIN: Got to object to the form.
25  BY MR. WALSH:

Page 199

1   Q    Yes, in the Power Tool Institute.
2   A    The power -- it was my looking at that
3   study and making an engineering realization that that
4   was applicable to the -- that technology was
5   applicable to the -- these cut-off saws.
6   Q    Was there any test -- was there any
7   testing on a cut-off machine of any guard or break in
8   that study?
9   A    This study was directed towards the
10  electrical saws.
11  Q    I understand. Was there any testing of a
12  guard or a brake specifically on a cut-off machine in
13  that study?
14  A    That wasn't for a cut-off machine.
15  Q    All right. Do you know of anything in
16  the professional literature that has looked at,
17  tested, or published the results of testing of a brake
18  or a guard like you've described for a cut-off
19  machine?
20  A    I don't.
21  Q    Okay. Are you aware of any cut-off --
22  A    Actually, I know that Stihl has not done
23  that because Stihl has -- you told me today that
24  they've had brakes for 40 years on chainsaws. And
25  they've been making these things 15, 20 years prior to

Page 200

1   McGee's accident.
2       You would think in the interim that --
3   from when they developed a chainsaw brake, that they
4   would at least try to see if it was -- if it was
5   adaptable and could be done.
6       Linsbauer said they never even considered
7   it, and here you have -- you have a known hazard.
8   Now, he knows -- you know, Stihl knew that people put
9   these saw blades on these cut-off machines and these
10  demo saws, and he knew that people were injured. They
11  knew. Stihl knew and the other fellow, the engineer,
12  his name escapes me at the moment, yet they didn't try
13  to do anything engineering design wise to mitigate
14  that dangerous hazard, even though Enright -- I can't
15  think of his name. Isen, whatever his name was. He
16  said that an engineer was obligated that if they could
17  do something, they should. They have to do it.
18  Q    Have you read Linsbauer's reports in this
19  case?
20  A    Yes, I have.
21      MR. PACKIN: We just have about two
22  minutes left.
23  BY MR. WALSH:
24  Q    And did he address the issue of chain
25  brakes in the report for brakes on cut-off machines?

Page 201

1   A    I'm trying to remember. Nothing comes to
2   my mind at this moment.
3   Q    Is there anyplace in your report that you
4   filed in the case where you mention anything like the
5   guard you just described?
6   A    I don't believe so.
7   Q    Do you know of any cut-off machine ever
8   produced anywhere in the world -- anywhere in the
9   world that has used either a brake or the kind of
10  guard you just described?
11      MR. PACKIN: Object to form.
12      You can answer it.
13      THE WITNESS: I believe there are some
14  large diameter circular saws. In other words, not
15  10-inch, but, like, 12 or 14-inch that have been in
16  the market, and they may not be electric. They may
17  also be pneumatic that have lower blade guards similar
18  to what I've described.
19  BY MR. WALSH:
20  Q    I'm talking about, again, hand-held
21  gasoline-powered cut-off machine. Anyone ever
22  produced anywhere in the world that you know that's
23  ever used a brake or has used the type of guard you
24  described?
25      MR. PACKIN: Object to the form.

51 (Pages 198 to 201)

DEGNAN & BATEMAN
(856)  232-7400

Page 202

1      You can answer it.
2      THE WITNESS: I haven't seen it, but the
3  technology is transferable from the chainsaws and also
4  from those circular saws with the lower blade guard.
5  That -- that technology is -- you're in the same grade
6  type of machinery. Same level of machinery. It's
7  existing in the market just waiting for somebody to
8  put it together and protect their users of their demo
9  saws.
10 BY MR. WALSH:
11     Q    Have you done a patent search to see if
12 anybody has ever patented either a brake or a lower
13 guard like you described for a hand-held
14 gasoline-powered cut-off machine?
15     A    I did do -- started to do a patent
16 search. I forget where I was on it.
17     Q    Did you find any for a cut-off machine?
18     A    I'd have to look in my file; I'm trying
19 to remember.
20     MR. PACKIN: Are we getting near a good
21 time?
22     MR. WALSH: Just a couple more.
23 BY MR. WALSH:
24     Q    Did you -- have you gone to any of the
25 standards organizations and asked them if it was --

