# EXHIBIT C

Page 1

 1                  IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF NEW JERSEY
 2               DOCKET NO. 08-CV-00520 (MLC)

 3

      ROBERT MCGEE and TIFFANY MCGEE, his wife,
 4
                    Plaintiffs,
 5
        -vs-
 6
      STIHL INCORPORATED; STIHL GROUP; ANDREAS STIHL AG&CO.,
 7    KG; STIHL SAW COMPANY; NORTHEAST STIHL; OLDHAM
      COMPANY; BLACK & DECKER CORPORATION; SANDER POWER
 8    EQUIPMENT COMPANY; JOHN DOE I (being a fictitious
      name); JOHN DOE II (being a fictitious name); JOHN DOE
 9    III (being a fictitious name), JOHN DOE IV (being a
      fictitious name),
10
                    Defendants.
11

12

                              - - -
13                     June 15, 2010
                              - - -
14                     Volume II

15

16         Continued sworn video deposition of NEAL A.

17    GROWNEY, P.E., 265 Steves Lane, Franklin Lakes, New

18    Jersey, taken in the offices of Nagel Rice, LLP, 103

19    Eisenhower Parkway, Roseland, New Jersey, before Cindy

20    Pineiro, C.M., CSR #XIO1815, and Notary Public of the

21    State of New Jersey, on the above date, commencing at

22    10:10 a.m., there being present:

23

24

25

## Page 2

```
 1
 2        NAGEL RICE, LLP, ESQUIRES,
          BY:  BARRY M. PACKIN, ESQUIRE,
 3        Attorneys for the Plaintiffs.
 4
 5        MCGUIRE WOODS, LLP, ESQUIRES,
          BY:  JAMES WALSH, ESQUIRE,
 6        Attorneys for the Defendants Stihl Incorporated,
          Stihl Group, Andreas Stihl AG & Co., KG, Stihl
 7        Saw Company, and Northeast Stihl.
 8
 9        RUDOLPH & KAYAL, ESQUIRES,
          BY:  STEPHEN A. RUDOLPH, ESQUIRE,
10        Attorneys for the Defendants Stihl Incorporated,
          Stihl Group, Andreas Stihl AG & Co., KG, Stihl
11        Saw Company, and Northeast Stihl.
12
13        MCCARTER & ENGLISH, ESQUIRES,
          BY:  DAVID R. KOTT, ESQUIRE,
14        Attorneys for the Defendants Oldham Company and
          Black & Decker Corporation.
15
16
17
18        ALSO PRESENT:
          James Bateman, Video Technician.
19
20
21
22
23
24
25
```

## Page 4

```
 1                    E X H I B I T S
 2   MARKED FOR I.D.                            PAGE
 3   Growney-47 - Diagram                        9
 4   Growney-48 - Diagram                        9
 5   Growney-49 - Diagram                        9
 6   Growney-50 - Diagram                        9
 7   Growney-51 - Diagram                        9
 8   Growney-52 - Diagram                        9
 9   Growney-53 - Diagram                        9
10   Growney-54 - Diagram                        9
11   Growney-55 - Book                          47
12   Growney-56 - Report                        65
13   Growney-57 - Saw                           83
14   Growney-58 - Document                     140
15   Growney-59 - Document                     180
16
17
18
19            (Exhibits retained by counsel.)
20
21
22
23
24
25
```

## Page 3

```
 1        (By agreement of counsel, the signing,
     sealing and certification of the deposition were
 2   waived, and all objections, except as to the
     form of the questions, were reserved to the time
 3   of trial.)
 4
 5               I N D E X
 6   Witness                                  Page
 7   Neal A. Growney, P.E.
 8     By Mr. Walsh                             5
 9     By Mr. Kott                            124
10
11            E X H I B I T S
```

```
12   MARKED FOR I.D.                          PAGE
13   Growney-36 - Bills                        6
14   Growney-37a - Document                    7
15   Growney-37b - Document                    7
16   Growney-37c - Document                    7
17   Growney-38 - Handwritten document         8
18   Growney-39 - Handwritten document         8
19   Growney-40 - Handwritten document         8
20   Growney-41 - Handwritten document         8
21   Growney-42 - Document                     8
22   Growney-43 - Document                     8
23   Growney-44 - Document                     8
24   Growney-45 - Document                     8
25   Growney-46 - Diagram                      9
```

## Page 5

```
 1        MR. KOTT:  Yesterday the end of the day
 2   I marked as exhibits Growney-9 and Growney-9a through
 3   9ii, which were the Growney exhibits that were
 4   attached to Mr. Growney's report.  He had certain
 5   photos that were attached.
 6        I marked as Growney-10 through, I believe,
 7   Growney-33, but I will check that, photographs Mr.
 8   Growney produced yesterday here of a blade or blades.
 9        I marked as Growney-34 Mr. Growney's Rule
10   26 disclosures which were served by Mr. Packin when he
11   served Mr. Growney's report, and as Growney-35 is a
12   August 2, 2007 letter from Mr. Growney to Mr. Packin
13   attaching a July 19, 2007 letter from Mr. Growney to
14   Mr. Packin with respect to his fee schedule, which was
15   also produced by Mr. Packin when he served Mr.
16   Growney's report.
17        MR. PACKIN:  Off the record for a second.
18        (Off-the-record discussion was held.)
19        VIDEO TECHNICIAN:  The time is now 10:08,
20   and we're on the video record.  Will the court
21   reporter please swear in the witness?
22        NEAL A. GROWNEY, P.E., having been duly
23        sworn, was examined and testified as follows:
24   BY MR. WALSH:
25        Q    Good morning, Mr. Growney.
```

Page 6

```
1        A    Good morning.
2        Q    Yesterday, during the course of the
3    deposition, we had talked about some items that you
4    couldn't locate in your file, and you had indicated
5    that you would bring them in today.  That included
6    bills in the case.
7             Did you bring those with you today?
8        A    Yes, I did.
9        Q    Could I have the bills, please?
10       A    (Witness complies).
11            MR. WALSH:  And let's go ahead and get
12   this marked as the next exhibit, please.
13            (Bills were marked as Growney-36 for
14            identification by the court reporter.)
15   BY MR. WALSH:
16       Q    What we have marked as Exhibit 36 appears
17   to me to contain various bills collectively.  There is
18   one dated August 13, 2007, in the amount of $1,260.11.
19   There is another dated November 16, 2009, in the
20   amount of $19,098.90.  There is one dated February 9,
21   2010, in the amount of $1,375.90.  And then there is a
22   statement, I believe, that is dated June 6, 2010,
23   which I believe is a summary of the attached bills.
24            Can you confirm for me that what I have
25   just stated is correct?
```

Page 7

```
1        A    Yes, it is.
2        Q    Okay.  Now, before we look at these in
3    further detail, are there other documents that you
4    brought with you today that were not in your file
5    yesterday?
6        A    Yes.  This document that actually is not
7    part of my file, but you had asked me to bring in the
8    Power Tool Institute kickback study.  So these three
9    volumes here constitute that (indicating).
10       Q    All right.  Let's get those marked then,
11   if we could, by the court reporter as Volumes I, II --
12   well, as Exhibits 37a, b, and c.
13            MR. PACKIN:  Are you going to be asking
14   me to get those copied?
15            MR. WALSH:  Well, I'll ask somebody to
16   get them copied eventually, or we can have them sent
17   out if you want, and -- or we can pay for copying
18   them, or however you want to handle it.
19            MR. PACKIN:  Okay.
20            (Documents were marked as Growney-37a, b,
21            and c for identification by the court reporter.)
22   BY MR. WALSH:
23       Q    Are there any other documents that were
24   not in your file yesterday that you brought with you
25   today?
```

Page 8

```
1        A    No.
2        Q    I'd like you to do one thing for me.
3    Would you identify in your file and remove from your
4    file, so that we can mark it as an exhibit, anything
5    that is in your file that constitutes some type of
6    drawing, sketch, or engineering computation of some
7    type that relates to the McGee case?
8        A    Okay.
9            MR. PACKIN:  Mr. Growney, I just want to
10   tell you, which it's a perfectly legitimate request
11   that's been made, but I want you to go through the
12   boxes there carefully to make sure you don't look over
13   anything.
14            THE WITNESS:  Yes.
15            MR. PACKIN:  There's no time constraint
16   here.
17            MR. WALSH:  Mark these, please.
18            (Handwritten documents were marked as
19            Growney-38 through Growney-41 for
20            identification by the court reporter.)
21            MR. WALSH:  Mark these as the next
22   exhibits, please.
23            (Documents were marked as Growney-42
24            through Growney-45 for identification by the
25            court reporter.)
```

Page 9

```
1            MR. WALSH:  Mark these, please.
2            (Diagrams were marked as Growney-46 and
3            Growney-47 for identification by the court
4            reporter.)
5            (Diagrams were marked as Growney-48
6            through Growney-54 for identification by the
7            court reporter.)
8    BY MR. WALSH:
9        Q    Have you now -- Mr. Growney, have you now
10   had the opportunity to look through both of your files
11   in McGee and Stout and produced any of the sketches,
12   drawings, or engineering computations in those files?
13       A    Yes.  Yes.  Yes.
14            Before we go any further, I need to
15   correct my testimony yesterday in which, one, I said
16   that I hadn't spoken with Mr. McGee when, actually, I
17   have, and I did generate notes, and they're in that
18   example.  So --
19       Q    They're in what example?
20       A    I'm sorry.  They're in that collection of
21   exhibits that you have.
22       Q    That you just identified this morning?
23       A    Yes.  I came across them, and I realized
24   that they were there.
25       Q    Go ahead and identify the exhibits you're
```

3  (Pages 6 to 9)

dacdbde8-6f3c-4733-8e08-f07653c1f20c

Page 10

1  talking about.
2       MR. PACKIN: Let him finish what he was
3  saying first.
4  BY MR. WALSH:
5       Q    I'm sorry. Sorry.
6       A    So I wanted to correct that, 'cause,
7  actually, on my report -- I also say on my report that
8  I interviewed him. So it was just faulty memory on my
9  part.
10      The second thing is that I misspoke when
11 you asked me the time that the chain brake -- the time
12 for the chain brake to stop, or the time for the chain
13 to stop during -- with kick brake -- when the brake is
14 actuated.
15      Q    On a chainsaw?
16      A    On a chainsaw, that's correct.
17      And I had said, seven-tenths of a second.
18 That was just what popped into my head at the moment.
19 Now, I know that it's -- the average is -- average
20 time is .12 of a second. That would translate into
21 12-100ths of a second with a maximum stopping time of
22 15-100ths of a second.
23      Q    And is that something you looked up in
24 the chainsaw standards?
25      A    Yes. But we had a discussion in the 01.1

Page 11

1  -- the ANSI 01.1 standard, one of the committee
2  meetings about stopping times of various saws, and so
3  I knew that at that time, and I advised somebody had
4  said what I had said, and so I advised them that that
5  was correct.
6       Q    Are you familiar with the chain brake
7  stopping time test that ANSI employs for chainsaws?
8  Are you familiar with how that test is done?
9       A    Well, yeah. On the back of the standard
10 there's a description of the tests. I have gone
11 through it.
12      Q    Okay. Have you ever seen that test done?
13      A    No, I haven't.
14      Q    Have you ever performed that test?
15      A    No. No. But, you know, you asked me
16 about kickback tests, and so this -- I brought this,
17 and so that's part of my knowledge of these types of
18 tests which are, in essence, just applications of
19 basic engineering principles.
20      Q    Could you describe for me how the ANSI
21 kickback chain brake stopping time test is done?
22      A    Not off the top of my head, but I know
23 that it is mounted in a fixture that enables it to
24 swing.
25      I believe, if I remember correctly, and I

Page 12

1  think there's electronic equipment that is attached
2  that makes those speed measurements.
3       Q    For example, what are the test operating
4  parameters they use? New saws or old saws?
5       A    I think it's a saw --
6       MR. PACKIN: Object to the form. You can
7  answer.
8       THE WITNESS: Yeah. I think it's a -- a
9  new saw that has been run for a certain amount of time
10 broken in. I have the standard here with me. I've
11 had it for a while, and I have referred to it in this
12 -- in my working on this case.
13 BY MR. WALSH:
14      Q    Is the test done with one saw or multiple
15 saws?
16      MR. PACKIN: I'm going to object.
17      You want him to ask him from memory?
18      MR. WALSH: I'm asking him from memory if
19 -- his working knowledge of what the chain brake
20 stopping time test consists of.
21      MR. PACKIN: Well, if you're asking
22 working knowledge, that could include referring to
23 literature, if you're asking memory --
24      MR. WALSH: I'm asking what he knows
25 about it from memory.

Page 13

1       THE WITNESS: Well, from memory I think
2  that they used the number of saws, because they're
3  working for an average time. And since they had a
4  spread of, you know, the maximum .15 or 15-100ths of a
5  second.
6  BY MR. WALSH:
7       Q    All right. How many activations take
8  place during the test procedure?
9       A    I don't know. In my -- if I was to do
10 one, I would have that -- that material with me so I
11 could constantly reference. As a matter of fact, I
12 laid it out in a protocol as to what I was going to
13 do.
14      Q    Does the test protocols for activation
15 times differ depending on bar and chain combinations,
16 or are they -- or what type of bar and chain
17 combinations are used to do the test?
18      A    Well, there are combinations because
19 there's features on the chain's anti-kickback
20 features, which there's a variety of forms that are
21 used so that -- I'm sorry. That affects the kickback.
22      Q    What are the bar and chain combinations
23 that are used in the test?
24      A    I'm sorry. I don't remember from memory.
25      Q    Are the saws under load or not under load

4  (Pages 10 to 13)

DEGNAN & BATEMAN
(856)   232-7400

dacdbde8-6f3c-4733-8e08-f07653c1f20c

Page 14

1 when the test is performed? -- I can't recall clearly.
2    A    It seems to me -- I can't recall clearly.
3    Q    Are the times measured from the point of
4 activation or some other point?
5    A    That I -- the detail I don't remember.
6    Q    Do you have any knowledge about how the
7 test -- the times in the standards using the test
8 procedures under the conditions specified in the test
9 compares to actual field stopping times of chain
10 brakes?
11       MR. PACKIN: Object to the form.
12       You can answer.
13       THE WITNESS:  I don't recall seeing that
14 data.  Certainly I would like to see it, because that
15 would give you an idea as to how long a chain brake is
16 effective.
17 BY MR. WALSH:
18    Q    Would you -- have you ever seen any data
19 on chain braking times of chain brakes on chainsaws
20 that have been in the field as opposed to a new saw?
21    A    No, I have not.  But if those -- if that
22 data was available and I was to pursue that, I
23 certainly would review that data.
24    Q    All right.  You've gone through your
25 Stout files and McGee files and the documents that you

Page 15

1 have pulled out, and we -- I've shown to Mr. Packin
2 and complete, are as follows: Growney-36, which are
3 some bills from the case?
4    A    Correct.
5    Q    And then Growney -- you've brought 37 in,
6 and then the documents that we've now marked as
7 Growney-38, 39, 40, 41, 2, and I think all the way
8 through Growney-54.
9       So, basically, 38 through 54.  And I'm
10 going to hand those to you and let you confirm that
11 for me, that those are the documents that you pulled
12 out and handed me in response to my request for
13 drawings, sketches, or engineering computations.
14    A    Yes.  But now I realize that there is one
15 that I have overlooked, and I'm going to see if I can
16 find it, if you'll bear with me.
17    Q    What have you overlooked?
18    A    Well, I know, when I made my estimate of
19 the distance between the two pipes, that I know I was
20 working with a -- one of the photographs from the --
21 taken at the scene, and I probably marked that
22 photograph up as to show where I was working because
23 -- because then I would take those dimensions off.
24    Q    Let -- all right.  Let's put that aside
25 for a moment, and we may go back and ask you to look

Page 16

1 for that photograph.  But let's put that aside for the
2 moment.
3    A    Okay.
4    Q    Are those documents, 38 through 54, are
5 those represent the documents that -- are those the
6 documents that you have identified in response to my
7 request for drawings, sketches, and engineering
8 computations?
9    A    Yes.
10    Q    All right.  Could I have them -- well,
11 first, let me -- let me ask you to look at 38.  And,
12 well, before we do that, I want to go back just for a
13 second on the chain brake question.
14       Do you have any information, statistics,
15 or data that tell you how many kickback injuries occur
16 with chainsaws equipped with chain brakes each year?
17    A    I don't, but I believe the Consumer
18 Product Safety Commission does track chainsaw
19 injuries.  I can't remember if it breaks it down.
20    Q    All right.  Take a look at Exhibit Number
21 38 and tell me what that is.
22    A    I think this was a calculation of the CD
23 video cost.
24    Q    A calculation of what?
25    A    I'm sorry.  Lumping -- there was a --

Page 17

1 there was a report -- there was a statement in this
2 case about -- there was questions -- I'm sorry.  There
3 was questions about, did McGee read the document in
4 its entirety?  And he said no.  He thought --
5    Q    Read what document?
6    A    I'm sorry.  Read the manual in its
7 entirety.
8    Q    Okay.
9    A    And he said no.  He thought the manual
10 was to refer to when he had a problem or needed some
11 specific information.
12       Well, there was a study done by Schriver
13 in the '90s, and it said that about 80 percent of the
14 people who had access to manuals accompanying pieces
15 of equipment treated -- treat those manuals the same
16 way McGee does.
17       In other words, McGee's approach to the
18 manuals is representative of a very vast majority of
19 the people who -- who have access to manuals.  And
20 this calculation was actually -- it was -- the study
21 was done at the time when CDs were available and DVDs
22 were available, and I think also videotapes.
23       And so I lumped the figures together, and
24 it come out to be about six and a half percent of the
25 people would refer to them.

5  (Pages 14 to 17)

dacdbde8-6f3c-4733-8e08-f07653c1f20c

Page 18

1    Q    Okay.  So what you're doing here is on
2  Exhibit 38.  You're trying to do some kind of
3  calculation of what percentage of people would do
4  what?
5    A    I was referring to the CD video.
6    Q    Okay.  But what are you trying to
7  calculate?
8    A    I was lumping those two.  In other words,
9  there was a figure for CDs and there was a figure for
10  video.  So I was lumping them together and saying
11  that, you know, if you take -- at that time there was
12  a mixture.  So there was a transition.  So I was
13  looking at them as -- as some kind of -- putting them
14  together representing a single category.
15    Q    Okay.  But where were the figures coming
16  from?
17    A    A study by the name of -- by a person by
18  the name of Schriver, and it's in the '90s.
19    Q    And do you have that with you?
20    A    I didn't bring it here.  I may have it
21  out in the car.
22    Q    Do you recall where it was published?
23    A    Yeah.  I have this -- I have the book
24  from which it came from.  Yes, I do have that.
25    Q    Do you have some -- do you have materials

Page 19

1  here with you in your car that you've relied on in
2  connection with the opinions you've reached in the
3  case?
4        MR. PACKIN:  Object to the form.
5        You can answer.
6        THE WITNESS:  I know I have that book in
7  the car.  I don't think there's -- I don't know if
8  there's anything else that I relied upon.
9        MR. KOTT:  At a break could you bring
10  that in?
11        THE WITNESS:  Sure.
12  BY MR. WALSH:
13    Q    All right.  I'm still puzzled.  Maybe I'm
14  just not asking a clear enough question.
15    A    Well --
16    Q    I'm trying to figure out what the 6 --
17        MR. PACKIN:  Hold on.
18  BY MR. WALSH:
19    Q    What does the 6.46 represent?  What is
20  that?
21    A    A percentage of the people who looked at
22  the CD videos.
23    Q    Okay.  6.46 percent looked at CD videos?
24    A    Yeah.
25    Q    And that comes from the Schriver report?

Page 20

1    A    Yeah.
2    Q    And how does that compare to people who
3  read manuals?
4    A    Well, it didn't say whether the videos
5  were -- I don't recall it saying whether they were
6  accompanied or you had to get them.  So I was -- I was
7  a little perplexed by that.
8    Q    Little perplexed by what?
9    A    I'm sorry.  That's the wrong word.  I
10  take a look at that and say, well, you know, that's
11  about six and a half percent that I don't know about.
12    Q    All right.  So are you trying to make a
13  calculation here to compare the percentage of
14  operators who read manuals versus the percentage of
15  operators who look at videos, DVDs, or other forms of
16  warnings?
17        MR. PACKIN:  Object to the form.
18        THE WITNESS:  No.  No.
19  BY MR. WALSH:
20    Q    What are you trying to do?
21    A    I was just -- they apparently broke it
22  out in different categories, and I was just lumping
23  them together.
24    Q    Lumping what together?  Manuals and DVDs?
25    A    CDs and DVDs.

Page 21

1    Q    Okay.
2    A    Because I think at that time CDs
3  predominated.
4    Q    What time was this period?
5    A    Early to middle '90s.
6    Q    All right.  And you got lumped CD/DVD
7  with video equals 3.56 plus 2.90 equals 6.46.  Is that
8  what you're just taking from the article and trying to
9  -- and representing the percentage of people who
10  looked at CDs, DVDs, or videos?  Is that what that
11  figure is?
12    A    Yeah.
13        MR. PACKIN:  Object to the form.
14  BY MR. WALSH:
15    Q    It's no computation.  It's just adding
16  figures that were in the article?
17    A    Computation.
18    Q    Okay.  Is there any other computation,
19  engineering computation, in Growney-38 other than
20  adding up the number of people who looked at CDs,
21  DVDs, or videos?
22    A    No.
23    Q    Okay.  In that article was there a
24  comparison of the number of people who read manuals
25  contrasted to the number of people who looked at CDs,

6  (Pages 18 to 21)

DEGNAN & BATEMAN
(856)   232-7400

dacdbde8-6f3c-4733-8e08-f07653c1f20c

Page 22

1   DVDs, or videos?
2      A     I don't believe so.
3      Q     Could I see 38, please?
4      A     (Witness complies.)
5      Q     There's a figure in that paragraph, you
6   put 90 to 100 percent.  Do you know what that figure,
7   90 to 100 percent, represents?
8      A     Yes.
9      Q     What's that?
10     A     Study by Leonard and Kearns said that
11  only about 5.2 percent of the people who have access
12  to manuals read the manuals 100 percent.
13     Q     Okay.
14     A     Now, I read this manual 100 percent, and
15  it took me -- I sat down, you know, and didn't do
16  anything else.  It took me an hour and a half to read
17  the TS-400 manual cover to cover, and I had to take a
18  break; I could not do it continuously.  But I tracked
19  my time.  So, you know, I would -- to me that only
20  five percent of the people who have access to manuals
21  conforms with or is -- corroborates my experience that
22  it is a very lengthy process, and so, hence, it --
23  it's unlikely that people will read the entire manual
24  cover to cover.
25     Q     Okay.  And have you read your manuals for

Page 23

1   your automobile?
2      A     No, I haven't.
3      Q     Have you read --
4      A     I've treated them like McGee.  Based on
5   my experience with reading the TS-400 manual, it would
6   probably take me days to read my manual, my automobile
7   manual, cover to cover.
8      Q     How about your lawnmower?
9      A     I have read the manual.  Also like McGee,
10  in other words, I was interested in the safety
11  aspects.  So I went out, of course, like McGee, I was
12  experienced with lawnmowers.  I mean, I had a number
13  of lawnmowers.  I have owned them myself.  Some with
14  manuals, some without manuals.
15         I'm well experienced in operating those
16  types of machines, those types of engines, the small
17  gasoline-powered engine from a lot of things.
18         So I went to the parts, how to start the
19  machine, I read the safety -- safety aspects, how to
20  install the various components that I had to put in,
21  how to charge the battery, et cetera.
22     Q     So you went to the parts you thought you
23  needed, including the safety information in the
24  manual?
25         MR. PACKIN:  Object to the form.