Page 203

1  they believed it to be feasible or appropriate to use
2  a brake or a lower guard on a hand-held
3  gasoline-powered cut-off machine?
4      MR. PACKIN: Object to the form.
5      THE WITNESS: Let's see. Well, you would
6  say that since the ANSI B 175.4 is --
7  BY MR. WALSH:
8      Q    The chainsaw standard?
9      A    No. No, not the chainsaw standard, but
10 the cut-off machine.
11     Q    2006?
12     A    2006, the cut-off saw standard. When you
13 look at it, you know, and you look at the membership,
14 you see that it's -- it's all manufacturers. This is
15 a manufacturer's standard, and none of these
16 manufacturers have it, so it's a foregone conclusion.
17 I mean, why bother? You know, you're going to go --
18 you know, if nobody has it, and --
19     Q    Do you know who's --
20     A    -- yet they all have the same hazard.
21     Q    Do you know who is on the actual canvas
22 committee for the 2006 standard?
23     A    The personnel?
24     Q    Yes.
25     A    It is -- it's usually published someplace

Page 204

1  in here, and I thought this was in it.
2      Q    Do you know whether it included OSHA?
3      A    OSHA is a non-voting member of these
4  committees. I mean, I sit on the committee with OSHA.
5  They show up, they're nice. You ask them to comment,
6  they give you commentary. They do not vote.
7      Q    Do you know whether they included the
8  Alliance of American Insurers?
9      A    Which did?
10     Q    The 2006 standard.
11     A    You know, I don't see it here.
12     Q    I'm not talking about the technical
13 committee. You're looking at the technical committee?
14     MR. PACKIN: Object to the form.
15 BY MR. WALSH:
16     Q    You know the difference between the
17 technical committee and the general committee?
18     A    Yes. Yes. I don't -- I don't know why
19 it's not in this copy. Usually these copies have the
20 individual actual members of the committees. Now I
21 don't see it here.
22     Q    Well, you do know under ANSI protocol
23 there was a general committee that consisted of far
24 more than the manufacturers of the machines that
25 participated in the standard; do you not?

Page 205

1      MR. PACKIN: Object to the form.
2      THE WITNESS: Yes, I do know that.
3  BY MR. WALSH:
4      Q    Okay. We can break here for the evening.
5      MR. KOTT: Mr. Packin, just one thing. I
6  was going to stay behind with the court reporter and
7  mark what were attached to Mr. Growney's November 12,
8  2009 report as Growney Exhibit 10, photos that are in
9  one of his packets that he produced today of blades;
10 is that okay?
11     MR. PACKIN: That's fine with me.
12     MR. KOTT: I'll identify it.
13     MR. PACKIN: That's fine. You can do it
14 in the morning or do it now if you want.
15     MR. KOTT: Mark these, please, as
16 Growney-9 and Growney-9a through Growney-9gg.
17     (Packet of documents and photographs were
18 marked as Growney-9 and Growney-9a through
19 Growney-9gg for identification by the court
20 reporter.)
21     THE COURT: Mark these Growney-10 through
22 35.
23     (Photographs were marked as Growney-10
24 through Growney-33. Photographs and documents
25 were marked as Growney-34 and Growney-35,

52  (Pages 202 to 205)

DEGNAN & BATEMAN
(856)  232-7400

Page 206

1  respectively, for identification by the court
2  reporter.)
3              - - -
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 207

1            C E R T I F I C A T I O N
2  STATE OF NEW JERSEY
3  COUNTY OF BURLINGTON
4
5         I, Cindy Pineiro, a Certified Shorthand
6  Reporter and Notary public of the State of New Jersey,
7  do hereby certify that I reported the deposition in
8  the above-captioned matter; that the said witness was
9  duly sworn by me; that the reading and signing of the
10 deposition were waived by said witness and by counsel
11 for the respective parties; that the foregoing is a
12 true and correct transcript of the stenographic notes
13 of testimony taken by me in the above-captioned
14 matter.
15        I further certify that I am not an attorney
16 or counsel for any of the parties, nor a relative or
17 employee of any attorney or counsel connected with the
18 action, nor financially interested in the action.
19
20        _____
21        Cindy Pineiro, CSR #X1001815
22        Notary Public #2327620 Exp. 4/14/15
23
24 Dated: June 14, 2010
25

53  (Pages 206 to 207)

DEGNAN & BATEMAN
(856)  232-7400