Page 24

1         THE WITNESS:  Yes, I did.
2   BY MR. WALSH:
3      Q     Okay.
4      A     Of course I'm experienced in this area
5   'cause, I mean, I have read other lawnmower manuals or
6   -- from my previous owner's lawnmowers that I have
7   owned.
8      Q     Let me ask you this:  As an experienced
9   person in lawnmowers, using lawnmowers, do you, each
10  time you take -- you mow your lawn, do you read each
11  of the labels on the lawnmower itself?
12     A     No, I don't, but I -- I do observe the
13  precautions that I have read because I am conscious of
14  that.
15     Q     Okay.  And are --
16     A     Plus, one of the problems is is that
17  they're not located -- necessarily all located where
18  it catches your eye when you look at it.  They're not
19  extremely conspicuous.
20     Q     On the lawnmower?
21     A     Right.
22     Q     And the -- is there any piece of
23  equipment that you own that you -- before using it
24  that you take the time to read the labels that are --
25  the warning labels that are on the tool or the

Page 25

1   equipment?
2      A     Well, I know I have read the warning
3   labels on virtually every piece of equipment that I
4   own, and I am quite familiar with the safety aspects
5   of these pieces of equipment.  And so I have, from
6   time to time, looked at the labels and read the
7   labels.  I don't recall reading every label every time
8   I ran a piece of equipment.
9      Q     Can you --
10     A     Of course one of the other problems is,
11  as I said with the lawnmowers, is some of them --
12  these labels are not conspicuous and not placed where
13  it catches your eye when you approach the machine.
14     Q     Of course you know that there are labels
15  on the machine, safety labels, whether they catch your
16  eye or not, you know -- you know from your own
17  experience there's labels on there and that they're
18  safety labels, correct?
19         MR. PACKIN:  Object to the form.
20         THE WITNESS:  I know there are safety
21  labels on the machine because I have inspected the
22  machine for the safety labels.  I'm interested in what
23  kind of safety labels are on the machine, where
24  they're located, what they say, et cetera.
25  BY MR. WALSH:

7  (Pages 22 to 25)

dacdbde8-6f3c-4733-8e08-f07653c1f20c

Page 26

1   Q   And do you do that with your automobile
2   too? Can you tell me what safety labels are on your
3   automobile when you get in to drive it? Are there
4   safety labels there that you review?
5   A   Well, one of the safety labels that I had
6   had to do with -- with one of the cars that I had.  It
7   was a Toyota.  It had to do with the air bags, and it
8   was positioned whereby, when you opened the door, you
9   would see it.  I've since gotten rid of that car.
10  Q   Where was it positioned?
11  A   It was positioned, when you opened the
12  door, there was -- the side of the dashboard had a
13  safety label stuck on it.
14  Q   Any other safety labels in that car that
15  you can recall?
16  A   There probably are, but I don't recall
17  them right now.
18  Q   How about -- what are you driving
19  currently?
20  A   A Toyota 2009 -- eight.
21  Q   2008?  What -- what make and model?
22  A   Toyota.
23  Q   Yeah, but what model?
24  A   Camry.
25  Q   Camry?  What safety labels are in that?

Page 27

1   A   I think there's one on the mirrors that
2   the objects are -- warning you about the depth
3   perception of the objects.  That's all I can recall at
4   this point.
5   Q   Okay.  And have you read the safety
6   manual for that car?
7   A   I believe so, yes.
8   Q   Cover to cover?
9   A   No.  Like I said before, you know, it
10  would take me days.  I mean, because I have actually
11  gone to the manual for some specific items, and took
12  the manual and read it and tried to apply it, and I
13  had to read the manual over and over and over again
14  for that part because, apparently, it wasn't getting
15  through to me, or I wasn't getting through to it; I
16  don't know.  But I had some difficulty.
17      There was another warning that I just
18  recalled.  It is -- it's a warning light that tells
19  you that your tire pressure is low that comes on if
20  your tire pressure is low.
21  Q   Let me look -- let's go to Exhibit 39 and
22  tell me what that is, please.
23      MR. KOTT:  Can I look at the preceding
24  exhibit?
25      THE WITNESS:  Yes.  This was a -- a

Page 28

1   conversion of type points.  There was testimony in
2   Roads' report about the -- the type -- type size and
3   used the figure 12 points.
4       And so what I had to do -- that's fine if
5   people are in the printing industry or in the --
6   whatever industry that they understand how high 12
7   points are.
8       But what I had to do was convert that
9   into inches.  So then it comes in to about a sixth of
10  an inch, 12 point height.  So, in other words, the
11  typeface that he's referring to is about a sixth of an
12  inch high.  Now, I have used that as a comparison in
13  the typeface that was on the items that are in
14  question in this case.
15  BY MR. WALSH:
16  Q   Okay.  Is that -- then that's a
17  measurement of the type used on print on the Oldham
18  wheel; is that what that is?
19      MR. PACKIN:  Object to the form.
20      THE WITNESS:  My notation here is that
21  Roads would like a lawyer to accompany laborers in the
22  field so they can interpret Stihl's warning for the
23  laborer.
24      So I guess it's Roads' assessment of
25  Stihl's warnings.  I can't remember who Roads --

Page 29

1   whether that was Oldham or Stihl.
2   BY MR. WALSH:
3   Q   Roads was -- I'll represent to you was a
4   witness produced on behalf of Oldham.
5       Do you have any recollection, from
6   reading any material, whether he voiced any opinions
7   on Stihl's warnings?
8   A   Not without going over my notes or my
9   report; I may have.  This is one particular one which
10  I just recall.
11  Q   Are there any other computations on
12  Growney-30 other than -- 39 other than measuring print
13  on whatever you were measuring print on?
14  A   On 39?
15  Q   Yes.
16      THE WITNESS:  Mr. Kott, may I see that
17  again?
18      MR. KOTT:  I'm sorry.
19      THE WITNESS:  No.  Wait.  I'm sorry.
20  Once again, there's a reference to Schriver's 80
21  percent, but that's it.
22  BY MR. WALSH:
23  Q   Schriver's 80 percent.  What's that in
24  reference to?
25  A   The study that I mentioned before on the

8 (Pages 26 to 29)

dacdbde8-6f3c-4733-8e08-f07653c1f20c

Page 30

1  previous page, Schriver -- 80 percent of the
2  population that they -- that they tested treat the
3  manual the same way as McGee.
4      Q    Do you know what kind of manuals for what
5  kind of products they were studying in that study?
6      A    Yes. I believe it was electronics. Some
7  kind of electronics, like a VHS, or something of that
8  nature.
9      Q    All right. And do you know how long or
10 how detailed or what the design of the owner's manuals
11 were that they were looking at in that study?
12     A    There may have been some writeup on it,
13 because I did go and look at it and I did, you know,
14 knowing with my experience initially with VHSs, I was
15 interested.
16     Q    Do you know what sample size was used for
17 those studies or what the samples consisted of that
18 they were using?
19     A    The sample -- it is given in the report,
20 off the top of my head I can't remember exactly, but
21 it was, you know, maybe in the range of 50 or
22 something like that; I don't know. Something; I don't
23 know.
24     Q    Do you know whether the sample included
25 any people who use cut-off machines or power tools as

Page 31

1  part of their living?
2      A    That I don't know. I don't think the
3  study made that reference.
4      Q    All right. Take a look at Growney-40 and
5  tell me what Growney-40 is.
6      A    This was a -- a sketch of 18 inches
7  versus 30 inches.
8      Q    In reference to what?
9      A    This is in Morabit. Morabit was talking
10 about the spacing. The pipes were spaced 18 inches
11 apart, and I was just trying to make a comparison
12 where that would be. Where that would wind up on a
13 machine. You know, that's what I was doing then.
14     Q    So you were comparing Morabit's opinion
15 letter and where he placed the pipes a distance apart
16 and comparing that to the length of the body of the
17 machine; is that what you were doing?
18     A    Yeah.
19     Q    Any other --
20     A    Of course what you could have is
21 certainly is that --
22        MR. PACKIN: There's no question pending.
23        THE WITNESS: Oh, I'm sorry.
24 BY MR. WALSH:
25     Q    Are there any other computations or

Page 32

1  calculations or sketches on that particular document?
2      A    No.
3      Q    Take a look at Exhibit 41. Tell me what
4  that represents.
5      A    This was a calculation of the angle that
6  is needed for -- and the angle that is needed for the
7  distance at which a person's eye can recognize an
8  object.
9          In other words, if you have -- I'm sorry.
10 It's not the angle. It's the distance from the object
11 versus the height of the object.
12     Q    All right. And what were you using as
13 your base data for that?
14     A    There's a -- report that I referenced
15 in my report. There's a document referenced in my
16 report that breaks this out, how this is done.
17     Q    All right. So were you summarizing --
18 was this something that you were taking from that
19 document as opposed to creating yourself, or what does
20 this represent?
21     A    No. I was taking those figures in the
22 document and applying them to Stihl's, the type size,
23 the height of the type --
24     Q    Okay.
25     A    -- on Stihl's warning labels to determine

Page 33

1  how far away or how close the person had to be to be
2  able to read it.
3          And I believe in my report I offered an
4  opinion on it, that the size of the type was so small
5  that it was -- required an unreasonable closeness
6  to the object -- to the saw to be able to read it.
7          In other words, it would be not
8  reasonable to expect an operator to get that close in
9  order to read it. It would not even be reasonable to
10 expect a person who was installing a toothed
11 wood-cutting saw blade on a saw to get his -- to get
12 that close to the saw -- to the saw to be able to read
13 the warning if the warning or if the typical Stihl
14 warnings that I have seen was on the saw.
15         Of course in this case those warnings or
16 Stihl's warnings, whatever they were, and I seen two,
17 and I know there's a third one. I don't know how many
18 warnings Stihl had at that time, but they were not on
19 the saw.
20         So this is relevant because, first of
21 all, he couldn't read what wasn't there, you know. So
22 -- but if something was there and if it was
23 representative of what Stihl has been put out, well,
24 this shows it requires an unreasonable closeness to
25 the saw to be able to read it.

9 (Pages 30 to 33)

DEGNAN & BATEMAN
(856) 232-7400

Page 34

```
 1    Q    What is the calculation -- what do you
 2  calculate how close somebody would have to be to read
 3  it?
 4    A    You know, I forget now the height.  The
 5  heights.  I have it in my report.  I know it's in my
 6  report.  I think it would be -- it's in my report.
 7    Q    All right.  Take a look at Exhibit Number
 8  42 and tell me what that is.
 9    A    That's a -- my sketch of, actually, going
10  out and measuring the -- what I had read in Morabit's
11  report.  It had a little sketch there.  This one here
12  (indicating).
13    Q    What's the number?
14    A    This one being Growney-40.
15        So this is 12/22.  I believe I sketched
16  this first before I went out and actually took these
17  measurements.  I don't know which -- I don't know
18  which came first.
19    Q    All right.  What are the two exhibits?
20    A    Maybe this one came first (indicating).
21    Q    What are the two exhibit numbers?  You
22  have 40, and what's the other one?
23    A    And 42.
24    Q    Okay.  So when you say this might have
25  come first, were you referring to 40 or 42?
```

Page 35

```
 1    A    42 might have come first before sketch
 2  40.
 3    Q    And was 42 simply recording what you went
 4  out and physically measured on a machine, or was it --
 5  or does it represent something else?
 6        MR. PACKIN:  Object to the form.
 7        THE WITNESS:  Well, it does represent
 8  something else to me.  I mean, I took these
 9  measurements and I realized that he certainly had
10  space to cut the plastic pipe when he stood in between
11  them.
12        In other words, the machine wouldn't have
13  necessarily precluded his cutting.  It wouldn't have
14  -- in other words, he wouldn't have necessarily
15  interfered because there is -- you have a certain
16  amount of vertical latitude in handling the machine,
17  knowing that, based on my handling of the machine.
18  BY MR. WALSH:
19    Q    Did you make any calculation about the
20  pipes he was standing, the pipe behind him, whether it
21  was the same height, lower than or higher than the
22  pipe he was cutting?
23    A    Well, I tried to gather that from the
24  photographs.
25    Q    What --
```

Page 36

```
 1    A    And it seems to me that I think the one
 2  behind him was lower.
 3    Q    You think the one behind him was lower?
 4    A    Well, that's recalling -- if I understand
 5  the photographs.  I mean, I have a bunch of
 6  photographs in there.
 7    Q    All right.  And if the -- if the pipe --
 8  was that an assumption you made in terms of
 9  determining whether the machine as measured could fit
10  in between the pipes?
11        MR. PACKIN:  Object to the form.
12  BY MR. WALSH:
13    Q    That the pipe behind him was lower than
14  the pipe he was cutting?
15    A    Well, first of all, I believe McGee
16  testified to it, and I don't remember exactly right
17  now what he testified, whether it was higher or lower.
18  But knowing that you could -- the blade could, as it
19  was cutting, since it was cut on the other side
20  already, that he could extend the blade all the way
21  over so there was ample room for that machine to be in
22  between -- to him to be able to cut that pipe without
23  them -- without the machine being interfered with by
24  the pipe behind him.
25    Q    How much lower did you assume the pipe
```

Page 37

```
 1  behind him was for purposes of reaching that
 2  conclusion?
 3    A    I didn't make any assumption at all.
 4    Q    Okay.  You didn't calculate whether it
 5  was two inches or five inches or 10 inches lower?
 6    A    Well --
 7        MR. PACKIN:  Object to the form.
 8        THE WITNESS:  -- I wasn't sure how I
 9  could calculate that.  I mean, knowing -- based on
10  what I had said -- testified yesterday about the
11  inaccuracies of trying to estimate distances from the
12  -- from a photograph, I know -- I think I had said
13  that.  Maybe I didn't say it.  I know I said the best
14  place to take the estimates from is if the object is
15  in the center of the photograph.
16        The reason for that is that there's a
17  visual distortion of the dimensions the further away
18  you get from the center.  So -- and there are so many
19  complexities to be able to accurately calculate
20  distances in those areas that are away from the
21  center.
22        MR. PACKIN:  Also for the record, as I
23  mentioned at Dr. Kalsher's deposition, he's not been
24  offered for any formal accident reconstruction
25  expertise.
```

10  (Pages 34 to 37)

DEGNAN & BATEMAN
(856) 232-7400

dacdbde8-6f3c-4733-8e08-f07653c1f20c

Page 38

1 BY MR. WALSH:
2      Q     Did you read Toby Hayes' report as part
3 of your reading in this case?
4      A     I'm sorry. I can't remember whether I
5 did or didn't.
6      Q     Did you read Harry Smith's report as part
7 of your readings in this case?
8      A     I believe I did.
9      Q     Is there any particular reason why you
10 didn't go out and get a couple of lengths of HDPE pipe
11 and put them up at varying distances and different
12 heights and just see in what circumstances and what
13 positions it would be possible to use the machine and
14 which ones it would not?
15          MR. PACKIN: Object to the form.
16          You mean otherwise him not being asked to
17 do so?
18 BY MR. WALSH:
19      Q     Is there any reason why intellectual
20 curiosity wouldn't have led you to try to support your
21 opinions that there was sufficient room to cut, which
22 I understand you just voiced by actually taking pipe
23 and seeing if you could do it?
24          MR. PACKIN: Object to the form.
25          THE WITNESS: Well, you know, one of the

Page 39

1 things was that wasn't any part of -- I wasn't asked
2 to do that. It wasn't part of what I was asked to do.
3 But this shows you my intellectual curiosity. Being
4 an engineer and applying basic engineering principles,
5 I don't necessarily have to do that because I have the
6 dimensions. We know what the dimensions are.
7 BY MR. WALSH:
8      Q     So the -- so the basic engineering
9 principles are you measured the machine and did what?
10          MR. PACKIN: Object to the form and asked
11 and answered.
12 BY MR. WALSH:
13      Q     What did you do after you measured the
14 machine?
15      A     I then evaluated it to my estimation of
16 the space between the two pipes, took into
17 consideration that the closest points, whatever I
18 estimate, and I said I think it as between 18 and 24
19 inches, that that was not necessarily the space
20 between the tops of the pipes, because they're 10-inch
21 diameter pipes.
22          So you've got five inches for one, five
23 inches for the other. So you add that to the 18 to
24 24, you're now in a range of 28 to 34. And then if
25 you add into that the fact that the front end of the

Page 40

1 machine or the front end of the saw blade doesn't have
2 to be constricted by the inner edge of the pipe, then
3 you have additional space.
4          So it looked to me that certainly could
5 have handled it. And, plus, I had the saw. You know,
6 I handled the saw. I used it up and down, so that
7 gave me a sense.
8      Q     Did you do --
9      A     Because I know that you don't have to
10 hold that saw exactly level. In other words, you have
11 a vertical variation.
12      Q     Did you do any scaling or modeling of the
13 pipes or the machine to aid you in your -- in your
14 undertaking to see whether the machine -- what
15 distances would have to be there to allow the machine
16 to be used?
17      A     I wasn't asked to do that.
18      Q     All right. Take a look at Exhibit 43 and
19 tell me what that is.
20      A     Down on the bottom there is -- let me
21 see.
22          Well, this is the super imposition of one
23 circle representing the blade. The toothed saw cut
24 blade over a circle representing the pipe. And it
25 comes in at a 3:00 position. And this is from McGee's

Page 41

1 dep. And, you know, he says that he lined up the
2 second to the last cut, top portion of wheel above top
3 surface of the pipe.
4          So that's what I was explaining to you
5 before, was that when you do that, you know, the saw
6 goes further forward over the pipe. So you have to
7 add that distance when you're -- as I have calculated
8 before.
9          So this was -- this would be part of what
10 you asked me. Had I done any engineering
11 investigation to satisfy my curiosity? Well, this is
12 what I had done. This is one of the things that I had
13 done.
14      Q     Is that -- is it your testimony that that
15 sketch that's there of the two innerlocking circles
16 that that is scaled to -- from the size of the blade
17 to the size of the pipe?
18          MR. PACKIN: Object to the form.
19          THE WITNESS: I believe it is, yeah.
20 BY MR. WALSH:
21      Q     Which one of those represents the blade
22 and which one represents the pipe?
23      A     Well, the blade being 14-inch diameter
24 would be represented by the larger circle.
25      Q     Okay. And the -- is there -- have you

11 (Pages 38 to 41)

dacdbde8-6f3c-4733-8e08-f07653c1f20c

Page 42

1   ever cut a pipe with a cut-off machine?
2       A    No. I've cut a pipe, you know, a lot of
3   pipes. We talked about this, and I've been on job
4   sites where large diameter plastic pipe has been cut
5   with the intent of it being welded back together.
6       Q    What job sites have you been on where
7   large diameter pipe was cut with the intent of welding
8   it together?
9       A    Well, when I worked for Wist I had
10  environmental considerations under my jurisdiction,
11  and so we installed -- well, the company installed a
12  new plating machine, and so I had handled the
13  engineering part -- portion on the pollution control
14  equipment, which was a plastic scrubber, so it was
15  plastic, it was PVC, so that the chemicals that we
16  handled wouldn't corrode.
17       So in the fabrication of the duct lines
18  into the -- into the scrubber and out of the scrubber,
19  well, yes, out of the scrubber -- I'm sorry. No, not
20  out of the scrubber. The large diameter ducts had to
21  be plastic duct, PVC ducts, had to be cut, cut square,
22  repositioned together, and then the field technician
23  had to weld it back up.
24       Q    What diameter was the PVC pipe?
25       A    It was probably 12 or 14-inch diameter.

Page 43

1       Q    What was it cut with?
2       A    Seems to me, you know, I don't remember
3   what he cut it with, to tell you the truth.
4       Q    And it's your testimony that the PVC pipe
5   was going to be welded together?
6       A    Well, you know, when people say welding,
7   they think of mechanical -- of metal welding.
8       Q    No. No.
9       A    But that's a term that is used. What it
10  does is, actually, the technician, they butt the two
11  pieces together, and he uses some kind of an
12  electrically-heated torch, and he begins to -- when I
13  say a torch, it's actually a source of heat; it's not
14  a torch; it's electric. But, anyhow, it's a heat
15  supply, and he puts it to the joint, and it begins --
16  the joint begins to melt, and he has a rod of the same
17  material, and he feeds the rod in. So that is
18  welding, but in the plastic.
19       Q    What year did you work for Wist?
20       A    In 1970 through '77, I guess, '78.
21       Q    And can you identify this welding
22  equipment that was used to weld PVC pipe in the late
23  '70s?
24       A    Well, what I just told you was what I
25  knew. I don't remember what the particular heat

Page 44

1   source that he had.
2       Q    Your testimony is you actually sat there
3   and watched them weld PVC pipe in the '70s?
4       A    I didn't sit there. My testimony was not
5   that I sat there. I said I saw them doing it.
6       Q    Okay. When you say you saw them doing
7   it, were you standing there observing them doing it?
8   Did you see them from a distance? What was the
9   situation?
10       A    I was in and out.
11       Q    How many times did you see somebody in
12  the '70s cut a PVC pipe and weld it in the manner
13  you've described?
14       A    Well, that was the incident that I
15  recall.
16       Q    One time?
17       A    I recall seeing that, and I knew that
18  that was a technique in the industry, because I had to
19  deal with PVC piping and PVC equipment, so I needed to
20  know how it was joined.
21       Q    Was it one time one pipe, or was it more
22  than one time and more than one pipe?
23       A    It may have been more than one joint. It
24  was that particular project.
25       Q    Okay. Do you know -- did you observe it

Page 45

1   -- are we talking about hours, minutes, seconds?
2   What was your observation of the welding of PVC pipe
3   in the 1970s?
4       A    I was -- that was in and out. I was
5   constantly on the job site. This was a project of
6   mine, so I would see this from time to time. How much
7   time I was there, I don't remember.
8       Q    How many times did you observe somebody
9   cut one of those pipes?
10       A    Well, that was the same project.
11       Q    Okay. Did you see him make one cut? Did
12  you see him make more than one cut? How many cuts did
13  you see him make in the pipe on that project?
14       A    I have no recollection.
15       Q    Okay. And you don't have any
16  recollection of what they used to cut it?
17       A    No.
18       Q    Was it power equipment? Was it non-power
19  equipment?
20       A    I have no recollection of what they used
21  to cut it.
22       Q    All right. Let's take a look at this
23  Growney-44, and tell me whether that are notes from
24  the interview with Mr. McGee that you are -- you
25  referred to earlier in the deposition today?

DEGNAN & BATEMAN
(856)   232-7400

dacdbde8-6f3c-4733-8e08-f07653c1f20c

Page 46

1    MR. PACKIN:  Can I see that one again for
2  a second, please?
3    (Witness complies.)
4    THE WITNESS:  I'd like to get a cup of
5  water.
6    MR. PACKIN:  Go ahead, take me just a
7  second to take a look at this.
8    (Short recess was held.)
9  BY MR. WALSH:
10    Q    Mr. Growney, during the break I think you
11  went out to your car to get the book that you referred
12  to earlier.  Did you bring that in with you?
13    A    Yes, I did.
14    Q    Could I see it, please?
15    A    (Witness complies.)
16    Q    And the -- can you tell me -- you've got
17  some yellow tabs in here.  Are they in reference to
18  this case?
19    A    They're in reference to the study that I
20  referenced -- referred to.
21    Q    Okay.  Show me which pages the study that
22  you were referring to falls in.
23    MR. KOTT:  What's the name of the book?
24    THE WITNESS:  The name of the book is
25  Dynamics in Document Design.

Page 47

1    MR. KOTT:  Thank you.
2    THE WITNESS:  This page, page 213,
3  there's reference to it.
4  BY MR. WALSH:
5    Q    Okay.  Is there anything else other than
6  page 213 that you used from this book?
7    A    Well, I read the parts of the chapter
8  leading up to it, so there might be some information
9  in there.
10    Q    All right.  And this -- on page 213 that
11  you referred me to it says -- it's got a table that
12  says how consumers read documents, correct --
13    A    Yes.
14    Q    -- cover to cover, 15 percent?
15    A    Yes.
16    Q    Scan, 46 percent?
17    A    Yes.
18    Q    Read as reference, 35 percent?
19    A    Yes.
20    Q    And then never read, that was four
21  percent?
22    A    Yes.
23    MR. WALSH:  All right.  Let's get this
24  marked as an exhibit, please.
25    (Book was marked as Growney-55 for

Page 48

1    identification by the court reporter.)
2  BY MR. WALSH:
3    Q    On the -- this book has on the end
4  somebody has written in ink Wenzel on both ends of it.
5  Who is Wenzel?
6    A    I have no idea.
7    Q    Where did you get the -- it says
8  Elizabeth Wenzel, 21 Bridge Street, Millis,
9  Massachusetts.  Do you know who that is?
10    A    No.
11    Q    Where did you get the book?
12    A    Off the Internet.
13    Q    Okay.  So when did you get it?
14    A    Oh, couple of years ago maybe.  Year,
15  year and a half.
16    Q    All right.  Let's go back to -- as we
17  broke we were getting ready to look at Exhibit 44,
18  Growney-44.  I'd ask you if those were your notes, and
19  there's a date on this two-page document of 8/9/07,
20  August 9, '07, whether those reflect notes made during
21  interview with Robert McGee?
22    A    Bear with me for a minute because I
23  didn't get a chance to read these before.
24    Q    Sure.
25    A    Yes, this was my notes from that

Page 49

1  interview.
2    Q    Where did that interview take place?
3    A    That took place at Jingoli's office on
4  the day of my inspection.
5    Q    Was -- okay.  So this was the same day of
6  the inspection?
7    A    Yes.
8    Q    And do you know how long you actually
9  spoke with Mr. McGee?
10    A    Fifteen, 20 minutes.
11    MR. PACKIN:  Are you guessing or do you
12  remember?
13    THE WITNESS:  I don't remember exactly.
14    MR. PACKIN:  Don't guess.
15    THE WITNESS:  I'm sorry.
16  BY MR. WALSH:
17    Q    Go ahead and read those notes to us.  I
18  think I can understand most of your handwriting, but
19  I'm not sure that I understand all of it, so -- just
20  so there's no miscommunication as to what you wrote
21  there, would you just read that document into the
22  record?
23    MR. KOTT:  Counselor, are you asking the
24  witness to mechanically read exactly what he said
25  without any commentary?

13  (Pages 46 to 49)

DEGNAN & BATEMAN
(856)  232-7400

dacdbde8-6f3c-4733-8e08-f07653c1f20c

Page 50

1     MR. WALSH:  Yes.
2     THE WITNESS:  Here we go.  "Per Robert
3  McGee, 1/2 8-9-07.  7PJ18."
4  BY MR. WALSH:
5     Q    That's your file number?
6     A    That's correct.
7     "Didn't know not to use for wood blade.
8  10-inch HDPE plastic pipe.  Did it before.
9  Experienced with saws and this one.  Did this cutting
10 (PP) before."
11    Q    What is the PP?
12    A    Plastic pipe.
13    Q    Plastic pipe?  Okay.
14    A    "Cutting pipe 1,000 feet.  Cut off
15 approximately 300 feet.  (Outside) trench pipe below
16 his height.  Pipe supported by spoil pile.  (Dirt).
17 Cutting square (wall) approximately half-inch thick."
18    Q    Do you know what that refers to?
19    A    Question mark, close parentheses.
20    Q    Do you know what that half-inch thick
21 wall refers to?
22    A    It means -- I'm sorry.  I used the symbol
23 for approximate.  I said wall, then I have the symbol
24 for approximate half inch thick.
25    Q    Okay.  What wall is it referring to?

Page 51

1     A    That means the wall thickness of the
2  plastic pipe.
3     Q    Thank you.
4     A    "Pipe approximately 18 inches above
5  ground.  Cut one side top to bottom.  North side.  Cut
6  approximately five" -- I have something crossed out.
7     "Went around to south side.  Picked up
8  slot from bottom and cut up.  Pulled out saw.  Plunge
9  cut inside, then went into side, went back in and
10 towards top.  Saw kicked back.  He was standing offset
11 with saw to his right.  March 15, 2007, approximately
12 11:30 a.m.  Morrisville, PA, Grove's Landfill.  Forced
13 main for landfill leach.  Saw from Steve Caldwell's
14 truck."
15    Q    The piece on the first page that you read
16 that was crossed out, you said cut five.  What was
17 crossed out?
18    A    Well, I don't know.
19    Q    Can I see it, please?
20    A    Yeah.  It looks like a six.  I don't know
21 what it is, though.
22    Q    Do you know what the cut five was
23 referring to?
24    A    No.  No.
25    Q    Okay.  Now, the next -- the rest of the

Page 52

1  exhibits that I have that you identified this morning,
2  45 through 54, are either what appear to me to be
3  documents related to warnings issues in the sense of
4  pictograms or proposed pictograms, and your bill, and
5  a copy of certain statements.  And I'm going to hand
6  those to you and ask you if there's anything in any of
7  these documents that constitute an engineering
8  computation of some type.
9     MR. PACKIN:  Object to the form, but you
10 can answer it as soon as I get rid of these documents.
11    THE WITNESS:  These documents don't have
12 any engineering computations.  You had asked me for
13 sketches also, so they're predominantly sketches.
14 BY MR. WALSH:
15    Q    Okay.  And related to warnings issues?
16    A    Yes.
17    Q    Let me ask you this:  Is there -- on any
18 of the documents that we looked at, is there any
19 calculation of kickback energies?
20    MR. KOTT:  Of kickback -- I'm sorry, Jim.
21    MR. WALSH:  Energies.
22    MR. KOTT:  Energies.
23    THE WITNESS:  No.
24 BY MR. WALSH:
25    Q    Are there any calculations attempting to

Page 53

1  estimate the transmittal of forces from a cut-off
2  machine -- in a cut-off machine during a kickback
3  reaction?
4     A    No.  Whatever I had done, apparently I
5  didn't save it.  Or if I've got it, it's on something
6  that I am unaware of.  It may be buried in a pad in
7  some other case.
8     Q    Well, tell me what you've done that you
9  think you've done in this area.
10    A    Well, I considered, as I said yesterday
11 about the horsepower of the machine, that being the
12 total energy available, and then how much energy would
13 I have to dissipate with a brake, and then the amount
14 of time and a talk reaction to the application of the
15 brake; things of that nature.  Which were basic
16 engineering considerations.
17    Q    Do any of those calculations appear in
18 your report?
19    A    No.
20    MR. PACKIN:  The calculations themselves
21 or the results?
22    MR. WALSH:  Either.  The results.
23 BY MR. WALSH:
24    Q    Do you provide any -- any of the figures
25 you've just described in your report?

14  (Pages 50 to 53)

DEGNAN  &  BATEMAN
(856)   232-7400

dacdbde8-6f3c-4733-8e08-f07653c1f20c

Page 54

1       MR. PACKIN: Object to the form.
2       THE WITNESS: I didn't provide any
3  figures, but I provided the opinion that a brake was
4  possible. Brake was --
5  BY MR. WALSH:
6       Q    And what would the characteristics of the
7  brake be? What -- what are the energies you
8  calculated would need to be stopped within what time
9  periods and what the dynamic reactions of the machine
10 would be? What are the values that you came up with?
11      MR. PACKIN: Object to the form.
12      You can answer.
13      THE WITNESS: Well, I know I started with
14 the approximate four horsepower of the engine. And
15 utilizing that as an outside figure and then working
16 that downward. And the length of time would be equal
17 to the -- I chose to be equal to the chainsaw
18 standard. And then I worked it on that.
19 BY MR. WALSH:
20      Q    Can you tell me any of the values that
21 you came up with?
22      MR. PACKIN: Off the top of his head,
23 you're asking?
24      THE WITNESS: Not off the top of my head,
25 no.

Page 55

1  BY MR. WALSH:
2       Q    All right. Can you tell me the --
3       A    Well, I'm sorry. And then as I worked
4  this through, I took a look at it and said that, you
5  know, is there any alternatives that I can use to this
6  design? And of course the alternative is the guard
7  similar to the lower blade guard on the hand-held
8  electric saws.
9       And so then I began to consider that.
10 And because there was a lot less mass to be considered
11 that you had to drive when you actuated -- when the --
12 when the trigger was actuated during a kickback.
13      In other words, you weren't going to
14 start -- stop the whole saw from rotating. You aren't
15 going to have to design a brake that would do that.
16 You were going to design a small simple mechanism that
17 could consist of a lower blade guard and some guides
18 and a coiled spring like in a clock.
19      And so then once you -- once the trigger
20 was hit, it would spring through, and we certainly
21 could accommodate that in that length of time.
22      Q    When did you come up with the idea of the
23 guard? And you've worked on the Stout case for a
24 couple of years. You've worked on this case since
25 2007.

Page 56

1       Is there anyplace in either the Stout
2  report or the McGee report where you mention the
3  feasibility of a lower guard on a hand-held
4  gasoline-powered cut-off machine?
5       MR. PACKIN: Object to the form and asked
6  and answered yesterday. Go ahead.
7       THE WITNESS: Well, I may have mentioned
8  in both cases that it's commonplace to put the common
9  application of the lower blade guard to safeguard
10 people from the hazards of the spinning blade on the
11 -- the wood-cutting saws. And so that was always on
12 my mind, but I did not -- it was right after I wrote
13 my report. And I'm sitting there and saying, that's
14 when I come up with this.
15 BY MR. WALSH:
16      Q    My question was: Is there anyplace in
17 either of those reports that meant -- that says that
18 one of the design features that should have been
19 adopted for a Stihl cut-off machine was a lower guard
20 of some kind in either report? Is there any position
21 taken in either report to that effect?
22      MR. PACKIN: Object to the form. Asked
23 and answered yesterday.
24      You can answer.
25      THE WITNESS: No, I did not put that

Page 57

1  anywhere.
2  BY MR. WALSH:
3       Q    On either your brake or your guard
4  theories have you published anything for peer review
5  or comment by other professionals on those ideas?
6       A    No, I have not.
7       Q    Have you read anything in the
8  professional literature that says that a brake or a
9  lower guard of the type you described is a feasible
10 safe -- safety device for use on a hand-held
11 gasoline-powered cut-off machine?
12      MR. PACKIN: Object to the form.
13      You can answer.
14      THE WITNESS: Well, I haven't seen
15 anything other than, you know, in doing this research.
16 I've certainly have searched patents, Linsbauer's
17 clutch, 'cause that was a consideration in a brake
18 application because I advocate that you actuate the
19 clutch to disengage the wheel spinning.
20 BY MR. WALSH:
21      Q    Do you know of anyone who has
22 successfully tested a brake or a lower guard, as you
23 described, for a hand-held gasoline-powered cut-off
24 machine?
25      MR. PACKIN: Object to the form.

15  (Pages 54 to 57)

DEGNAN & BATEMAN
(856) 232-7400

dacdbde8-6f3c-4733-8e08-f07653c1f20c

Page 58

```
1            You can answer.
2        THE WITNESS: No.
3    BY MR. WALSH:
4        Q    Have you approached -- does OSHA have
5    guarding standards for hand-held gasoline-powered
6    cut-off machines?
7        A    New York State has -- that's applicable?
8    I'm just trying to remember.  I can't remember the
9    OSHA.  There was a case in New York State in which
10   somebody was injured on one of the saws, and it was my
11   recollection -- a Stihl saw.  And my recollection was
12   it is -- it had a wood-cutting toothed blade on it,
13   and that was the issue.
14           But I don't remember what the resolution
15   of it was.  I'm sorry.  That was -- that was New York
16   State regulations.  I remember that specifically.
17       Q    New York State OSHA regulations?
18       A    No.  New York State labor law
19   regulations.  Rule -- I think it's Rule 19, if I
20   remember correctly, or -- I don't remember, but -- I'm
21   sorry.  I looked through so much data that I can't
22   clearly recall whether or not OSHA does have a
23   regulation.
24       Q    If OSHA has a regulation, do you
25   understand OSHA regulations to be mandatory or
```

Page 59

```
1    voluntary?
2        MR. PACKIN:  Object to the form.
3        If he doesn't know if he has one -- if he
4    doesn't know that they have one, how can he know
5    whether it's mandatory?
6        MR. WALSH:  Well, he knows --
7    BY MR. WALSH:
8        Q    You're familiar with OSHA standards
9    generally; are you not?
10       A    Yes.
11       Q    And OSHA standards, among other things,
12   impose a requirement on the employer to provide a safe
13   workplace?
14       MR. PACKIN:  Object to the form.
15   BY MR. WALSH:
16       Q    Correct?
17       A    Yes.
18       Q    And to properly train workers in the use
19   of the equipment they are going to use, correct?
20       MR. PACKIN:  Object to the form.
21       THE WITNESS:  Yes.
22   BY MR. WALSH:
23       Q    And the OSHA standards as they apply to
24   the employer, are they mandatory or are they
25   voluntary?
```

Page 60

```
1        MR. PACKIN:  Object to the form.
2        THE WITNESS:  OSHA standards are
3    mandatory, but when it comes to equipment it is the
4    custom and practice for the employers to rely upon the
5    equipment manufacturers to provide them with adequate
6    training material, and also to provide them with
7    equipment that is safe.
8        So if an employer wants to teach somebody
9    -- train somebody about a piece of equipment, and of
10   course people in the construction trades have a lot of
11   equipment, well, usually they get from the employer --
12   sorry.  From an equipment manufacturer, because most
13   equipment manufacturers provide it, some kind of
14   training assistance, whether it would be a toolbox or
15   tailgate outline of the safety features that should be
16   trained or taught to their workers, or a video whereby
17   they can have the worker watch the video.  That is the
18   common way that it is done.
19   BY MR. WALSH:
20       Q    What percentage of equipment and tool
21   manufacturers are you aware of that provide training
22   materials for employers?  And I want you to tell me
23   what the basis for that information might be.
24       MR. PACKIN:  Object to the form.
25       THE WITNESS:  Well, I have investigated a
```

Page 61

```
1    number of construction site accidents, and in my
2    investigations I have found that there's common
3    practice to meet OSHA regulations.  They have what
4    they call a tailgate or toolbox talk commonly taken
5    place Monday morning coffee break time on the job
6    site.  The people giving the talk commonly get
7    guidance from material that comes from the
8    manufacturers of equipment that they want to address.
9    BY MR. WALSH:
10       Q    Tell me -- identify for me a single
11   manufacturer that you know of and have experience
12   with.  In fact, give me a couple of them, if you know
13   of any, where the subject of tailgate safety meetings
14   at construction sites has been provided by tool
15   manufacturers as rather than OSHA or the unions or
16   some other source like that.
17       MR. PACKIN:  Object to the form.
18   BY MR. WALSH:
19       Q    What manufacturer do you know that have
20   provided materials for toolbox safety meetings?
21       A    At this point I cannot recollect the
22   brand name, but I know I've come across this from time
23   to time.
24       Q    Okay.
25       A    And certainly it is logical, because here
```

16  (Pages 58 to 61)

dacdbde8-6f3c-4733-8e08-f07653c1f20c

Page 62

1    it is. You have a mandatory meeting and you have
2    these pieces of equipment that are on the job site
3    that have well-known dangerous hazards, such as this
4    Stihl cut-off saw, that can have very, very severe
5    consequences, fatalities. So this is an opportunity,
6    these tailgate or toolbox meetings, for the employer
7    to provide -- I'm sorry. For the manufacturer to
8    provide for the employer simple training aids that
9    would educate or train his employees in the safety of
10   these very dangerous pieces of machinery.
11          I'm sorry. You know, my recollection is
12   one of the ladders does have a safety training
13   collection of documents that's been used on tailgate
14   meetings or is intended for -- or as intended as one
15   of the applications.
16   Q    Do you know what safety materials Stihl
17   has available and safety training services Stihl has
18   available for employers?
19          MR. PACKIN: Object to the form.
20          You can answer.
21          THE WITNESS: Prior to this incident it's
22   my understanding that Stihl had no training material
23   that it saw to it that got to the purchasers of these
24   demo saws. It did have -- it's my understanding that
25   it did have a video, but it didn't supply the video

Page 63

1    automatically with the saw. It required the people
2    who are interested in the video to purchase that.
3    Now, the price of the video is cheap. You know, DVD
4    is very cheap. And these things cost at this time
5    $700, $800, $900. I forget the figure; in that range.
6    I see no reason why that video could not have been
7    added into the package and automatically gone with
8    every saw so that every purchaser got a video.
9          I know that Stihl was well aware of the
10   dangers of these machines, because it has on its
11   website -- on every page of its website, the warnings
12   of the dangers, hazards of this -- these machines.
13   And it's the only warning that it has on every page of
14   its website.
15   Q    Have you ever seen a Stihl cut-off
16   machine safety manual?
17   A    I believe I did with this in this case,
18   yes, and I think that was subsequent to the
19   manufacturer of this machine.
20   Q    You think that the chainsaw, the cut-off
21   machine safety manual, was subsequent to the
22   manufacturer of the machine in McGee?
23   A    I think so.
24   Q    What's your understanding of the purpose
25   of the cut-off machine safety manual?

Page 64

1    A    To provide material for a -- to educate
2    users of the machine in the various safety issues with
3    the machine.
4    Q    What's your understanding of when the
5    McGee machine was manufactured?
6    A    Let me just -- I think 2004. I think it
7    was in 2004.
8          MR. PACKIN: Don't guess on it.
9          THE WITNESS: Okay. Let me just look in
10   my report.
11          Are we on the record?
12   BY MR. WALSH:
13   Q    Are you able to find it?
14   A    No. I thought I had it in here.
15          My recollection, of course I know the
16   accident occurred on -- in 2007, and I recall
17   deposition testimony that the machine was three years
18   old. That would replace the machine back in 2004, so
19   that's where that come from.
20          MR. PACKIN: You have the purchase
21   records in reference to your report, so they're in
22   your file.
23          THE WITNESS: Where the hell are those?
24   BY MR. WALSH:
25   Q    Why don't we press on, because the

Page 65

1    purchase records from Jingoli aren't going to tell the
2    manufacturing date anyway.
3          MR. PACKIN: The purchase date?
4          MR. WALSH: Yeah.
5    BY MR. WALSH:
6    Q    And do you -- Mr. Growney, do you have
7    any information about when the machine was actually
8    manufactured?
9          MR. PACKIN: Well, I'm going to object to
10   the form. I mean, I know from the document -- when
11   you say has it, in the boxes?
12          MR. WALSH: Does he know when the machine
13   was manufactured?
14          THE WITNESS: I just know at this point,
15   like I said, I believe it to be three years old, and I
16   don't recall the manufacturing date. I'm sure I have
17   read it in one of these deposition transcripts.
18   BY MR. WALSH:
19   Q    All right. Let's look at that. You've
20   pulled out your report a minute ago. Do you still
21   have that in front of you?
22   A    Yes, I do.
23   Q    If you'd hand that to the court reporter
24   so we can mark that, I would appreciate it.
25          (Report was marked as Growney-56 for

17 (Pages 62 to 65)

DEGNAN & BATEMAN
(856) 232-7400

dacdbde8-6f3c-4733-8e08-f07653c1f20c

Page 66

```
1        identification by the court reporter.)
2   BY MR. WALSH:
3        Q    Do you have it back in front of you?
4   What's the number on that now, Mr. Growney?
5        A    56.
6        Q    All right.  56.  In the middle of the
7   first page it says available information.
8        A    Yes.
9        Q    And 2.2 says, "Transcripts of the
10  depositions of Robert McGee, Peter Linsbauer, Thomas
11  Elsner, Holger Lochmann, Randy Scully, Steve Caldwell,
12  and Tony Rivera, Bruce Knelly, Stefan Hofmaster,
13  George Brown, Ed Kuhn, Joseph Rufolo, Anton
14  Spiritsanto, Ron Brown, Michael Klemick, Stephen
15  Hanes, Dionoso Roman, and Terence Kilker.
16       Have you read all of those depositions?
17       A    I've skimmed, yes.  Yeah.
18       Q    Okay.  Take a look, if you would, at what
19  we marked as Exhibit 36.  Are these all of the bills
20  that have been rendered to date in this case?
21       A    Yes.
22       Q    Okay.  Could you point out to me where in
23  the itemized billing review of the deposition
24  transcripts of any of those people, other than Robert
25  McGee and Peter Linsbauer, where that's noted?
```

Page 67

```
1        A    Well, it was in -- when I was working on
2   reports.
3        Q    Okay.  So why is it that you noted some
4   depositions as time allocated to depositions read, but
5   not others?
6        A    I may have been skimming it as I was
7   writing it and I didn't take note of it.
8        Q    Well, when you say you skim it, what does
9   that mean when you skim a deposition?  How carefully
10  do you read a deposition that in your -- that you
11  describe as skimming?
12       MR. PACKIN:  Object to the form.
13       You can answer.
14       THE WITNESS:  In other words, I may be
15  looking through it for anything that I might consider
16  -- that I might be looking for at that moment at that
17  time.
18  BY MR. WALSH:
19       Q    How do you do that?  When you skim it,
20  what are you doing?  Are you leafing through it?  Are
21  you -- are you looking?  What are you doing?
22       MR. PACKIN:  Object to the form.
23       THE WITNESS:  Turning the page and going
24  down and see what's on it.
25  BY MR. WALSH:
```

Page 68

```
1        Q    All right.  Did you -- in terms of how
2   you've described it, skimming, did you -- are there
3   any of the following depositions that you did anything
4   other than skim?  In other words, read more carefully
5   than skim?  And just stop me as I read these names.
6   I'll give you a chance to stop me.  And if you read it
7   more carefully, let me know.
8        MR. PACKIN:  Object to the form.
9   BY MR. WALSH:
10       Q    Steve Caldwell, Antonio Rivera.
11       A    I don't remember.  I don't remember.
12       Q    Antonio Rivera?
13       A    Seems to me I skimmed; I don't remember.
14       Q    Bruce Knelly?
15       A    Don't remember.
16       Q    Stefan Hofmaster?
17       A    I don't remember.
18       Q    George Brown?
19       A    Don't remember.
20       Q    Ed Kuhn?
21       A    It seems to me I read George Brown's more
22  than skimming, yes, and also Ed Kuhn's, yeah.
23       Q    Okay.  Do you have any notes from those
24  two depositions?
25       A    I don't know.
```

Page 69

```
1        Q    Is there a section in your file, without
2   going through your entire file, where you would keep
3   notes from depositions?
4        A    Well, there was, but the file seems to
5   have been disheveled since the inspection.
6        Q    All right.  Do you have the deposition
7   transcripts with you?
8        A    Yes, I do.
9        Q    Okay.  Would you pull those deposition
10  transcripts for Ed Kuhn and George Brown out, please?
11  And while you're at it, if you would pull the
12  deposition transcript from Mr. McGee out.
13       MR. PACKIN:  There's more than one.
14       THE WITNESS:  Which did you ask for,
15  please?
16  BY MR. WALSH:
17       Q    The two gentlemen, Ed -- sorry.  George
18  Brown and Ed Kuhn.
19       Is that your book of depositions?
20       A    Yes, it is.
21       Q    Why don't you just hand that to me?
22       MR. PACKIN:  Let me see it first.
23       Just for the record, I'll hand you the
24  notebook.  You'll see there's a table of contents in
25  it.  It reflects documents that I have put in a
```

DEGNAN & BATEMAN
(856)  232-7400

dacdbde8-6f3c-4733-8e08-f07653c1f20c

Page 70

```
 1    notebook regarding the case with a section that's
 2    attorney notes.  It's blank.  I haven't removed it
 3    from Mr. Growney's file.  I never provided it to him.
 4    Whoever copied it just used the same table of
 5    contents, and it was never provided to me.  Those were
 6    my own personal notes.  That's why there's a blank
 7    section here.
 8            It's seven or so minutes to 1:00.
 9    BY MR. WALSH:
10    Q    All right.  Take a look at George Brown
11    deposition under -- in your notebook, and tell me
12    whether you can tell from that whether you skimmed it
13    or read it more carefully.
14            MR. PACKIN:  Object to the form.
15            THE WITNESS:  I would say I probably
16    skimmed it.
17    BY MR. WALSH:
18    Q    Okay.  Let's go back then to the list of
19    -- let me continue and read the names.
20            MR. PACKIN:  Same objection as to the
21    process.
22    BY MR. WALSH:
23    Q    It's the same question, whether -- as I
24    read these names, whether your belief is that you
25    skimmed it, the deposition, or read it more carefully.
```

Page 72

```
 1    Q    Michael Klemick?
 2    A    I don't remember.
 3    Q    Do you know who Ron Brown is?
 4    A    There were two Browns, and I'm trying to
 5    remember distinction.  One was -- I think the one you
 6    asked me about before, George Brown, was the mechanic.
 7            And I'm trying to remember who Ron Brown
 8    is.  I can't remember at this point.
 9    Q    How about Michael Klemick?  Do you know
10    who he was?
11    A    Name sticks in my -- I would have to
12    refresh my memory.
13    Q    How about Stephen Hanes?  His deposition;
14    you skim it or read it more carefully?
15            MR. PACKIN:  Object to the form.
16            THE WITNESS:  I can't tell you at this
17    point.
18    BY MR. WALSH:
19    Q    Do you know who Stephen Hanes is?
20    A    I'd have to refresh my memory.
21    Q    Okay.  I don't know how to pronounce
22    this.  Maybe Mr. Packin can help me.  Mr. Roman's
23    first name.
24            MR. PACKIN:  Dionoso.
25    BY MR. WALSH:
```

Page 71

```
 1    Joseph --
 2            MR. PACKIN:  Object to the form.
 3    BY MR. WALSH:
 4    Q    Rufolo, R-U-F-O-L-O?
 5            MR. PACKIN:  Rufolo.
 6    BY MR. WALSH:
 7    Q    Rufolo?
 8    A    I don't have a recollection at this point
 9    what I had done.  I know I had read portions of this,
10    skimmed it or whatever.  But I can't tell you right
11    now.
12    Q    All right.
13            MR. PACKIN:  Do you want him to look in
14    there?
15            MR. WALSH:  Well, let's go through the
16    list, and then we can go back if --
17    BY MR. WALSH:
18    Q    Anton Spiritsanto?
19            MR. PACKIN:  Spiritsanto.
20            MR. WALSH:  Spiritsanto.
21            MR. PACKIN:  Police officer.
22            THE WITNESS:  I don't remember.
23    BY MR. WALSH:
24    Q    Ron Brown?
25    A    I don't remember.
```

Page 73

```
 1    Q    Dionoso Roman; skim his deposition or
 2    read it more carefully?
 3            MR. PACKIN:  Dion.
 4            THE WITNESS:  No, I couldn't tell you at
 5    this point.
 6    BY MR. WALSH:
 7    Q    Do you know who --
 8            MR. PACKIN:  Do you mean without looking
 9    at the notebook?
10            THE WITNESS:  Without looking at the
11    notebook, yeah.
12    BY MR. WALSH:
13    Q    Do you know who Mr. Roman is?
14    A    I'd have to refresh my memory.
15    Q    How about Terence Kilker?
16    A    What about him?
17    Q    Skim it?  Read it more carefully?
18            MR. PACKIN:  Object to the form.
19            THE WITNESS:  I'd have to check.
20    BY MR. WALSH:
21    Q    Who is Terence Kilker?
22    A    I'd have to refresh my memory.
23    Q    Was -- to your knowledge has Peter
24    Linsbauer been deposed in the McGee case?
25    A    Peter Linsbauer was deposed in the --
```

19 (Pages 70 to 73)

dacdbde8-6f3c-4733-8e08-f07653c1f20c

Page 74

1 both cases, is what my recollection is.
2      Q    Both McGee and Stout?
3      A    McGee and Stout, yes.
4      Q    Did you read his deposition in both McGee
5 and Stout?
6      A    Yes.
7      Q    How about Thomas Elsner?  Was he deposed
8 in both McGee and Stout?
9      A    Yes.
10      Q    Did you read both those depositions?
11      A    I believe I did.
12      Q    How --
13      A    Yes.
14      Q    How about Holger Lochmann?  Was he
15 deposed in both McGee and Stout?
16      A    I don't recall him being in Stout.
17      Q    And not in Stout but in McGee?
18      A    Yeah.
19      Q    Did you read his deposition?
20      A    I couldn't tell you without looking at
21 it.
22      Q    Randy Scully; was he deposed in both
23 McGee and Stout?
24      A    I have no recollection of him being in
25 Stout.

Page 75

1      Q    Okay.  But in McGee?
2      A    Yeah.
3      Q    You read his deposition in McGee?
4      A    I couldn't tell you at this point whether
5 I skimmed.
6          MR. PACKIN:  1:00, so --
7 BY MR. WALSH:
8      Q    All right.  One of the things before we
9 go, just take a quick look at the deposition you have
10 for Ed Kuhn in the book in front of you and tell me,
11 based on your view there, whether you believe you
12 skimmed it or read it more carefully?
13          MR. PACKIN:  Object to the form.
14          THE WITNESS:  I skimmed it.
15 BY MR. WALSH:
16      Q    All right.  And is there -- can we agree
17 that, putting aside Linsbauer and Robert McGee, there
18 is no reference in your itemized billing records to
19 any -- by name, at least, to any of the names that are
20 listed in paragraph 2.2 of your report?
21          MR. PACKIN:  Whatever it says, it says.
22          THE WITNESS:  Can you repeat that
23 question?
24 BY MR. WALSH:
25      Q    Yeah.  Putting aside Linsbauer and Mr.

Page 76

1 McGee for the moment, can we agree that there's no
2 reference in any of your bills to any of the names
3 mentioned in paragraph 2.2 of your report?
4          MR. PACKIN:  What are the names you said?
5          MR. WALSH:  Linsbauer and McGee.  We can
6 stipulate that in the itemized bill the only deponents
7 whose name is specifically mentioned are those two.
8          Break for lunch?
9          MR. PACKIN:  Yeah.
10          (Lunch recess was held.)
11          VIDEO TECHNICIAN:  We're back on.
12 BY MR. WALSH:
13      Q    Mr. Growney, I want to go back for a
14 moment to the issue of brakes.  Have you ever -- have
15 you -- do you know what energy values, if any, would
16 need to be braked in a TS 400 cut-off machine?
17          MR. PACKIN:  Object to form.
18          THE WITNESS:  Well, yes.  It would be, in
19 essence, the -- less than the horsepower of the
20 machines.
21 BY MR. WALSH:
22      Q    What does that translate to in terms of
23 values that would need to be considered to brake?
24      A    Well, it would be --
25          MR. PACKIN:  Object to the form.

Page 77

1          You got to give me a little bit of a
2 window.
3          THE WITNESS:  I'm sorry.  I'm sorry.
4          Well, it would be the full horsepower,
5 and deduct from there.
6 BY MR. WALSH:
7      Q    Okay.  And so you had measured in terms
8 of horsepower?
9      A    Well, then I convert it into BTUs, the
10 type of energy that you need to create -- convert into
11 heat, and a brake would do that for you.
12      Q    Do you know what -- do you know what
13 values those are?
14      A    I don't recall.
15      Q    Do you know how that, the values there,
16 compared to the values on a chainsaw?
17          MR. PACKIN:  Object to the form.
18          Go ahead.
19          THE WITNESS:  I don't.  I don't, off the
20 top of my head, know.  Look it up.
21 BY MR. WALSH:
22      Q    Let's -- I want to take -- one of the
23 opinions -- can you still hear me?
24          One of the opinions that you provided has
25 to do with a compartment for storing an owner's manual

DEGNAN & BATEMAN
(856)   232-7400

dacdbde8-6f3c-4733-8e08-f07653c1f20c

Page 78

1  on the machine; is that correct?
2      A    That's correct.
3      Q    And you've brought in a machine.  Is this
4  the machine?  Can I put it up here?
5      A    Sure.
6          MR. WALSH:  Is it okay to put it on this
7  table?
8          MR. PACKIN:  Sure.
9  BY MR. WALSH:
10     Q    Is this the machine that we talked about
11 earlier in your deposition as having been purchased on
12 the Internet?
13     A    Yes, it is, except that it has this
14 compartment that I added to demonstrate the
15 feasibility of a storage compartment in the handle.
16 This is just a crude attempt made with material that
17 was pulled out of a scrap heap, actually.
18     Q    Let me just turn this.  This handle that
19 you're referring to here, is what you're talking
20 about?
21     A    Yes.
22     Q    All right.  And show me how that's
23 envisioned to operate.  You just unscrew the ends of
24 it, or what do you do?
25     A    Well, in my envisioning of it, being it's

Page 79

1  designed as a part of the saw, you would not have this
2  configuration at all.  You know, I mean, I wouldn't
3  design this.  This was something that I did to
4  demonstrate that it -- the feasibility.  It's easy to
5  do.
6          This is a piece of aluminum conduit I
7  pulled off of a scrap heap.  And what I did was I cut
8  the handle, and then the conduit was welded to the
9  handle.  Of course when you make this thing in a
10 production setting, such as one you're going to make
11 thousands of these, you don't make it this way.
12 Somebody sits down and designs it so that it blends
13 right in, and as an engineer we would make that
14 visualization.  It's easy for us to do.
15         Perhaps you might think that this is
16 exactly what I mean.  This is not exactly what I mean.
17 This is, like I said, demonstration, but it certainly
18 is feasible.  And the caps don't have to be external;
19 they can be internal.
20         But, anyhow, what you have, of course, as
21 you see here is that this is hollow, so you can take a
22 manual, roll it up, and stick it inside the -- the
23 tube.
24         Now, of course I engineered this length
25 based on the length of a typical manual, plus seeing

Page 80

1  the way the handle was curved, I need some clearance
2  for these caps.  I would not do it this way.  It would
3  be designed much easier.
4          In other words, you'd blend the
5  compartment into the handle.  You might have a
6  different cap, you might have an internal rather than
7  an external.  You roll the manual up and you put it
8  inside.
9          So the other thing is, is that, you know,
10 really, for these purposes you probably don't need the
11 full manual.  You know, you need for just what the
12 people out in the field would need, such as the safety
13 instructions and also operating information that they
14 would need to -- you know, they want to consult the
15 manual because they're having a problem with the
16 machine, they just pull the manual out and there it
17 is.
18         There's a lot of information in the
19 manual that's not necessary to go into an abridged
20 version.  That would be handy for safety information
21 and also for operating information.
22     Q    When you -- when you bought this machine
23 on the Internet, have you replaced any of the warning
24 labels that are on the machine, or were those warning
25 labels on it when you purchased it?

Page 81

1      A    These warning labels were on the machine
2  when I purchased it.
3      Q    Have you -- have you changed any of the
4  labeling on the machine at all?
5      A    No, I have not.
6      Q    And the -- do you know what year of
7  manufacture this machine is?
8          MR. PACKIN:  This one here (indicating)?
9          MR. WALSH:  Yes.
10         THE WITNESS:  No, I haven't looked.  I
11 haven't made an attempt to determine the year.
12 BY MR. WALSH:
13     Q    All right.  And do you know what any of
14 the background or history of the machine was?  Who
15 owned it?  How it was used?  What it was used for?
16     A    No, I don't believe so.
17     Q    Has there been -- I mean, you noted a
18 couple of things that you changed -- you told us
19 yesterday you changed the air filter, you replaced the
20 pull starter cord that had broken, you may have gaped
21 the spark plug or changed the spark plug.
22         Is there anything else, when the machine
23 came to you, that was damaged or broken or needed
24 repair?
25     A    Yes.  This -- this cover didn't exist on

21 (Pages 78 to 81)

DEGNAN & BATEMAN
(856)  232-7400

dacdbde8-6f3c-4733-8e08-f07653c1f20c

Page 82

1   the machine. I got a used one off the Internet and
2   installed it (indicating).
3        Q    This piece up here, that's this front
4   piece, that's the end of it, has got three bolts in
5   it?
6        A    Yes, that's correct.
7        Q    Anything else?
8        A    Air filter, fuel filter, cord, pull cord.
9   That's all.
10       Q    All right. And from a standpoint can you
11  tell me why you -- what it is that's causing it not to
12  operate now? Have you not been able to determine why
13  it won't start and run?
14       MR. PACKIN: Before we get to that, do we
15  want to mark that?
16       MR. WALSH: We can.
17       MR. PACKIN: Doesn't matter to me. It's
18  your deposition, but it's an exhibit.
19       MR. WALSH: Let's go ahead and do it.
20  Just -- and what's the number on this one? 57? Does
21  anybody have a preference of where it is marked?
22       MR. PACKIN: Why don't we just do it up
23  on the top, just below where it says Stihl TS 400 in
24  large letters.
25       THE WITNESS: Yeah, that's good.

Page 83

1            (Saw was marked as Growney-57 for
2         identification by the court reporter.)
3   BY MR. WALSH:
4        Q    All right. Do you know why the machine's
5   not operating? Have you been able to diagnose what's
6   wrong with the machine or fix it?
7        A    No, I haven't been able to. As a matter
8   of fact, I haven't even tried. I'm sorry, I tried a
9   couple of times to pull, after I got the pull starter
10  on, and then I replaced the intake air filter.
11       But, you know, I forgot to mention in my
12  doing of this you could see that, by including this
13  storage compartment on the handle, it does not
14  appreciably affect the weight, the balance of the
15  machine, nor the ability to hold it. This is -- this
16  is easy to pick up, just as the original one. Some
17  people might even say that the larger handle is easier
18  to grip.
19       But, nevertheless, if you can visualize
20  this compartment blended in here, like I said, it
21  wouldn't be this style. Then you would have something
22  that your message -- that Stihl would have something
23  that their message regarding safety was always with
24  the machine. Was with the machine so that the
25  operator can take it and consult it.

Page 84

1        Q    You can put that down.
2        Was the wheel that's on there, was that
3   the wheel that came with the machine?
4        A    Yes, it was.
5        Q    Let me ask you this: Are you aware of
6   any hand-held gasoline-powered cut-off machine in the
7   world that uses a mechanism for storing a manual
8   somewhere on the machine?
9        MR. PACKIN: Object to the form.
10       You can answer.
11       THE WITNESS: No, I'm not aware of any,
12  but, you know, that shouldn't serve as a reason for
13  somebody to not to design one. It's like we won't do
14  it unless somebody else does it. Everybody's standing
15  around waiting for somebody. All the manufacturers
16  are standing around waiting for somebody to make the
17  first move.
18       Well, somebody has to make the first
19  move, and I would expect the leader of the industry
20  volume-wise, anyhow, would -- would make that move
21  because it's an obvious need. You know, the safety of
22  this machine, Stihl, is dependent upon or it's been
23  heard that it's dependent upon the manual being
24  available.
25  BY MR. WALSH:

Page 85

1        Q    Do you know of any hand-held power tool
2   manufacturer anywhere in the world that utilizes some
3   kind of storage compartment on the machine for a
4   manual?
5        MR. PACKIN: Object to the form.
6        You can answer.
7        THE WITNESS: I don't know, but as I
8   demonstrated, this machine -- the size of this machine
9   and the size of the manual make it suitable to be
10  stored on the machine. And, actually, as I said
11  before, in the design of the handle I would coordinate
12  that with the design of the manual so that it would be
13  compatible. You know, you might -- you could get some
14  different dimensions.
15  BY MR. WALSH:
16       Q    Have you done those drawings of the
17  handle you envision?
18       MR. PACKIN: Object to the form.
19       THE WITNESS: Well, rather than do the
20  handle, you know, rather than sit down and do some
21  handle drawings, I figured, well, let me demonstrate
22  it's possible.
23  BY MR. WALSH:
24       Q    Have you done any drawings of the final
25  handle that you envision?

22  (Pages 82 to 85)

DEGNAN & BATEMAN
(856)  232-7400

dacdbde8-6f3c-4733-8e08-f07653c1f20c

Page 86

1      A     No.  I would leave that up to the
2  industrial designer.
3      Q     Have you done any testing to determine
4  whether an on-machine manual increases the number of
5  operators who read the manual versus not having the
6  manual permanently stored?
7          MR. PACKIN:  Object to the form.
8          You can answer.
9          THE WITNESS:  Well, there was this
10  constant issue about reading the manual, reading the
11  manual, and this demonstrates that, as I had said,
12  that commonly manuals are not with the machine.  It's
13  a well-known fact that is known by engineers for a
14  long time, usually manuals are someplace quite remote
15  from the scene from where the machines are used, are
16  unavailable.
17          So if you want your safety to be
18  dependent upon the manual, what's in the manual, then
19  put the manual with the machine if it's physically
20  possible, if it's practical.  I demonstrated it's
21  practical.  That way then you presented the operators
22  with the manual.
23      Q     Wasn't my question.
24          My question was:  Are you aware -- have
25  you done any testing to determine whether it is --

Page 87

1  that an operator is more likely to read the manual for
2  a cut-off machine if it's in the handle of the machine
3  rather than separate from the machine in a toolbox,
4  pickup truck, wherever it may be maintained?
5          MR. PACKIN:  Object to the form.
6          THE WITNESS:  Well, you know, I don't
7  need to do testing to know that the operator would
8  read the manual if it was with it, because with these
9  things, these two-cycle machines -- engine, you know,
10  you always have problems.  These additionally have
11  some other problems.  So I know operators would like
12  to consult a manual when they have problems.
13  BY MR. WALSH:
14      Q     Do you know what -- do you have any data
15  on what percentage of people read the manuals of their
16  automobile?
17          MR. PACKIN:  Object.
18          You can answer that one.  Well, no.
19  Actually, I do object to the form.  Go ahead.
20          THE WITNESS:  Automobile?
21  BY MR. WALSH:
22      Q     Uh-huh.
23      A     Well, actually, there is a study -- I'm
24  just trying to remember who it is that talks -- that
25  investigated how, despite the fact that you would

Page 88

1  think that manuals travel with the automobile, 'cause
2  there's a glove compartment, that they don't always.
3  So I don't know how many operators read the manuals.
4      Q     You mentioned earlier in the deposition
5  some tools, not hand-held tools, but other tools, not
6  hand-held tools, where they did have some mechanism
7  for keeping the manual with the tool, the power -- or
8  something on larger equipment.
9          Do you have any -- do you have any data
10  that indicates whether people read those manuals more
11  often that are included -- that are kept with the
12  machine than for equipment where the manual is not
13  kept with the machine?
14          MR. PACKIN:  Object to the form.
15          You can answer.
16          THE WITNESS:  Well, I know from my
17  personal experience that that is the case.  That since
18  the manual is not with the equipment, and I know that
19  people who have had trouble with a machine or
20  whatever, whatever in the field, that they have
21  consulted the manuals because it was with the machine.
22  BY MR. WALSH:
23      Q     And when people are in the field with a
24  machine and they have trouble with the machine and the
25  manual's in the toolbox or a pickup truck or a tool

Page 89

1  shed, do you have personal experience with people
2  going to get the manual to look up what they need to
3  fix it?
4          MR. PACKIN:  Object to the form.
5          You can answer.
6          THE WITNESS:  I have never had that --
7  heard of that experience.
8  BY MR. WALSH:
9      Q     Okay.  Well, tell me the ones -- the
10  experiences you've had where people have referred to
11  manuals when they've had trouble with a machine.  Who
12  are these people?  What are the circumstances?
13          MR. PACKIN:  Object to the form.
14          THE WITNESS:  Well, I believe there's --
15  stump grinders have a manual stored -- typically have
16  a manual stored on them, and they're tethered to the
17  machine.  I know --
18  BY MR. WALSH:
19      Q     What's your experience in somebody
20  reading that when they had trouble?
21      A     It seems to me that I was involved in a
22  case, and I think that there was some testimony to
23  that effect.
24      Q     Okay.  So one -- what case was that?
25  Can you recall the name, when it was, where it was?

DEGNAN & BATEMAN
(856)  232-7400

dacdbde8-6f3c-4733-8e08-f07653c1f20c

Page 90

```
 1       A    Not at this moment.
 2       Q    All right. Can you recall any other
 3  example where your personal experience -- somebody
 4  read a manual -- did they read -- by the way, with the
 5  stump grinder did they read the manual for safety
 6  instructions or did they read the manual for some type
 7  of operational maintenance or repair reason?
 8       A    I don't recall at this point.
 9       Q    You got any other examples from your
10  personal experience?
11       A    Well, forklifts. Forklifts have had
12  manuals installed on them since early '90s, virtually
13  the entire industry. Stationary machinery.
14       Q    Wait a minute. Let me --
15       MR. PACKIN: Don't interrupt him.
16       MR. WALSH: Let me ask him --
17       MR. PACKIN: Don't interrupt him. You
18  can go back. He's in the middle of an answer.
19       THE WITNESS: The stationary machinery --
20       MR. WALSH: It's not interrupting the
21  answer.
22       THE WITNESS: Well, wait a second. I'm
23  talking.
24       MR. PACKIN: Finish your answer and then
25  we'll have our discussion.
```

Page 91

```
 1       THE WITNESS: Stationary machinery in
 2  industrial settings commonly have manuals installed on
 3  them, and they are commonly referred to by the people
 4  attending to the machine.
 5  BY MR. WALSH:
 6       Q    Okay. You keep using terms like
 7  "commonly." And what I'm trying to get to is what's
 8  the basis for that? That's part one.
 9       And part two of the question is: And are
10  they -- what's your knowledge about whether they're
11  referring to those manuals for repair and maintenance
12  issues or safety issues?
13       MR. PACKIN: Object to form.
14       You can answer.
15  BY MR. WALSH:
16       Q    But first give me the basis for your
17  statement that people commonly refer to manuals on
18  forklifts or other types of stationary industrial
19  equipment. What's the basis for that?
20       A    That's my 25, 35 years of engineering
21  experience.
22       Q    Can you cite --
23       A    In addition to engineering investigations
24  into accidents.
25       Q    Okay. Give me an example of accidents
```

Page 92

```
 1  that you have investigated where somebody with a
 2  forklift or a stationary piece of industrial equipment
 3  read the manual --
 4       A    Well, I --
 5       Q    -- that read the manual that was attached
 6  to the machine.
 7       A    Well, I recall one printing press in
 8  Newark. I also recall a printing press in Maine. I
 9  also recall -- you know, I've done -- I've done a
10  number of forklift -- investigations of forklift
11  accidents, and so I'm not sure if I could identify any
12  particular one.
13       Q    Well, let me ask you this: In the
14  printing press in Newark, the printing press in Maine,
15  is it your testimony that people read, some time after
16  the machine was introduced to the floor, not just an
17  initial reading of the manual when they were learning
18  the machine, but subsequent to that they read it for
19  purposes of conferring -- of looking at safety
20  instructions as opposed to maintenance and repair
21  instructions?
22       MR. PACKIN: Object to the form.
23       You can answer.
24       THE WITNESS: Well, they may have been
25  reading it for operational instructions, maintenance
```

Page 93

```
 1  instructions, repairs. I know definitely operational
 2  instructions. There's a lot of machinery that, in the
 3  woodworking industry, that the manuals are on the
 4  floor, that they're complex and people do read the
 5  manuals.
 6       The safety information. Reading of the
 7  safety information is -- can be a function of how well
 8  the manufacturer presents the safety information in
 9  the manual.
10  BY MR. WALSH:
11       Q    Can you -- can you think of an example in
12  which somebody has read a manual for operational or
13  repair or maintenance issues of a manual that was not
14  with the machine?
15       MR. PACKIN: Object to form.
16       You can answer.
17       THE WITNESS: Well, I know that, from my
18  experience, that from an engineering maintenance
19  repair point of view, that that is commonly done in
20  the offices of companies that have equipment, that
21  have manuals, instruction manuals, maintenance
22  manuals, parts manuals.
23       So -- and I have done it many, many
24  times. I mean, you wind up having to find out some
25  operational instruction or some maintenance
```

24  (Pages 90 to 93)

DEGNAN & BATEMAN
(856)  232-7400

Page 94

1  instruction and/or order spare parts; that type of
2  thing.
3         So, yeah, that's -- that's a common
4  occurrence.
5  BY MR. WALSH:
6     Q     All right. Now, other than your
7  anecdotal experience, can you point us towards any
8  studies, any professional writings, literature, or
9  data which have attempted to demonstrate that manuals
10 are read more often when attached in some fashion to a
11 piece of equipment than when not read -- not attached
12 in some fashion?
13        MR. PACKIN: Object to the form.
14        You can answer.
15        THE WITNESS: Well, I think this Schriver
16 one was that, although this piece of equipment was
17 small, and so the manual was with the machinery, so I
18 think that this study demonstrated the manual being
19 read because the manual was with the machinery.
20 BY MR. WALSH:
21    Q     Which --
22    A     Machine.
23    Q     What are you pointing to specifically?
24 What type of machine and what study? What are you
25 referring to in Schriver which is -- we marked as

Page 95

1  Exhibit 55? What are you referring to in there
2  specifically?
3     A     Well, I think this had to do with
4  electronic equipment, programming a VCR.
5     Q     Okay. Is this the one you were referring
6  to earlier that's where you were citing it for the
7  proposition that most people don't read a manual from
8  cover to cover?
9         MR. PACKIN: Object to the form.
10        THE WITNESS: Well, that I was citing
11 that most people use it for either specific points or
12 reference. And, yes, they don't read it cover to
13 cover.
14 BY MR. WALSH:
15    Q     Are you aware of anything that looks at
16 construction -- the construction trades and attempts
17 to look at whether there is a higher prevalence of
18 reading of manuals when somehow attached to equipment
19 as rather than not attached to it?
20        MR. PACKIN: Object to the form.
21        You can answer.
22        THE WITNESS: Well, I know it is the
23 practice in the crane industry to attach the manuals
24 to the cranes. And the intent of that I know is so
25 that it's available to the operator to read, and the

Page 96

1  operator has a very important function in the
2  operation of a crane. So he's got it there if he
3  needs it.
4  BY MR. WALSH:
5     Q     Didn't ask you what the intent was.
6         The question was, I think,
7  straightforward enough, and that is: Are you aware of
8  any data, any professional writings, any -- that
9  attempt to compare the percentage of people who read
10 manuals that are attached to equipment in some way
11 versus people who read manuals that are not attached
12 in some fashion?
13        MR. PACKIN: Object to the form.
14        You can answer.
15        THE WITNESS: I'm not aware, but I don't
16 need to be aware. I know from 40 years of experience
17 that if that manual is not with the machine, they're
18 not going to read it when they want it.
19 BY MR. WALSH:
20    Q     Let me come back to this: Have you done
21 any testing of this concept, your handle concept, to
22 see if that would improve the percentage of -- if that
23 would improve the percentage of people who read
24 manuals over a baseline of those who currently read
25 them without any handle -- without the manual being in

Page 97

1  the handle?
2         MR. PACKIN: Object to the form.
3         You can answer.
4         THE WITNESS: Can you repeat the
5  question?
6  BY MR. WALSH:
7     Q     Yeah.
8         Have you done any type of testing to try
9  to determine or measure whether including a manual in
10 the handle of a TS 400 would increase the number of
11 people who read the manual?
12        MR. PACKIN: Object to the form.
13        You can answer it.
14        THE WITNESS: I haven't done such
15 testing, but I know that there is a sign on some Stihl
16 TS 400s, not all of them, because some of them get
17 washed off, but there's a sign on this one that says
18 read the manual.
19        Now, I got this machine with no manual,
20 but I have four or five manuals, so it's easy for me
21 to read the manual. But a man out in the field
22 doesn't have a manual.
23        So if Stihl says, in order to be safe,
24 read the manual, then Stihl is obligated to put the
25 manual with the machine if it's physically possible.

25 (Pages 94 to 97)

dacdbde8-6f3c-4733-8e08-f07653c1f20c

Page 98

1  And I've demonstrated it's physically possible.  And
2  not only that, but the inclusion of the manual with
3  the machine is not a detriment at all to the machine.
4  BY MR. WALSH:
5     Q    Have you done any testing to determine --
6     A    No.  Like I said --
7        MR. PACKIN:  Object to the form.  Object
8  to the form.
9  BY MR. WALSH:
10    Q    Have you done any testing internally?
11    A    Like I said, I haven't done any testing.
12  I don't need to do any testing, because this is not a
13  test matter.  This is a simple statement by Stihl --
14  Stihl, read the manual.
15        Well, I got the machine.  There was no
16  manual with it.  You know, if somebody out in the
17  field gets the machine, there's no manual, how is he
18  going to read the manual?
19    Q    My question was directed to your
20  statement that it doesn't affect the utility of the
21  machine.  Have you done any testing with workers who
22  use this machine to try to determine whether a changed
23  handle configuration would or would not impede the
24  utility of the machine?
25        MR. PACKIN:  Object to the form.

Page 99

1        You can answer.
2        THE WITNESS:  I don't need to do testing.
3  I make my engineering judgment.  This -- as a matter
4  of fact, I was quite concerned about the size of the
5  compartment, and so I selected that -- that piece of
6  scrap aluminum conduit because of its diameter.
7  BY MR. WALSH:
8     Q    Have you --
9     A    And when you make it, you could make it a
10  different configuration, you know, especially if you
11  coordinate the size of the -- of the manual or the
12  abridged manual, the one that goes in the field with
13  -- with the handle design so that it changes
14  dimensions to whatever suits your design criteria.
15    Q    Have you published anything in --
16  regarding your handle idea for peer review?
17    A    No, I have not.
18    Q    Have you --
19    A    I haven't had the opportunity to.  I've
20  only done this just two months ago.
21    Q    Well, you had -- the idea is something
22  you raised in the Stout case; was it not?
23    A    Yes, that's true.
24    Q    And so your thought process in both cases
25  has been the same.  And have you published anything

Page 100

1  for peer review of that idea?
2        MR. PACKIN:  Object to the form.
3        You can answer.
4        THE WITNESS:  Well, I always want to make
5  some example, physical example, if I'm talking about
6  something that's physical.
7  BY MR. WALSH:
8     Q    Have you done a patent search to see if
9  there's ever been a patent filed on some kind of
10  compartment for holding manuals or some method of
11  attaching manuals permanently to hand-held power
12  tools?
13    A    Well, I began a patent search for Stihl,
14  and, you know, I didn't find anything, but that was
15  the length of it.
16    Q    Okay.  So have you gone to any of the
17  standards organizations or a manufacturer or anybody
18  involved in the design, development of cut-off
19  machines and discussed this idea with them to
20  determine whether they believed it to be feasible or
21  not?
22        MR. PACKIN:  Object to the form.
23        You can answer.
24        THE WITNESS:  Well, I believe that it
25  would be necessary for me to have an example.  This is

Page 101

1  not even a prototype.  This is a crude improvision.
2  So if I go to them, they say, what are you talking
3  about, you know, like that, it's like kind of reading
4  one of Morabit's reports, or one of the other ones,
5  you know, or whoever that said it was ridiculous.
6        But here it is; it's in existence.  So if
7  I was to go to a manufacturer, I say, well, this is
8  what I got in mind, see this here?  But I don't know
9  why I would do that because I didn't patent it.  You
10  know, I'm not going to sell it to them.
11  BY MR. WALSH:
12    Q    How about -- have you found any
13  professional writings, any engineering literature that
14  talks about the need or the desirability or the
15  feasibility of making compartments on hand-held tools
16  for owner's manuals?
17        MR. PACKIN:  Object to the form.
18        You can answer.
19        THE WITNESS:  Well, I haven't found any
20  of that, but like I said before, there it is on
21  Stihl's warning.  Stihl's warning, you know, read the
22  manual, and yet everybody knows the manuals aren't
23  with the machine.  You want to read the manual to be
24  safe, put the manual with the machine.
25  BY MR. WALSH:

26  (Pages 98 to 101)

DEGNAN & BATEMAN
(856)  232-7400

dacdbde8-6f3c-4733-8e08-f07653c1f20c

Page 102

1    Q     Do you know of any standards applicable
2  to cut-off machines that call for a manual to be with
3  the machine in a pouch or a handle configuration or
4  somehow permanently attached to the machine?
5           MR. PACKIN: Object to the form.
6           THE WITNESS: Well, the standards that I
7  have looked at are minimum standards, and they don't
8  stretch that far.
9  BY MR. WALSH:
10    Q     Do the -- do you know of standards
11  applicable to any hand-held tool anywhere in the world
12  that requires or calls for a handle compartment or
13  some other compartment pouch or attachment method for
14  an owner's manual?
15           MR. PACKIN: Object to the form.
16           You can answer.
17           THE WITNESS: Well, all of the standards
18  that I've looked at are in a similar category. In
19  other words, minimum consensus standards. And the
20  fact that it's not there, it doesn't mean it's not
21  feasible.
22  BY MR. WALSH:
23    Q     In your seven years on the 01.1 committee
24  for woodworking equipment, has there ever been a
25  requirement that any piece of woodworking equipment

Page 103

1  have a place for either storing the owner's manual or
2  a method of permanently attaching it?
3    A     I have offered that idea to the
4  membership, and it's been discussed. It's
5  interesting, and, actually, some of the membership has
6  stated that the machines they make have storage on
7  them.
8    Q     Has it been rejected as part of the
9  standard?
10           MR. PACKIN: Object to the form.
11           Go ahead.
12           THE WITNESS: I'm sorry. It hasn't been
13  adopted, but I know there is a practice on some
14  machinery manufacturers to include a standard -- I'm
15  sorry, a manual on the machine.
16  BY MR. WALSH:
17    Q     And is there any hand-held -- a
18  manufacturer of hand-held tool with that distributor?
19           MR. PACKIN: Object to the form.
20           Go ahead.
21           THE WITNESS: Not that I know of.
22  BY MR. WALSH:
23    Q     And is it fair to say -- do you have any
24  idea --
25    A     But then, you know, maybe on some

Page 104

1  hand-held machines -- like, I've done a lot of work
2  with grinders: Electric grinders, pneumatic grinders.
3  And they're small, very small machines. And it's not
4  practical to install a manual storage compartment on
5  those machines because the size of the machine is so
6  small.
7           But something like this -- this machine
8  has ample space to accept the storage -- to accept the
9  storage compartment for the manual, especially if you
10  made a manual that was devoted to safety and
11  operations. And you don't have to put it in the
12  handle as I showed. You can mold the body differently
13  so that it sits on the side someplace there.
14    Q     Is it your view that any machine large
15  enough to accommodate some compartment for the owner's
16  manual that does not incorporate such a compartment is
17  defective?
18           MR. PACKIN: Object to the form.
19           THE WITNESS: Well, if the safety of the
20  machine depends upon the operator reading the manual,
21  and there is the ability to -- a reasonable pragmatic
22  ability to install a manual on the machine, well,
23  then, yeah, that's a defect, because here you have the
24  manufacturer telling the people, in order to be safe,
25  read the manual.

Page 105

1           But it's reasonable foreseeable by those
2  manufacturers that the manual's not going to be with
3  the machine. So you have a conflict there. The way
4  to resolve it is, if you can install the manual on the
5  machine, then go ahead and do it.
6  BY MR. WALSH:
7    Q     Can you think of any product where -- any
8  power product where reading the manual is not
9  necessary for safe operation of the machine?
10           MR. PACKIN: Object to the form.
11           THE WITNESS: Well, that's a little bit
12  of a universal question. Cosmic question, you might
13  say. Whatever.
14           One of the points that is in the manual
15  for safety would be warnings. And of course if the
16  warning -- what that does is that alerts the operator
17  to potential problems. And of course if the operator,
18  through his education, training, experience, whatever,
19  absorbs those items that it warned about, well, then
20  the warning isn't that great. But -- but if the
21  manual -- if the machine says, read the manual, then
22  -- well, then it's helpful for him to re -- be
23  reminded of it by reading the manual.
24  BY MR. WALSH:
25    Q     Do you know of any power product that

27 (Pages 102 to 105)

DEGNAN & BATEMAN
(856)   232-7400

dacdbde8-6f3c-4733-8e08-f07653c1f20c

Page 106

1  doesn't have -- in this day and age that doesn't have
2  a warning on it that says read the owner's manual for
3  safe operation?
4        MR. PACKIN:  Object to form.
5  BY MR. WALSH:
6     Q   Do you know of any power products?
7     A   I haven't seen all power products.
8     Q   The ones you've seen.
9     A   I have seen products with no mention of
10 the manual, and I've seen products with that very same
11 thing.  Read the owner's manual, and the owner's
12 manual is attached to the product.
13    Q   All right.  Let me ask you this:  Do you
14 have an owner's manual attached to your lawnmower?
15    A   No, I do not.
16    Q   Does the --
17    A   But then I didn't design it.
18    Q   Does the lawnmower say, read the owner's
19 manual?
20    A   Yes, it does.
21    Q   Do you consider the lawnmower defective
22 because it's not -- it doesn't have a
23 permanently-attached manual?
24    A   Well, the lawnmower could have a
25 permanently-attached manual.  And if the safety of

Page 107

1  that lawnmower is dependent upon reading the manual,
2  then the manual should be with that lawnmower.
3     Q   Do you -- so is that yes or no?  Do you
4  believe the safety -- or the safe operation of the
5  lawnmower -- for safe operation of the lawnmower that
6  the operator should read the manual?
7     A   I would state it this way:  If the safety
8  of the operators are who are ignorant of the machine's
9  hazards, and they are explained -- warned of in the
10 operator's manual, and the manual is not on the
11 machine, well, then, yeah, that's a defective product.
12    Q   Your chainsaws, do they have a
13 permanently-attached manual?
14    A   No.  But the McCullough that I bought had
15 a carrying case, and of course the McCullough, the
16 chainsaw, would have been a little bit awkward to
17 install a manual.  But the manual was installed in the
18 carrying case.  So that's like -- that's second best.
19       So when I go out into the field and I
20 carry my machine in the carrying case, which is very,
21 very convenient, I got the manual with me.
22    Q   How about for people who don't get a
23 carrying case or do not take it with them?
24       MR. PACKIN:  Object to the form.
25       THE WITNESS:  Well, I've seen some and

Page 108

1  have some.  I guess the Homelite machine is -- has a
2  very small manual.  And, actually, you know, the
3  configuration of chainsaws are such that you could
4  probably put a storage compartment in the handle in
5  the rear where you could put in an abridged manual,
6  one that would have strictly the operating
7  instructions that the operator needs, nominal minimal
8  repairs that he could do in the field, and the safety
9  instructions.  Especially when, you know, you'll find
10 a warning on the chainsaw that says read the manual.
11 BY MR. WALSH:
12    Q   And is the chainsaw defective that
13 doesn't contain such a compartment?
14       MR. PACKIN:  Object to the form.
15       You can answer it.
16       THE WITNESS:  Well, I would say yeah.
17 Yeah.
18 BY MR. WALSH:
19    Q   Okay.  I want to come back to my initial
20 question then.  Is it your position that every
21 hand-held power tool, or for that matter any power
22 tool, whether hand-held or not, large enough to
23 accommodate either a compartment for a manual or a
24 method of permanently attaching it that does not do so
25 is defective?

Page 109

1        MR. PACKIN:  Object to the form.
2        THE WITNESS:  Yes.
3        MR. PACKIN:  You can answer.  Just give
4  me a little window.
5        THE WITNESS:  I'm sorry.  I'm sorry.
6  BY MR. WALSH:
7     Q   Is it -- is it your belief then that
8  every cut-off machine ever manufactured at any point
9  in time in the world is defective for failure to
10 include a compartment for carrying the owner's manual?
11       MR. PACKIN:  Object to the form.
12       You can answer.
13       THE WITNESS:  Well, first of all, I
14 haven't seen every cut-off machine ever manufactured
15 in the world.  I mean -- and that includes pneumatic
16 cut-off machines, which I've worked on.  But I have
17 demonstrated that it is physically possible, and it's
18 reasonable, to put a storage compartment on cut-off
19 machines.  And if the safety of those cut-off machines
20 are dependent upon the operator's reading the manual
21 and the manual -- then it is a defect for the
22 manufacturer to not devise a storage system so the
23 manual is with the machine.
24       And if every manufacturer does it, then
25 every machine is defective.  That is -- we can't -- we

                                28 (Pages 106 to 109)

dacdbde8-6f3c-4733-8e08-f07653c1f20c

Page 110

```
1   can't hide behind the principle that, well, if we all
2   do it defective, it must be right.  The fact that
3   everybody does it wrong doesn't make it right.
4   BY MR. WALSH:
5       Q    I'm trying to find somebody in the world,
6   in the hand-held tools of any description that, under
7   your definition, has done it right.  Any hand-held
8   tool anytime anywhere, has anybody done it right,
9   under your definition?
10          MR. PACKIN:  Object to the form.
11          THE WITNESS:  Well, obviously, Stihl
12  hasn't done it right, and, obviously, the engineers
13  who work for Stihl who designed this machine are
14  sitting back and waiting for somebody else to do
15  something before they take it upon themselves.
16  BY MR. WALSH:
17      Q    Okay.  Now, try to answer my question if
18  you would.  Do you know of -- under your definition,
19  of any hand-held tool manufacturer that has ever
20  produced a machine that, under your definition, would
21  be non-defective?
22          MR. PACKIN:  Object to the form and to
23  the unnecessary colloquy.
24          THE WITNESS:  Well, of course you say if
25  it's physically possible.  So those machines that are
```

Page 111

```
1   not physically possible, we can't do it.  But if it is
2   physically possible, yeah, then they are defective.
3   BY MR. WALSH:
4       Q    All right.  Do you know of anybody where
5   it is physically possible?  Any kind of machine,
6   hand-held kind of machine, where it's ever been done
7   by anyone?
8           MR. PACKIN:  Object to the form and asked
9   and answered.
10          Go ahead.
11          THE WITNESS:  No.  But the fact that
12  nobody's hasn't done it doesn't mean it shouldn't be
13  done.  That's my point.  That's my point for Stihl.
14  Stihl sits back and says, let us wait for somebody
15  else to do it.  The entire industry, the cut-off
16  industry, has that position.  We're all afraid to take
17  the first step forward because we'll be the
18  initiators, whatever.  Whatever it is.
19          So, you know, everybody's sitting back
20  waiting for somebody else to do it.  The end result is
21  you get a whole bunch of cut-off machines in the field
22  that have signs on them that say, read the manual in
23  order to be safe, and the manuals are not included
24  with the machine.
25  BY MR. WALSH:
```

Page 112

```
1       Q    All right.  Do you know of any engineer
2   in the world besides yourself who has ever taken the
3   position in writing, in the literature, in the
4   lectures, in anything, that a hand-held power tool
5   should have a pouch for permanently attaching the
6   owner's manual?
7           MR. PACKIN:  Object to the form and asked
8   and answered maybe three or four times.  Last time
9   I'll allow him to answer.
10          THE WITNESS:  I do not, despite my
11  expectations contrary from Stihl.
12  BY MR. WALSH:
13      Q    Tell me -- tell me each and every fact in
14  this record that you rely on -- for -- for the opinion
15  that, if something like your handle configuration had
16  been on the Stihl TS 400, that Robert McGee, prior to
17  going and standing between the pipes and cutting the
18  pipes on the day of his accident, would have pulled
19  out the manual from the handle and read it before
20  starting that operation?
21          MR. PACKIN:  Object to the form of the
22  question.
23          You can answer.
24          THE WITNESS:  Well, the one fact that
25  negates that is that there was no warning sign on this
```

Page 113

```
1   machine for him to read the manual.  So, you know, I
2   would not expect him to be reminded to read the manual
3   in order to be safe by a sign that was not there.
4   BY MR. WALSH:
5       Q    There was no warning on the machine
6   Robert McGee was using to read the owner's manual?
7       A    I'm sorry.  I'm talking about the written
8   one.  Yes, there was a pictogram.
9       Q    And was there also -- was there also a
10  separate written warning in text not on the guard but
11  on another portion of the machine directing users to
12  read the owner's manual?
13      A    Yes, there was.
14      Q    So there was pictogram and the text,
15  correct?
16      A    That's correct.
17      Q    All right.  Now, let's go back to my
18  question.  I want to know each and every fact you rely
19  on in this record to demonstrate that if there had
20  been an owner's manual in the handle of the machine,
21  that Robert McGee would have pulled that manual out
22  and read it?
23          MR. PACKIN:  Object to the form.
24          You can answer.
25          THE WITNESS:  Well, maybe my point is --
```

29 (Pages 110 to 113)

DEGNAN & BATEMAN
(856) 232-7400

dacdbde8-6f3c-4733-8e08-f07653c1f20c

Page 114

1  my position isn't clearly understood.
2        My understanding, from the flow of this
3  case, is that Stihl's position -- it's Stihl's
4  position -- Stihl's position that they instructed him
5  to read the manual. And I'm saying that that's a
6  self-serving instruction, because they did not include
7  the manual on the machine. So I'm saying that that
8  position is a hollow position. Now, had they put the
9  manual on the machine, that could be a different
10  story.
11 BY MR. WALSH:
12     Q    I'm asking you to tell me what that
13  different story was. And, hypothetically, assuming
14  the manual's with the machine, tell me each and every
15  fact in the record that you rely on for the
16  proposition that the manual would have been read by
17  Mr. McGee if it was with the machine, particularly in
18  light of his testimony that he believed the manual, he
19  knew how to use the machine, and the manual is there
20  for reference if he had a problem.
21     MR. PACKIN: Object to the form.
22     THE WITNESS: Yes. Well, it would not
23  necessarily take Mr. McGee's reading of the manual to
24  have prevented this accident. I mean, there was a
25  whole number of people, 10 people or so, that had

Page 115

1  operated these saws in -- at Jingoli, and had any one
2  of them read the manual and read that portion, then
3  they -- it's likely that they would have. Although,
4  you know, I know there's a warning in there in the
5  manual and the warning -- and I know there's a
6  pictogram -- nice pictogram of a saw blade.
7        But there's no pictogram in the manual of
8  this type of accident. There is words to describe
9  this type of accident, but there's no pictogram that
10  -- that transfers to the reader the -- the potential
11  kind of accident that Robert McGee had.
12        This manual, although it tells you to
13  read it, is defective because it did not have a
14  pictogram that illustrated sufficiently -- adequately
15  illustrated the kind of accident that he had.
16        And those types -- that type of a
17  pictogram is relatively easy to do. And I did this
18  one in, you know, 20 minutes or so; something like
19  that. I'm sorry. Maybe it might have taken me
20  longer.
21        In other words, I got a pictogram here
22  that should have been on the manual -- in the manual
23  that shows the -- one of these saws flipping into the
24  -- and it shows the blade, illustrates the blade
25  facing his face. That's the kind of pictogram that

Page 116

1  should be in this manual to trans -- to communicate to
2  the manual readers what kind of a danger they
3  proposed.
4  BY MR. WALSH:
5     Q    What --
6     A    This --
7     Q    Sorry.
8     A    -- presents.
9     Q    What basis can you cite in the record
10  that, if there had been a manual in the handle
11  configuration like you've produced here, that anyone
12  at Jingoli would have opened the handle and read the
13  manual prior to the accident? I just need you to cite
14  me to the evidence where somebody that you rely on for
15  the proposition that, if it had been in the handle,
16  somebody would have opened the handle and read it.
17     MR. PACKIN: Object to the form.
18     THE WITNESS: Well, I know these saws are
19  troublesome, and I know the trouble occurs in the
20  field. There is testimony bringing it back to the
21  shop, working on them. So we have a number of people
22  who likely would have consulted the manual when
23  trouble occurred, because the manual was with the
24  machine, and this -- it is likely then the manual had
25  this kind of a pictogram in it. It would have

Page 117

1  transferred -- it would have communicated to the
2  reader the kind of problem -- the kind of danger that
3  the machine posed, and word would have gotten --
4  eventually to McGee or the suppliers or the
5  users who install the tooth-cutting saw blades on
6  these machines, because it had been an ongoing
7  practice at Jingoli.
8  BY MR. WALSH:
9     Q    Who -- who testified on the record that
10  they had repairs to the cut-off machine that they
11  needed to make in the field?
12     MR. PACKIN: Object to the form.
13     THE WITNESS: Well, somebody testified
14  that they had to send them back to the shop. Ron --
15  one of the Browns. I have trouble remembering which
16  one is which, which I have a trouble remembering a lot
17  of names. As a matter of fact, I had trouble
18  remembering which ones were in Stout and -- which ones
19  were deposed in Stout and which ones were deposed in
20  in McGee.
21        But one of the Browns talked about
22  repairing the machines. And there it was a common
23  practice for them to clean the machine. So -- and I
24  know -- I know, based on my own experience with this
25  type of machinery, they're troublesome.

30  (Pages 114 to 117)

dacdbde8-6f3c-4733-8e08-f07653c1f20c

Page 118

1  BY MR. WALSH:
2      Q    I'm looking at the record in the case.
3  I'm asking you if there's -- you know of any evidence
4  that there was any field repairs done on a Stihl TS
5  400 at Jingoli?
6          MR. PACKIN:  Asked and answered and
7  objected to the form.
8          THE WITNESS:  I'd have to go back to
9  review.
10 BY MR. WALSH:
11     Q    All right.  The pictorial that you
12 mentioned a few months ago you marked as Growney-48;
13 is that correct?
14     A    Yes.
15     Q    Has there been any type of testing on
16 this pictorial with any group of construction workers
17 or anybody else to determine whether this pictorial
18 has meaning to them?
19         MR. PACKIN:  Object to the form.
20         THE WITNESS:  No testing has been done,
21 but I know from the composition, the illustration,
22 what's illustrated in this pictorial, that it's an eye
23 catcher.  And I think, you know, here I've reduced it
24 down to a small size.  It may even be a little smaller
25 than what should be in the manual.  That was because

Page 119

1  of the limitations of my printer.  But, you know, when
2  you have it in a larger size you understand what the
3  thing is.
4  BY MR. WALSH:
5      Q    Have you seen this -- a pictogram like
6  this in any manual in any power tool anywhere?
7      A    No.  But that's -- once again, what I say
8  is that everybody is sitting back waiting for somebody
9  else to do it, then we can follow the leader, and the
10 leader is sitting on his hands.
11     Q    What is the reference to NAG down in the
12 right-hand corner of this?
13     A    Neal Anthony Growney.
14     Q    And have you published this pictogram
15 anywhere for comment or peer review?
16     A    No, I haven't.
17     Q    Have you -- in your -- in the literature
18 have you found anybody who has recommended use of a
19 pictogram?  Anything remotely like this?
20         MR. PACKIN:  Object to the form.
21         THE WITNESS:  Remote is accurate.  Stihl
22 has the pictogram in its manual that illustrates
23 reactive forces.  And when I say remote, it is
24 remotely related to it because the illustration in the
25 manual is the -- one of these machines coming back up.

Page 120

1  And that's not what the hazard is.
2          Because if you see that in the manual, a
3  person reading, observing that pictogram would get the
4  false impression that he is protected by the top blade
5  cover, because that's the way the pictogram indicates
6  it will happen, yet we know, Stihl knows, that that's
7  not what the hazard of it is.
8          The hazard of this thing is the machine
9  flipping around and the spinning blade contacting the
10 operator; that's the hazard.  And nowheres in the
11 manual does it have a pictogram illustrating that.
12 That's a defect.  Because Stihl knows that that's the
13 hazard, that's the one that kills people.  And the
14 operators need to know that.
15 BY MR. WALSH:
16     Q    Have you ever seen any demonstration of
17 kickback in which -- first of all, have you ever seen
18 any demonstration of kickback with a cut-off machine
19 or any other tool, period?  Have you ever seen a
20 demonstration of the kickback, what it looks like?
21         MR. PACKIN:  Object to the form and asked
22 and answered.
23         MR. KOTT:  A hand-held, Jim?
24         MR. WALSH:  Yeah.
25         THE WITNESS:  I don't think so.  Other

Page 121

1  than still pictures, I don't think so.
2  BY MR. WALSH:
3      Q    Stihl pictures in the manual?
4      A    No.  No.  I'm sorry.  I think in the
5  Power Tool Institute study it has still pictures.
6      Q    Still?
7      A    Still.
8      Q    Still, S-T-I-L-L?
9      A    Yeah, right.
10     Q    Still pictures?
11         Okay.  Have you ever --
12     A    Right.  Right.  I did look at the Stihl
13 video, and I'm trying to remember if they're -- to
14 tell you the truth, I can't remember at this moment.
15     Q    Have you ever seen the actual dynamic
16 movement of a cut-off machine, a chainsaw, or any
17 other power tool in kickback?
18     A    No.
19     Q    Do you -- do you have -- have you ever
20 seen a cut-off machine that, as a result of a kickback
21 reaction, flipped over like you show it in Growney-48?
22         MR. PACKIN:  Object to the form.
23         THE WITNESS:  Well, I have never seen it,
24 but I don't need to see it because I know from my
25 investigation of two of these instances where the

31  (Pages 118 to 121)

dacdbde8-6f3c-4733-8e08-f07653c1f20c

Page 122

1  spinning blade contacted the operator's face.
2      Now, the only way -- let me demonstrate
3  this with this machine, okay?  If this thing kicks
4  back and comes back here, it hit me in the head, the
5  guard -- the guard over the spinning wheel.  Now, the
6  spinning wheel didn't contact me.  The spinning wheel
7  didn't cut my face.  The only way the spinning wheel
8  is going to cut my face is for the spinning wheel to
9  contact my face like this, okay?
10     So as an engineer it's pretty easy to
11 figure out that this machine has got to flip over and
12 has got to present the spinning blade to somebody's
13 face.  I know two people that have had the spinning
14 blade contact their face; Stout and McGee.
15     And in addition, there are other court
16 records of other people being -- I think it was Dale
17 Erb -- Dale Erb.  It cut his neck.  And the only way
18 you can get a blade to cut your neck, it's got to flip
19 over.
20     So as an engineer I could do an
21 engineering analysis that -- that I don't need to see
22 a demonstration of it.  I mean, you know, anybody can
23 figure that one out.
24 BY MR. WALSH:
25     Q    Is that the position the guard -- the

Page 123

1  position the guard is in on this machine?  Is it your
2  belief that that's the position the guard was in when
3  Mr. McGee was using it?
4      MR. PACKIN:  Object to the form.  That's
5  not what he said.
6      THE WITNESS:  I'd have to go back and
7  recollect.  I don't -- I have to go back and check
8  that.
9  BY MR. WALSH:
10     Q    And do you --
11     A    Even if it was or wasn't, you know,
12 machine still got to flip over, you know.  How you
13 going to hit -- how you going to hit your face without
14 presenting the blade to your face?
15     Q    Do you have any indication that Mr. McGee
16 -- that the machine ripped itself out of his hands
17 before it contacted him?
18     MR. PACKIN:  Object to the form.
19     THE WITNESS:  I don't remember his
20 deposition testimony, but it would be reasonably
21 likely that, in a kickback such as he experienced,
22 that the machine is not controllable by his hands,
23 despite the fact that one of the experts said anybody
24 can control any kickback.
25     MR. PACKIN:  Wherever it's good to take a

Page 124

1  minute.
2      MR. WALSH:  I'm going to turn the
3  questioning over to Mr. Kott, because he's -- he's not
4  sure he's going to be able to be here if we come back.
5  So I'm going --
6      MR. PACKIN:  Then I got to object to Mr.
7  Kott questioning the witness.  Let's just take a
8  restroom break.
9      MR. KOTT:  I'm going to move over there.
10     (Short recess was held.)
11     VIDEO TECHNICIAN:  We're back on.
12 BY MR. KOTT:
13     Q    Mr. Growney, my name's David Kott.  I
14 represent Black & Decker with respect to the Oldham
15 blade.  If I ask you a question and you do not
16 understand it, will you tell me?
17     A    Yes, I will.
18     Q    So you answer a question, we will assume
19 you understood it; is that okay with you?
20     A    Yes.
21     Q    And if I interrupt you or cut you off in
22 the middle of an answer, will you tell me that I've
23 interrupted you?
24     A    Certainly will.
25     Q    So if you answer a question, we will

Page 125

1  assume your answer is a full, fair, and complete
2  answer to the question; is that okay with you?
3      MR. PACKIN:  Object to the form.
4      THE WITNESS:  Yes.
5  BY MR. KOTT:
6      Q    Did you act as an expert in a case called
7  Stout, S-T-O-U-T?
8      A    Yes, I did.
9      Q    And that was a case against both Stihl
10 and Black & Decker/Oldham; is that correct?
11     A    Yes.
12     Q    And the Stihl machine involved in Stout
13 was the same model machine as involved in this case?
14     A    Yes.
15     Q    And the Oldham blade was the same blade
16 as was involved in this case; is that correct?
17     A    No, that's not correct.
18     Q    Let me try it again.
19     Q    Was the Oldham blade the same model blade
20 as involved in this case?
21     A    Yes, with a qualifier.
22     Q    What's the qualifier?
23     A    We don't know when the blades were
24 manufactured.  In other words, it could have been the
25 same model.

32 (Pages 122 to 125)

DEGNAN & BATEMAN
(856) 232-7400

Page 126

1    Q    Right.
2    A    But there were some -- Oldham made some
3    changes in that model.
4    Q    Okay.  But just with respect to what you
5    seen as far as the Oldham blade in this case, is it
6    the same model as was involved in the Stout case?
7    A    What I have seen with regard to the blade
8    that was involved -- the incident blade what I call,
9    the one that was there at the time of the accident, is
10   reduced to the incident photographs.
11   Q    Right.
12   A    The photographs taken at the scene.  That
13   is what I've used to identify the blade.  And, yes,
14   that, in essence, is the same basic model.  Whether --
15   whether it was the same vintage, can't tell you.
16   Q    With respect to the warnings on the
17   Oldham blade in Stout and the warnings on the Oldham
18   blade in this case, as far as you know were they
19   identical?
20   A    Well, as far as I know, no, because I
21   really don't know what was on the incident blade.
22   Q    Okay.
23   A    Because I don't know if anybody does,
24   because there are other versions of this blade.
25   Q    Other versions?  You mean at a later time

Page 127

1    the writing on the face of the blade was changed?
2    A    Yes.
3    Q    Do you know when that occurred?
4    A    The packaging that I have -- in fact, if
5    you want to see it, I'll get it --
6    Q    That's okay.
7    A    -- is copyrighted 2006.
8         That doesn't mean that the blade and the
9    warnings weren't made prior to 2006.  Just because --
10   I'm sorry.  Right.  Right.
11   Q    Okay.  Do you recollect giving a number
12   of depositions in the Stout case?
13   A    I recollect three days in the Stout case,
14   if that's what you consider a number.
15   Q    Yes, that's what I consider.
16   A    Okay.
17   Q    And do you remember that the last one was
18   on November 17, 2008?
19        MR. PACKIN:  You asking, does he remember
20   the date?
21        MR. KOTT:  Yeah.
22        THE WITNESS:  Wow.  I don't remember the
23   date.
24   BY MR. KOTT:
25   Q    Okay.  I will represent to you that your

Page 128

1    last deposition in the Stout case was November 17,
2    2008.
3    Q    Okay.
4    Q    Since your last deposition in Stout on
5    November 17, 2008, do you have any training,
6    education, or experience with respect to warnings,
7    meaning, that you've received since that date?
8    A    Well, yes.  My ongoing efforts.  I have
9    testified, I believe, in Stout that I have this
10   ongoing effort on warnings.  And one of the efforts
11   that I pointed out was researching articles.  I do
12   this all the time with respect to warnings, and
13   there's one that I made reference to.
14   Q    You're referring to Growney-55?
15   A    Yes.
16   Q    What other literature with respect to
17   warnings have you researched since your last
18   deposition in Stout on November 17, 2008?
19   A    I have some articles by Roads.  There are
20   some other articles that -- that I have obtained.  One
21   talks about variance in language.  Another one studied
22   the effects of multiple warnings on a product, the
23   effect of putting a second warning on a product.
24   Q    About how many articles are there that
25   you're referring to?  Give me an approximation.

Page 129

1    A    I've seen 10, 15 plus.  These come to
2    mind right now.
3    Q    Right.  Okay.
4         With respect to any articles that you own
5    or have access to --
6    A    Yeah.
7    Q    -- if I were willing to pay your costs of
8    pulling them and photocopying them, could you do that
9    for us?
10   A    Everything?
11   Q    The ones you were referring to that
12   you've read since your last deposition in Stout.
13   A    Oh, okay.
14   Q    Could you do that for us?
15   A    Sure.  Sure.
16   Q    Since --
17        MR. PACKIN:  You better put that in a
18   letter to me, Dave.
19        MR. KOTT:  Yeah.  Okay.
20        MR. PACKIN:  I know you do anyway, but
21   just remind me.
22        MR. KOTT:  I will.
23        THE WITNESS:  My understanding is you
24   inspected -- this is my understanding, not from you,
25   but I know the intent was for me to bring my file here

33  (Pages 126 to 129)

DEGNAN & BATEMAN
(856)  232-7400

dacdbde8-6f3c-4733-8e08-f07653c1f20c

Page 130

```
 1   for inspection. I assumed you inspected my file?
 2   BY MR. KOTT:
 3        Q    I did.
 4        A    Okay. Some of those articles were in the
 5   file.
 6        Q    Okay.
 7        A    But not all of them.
 8        Q    All right. The ones that you've referred
 9   to that you've reviewed since your last deposition in
10   Stout but are not in your file, I would like copies of
11   those, and I'd also like you to pull out the ones in
12   your lengthy file as well that you've looked at since
13   your last deposition in Stout and photocopy them and
14   send that to Mr. Packin. But I'll put that in a
15   letter to Mr. Packin.
16             Since your last deposition in Stout on
17   November 17, 2008, do you have any additional
18   training, education, or experience with respect to
19   blades?
20        A    Training, education, and experience?
21   Well, one of my experiences was to generate some
22   warnings which are referred to as temporal warnings.
23        Q    I'm sorry. You're referring now to
24   Exhibits Growney-47, 49, and 50?
25        A    Yes.
```

Page 131

```
 1        Q    Anything else?
 2        A    I can't remember whether that was -- was
 3   in Stout or not. Of course it was in my report, and
 4   of course I have this one I illustrate with the
 5   prohibition symbol, and I wanted it to be red. And of
 6   course here's an illustration of the red prohibition
 7   symbol.
 8        Q    Stay with me. I was just asking,
 9   whether, since your last deposition in Stout on
10   November 17, 2008, do you have any other training,
11   experience, or education with respect to blades other
12   than what is reflected in Exhibits Growney-47, 49, and
13   50?
14        A    That's a good question. I know I have
15   scoured -- done searches for availabilities of blades.
16   You know, does anybody else make them? What do they
17   look like? I've had that. I can't -- nothing
18   particular comes to mind right now.
19        Q    Okay. Since your last deposition in
20   Stout on November 17, 2008, do you have any additional
21   training, education, or experience in cutting
22   attachments, other than what you've already told me in
23   this deposition today?
24        MR. PACKIN: Or yesterday.
25   BY MR. KOTT:
```

Page 132

```
 1        Q    Or yesterday.
 2        A    I think we discussed the ANSI 01.1, my
 3   offering to the committee about installing a warning
 4   on 12 and 14-inch saw blades.
 5        Q    Didn't you do that before your last
 6   deposition in Stout?
 7        A    I can't remember. I can't place it in
 8   time.
 9        Q    Okay. Go ahead.
10        A    You may be right. Yes, okay.
11        Q    Go ahead.
12        A    Right. And we did have a discussion at
13   length. I don't think I informed you of that at the
14   committee meeting.
15        Q    Well, hold on. I'm just talking --
16        MR. PACKIN: Don't interrupt now. Yeah,
17   don't interrupt him. Finish, then you can clarify.
18        THE WITNESS: At the committee meeting
19   that the standard actually did address cutting
20   attachments, and the existing standard addressed
21   cutting attachments. I think I had testified I didn't
22   think it did.
23             But it was a certain amount of ambiguity
24   because that discussion took place when we were
25   discussing computer numerically-controlled machinery.
```

Page 133

```
 1   So the language was written for that.
 2             But when we discussed, it said the
 3   language allowed for those comments to be applied to
 4   blades. So I believe I made the motion. It's in the
 5   -- it should be in the current standard that that was
 6   included. That that is now included in the standard.
 7             In other words, the things to do and not
 8   to do apply not only to just cutting attachments,
 9   which is cutters that are attached to
10   numerically-controlled computer -- computer
11   numerically-controlled machinery, but now it applies
12   to blades of all kinds.
13   BY MR. KOTT:
14        Q    Anything else since your last deposition
15   in Stout with respect to your training, education,
16   experience on cutting attachments besides what you
17   just told me?
18        A    Yeah. Nothing I can think of at this
19   moment.
20        Q    In your opinion -- well, let me back up.
21             The blade is rated for how many rpms?
22        A    5,000.
23        Q    And how about the machine?
24        A    Machine is 5,340, I believe.
25        Q    So the blade was not sufficiently highly
```

34 (Pages 130 to 133)

dacdbde8-6f3c-4733-8e08-f07653c1f20c

Page 134

1  rated for the machine?  Or should I say the machine
2  was too high an RPM for safe usage of this blade?  How
3  should I phrase that?
4       A    Okay.
5            MR. PACKIN:  Object to the form.
6            THE WITNESS:  The rating of the machine
7  exceeded the rating of the blade.  That's it.
8  BY MR. KOTT:
9       Q    Thank you.
10      A    'Cause we do not know the speed at which
11 the machine ran at at the time of this incident.
12      Q    In your opinion did the fact that the
13 rating for the machine exceeded the rating for the
14 blade cause or contribute to this accident?
15      A    I don't know of any direct cause.  It's
16 possible it could have, but I don't know.
17      Q    I think my question was not only direct
18 cause but caused or contributed, so let me try it this
19 way:  In your opinion, to a reasonable degree of
20 engineering certainty, did the fact that the machine
21 was -- had a higher rating than the blade cause or
22 contribute to this accident?
23      A    I don't believe so.
24      Q    Thank you.
25      A    Because the --

Page 135

1            MR. PACKIN:  It's the only question he
2  asked.
3            THE WITNESS:  Okay.
4  BY MR. KOTT:
5       Q    The blade that we're talking about is a
6  carbide-tipped blade; is that correct?
7       A    Yes.
8       Q    And it's 14 inch?
9       A    Yes.
10      Q    Is it generally used on woodworking
11 equipment?
12      A    That -- actually, this is a very specific
13 blade.
14      Q    Right.
15      A    It is made for specific woodworking
16 equipment.
17      Q    Okay.  When you say this, are you talking
18 about the size of the blade, 14 inches?
19      A    The tooth configuration.  If I understand
20 what the proper blade is, I think I do.
21      Q    Well, let me try it this way:  With
22 respect, generally, to carbide-tipped blades of all
23 sizes, generally, what kind of machines are intended
24 to have those put on them?  Withdrawn.
25            What machines are intended to have as

Page 136

1  cutting attachments carbide-tipped blades of any size?
2       A    You could have woodworking machinery, you
3  can also have metal-cutting machinery that have
4  carbide tips on the saw blades.
5       Q    Okay.  And can you be specific both as to
6  the types of woodworking equipment and the types of
7  metal-working equipment?  Meaning names of the saws or
8  names of the metal working?
9       A    Sure.  In the woodworking machinery
10 there's table saws, there's gang saws, there's a
11 variation of a table saw.  In other words, I'm sorry.
12 It's a different saw.  There's cut-off saws, which is
13 not like the incident cut-off saw.
14      Q    You mean unlike when you say not like?
15      A    I'm sorry.  Is unlike, right.  There's a
16 particular type of saw used in the woodworking
17 industry.  There is -- there are a lot of machinery --
18 saw mills have a blade, but that -- that's beyond us.
19 They're very large.
20           There's radial arm saws.
21      Q    Circular saws?
22      A    Circular saws, yes.
23      Q    Miter saws?
24      A    Yes.  Miter saws, yes, that's correct.
25      Q    Compound miter saws?

Page 137

1       A    Yes.
2       Q    Jump saws?
3       A    That's what I meant when I said cut-off
4  saws.  But, yes, jump saws, yes.
5       Q    And with respect to metal-working
6  equipment, what kinds of metal-working equipment are
7  intended to be used with carbide-tipped blades?
8            MR. PACKIN:  Can you repeat that for me,
9  please?
10           (Above-mentioned question was read back
11 by the court reporter.)
12           THE WITNESS:  Cut-off saws.
13 BY MR. KOTT:
14      Q    By that do you mean jump saws or do you
15 mean something else?
16      A    No.  Actually, I don't mean jump saws.
17      Q    Okay.  What do you mean?
18      A    A stationary cut-off saw, which we have
19 referred to in the past in either this case or in
20 Stout.  In other words, a cut-off saw that is similar
21 to this, but has -- the blade is pivoted, provided
22 that the saw is equipped with the proper guarding.
23      Q    And would that be different guarding than
24 the Stihl machine we're talking about here?
25      A    Yes.

35  (Pages 134 to 137)

DEGNAN & BATEMAN
(856)  232-7400

dacdbde8-6f3c-4733-8e08-f07653c1f20c

Page 138

1    Q    Would it be more extensive than the
2  guarding on the Stihl machine here?
3    A    Yes. It would include a lower blade
4  guard.
5    Q    As well as an upper blade guard?
6    A    Yes. Yes.
7    Q    Now -- now, I want to call your attention
8  to 14-inch carbide-tipped blades. Of all of the
9  machines you've identified are intended to have
10 carbide-tipped blades used on, do all of those also
11 intend to have 14-inch carbide-tipped blades on them?
12       MR. PACKIN: Object to the form.
13       THE WITNESS: I'm a little confused by
14 your question.
15 BY MR. KOTT:
16   Q    Okay. You gave me a list of types of
17 machines that intend to use a carbide-tipped blade; do
18 you remember that?
19   A    Yes.
20   Q    You gave me two categories; wood-cutting
21 machines and metal cutting. Do you remember that?
22   A    Yes. Yes.
23   Q    And then within each of those categories
24 you gave me some names of saws, correct?
25   A    Yeah.

Page 139

1    Q    On all those saws that you gave me, are
2  they all intended to use 14-inch carbide-tipped
3  blades?
4    A    Well, I can't say they all are. I
5  haven't seen them all, but because you might have saws
6  built to different diameters, and so they may not all
7  be able to accommodate 14-inch blades.
8    Q    Tell me the ones you know about that are
9  able to accommodate 14-inch blades.
10   A    Table saws, radial arm saws. There are
11 some miter saws. And in the woodworking -- I'm sorry.
12 In the metal working, I can't be certain that the
13 cut-off saws accommodate 14-inch.
14   Q    Okay. How about circular saws? Are
15 there any circular saws that accommodate 14-inch
16 carbide blades?
17   A    I'm sorry. Are you talking about metal
18 working or woodworking?
19   Q    Either one.
20   A    Yes; table saws.
21   Q    No. No. I'm sorry. I was using
22 circular saws like people talk about a Skill saw,
23 hand-held.
24   A    Oh.
25   Q    Let's see if we can agree on the

Page 140

1  definition. Seven and a half or seven and a quarter,
2  whatever it is, circular saw. You know what I'm
3  referring to?
4    A    Yes.
5    Q    Hand-held?
6    A    Yes.
7    Q    And that's a hand-held with a retractable
8  lower blade guard, correct?
9    A    Correct.
10   Q    Does that kind of saw come in a 14-inch
11 variety?
12   A    Well, I searched and searched for all the
13 possibilities. I think I did come across a -- one
14 saw. It's obscure. I can't -- I found something for
15 it. I think there is one that does accommodate it.
16   Q    Would that have been something called the
17 Big Foot brand?
18   A    It may have been. I know I looked at Big
19 Foot, and I can't remember clearly.
20       MR. KOTT: Will you mark that for me,
21 please?
22       (Document was marked as Growney-58 for
23       identification by the court reporter.)
24 BY MR. KOTT:
25   Q    Let me show you Growney-58, which I will

Page 141

1  represent to you is a copy of a document from either
2  your Stout file or your McGee file or both.
3        Does that refresh your recollection as to
4  whether Big Foot offered a 14-inch circular saw?
5        MR. PACKIN: Object to the form.
6        Can we first ask him a foundational
7  question?
8        MR. KOTT: Don't need to.
9        MR. PACKIN: Okay. I think you do.
10 Object to the form.
11       THE WITNESS: Yes, it does.
12 BY MR. KOTT:
13   Q    And how does it refresh your
14 recollection? What is your recollection now as to
15 whether Big Foot offered a 14-inch circular saw?
16   A    It did at one time or does.
17   Q    Were there any metal-cutting saws that
18 were -- that were intended to use a 14-inch
19 carbide-tipped blade?
20   A    I believe so. I'm not 100 percent
21 certain, 'cause I know I've seen cut-off saws cutting
22 aluminum, and I thought they were approximate -- that
23 approximate data.
24   Q    Do you know whether Rockwell had one?
25   A    I don't recall.

36  (Pages 138 to 141)

DEGNAN & BATEMAN
(856)  232-7400

Page 142

1    Q    Now, I want to come back to something you
2  said earlier. Just try to get you back there.
3  Something about the number of teeth on this blade. Do
4  you remember you mentioned something during my
5  questions about the number of teeth on this blade?
6    A    Refresh my memory.
7    Q    All right. Let me try it. How many
8  teeth on the blade?
9    A    I believe it's 24.
10    Q    Does the fact that this blade had 24
11  teeth play any part in any opinions you have in this
12  case?
13    A    The --
14         MR. PACKIN: Are we talking about -- I
15  don't want to ask for the clarification while he's
16  here.
17         MR. KOTT: That's okay. Let him answer.
18         THE WITNESS: Well, yes, it does.
19  BY MR. KOTT:
20    Q    Okay. Tell me what it does.
21    A    Well, that indicates that it had teeth.
22  In other words, it was a wood-cutting blade, and the
23  -- for any given diameter the lower number of teeth,
24  say 24, gives -- is a far more aggressive cut than --
25  and would give a rougher cut than a higher number, 60,

Page 143

1  80, 90, or something.
2    Q    So in a very -- in a very general lay
3  sense the lower number of teeth on any given diameter
4  blade will be a less pleasing esthetic cut than a
5  higher number of teeth?
6         MR. PACKIN: Object to the form.
7         THE WITNESS: If your objection is
8  esthetics, I don't think they had esthetics in their
9  mind at this point.
10         Also, the lower number of teeth, I said,
11  is more aggressive. You can feed it usually faster.
12  It takes -- each tooth takes a bigger cut.
13  BY MR. KOTT:
14    Q    I'm not being a wise guy when I ask this:
15  What does any of that have to do with the issues in
16  this case?
17         MR. PACKIN: What does any of what?
18         MR. KOTT: The fact that the saw had 20
19  teeth or 24.
20         THE WITNESS: Well, that contributes to
21  -- that's the aggressive nature of the teeth. It can
22  take a bigger bite. In other words, in the same
23  rotation on a 24 tooth you can take a bigger bite with
24  the material. So the larger -- I'm sorry. The larger
25  teeth which corresponds to the smaller number of teeth

Page 144

1  for a given diameter is more likely to jam, to catch,
2  to climb up on the work rather than the smaller, finer
3  toothed blade.
4  BY MR. KOTT:
5    Q    Are miter saws and, in particular,
6  14-inch miter saws, used on construction sites?
7    A    I have only seen, I think, one
8  manufacturer of a miter saw, and it's -- and as far as
9  I know, they have discontinued their saw, and that is
10  -- it's not Makita. It begins with an M.
11    Q    No. It was Makita.
12    A    It was Makita? You answered for me.
13         MR. PACKIN: Yeah. He's not under oath,
14  though.
15         THE WITNESS: Well, I know one of them --
16  as a matter of fact, I tried to -- I have some
17  catalogs to try to track it down.
18  BY MR. KOTT:
19    Q    Whatever one it was that manufactured a
20  14-inch miter saw, was that saw used on construction
21  sites?
22    A    I can't verify that it was.
23    Q    Is that a saw that would make cuts that
24  would be needed on a construction site?
25    A    That's a possibility. Meaning, you know,

Page 145

1  those saws could be applied to construction sites.
2    Q    Do you know whether Dewalt, D-E-W-A-L-T,
3  or Black & Decker ever made a 14-inch miter saw?
4    A    I don't.
5    Q    Do you know whether 14-inch table saws
6  are ever used on construction sites?
7         MR. PACKIN: Object to the form.
8         THE WITNESS: I -- I couldn't say yes or
9  no; I don't know. It certainly is possible the
10  14-inch, but I don't know of an instance where
11  somebody would take a 14-inch, when you get up into
12  that size saw, you're getting into pretty husky saw,
13  so --
14  BY MR. KOTT:
15    Q    Does a 14-inch table saw make cuts that
16  would need to be made on construction sites?
17         MR. PACKIN: Object to the form.
18         THE WITNESS: 14-inch table saw?
19  BY MR. KOTT:
20    Q    Yeah.
21    A    It can make cuts that can be desirable on
22  a construction site, not necessarily that they have to
23  be.
24    Q    Right. A variety of saws you can make
25  the cuts with, correct?

37  (Pages 142 to 145)

dacdbde8-6f3c-4733-8e08-f07653c1f20c

Page 146

1      A    Yes.
2           MR. PACKIN: Object to the form.
3   BY MR. KOTT:
4      Q    Calling your attention to Growney Exhibit
5   7, that's -- do you remember -- and I'm just going to
6   paraphrase -- your testimony the other day about --
7   you had made a suggestion to the ANSI committee about
8   having a warning on carbide blades, and the committee
9   decided that that was not covered by the 01.1
10  committee. Do you remember that?
11     A    It was out of the 01.1 committee's
12  jurisdiction.
13     Q    And the reason for that was that the
14  machines involved were not in the jurisdiction of
15  01.1.
16     A    That's correct.
17     Q    Okay. Is there an ANSI committee that
18  has jurisdiction over the type of Stihl machine we're
19  talking about in this case?
20     A    Yes.
21     Q    Okay. And we looked at a standard
22  governing cut-off machines yesterday or today. Is
23  that the committee that set that standard?
24     A    I'm sorry. Could you repeat that?
25     Q    What's the standard that governs cut-off

Page 147

1   machines?
2      A    It's the ANSI 7. -- I have it here.
3   Hand-held gasoline-powered cut-off machines.
4      Q    Okay. Did you ever suggest to that
5   committee, the committee that drafted that statute,
6   the warning that you had suggested to the 01.1
7   committee?
8      A    Have not yet done that.
9      Q    With respect to Exhibit Growney-6, the
10  Bridgewater table saw manual, you said you drafted
11  some portion of this; is that correct?
12     A    Yes.
13     Q    Did you have any co-authors with the
14  portion you drafted?
15     A    Yes.
16     Q    Who?
17     A    Les Winter.
18     Q    Okay. And --
19     A    There was -- can you hand me that?
20     Q    This one?
21     A    Yes.
22          MR. KOTT: Handing the witness Growney-6.
23          THE WITNESS: I believe it's Ian Kirby.
24  I'm sorry. John Kelsey.
25  BY MR. KOTT:

Page 148

1      Q    Okay. You mentioned Ian Kirby. Did Ian
2   Kirby have anything to do with that Bridgewood manual?
3      A    No. He had something -- not to my
4   knowledge. He may have; I don't know.
5      Q    Well, you say not to your knowledge.
6   Given your work on the Bridgewood manual, do you
7   believe you would have known if Mr. Kirby were
8   involved in it?
9      A    Not necessarily.
10          MR. PACKIN: Object to the form.
11          THE WITNESS: Not necessarily.
12  BY MR. KOTT:
13     Q    With respect to ANSI 01.1, do you have
14  that standard, Growney-7, in front of you? Let me
15  give it to you.
16          Calling your attention to section 2.2.1
17  on page three, that has a definition of cut-off saws;
18  is that correct?
19     A    Yes.
20     Q    And it states that Kent -- examples of
21  cut-off saws are manual-operated pull, chop, miter,
22  and swing arm saws.
23          MR. PACKIN: Hold on. Are we on the
24  same --
25          THE WITNESS: It's over in the right-hand

Page 149

1   column. The right-hand column is the explanatory
2   column.
3           MR. PACKIN: Sorry.
4   BY MR. KOTT:
5      Q    Is that correct? That's what it states?
6      A    Yes.
7      Q    Do you agree that examples of
8   manually-fed cut-off saws are manually-operated pull,
9   chop, miter, and swing arm saws?
10     A    Yes.
11     Q    Do you agree that examples of power-fed
12  cut-off saws are jump, chop, straight line, cut off,
13  and similar saws where power feed is by electrical,
14  hydraulic, or pneumatic means?
15     A    Yes.
16     Q    And then there's a definition. Well,
17  then looking at this page underneath, there's an
18  overhead swing cut-off saw.
19     A    Yes.
20     Q    Do you see that? They list a number of
21  things they call cut-off saws, correct?
22     A    Yes.
23     Q    They call an overhead swing saw cut-off
24  saw, a straight line saw cut-off saw, an inverted
25  swing saw cut-off saw, correct?

DEGNAN & BATEMAN
(856)   232-7400

dacdbde8-6f3c-4733-8e08-f07653c1f20c

Page 150

1    A    Yes.
2    Q    And they also call a miter saw a cut-off
3  saw, correct?
4    A    Yes.
5    Q    And miter saws -- it says on the right
6  that machines of this type are known by various names
7  such as chop saws, pull-through miter saws, and
8  vertical miter saws; is that correct?
9    A    That's what it says, yes.
10   Q    Do you also agree that in the trade some
11  circular saws are referred to by tradesmen as cut-off
12  saws?
13        MR. PACKIN:  Object to the form.
14        You can answer it.
15        THE WITNESS:  Yes.
16  BY MR. KOTT:
17   Q    Do you also agree that in the trade
18  certain table saws are referred to by certain
19  tradesmen as cut-off saws?
20        MR. PACKIN:  Object to the form.
21        You can answer it.
22        THE WITNESS:  What trades?
23  BY MR. KOTT:
24   Q    Any trade that you would use that?
25   A    I would agree it's a possibility.

Page 151

1    Q    At the time Mr. McGee was cutting, did
2  the blade guard cover both halves of the machine?
3        MR. PACKIN:  Object to the form.
4        THE WITNESS:  No.
5  BY MR. KOTT:
6    Q    To your knowledge did -- withdrawn.
7        At the time Mr. McGee was cutting, did
8  the guard extend to the lowest point of the cutting
9  teeth on the bottom of the blade?
10   A    I don't believe so.
11   Q    At the time Mr. McGee is cutting -- was
12  cutting or at any time before that did he read any
13  manuals for the cut-off saw that he was using?
14   A    No.  I'm sorry.  He had read manuals, but
15  I don't think it was for the cut-off saw that he was
16  actually physically using at that moment.
17   Q    Okay.  At the time Mr. McGee was injured
18  or at any time before that had he read any manuals for
19  any cut-off -- gasoline-powered cut-off machines?
20   A    I think he testified that some time way
21  back in the past he had read --
22   Q    Manuals for cut-off machines,
23  gasoline-powered?
24   A    I'm sorry.  I don't recall.
25   Q    Okay.  Are miter saws can you cut

Page 152

1  materials other -- withdrawn.
2        On miter saws with a carbide-tipped blade
3  can you cut materials other than wood such as metal?
4        MR. PACKIN:  Could you repeat that?
5        (Above-mentioned question was read back
6    by the court reporter.)
7        THE WITNESS:  On some miter saws you can.
8  BY MR. KOTT:
9    Q    Does the ANSI 01.1 2004 standard, marked
10  as Growney-7, require that each cut-off saw be
11  provided with guarding to minimize the risk of the
12  operator's hand inadvertently contacting the saw blade
13  and to minimize the risk of injury from flying
14  splinters and broken saw teeth?
15   A    It sounds like you're reading
16  requirement --
17   Q    Page 56.
18   A    Page 56.
19        MR. PACKIN:  Object to the form.
20        THE WITNESS:  Yes, it does.
21  BY MR. KOTT:
22   Q    Generally does the ANSI 01.1 2004
23  standard for woodworking machinery require guarding on
24  machinery?  And I'm talking about guarding to reduce
25  the chances of blade contact.

Page 153

1    A    Yes, it does.
2    Q    And, generally, does that guarding
3  require some type of guarding across the top of the
4  blade and some type of guarding across the bottom of
5  the blade?
6        MR. PACKIN:  Object to the form.
7        Go ahead.
8        THE WITNESS:  Pretty much does.  There
9  may be some instances where the configuration still
10  doesn't require it, but, yes.
11  BY MR. KOTT:
12   Q    So on those types of saws, the ones
13  covered by 01.1, there is guarding on both,
14  essentially, the top and bottom of the blade to reduce
15  the chances that the operator will make inadvertent
16  contact with the rotating blade; is that true?
17        MR. PACKIN:  Object to the form.
18        THE WITNESS:  Yes.
19  BY MR. KOTT:
20   Q    In your report in this case, and you can
21  look at it, I didn't see any place where you talked
22  about what words, if any, you believe should have been
23  on the Oldham blade.  That is, what the wording of any
24  warning should be.  Did you do that in this case?
25        MR. PACKIN:  Object to the form.

39  (Pages 150 to 153)

dacdbde8-6f3c-4733-8e08-f07653c1f20c

Page 154

1        MR. KOTT:  What's your objection?
2        MR. PACKIN:  He did.
3        MR. KOTT:  Okay.  Then he'll tell me.
4    That's the question standing.
5        THE WITNESS:  Yes, I did.
6    BY MR. KOTT:
7        Q    Okay.  Can you tell me what paragraph
8    that was in your report?
9        A    In my report?
10       MR. PACKIN:  Take your time.  Look at
11   your report.
12       MR. KOTT:  You know what?  I will come
13   back to that.  Let me --
14       MR. PACKIN:  I mean, it's 30 pages, and I
15   don't want him to feel compelled to try to do it by
16   memory.
17   BY MR. KOTT:
18       Q    This accident occurred on March 25, 2007;
19   is that your understanding?
20       A    Yes.
21       Q    For the five-year period before March 25,
22   2007, who were the manufacturers of carbide-tipped
23   blades?
24       A    Oh.  If you count the Far East, there's
25   more than I can count.

Page 155

1        Q    Well, can you just give me the names of
2    the ones you remember manufactured carbide-tipped saw
3    blades for the five-year period before March 25, 2007?
4        A    Yes.  Vermont American, Diablo.  There's
5    two local ones here; Forest.  There's another one in
6    Jersey or in Hudson County area.  There's a number of
7    private labels.
8        Q    Can you give me the names of -- any names
9    I'll take that you can recollect for that five-year
10   period, private label or otherwise?
11       A    Well, Oldham is one.
12            You said carbide-tipped saws, right?
13       Q    Yes.
14       A    I have a bunch of them in my file.  If
15   you want, I'll go and look in my file.
16       Q    Of the ones you mentioned so far, did any
17   of them make 14-inch saw blades, carbide tipped?
18       A    Oldham did.  I'm trying to remember
19   whether Vermont American had an arrangement with a
20   European company.  I'm sorry, I can't remember the
21   particular details.
22       Q    How about Evolution or Rage?
23       A    Yes.  Yes.
24       Q    Did they make carbide-tipped saw blades
25   during that five-year period before the date of the

Page 156

1    accident?
2        A    I believe so, for a different type of a
3    saw I think that was for.
4        Q    Did they make 14-inch blades?
5        A    I'd have to look in my file to remember.
6        Q    In any event, were there a number of
7    manufacturers of carbide-tipped blades before -- for
8    the five-year period before the date of this accident?
9        A    Repeat the question, please.
10       Q    Were there a number of manufacturers --
11   blades sold in the United States -- withdrawn.
12            For the five-year period before the date
13   of this accident, were there a number of different
14   branded carbide-tipped saw blades sold in the United
15   States?
16       A    Yes.
17       Q    Can you estimate just a range of how many
18   different brands there were?
19       A    Fifteen maybe, plus or minus.
20       Q    And can you estimate for the five-year
21   period before the date of the accident in this case
22   how many different brands of 12 or 14-inch
23   carbide-tipped saw blades were available in the United
24   States?
25       A    That shrunk down that I could only find

Page 157

1    maybe four or five.
2        Q    And of the --
3        A    That's -- doesn't mean that that's all
4    there was.
5        Q    Can you remember the names of any of the
6    four or five you found?
7        A    Of course Oldham.  I think Bosch did.
8    And, yeah, there was the Vermont American arrangement
9    with the German saw manufacturer.  I think there was
10   one made under their arrangement.
11       Q    With respect to your proposed warnings in
12   this case for the blade, and I'm talking about the
13   words --
14            MR. WALSH:  Can we get clarification what
15   German saw manufacturer we're talking about?
16   BY MR. KOTT:
17       Q    Can you clarify what German saw
18   manufacturer you're talking about?
19            MR. PACKIN:  There's an echo in the room.
20            THE WITNESS:  I'd have to go into my file
21   and pull it out.
22            MR. PACKIN:  Do you want him to do that?
23            MR. WALSH:  It wasn't Stihl?
24   BY MR. KOTT:
25       Q    Was it Stihl?

40  (Pages 154 to 157)

DEGNAN & BATEMAN
(856)  232-7400

Page 158

1    A    No, it was not.
2    Q    You told me before that in your report
3  you suggested a certain warning for the Oldham blade;
4  is that correct?
5    A    Yes.
6    Q    Did any manufacturer -- withdrawn.
7         Has any manufacturer ever anyplace in the
8  world used the wording of the warning on
9  carbide-tipped saw blades that you suggest?
10        MR. PACKIN: Object to the form.
11        THE WITNESS: I certainly haven't seen
12  all of the blades manufactured in the world. Perhaps
13  some manufacturer has.
14  BY MR. KOTT:
15    Q    Are you aware --
16        MR. PACKIN: Hold on. Did you finish?
17        THE WITNESS: No, I didn't. I didn't.
18  It would certainly be realistic to -- for those
19  manufacturers to know if this has it, but I don't know
20  of any manufacturer that has this warning. This is,
21  once again, the situation.
22  BY MR. KOTT:
23    Q    Were you done? I'm sorry.
24    A    I'm sorry. I lost my train of thought.
25        This is, once again, a situation whereby

Page 159

1  the fact that everybody doesn't do it doesn't make it
2  right.
3         MR. PACKIN: We need to stop. She may
4  need one of you guys; I don't know.
5         (Brief interruption.)
6  BY MR. KOTT:
7    Q    Of the manufacturers of carbide-tipped
8  saw blades that you've identified for me earlier in
9  this deposition, do any of them have the warning that
10  you suggest in this case on their saws?
11    A    I have not seen it.
12    Q    Okay. You also suggest that this saw
13  should have a pictorial with respect to the use of
14  this kind of blade on gasoline-powered cut-off
15  machines; is that correct?
16    A    That's --
17        MR. WALSH: I think you're saying saw. I
18  think you mean saw blade.
19  BY MR. KOTT:
20    Q    Okay. Let me try it again.
21        You are also of the opinion that the
22  Oldham blade should have a pictorial with respect
23  to the use of the Oldham blade on a gasoline-powered
24  cut-off machine; is that correct?
25    A    Yes.

Page 160

1    Q    Has any manufacturer that you're aware of
2  anywhere in the world ever had a warning, a pictorial
3  warning, like your proposed warning, on their blades?
4        MR. PACKIN: Object to the form.
5        You can answer.
6        THE WITNESS: Well, I certainly haven't
7  seen all the blades manufactured in the entire world,
8  so there certainly could very well be.
9  BY MR. KOTT:
10    Q    Are you aware personally of any
11  manufacturer of carbide-tipped blades that has a
12  pictorial warning of the type you have suggested
13  should be on the Oldham blade?
14    A    I am aware of pictorial warnings,
15  pictorials -- pictorial warnings on blades, but not of
16  the type that I've suggested.
17    Q    Okay. Are you aware of any blade ever
18  sold anywhere in the world -- withdrawn.
19        Are you aware of any carbide-tipped saw
20  blade ever sold anywhere in the world that had a
21  pictorial of any type that suggested that the
22  carbide-tipped saw blade should not be used on a
23  gasoline-powered cut-off machine?
24        MR. PACKIN: Object to the form.
25        You can answer.

Page 161

1        THE WITNESS: Could you repeat the
2  question?
3        MR. KOTT: Yeah. The court reporter will
4  read it back.
5        (Above-mentioned question was read back
6  by the court reporter as follows:)
7        "QUESTION: Okay. Are you aware of any
8  blade ever sold anywhere in the world --
9  withdrawn.
10        "Are you aware of any carbide-tipped saw
11  blade ever sold anywhere in the world that had a
12  pictorial of any type that suggested that the
13  carbide-tipped saw blade should not be used on a
14  gasoline-powered cut-off machine?"
15        THE WITNESS: As I responded earlier, you
16  know, I certainly haven't seen all the carbide-tipped
17  blades that have been sold throughout the world.
18  BY MR. KOTT:
19    Q    Have you ever seen a carbide-tipped saw
20  blade sold anywhere in the world that had a pictorial
21  that indicated that the carbide-tipped saw blade
22  should not be used on a gasoline-powered cut-off
23  machine?
24        MR. PACKIN: Object to the form for the
25  same reason, and asked and answered.

41 (Pages 158 to 161)

DEGNAN & BATEMAN
(856)  232-7400

dacdbde8-6f3c-4733-8e08-f07653c1f20c

Page 162

```
1          THE WITNESS: No.
2   BY MR. KOTT:
3      Q    Thank you.
4          Sir, I want to -- I had a question about
5   Growney-4 and Growney-5, the photographs where I think
6   you were identifying the reducing bushing?
7      A    Yes.
8      Q    Do you know where that reducing bushing
9   came from?  And what I mean by that is, do you know
10  where Jingoli got that reducing bushing?
11     A    That specific reducing bushing?
12     Q    Right.
13     A    I certainly don't know.  I do know that
14  -- no, I don't know.
15     Q    Do you know whether either the Oldham
16  blade or the Stihl cut-off machine were sold with
17  reducing bushings?
18     A    It's possible the Oldham blades were sold
19  with the reducing bushing.  I think I've seen some
20  Jingoli purchase orders that showed -- identified
21  reducer bushings.
22     Q    Do you know whether, when Oldham sold
23  this blade to the distributor, whether it sold it with
24  a reducing bushing?
25     A    I don't know for certain.
```

Page 163

```
1      Q    The invoices you just referred to, were
2   those invoices from the distributor, Sander, to
3   Jingoli?
4      A    Yes.
5      Q    And those invoices reflected that Jingoli
6   had purchased certain reducer bushings, correct?
7      A    Yes.
8      Q    Do you know where Sander got those
9   reducer bushings from?
10     A    No, I don't.  They're commonly available.
11  There's a variety of sources you can get them from.
12     Q    What is the hook angle -- withdrawn.
13         Can you put in lay terms, as you would do
14  in front of a jury, what a hook angle is on a saw
15  blade?
16     A    Yes.
17     Q    Will you do that?
18         MR. PACKIN:  Object to the form, but you
19  can answer.
20  BY MR. KOTT:
21     Q    Will you do that?
22     A    Now?
23     Q    Yes.
24     A    Yes.
25         Okay.  If you drew a line from the center
```

Page 164

```
1   of the saw blade out to its periphery, in other words,
2   this would be a radial line, and then you imagined
3   that the tip of the saw blade was at that line, if the
4   saw blade -- I'm sorry.  If the tip tilted forward,
5   that would be a hook angle.  And tilting forward --
6   when I say forward, that would be in the direction of
7   rotation.  And that would be a positive hook angle.
8   If the tip, the carbide tip, leaned back from that
9   radial arm, that would be a negative hook angle.
10     Q    What was the hook angle on the Oldham
11  saw?
12     A    It was a negative, I believe.
13         MR. PACKIN:  Blade.
14         MR. KOTT:  Blade.  Sorry about that.
15  BY MR. KOTT:
16     Q    Let me try it again.
17         What was the hook angle on the Oldham
18  blade?
19     A    I think it was a negative 15 degrees.
20     Q    Or a negative five, one or the other?
21     A    Five, I'm sorry.
22     Q    Okay.  And does the fact that there was a
23  negative angle five hook angle on the Oldham blade
24  play any part in any opinions you have in this case?
25     A    Well, the only opinion that I said that
```

Page 165

```
1   this was a very specialized blade.  I mean, you don't
2   use that blade on saw -- no.  I'm sorry.  You don't
3   use that hook angle on saw blades that you want --
4   that you really want to cut with.  That -- that you
5   want to -- they're high-production angles, and it's
6   common that most -- the majority of the blades have a
7   positive hook angle on them on their teeth, on the
8   tip, because you get a better -- you get a faster
9   cutting action, a bigger chip.
10         There are certain saws that this is --
11  that you don't want that to happen, or you want that
12  -- you want to minimize that.  So those saws you
13  design a blade with a negative hook angle.
14     Q    What are those saws where you don't want
15  that to happen?
16     A    Well, principally, radial arm saws and
17  miter saws.  But, you know, the term, "miter saw"
18  covers a lot of different saws.  And perhaps a miter
19  saw might be one thing to one person, another to
20  another.  So certain types of miter saws you don't
21  want.  You want a negative hook angle.
22     Q    Like this blade had?
23     A    That's correct.
24     Q    Any other besides radial arm and certain
25  types of miter saws?
```

42  (Pages 162 to 165)

dacdbde8-6f3c-4733-8e08-f07653c1f20c

Page 166

1    A    Well, there's always the potential of
2  special application I'm not aware of, but that's what
3  comes to mind right now.
4    Q    And when you said certain types of miter
5  saws, what were you referring to?
6    A    A single blade miter saw that would be --
7  actually, a compound miter saw, what we call a
8  compound miter saw, whereby not only could you cut a
9  miter, but you could pull it forward and rip.
10   Q    You referred to a lawsuit involving a
11  person, Dale Erp, or Erb; do you remember that?
12   A    Erb, yes.
13   Q    What cutting -- what type of cutting
14  attachment was on his saw?
15   A    I believe he had a composite abrasive
16  wheel.
17   Q    Okay.  Are you aware, other than Mr.
18  McGee and Mr. Stout, of anyone else who was ever
19  injured using a carbide-tipped saw blade on a
20  gasoline-powered cut-off saw?
21   A    Yes.
22   Q    Who?
23   A    I made reference to a New York State case
24  earlier.  I also think there was a case in
25  Pennsylvania in the Philadelphia area.  There may have

Page 167

1  been two; I can't remember.
2    Q    What are the names of those cases?
3    A    I'd have to look them up.
4    Q    Were they in your file?
5    A    Could possibly be.
6    Q    Any others?
7    A    There's possibly more that I don't
8  remember without looking it up.
9    Q    Are you aware of any people who have used
10  carbide-tipped saw blades on gasoline-powered cut-off
11  machines, other than the people you just referred to
12  who were injured, we just went over that, and other
13  than co-workers of either Mr. Stout or Mr. McGee or
14  both?
15   A    No.
16   Q    What I want to come back to -- with
17  respect to the blade involved in the accident, do you
18  know whether that blade had the same writing on it as
19  the Stout blade, or do you know whether it had
20  different writing, or do you not know one way or the
21  other?
22   A    Well, I know on one-half of one side --
23  approximately one-half of one side it was the same as
24  Stout's.  That I know.
25   Q    And was that half the half that had some

Page 168

1  or all of the warning?
2    A    No.  It was the half that was empty, that
3  had nothing.
4    Q    Okay.
5    A    You know, so --
6    Q    Let me try it a different way.  Did you
7  see photographs taken by the police?
8    A    Yes.
9    Q    And did those photos show the Oldham
10  blade in part?
11   A    Yes.  Yes.
12   Q    Did the Oldham blade -- could you see
13  that there was some writing on the Oldham blade?
14   A    Yes.  Yes.
15   Q    This is what I'm driving at.
16   A    Right.
17   Q    And was that writing on the Oldham blade
18  the same writing that was on the Oldham blade in the
19  Stout case?
20   A    I'd have to just go back and compare the
21  pictures, picture to picture.  I'm trying to remember,
22  because I've seen more than one Oldham blade.
23   Q    Is that -- would that take you long to do
24  before your next deposition?
25   A    No.

Page 169

1    Q    Do you have the police photos here
2  somewhere handy?
3    A    I have.  I know I have, yeah.  Yeah.
4    Q    But are they handy?  Would it take you
5  long to pull them out?
6        MR. PACKIN:  It wouldn't take me long.
7        MR. KOTT:  Okay.
8        MR. PACKIN:  You want me to do that?
9        MR. KOTT:  Yeah.
10       MR. PACKIN:  Here they are.  Easier to
11  find the photos than my glasses.
12  BY MR. KOTT:
13   Q    While Mr. Packin's pulling them out,
14  calling your attention to Growney-34, your list of
15  testimony, have you given any testimony since
16  September 16, 2009?
17   A    Yes, I have.
18   Q    And what was that?
19   A    Approximately a month ago I gave
20  deposition in New Jersey.
21   Q    Name of the case?
22   A    It was Johnson versus Ingersoll-Rand.
23   Q    And were you testifying on behalf of the
24  plaintiff?
25   A    Plaintiff.

43  (Pages 166 to 169)

dacdbde8-6f3c-4733-8e08-f07653c1f20c

Page 170

1    Q    Do you remember the defense lawyer in the
2  case? Was it Ken Myers from the Porzio, Bromberg law
3  firm?
4    A    No.
5    Q    Who was it; do you remember?
6    A    William Stewart.
7    Q    Any other testimony since then?
8    A    Yes.
9    Q    I'm sorry. Any other testimony not
10 reflected on that exhibit?
11   A    Yes.
12   Q    Go ahead.
13   A    I think in February there was a case, a
14 forklift case.
15   Q    And what was the name of the case?
16   A    Beuhlmeier versus Prime Mover.
17   Q    Did you testify on behalf of the
18 plaintiff?
19   A    Yes.
20   Q    And who was the defense attorney?
21   A    I don't know.
22   Q    Who was the lawyer you worked for? Who
23 was the plaintiff's lawyer?
24   A    Raymond Vivino.
25   Q    Okay. Did that case involve warnings at

Page 171

1  all?
2    A    I don't think so. No, I don't know. No,
3  I don't know.
4    Q    Any other testimony not reflected on that
5  list since the last date on that list?
6    A    I can't -- I don't recall.
7         MR. KOTT: Okay. Barry, can I have those
8  photos?
9         MR. PACKIN: Yeah. Just for the record,
10 these are the ones I pulled out of my own notebook as
11 being police photos. I believe they're complete. And
12 just to speed things along, I tried to put on top the
13 ones that would be most possible to see segments of
14 the blade. But if you want to reorder them, shuffle
15 them, whatever you want to do.
16 BY MR. KOTT:
17   Q    Calling your attention to this photo, and
18 it's one of the police photos. Do you see the Oldham
19 blade there?
20   A    Yes, I do.
21   Q    Can you tell from looking at that photo
22 whether that blade had the same writing as was on the
23 Oldham blade in the Stout case?
24   A    I'd be calling on memory of what the
25 Stout writing is, but it seems to me to resemble it.

Page 172

1  It looks similar.
2    Q    Okay. Let me show you what was marked
3  for identification as Kalsher-49, which is a blueprint
4  of the Oldham blade. Do you see that?
5    A    Yes.
6    Q    Does that assist you in determining
7  whether or not the writing on the Oldham blade in this
8  case was the same as the writing on the Oldham blade
9  in Stout?
10   A    Well, what is this? Is this from Stout?
11 Kalsher-49; is that from Stout?
12   Q    No. It's from this case. But I will
13 represent to you that that's the same print as we
14 produced in Stout.
15   A    Oh, okay. I don't remember it from
16 Stout. It certainly appears similar.
17   Q    Now, having looked at one of the police
18 photos and the print of the Oldham blade, do you
19 believe it's probable that the writing on the Oldham
20 blade involved in McGee was the same as the writing
21 involved in the Oldham blade in Stout?
22   A    Yes.
23   Q    Thank you. That's all.
24         Is your current hourly rate $250 per
25 hour?

Page 173

1    A    That's the current rate. That's due to
2  increase in -- 1st of July.
3    Q    Is that why you're going to Europe? So
4  we'll have to pay the higher rate?
5         MR. PACKIN: Object.
6         THE WITNESS: You want to pay beforehand?
7         MR. PACKIN: You can prepay.
8  BY MR. KOTT:
9    Q    You had said earlier that in your report
10 you did suggest certain writing.
11        MR. PACKIN: Are you done with the
12 photos?
13        MR. KOTT: Yeah.
14 BY MR. KOTT:
15   Q    Calling your attention to Exhibits 49,
16 47, and 50, they all have writing on them, correct?
17   A    Yes.
18   Q    Writing -- by "writing" I mean words,
19 right?
20   A    Yes.
21   Q    Are any of the words on any of these
22 three exhibits what you suggest should be on the
23 Oldham blade?
24   A    They could be. These were just attempts
25 to write a warning on there. And the warning that's

44  (Pages 170 to 173)

dacdbde8-6f3c-4733-8e08-f07653c1f20c

Page 174

1   in my report, I think, is similar to some of this
2   wording, and I was trying different wording, different
3   arrangements.
4        Q     Have you settled -- by "settled" I mean
5   have you made a decision -- withdrawn.
6             Have you -- withdrawn.
7             Are you able to articulate today what the
8   words of your proposed warning should be?
9        A     Well, they are what's in my report. But
10  this is a different warning. This is not -- this is a
11  similar warning, but it's -- it's applied a little
12  differently.
13       Q     Okay. I had marked as Exhibit Growney-9
14  and then 9a through 9ii, which were Growney exhibits.
15  Can you look at these exhibits and tell me whether
16  they were attached to your report?
17            MR. PACKIN:  Can I just see them real
18  quick first?
19            (Witness complies.)
20            MR. PACKIN:  Look at them all. Not that
21  I distrust in any way Mr. Kott, but you've been asked
22  a specific question under oath, so make sure they are.
23  BY MR. KOTT:
24       Q     I'll help you with this.
25       A     I'll turn this while you turn yours. One

Page 175

1   second. Okay.
2             Can I correct my testimony earlier?
3        Q     No. First let's finish this, then I'll
4   let you correct.
5             First let's go through and get an answer
6   to this question, and then I'll let you --
7        A     One second.
8        Q     -- go back.
9             Where are you? Hold on. I'll catch up
10  to you. I'm here.
11       A     Okay. Here we go.
12       Q     With me?
13       A     6.85?
14       Q     Uh-huh.
15       A     Okay. 6.104?
16       Q     Uh-huh.
17       A     One second. Let's see. Okay.
18       Q     So I think the question I posed is, can
19  you confirm that Exhibits Growney-9 and 9a through 9ii
20  were, in fact, copies of exhibits attached to your
21  report in this case that we marked earlier today as an
22  exhibit?
23       A     Yes.
24       Q     Okay. Did you want to correct something
25  earlier?

Page 176

1        A     Yes. I had stated that the speed rating
2   of the machine was 5,340 rpm, and it's actually 5,350
3   rpm. That's what it's rated.
4        Q     Would that correction change any of the
5   answers you gave to my questions about the rpms?
6        A     No, but there is a point about the rpms.
7        Q     What's the point about the rpms?
8        A     The maximum speed limit of the blade, the
9   rating, is based on the surface speed for the -- the
10  attachment of the carbide tip to the steel --
11       Q     Steel, S-T-E-E-L?
12       A     S-T-E-E-L, steel, blade body.
13       Q     Okay.
14       A     That rating, it is felt -- and that
15  rating has been in existence for a long time. That if
16  you exceed that speed rating, you run the risk of
17  throwing teeth off. But other than that, that's the
18  -- just the only reason for that.
19       Q     Does exceeding the speed rating increase
20  or play any part in the likelihood of a kickback
21  occurring?
22       A     What do you mean, the speed?
23       Q     I'm sorry. You said the risk of
24  operating this carbide-tipped saw blade on a machine
25  that had a greater rating than 5,000 rpms as that you

Page 177

1   would have a thrown object from the tips. Am I
2   understanding that correctly?
3             MR. PACKIN:  Thrown tips.
4   BY MR. KOTT:
5        Q     Thrown tips?
6        A     Yes.
7        Q     Okay. Is there any greater risk of
8   kickback than you otherwise would have by using this
9   blade, the Oldham blade, on a machine that's rated
10  higher than 5,000 rpm?
11       A     Well, you got about a six percent
12  increase in speed; six or seven percent. So there
13  might be some slightly commensurate increase for
14  kickback, but it's minimal. That ability for the
15  teeth to grab in and cause the kickback, that's there
16  whether you have 5,000 or 5,300.
17       Q     Is the risk of thrown carbide tips -- is
18  there a risk of severe injury for thrown carbide tips?
19       A     Yes. Could be, yes, right.
20       Q     Potentially loss of eyesight in one or
21  more eyes?
22            MR. PACKIN:  Object to the form.
23  BY MR. KOTT:
24       Q     Is that a potential?
25       A     That's one of the potentials, sure.

45 (Pages 174 to 177)

dacdbde8-6f3c-4733-8e08-f07653c1f20c

Page 178

```
 1      Q    What is the most serious injury that can
 2  occur from thrown carbide tips --
 3          MR. PACKIN:  Object to the form.
 4  BY MR. KOTT:
 5      Q    -- of a saw blade?
 6      A    Well, that's the serious -- serious
 7  injury that I'm aware of that's occurred.  Potentially
 8  you could have any kind of injury from it.
 9      Q    Could you potentially have death from
10  that?
11      A    That's potential, sure.
12      Q    Calling your attention to Exhibit
13  Growney-9, have --
14      A    What is that?
15      Q    That's -- you have it as attachment 61.
16  Sorry.  6.141.  I'll hold it up for you.
17      A    Okay.
18      Q    Now, this is something you created; is
19  that correct?
20      A    That's correct.
21      Q    In fact, you have a copyright symbol on
22  the bottom.  Is that a way, in a lay sense of saying
23  this is your creation?
24      A    That is a way of saying my creation.
25      Q    Why did you put that copyright symbol
```

Page 179

```
 1  there?
 2      A    I have some recollection of somebody
 3  telling me the need for a copyright whatever you did.
 4  But this is a crude -- my crude attempt at artwork.
 5  And my crude attempt consists of cutting and pasting.
 6  But go ahead.
 7      Q    What do you mean when you say it's your
 8  crude attempt at artwork?
 9      A    Well, I got to admit that I'm not so good
10  at artwork.  That's what I mean, you know.  In other
11  words, I would like certain more refinements.
12      Q    To this?
13      A    Yeah.  Yeah.
14          MR. PACKIN:  "This" being attachment
15  6.141, for the record.
16  BY MR. KOTT:
17      Q    Am I correct that in the Stout case you
18  had a different pictorial or you proposed a different
19  pictorial?
20      A    I don't recall.
21      Q    Well, looking at this Growney Exhibit
22  9ff, do you see in the lower -- in the bottom it's
23  handwritten 9/12/2009?
24      A    Yes.
25      Q    Is that about the time that you prepared
```

Page 180

```
 1  that document?
 2      A    Yes.
 3      Q    Okay.  Was there an earlier iteration of
 4  this drawing?
 5      A    I believe there was.  I believe I hadn't
 6  -- in Stout I hadn't put these two things together.
 7  And I may have tried to refine one or the other parts.
 8  When I say these two, I mean the prohibition sign and
 9  the cut-off saw, demo saw.
10          MR. KOTT:  Would you mark this, please,
11  as the next sequential?
12          (Document was marked as Growney-59 for
13      identification by the court reporter.)
14  BY MR. KOTT:
15      Q    I've marked for identification Exhibit
16  Growney-59, and ask you -- this says copyright, Neal
17  A. Growney & Associates, LLC, July 29, 2008.  Do you
18  see that?
19      A    Yes.
20      Q    And is that something you prepared on or
21  about July 28, 2008, is it?
22      A    July 29, 2008, yes.
23      Q    All right.  Let me try it again.
24          Is that something you prepared in or
25  around July of 2008?
```

Page 181

```
 1      A    Yes.
 2      Q    Was that something you prepared for the
 3  Stout case?
 4      A    Yes.
 5      Q    Okay.  And you also have 47, 49, and 50.
 6  Are they -- is the pictorial there the same as the
 7  pictorial in Growney-9ff?
 8      A    Yes.
 9      Q    Okay.  And why did you make the change to
10  the pictorial from Growney-59 to Growney-9ff?
11      A    Well, I was taking a look at it and I
12  thought it would be -- it would be an improvement.  It
13  would help to convey the message, communicate the
14  warning to don't put this particular blade on this
15  saw, if I could simulate teeth.  And of course this is
16  my crude attempt at simulating teeth, which probably
17  wasn't so hot (indicating).
18      Q    "This" being Growney-9ff?  That's what
19  you're referring to?
20      A    Yes.  Yes.
21      Q    So Growney-59, there's no simulation of
22  teeth; is that what you're telling me?
23      A    Yes.
24      Q    Okay.
25      A    And I thought that this, as you described
```

46 (Pages 178 to 181)

DEGNAN & BATEMAN
(856) 232-7400

Page 182

1  it, iteration, I thought that this iteration was an
2  improvement over this. Either one would work, I
3  believe. This one might get a little better response.
4        Q     This one, Growney-9ff?
5        A     Yes.
6        Q     The profile or the picture of the
7  machine, is it the same in both?
8        A     Yes.
9        Q     So the only thing -- withdrawn.
10       The blade guard, is that the same in
11  both?
12       A     Yes.
13       Q     So the only thing that's different in
14  both is what the blade looks like, correct?
15       A     Yes. And as I said before, it's my crude
16  representation of teeth. You know, if I had somebody
17  able to make these drawings for me, I might do them a
18  little different.
19       Q     Did you -- did you draw the machine
20  that's shown there, or did you adopt that from
21  somebody else?
22       A     This is from Norton. Norton is a
23  manufacturer of grinding wheels. It is -- they're
24  actually -- they're owned by an outfit called
25  Saint-Gobain, and it is on their website, but it also

Page 183

1  appears in a number of places other than that. And it
2  escapes me right now where else they appear.
3        Q     And you're talking about what the machine
4  looks like?
5        A     That's correct.
6        Q     Okay. Is there any cut-off machine that
7  you're aware of that looks like the machine pictured
8  in Exhibit Growney-9ff?
9        MR. PACKIN: Object to the form.
10       THE WITNESS: Yes.
11  BY MR. KOTT:
12       Q     Which ones or what brand?
13       A     Stihl TS-350.
14       Q     Okay. Any others?
15       A     The Homelites had a similar appearance.
16       Q     Any others?
17       A     There are some obscure brands that maybe
18  aren't made anymore that have a similar appearance, or
19  at the time their manufacture had a similar
20  appearance.
21       Q     And what percentage of the market would
22  you estimate in 2007 and five years before that had --
23  withdrawn.
24       What percentage of machines out in the
25  trade in the five-year period before this accident

Page 184

1  looked like the machine pictured on Growney-9ff?
2        MR. PACKIN: Object to the form.
3        THE WITNESS: I couldn't estimate the
4  appearance, but I do have to go back and alter my
5  response to the previous question about what machines
6  looked like this. This is very similar to the
7  illustration in the standard, in the cutting-off
8  machine standard.
9  BY MR. KOTT:
10       Q     All right.
11       A     It's also similar to the AEM. Name
12  escapes me right now. Their illustration of a
13  cutting-off machine.
14       Q     I think my question was: In the
15  five-year period before the date of the accident what
16  percentage approximately of the cut-off machines out
17  in the trades in the United States looked like the
18  machine pictured on your Exhibit Growney-9ff?
19       MR. PACKIN: Object to the form.
20       You can answer.
21       THE WITNESS: It would be difficult for
22  me to estimate that. However, the people in
23  construction who use concrete cut-off machines, I'm
24  sure they predominantly recognize this as a concrete
25  cut-off machine.

Page 185

1        I don't mean to infer that this
2  illustration is the be all, end all. You can change
3  it and alter it. You can move the machine to get a
4  better profile, if that's what you want. You want to
5  modernize it, you know, that's fine. This is just
6  representative of the type of warning that should be
7  on the blade.
8  BY MR. KOTT:
9        Q     Would you agree that under 20 percent of
10  the machines in the United States in the workplaces,
11  cut-off machines, in the five-year period before the
12  date of the accident looked like the machine pictured
13  in Growney-9ff?
14       MR. PACKIN: Object to the form. And, in
15  essence, it's already been asked and answered.
16       THE WITNESS: I would not agree.
17       MR. KOTT: Okay. All right. I think --
18  let's go off the record.
19       MR. PACKIN: David, I have one follow-up
20  question to yours. And in fairness to you, if you
21  want to be here when I do that --
22       MR. KOTT: Well, I'm going to have to be
23  here for the next time, whenever we do it.
24       MR. PACKIN: Then it doesn't matter.
25       MR. KOTT: Let's go off the record just

47  (Pages 182 to 185)

dacdbde8-6f3c-4733-8e08-f07653c1f20c

Page 186

1  to discuss scheduling.
2        (Off-the-record discussion was held.)
3        MR. KOTT:  With respect to any exhibits
4  that I marked for identification, I will supply copies
5  to other people.
6        With respect to continuing the deposition
7  of Mr. Growney, Mr. Packin said he will get dates and
8  circulate that to us.
9        With respect to the balance of the
10 exhibits, I'll let Mr. Walsh or Mr. Packin put on the
11 record who's doing what, because we've already had
12 some unclearness as to who was doing what with the
13 exhibits.
14       MR. WALSH:  What is the arrangement here,
15 Barry? The ones you're taking back that came from his
16 file, are you going to provide copies of those to
17 everybody? And I understand that there may be a
18 special case for the long one that's -- which we were
19 willing to pay for, but we -- but we just need -- we
20 need to get copies of them, obviously.
21       MR. PACKIN:  Some of them have difficulty
22 of copying, such as 47, but to the best we can we
23 will.
24       MR. WALSH:  But we need to know which
25 ones you have for the record so that we don't -- if we

Page 187

1  have a missing exhibit, we know where to start
2  looking.
3        MR. PACKIN:  Anything that came from Mr.
4  Growney's file.
5        MR. WALSH:  But that's not clear. For
6  the record, why don't we just take the stack that
7  we're taking and read the numbers?
8        MR. PACKIN:  I'm taking -- there's 75
9  numbers.
10       MR. WALSH:  Put the photographs aside for
11 the moment, but -- because not all of those were
12 marked anyway.
13       MR. PACKIN:  47, 59, 48, 44, 49, 50, 34,
14 five, four, six.
15       MR. WALSH:  Did you get the one that was
16 just --
17       MR. PACKIN:  Uh-huh. 58, 46, 51, 52, 53,
18 54, 42, 43, 40. This wasn't marked. 36, 56, seven,
19 although everybody has a copy of that. This wasn't
20 marked; it's just another copy. 39, 38, 41, 45,
21 three, two, one.
22       MR. WALSH:  And that was marked on the
23 back?
24       MR. PACKIN:  55. For the record I'm not
25 going to photocopy 55.

Page 188

1        MR. WALSH:  There were certain pages.
2        MR. PACKIN:  That was already done.
3        MR. WALSH:  Asked for -- are there in
4  there -- in a separate one?
5        MR. PACKIN:  We already gave them, Dave.
6        MR. KOTT:  I gave him what I wanted from
7  this. I gave you a set from what I wanted from it.
8        MR. RUDOLPH:  This is some of it.
9        MR. PACKIN:  If you want this whole book
10 you're going to have to pay for this.
11       MR. WALSH:  We've got what it is.
12       MR. RUDOLPH:  Kott wanted one.
13       MR. WALSH:  And the other ones that you
14 have, Barry, are 37a, b, and cc.
15       MR. PACKIN:  The three books and the
16 three volumes of the study and the photos.
17       MR. WALSH:  The only ones we have right
18 now are Growney-44, Growney-8, and we have a copy from
19 the Dynamic Document Design book, but it was unmarked
20 as an exhibit.
21       Do we have any others, Steve?
22       MR. RUDOLPH:  Yesterday we did. Is she
23 retaining some of them?
24       MR. KOTT:  The last one that I marked,
25 which was his drawing from Stout.

Page 189

1        MR. WALSH:  I don't have that.
2        MR. KOTT:  Barry, how about the last one
3  I marked, which was his drawing?
4        MR. PACKIN:  It's in the pile. It's in
5  the pile.
6        MR. WALSH:  Do you have any of the
7  exhibits, Dave?
8        MR. KOTT:  Yeah, I have.
9        MR. WALSH:  Which ones do you have?
10       MR. KOTT:  Growney-9 and then Growney-9a
11 through 9ii. Hang on for me.
12       MR. RUDOLPH:  What happened to that big
13 pile from yesterday? You have all those from
14 yesterday?
15       MR. PACKIN:  What's that?
16       MR. RUDOLPH:  All the exhibits he marked
17 yesterday at yesterday's dep, like one through
18 whatever.
19       MR. PACKIN:  Yeah.
20       MR. RUDOLPH:  You have those?
21       MR. PACKIN:  Yeah. 143.
22       MR. KOTT:  I have Growney-45. Let me
23 tell you what I'm not seeing. I'm not seeing
24 Growney-34.
25       MR. PACKIN:  What is it?

48 (Pages 186 to 189)

DEGNAN & BATEMAN
(856)   232-7400

dacdbde8-6f3c-4733-8e08-f07653c1f20c

Page 190

1       MR. KOTT:  Which is his Rule 26.
2       MR. PACKIN:  That -- I don't have that in
3  that pile.  You must have.
4       MR. KOTT:  And I have not seen Growney --
5  I think it was 36, but it was his drawing from the
6  Stout case.
7       MR. WALSH:  What are these?  Are these
8  yours, Dave?
9       MR. KOTT:  It's not there.  Steve, do you
10  have those?
11       MR. RUDOLPH:  No.  Jim just ran off the
12  three or two that we have, eight and 40 something.
13       MR. WALSH:  We didn't have the -- have
14  any of the originals yesterday.
15       MR. RUDOLPH:  No.  We left them with him.
16  She had most of them, but I think Barry has them all
17  from yesterday.
18       MR. KOTT:  Those are the ones I'm
19  missing.
20       MR. PACKIN:  Stuff on the top here.  I'm
21  going to tell my crew to copy, other than the three
22  volumes of the study, which I'll abide your letter
23  saying send them out and you'll pay for them.
24       MR. WALSH:  That's correct.  We'll go on
25  the record saying if you'll send those out and get

Page 191

1  them copied, we'll pay for the copy.
2       MR. PACKIN:  Okay.  Done.
3       MR. WALSH:  And, Dave, do we have
4  agreement that everybody, whatever exhibits we have,
5  with the exception of those three volumes, just made a
6  separate agreement on everybody will provide everybody
7  else with copies?
8       MR. KOTT:  Yeah, we do, except for I
9  can't find two of mine, the two that I mentioned.
10       MR. PACKIN:  You'll sort it out.  I'll
11  leave it to you.
12       MR. WALSH:  Are they in here possibly
13  somewhere?
14       MR. KOTT:  No, they're not in there.
15       MR. PACKIN:  Obviously I can't make a
16  copy of Growney-57, which is the saw.
17       MR. WALSH:  But you have possession of
18  that.
19       MR. PACKIN:  So long all.
20       MR. RUDOLPH:  See you, Barry.
21       MR. KOTT:  Here's Growney-59.  He did
22  have it.  So I'm taking Growney-59, so now I'm only
23  missing one, which is his Rule 26 list, which I see
24  here as well.  Rule -- Growney-34.
25       MR. WALSH:  So you've got those two now,

Page 192

1  and Barry's got the other ones he pulled out.  We have
2  the two that we identified on the record.  And,
3  hopefully, when we read this transcript and put all
4  the numbers together, they'll all be here.
5       All right.  We're off the record.
6       (Off-the-record discussion was held.)
7       MR. WALSH:  Go back on the record just
8  for a second.
9       The videographer has just advised us
10  that, his measure, we have -- nine and a half hours of
11  deposition time have elapsed.
12       Does that include or not include, Jim,
13  the 30 minutes attributable to Mr. Growney's searching
14  through his box.
15       VIDEO TECHNICIAN:  Includes.
16       MR. KOTT:  So it's --
17       MR. WALSH:  So it's nine and a half
18  hours, including 30 minutes that he was searching
19  through his file.
20       VIDEO TECHNICIAN:  Exactly.
21       MR. WALSH:  All right.  Thank you.
22       Now we're off the record.
23       - - -
24
25

Page 193

1       C E R T I F I C A T I O N
2  STATE OF NEW JERSEY
3  COUNTY OF BURLINGTON
4
5       I, Cindy Pineiro, a Certified Shorthand
6  Reporter and Notary public of the State of New Jersey,
7  do hereby certify that I reported the deposition in
8  the above-captioned matter; that the said witness was
9  duly sworn by me; that the reading and signing of the
10  deposition were waived by said witness and by counsel
11  for the respective parties; that the foregoing is a
12  true and correct transcript of the stenographic notes
13  of testimony taken by me in the above-captioned
14  matter.
15       I further certify that I am not an attorney
16  or counsel for any of the parties, nor a relative or
17  employee of any attorney or counsel connected with the
18  action, nor financially interested in the action.
19
20
21       Cindy Pineiro, CSR #X1001815
22       Notary Public #2327620 Exp. 4/14/15
23
24  Dated:  June 15, 2010
25

49 (Pages 190 to 193)

DEGNAN & BATEMAN
(856)  232-7400