# EXHIBIT D

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CIVIL ACTION NO. 08-CV-00520 (MLC)


ROBERT MCGEE and TIFFANY MCGEE, his
wife,

                              Plaintiffs,

        vs.

STIHL INCORPORATED; STIHL GROUP, ANDREAS
STIHL, AG & CO., KG; STIHL SAW COMPANY;
NORTHEAST STIHL; OLDHAM COMPANY; BLACK &
DECKER CORPORATION; SANDER POWER
EQUIPMENT COMPANY, JOHN DOE I (being a
fictitious name); JOHN DOE II (being a
fictitious name); JOHN DOE III (being a
fictitious name); JOHN DOE IV (being a
fictitious name,

                              Defendants.


                --------------------

                 August 23, 2010

                --------------------


                Oral sworn deposition of NEAL A.
GROWNEY, 265 Steves Lane, Franklin Lakes, New
Jersey, was taken at the law office of NAGEL RICE,
LLP, 103 Eisenhower Parkway, Roseland, New Jersey
07068-1031, before Jean B. Delaney, Certified
Shorthand Reporter and Notary Public of the State of
New Jersey, on the above date, commencing at 10:19
a.m. there being present:

          NAGEL RICE, LLP
          BY: BARRY M. PACKIN, ESQUIRE
          Attorneys for Plaintiffs



     D E G N A N  &  B A T E M A N ,  I N C.

Page 4

MCGUIRE WOODS, LLP, ESQUIRES
BY: JAMES H. WALSH, ESQUIRE
Attorneys for Defendant, Stihl
Incorporated; Stihl Group; Andreas Stihl
AG & CO., KL; Stihl Saw Company; Northeast
Stihl

RUDOLPH & KAYAL, ESQUIRES
BY: STEPHEN A. RUDOLPH, ESQUIRE
Attorneys for Defendant, Stihl
Incorporated; Stihl Group; Andreas Stihl
AG & CO., KL; Stihl Saw Company; Northeast
Stihl

MCCARTER & ENGLISH, LLP
BY: DAVID KOTT, ESQUIRE
Attorneys for Defendants, Oldham Company;
Black & Decker Corporation

D E G N A N & B A T E M A N, I N C.

| | | | |
|---|---|---|---|
| 1 | Growney-66 | Makita catalog | 126 |
| 2 | Growney-67 | Steel Demon catalog | 126 |

Page 3

1
2        (By agreement of counsel, the signing,
3   sealing and certification of the deposition
4   were waived, and all objections except as to
5   the form of the question were reserved to the
6   time of trial.)
7              I N D E X
8   Witness                              Page
9   NEAL A. GROWNEY
10      By Mr. Kott              5  212  235
11      By Mr. Walsh               96  236
12      By Mr. Packin                 225
13
14           E X H I B I T S
15
16  Marked for I.D.                       Page
17  Growney-60  Notebook of articles from   64
18              Mr. Growney
19  Growney-61  ANSI Z535.4-2002            65
20  Growney-62  Saw blade and hand saw     121
21              manufacturing:  2002
22              booklet
23  Growney-63  Grizzley catalog           126
24  Growney-64  Milwaukee catalog          126
25  Growney-65  Diamond Products catalog   126

Page 5

1           VIDEO SPECIALIST:  The time is now
2   10:19 and we're on the video record.  Will the court
3   reporter please swear in the witness.
4           NEAL A. GROWNEY, having been duly
5           sworn, was examined and testified as follows:
6   BY MR. KOTT:
7       Q    Mr. Growney, when we -- have you
8   reviewed your transcripts of your first or second
9   deposition in this case?
10      A    I started to.  I didn't finish
11  completely.
12      Q    Did you -- did you read any of your
13  second deposition?
14      A    I may have.
15      Q    Well, do you recollect whether you did?
16      A    I -- I -- I know I did run through part
17  of it.
18      Q    Okay.  Do you recollect in your second
19  deposition, and I'm going to paraphrase, I had asked
20  you about what qualifications and educational
21  experience you had since your last deposition, the
22  Stout case, and I asked you some questions, and you
23  referred to having read some articles on warnings.
24      Does that sound familiar?
25      A    Um.  In between the two cases, are you

(Pages 2 to 5)

Page 6

1   talking about that, or --
2       Q       Yes.  Yeah.
3       A       Yeah, I read articles on warnings all
4   the time.
5       Q       Right.
6       A       Anything relevant to it.  I -- I have
7   read quite a number of articles.
8       Q       And do you remember in your last
9   deposition in this case, I asked you to bring the
10  articles you had read, which included an article by
11  Timothy Rhoades, with you to this deposition?
12      A       I thought I was -- that was -- that you
13  were going to provide that -- that written request.
14      Q       Yes.  And are you aware that I did make
15  a written request of that to Mr. Packin?
16      A       No.  I'm not, but I happen to have
17  Rhoades' articles.
18      Q       Okay.  And do you have the other
19  articles which you had reviewed since your last
20  deposition in Stout?
21      A       I am uncertain whether I do or not.
22      Q       Okay.  Could you pull out the Rhoades'
23  articles that you do have?
24      A       Sure.  These are some of them.
25      Q       When you say these are some of them,

Page 7

1   did you have others you did not bring with you?
2   Others, I'm referring to others written by Rhoades.
3       A       I -- I think they are all -- I have had
4   them in different locations in the -- in my files,
5   and so it's possible I might have duplications still
6   in the file.
7       Q       Okay.  I don't care about duplications,
8   but as far as any articles you've read by Rhoades,
9   either authored by him or coauthored, are they here
10  in the black notebook you provided to Mr. Packin?
11      A       I think so.
12      Q       Thank you.
13              MR. PACKIN:  Just for the record, it
14  appears there's also some that have nothing to do
15  with Mr. Rhoades, but rather than pull it apart,
16  they are all in here.
17              MR. KOTT:  Yeah.  I'm going to identify
18  them a little later.
19              MR. PACKIN:  Do you want this?  Do you
20  want it marked?
21              MR. KOTT:  Yes, I do.
22  BY MR. KOTT:
23      Q       Mr. Growney, I want to call your
24  attention to your Exhibit-39.
25              Do you have a copy of that?  That is

Page 8

1   Growney-39 from your June 15th deposition in this
2   case.
3       A       Perhaps you could provide me with one,
4   somebody.
5               MR. KOTT:  Steve, do you have a copy?
6               MR. RUDOLPH:  This is what Barry gave
7   me.  Is it in here?  Is 39 in here?
8               MR. PACKIN:  If it was one that came
9   from our materials, it would be.
10              MR. RUDOLPH:  What is it, David?
11              MR. KOTT:  It's his handwritten notes.
12  And it would be with Barry's July 21, 2010 letter.
13              MR. RUDOLPH:  What's the exhibit
14  number?
15              MR. KOTT:  39.  It is -- it is -- go --
16  after that.
17              MR. RUDOLPH:  Seven -- 39.  One page
18  in.
19              MR. KOTT:  Yeah.  Would you hand that
20  to the witness?
21              THE WITNESS:  Thank you.
22  BY MR. KOTT:
23      Q       Sir, Exhibit-39, is that your
24  handwriting?
25      A       Yes, it is.  It looks like it, right.

Page 9

1       Q       And what is this document?
2       A       This looks like my notes when I read
3   Rhoades' report.
4       Q       Okay.  About a halfway down you got the
5   words categorical prohibition.  Do you see that?
6       A       Yes.
7       Q       Can you just read what you wrote there?
8       A       Categorical prohibition.  Stihl makes a
9   categorical prohibition against cutting materials
10  other than wood with their chainsaws even though the
11  ANSI standard accommodates that practice.
12      Q       And how is that -- withdrawn.
13              And I'm not being pejorative when I ask you
14  this.  What does that have to do with this case?
15      A       Well, it makes -- it looks like there
16  is a 17 out in the column.  And -- and it must refer
17  to item number 17 or paragraph 17 in Rhoades'
18  report.
19      Q       Okay.  Where does Stihl make that
20  categorical prohibition?  Is that -- I'm going to
21  ask you, is that in the Stihl owner's manual, on the
22  product itself, somewhere else?
23      A       At this -- at this point, I can't tell
24  you.  It -- it -- Stihl has a safety book related to
25  chainsaws.  I'm not sure.  But -- but this is

3                                        (Pages 6 to 9)

Page 10

1  related to Rhoades' report, so it may be something
2  that Rhoades said.
3       Q    Okay.  All right.  Does Stihl, in the
4  owner's manual in this case, the one for the cut-off
5  saw we are talking about, does Stihl have some
6  things that the saw shouldn't be used for?  For
7  instance, shouldn't be used to cut wood?
8       A    Oh, yes.  Right.
9       Q    And is there an instruction or a
10 warning in the Stihl owner's manual that you should
11 not use the type of Oldham blade that was being used
12 at the time of the accident on the Stihl cut-off
13 machine?
14           MR. PACKIN:  Object to the form.
15      You can answer.
16           THE WITNESS:  Yes.
17 BY MR. KOTT:
18      Q    Okay.  And is there also a pictorial in
19 the Stihl manual to that effect?
20      A    Yes.
21      Q    Can you describe generally, with words,
22 the -- the pictorial?
23      A    I believe it has a -- the international
24 prohibition symbol, which is the circle with the
25 diagonal slash imposed over a blade, the -- the --

Page 11

1  the out -- the outline of a blade.
2       Q    Okay.  And is it an outline of what you
3  interpreted to be a wood-cutting blade?
4       A    That I would interpret, yeah.  Yeah.
5       Q    Like the Oldham blade?
6       A    Yes.
7       Q    Okay.  So would it be fair to say that
8  if Mr. McGee had read the manual in this case, and
9  I'm referring to the Stihl manual, that he would
10 have learned that it was unsafe to use the
11 Oldham-type blade on this cut-off machine?
12           MR. PACKIN:  I object to form.
13      You can answer.
14           THE WITNESS:  He -- if he had read it,
15 he would have learned it, but he wouldn't -- not
16 necessarily retained the knowledge of it.  I mean,
17 I've read the entire manual, and as time goes on, I
18 lose recall of many, many things.
19 BY MR. KOTT:
20      Q    Okay.  But, when he read it, at the
21 time he read it, he would have been informed that it
22 was unsafe to use this type of Oldham blade on the
23 Stihl cut-off machine; is that true?
24           MR. PACKIN:  I object to the form.
25           THE WITNESS:  Yes.  Yes.

Page 12

1  BY MR. KOTT:
2       Q    Have you done any testing of Mr. McGee
3  to determine his memory; that is, how long he would
4  retain something that he has read?
5           MR. PACKIN:  I object to the form.
6           THE WITNESS:  No.  No.  I haven't
7  tested McGee.
8  BY MR. KOTT:
9       Q    Would you agree that how long somebody
10 recollects something they read is individual to the
11 person?  What I mean by that is, it might be
12 different from one person to the next.
13      A    I would grant that possibility, yes.
14      Q    Now, further down on Exhibit-39 you
15 state:  It begins, Rhoades would like.  Do you see
16 that?
17      A    Yes.
18      Q    Would you read just what you wrote in
19 that paragraph?
20      A    Rhoades would like a lawyer to
21 accompany laborers in the field so they can
22 interpret Stihl's warnings for the laborers.
23 Rhoades unrealistic.
24      Q    And what did you mean by that?
25      A    I would have to see Rhoades' report,

Page 13

1  but, you know, to -- to refresh my memory.
2       Q    Well, if I represent to you that
3  Dr. Rhoades was an expert for my client, Oldham,
4  rather than for Stihl, would that affect what you
5  mean by that?
6       A    I'm referring to Rhoades.
7       Q    Okay.
8       A    I don't care who he -- who he is an
9  expert for.
10      Q    Okay.  And then the last line at the
11 bottom of Growney-39, you've got 12 point equals.
12 Will you read that, please?
13      A    12 point equals.  12 times .013837,
14 approximately .166.  Approximately 1/6th of an inch.
15      Q    And what does that refer to?  Can you
16 put in lay terms what you are doing there?
17      A    Yeah.  I was taking twelve point type
18 and converting it into inches, the height.
19      Q    I'm sorry.  Why were you taking twelve
20 point type?
21      A    At that moment, I don't know.  It may
22 have been because I was considering what -- I -- I
23 don't remember exactly at this point.
24      Q    Okay.  Did you, in your work in either
25 this case or in the Stout case, photograph some

(Pages 10 to 13)                                    4

Page 14

1  cut-off machines that were manufactured by people
2  other than Stihl?
3      A      I don't recall photographing any other
4  manufacturers. I've looked at a number of catalogs,
5  and pictures, and such. But I don't recall
6  photographing, me, myself photographing.
7      Q      Do you recollect ever sending to
8  Dr. Kalsher, photos or pictures of cut-off machines
9  manufactured by companies other than Stihl?
10      A      That's possible. I don't recollect at
11  this point.
12      Q      Okay. I'm going to show you
13  photographs that were marked as Kalsher-4 through
14  Kalsher-10 at the May 11, 2010 deposition of
15  Dr. Kalsher, and I will represent to you that he
16  testified in his deposition that he received these
17  photos from you.
18          And let me just have you take a look at them
19  and then I will ask you the questions about them.
20      A      The ring saw. Yeah, I probably sent
21  them to him.
22      Q      Okay. While you were looking through
23  those, I think you said, but I didn't hear, a ring
24  saw. Is that what you said?
25      A      Yes.

Page 15

1      Q      What were you referring to?
2      A      One of the photographs, exhibit
3  Kalsher-7, is a Partner K90 ring saw.
4      Q      What is a ring saw?
5      A      Well, it -- it has a blade that is --
6  has a very, very large diameter. And, actually,
7  that is taking my -- one of my design alternatives
8  and carrying it to its logical extreme.
9          MR. PACKIN: He just wants to know what
10  a ring saw is.
11          THE WITNESS: Okay. I'm sorry.
12      A ring saw is one of these demo saws or
13  concrete cut-off saws whose blade is -- is shaped in
14  a ring. It has a very large diameter.
15  BY MR. KOTT:
16      Q      Okay. And what is the intended or safe
17  intended cutting attachment? Is that a wood-cutting
18  blade for a ring saw or is it an abrasive blade?
19          MR. PACKIN: I object to form.
20      You can answer.
21          THE WITNESS: The intended one? Is
22  that what you're asking?
23  BY MR. KOTT:
24      Q      Yes, yes.
25      A      The intended one is an abrasive blade.

Page 16

1      Q      Is it safe on the ring saw, the Partner
2  ring saw there, to use a wood-cutting blade such as
3  the Oldham blade?
4      A      The Oldham blade, would be impossible
5  to install the Oldham blade on this ring saw.
6      Q      And why would that be?
7      A      The arbor is too big.
8      Q      Okay. Could you install any kind of
9  wood-cutting blade that was available in the
10  marketplace on that ring saw?
11      A      No. Absolutely not.
12      Q      Okay. When you started to give an
13  answer and Mr. Packin interrupted, you were -- about
14  the ring saw had something to do with one of your
15  alternative designs, was that something to do with
16  Stihl as opposed to Oldham?
17      A      Yes.
18      Q      Okay. I don't have any other questions
19  about that.
20          Have you ever used any kind of 14-inch cutting
21  attachment, saw blade, abrasive, anything of that
22  nature?
23      A      On what?
24      Q      On any kind of machine.
25      A      Yes.

Page 17

1      Q      Okay. Have you ever used any 14-inch
2  wood-cutting blade?
3      A      Yes.
4      Q      On what kind of machines?
5      A      I believe a table saw.
6      Q      Any others?
7      A      May have been a radial arm saw. I
8  can't remember if that was 14 or 16.
9      Q      Have you had any other cases that
10  involved wood-cutting blades that are 12-inches or
11  larger besides this case and Stout?
12      A      Yes.
13      Q      And what -- what are those cases?
14      A      Table saws, radial arm saws, miter
15  saws.
16      Q      And were those cases that involved
17  primarily blade contact?
18      A      Yes. If I can remember clearly, yes.
19      Q      Did any of them involve --
20      A      No, well, one of them --
21      Q      You said primarily.
22      A      Yeah. Primarily.
23      Q      Okay. Did any of them involve other
24  accident modes, M-O-D-E-S, besides blade contact?
25      A      Yes.

5                                          (Pages 14 to 17)

Page 18

1    Q    What did they involve?
2    A    If I can recall clearly, kickback of
3  material.
4    Q    With the work piece or the material
5  striking the operator?
6    A    Yes.
7    Q    Any other accident modes?
8    A    Nothing I can recall at this point.
9    Q    And in those cases were your -- did
10  your opinions focus on whether or not the machine
11  was defective as opposed to whether or not the blade
12  was defective?
13    A    Yes.  The focus was the machine's
14  design.
15    Q    Okay.  Have you had any other cases in
16  which a 12-inch saw blade or larger was on the
17  machine which it was not intended to be placed on,
18  besides this case and Stout?
19    A    No.
20    Q    You had told me you had used, I think,
21  14 and maybe 16-inch saw blades.  Was that at work
22  or around the house?
23    A    At work, or work-related.
24    Q    Okay.  On the photos, going back to
25  Exhibits Kalsher-4 through 10, what brand is

Page 19

1  Kalsher-4?  Is that a Partner gasoline-powered
2  cut-off machine?
3    A    It appears to be.  It is a K750, you
4  know.
5    Q    Okay.  And where did you take that
6  photo or where does the photo come from?
7    A    I downloaded it off the internet.
8    Q    Okay.  Do you remember why you were
9  sending those photos to Dr. Kalsher?
10    A    Well, I see some of them illustrate
11  warning signs on the top of the saw.  In other
12  words, that was a practice in the industry such as
13  on like Kalsher-4, there is a warning sign on top.
14  Kalsher-5 there is pictograms on top, and I
15  advocated this.  And that's a Wacker.  You know, I
16  would --
17    Q    Hold up.  Let's stay with 5 and then I
18  will let you continue.  What product is depicted on
19  Kalsher-5?
20    A    That's a Wacker cut-off saw.
21    Q    Gasoline-powered cut-off saw?
22    A    Yeah.
23    Q    And what model?
24    A    I can't read it here.
25    Q    Okay.  And I think you were going to

Page 20

1  say something about the next one, Kalsher-6.
2        First tell us what's depicted on Kalsher-6.
3    A    Kalsher-6 isn't blown up so big.  I
4  can't read the brand name.  But that has a Makita
5  style blade guard.  It's possible it could be a
6  private label made by Makita.  I don't know.
7    Q    Referring to Kalsher-6, are you able to
8  say that it is probably --
9    A    Oh, I'm sorry.  I see -- I read it
10  right here.  It's -- it is a Hilti.  It is a Hilti
11  brand.
12    Q    H-I-L-T-E?
13    A    H-I-L-T-I.
14    Q    Okay.  And it's a Hilti
15  gasoline-powered cut-off saw?
16    A    Yes, it is.
17    Q    And what is -- what model?
18    A    I can't read the model.
19    Q    Okay.  The next one.  That's 7 that we
20  discussed.
21    A    Kalsher-7 is a Partner K950 ring saw.
22    Q    Okay.  Kalsher-8?
23    A    I can't tell from the picture.  It's
24  been expanded too large.  The -- the wording has
25  washed out.  I should recognize it, though.

Page 21

1    Q    Okay.  Is there anything else in your
2  file that would tell you what that is on K-8 or not?
3    A    Not that I can think of.
4    Q    Does K-8 depict a gasoline-powered
5  cut-off machine?
6    A    Yes, it does.
7    Q    Thank you.
8        Next one, K-9?
9    A    That's a Makita.
10    Q    Is it a Makita gasoline?
11    A    Yes.  It is.
12    Q    Is it a -- let me finish the question.
13  I'm sorry.
14        Is it a Makita gasoline-powered cut-off
15  machine?
16    A    Yes, it is.
17    Q    And what model, can you determine?
18    A    It appears to be a DPC7311.
19    Q    And how about Kalsher-10, what's
20  depicted in that photograph?
21    A    This is the back end of what looks like
22  would be a -- a Partner saw.
23    Q    When you say saw, are you referring to
24  a gasoline-powered cut-off machine?
25    A    Yeah.  Yeah.  A cut-off saw.  Yeah, a

(Pages 18 to 21)                                              6

Page 22

1  demo saw.  Right.  A concrete cut-off saw.  Right.
2        And it illustrates all the pictograms right
3  where you put your hand.
4        Q     Were there other gasoline-powered
5  cut-off machines that you saw depicted on the
6  internet that you did not make pictures of?
7        A     Oh, sure.
8        Q     And did any of them have profiles
9  different than these?
10        A     Well, specifically, yes.  Generally,
11  no.  They are -- they are -- they are all kind of
12  similar.
13        Q     What do you mean when you say
14  specifically, yes, they had different profiles than
15  these?
16        A     Well, like the -- the Stihl 350 has an
17  air cleaner that sits up on top, projects out, which
18  none -- none of these have.
19        Q     I'm sorry.  I might not have made my
20  questioning clear.
21        The gasoline-powered cut-off machines that you
22  saw on the internet but you did not make photos of,
23  how did they differ in profile from Exhibits
24  Kalsher-4 through 10?
25        A     Well, that's what I was just

Page 23

1  describing.
2        Q     I'm sorry.  Go ahead.  I'm sorry.
3        A     The -- the Stihl 350 has a -- an air
4  cleaner that sticks up at top, looks like a little
5  projection.  But otherwise most of them, the
6  majority of them have some -- have the saw blade,
7  have the handle, and then the handle on the back.
8        Q     Uh-huh.
9        A     You know, so they are just variations,
10  different sizes.
11        Q     Do you recollect whether you sent these
12  to Dr. Kalsher because -- withdrawn.
13        Did you talk to Dr. Kalsher about this case
14  before you sent them to him?
15        A     I -- I don't remember.
16        Q     Do you recollect whether he initiated
17  them sending -- you sending them to you or you
18  initiated?  And what I mean by that is, did he ask
19  you about what cut-off machines look like or to send
20  you pictures, or did you offer that to him?
21        A     I don't believe he asked me what
22  cut-off machines look like.  I don't remember
23  whether I initiated it or not.  I probably did.  I
24  don't know.
25        Q     Okay.  And if you probably initiated

Page 24

1  it, why would you have done that?
2        MR. PACKIN:  I object to the form.
3        THE WITNESS:  Perhaps just -- I don't
4  know.  I would be speculating right now at this
5  point.  I don't recall.
6  BY MR. KOTT:
7        Q     Have you spoken to Dr. Kalsher about
8  this case?
9        A     I've spoken to him, yes.
10        Q     How many times?
11        A     I don't remember.
12        Q     Why was that?
13        A     Well, I wanted to know when he had
14  testified and wanted to find out -- subsequently got
15  his deposition transcript.
16        Q     Are you talking about in this case?
17        A     Yeah.
18        Q     I'm not sure I'm understanding.  It's
19  my fault.
20        You spoke to him, you are telling me, because
21  you wanted to know when he had given a deposition or
22  depositions?
23        A     Well, yeah.  I wanted to know if he had
24  given the deposition, if he had been deposed.
25        Q     Did you ask Mr. Packin that?

Page 25

1        A     I don't recall.
2        Q     Isn't that something you normally
3  determine from the lawyer who retained you rather
4  than contacting another expert directly?
5        MR. PACKIN:  I object to the form.
6        THE WITNESS:  I would do it either way.
7  BY MR. KOTT:
8        Q     Did you discuss any of your opinions or
9  the bases, B-A-S-E-S, for your opinions with
10  Dr. Kalsher?
11        A     No.
12        Q     Did he discuss any of his opinions or
13  the bases for his opinions with you?
14        A     No.
15        Q     So the only conversation was a
16  conversation where you called him and asked whether
17  he had been deposed, essentially?
18        A     Well, I had talked to him about another
19  case, a case that's not, you know, separate.
20        Q     What case was that?
21        A     It had to do with a -- I think it was a
22  lawn mower.
23        Q     Is he an expert in that case?
24        A     No.  It had to do with the warnings,
25  the warnings.

7                                        (Pages 22 to 25)

Page 26

1    Q      Okay.  Was he an expert in that case?
2    A      He may have consulted the attorney.  I
3  think I asked -- yeah, that's what it was.  The
4  attorney asked me to recommend somebody.
5    Q      And was the attorney looking for
6  somebody who had a specialty in warnings?
7    A      Yes.
8    Q      Do you have a specialty in warnings?
9    A      Well, I certainly do address warnings,
10  yes.
11    Q      I'm sorry.  I didn't ask if you
12  addressed warnings.  Let me try it again.
13    Do you have a specialty in warnings?
14    A      Yes.
15    MR. PACKIN:  Asked and answered.  Let's
16  not be argumentative.
17    THE WITNESS:  Sorry.  It was not -- it
18  was not a lawn mower case.
19  BY MR. KOTT:
20    Q      Do you remember the name of the
21  attorney that retained you?
22    A      Not off the top of my head, no.
23    Q      Was it an attorney representing a
24  plaintiff in a products liability case?
25    A      Yes.

Page 27

1    Q      Was the product involved, a machine of
2  some sort, some kind of mechanical apparatus?
3    Q      Yes.
4    Q      And did you render warning opinions in
5  that case?
6    A      I did.
7    Q      And have you given a deposition in that
8  case?
9    A      No.
10    Q      Has your report been served, to your
11  knowledge?
12    A      I think the case has been settled.
13    Q      Do you recollect, in your report you
14  referred to an Amana blade?
15    A      Yes, I do.
16    Q      And do you recollect you, again
17  paraphrasing, you said something in your report
18  about Amana having a pictorial not to use the blade
19  on a cut-off machine?
20    A      Yes.  Yes.  As a matter of fact, I was
21  asked -- I can't remember whether you asked me or
22  Mr. Walsh asked me, because I think it was you, but
23  anybody having pictorials warning against the use of
24  these blades on these cut-off machines, and Amana
25  does.  Now, I had said -- talking about deposition.

Page 28

1    Q      During the deposition in this case?
2    A      Yes.
3    Q      Okay.
4    A      I said no because I just -- I guess I
5  just didn't remember at that point.
6    Q      Forgot.  Fair enough.
7    A      But I have it in my report, and I have
8  an attachment that illustrates.
9    Q      I'm with you.  I understand.
10    A      Okay.
11    Q      So -- so you -- you made a mistake when
12  you testified last time and you are correcting the
13  mistake now?
14    A      Correct.
15    MR. PACKIN:  I object to the form.
16    You can answer.
17  BY MR. KOTT:
18    Q      All right.  Now, about the Amana
19  pictorial, is that actually on the blade itself or
20  is that on the packaging?
21    A      I would have to check my source, but I
22  think it is on the blade itself.
23    Q      You do?
24    A      I -- I -- I have to check.  Yeah.  I
25  would have to check.

Page 29

1    Q      I'm not sure what you are telling me.
2  Are you telling me you believe it's on the blade or
3  that you would need to check to see if it's on the
4  blade?
5    A      No.  If -- if I wrote in my report that
6  it's on the blade, then it's on the blade.
7    Q      No, I don't think you did write in your
8  report that it's on the blade.
9    MR. PACKIN:  Want a copy of his report
10  for him to look at or no?
11  BY MR. KOTT:
12    Q      Paragraph 6.143, page 26.
13    You say as follows:  Manufacturers are, of
14  course, not restricted to the industry available
15  icon I propose.  They certainly are free to create
16  their own in order to indicate their blade is
17  unsuitable for demo saws as Amana does for its AGE
18  14-inch diameter, 24-teeth blade.  AGE's icon which
19  clearly depicts a demo saw is remarkably similar to
20  a Stihl 400.  See attached.
21    My question to you is, when I read this, are
22  you saying that Amana's actually has it on the
23  blade, or they have it on their website, or they
24  have it in their catalog, or they have it on the
25  internet, or somewhere else?  That's what I'm trying

(Pages 26 to 29)                                                          8

Page 30

1  to find out.
2      A    At this point, I can't recall.
3      Q    Okay. Do you remember whether I asked
4  you that question in the Stout case?
5      A    I don't remember.
6      Q    Okay. Do you remember what Amana's
7  reasoning was in using that pictorial? That is,
8  have you ever spoken to anybody about Amana, why
9  they put it on?
10         MR. PACKIN: I object to the form.
11 BY MR. KOTT:
12     Q    I'm going to withdraw the question.
13     Have you ever spoken to anybody from Amana
14 about Amana put that pictorial on whatever they put
15 it on?
16     A    I have not spoken to anybody from
17 Amana.
18     Q    Do you have any firsthand knowledge
19 from any source as to why Amana used that pictorial?
20     A    I would have no firsthand knowledge.
21     Q    Have you done any investigation to try
22 to determine why Amana used that pictorial?
23         MR. PACKIN: Object to the form.
24         THE WITNESS: No.
25 BY MR. KOTT:

Page 31

1      Q    I'm going to ask you to assume that
2  Amana uses it in some places, like on the packaging,
3  but not on the blade itself.
4      Do you have any information how Amana made the
5  decision to not use that pictorial on the blade
6  itself?
7          MR. PACKIN: I object to the form.
8          THE WITNESS: Do not.
9  BY MR. KOTT:
10     Q    What are the foreseeable misuses of
11 carbide-tipped saw blades?
12         MR. PACKIN: I object to the form.
13     You can answer.
14         THE WITNESS: One would be running it
15 too fast. Another one would be installing it on
16 these hand-held, gasoline-powered concrete cut-off
17 saws, demo saws. Another one would be using it with
18 a cracked -- a crack in it. Another one would be
19 installing it not centered on the Arbor. Another
20 one would be chipped, having missing teeth. Another
21 one would be operating with a blade that's warped or
22 putting a warped blade on a saw. Another one would
23 be installing it backwards. That's all that comes
24 to mind at this moment.
25 BY MR. KOTT:

Page 32

1      Q    I just have a couple questions about
2  that answer.
3      When you said installed not on the center of
4  the arbor, do these not center by themselves?
5      A    Well, if you install the blade on an
6  arbor that was smaller, you would need a bushing.
7      Q    Okay. That's what you meant by that --
8      A    Which is common practice.
9      Q    That's what you meant by that answer?
10     A    Right.
11     Q    Okay. How do you know that those
12 foreseeable misuses you listed are foreseeable
13 misuses?
14         MR. PACKIN: I object to the form.
15     You can answer.
16         THE WITNESS: My experience doing these
17 forensic investigations over the past 14 or 15
18 years, whatever it is, plus my engineering
19 experience, my familiarity with the -- the
20 equipment, plus my participation in the ANSI 01.1,
21 the writing of the ANSI 01.1 standard for -- for
22 woodworking.
23 BY MR. KOTT:
24     Q    Have you -- are you aware either
25 through your own work or from the ANSI committee of

Page 33

1  accidents occurring with each one of those
2  foreseeable misuses, you know, where somebody
3  actually got hurt?
4      A    Maybe not specifically or, you know,
5  over the years I've known of things of that nature,
6  yes. Did I -- did I also mention throwing teeth?
7      Q    I don't remember if you did, but if you
8  did, the court reporter --
9          MR. PACKIN: He asked for foreseeable
10 misuses.
11         THE WITNESS: Yeah. Oh, I'm sorry.
12 That's not a misuse.
13 BY MR. KOTT:
14     Q    And with respect -- were you done with
15 your answer?
16     A    Yes.
17     Q    With respect to foreseeable uses, are
18 there ways people can get hurt even when a blade is
19 used in a foreseeable use?
20     A    Yes.
21     Let me back up on foreseeable misuses.
22     Q    Right.
23     A    Installing a blade on a saw that is not
24 equipped with a guard. I mean, that's --
25     Q    That's another one?

Degnan & Bateman, Inc.
(856) 232-7400

Page 34

1      A      That's another one.  Right.  Or
2  operating it, right.
3      Q      Right.  And when you say saw, in that
4  case you are referring to a wood-cutting piece of
5  machinery?
6             MR. PACKIN:  I object to the form.
7             THE WITNESS:  Yes.
8  BY MR. KOTT:
9      Q      Now, let me come back to the question I
10  asked.
11      With respect to foreseeable uses, that is
12  somebody is using with -- it in a way that is not a
13  misuse, are there accident modes that people can get
14  hurt on?
15      A      Yes.
16      Q      And what are those accident modes?
17      A      One is inadvertent contact with the
18  blade despite the fact that the saw is equipped with
19  a guard.  The guard has an ability to prevent it.
20  That's one.
21      Number two would be kickback material being
22  struck by the material, and that can include
23  fatalities.
24      Q      Can being struck by the blade include
25  fatalities?

Page 35

1      A      It could.  Yeah.
2      Q      You gave me the inventory of
3  foreseeable misuses before.  Could all of those
4  result in severe injury or worse?
5             MR. PACKIN:  I object to the form.
6             THE WITNESS:  Sure.
7  BY MR. KOTT:
8      Q      Okay.  Is this size blade usually used?
9  By this size, you know, I'm referring to the blade
10  in this case.
11      A      You mean the 14-inch?
12      Q      Yes, sir.
13      A      24-tooth?
14      Q      Yeah.  Well, let's just deal with
15  14-inch.
16      Are 14-inch saw blades usually used by
17  professionals?
18             MR. PACKIN:  I object to the form.
19             THE WITNESS:  Well, I -- flip it
20  around, the other way around and say that usually
21  14-inch tools, 14-inch blades are used in a
22  professional setting.
23  BY MR. KOTT:
24      Q      Okay.
25      A      Not necessarily by professionals,

Page 36

1  though.
2      Q      Are you aware of anybody who has ever
3  used a 14-inch blade for a nonprofessional use or in
4  the employment setting?
5      A      Well, there are a lot of saws in the --
6  you know, in use, and it's likely that
7  nonprofessionals in a nonprofessional setting could
8  use it.
9      Q      But are you, Mr. Growney, aware of
10  anybody who has ever used a 14-inch wood-cutting
11  blade in a nonprofessional use?
12             MR. PACKIN:  Personal, firsthand?
13             MR. KOTT:  Sure.
14             THE WITNESS:  I did.
15  BY MR. KOTT:
16      Q      Anyone else?
17      A      A friend of mine who had the saw.
18      Q      Anyone else?
19      A      None comes to mind.
20      Q      Are 14-inch saw blades generally sold
21  in the big box retailers?  And what I mean by big
22  box retailers are Home Depot, Lowes, Sears.
23             MR. PACKIN:  I object to the form.
24             THE WITNESS:  14-inch wood-cutting
25  blades?

Page 37

1  BY MR. KOTT:
2      Q      Yes.
3      A      Wood cutting.  When I've looked, I
4  haven't found them there.
5      Q      Have you gone on the websites for Home
6  Depot, or Lowes, or Sears to see if they are offered
7  on the websites of those companies?
8      A      I don't recall doing that.
9      Q      What are the characteristics of the
10  people who use 14-inch saw blades?
11             MR. PACKIN:  All people in all
12  settings?
13             MR. KOTT:  You can answer.
14             MR. PACKIN:  Is that the question?
15  Otherwise I object to the form.
16             MR. PACKIN:  Mr. Packin, no speaking
17  objections, if we can.  You can just say objection
18  to the form.
19  BY MR. KOTT:
20      Q      The question is, what are the
21  characteristics of people who use this type of
22  blade?  And by this type, I'm referring to 14-inch
23  wood-cutting blades.
24      A      I don't know how I would know all the
25  characteristics of all the people who use 14-inch

(Pages 34 to 37)                                                    10

Page 38

1  blades.  You know, I don't know where there is
2  anyplace that you can go and get that information.
3  You know, it is speculative.
4      Q      Can you give me the characteristics of
5  any of the people who use 14-inch saw blades?
6          MR. PACKIN:  I object to the form.
7          THE WITNESS:  Well, I -- I know that
8  they are used in a professional setting.
9  BY MR. KOTT:
10     Q      Okay.  Do you recollect testifying in
11 your last deposition about a Big Foot, 14-inch
12 circular saw?
13     A      Yes.
14     Q      Does -- does -- were you done?  I'm
15 sorry.
16     A      Yeah.  You know, I can't remember
17 whether Big Foot made the 14-inch or not.  There's
18 -- there's -- whether or not -- but -- yes, go
19 ahead.
20     Q      Does Big Foot make a 12 or 14-inch
21 circular saw that's gasoline-powered?
22     A      I -- I don't know.  I've never seen
23 one.
24     Q      Okay.  Does any manufacturer of
25 wood-cutting saw blades include bushings with the

Page 39

1  blade?
2      A      Yes.
3      Q      Who does that?
4      A      Stihl.  I'm sorry.  Not Stihl.  Oldham.
5      Q      Is that on a wood-cutting blade?
6      A      Yes.
7      Q      So Oldham includes bushings on
8  wood-cutting blades?
9      A      My recollection, yes.
10     Q      Where -- where does that come from?
11 What are you referring to?
12     A      Well, I bought a 14-inch, 24-tooth
13 Oldham blade off the internet.
14     Q      Right.
15     A      And I believe it was supposed to have a
16 bushing.
17     Q      Was there a bushing with it?
18     A      No.  The packaging was broken when I
19 got it, so it was missing.
20     Q      Okay.  When you say it was supposed to
21 have a bushing, where are you getting that from?
22     A      Well, that's my recollection.
23     Q      From where?  That's what I'm asking.
24 where did you see that Oldham sold bushings with
25 their wood-cutting blades?

Page 40

1      A      I'm sorry.  Maybe I'm confusing that
2  with the -- the DeWalt abrasive blade.
3      Q      Right.  Yes.
4      A      Right.  And there was a reducer bushing
5  with that one.
6      Q      Right.  In your report you refer to a
7  DeWalt abrasive blade.
8          My question is wood-cutting blade, so let me
9  try it again.
10     A      Okay.
11     Q      Are you aware of any manufacturer of
12 wood-cutting blades that includes reducing bushings
13 with their blades?
14     A      The fact that I'm -- I'm not aware, but
15 that doesn't mean nobody does it.
16     Q      Okay.  But you are not aware of any?
17     A      Right.  I am aware that they are
18 commonly included with -- with a lot of abrasive
19 wheels.
20     Q      Okay.
21     A      Right.
22     Q      With respect to wood-cutting blades,
23 are you aware of any manufacturer that includes
24 bushings with wood-cutting blades?
25     A      Well, like I said, you asked me that

Page 41

1  before, and I said I'm not aware.  It doesn't mean
2  that nobody does.
3      Q      Do you -- do you know why -- I'm going
4  to ask you to assume that they are not included with
5  wood-cutting blades.
6          Do you know why some manufacturers of abrasive
7  blades include bushings but the manufacturers of
8  wood-cutting blades do not?
9          MR. PACKIN:  I object to the form.
10         THE WITNESS:  No manufacturer has told
11 me that.
12 BY MR. KOTT:
13     Q      Okay.  But do you have any information
14 on that?
15         MR. PACKIN:  I object to the form.
16         THE WITNESS:  Well, that's a
17 compound -- no, I don't.
18 BY MR. KOTT:
19     Q      In your opinion on the Stihl cut-off
20 machines, should the operator read the Stihl owner's
21 or operator's manual before operating the machine?
22     A      Sure.
23     Q      why?
24     A      Well, there is a whole lot of
25 information in it, although it is quite a -- quite a

11                                                      (Pages 38 to 41)

Page 42

1  bit to read and quite a bit of information to digest
2  it.  A lot of information is helpful to them.  A lot
3  of information is related to -- on safety.
4      Q     Is the safety of a cut-off machine
5  dependent on the operator reading the manual?
6          MR. PACKIN:  Objection to form.
7          MR. KOTT:  What's the basis of your
8  objection, Mr. Packin?
9          MR. PACKIN:  Because that is a
10 speculative question and far too broad.
11 BY MR. KOTT:
12     Q     Okay.  You may answer.
13     A     Repeat the question, please.
14     Q     Is the safety of an operator operating
15 a cut-off machine dependent on the operator reading
16 the manual for the machine?
17     A     Could be.
18     Q     Is the safety of a cutting attachment
19 dependent upon the operator reading the manual for
20 the machine that the cutting attachment is going to
21 be placed on?
22         MR. PACKIN:  Same objection as to form.
23         THE WITNESS:  Could you please repeat
24 that question?
25         (The court reporter read back the

Page 43

1      pending question as follows:
2          "Question:  Is the safety of a cutting
3      attachment dependent upon the operator
4      reading the manual for the machine that the
5      cutting attachment is going to be placed
6      on?")
7          THE WITNESS:  I don't think that
8  question makes sense.
9  BY MR. KOTT:
10     Q     Okay.  You don't understand it?
11         MR. PACKIN:  That's not what he said.
12 BY MR. KOTT:
13     Q     If you don't understand it, I will ask
14 you a different question.
15     A     I thought I understood it.  I didn't
16 think it made sense because I can't see the safety
17 of the cutting attachment.
18     Q     What do you mean by that?
19     A     Well, you asked if the safety of the
20 cutting attachment is dependent upon the operator
21 reading the manual.
22     Q     Is the safety of a person using the
23 machine dependent upon the operator reading any
24 instructions that come with the cutting attachment?
25         MR. PACKIN:  I object to the form.

Page 44

1  Asked and answered.
2          THE WITNESS:  It could be.  He could --
3  BY MR. KOTT:
4      Q     In what way?
5      A     Well, he could learn things that he
6  doesn't know, but that's not the only way he could
7  learn.
8      Q     In your report you rendered a number of
9  opinions; is that correct?
10     A     Yes.
11     Q     Were all the opinions you rendered in
12 your report to a reasonable degree of engineering
13 probability?
14     A     Well, that's one of the qualifiers.
15 Yes.
16     Q     Okay.
17     A     Is that what I said in my report?
18     Q     I don't remember.
19 You mean whether you used that language?
20     A     Yes.
21     Q     I don't think you did, but I'm not
22 representing that, but that's why I was asking.
23     A     Well, some people make a distinction
24 between engineering probability and engineering
25 certainty.

Page 45

1      Q     Do you make that distinction?
2      A     Well, I have to check my reports, see
3  what I said.
4      Q     Okay.  Of the manufacturers of
5  carbide-tipped saw blades that you are aware of, do
6  any of them have the warnings that you suggest in
7  this case on their blades themselves?
8      A     Well, we mentioned Amana.
9      Q     Which you didn't know one way or the
10 other.
11     A     Yeah.  At this point, I can't recall.
12     Q     Okay.
13     A     But the other ones, I -- I don't
14 believe so.  But that doesn't mean they shouldn't.
15     Q     Okay.
16     A     It is not a case of where, if we all do
17 it wrong, it is right.
18     Q     Move to strike as not being responsive,
19 but we will let the judge deal with that.
20 Do you know where Jingoli obtained the reducer
21 bushing that was on the cut-off machine at the time
22 of the accident?
23     A     Well, they obtained a number of reducer
24 bushings from Hanes.  I don't know if there was --
25     Q     From Hanes or from Sanders?

(Pages 42 to 45)                                              12

Page 46

```
1        A     I'm sorry.  Not Hanes.
2              MR. PACKIN:  Let him finish.
3              THE WITNESS:  Sander Power Equipment.
4    I -- I don't know if we know that that was exactly
5    where it came from.
6    BY MR. KOTT:
7        Q     Do you know where Sander Power
8    Equipment obtained those reducer bushings?
9        A     I don't recall.
10       Q     Do you know who the manufacturer was of
11   the reducing bushing that was on the cut-off machine
12   at the time of the accident?
13       A     I don't.
14       Q     You purchased a Stihl cut-off machine
15   off the internet?
16       A     Yes.
17       Q     Did you actually start it up?
18       A     Yes.
19       Q     Did you put gasoline in it?
20       A     Yes.
21       Q     And where did you store it when you
22   were done with it?
23       A     In my garage.
24       Q     And did you drain the gasoline in some
25   fashion?
```

Page 47

```
1        A     Yes.
2        Q     How did you know to do that?
3        A     I have 55 years of experience with
4    two-cycle engines.
5        Q     Okay.  In your opinion --
6        A     I'm sorry.  Go ahead.
7        Q     Mr. Growney, if I interrupt you, just
8    tell me and I will let you finish; okay?
9        A     I will.
10       Q     Thank you, sir.
11             In your opinion, was it unsafe to cut the
12   plastic piping cut at the time of the accident with
13   the stihl cut-off machine?
14       A     Yes.
15       Q     In your opinion, what would have been a
16   safe tool to cut that pipe with?
17       A     Well, that's an interesting question
18   because these Stihl -- Stihl, I'm sorry, concrete
19   cut-off saws and demo saws are made to cut plastic,
20   so there is some kind of an attachment, cutting
21   attachment, that is suitable for cutting plastic.
22   But Stihl knows about.  Stihl knows about.
23       Q     Can you explain what you meant by that
24   answer?  Because I didn't follow it.
25       A     Well, you asked me --
```

Page 48

```
1              MR. PACKIN:  You need to tell him what
2    you don't follow.
3    BY MR. KOTT:
4        Q     Go ahead.  You can answer.
5              MR. PACKIN:  I object to the question.
6        Go ahead.
7              THE WITNESS:  You asked me what was the
8    proper one.
9    BY MR. KOTT:
10       Q     Okay.  Are you saying that you can use
11   the Stihl cut-off machine involved in this case to
12   cut the pipe safely?
13       A     Well, that potential exists because
14   these machines are made to cut plastic.  But it
15   requires some kind of a -- an appropriate cutting
16   attachment.
17       Q     And what would be the appropriate
18   cutting attachment?
19       A     Well, I don't know.  I -- I -- I
20   searched for them and I couldn't find them.
21       Q     So if Jingoli were to ask you as an
22   expert --
23       A     Well -- well --
24       Q     Go ahead.
25       A     Go ahead.  I'm sorry.
```

Page 49

```
1        Q     If Jingoli were to hire you and ask you
2    as an expert what is a safe tool to use to cut the
3    pipe that was being cut at the time of the accident,
4    what would you tell them?
5        A     Well, the pipe manufacturer recommended
6    chainsaws, so that would be one.
7        Q     And in your opinion --
8        A     Hand saws would be another one.  Like I
9    said before, there is a potential that exists that
10   these things, the Stihl saws might be suitable.  It
11   is dependent upon whatever that cutting attachment
12   is.
13       Q     When you referred to hand saws, you
14   mean something not powered?
15       A     Yes.
16       Q     Okay.  In your opinion --
17       A     And -- I'm sorry.  And you have some
18   other saws.  You could use a pneumatic saw.
19       Q     Okay.  In your opinion, would it be
20   safe to cut the piping cut at the time of the
21   accident with a chainsaw?
22             MR. PACKIN:  I object to the form.
23       You can answer.
24             THE WITNESS:  Yes.
25   BY MR. KOTT:
```

Degnan & Bateman, Inc.
(856) 232-7400

Page 50

```
1        Q       Okay.  You, in your earlier
2    depositions, referred to being aware of four
3    other -- I'm sorry -- a total of four accidents
4    where a wood-cutting blade was used; this case,
5    Stout, a case in Florida, and a case in New York.
6    Do you remember that?
7        A       A case in Europe?
8        Q       A case in New York state.
9        A       Yes.
10       Q       Were all those wood-cutting blades?
11       A       I don't think Dale Erb was.
12               MR. PACKIN:  E-R-B-B.
13   BY MR. KOTT:
14       Q       And the case in New York, was it a
15   wood-cutting blade?
16       A       Yes.
17       Q       How do you know that?
18       A       There is a -- a synopsis of the case
19   that's available on the internet.
20       Q       And what brand was that blade in that
21   case?
22       A       That I don't recall if that information
23   was available.
24       Q       Have you reviewed any NEISS, N-E-I-S-S,
25   data in this case?
```

Page 51

```
1        A       Yes, I think I did.
2        Q       And -- and when you reviewed the NEISS
3    data, did you see any indication that anyone had
4    been injured while using a wood-cutting blade on any
5    kind of gasoline-powered cut-off saw?
6        A       Well, the NEISS information doesn't
7    break it down that good.
8        Q       Okay.  Did you see any information on
9    the NEISS data that indicated that anybody was
10   injured while using a wood-cutting blade on a
11   gasoline-powered cut-off saw?
12               MR. PACKIN:  Asked and answered.
13               THE WITNESS:  Well, NEISS doesn't
14   present that data that way, so -- so, obviously, if
15   they don't present it, well, then I can't see it.
16   BY MR. KOTT:
17       Q       In your opinion, was the placing of the
18   Oldham blade on the Stihl cut-off machine a misuse?
19       A       Yes.
20       Q       In your opinion, was it a foreseeable
21   misuse?
22               MR. PACKIN:  Objection to form.
23               THE WITNESS:  Yes.
24   BY MR. KOTT:
25       Q       What's your definition of, quote,
```

Page 52

```
1    foreseeable misuse, close quote?
2                MR. PACKIN:  I object to the form.
3                THE WITNESS:  It is actually a
4    reasonably foreseeable misuse.  The fact that it has
5    been known -- has been a known practice for
6    considerable time before this incident.  Stihl had
7    known it.
8    BY MR. KOTT:
9        Q       Have you done any analysis of the
10   frequency of accidents on wood-cutting blades,
11   meaning the frequency of the various accident modes
12   on wood-cutting blades?
13               MR. PACKIN:  I object to the form.
14               THE WITNESS:  Well, you know, I don't
15   know if that -- that data exists.  And if it did
16   exist, I don't know of what -- how accurate or the
17   veracity of it would be because, you know, you have
18   a situation where you have the amount of hours that
19   wood-cutting blades are used.  In other words, on
20   the saws, say on its intended uses, how many hours
21   they are used, what kind of accidents that -- that
22   occur during those hours.  And then you have these
23   misuses.  How many hours, man hours are used, are
24   they in use and what kind of accidents that they
25   have.  So you have frequency.  You have severity.
```

Page 53

```
1    You have -- so if you had a case where you didn't
2    have a lot of frequency but you had very severe
3    cases, severe injuries, you would have to -- I don't
4    know where you would get that information.  You
5    know, you would have to judge that against what the
6    experience was in the intended uses.
7    BY MR. KOTT:
8        Q       Why would you have to make that
9    judgment?
10       A       Well, you -- you were -- I'm sorry.
11   You want to make a comparison.  I thought that's
12   what you were asking me about, a comparison.
13       Q       Why do you want to make that
14   comparison?
15               MR. PACKIN:  I object to the form.
16               Go ahead.
17               THE WITNESS:  Why do I want to make a
18   comparison?
19               Well, if you want to say that this type of
20   foreseeable misuse occurs so rarely that there is no
21   need to warn against it, I would say that that's not
22   a basis for a judgment.
23               In other words, the -- the evaluation of that
24   data would not be a sufficient basis.
25   BY MR. KOTT:
```

(Pages 50 to 53)                                                          14

Page 54

1    Q    Okay.  In determining what warnings to
2  place on a product, should you look at the frequency
3  of the various potential accident modes?
4    A    If -- if you have access to data,
5  certainly.  You know, that's helpful.  That can be.
6    Q    Why should you look at the frequency of
7  the various accident modes?
8    A    Well, it's like everything else.  You
9  know, you look at the frequency.  You look at the
10  severity.  You look at the latency.
11    Q    Why do you look -- my question is why.
12  Why do you look at the frequency and the severity?
13  Why do you look at those two factors?
14    A    Well, there are three factors.
15    Q    Okay.  Why do you look at all three
16  factors, how do you do the analysis?
17    A    It helps you to judge.
18    Q    How does it help you to judge?
19    A    Well, you know, like, if you -- if you
20  have an accident, potential accident that happens a
21  lot, that you know happens a lot, well, then, you
22  know, that certainly is a basis for a warning.  Or
23  if when it happens, it produces such severe results,
24  even death, well, that's something that you need to
25  warn against, too.  And the other thing is, is

Page 55

1  latency.  In other words --
2    Q    What's latency mean?
3    A    Okay.  It means that it's not obvious
4  to the users, such as in this case.  They were doing
5  it for years, you know.
6    Q    Okay.  In this case, have you done any
7  analysis of the frequency of the various accident
8  modes that can occur using these types of blades?
9    MR. PACKIN:  I object to the form.
10    THE WITNESS:  Well, I can't find any
11  data.
12  BY MR. KOTT:
13    Q    Does that mean you have not done any
14  such analysis?
15    A    Well, I mean, I looked.
16    Q    Right.
17    A    You know.  Maybe it exists someplace,
18  you know, and I don't know whether it is -- even if
19  it exists, if it is useful, because as I explained
20  earlier, you need a good basis to judge the
21  frequency of accidents versus the -- the man hours
22  of the -- of the saw blades actually being used.
23    Q    Have you done any analysis of the
24  severity of the various accident modes that can
25  occur when using these blades?

Page 56

1    A    Well, I have -- have looked for
2  information.  I have found that there has been some
3  severe accidents, yes.
4    Q    And severe accidents in a number of
5  different accident modes using these blades, both
6  with foreseeable uses and foreseeable misuses?
7    MR. PACKIN:  I object to the form.
8    THE WITNESS:  Well, I was focusing on
9  this foreseeable misuse.
10  BY MR. KOTT:
11    Q    Okay.
12    A    This particular -- are you talking
13  about --
14    Q    Let me ask another question.
15    MR. PACKIN:  Let him finish.
16    THE WITNESS:  Are you expanding it out
17  to all possible uses of the 14-inch?
18  BY MR. KOTT:
19    Q    Have you done -- have you done any
20  analysis of the severity of the injuries in the
21  various foreseeable misuses that you've talked about
22  in this deposition for the blade?
23    A    Well, there is some information that's
24  available.  It doesn't shrink it down to 14-inch
25  blades, but the -- and, of course, it is not

Page 57

1  necessarily in a -- all within a professional
2  setting.  But the Consumer Product Safety Commission
3  did -- has done an extensive study on injuries
4  related to wood-cutting saws.
5    Q    That's foreseeable uses; correct?
6    A    That's right.
7    Q    I was asking foreseeable misuses.
8    A    Oh.
9    Q    Have you done any analysis of the
10  severity of the various accident modes that can
11  occur when there is a foreseeable misuse of this
12  blade?
13    A    Well, yeah.  I've searched for -- and I
14  made mention of it earlier, in the earlier
15  depositions, of the cases that have gone to federal
16  court.
17    Q    Okay.
18    A    And that's indicated the severity of
19  misuses, sure.
20    Q    Okay.  And you are aware of various
21  severe injuries occurring with a wide variety of
22  foreseeable misuses; is that true?
23    MR. PACKIN:  I object to the form.
24    THE WITNESS:  What do you mean wide
25  variety?

15                                          (Pages 54 to 57)

Page 58

```
 1   BY MR. KOTT:
 2       Q       Well, you gave me an inventory of
 3   foreseeable missuses before.  Do you remember that?
 4       A       Yes.
 5       Q       And for each of those foreseeable
 6   misuses, severe injuries can occur; is that correct?
 7       A       That's possible.  Yes.
 8       Q       And, in fact, for each of these
 9   foreseeable misuses that you listed for me, death
10   can occur; is that correct?
11       A       That's another possibility.
12       Q       Thank you.
13       Now, sir, in your opinion, was the training of
14   Mr. McGee by his employer adequate in this case?
15           MR. PACKIN:  I object to the form.
16           THE WITNESS:  Well, there was one area
17   of inadequacy, but it turns out that they didn't
18   have -- the entire company didn't know you weren't
19   supposed to use these saw blades on these saws.
20   BY MR. KOTT:
21       Q       What was the one area of inadequacy?
22       A       Well, that.
23       Q       Okay.
24       A       You know.
25       Q       Are you aware that Mr. Kuhn testified
```

Page 59

```
 1   in his deposition, K-U-H-N, that he was aware that
 2   it was not safe to use these blades on these cut-off
 3   machines?
 4           MR. PACKIN:  I object to the form.
 5           THE WITNESS:  You know, I don't
 6   remember that.
 7   BY MR. KOTT:
 8       Q       Okay.  And this Oldham blade, when it's
 9   sold in its packaging new, is the wording on the
10   blade itself visible?
11       A       In the packaging.  I have to remember
12   what -- what it looks like in the packaging.
13       Q       Here's what I'm driving at.
14       Does the packaging appear such that there is a
15   clear color cover over the blade so somebody can see
16   what's written on the blade through the packaging?
17   That's what I'm asking.
18       A       Yes.  And I think I had discussed the
19   font size.
20       Q       Okay.  We are going to come to the font
21   size.
22       You are critical of the wording of the Oldham
23   warning; is that correct?
24       A       Is that what I wrote in my report?
25       Q       Well, I thought you said you were
```

Page 60

```
 1   critical -- well, you tell me.  Are you critical of
 2   the Oldham warning?
 3       A       I'm sorry.  I have to check my report.
 4   I -- I forgot what I read -- what I wrote.
 5       Q       Okay.  Is there -- withdrawn.
 6       In your review of the record in this case, did
 7   you see anybody who was misled by the wording of the
 8   Oldham warning?
 9           MR. PACKIN:  I object to the form.
10           THE WITNESS:  I don't recall anybody
11   being misled --
12   BY MR. KOTT:
13       Q       In your review --
14       A       -- because it was -- it just wasn't
15   read.
16       Q       All right.  In your review of the
17   record in this case, did you see anybody who read
18   the warning on the Oldham blade and concluded from
19   the wording of the warning that it was safe to use
20   it on the Stihl cut-off machine?
21           MR. PACKIN:  I object to the form.
22           THE WITNESS:  You know, I want to check
23   my report.
24   BY MR. KOTT:
25       Q       Okay.  We will let you do that at a
```

Page 61

```
 1   break.
 2       In your report --
 3           MR. PACKIN:  Which I will need in about
 4   five minutes.
 5   BY MR. KOTT:
 6       Q       In your report you refer to an Oldham
 7   blade that has warnings on the side that would face
 8   the installer if installed on a Stihl demo saw.  Do
 9   you know what I'm referring to?  I will read it to
10   you if you don't.
11       A       Would you please read it?
12       Q       Yeah.  I'm reading from paragraph 6.149
13   on page 27.
14       Dewalt, another division of Black and Decker,
15   sells 14-inch carbide-tipped saw blades for cutting
16   ferrous materials.  See DW7747, DW7745, DW7749, with
17   writing on the side that would face the installer if
18   installed on a Stihl demo saw.
19       Do you know what I'm referring to?
20       A       Yes.
21       Q       What -- what types of saws are those
22   blades used on?
23       A       Metal-cutting saws.
24       Q       And on those metal-cutting saws, does
25   the warning face out towards the operator when the
```

(Pages 58 to 61)                                                        16

Page 62

1  operator correctly puts the blade on?
2      A     Depends on the saw.  I believe so.  It
3  does, yes.
4      Q     Okay.  If this blade, the Oldham blade,
5  were mounted on a machine which it was intended to
6  be mounted on, would the writing on the blade itself
7  face out towards the operator?
8      A     Usually, yes.
9      Q     Okay.  And is the reason in this case
10  that the writing did not face out toward the
11  operator because it was -- the blade was placed on a
12  machine that it was not intended to be placed on?
13      A     Yes.
14      Q     Okay.  And are you -- withdrawn.
15      Even with the writing only on one side of the
16  Oldham blade, would it still be visible to someone
17  operating the machine?
18      A     Would what still be visible?
19      Q     If there is writing on the blade.
20          MR. PACKIN:  Object to the form.
21  You can answer.
22          THE WITNESS:  Well, there is a lot of
23  writing on the blade.  As a matter of fact, the name
24  is gigantic compared to the -- the warning.  So, you
25  know, yeah, you would see the name.  I doubt you

Page 63

1  would see the warning.  And when you are installing
2  it on the blade, on the machine, nothing is --
3  nothing faces you.  No -- no writing faces you.
4  BY MR. KOTT:
5      Q     From the operator's position of the
6  Stihl TS400, the operators operating the machine, is
7  there writing on the face of the blade visible to
8  the operator?
9      A     I doubt it.
10      Q     Really?  Why do you say that?
11      A     Really, really, really, really, really.
12          MR. PACKIN:  Argumentative.  I object
13  to the form.
14  BY MR. KOTT:
15      Q     Why do you say that?
16      A     Because the operator stands above the
17  machine.  I got my machine here now.  And you can't
18  see the blade when you are cutting it.  You can --
19  you know, you are standing above it.  You are not
20  reading the thing while it is spinning, while it is
21  going 5,000 RPM, you know.
22      Q     How about before it is turned on?  Is
23  it visible to the operator?
24          MR. PACKIN:  I object to the form.
25          THE WITNESS:  The --

Page 64

1  BY MR. KOTT:
2      Q     You know, let me withdraw the question.
3      A     Wait, wait, wait.  I want to finish.
4  You know, I was starting to answer.
5      The guard covers more than half the blade so
6  more than half the blade is covered.  So if that
7  little warning that's this big is underneath that,
8  he is never going to see it.  You don't see the
9  entire blade at all when it is installed on the
10  machine.
11      Q     If an operator is holding the machine
12  in the operator's position, but it is not turned on,
13  can the operator see that there is some writing on
14  the blade?
15      A     It's possible.  It's possible he can
16  see on the other side there is none.
17      Q     Okay.
18      A     You can see both sides.
19      Q     Okay.  Okay.  That's all I was asking.
20          MR. PACKIN:  Whenever --
21          MR. KOTT:  Yeah, let's take a break.
22          (Brief recess.)
23          (Growney-60  Notebook of articles from
24      Mr. Growney marked for identification.)
25          MR. KOTT:  Before we go back, I marked

Page 65

1  as Exhibit Growney-60, which is a black notebook
2  that has a number of technical articles in it that
3  the witness produced this morning as having articles
4  he has read that were either authored or coauthored
5  by Timothy Rhoades, and maybe some articles authored
6  by others or not Timothy Rhoades, and I will
7  identify on the record later during a break what
8  articles are in that booklet.
9          Mr. Growney, would you hand to the
10  court reporter -- and I'm going to ask the court
11  reporter to mark as Growney-61, ANSI Z535.4-2002.
12          (Growney-61  ANSI Z535.4-2002 marked
13      for identification.)
14  BY MR. KOTT:
15      Q     Okay.  Mr. Growney, I want to call your
16  attention to the ANSI Z535.4-2002, if I may.  And
17  particularly, pages 19 and 20.
18          MR. PACKIN:  Give me one second.  I
19  have to get my ANSI book.  I thought it was here.
20      Thanks.  Which pages, Dave?
21  BY MR. KOTT:
22      Q     19 and 20.  Do you see at the bottom of
23  page 19 there is a section that begins "letter size"
24  and it goes over to page 20?
25      A     Yes.

17

(Pages 62 to 65)

Page 66

1      Q      And in footnote three at the bottom of
2  page 19, it refers to a minimum safe distance?
3      A      Yes.
4      Q      And if I am simply holding the blade in
5  my hand, what is the minimum safe distance?
6      A      Can be -- you can put it right up to
7  your nose.
8      Q      And if I have the blade on a cut-off
9  machine but the machine is not turned on, what is
10  the minimum safe cutting distance -- what is the
11  minimum safe distance?
12      A      It would be the same thing.
13      Q      Okay.
14      A      But what we really want to look at is
15  how close do you need to be in order to read it.
16      Q      Okay.
17      A      You know, so --
18      Q      Now, on page 20, there is a discussion
19  of minimum letter height calculations?
20      A      Yes.
21      Q      As I recollect, you first obtained this
22  standard in your work in the Stout case.  You
23  actually wrote away and got this standard for your
24  work in the Stout case.  Does that sound right?
25      A      Yeah, that sounds right.

Page 67

1      Q      Okay.  Have you ever actually applied
2  the analysis contained in section B3.3.13, minimum
3  letter height calculations, on page 20 of this
4  document?
5              MR. PACKIN:  I object to the form.
6              THE WITNESS:  Yes.
7  BY MR. KOTT:
8      Q      Okay.  And did you do that in this
9  case?
10      A      Yes.
11      Q      Did you do that as to the Oldham blade?
12      A      Yes.
13      Q      What was the letter height of the word
14  "warning" on the Oldham blade?
15      A      I would have to check my notes.
16      Q      Okay.  At a break I'm going to ask you
17  to come -- pull those out.
18              You have notes.  Is that something --
19              MR. PACKIN:  I'm going to object to you
20  having him do it on a break.
21              MR. KOTT:  Whatever you want.
22              MR. PACKIN:  That counts as part of the
23  time he is going to spend.  You want him to look for
24  it, he would look for it.
25  BY MR. KOTT:

Page 68

1      Q      What notes are you referring to?  Is it
2  something different than you -- that's already been
3  marked?
4      A      Probably not.
5      Q      Oh.  So it's already been marked.
6              MR. PACKIN:  He said probably not.  He
7  didn't say it has.
8              THE WITNESS:  One second.  We need a
9  little clarification.
10              In other words, if I had done this on an
11  exemplar, is that -- is that what you are talking
12  about?
13  BY MR. KOTT:
14      Q      Well, let me try.
15              On an exemplar Oldham blade, exemplar of the
16  one we're talking about, had you measured the height
17  of the word "warning"?
18      A      I believe so.
19      Q      And is that reflected in some of
20  your -- in some of your notes?
21      A      Think so.
22      Q      And you also measured the height of the
23  rest of the words of the warning after the word
24  warning on the Oldham exemplar?
25      A      I believe so.

Page 69

1      Q      And is that also reflected in your
2  notes?
3      A      Yes.
4      Q      Okay.  And your best recollection is
5  that those were notes that were previously marked in
6  your deposition in this case?
7      A      Probably not.
8      Q      Okay.  Can you pull those out, please?
9              Let me interrupt you for one moment.  Let me
10  hand this to the court reporter.  Is Growney-41 what
11  you are looking for?
12      A      I don't know.  What is that?
13              Well, no.
14              Actually, what I'm looking for is my field
15  notes from Stout, because that's when I measured --
16  took those measurements that you are asking about.
17      Q      Okay.  Well, did you measure the size
18  of the warning, the word "warning" on Stout, the one
19  that was on the exemplar blade?
20      A      I think so.
21      Q      Can you estimate for us what the
22  size -- what the measurement was?
23              MR. PACKIN:  I object to the form.
24              THE WITNESS:  No, I can't.
25  BY MR. KOTT:

(Pages 66 to 69)                                                    18

Page 70

1      Q      Do you know -- calling your attention
2  to page 20 of the ANSI standard, there is a chart
3  there.
4      Do you know whether it was -- the size of the
5  word "warning" on the Oldham blade was greater or
6  less than the .084 of an inch?
7      A      That's the recommended letter height
8  for favorable reading conditions.  Is that what you
9  are saying?
10     Q      I'm just asking -- let me withdraw the
11 question.
12     Do you know whether the size of the warning on
13 the Oldham exemplar that you measured was greater or
14 less than .084 of an inch?
15     A      Not without checking my notes.
16     Q      Do you know whether the other words in
17 the warning other than the word "warning" were
18 greater or smaller than .084 of an inch?
19     A      Well, I think I addressed that in my
20 report.  And I would have to check my report.
21     Q      Well, you said in paragraph 6.98 of
22 page 19 of your report -- sorry.  Strike that.
23     You said on paragraph 6.137 on page 26 of your
24 report that the mean letter height of text of Oldham
25 safety instructions and warnings on the packaging,

Page 71

1  on the packaging, was approximately .050 inches
2  high.  Does that sound right to you?
3      A      Yes.
4      Q      Do you recollect whether in your report
5  you had -- in this case you listed any measurements
6  of the on-product warning that was on the Stihl --
7  that was on the Oldham blade?
8      MR. PACKIN:  The letter height?
   BY MR. KOTT:
10     Q      The letter height, right.
11     A      It would be in my report.
12     Q      Well, that's my question.
13     Do you recollect whether -- let me tell you
14 why I'm asking.  I didn't see in your report, and I
15 might have missed it.  But I didn't see in your
16 report anywhere where you set forth the height of
17 the lettering on the Oldham warning.
18     A      Well, I know I meant to address it
19 because I addressed it in Stout.
20     Q      Right.
21     A      And if I omitted it, it is a
22 typographical error.  Maybe when I was writing it, I
23 overlooked it but I know I meant to address it, and
24 you can take whatever I said in Stout as pretty much
25 the same thing here.

Page 72

1      Q      Okay.  But I'm not sure you were asked
2  in Stout this precise question.
3      Would you be able to provide Mr. Packin with
4  your measurements of the on-product warning on the
5  Oldham exemplar blade, meaning how high or tall they
6  were?
7      A      Yes.
8      Q      Did you measure the capital letter,
9  quote, H, close quote, on the Oldham blade?
10     A      I'm trying to remember if it had a
11 capital H.  I can't remember whether it had a
12 capital H.
13     Q      Whatever measurements you reached, do
14 you know whether they met what is required on pages
15 19 and 20 of the ANSI standard or did not meet what
16 is required there?
17     A      Well, here's -- I don't have my --
18     Q      Do you want the court reporter to read
19 it back, or do you have --
20     A      No, no, no.  That's fine.  I got it.
21     Here's the problem.  These are all for
22 favorable reading conditions, you know, and how
23 far -- oh -- oh -- I'm sorry.  I just knocked --
24 okay -- and how far -- the distance you are from the
25 hazard.  Well, what we do is we take that and just

Page 73

1  apply it to how close or how far you need to be to
2  read the -- read the sign.  This doesn't make any
3  difference whether it is a hazard or not.  If you
4  are going to get some instruction from that warning,
5  well, then how close do you have to be to read it?
6  You know, if you hold it up to your nose, you can
7  probably read it, but that's not a normal spot for
8  somebody who can read English, you know, or for a
9  condition in which the -- you face the blade with
10 the warning on it, the size of the warning.
11     So if that warning was -- if you held that,
12 you know, would you hold it one foot away from you
13 and read it?  I doubt it.  You know, in the normal
14 procedure, to process your normal routine of
15 installing a blade, which apparently all these guys
16 who have done this installation have done it over,
17 and over, and over for quite a number of years.  So
18 you -- you take the distance from the hazard, that
19 distance, okay, and you equate that to the distance
20 that you need to read the sign.  That's the
21 comparison.
22     Q      Okay.  On the Oldham blade, the warning
23 that's present, the one that we are talking about in
24 this case --
25     A      Yes.

19                                    (Pages 70 to 73)

Page 74

1    Q       -- how far away can somebody with
2  normal eyesight read it? Can they -- can they read
3  it a foot away, two feet away, three feet away?
4    A       Calling on my recollection, I think I
5  -- I did this calculation. It was eight or nine
6  inches, or something like that. It was less than a
7  foot. So in other words, you had to get that close.
8  Now, in a normal handling of the blade, are you
9  going to sit there with that blade for that length
10  of time, for the length of time that it takes you to
11  read it? No. It is not reasonable. That's --
12  that's not a -- a reasonable letter height. You
13  need to be able to see the letter height while you
14  are sitting there and read it at a normal distance,
15  which would be like 14 inches, 16, inches, 18
16  inches. You know, arm's length.
17    Q       Are you telling me that arm's length,
18  14 through 18 inches --
19    A       Whatever, right.
20    Q       -- somebody cannot read the warning on
21  the oldham blade?
22    A       Well, yeah. That's -- yes.
23    Q       Can they read the word "warning" on the
24  oldham blade at 14 to 16 inches?
25    A       I don't remember the -- my measurement

Page 75

1  of the height. So --
2    Q       You said, referring to page 20, these
3  are all for favorable conditions?
4    A       Yes.
5       MR. PACKIN: Page 20 of which, the ANSI
6  or the report?
7  BY MR. KOTT:
8    Q       The ANSI.
9  Go back to page 20. Do you see the right
10  column?
11    A       Right.
12    Q       And the right column is entitled
13  recommended letter height for favorable reading
14  conditions; right?
15    A       Yeah.
16    Q       The middle column is worded exactly the
17  same way?
18    A       Right.
19    Q       And if you actually go up right above
20  the table it says recommended letter height for
21  unfavorable reading conditions, all distances,
22  viewing distance, feet times .084; is that correct?
23    A       I'm sorry. Say that again.
24    Q       Yeah. Do you see right above the
25  table, recommended?

Page 76

1    A       Yes.
2    Q       Okay. And the .084 is the same as .084
3  for one foot and less?
4    A       Right.
5    Q       Here's my question. Is there a typo in
6  this document? That is, should the right-hand
7  column, instead of saying, quote, recommended letter
8  height for favorable reading conditions, close
9  quote, state, recommended letter height for
10  unfavorable reading conditions, close quote?
11    A       Not to my knowledge.
12    Q       Well, are they -- the heading above the
13  columns is the same, the middle and the right; is
14  that right?
15    A       Right.
16    Q       But there is different distances listed
17  under both.
18    A       Yes.
19    Q       Why would that be? Why would you have
20  a different distance both for favorable reading?
21    A       Well, you know, they are showing it in
22  -- in the center column as two decimal points and
23  they're showing it in the right column as three
24  decimal points. I mean, the right column matches up
25  with the -- with the formula up above.

Page 77

1    Q       Okay. And the formula up above -- the
2  formula up above is for unfavorable reading
3  conditions; right?
4    A       Yes.
5    Q       That's why I'm asking if there is a
6  typographical mistake. Do you see why I'm asking
7  that?
8    A       I did not get any errata with this
9  standard.
10    Q       Let me ask you what you think. Do you
11  think there is a typographical error in this?
12    A       I'm going to have to wait for them to
13  correct it.
14    Q       Okay. What is the definition of a,
15  quote, favorable, close quote, reading condition in
16  the ANSI standard? Is that defined?
17    A       I think I -- I'm sorry. I can't recall
18  whether it is or isn't.
19    Q       What is your definition of, quote,
20  favorable, close quote, reading conditions?
21    A       Bright, sunlit, no snow, no rain, no --
22  no mud or dirt obscuring anything.
23    Q       What was your understanding on the day
24  of the accident of the reading conditions?
25       MR. PACKIN: I object to the form.

(Pages 74 to 77)                                              20

Page 78

1       THE WITNESS:  It was -- was cold.  I
2  can't recall what the weather was, but, you know,
3  really what you got to investigate is what the
4  conditions were when it was installed.
5  BY MR. KOTT:
6       Q     I'm sorry.  My question was, can you
7  recollect what the reading conditions were on the
8  date of the accident?
9       A     No, I can't.
10      Q     Do you have any information about what
11 the reading conditions were when the blade involved
12 in the accident was installed on the stihl cut-off
13 machine?
14      A     Repeat the question, please.
15      Q     Do you have any information as to the
16 reading conditions on the date that the Oldham blade
17 was installed on the Stihl cut-off machine?
18      A     No.
19      Q     Are you -- withdrawn.
20      Do you consider yourself an expert in the area
21 of warnings?
22      A     Yes.
23      Q     What -- and you've described for us
24 some or all of your expertise in the area of
25 warnings; is that correct?

Page 79

1       MR. PACKIN:  I object to the form.
2  You can answer.
3       THE WITNESS:  Some, yeah.
4  BY MR. KOTT:
5       Q     Okay.  Would a group of lay people,
6  meaning six or eight people selected randomly from
7  the community, have the ability to analyze whether
8  warnings on the Oldham blade were adequate or not?
9       MR. PACKIN:  I object to the form.
10      You can answer.
11      THE WITNESS:  That would depend upon
12 the people.
13 BY MR. KOTT:
14      Q     Okay.  Well, I guess what I'm asking
15 for, are warnings a subject you need some expertise
16 on or is that a subject that generally lay people
17 can determine?
18      MR. PACKIN:  I object to the form.
19      THE WITNESS:  Well, you need some
20 expertise.
21 BY MR. KOTT:
22      Q     Why do you need some expertise?
23      MR. PACKIN:  I object to the form.
24      THE WITNESS:  There are a lot of things
25 that are not immediately evident to you.

Page 80

1  BY MR. KOTT:
2       Q     You mean immediately evident to someone
3  who is not trained in the field?
4       A     Yes.
5       Q     And you need to do some analysis of the
6  warnings that involves looking at hazards, and
7  frequency, and things of that nature; correct?
8       MR. PACKIN:  Object to the form.
9       THE WITNESS:  I don't understand the
10 question.
11 BY MR. KOTT:
12      Q     In doing an analysis of whether a
13 warning is adequate, one thing you would need to
14 look at is what standards might apply; correct?
15      A     That's one thing, yes.
16      Q     And another thing you would need to
17 look at is an analysis of the various ways people
18 can get hurt on the product; correct?
19      A     Yes.
20      Q     And you need to do an analysis of the
21 ways -- I'm sorry.  You need to do an analysis of
22 the severity of the injuries; correct?
23      A     Yes.
24      Q     And that -- you've done that in this
25 case; correct?

Page 81

1       A     Yes.
2       Q     And all those things would you expect
3  generally that an expert would have -- withdrawn.
4       You have the expertise to do that; correct?
5       A     Yes.
6       Q     Would you expect that six or eight lay
7  people from the community would have the expertise
8  to do that?
9       MR. PACKIN:  I object to the form.
10 BY MR. KOTT:
11      Q     Just randomly chosen.
12      MR. PACKIN:  I object to the form.
13      THE WITNESS:  All of those?
14 BY MR. KOTT:
15      Q     Yes.
16      A     All of those things?
17      Well, randomly chosen, you probably would get
18 some that couldn't do that.
19      Q     Some that could not, did you say?
20      A     Yes.
21      Q     Have you done any testing of your
22 proposed warning as it relates to Oldham in this
23 case?
24      A     No.
25      Q     If you did testing, what group would

Degnan & Bateman, Inc.
(856) 232-7400

Page 82

```
1    you test it on?  That is, how would you determine
2    the people you would test it on?
3         A      I would go to construction sites.
4         Q      Why would you go to construction sites?
5         A      Because that's the -- the venue in
6    which this accident took place.  I would look for
7    people who operated these hand-held concrete cut-off
8    saws, demo saws.
9         Q      Why would you look for people that
10   operated these hand-held cut-off saws?
11        A      Because that's the target audience.
12        Q      Well, isn't the target audience, and
13   you correct me if I'm wrong, the people who also use
14   these blades on wood-cutting machines?
15        A      Well, no, because this hazard doesn't
16   exist on -- on wood cutting -- wood-cutting
17   machines.
18        Q      But I think you told me there are other
19   hazards that do exist on wood-cutting machines;
20   right?
21        A      Yes.
22        Q      Would you do any testing of this
23   warning on people who are using the blade on
24   wood-cutting machines?
25        A      That could be done.
```

Page 83

```
1         Q      Would you --
2         A      You know --
3         Q      My question is --
4              MR. PACKIN:  Let him finish.
5              THE WITNESS:  That could be, you know,
6    that could be done, but, you know, it might give you
7    misleading information.
8    BY MR. KOTT:
9         Q      What material can you cut with this
10   blade?  By that I'm asking, I know you can cut wood.
11   Can you safely cut concrete with this blade, being
12   the Oldham blade?
13        A      I've never seen anybody -- any
14   information that said you could cut concrete with
15   this blade.
16        Q      My question was, can you safely cut
17   concrete with this blade assuming that you are using
18   it on, for instance, a circular saw, a wood-cutting
19   circular saw?
20        A      I've never seen any information that
21   you can cut concrete with this blade.
22        Q      By that answer do you mean that you
23   don't know whether it can safely be used to cut
24   concrete?
25              MR. PACKIN:  I object to the form.
```

Page 84

```
1              THE WITNESS:  Well, I -- I wouldn't try
2    it.  I wouldn't recommend it.
3    BY MR. KOTT:
4         Q      And why wouldn't you recommend it?
5         A      Because you are liable to throw teeth.
6         Q      And that would be unsafe?
7         A      Right.
8         Q      Any other materials where it would be
9    unsafe -- withdrawn.
10        Are there any other materials that you could
11   cut with this material where it would be unsafe to
12   use it?
13        A      Steel.  You know, there might be other
14   metals that you might not want to use it.
15        Q      And what's the potential accident mode
16   if you use it to cut steel, S-T-E-E-L?
17        A      With what kind of a saw?
18        Q      With any kind of saw that it's
19   appropriate to use this blade on?
20        A      You could have kickback.  You could
21   throw teeth.
22        Q      In throwing of teeth, is one of the
23   potential injuries, loss of eyesight?
24        A      Yes.
25        Q      And in kickback, is one of the
```

Page 85

```
1    potential injuries, catastrophic injuries, meaning
2    amputations?
3              MR. PACKIN:  I object to form.
4              THE WITNESS:  That's possible, yes.
5    BY MR. KOTT:
6         Q      Are any of the opinions you've given in
7    this case as to my client, Oldham, been peer
8    reviewed?
9         A      Here's my peers.
10        Q      You are pointing to the lawyers?
11        A      And also the experts that have read my
12   opinions.  So, yeah, they've -- they've reviewed it.
13        Q      Is there anybody outside of this case,
14   meaning people who are not involved in this case,
15   who have peer reviewed your opinions in this case?
16        A      I am unaware of anybody.
17        Q      If you were hired by my client, Oldham,
18   to consult on whether the warning was adequate, how
19   would you go about doing that task?  What would your
20   way of doing it be?
21        A      You mean the existing warning?
22        Q      Yeah.
23        A      Well, I think I've laid that out in my
24   report.
25        Q      Well, tell me what you would do if
```

Page 86

1  hired by Oldham. I know you're -- all right. And
2  if you want to have an alternative warning, how
3  would you go about the process of developing an
4  alternative warning?
5          MR. PACKIN: Which question is pending?
6  BY MR. KOTT:
7          Q   If you were hired by my client, Oldham,
8  and you were asked to develop an alternative
9  warning, what process would you use to develop the
10 alternative warning?
11         And my question assumes not in the litigation
12 context, but as a consultant.
13         A   Are you looking to hire me?
14         Q   Please answer the question.
15         A   Well, I would review the existing
16 warnings. I would review the sales literature. I
17 would interview people who are close to the blade.
18         Q   You mean users?
19         A   Well, first -- first Oldham --
20         Q   Okay.
21         A   -- you know. And then I would review
22 literature in the field. And then I would do an
23 analysis, come up with a recommendation.
24         Q   Come up with what I would call a
25 candidate warning?

Page 87

1          A   Yes.
2          Q   And then --
3          A   It may be more than one.
4          Q   Okay.
5          A   I might have alternatives.
6          Q   All right. And then what would you do
7  after you had your alternative candidate warnings?
8  Would you do some testing of them?
9          A   I would like to, yes.
10         Q   And what else would you do, if
11 anything?
12         A   Make mock-ups, and I guess that's it.
13         MR. KOTT: Mr. Walsh, let's go off the
14 record for a moment.
15         (Discussion off the record.)
16         MR. KOTT: On the record. I'm going to
17 stop my questioning now, but Mr. Walsh has agreed
18 that he will save for me seven to ten, which I may
19 not need, and if I don't need it, I will turn it
20 back to Mr. Walsh.
21         (Discussion off the record.)
22 BY MR. KOTT:
23         Q   I'm going to continue on.
24         Do you know about when Sander sold the blade
25 in this case to Jingoli?

Page 88

1          A   There is a series of purchase --
2  purchasing records. The specific blade, I don't
3  know if anybody knows exactly when the specific
4  blade was sold.
5          Q   At the time period that Sander was
6  selling this type of blade to Jingoli, during that
7  time period as reflected in the records, do you know
8  what icons Black & Decker had on their wood-cutting
9  blades, calling your attention to a specific period
10 of time?
11         MR. PACKIN: Are you saying this blade
12 or all wood-cutting blades?
13 BY MR. KOTT:
14         Q   At the time that Oldham was selling --
15 withdrawn.
16         At the time that Sander was selling Oldham
17 wood-cutting blades to Jingoli, during that time
18 period as reflected in the records, do you know what
19 pictorials or icons Black & Decker had on its
20 wood-cutting blades?
21         A   All of Black & Decker's?
22         Q   Any of them.
23         A   Well, I certainly haven't seen all of
24 Black & Decker's wood-cutting blades so, you know,
25 from that standpoint, I can't say yes.

Page 89

1          Q   Do you know what was on any of Black &
2  Decker's wood-cutting blades during that period of
3  time as far as pictorials and icons?
4          A   Yes. There was one for safety glasses.
5  And the other one was -- oh, shoot. I'm drawing a
6  blank. There was two.
7          Q   Read the owner's manual?
8          A   Yes. Right. Right.
9          Q   Are you aware --
10         A   I'm sorry.
11         Q   Are you aware of any other icons that
12 Black & Decker had on their wood-cutting blades at
13 the time that Sander sold these Oldham blades to
14 Jingoli?
15         A   Well, I think you asked me that before,
16 didn't you? I -- I can't recall any.
17         Q   Okay. Coming back to the Amana blade,
18 the one with the pictorial --
19         A   Yes.
20         Q   Was that on all the 14-inch Amana
21 blades or only on the 24-tooth?
22         A   I don't recall without checking my
23 file.
24         Q   I'm going to ask you to assume for
25 purposes of my question that it is only on the

Degnan & Bateman, Inc.
(856) 232-7400

Page 90

```
1    24-tooth, 14-inch blade, and not the other 14-inch
2    blades that had a different or higher number of
3    teeth.
4         Do you know why Amana would have done that?
5              MR. PACKIN: I object to the form.
6              THE WITNESS: I would be speculating.
7    BY MR. KOTT:
8         Q    Did you do any investigation to
9    determine why Amana put it on certain of their
10   14-inch blades -- I'm sorry.
11        Do you have -- do you have any knowledge as to
12   why Amana on its website, had that pictorial for
13   certain of its 14-inch blades but not for others?
14             MR. PACKIN: I object to the form.
15             THE WITNESS: Do I have any knowledge?
16   BY MR. KOTT:
17        Q    Right.
18        A    Not from Amana.
19        Q    Did you -- do you have knowledge from
20   anywhere else?
21        A    No.
22        Q    Did you do any investigation into that?
23             MR. PACKIN: I object to the form.
24             THE WITNESS: I looked at a lot of
25   14-inch blades.
```

Page 91

```
1    BY MR. KOTT:
2         Q    No. My specific question was -- I
3    wasn't clear. My fault.
4         Did you do any investigation as to why --
5    assuming Amana only put it on the 24-tooth, 14-inch
6    blade, did you do any investigation as to why they
7    only put it on the website for that blade --
8              MR. PACKIN: I object to the form.
9              THE WITNESS: No.
10   BY MR. KOTT:
11        Q    Do you agree that lettering on a
12   product should be of a size that enables a person
13   with normal vision, including corrective vision, to
14   read the safety sign or a label message panel text
15   at a safe viewing distance from the hazard?
16        A    Yes.
17        Q    Do you know where I was reading from
18   when I read that?
19        A    That -- that comes out of the standard.
20        Q    ANSI Z535.4-2002?
21        A    Yeah.
22        Q    Under ANSI Z535.3 or .4, are pictorials
23   required to be tested?
24        A    The requirement -- under?
25        Q    Yes.
```

Page 92

```
1         A    Under certain circumstances, yes.
2         Q    And which is it? Is it both of those
3    standards or just one of them?
4         A    I can't remember whether it is .3 or
5    .4.
6         Q    What are the circumstances where
7    pictorials are required to be tested?
8         A    If you are going to rely solely on the
9    pictorial to transmit your message. You are not
10   going to accompany any -- any text.
11        Q    And does the ANSI standard lay out a
12   protocol for the testing?
13        A    Yes, yes.
14        Q    In your opinion, should the Oldham
15   blade have a warning of some sort, pictorial or
16   otherwise, for the user to read the owner's manual?
17             MR. PACKIN: I object to the form.
18             THE WITNESS: Well, of course, that's
19   misleading because it implies that there is an
20   owner's manual for the blade.
21   BY MR. KOTT:
22        Q    Okay. Let me try --
23             MR. PACKIN: Let him finish.
24        Go ahead.
25             MR. KOTT: He is going to tell me if I
```

Page 93

```
1    interrupt, him, Barry. You don't have to do that.
2    That's why I asked him before --
3              MR. PACKIN: You don't need someone to
4    tell you you're interrupting when a man's talking
5    and you start talking over him.
6         So if you are not finished, you may finish
7    your answer.
8              THE WITNESS: I'm sorry. Can you
9    refresh -- repeat the question?
10             MR. PACKIN: Please don't do that
11   again.
12   BY MR. KOTT:
13        Q    Yeah. In your opinion -- in your
14   opinion, should the Oldham blade have a warning
15   telling the person to read the manual for the
16   machine that the Oldham blade is going to be put on?
17        A    Sure.
18        Q    Why?
19        A    It's a -- it furthers the cause of
20   safety.
21        Q    How does it further the cause of
22   safety?
23        A    Because in the -- there may be
24   something in the owner's manual that has a bearing
25   on the application of this blade to that machine.
```

(Pages 90 to 93)                                              24

Page 94

1    Q      In connection with the facts of this
2  case, is there something in the Stihl owner's manual
3  that has a bearing on the application of the Oldham
4  blade to the cut-off machine?
5    A      Yes.
6    Q      What is that?
7    A      Don't use it.
8    Q      And that you understand to be a safety
9  warning?
10   A      Yes.
11   Q      Have you done a hazard analysis of the
12 Oldham blade in this case?
13   A      Yes.
14   Q      What is a hazard analysis?
15   A      Well, it would be an analysis to see
16 what hazards are associated with the -- with the
17 blade and its use.
18   Q      And would some of those hazards be the
19 ones that you talked about before where you
20 inventoried the foreseeable uses and the foreseeable
21 misuses for the blade?
22   A      Yes.
23   Q      And would some of those hazards also
24 involve the materials being cut, meaning concrete or
25 steel?

Page 95

1    A      Yes.
2    Q      What other hazards would be applicable,
3  or would there be any other hazards that we haven't
4  already talked about today?
5    A      None comes to mind at this moment.
6    But then I recall you asked me that before,
7  and then one occurred to me a little time later.
8  So, yeah, there could be other problems, yes.
9    Q      Can you think of any now?
10   A      Yeah, misfeeding, forcing the blade --
11 I'm sorry.  Forcing the work onto the blade at a
12 rate that it couldn't handle.
13   Q      Is that a risk that can occur on an
14 expected use of this blade, meaning on a table saw,
15 for instance?
16   A      Yes.
17   Q      And what's the risk of injury there?
18 Is that a kickback risk?
19   A      Depends.  Could be a kickback risk or
20 it could be a -- an inadvertent contact.
21   Q      Inadvertent contact with what?
22   A      Well, in other words, the -- if the
23 operator is attempting to force the material through
24 the saw, and they are pushing harder than it can
25 take, and your hands slip and go into the blade.

Page 96

1    Q      And when you referred to the kickback
2  risk, that is the work piece coming back and
3  striking the operator?
4    A      Yes.
5    MR. KOTT:  How much time is left on the
6  tape?
7    VIDEO SPECIALIST:  Ten minutes.
8    MR. KOTT:  Why don't we break for
9  lunch?
10   Is that okay, Mr. Growney, with you?
11   THE WITNESS:  Sure.
12   MR. KOTT:  Okay.  Thank you.
13   MR. PACKIN:  Back in about an hour?
14   MR. KOTT:  Yup.
15   (Luncheon recess.)
16   VIDEO SPECIALIST:  Back on the record.
17 BY MR. WALSH:
18   Q      Good afternoon, Mr. Growney.
19   A      Good afternoon.
20   Q      The last -- according to my notes, the
21 last time you sat for a deposition in this case when
22 we continued it was on, I think, June 15th?
23   A      I think so.
24   Q      Between now and June 15th, I want to
25 just spend a couple of minutes seeing what, if any,

Page 97

1  additional work you may have done on the case.
2    Has there been any additional work that you
3  have done on the case since June 15th?
4    A      Well, I reviewed the case.
5    Q      When you say you reviewed the case,
6  what does that mean?  What did you review?
7    A      I went back over my file.
8    Q      Okay.  Did you read any depositions?
9    A      Started to a little bit.
10   Q      Okay.  Can you recall specifically
11 which ones you started to?
12   A      Kalsher, and my own, and I glanced over
13 a number of the previous depositions.
14   Q      Okay.  Now, can you recall any of the
15 ones, the previous depositions that you glanced
16 over, specifically which ones?
17   A      I may have looked at parts of the
18 majority of the people that, you know --
19   Q      Do you know that you did or -- you say
20 that you may have.  Do you know that you --
21   A      I'm sorry.  I interrupted you.  Go
22 ahead.
23   Q      No.  You said may -- you may have.  Do
24 you know which ones you looked at?
25   A      I looked at Caldwell, Rivera, Bausman.

25

(Pages 94 to 97)

Page 98

1    That's not the proper pronunciation of his name.
2    Bausman, I guess it is. Canelli, DuBois. I'm
3    trying to think of the rest of them. I didn't do it
4    continuously. I did it on and off, on and off.
5         Q    Did -- did you read them? Did you skim
6    them? What did you do?
7         A    Well, I would read through -- I would
8    scan, look for things that I might consider to be
9    relevant, and then maybe read that intentionally,
10   you know, deliberately for comprehension. And then
11   go on looking for highlights, other items that I
12   might have been interested in.
13        Q    Did you take any notes when you did
14   this?
15        A    No.
16        Q    Have you submitted a bill since the
17   last deposition?
18        A    No.
19        Ah, yes. Yes. I submitted a bill for the
20   last deposition.
21        Q    Okay. And other than the deposition,
22   for any work that you've done since the last one,
23   have you submitted additional bills?
24        A    No.
25        Q    Do you have any bill pending now that's

Page 99

1    ready to go for the work you've done between the
2    depositions?
3         A    No. That was just me refreshing my
4    memory. That's all.
5         Q    Do you know how much time was spent
6    doing that?
7         A    No.
8         Q    Have you -- since the last deposition,
9    have you purchased any HDPE pipe?
10        A    No.
11        Q    Cut any HDPE pipe?
12        A    No.
13        Q    Seen anybody cut any HDPE pipe?
14        A    No.
15        Q    Have you gone, have you visited the
16   accident site since the last deposition?
17        A    No.
18        Q    Have you communicated with the
19   plaintiff since the last deposition?
20        A    No.
21        Q    Have you communicated with any of the
22   plaintiff's coworkers since the last deposition?
23        A    No.
24        Q    The -- have you used a cut-off machine
25   since the last deposition?

Page 100

1         A    No.
2         Q    Have you seen a dep -- have you seen a
3    cut-off machine used since that last deposition?
4         A    I -- I -- I think I did. I possibly
5    did, yeah.
6         Q    Where did you possibly see one?
7         A    Passing a construction site, but it
8    was -- I may have been in a car at the time.
9         Q    Okay. Do you know what make or model
10   it was?
11        A    No.
12        Q    Do you know what it was being used to
13   do?
14        A    No.
15        Q    Do you know what kind of cutting
16   attachment it had on it?
17        A    No.
18        Q    Have you assembled your Saw Stop table
19   saw since the last deposition?
20        A    No, I haven't gotten to that, either.
21        Q    Have you done anything further to work
22   on the Saw Stop table saw?
23        A    Yes, I did. I cleared my -- the
24   material off of it, did a little stuff. But other
25   activities precluded my attentions.

Page 101

1         Q    Okay. So it's still not fully
2    assembled?
3         A    Right.
4         Q    Haven't used it yet?
5         A    Right.
6         Q    Okay. I want to focus a little bit --
7    one of the -- one of the opinions in your report has
8    to deal with what I'm going -- I don't think you've
9    used this term necessarily. I'm going to use the
10   term to generally describe what I'll call a
11   proprietary arbor for a cut-off machine. An arbor,
12   as I understand your opinion, would either be an
13   enlarged arbor, some type of shaped arbor, or some
14   type of drive mechanism for a cut-off machine that
15   would incorporate a dowel, D-O-W-E-L, pin
16   arrangement.
17        Now, that's what I understand from reading
18   your -- your report are the three potential variants
19   that you have considered in connection with this
20   case. Am I correct in that, or are there additional
21   ones?
22        A    Three variants of the arbor.
23        Q    Right.
24        A    Yes, that's correct.
25        Q    Okay. So either an enlarged arbor, a

(Pages 98 to 101)                                              26

Page 102

1 shaped arbor, or some dowel pin arrangement with the
2 arbor?
3      A     Yes.
4      Q     Okay. Now, since our -- the last --
5 well, have you -- at any point in time, have you
6 actually done engineering drawings of either an
7 enlarged arbor for a cut-off machine, a shaped arbor
8 for a cut-off machine, or a dowel pin arbor for a
9 cut-off machine?
10     A     Well, from the previous depositions, I
11 think you have some exhibits in which I have some
12 sketches.
13     Q     And have you done any prototypes of any
14 -- from those sketches, have you done any type of
15 prototypes of any of those types of dowel -- of
16 those arbors?
17     A     Well, no. The -- the, you know, the
18 prototype for an enlarged arbor is just, you know,
19 if the arbor is this size, you make it bigger, you
20 know.
21     Q     Well, let me ask you this. In --
22 concept-wise, have you done any sort of testing on
23 cut-off machine of any of the arbor designs that you
24 have conceptualized, either an enlarged arbor, some
25 type of shaped arbor, or a dowel pin arrangement?

Page 103

1 Any kind of testing?
2      A     Well, you know, I really don't need to
3 do testing on the enlarged arbor because, as I had
4 mentioned earlier, there really is a concrete
5 cut-off machine, a demo saw in the industry that has
6 an arbor that is so large that it is impossible to
7 put a ring -- I'm sorry, to put one of these
8 carbide-tipped tooth, wood-cutting saw blades on it,
9 and that's what I mentioned before, the ring saw.
10     Q     Ring saw.
11     A     That actually -- the existence of that
12 saw demonstrates the feasibility of that design.
13     Q     Okay. A ring saw, that's what you are
14 talking about? The Partner brand ring saw?
15     A     Yes.
16     Q     Have you actually ever seen a ring saw?
17 Have you held one in your hands?
18     A     I've seen it. I haven't held it in my
19 hands. I may have held it. It's possible.
20     Q     Where did you see it?
21     A     In a -- in a tool display.
22     Q     Do you recall where that tool display
23 was?
24     A     Yes.
25     Q     Where was that?

Page 104

1      A     I think it was down in Meyer Hardware
2 in Ridgefield, New Jersey.
3      Q     Okay. Was it a Partner ring saw?
4      A     I think so, yeah.
5      Q     The -- and the ring saw you -- you saw,
6 have you ever used a ring saw?
7      A     No, I have not.
8      Q     Have you ever seen a ring saw used?
9      A     I'm trying to remember if there is a
10 video of one in use. I can't -- I've seen so many
11 videos, I can't remember clearly whether I've seen a
12 Partner, the video of a Partner one in use. I may
13 have.
14     Q     Have you done any type of engineering
15 analysis of a ring saw?
16           MR. PACKIN: I object to the form.
17           THE WITNESS: What do you mean? Well,
18 what do you mean by that?
19 BY MR. WALSH:
20     Q     Well, have you done any type of risk
21 analysis, for example, of a ring saw?
22     A     Well, only from the standpoint of -- of
23 the same risk analysis for -- for these machines.
24     Q     Well, tell me what you did to do the
25 risk analysis of a ring saw.

Page 105

1      A     Well, I considered the application, you
2 know, how it was, in essence, the same application.
3 The -- the ring saw has additional capabilities that
4 these don't, but you can do -- what you could do
5 with, say, the Stihl TS400, you can certainly do
6 with a ring saw.
7      Q     All right. It is your belief that a
8 ring saw can do all the things that a TS400 does?
9      A     I believe so, yeah.
10     Q     Okay. The ring saw, are you familiar
11 with what ring saws were designed to do?
12     A     Well, they have an additional -- they
13 have capacity for additional depth.
14     Q     They were -- they were designed for
15 deep-cutting concrete; correct?
16     A     They have capacity design con-- to cut
17 deep concrete, but they cut concrete. It doesn't
18 have to be deep concrete.
19     Q     I understand.
20     A     It can be shallow concrete.
21     Q     Can they cut asphalt?
22     A     I can't recall.
23     Q     Can they cut masonry material like
24 bricks?
25     A     My understanding is that they can cut

27                                          (Pages 102 to 105)

Page 106

1  masonry block.
2      Q      Can they cut stone?
3      A      I have -- I don't recall.
4      Q      Can they cut metals?
5      A      I don't recall.
6      Q      Can they cut reinforced concrete?
7      A      I can't recall.
8      Q      Do you know how the cutting speed of a
9  ring saw compares to the cutting speed of a
10  hand-held gasoline-powered cut-off machine?
11      A      Oh, I'm sure I looked at it, but I -- I
12  forget it at this moment. The -- the important
13  thing to me about the ring saw is the large arbor
14  or, in essence, extending the arbor to its infinite
15  diameter and still be able to cut concrete. There
16  is no blade -- that's a demonstration of the
17  feasibility of the design of the enlarged arbor
18  precluding the installation of this commercially
19  available, carbide-tooth wood-cutting saw blade.
20      Q      Can a ring saw cut HDPE pipe?
21      A      I don't know if it has ever been tried.
22      Q      Do you know what the cost comparison
23  between a ring saw and a gasoline-powered hand-held
24  cut-off machine is?
25      A      Yes.

Page 107

1      Q      What are the comparisons?
2      A      Oh, it is probably about double.
3      Q      The ring saw is about double the cost?
4      A      Yes, yeah.
5      Q      How about the cutting attachments? Do
6  you know how they compare, the cost of a ring saw
7  and a cut-off machine?
8      A      They are more expensive.
9      Q      How much more expensive?
10      A      Maybe about double.
11      Q      Do you know what the maintenance
12  requirements are in a ring saw compared to the
13  maintenance requirements in the cut-off machine?
14      A      Well, I haven't looked at that.
15      Q      Do you have -- you have a guess as to
16  how they compare?
17      MR. PACKIN:  I object to the form.
18      THE WITNESS:  I don't guess.
19  BY MR. WALSH:
20      Q      Okay.  Have you ever seen a ring saw
21  anywhere in America on a construction site?
22      A      I've seen pictures of them on
23  construction sites.
24      Q      Where -- what pictures have you seen of
25  them on construction sites?

Page 108

1      A      Catalogs, brochures, websites.
2      Q      From the manufacturers of the machines?
3      A      Yes.
4      Q      Okay.  Have you, in any construction
5  site you've ever been on, ever seen a ring saw in
6  use?
7      A      No, I have not.
8      Q      The Partner who makes a ring saw, does
9  Partner also make hand-held gasoline-powered cut-off
10  machines?
11      A      Yes.
12      Q      Does it make more hand-held,
13  gasoline-powered cut-off machines models or more
14  ring saw models, or do you know?
15      A      I am uncertain which -- I think it -- I
16  don't know.  I don't know.
17      Q      Do you know whether there are reactive
18  forces associated with the use of a ring saw?
19      A      Yes, there are.
20      Q      Okay.  Have you -- have you seen any
21  comparison of the injury statistics between use of a
22  ring saw and use of a gasoline-powered cut-off
23  machine?
24      MR. PACKIN:  I object to the form.
25      THE WITNESS:  Well, I don't know if

Page 109

1  there is injury statistics for ring saw, or for that
2  fact, for hand-held concrete cut-off saws, demo saws
3  that we've been talking about in this case.  Even if
4  there was, it's -- even if they are available, I
5  don't know if they would provide us with sufficient
6  information to make a valid comparison because there
7  are so many various -- variabilities; the age of the
8  machine, the type of the cut, the -- the skill of
9  the operator, the conditions under which it's cut,
10  what type of blade the ring saw was using versus
11  what type of a blades, blades plural, that's on the
12  hand-held cut-off machines, cut-off saws, demo saws.
13  So, I mean, this -- these statistics may -- may
14  exist.  This information may exist, but I cannot --
15  there are so many variables involved with these
16  things that I can't see such a comparison would
17  be -- lead to valid conclusions.  And -- and, you
18  know, I'm sorry -- go ahead.
19      Q      Are -- are you aware -- do you know, do
20  you have any information that would let you make a
21  judgment whether more injuries occur with ring saws
22  or more injuries occur with gasoline-powered cut-off
23  machines?
24      MR. PACKIN:  I object to the form.
25      You can answer.

(Pages 106 to 109)                                      28

Degnan & Bateman, Inc.
(856) 232-7400

Page 110

```
1       THE WITNESS:  I don't know that such
2   statistics exist.  If they exist, I have the same
3   question about validity, because you have -- once
4   again, how many man hours are using hand-held
5   concrete cut-off saws, demo saws, whatever you want
6   to call them, versus ring saws?  How many hours are
7   using ring saws?  And the occurrence of accidents
8   that are reported or unreported, you know, how do
9   you account for the unreported accidents?  So I
10  don't know if -- it seems to me that if that data
11  exists, the existence of that data would be -- there
12  are so many variables involved that it would not be
13  -- give you a basis to make good comparisons.
14      Q       Do you know whether more severe
15  injuries occur with cut-off machines, hand-held
16  gasoline-powered cut-off machines or with ring saws?
17      A       Well -- well, once again, the -- that
18  existence of that data, it may be there.  It may be
19  out there, but same rationale.  All these variables
20  would not necessarily give you any basis to make a
21  comparison.
22      Q       Have you spoken to anybody in the
23  construction industry about the relative utility for
24  their jobs of a ring saw versus a hand-held
25  gasoline-powered cut-off machine?
```

Page 111

```
1       A       No, I have not.
2       Q       Have you spoken to any -- do you know
3   whether there are standards, safety standards that
4   apply to the design of a ring saw?
5       A       Well, the same standard that applies to
6   these hand-held cut-off -- concrete cut-off saws,
7   demo saws would apply to them.
8       Q       You believe the ring saws are governed
9   by ANSI standard B175.4?
10      A       If my recollection serves me correctly,
11  I think so.
12      Q       Okay.  What is it -- what is it in that
13  standard or what is it in a ring saw that directs
14  you to that conclusion?
15      A       Hand-held gasoline-powered -- unless
16  there was an exception, and I'm trying to remember
17  if I read an exception, and I can't -- I can't
18  recall reading an exception, but it is hand-held,
19  gasoline-powered, cuts concrete.
20      Q       The -- is it considered to be a
21  high-speed machine?
22      A       Well, that's a relative term.  I'm --
23  I'm uncertain about that.
24      Q       And was there any -- on any of the
25  machine -- have you seen one of these in person at
```

Page 112

```
1   the tool show?
2       A       Yes, I have.
3       Q       Okay.  And that's all, just the one
4   unit?
5       A       That's -- yeah.
6       Q       Okay.
7       A       And I've -- I've seen a number of them
8   for sale on the internet.
9       Q       Okay.  But I'm talking about units that
10  you've been in the physical presence of.  And when
11  you were in the physical presence of this machine, I
12  take it, it was not -- I you think you told me this,
13  it was not run; that's correct?
14      A       Yes.
15      Q       Was any part of it disassembled?
16      A       No.  I don't believe so.
17      Q       Do you know whether there are
18  unauthorized cutting attachments that can be mounted
19  on that machine?  In other words, cutting
20  attachments not authorized by the manufacturer that
21  can be mounted -- purchased and mounted on that
22  machine?
23      A       Do I know?
24      Q       Uh-huh.
25      A       No.  I would -- no, I don't know.
```

Page 113

```
1       Q       Do you know whether the machine that
2   you looked at, did it have a UL certification
3   certifying it as complying with any particular
4   safety standard?
5       A       I don't have a recollection of that on
6   the machine's label.
7       Q       Was the guard --
8       A       I may not have -- I may not have read
9   the label.
10      Q       Was more of the cutting attachment
11  exposed or less of it exposed than on a hand-held
12  gasoline cut-off machine?  In other words, was more
13  of the cutting attachment guarded or less of the
14  cutting attachment guarded on the ring saw?
15      A       Less was guarded.
16      Q       Okay.  The -- do you know whether there
17  are OSHA regulations governing the guarding systems
18  on ring saws?
19      A       I think, by interpretation, the one
20  OSHA regulation would be, yeah.
21      Q       Which one?
22      A       29 CFR 1926.302.
23      Q       Is that -- is that the same -- is that
24  the same standard that applies to the guarding
25  systems on hand-held gasoline-powered cut-off
```

29                                          (Pages 110 to 113)

Page 114

1  machines?
2      A    I think so.
3      Q    Okay. So under that standard, if that
4  applied to the ring saws, ring saws and cut-off
5  machines should have the same guard on them, should
6  they not?
7      A    Yes.
8      Q    Do they have the same guard on them?
9      A    No.
10     Q    Okay. The OSHA -- OSHA does have a
11  standard that dictates the guard that goes on a
12  gasoline-powered hand-held cut-off machine, does it
13  not?
14     A    Yes.
15     Q    And that standard is mandatory as to
16  employers using cut-off machines in the workplace;
17  is it not?
18     A    Yes.
19     Q    Do you know -- is it -- is it your
20  belief that if that standard applies to ring saws,
21  that the ring saw manufacturer in this case,
22  Partner, is violating the OSHA standard by producing
23  a different type of guard on the ring saw?
24     A    Well, I haven't given that any
25  consideration.

Page 115

1      Q    Okay. But in any event. It does
2  not -- the guard that you observed on a ring saw
3  would not comply with the OSHA standard mandating
4  the type of guard that must go on a hand-held
5  gasoline-powered cut-off machine; correct?
6          MR. PACKIN:  Asked and answered.
7          THE WITNESS:  Correct.
8  BY MR. WALSH:
9      Q    Let's go back to the shaped arbor.
10     On a -- on a gasoline-powered cut-off machine,
11  when we are talking about -- and let me ask you
12  this. Are any of those three alternatives in your
13  view okay; that is, either a shaped arbor, or an
14  enlarged arbor or a pin? Can you have either one of
15  those or is one better than the others?
16     A    Well, I would say the enlarged arbor
17  would be the primary one, because the design is
18  simpler. The other two are secondary.
19     Q    All right. What in your view would be
20  the size arbor -- how big would the arbor have to be
21  in order for, in your view, for a hand-held
22  gasoline-powered cut-off machine to be reasonably
23  safe?
24     A    Well, under the current design it would
25  have to be smaller than the -- the faces of the

Page 116

1  diameter of the -- smaller than the -- the inner
2  diameter of the faces of the amount of the washer
3  that clamps it.
4      Q    The flanges or thrust washers, as they
5  are sometimes called?
6      A    Yes. Yes.
7      Q    All right.
8      A    In other words, whoever would make that
9  decision would -- would decide which one -- what one
10  would be -- what diameter would be the diameter to
11  use. You would -- I mean, you have a multitude of
12  diameters. You have, you know, all across the --
13  the spectrum. So you take it and you review it, and
14  decide which one would be the best one.
15     Q    Have -- that's my question to you.
16     Have -- have you done that? Have you decided
17  what the -- what you would recommend, what the --
18  in -- in order for the machine to be appropriately
19  safe, what diameter arbor would you say would be
20  necessary on a hand-held gasoline-powered cut-off
21  machine?
22     A    Well, no, I haven't done that because
23  there is such a variety. In other words, if I
24  picked inch and some -- let's just say I picked
25  1.862-inches. Well, you know, somebody else could

Page 117

1  pick another one and it could be just as valid.
2  What you are looking for is a diameter that's not
3  used on anything else. So, as you mentioned, a
4  proprietary. So in other words, what you are really
5  looking for is a proprietary diameter, so that you
6  just don't happen to coincide with a diameter in
7  use, that's currently in use on saw blades.
8      Q    Right. And in the -- is there any,
9  from your -- to your knowledge, is there any
10  relationship between the size of the flanges on a
11  cut-off machine and the size of the arbor hole that
12  has to be maintained? Is there any relationship
13  between the size of the flanges and the size of the
14  arbor hole?
15     A    I'm not sure if I understand what you
16  are saying.
17     Q    You told me you could -- you could take
18  out the arbor to various sizes as long as it was
19  somewhat smaller than the outer diameter of the
20  flanges; correct? Did I understand you correctly?
21     A    Yes.
22          MR. PACKIN:  I think he said the inner
23  diameter of the flanges.
24  BY MR. WALSH:
25     Q    Smaller than the flanges. Somewhat

(Pages 114 to 117)                                          30

Page 118

1  smaller than the flanges.
2      A      Right.
3      Q      Do you -- do you know whether, from a
4  design and safety standpoint, there is any necessary
5  relationship between what size the arbor can be in
6  relation to the size of those flanges?
7      A      Well, there are some -- some
8  limitations.  I mean, you've got to -- but, I mean,
9  those -- that's typical design problems.  That's --
10  that's what a design engineer does.  He just takes
11  and manipulates the -- the particular dimensions to
12  suit -- to attain what he is -- he is trying to get
13  at.
14      Q      Do you know what those -- what those
15  relationships are between the flanges and the arbor
16  size in a -- in a case of a hand-held
17  gasoline-powered cut-off machine?
18      A      You've got to be able to transmit the
19  -- the driving torque, and you also got to be able
20  to have the securing nut secured.
21      Q      Do you -- well, for example, in any of
22  the standards, either in the standards pertaining to
23  abrasive wheels, or the standards applying to
24  gasoline-powered cut-off machines, is there any
25  relationship specified between the size of flanges

Page 119

1  and the size of the arbor?
2      A      Yes, there is.  Yes, there is.
3      Q      What is that?  In which of those
4  standards?
5      A      It's -- it's ANSI B7.1, and it does --
6  it does describe the limitations.
7      Q      Do you know what those limitations are?
8      A      I have looked at it a number of times
9  and I can't think of it off the top of my head.  I
10  -- I know I have the standard here with me.  I -- I
11  don't want to guess because I'll guess wrong.  I
12  have an inclination to say a figure, but I would
13  have to check it before I --
14      Q      Okay.  Is the -- and if we have time,
15  we will -- we'll take a look at that.
16      But what's the purpose?  Do you know what the
17  purpose of that relationship is?  Why -- why is that
18  specified in the standard; do you know?
19      A      It is to maintain the holding power.
20      Q      I'm sorry?
21      A      Maintain the holding power of the
22  thrust washers.
23      Q      All right.  Does it have anything to do
24  with the dissipation of stress on the wheel?
25      A      Oh, yeah, yes.

Page 120

1      Q      And do you know, based on that
2  relationship, is there -- what is the largest size
3  arbor that you possibly could use on a 14-inch
4  machine without seriously undermining the utility of
5  the machine?
6      MR. PACKIN:  I object to the form.
7  You can answer.
8      THE WITNESS:  I -- could you repeat
9  that question, please?
10  BY MR. WALSH:
11      Q      On a 14-inch cut-off --
12  gasoline-powered cut-off machine, what's the largest
13  size arbor that you could use based on those design
14  limitations in the standards and still -- without
15  seriously undermining the utility of the cut-off
16  machine?
17      MR. PACKIN:  I object to the form,
18  again, but you can answer.
19      THE WITNESS:  Okay.  I know I have
20  looked it up, and it doesn't come to my mind at this
21  moment.
22  BY MR. WALSH:
23      Q      All right.  Let me ask you this then.
24      In 2003, I want you -- I want you to think of
25  the year 2003.  How many saw blade manufacturers do

Page 121

1  you know that were manufacturing 12- or 14-inch
2  carbide-tipped saw blades?
3      A      Did I know, personally?
4      Q      Yeah.
5      A      Well, I -- I would have to look it up.
6  I actually do have a reference.
7      Q      What reference do you have with you?
8      A      Yeah, it's a -- it's a -- it -- it has
9  the saw blade industry.  I -- I can't remember the
10  name of it.  It is something I referred to before.
11      Q      Would you get that for us?  Is that
12  here with you?
13      A      I believe so.
14      Q      Would you get that for us?
15      A      All right.  I'm sorry.  I only have
16  2002.
17      Q      All right.  Well, that's fine.  Let's
18  use 2002.  Can I see the document?
19      MR. WALSH:  Can we get this marked
20  as -- what's the next exhibit, do you know?
21      (Growney-62   Saw blade and hand saw
22      manufacturing:  2002 booklet marked for
23      identification.)
24  BY MR. WALSH:
25      Q      What we marked as 62 is -- it's

Degnan & Bateman, Inc.
(856) 232-7400

Page 122

1  entitled: Saw blade and hand saw manufacturing,
2  2002, and apparently it's from the US Census Bureau;
3  is that correct?
4      A    Yes.
5      Q    When did you -- when did you get this
6  particular document?
7      A    Quite some time ago.
8      Q    All right. I mean, was it prior to
9  your last set of depositions, between your last set
10 of depositions and now, and was it --
11     A    More than -- prior to my last set of
12 depositions.
13     Q    Okay. Can you -- can you tell me --
14 can you show me in here, direct me to where the
15 section would be that would -- identifies saw blade
16 manufacturers who in 2002 were manufacturing 14-inch
17 -- 12- or 14-inch carbide-tipped saw blades?
18     A    Well, I'm sorry. This doesn't list
19 them by name. Actually, it has -- it's the product
20 statistics.
21     Q    Does it tell you how many 12-inch or
22 14-inch carbide-tipped saw blades were being
23 manufactured and sold?
24     A    No, it doesn't.
25     Q    What does it tell you -- what does it

Page 123

1  tell you?
2      A    Well, it gives you -- woodworking power
3  saw blades and accessories, power circular saw
4  blades for woodworking, solid tooth. Powered circular saw
5  blades for working insert tooth. Power -- okay.
6  And then it gives you number of companies with
7  shipments of a hundred thousand dollars or more.
8      Q    Of saw blades?
9      A    In these categories, yeah.
10     And then, also, it has all other hand-operated
11 saws.
12     Q    Now, are these -- is this simply
13 domestic production, that is US production, or does
14 this include all of them being sold in the US, or do
15 you know?
16     A    I did look that up, and it is explained
17 in here at some time, some place.
18     Q    That's all right, Mr. Growney. If it
19 is in there, I will take a look at it later. We
20 don't need to waste time looking for that, but you
21 believe that information is in there; correct?
22     A    Yes.
23     Q    All right. Now, let's go back to my
24 original question which is, do you know -- do you
25 know which saw blade manufacturers were

Page 124

1  manufacturing 12-inch or 14-inch carbide-tipped saw
2  blades. I asked you about 2003 specifically, but
3  even if we only go 2002, 2003, that's fine, too. Do
4  you know what manufacturers were making those blades
5  at that point in time?
6      A    Well, I believe Amana AEG were. There
7  are a number of sources that -- for 12- and 1-4 inch
8  wood-cutting circular saw blades that may be -- may
9  not manufacture them. They may have somebody else
10 manufacture for them. So -- but anyhow, Bosch falls
11 into that category. Amana. I said Amana. I'm
12 sorry. Forrest. Vermont. Vermont, Vermont America. There
13 are a couple local -- another local one besides
14 Forrest. There is -- those are the ones that come
15 to my mind at this point.
16     Q    Okay. So -- do you -- do you have --
17 do you know in total how many manufacturers, even if
18 you can't name them, do you know the number of
19 manufacturers that were selling, manufacturing and
20 selling in the United States, 12- and 14-inch
21 carbide-tipped saw blades in 2003?
22     A    Could you repeat the question?
23     Q    Even if you can't name them, do you
24 know how many manufacturers were making and selling
25 12- and 14-inch carbide-tipped saw blades in the

Page 125

1  United States in 2003?
2      A    Not with accurate precision.
3      Q    Do -- do you have a range?
4      A    Well, I know of seven or eight, I
5  guess.
6      Q    Do you know of any major saw blade
7  manufacturer that was not making a 12- or 14-inch
8  carbide-tipped saw blade in 2003?
9      MR. PACKIN: I object to the form.
10 You can answer.
11     THE WITNESS: Yeah. I left out Oldham
12 in your previous question.
13 BY MR. WALSH:
14     Q    Okay.
15     A    I've looked through a number of
16 catalogs for a number of different manufacturers for
17 a number of different distributors, and actually
18 what I was looking for was 14 inch. So when you
19 throw the 12 inch there, you kind of like skewed the
20 results.
21     Q    All right. Well, let's go on 14 inch.
22 Let's just look at 14 inch.
23     A    Okay. And there were a lot of
24 manufacturers that I anticipated finding 14-inch
25 blades did not offer that for sale, or did not list

Page 126

1  them in the catalog.  I -- I don't remember the
2  names.
3        Q      Did you have any 2000 -- catalogs from
4  2003?
5        A      Yes.
6        Q      What catalogs did you have from 2003?
7        A      I believe I have Bosch.  I have -- one
8  second.
9        Q      Would you pull out whatever ones you do
10  have with you from 2003 or earlier?
11              (Discussion off the record.)
12              (Growney-63   Grizzley catalog marked
13        for identification.)
14              (Growney-64   Milwaukee catalog marked
15        for identification.)
16              (Growney-65   Diamond Products catalog
17        marked for identification.)
18              (Growney-66   Makita catalog marked for
19        identification.)
20              (Growney-67   Steel Demon catalog
21        marked for identification.)
22  BY MR. WALSH:
23        Q      We've marked exhibits numbered 63
24  through 67 as various materials you took out of your
25  file.  And in response to my request that you look

Page 127

1  for any catalogs you had which would indicate which
2  manufacturers that were selling 14-inch or 12-inch
3  carbide-tipped saw blades in 2003 or earlier;
4  correct?
5        A      Yes.
6        Q      Okay.  Now --
7        A      Had I known you had that interest, I
8  would have gone through my personal library and
9  pulled out all these catalogs from 2003.  I have
10  more.  You know, but --
11        Q      Right.  Can we agree that in 2003 there
12  were a number of different saw blade manufacturers
13  that were manufacturing and selling either 12- or
14  14-inch carbide-tipped saw blades?
15        A      Yes.
16        Q      Now, what arbor sizes could you buy 12-
17  or 14-inch carbide-tipped saw blades off the shelf,
18  so to speak, what various arbor size were available
19  in 2003?
20        A      Well, probably the most common one was
21  one inch.  You could probably get some other sizes,
22  but once you got away from one inch, the -- the
23  available sources for sizes other than one inch just
24  shrunk right down.
25        Q      Well, let me ask you this.  Were you --

Page 128

1  were you aware that in 2003 there were
2  carbide-tipped saw blades in that -- in those two
3  sizes with four-inch arbor holes?
4        A      Well, probably, because there are
5  certain saws that take very large diameters, such as
6  a gang saw, and used to cut wood.  That's why I had
7  said that you select a proprietary size, because you
8  would survey the market.  Because, yeah, there are
9  gang saws, and they take large diameters, and
10  because the saws need that, so the blades need that.
11  But you pick a size that's -- that's proprietary.
12        Q      Are -- were you -- do you -- were you
13  aware that there were saw blades available in 12-
14  and -- and 14-inch carbide-tipped saw blades
15  available with arbors of 80-millimeters?
16              MR. PACKIN:  I object to form.
17        You can answer.
18              THE WITNESS:  I'm sorry, I can't
19  convert the 80 millimeters into inches in my head
20  anymore.  But most likely those are European gang
21  saws.
22  BY MR. WALSH:
23        Q      70 millimeters?
24        A      Well, once again, it would not surprise
25  me.

Page 129

1        Q      Three inches?
2        A      It would not surprise me, no, because
3  there are plenty of gang saws on the commercial
4  market.
5        Q      Two-and-a-half inches?
6        A      Could be.
7        Q      Two inches?
8        A      That's possible.
9        Q      Inch-and-three-quarters?
10        A      I don't doubt it.
11        Q      Inch-and-a-half?
12        A      Yes.
13        Q      Inch-and-a-quarter?
14        A      Yeah.  But these saws that have
15  these -- these arbors, they are specialized saws.
16  They are commercial saws, or they are industrial
17  saws with these sizes.  They go into, like -- they
18  fall under the ANSI 01.1 committee, which I'm on.
19  And these are -- those blades are not readily
20  available through -- to the consumers.  You can't
21  walk down to the local hardware store or the local
22  Home Depot and get a 14-inch diameter blade with a
23  four-inch ID.  That's just not available.  You ask
24  them for it.  They won't get it.
25        Q      Well, let me ask you this.  Can --

Page 130

1   when's the last time you tried to buy a -- a 14-inch
2   carbide-tipped saw blade with a, let's say, with a
3   four-inch arbor?  When's the last time you tried to
4   buy one?
5       A    I never did.
6       Q    Have you ever tried to buy one with
7   three inches?
8       A    No.  Because I -- I -- because I am
9   familiar with the application.  I know the
10  application, you know.  And I -- I know the market
11  that it's in.  And I -- I know where it goes and
12  what you have to do.
13      Q    What tooth configurations were those
14  blades available in in 2003?
15      A    They are probably available in any
16  tooth you want.  I don't know.
17      Q    How about number of teeth?
18      A    They are -- I'm sure there are a
19  predominant size.  Those kind of saws, the gang saws
20  usually cut, commonly, commonly cut rough wood to be
21  refinished, rehandled, processed.
22      Q    In 2003, were major saw manufacturers
23  custom boring arbors?  Did they have service
24  available to custom bore arbors to any size, or
25  shape, or keyhole or pinhole that a customer wanted?

Page 131

1           MR. PACKIN:  Saw manufactures?
2   BY MR. WALSH:
3       Q    Yes.  Saw blade manufactures.
4       A    It would not surprise me.  Sure.
5       Q    All right.  In -- in 2003, could you
6   buy off the shelf, could you buy reducing bushings
7   that would fit anything from four inches or greater
8   arbor size down to whatever arbor size you wanted to
9   put the blade on?
10          MR. PACKIN:  Object to the form.
11          THE WITNESS:  Off the shelf?
12  BY MR. WALSH:
13      Q    Yes, sir.
14      A    I doubt it.  You know, custom made,
15  that's a different story.  Off the shelf, you
16  know -- you know, no.  You know, if you had an -- an
17  inch -- like I said before, 1.8635 whatever, and you
18  had a blade with a -- a -- a 2 -- 2.425 bore, no,
19  you couldn't buy that thing off the shelf.  No.
20  That -- that -- that's not available.  You know,
21  could you get it made?  You can get anything made.
22  You can get anything made to bypass anything.
23  That's -- that's not the point.  The point is -- is
24  to -- is to preclude those types of products to be
25  readily available to the consumer market who doesn't

Page 132

1   know any better.
2       If you are going to say that because somebody,
3   someplace, somewhere can bypass this, hence, we
4   should never do it, is not a valid position because
5   what you are doing is -- is you're -- you are taking
6   the remotest possibility that it would be
7   circumvented, that you are sacrificing the safety and
8   protection that you are going to afford the average
9   consumer of these machines who don't know that it's
10  unsafe to install these blades, wood -- wood-cutting
11  tooth blades on these machines.  So it's -- it's --
12  your willingness to sacrifice the safety of the
13  majority of the -- of the population who would be
14  tempted to do this because maybe somebody in some
15  far-off place or someplace we don't know about it,
16  can bypass it.  That's not a valid position.
17      Q    Let me ask you this.  Do you know, do
18  you have any idea what reducing bushings were
19  available from all of the major saw manufacturers in
20  2003?  Do you know what they were?
21      A    Do I know all of them?
22      Q    Do you know any of them?
23      A    Reducer bushings are just like washers.
24  Washers are -- you can make any size you want.  They
25  are -- they are -- they are just, you know, that's a

Page 133

1   -- as a matter of fact, I had some association with
2   somebody who at one time made washers.  They are not
3   difficult to make.  The question is how cheap can
4   you make them.  That's the only question.
5       Q    My -- my question to you is, if in 2003
6   I picked up a -- a catalog from a -- any of the
7   major saw blade manufacturers, would I expect to see
8   a variety of reducing bushings in a variety of sizes
9   commercially available?
10      A    I don't know what you would expect to
11  see.
12      Q    Okay.  You don't know whether those --
13  those catalogs had them or didn't have them in 2003?
14          MR. PACKIN:  That wasn't what he said,
15  but you can answer the question.
16          THE WITNESS:  Well, the consumer --
17  what's in the consumer market -- first of all, these
18  types of blades that are installed on these
19  hand-held concrete cut-off machines, the demo saws,
20  they are a very special blade.  They have a very,
21  very limited application.  Now, you are going to
22  tell me you are going to take this limited blade and
23  you are going to go and you are going to either
24  manufacture it with a -- a different diameter, which
25  then that just shrinks right down the size of the

(Pages 130 to 133)

Page 134

1  market, or are you are going to say that I'm going
2  to take a 14-inch carbide-tooth saw blade made for a
3  radial arm saw, and I'm going to go and have it
4  bored out, custom bored?  To do that, you virtually
5  pay the same price for a blade that you could buy
6  the blade, for the price of the blade.  It's not --
7  it's uneconomical.  The market is so small that,
8  yeah, if you want to pay the custom price for the
9  machine set up, in other words, the machine shop
10  price to do it, yeah, you could do that.
11  BY MR. WALSH:
12       Q     Do you know what the price was in 2003
13  for custom boring a -- a carbide-tipped saw blade?
14  Do you know what the major manufacturers were
15  charging in 2003 to custom bore a blade?
16              MR. PACKIN:  I object to form.
17       You can answer.
18              THE WITNESS:  Well, the point being, is
19  that I'm talking about somebody who goes down to the
20  local hardware store and he buys -- not even a local
21  hardware store.  You got all of these things.
22  They're -- they're an uncommon blade.  And you are
23  going to turn around and say I want to use it on the
24  hand-held concrete cut-off saw, so I'll go and I'll
25  get it bored out.  You know, you go to a machine

Page 135

1  shop, you are not going to get it.  You know, you're
2  -- you're -- the price is just out of sight.
3  BY MR. WALSH:
4       Q     My -- my -- my question is, do you --
5  have you looked -- have you looked at a major saw
6  blade manufacturer from 2003 and seen whether --
7  what custom boring service they were offering, and
8  what they were charging for those custom boring
9  services?  Have you looked at any of those?
10       A     No.  But based on my experience, I know
11  that you would be talking about a quantity setup.
12  In other words, you would be -- in other words, from
13  my -- my engineering experience, to do something
14  like that, to get the price down reasonable, you got
15  to do a quantity -- quantity run.  So -- so if you
16  are talking about one saw blade, that's one thing.
17  If you are talking about a hundred saw blades,
18  that's a different thing.
19       Q     Would it surprise you that in 2003 you
20  could overnight any -- in quantities of one saw
21  blade, you could overnight a custom bored blade for
22  $10?
23              MR. PACKIN:  Object to form.
24  BY MR. WALSH:
25       Q     Would that be a surprise to you?

Page 136

1       A     Can I see your reference?
2       Q     Just ask -- just answer my question.
3  Would that be a surprise to you?
4       A     Well, I would like to see the source.
5  I would like to see all the facts about it.
6              MR. PACKIN:  I object to form.
7  BY MR. WALSH:
8       Q     Would it be a surprise to you that you
9  could call up -- you could order and overnight a 12-
10  or 14-inch carbide-tipped saw blade custom bored to
11  any size, shape you wanted for 10, $12?
12              MR. PACKIN:  I object to form, and
13  asked and answered twice.
14  BY MR. WALSH:
15       Q     Let me ask you this since you don't
16  seem to want to answer that question.
17       A     Well, I'm -- I'm -- I'm --
18              MR. PACKIN:  Whoa, whoa, whoa, I object
19  to that colloquy, too.
20  BY MR. WALSH:
21       Q     Are you going to answer?
22       A     Yeah, well, I can't see a 14-inch blade
23  being overnighted across the United States for $10.
24  No.  In other words, the -- is that what you are
25  telling me, you know?

Page 137

1       Q     Let me ask you -- let me ask you this.
2  Do you -- do you understand, do you
3  acknowledge that in -- that in 2003, major saw blade
4  manufacturers were custom boring 14- and 12-inch
5  carbide tip blades in any size or shape a customer
6  wanted, or custom boring, reducing borings in any
7  size that a -- that a -- that a customer wanted?
8  Do you -- do you know -- do you understand that?  Do
9  you know that?
10              MR. PACKIN:  I object to the form.
11              THE WITNESS:  What are you asking me?
12  BY MR. WALSH:
13       Q     I'm just asking you if you acknowledge
14  the fact that in 2003 that all the blade -- the
15  majority of the blade manufacturers providing 14-
16  and 12-inch blades would custom bore them and
17  produce custom either off the shelf or custom
18  reducing bushings to any size a customer wanted?
19  Were you aware of that?
20              MR. PACKIN:  I object to the form.  He
21  can answer.
22  BY MR. WALSH:
23       Q     Are you aware of that?
24       A     In principle, yes.
25       Q     Is there anything -- anything about

35                                    (Pages 134 to 137)

Degnan & Bateman, Inc.
(856) 232-7400

Page 138

1  boring out an arbor hole that is other than a tool
2  shop or machine shop exercise?
3          MR. PACKIN:  I object to the form.
4          THE WITNESS:  Well, yeah.  You've got
5  to make sure you get it centered.
6  BY MR. WALSH:
7      Q    I understand that.
8      A    Well, you know, you understand it.
9  Maybe other people don't understand it.  Maybe you
10 don't understand the -- the -- the risk that's
11 involved.  In other words, if you don't get it
12 centered, well then you are running it off center,
13 and then that becomes some of the hazards that
14 Mr. Kott was referring to.
15     Q    Very dangerous; correct?
16     A    Yeah, that's correct.  That's right.
17 It's like -- it's like running a blade without a
18 spacer, a reducing bushing.
19     Q    Okay.  And if I'm a -- if I'm a -- if
20 I'm a construction company with a machine shop, and
21 I have an inventory of composite wheels, and I have
22 an inventory of carbide-tipped saw blades, and I
23 want to fit them, I can -- I can go send them, my
24 machine shop, and in a few minutes they can bore
25 them out.  They may not get it right, but they can

Page 139

1  bore it out; correct?
2          MR. PACKIN:  Object to form.
3          THE WITNESS:  No.  Your -- your -- your
4  assumption is not correct.  First of all, you need a
5  machine to accommodate 14-inch diameter, that you
6  can turn it.  No.  And I doubt that you are going to
7  find a construction company with a machine shop that
8  can do that.  That's -- that's -- that's an example
9  of what I was talking about before.  Taking this --
10 carrying it to this logical extreme that somebody,
11 someplace is going to possibly do this.  And so
12 since somebody may be able to do it, we will not go
13 and give the general population the benefit -- the
14 safety benefit of the proprietary diameter arbor so
15 they cannot install commercially-available
16 wood-cutting, carbide-tipped wood -- wood-cutting
17 saw blades on it.  That's -- that's -- that's -- you
18 know, that's not a reason.  That's an excuse.
19 BY MR. WALSH:
20     Q    Do you know any -- do you know any saw
21 that's out there, hand held or otherwise, do you
22 know of any saw that a saw blade or a cutting
23 attachment that shouldn't be on there, can't be
24 potentially put on the saw?
25     A    You can do anything -- oh, I'm sorry.

Page 140

1          MR. PACKIN:  I object to the form.
2          You can answer.
3  BY MR. WALSH:
4      Q    Do you know of any saw of any kind that
5  where -- where that -- where you can attach an
6  unauthorized cutting attachment to it?
7          MR. PACKIN:  Object to the form.
8          THE WITNESS:  Well, once again, if
9  the -- if the -- the bore of the blade is smaller
10 than the arbor diameter, you can't attach it unless
11 you do something else.  So that's the whole
12 principle behind the larger arbor.  You know, you --
13 you know, you -- there is a plethora of a one-inch
14 diameter hole, arbor hole, 14-inch diameter saw
15 blades.
16 BY MR. WALSH:
17     Q    Let me ask you this.  Give me one
18 machine, woodworking machine -- let me -- let me ask
19 you this.
20     Is there any woodworking machine subject to
21 ANSI 01.1 that's subject to that standard that has a
22 specialized arbor on it to prevent blades that
23 shouldn't be mounted on it from being mounted?
24     A    Well, I can't think of any requirement
25 as such on that.  Do I know if there is any

Page 141

1  machines?
2      Q    Yes.
3      A    You know, the fact that I don't know
4  them doesn't mean they don't exist.  I don't know.
5      Q    Okay.
6      A    And there is no ANSI requirement as you
7  called for.
8      Q    Right.  There -- and -- but I'm asking
9  you more broadly than that.  Do you know of any
10 machine, do you know of any machine that's out
11 there, saw, that has a specially designed arbor that
12 will not allow an unauthorized cutting attachment to
13 be attached to it?
14     A    Well, as we mentioned earlier, there is
15 a number of shaped arbors, and there is a number of
16 pin-drive arbors, designs have been around for a
17 long, long time.  I probably have the catalog here
18 that shows them.  So those, if you have a pin drive,
19 and you go to put a blade on it, and the blade
20 doesn't have a hole for the pin, or the hole
21 diameter is the wrong size, too small, or the
22 location, it may be the right size but the location
23 from the center is wrong, you can't put it on
24 without doing something, you know.  In other words,
25 if you want to cut the pin off, you know, use the

(Pages 138 to 141)

                                                    36

Page 142

1    blade, if you want to do something to the blade.
2        Q      You can drill a hole in the blade;
3    correct?
4        A      You know, that's a potential.
5        Q      And let me ask you this.  My question
6    was a little more focused than that.  Do you -- do
7    you know -- is there any saw you know of that, using
8    an unauthorized attachment on it, does not make it
9    more dangerous?
10           MR. PACKIN:  I object to the form.
11           THE WITNESS:  Well, the unauthorized
12   covers a -- big range, and I don't know if I can
13   answer that question yes or no.
14   BY MR. WALSH:
15       Q      All right.  Let me ask you this.  If --
16   if -- on your -- last time we were here we talked
17   about your Saw Stop saw and warnings that were in
18   there about everything from using undersized blades,
19   to mounting blades backwards, to using dado heads or
20   dado heads, and molding heads, and the dangers of
21   that -- of nonconductive blades, all those sorts of
22   things that it warned in the manual against.  Would
23   you agree with me, that each one of those, if
24   mounted on the machine, makes the machine more
25   dangerous?

Page 143

1        A      Yes.  But experience has shown that
2    each one of those is on that far end of the
3    spectrum.  It is the kind of -- and this has been
4    proven out by the Consumer Product Safety
5    Commission, the common usage of these saws, these
6    are -- while they are problems, and they should not
7    be overlooked, and they are safety problems, they
8    are not everyday, day in and day out, occurrences.
9        Q      What percentage of people --
10       A      And what I might say is that they fall
11   more in the category of latency.  In other words,
12   not obvious.
13       Q      Well, all of those on -- on a table saw
14   are dangers.  Is there any table saw that has a
15   device on them that would prevent you from putting
16   an unsized blade on, mounting a blade backwards,
17   putting a -- a -- a dado head or other thing that's
18   a type of molding head that is not supposed to be on
19   there, is there anything on any table saw that you
20   know of including the Saw Stop that prevents you
21   from doing that other than the warnings?
22       A      Not that I know of.
23       Q      All right.  Do you know -- do you have
24   any data, any figures on what percentage of users of
25   hand-held gasoline-powered cut-off machines put

Page 144

1    unauthorized carbide-tipped saw blades on them?
2        A      What is -- what is your question?
3        Q      Yeah.  Do you have any data, do you
4    know what percentage of the users of hand-held
5    gasoline-powered cut-off machines actually mount and
6    use an unauthorized carbide-tipped saw blade on it?
7        A      If that data -- the existence of that
8    data -- I -- I don't know how you would get that
9    data because I don't know how you monitor each
10   individual person who operates one of these saws on
11   each circumstance, each instance, to whether they
12   put an unauthorized blade or not.  I don't know how
13   you collect that data.  Having that data doesn't
14   necessarily give you a basis for a -- a good
15   conclusion.
16       Q      Okay.  I'm just trying to -- I'm just
17   trying to compare.  You say that some of these other
18   uses on other bench saws are -- are -- don't
19   happen -- don't happen as often as the normal use of
20   the saw.  I'm just trying to figure out if we have
21   any basic comparison here.  Is it 99.999 percent of
22   the time that people using cut-off machines do
23   things properly, and appropriately, and use the --
24   the right cutting attachments?  Or what is the
25   percentage of people who misuse the machine and

Page 145

1    don't use the hundred percentage, and -- and -- and
2    what's your knowledge about that, what's the data
3    you have on that?
4            MR. PACKIN:  Object to form.  It was
5    just asked and it was just answered.  Asking it
6    again implies -- implies that he didn't answer it
7    when he, in fact, did.
8            THE WITNESS:  The -- the existence of
9    that data can be misleading because what you are
10   talking about is frequency.  In other words, how
11   often do they do it?  That's what you were asking
12   me.  99 percent of the time, do they do it right?  Or
13   such a percentage of the time do they do it wrong?
14   That refers to frequency.
15           The problem is, is that the severity, the
16   consequences of doing this is so great, even death,
17   that that trumps -- in this case, in this instance,
18   it trumps frequency.  And along with it is latency.
19   It is counterintuitive.  It looks like you can do
20   it.  What the heck?  I can cut concrete with one of
21   these saws.  Why can't I cut something soft like
22   wood or plastic with one of these saws?  Just stick
23   a saw -- look at how good it cuts through.  These
24   people have been doing it for years.  They've been
25   doing it forever.  That's frequency.  Does that mean

37                                    (Pages 142 to 145)

Page 146

1  that -- that -- that it should go on?  No, because
2  look at the -- look at the injury this guy had.
3  BY MR. WALSH:
4      Q       Is there potentially severe or fatal
5  injuries from using, for example, on your Saw Stop,
6  a -- a -- a molding head, or a unconducive blade, or
7  mounting a blade backwards?  Can people die from
8  those kind of errors on bench saws and table saws?
9           MR. PACKIN:  Object to the form.
10          THE WITNESS:  Well, that's like asking
11  is it possible.  Anything's possible.  Is it likely?
12  That's another story.
13  BY MR. WALSH:
14      Q       How many people die every year in hand
15  saw, wood-cutting saw accidents?  How many people
16  die every year in the United States?
17          MR. PACKIN:  Hand saw, did you say?
18  BY MR. WALSH:
19      Q       Power saw -- hand -- power tool hand
20  saw accidents.  Do you know how many deaths occur
21  every year from just inadvertent contact with a saw
22  blade?
23          MR. PACKIN:  That's a different
24  question than the first one.  Object to the form.
25  Go ahead.

Page 147

1           THE WITNESS:  Which one am I answering?
2  BY MR. WALSH:
3      Q       You can take them in order if you like.
4  Just tell me which one --
5           MR. PACKIN:  You can't do it that way.
6  Just give him a question and he can --
7  BY MR. WALSH:
8      Q       Do you have -- do you know how many
9  people die every year from wood-cutting saw
10  accidents in the United States?
11          MR. PACKIN:  I object to the form.
12      You can answer.
13          THE WITNESS:  I have obtained from the
14  Consumer Product Safety Commission, their four
15  reports on the number of wood-cutting machines, and
16  one of them is deaths.  Do I know how many?  Did I
17  total them up?  No.  But I'll tell you one thing,
18  you got about 10,000 fingers or so are cut off every
19  year, you know.  But people can die from
20  wood-cutting machines.
21  BY MR. WALSH:
22      Q       Would you pull the reports out that you
23  are referring to?  Do you have them with you?
24      A       I do not.
25      Q       Okay.  What -- what are they called?

Page 148

1      A       Well there is the NEISS, National
2  Electronic Injury Survey System.  That's the one
3  that's most inclusive.  I have it going back from
4  when they began taking it, which I think is 1970.
5  They update every year.  They have -- another one is
6  called Reported Incidents -- Incidences in which a
7  person calls in and reports it.  Another one is
8  Investigated Instances in which they decide that
9  they have to go out and do an investigation.  So
10  they go and they do the investigation, and write a
11  report, and then these reports are compiled.  Then
12  there -- there is the last one, which is deaths.
13  You can just call up the Consumer Product Safety
14  Commission today, and tell them you want all four,
15  to what machine you want, go back to when it was
16  originally taken, and in a week or two you will have
17  it.
18      Q       Can we agree that more people die every
19  year from the use of authorized wood-cutting blades
20  on wood-cutting saws than die from the unauthorized
21  use of wood-cutting blades?
22          MR. PACKIN:  I object to the form.
23      You can answer.
24          THE WITNESS:  Well, not necessarily,
25  because try as I may, I'm unable to determine how

Page 149

1  many people die from the use of Stihl hand-held
2  cut-off -- concrete cut-off machines, saws, demo
3  saws.
4  BY MR. WALSH:
5      Q       How many do you know about?
6      A       Excuse me?
7      Q       How many do you know?
8      A       I probably know about five or six.
9      Q       What are they?
10      A       Dale Erb, I mentioned.
11      Q       Anybody else?
12      A       There's somebody whose name begins with
13  an M.
14      Q       I'm sorry?
15      A       Somebody whose name begins with an M.
16  Martin or something like that from the Philadelphia
17  area.  The rest of them I don't know off the top of
18  my head.  I have produced the -- printouts from the
19  federal courts.  And I -- I can only get a very
20  small amount of the number of people who are --
21  number of cases or number of instances in which the
22  people have died.
23      The other thing is I cannot accept the
24  rationale that since there are so few people who die
25  because of putting tooth -- wood-cutting saw blades

(Pages 146 to 149)

Degnan & Bateman, Inc.
(856) 232-7400

## Page 150

1  on these hand-held concrete cut-off saws, so
2  many people -- so few people die that it is not
3  necessary to do something, when such a simple thing
4  as changing the arbor diameter would most likely
5  eliminate all of them --
6       Q       Tell me --
7       A       -- or -- or the vast majority of them.
8       Q       Tell me why it is that every saw
9  manufacturer under your -- your approach to this
10 should not have a proprietary arbor to accept only
11 cutting attachments that that saw manufacturer
12 authorizes for that saw.  Why shouldn't every saw,
13 regardless of design, why shouldn't every saw have a
14 proprietary arbor?
15      MR. PACKIN:  I object to form.
16      You can answer.
17      THE WITNESS:  Well, you know, actually,
18 Stihl, you know, your client, has said that.  In
19 other words, your client has said you are only to
20 operate, only to install or use authorized cutting
21 attachments on this saw.  So if you had a
22 proprietary arbor, that would eliminate it right
23 there.  In other words, then -- then you would have
24 these Stihl blades you could sell, would have this
25 proprietary diameter go on your proprietary arbor.

## Page 151

1  BY MR. WALSH:
2       Q       Not my question.  My question is, why
3  under your approach to this, why shouldn't every saw
4  since every -- as far as we've identified every saw
5  out there you can mount unauthorized cutting
6  attachments which are dangerous, why shouldn't every
7  saw have a proprietary arbor that only allows the
8  mounting of the -- of the blades that are supposed
9  to be on there in the manner they are supposed to be
10 on there?
11      MR. PACKIN:  I object to form.
12      You can answer.
13      THE WITNESS:  Well, that's a good idea,
14 actually.  And I would think that, of course, every
15 manufacturer is free to choose to solve this problem
16 whatever way he sees fit.  There may be that the
17 manufacturers might get together like they get
18 together to write the standard and say, listen,
19 we've got this problem.  These people keep putting
20 these two wood-cutting saw blades on our hand-held
21 concrete cut-off saws.  So why don't we, as an
22 industry, adopt some kind of a proprietary arbor
23 configuration, and then that would eliminate this
24 tendency to install these readily
25 commercially-available blades.

## Page 152

1  BY MR. WALSH:
2       Q       I'm not talking about the cut-off
3  machine industry.  I'm talking about every
4  wood-cutting saw that's out there.  Under your
5  approach, why shouldn't every wood-cutting saw, for
6  example, your Saw Stop as an example, why shouldn't
7  it have a proprietary arbor to prevent the mounting
8  of blades that shouldn't be on there or the mounting
9  of a blade in a manner, backwards, for example, that
10 shouldn't be on there?
11      MR. PACKIN:  I object to the form, and
12 just asked and answered.
13      THE WITNESS:  Well, some manufacturers
14 have chosen to do that.  There have been saws for
15 particular sizes that have arbors that don't match
16 what we commonly refer to as a standard arbor, a
17 standard size.  In other words, throughout the
18 industry, the wood-cutting industry, some diameter
19 arbors have been settled on because they are common.
20 BY MR. WALSH:
21      Q       Can you name one manufacturer that's
22 done that?
23      A       Done which?
24      Q       What you've just described, a
25 proprietary arbor.

## Page 153

1       A       Well, yeah, there is a couple of them.
2  One is a -- and I've got it in here.  They make a --
3  a saw, and it is currently available, for
4  undercutting baseboards, for tile people to do work,
5  to slip the stuff underneath.  There is another saw
6  that is a -- what used to be a -- for cutting
7  typeset.  Now it has been adapted to another reason
8  -- another application.  Sorry.  There has been,
9  over the years, a variety of proprietary-shaped
10 arbors from diamond shape, to -- to square shape, to
11 multiple pins have been used over the years, and --
12 and I have catalogs that show it.
13      Q       Let's look at the last ten years.  Are
14 you able to identify for me any saw manufacturer
15 that is using what you consider to be a proprietary
16 arbor?
17      A       Yeah, that one -- excuse me.  That
18 manufacturer, and I have it here in my -- in my
19 file.
20      Q       Anybody else?
21      A       Wait a second.  Wait a second.  Now --
22 you know, it escapes me at this moment, whatever it
23 is.
24      Q       Do you have any data that suggests --
25 and what size blade is on this one manufacturer that

Degnan & Bateman, Inc.
(856) 232-7400

Page 154

1   you can identify in the last ten years?
2              MR. PACKIN:  I object to the form.
3              THE WITNESS:  It might be, like, a
4   six-inch blade.
5   BY MR. WALSH:
6       Q    Six inch.  And do you have any data
7   that indicates that the proprietary arbor had any
8   effect on the number of accidents happening with
9   that unit?
10             MR. PACKIN:  I object to the form.
11             THE WITNESS:  I don't remember what I
12  have with it.  I -- I -- I have looked at it and I
13  have it, but I can't tell you what it is right at
14  this moment.
15             MR. PACKIN:  Whatever is a good time.
16  We haven't taken an official break where everybody
17  got to stand up.
18  BY MR. WALSH:
19      Q    Just a couple more questions.
20           Do you have a -- do you know of any cut-off
21  machine in the world that has ever used a shaped
22  arbor, an arbor size other than one inch or
23  20-millimeters, or a pin arrangement?  Any cut-off
24  machine that's ever been made and sold anywhere in
25  the world that's done that?

Page 155

1              MR. PACKIN:  I object to the form.
2   Asked and answered the first two times that
3   Mr. Growney was deposed in this case.
4          But you can do it again.
5              THE WITNESS:  Well, the ring saw.
6   BY MR. WALSH:
7       Q    I'm not talking about a ring saw.  I'm
8   talking about hand-held high-speed gasoline-powered
9   cut-off machines.  Do you know of any that have --
10  and, by the way, what are you calling the arbor on a
11  ring saw?
12      A    Well, what I'm saying by that is that
13  that's an example of extending the blade diameter to
14  its logical -- to the inside diameter, the hole
15  diameter, the bore diameter to its logical
16  conclusion whereby it becomes impossible to mount a
17  -- one of these tooth -- carbide-tooth wood-cutting
18  blades.
19      Q    Is there an arbor on a ring saw?
20      A    No.
21      Q    Okay.  The -- so let's go back.  Do you
22  know of any hand-held gasoline-powered cut-off
23  machine in the world that has ever used an arbor
24  that's shaped, or some kind of pin arrangement, or
25  some kind of enlarged arbor?

Page 156

1       A    I do not.
2       Q    Okay.  Let's break there then.
3              MR. KOTT:  During the break, if the
4   court reporter has time, I'm going to identify the
5   documents in Growney-60.  Just read them to her.
6              (Brief recess.)
7              MR. KOTT:  There is a document by
8   Frantz and others entitled:  Revision of ANSI
9   Standards for Warning Signs, Labels and Symbols,
10  published in the September 2002 edition of the STG
11  Newsletter.
12           There is an -- that article -- there is
13  an article entitled Comparison of ANSI and ISO
14  Standard Formats on People's Response to Product
15  Warnings by Shaver, S-H-A-V-E-R, and others,
16  published at page 2197 of the Human Factors Society
17  50th Annual Meeting in 2006.
18           There is an article by Young and
19  others, entitled Safety Signs & Labels, Does
20  Compliance with ANSI Z535 Increase Compliance with
21  Warnings, published at page 18 of Professional
22  Safety, the September 2002 edition.
23           There is an article by Young and others
24  entitled Safety Signs & Labels, Does Compliance with
25  ANSI Z535 Increase Compliance with warnings.  It

Page 157

1   seems to be a repeat of the same article.
2           There is an article by Miller and
3   others entitled A Model for Designing and Evaluating
4   Product Information, published in The Human Factors
5   Society 35th Annual Meeting, 1991, beginning at
6   1063.
7           There is ASTM F1749-02 Standard
8   Specification for Fitness Equipment and Fitness
9   Facility Safety Signage and Labels.
10          There is an article entitled -- there
11  is an article by Frantz and others entitled ANSI
12  Z535, Signal Words and the Ability to Infer Hazard
13  and Consequence Information -- 1992 versus 2004.
14  Published in the 2005, 49th annual meeting of the
15  Human Factors Society, beginning at page 1790.
16          There is an article entitled -- by
17  Frantz and others entitled Predicted versus Actual
18  Response to Warning Signs and Labels:  Examining the
19  Role of ANSI Z535 Features from the Human Factors
20  Society 49th annual meeting in 2009, beginning at
21  page 1785.
22          There is an article by Frantz and
23  Rhoades entitled a Task and Analytic Approach to the
24  Temporal and Spatial Placement of Product Warnings
25  published in 1993 in Human Factors, 1993, 35(4),

(Pages 154 to 157)

Page 158

1  719-730.
2       There is another article by Young and
3  others entitled Evaluation of Prototype Labeling for
4  Personal Flotation Devices:  Methods and
5  Observations, published in the Human Factors Society
6  48th Annual Meeting, 2004, beginning at page 2018.
7       There is another article by Frantz and
8  others entitled Assessing the Effects of Adding
9  Messages to Warning Labels, published in Human
10 Factors Perspectives on Warnings, volume-2.
11      There is another article entitled
12 Consideration for Developing a Consensus Standard
13 for Safety Information in Product-Accompanying
14 Literature by Young and others, published in the
15 Proceedings of the Human Factors Society, 46th
16 annual meeting in 2002, beginning at page 900.
17      There is another article by Young and
18 others entitled Behavioral Adaptation:  Unintended
19 Consequences of Safety Interventions, published in
20 the Human Factors Society, 46th Annual Meeting,
21 2002, beginning at page 895.
22      There is another article by Rhoades and
23 Wisniewski, W-I-S-N-I-E-W-S-K-I, entitled Judgments
24 of Risk Associated with Riding with a Reclined Seat
25 in an Automobile, in the Proceedings of the Human

Page 159

1  Factors Society, 48th Annual Meeting, 2004,
2  beginning at page 1136.
3       There is an article by Hall and others,
4  H-A-L-L, entitled Clarifying the Hierarchical
5  Approach to Hazard Control which seems to have been
6  presented at the Third International Conference on
7  Applied Human Factors in Ergonomics in Miami that
8  took place July 17-20, 2010.
9       And there is an article by Miller and
10 others entitled a Model for Designing and Evaluating
11 Product Information, published in the Proceedings of
12 the Human Factors Society, 35th Annual Meeting,
13 1991, beginning at page 1063.
14      (Brief recess.)
15      VIDEO SPECIALIST:  Okay.  We're back
16 on.
17 BY MR. WALSH:
18      Q     Mr. Growney, have you published any of
19 your ideas on arbor design to cut-off machines for
20 peer review in -- anywhere?
21      A     No, I haven't.
22      Q     Have you, in -- in formulating your
23 opinions on arbor design, have you found anybody in
24 any of the literature who has written about the need
25 for either shaped arbor, or enlarged arbor, some

Page 160

1  proprietary arbor, pin and dowel arrangement on a
2  cut-off machine as a safety feature?
3       A     The fact that nobody has written about
4  it doesn't mean that it's not needed.  No.  I have
5  not found anybody.  As a matter of fact, the -- the
6  perpetuation of this type of accident clearly is an
7  indication that it is needed.
8       Q     Have you found any standards applicable
9  to cut-off machines anywhere in the world that
10 require a -- any of the arbor concepts you've
11 recommended for the machine?
12      A     I have not found any.
13      Q     Have you found any -- anything anywhere
14 in the world in professional literature or elsewhere
15 where somebody has tested one of those concepts on a
16 cut-off machine, either an enlarged arbor, or a
17 shaped arbor, or a pin and dowel arrangement?
18      MR. PACKIN:  For cut-off machines?
19 BY MR. WALSH:
20      Q     Yes.
21      A     The fact that I haven't found it
22 doesn't mean that nobody has done it.  As a matter
23 of fact, I -- I would be surprised that some of the
24 manufacturers might have done it and have not chosen
25 not to publish it.  Keep it proprietary.

Page 161

1       Q     Okay.  My question was, in -- in any of
2  the professional literature, anything you've done in
3  connection with this case, have you come across any
4  reference to anybody in the world testing any of
5  those concepts on a cut-off machine or even voicing
6  the need for that kind of concept in a cut-off
7  machine?
8       A     I have not found anybody voicing a
9  need.  That doesn't mean they don't exist.
10      Q     Have you gone to any of the
11 manufacturers and shared the concepts with them, and
12 asked them if they've tested it?
13      MR. PACKIN:  I object to the form.
14 You can answer it.
15      THE WITNESS:  Well, I guess you could
16 say the prior case was that, in effect.  In other
17 words, there was one.  I did make this suggestion in
18 Stout, and I think Stihl -- Stihl was asked whether
19 they tried it and their answer was no.  My answer
20 was to that, I guess, is a -- is a yes.
21 BY MR. WALSH:
22      Q     And their answer was no because it was
23 a dumb idea?
24      MR. PACKIN:  I object to the form.
25 Let's not be --

41                                    (Pages 158 to 161)

Page 162

1  BY MR. WALSH:
2      Q     If we are going to say -- if we are
3  going to try to paraphrase what Stihl's answers
4  were, I think we need to paraphrase them correctly.
5      A     Wait a second.  I didn't say it was a
6  dumb idea.
7      Q     No.  I didn't suggest that you did.
8      A     Well, what was that wise-ass question
9  about then?  A dumbed idea?
10     Q     No.  I said Stihl's answer.
11     A     Stihl answer -- mine was a dumb idea?
12         MR. PACKIN:  Hold on, hold on, hold on.
13  Just for the record, the word dumb was never used by
14  anybody from Stihl in any report, deposition
15  testimony or anything else.  That's purely your
16  creation.
17         MR. WALSH:  Unsafe idea.  Is that
18  closer to what we need?
19         MR. PACKIN:  It is a more professional
20  way of addressing it, yes.
21  BY MR. WALSH:
22     Q     Let's do -- have you gone to any of the
23  standards organizations that have responsibility for
24  cut-off machine safety and made a presentation or
25  asked them what they thought of the idea, or whether

Page 163

1  they had tested any of these arbor suggestions?
2      A     No, I have not.
3      Q     Have -- outside of these cases, can you
4  cite me to anything, anywhere, another engineer, a
5  standards organization, another living soul besides
6  yourself who has suggested that it would make a
7  cut-off machine safer to adopt one of these
8  proprietary arbor suggestions?
9          MR. PACKIN:  I object to the form.
10         THE WITNESS:  No, I have not.
11  BY MR. WALSH:
12     Q     Okay.  Have you done a single test on
13  any of the concepts of any kind, shaped arbor, pin
14  and dowel, enlarged arbor, have you done any type of
15  testing to confirm that it would, in fact, make a
16  cut-off machine safer rather than less safe to it by
17  adopting one of these arbor suggestions?
18         MR. PACKIN:  I object to the form.  And
19  it's been asked and answered.
20         But you can do it again.
21         THE WITNESS:  Yeah, that's right.  You
22  know, it seems to me I did answer this before, but I
23  will answer it again if it will help you out.
24     I don't need the test.  You know.  This -- it
25  is quite obvious that if you have a larger arbor,

Page 164

1  and you pick up this saw blade and it has a smaller
2  hole, and you are out in the field trying to cut
3  some pipe or something like that, and it's some day
4  in which the -- or some night in which the -- the --
5  the supply houses aren't open, and you can't put
6  that saw blade on that large arbor, you are not
7  going to do it.  You are not going to make that
8  dangerous cut right then and there that could be
9  your life.
10  BY MR. WALSH:
11     Q     Did -- do you consider your Saw Stop
12  defective because it does not have any device on it
13  designed to prevent the mounting of unauthorized and
14  potentially dangerous cutting attachments?
15         MR. PACKIN:  That's been asked and
16  answered today, either the first time or the second
17  time we were here for his deposition.  I mean, you
18  don't have to use the time just because it is left.
19     You want to answer it again, go ahead.
20         THE WITNESS:  I consider the Saw Stop
21  mechanism an advancement, a safety advancement which
22  hasn't -- has not existed in the market, was not
23  available before, just a step forward in a new
24  direction.  It handles a number of -- it mitigates
25  certain types of injuries.  It is not the be all,

Page 165

1  end all that eliminates everything.  It still has
2  some -- some areas where it has hazards just like
3  other saws, but that's as far as I'm going to say.
4  BY MR. WALSH:
5      Q     Okay.  But my question is, the fact it
6  does not have a proprietary arbor, and the fact that
7  blades -- cutting attachments can be put on there
8  that are dangerous and should not be put on there,
9  does that fact make it defective?
10         MR. PACKIN:  Same objection, and asked
11  and answered now an additional time.
12         THE WITNESS:  Well, you would have to
13  evaluate it in -- in the -- no, it doesn't make it
14  -- make it defective.  Here you have -- here you
15  have a safety mechanism that provides an element of
16  protection that has never existed before.  And the
17  fact that it doesn't cover a hundred percent of all
18  the possibilities does not make it defective.  It is
19  an advancement.  It is something over and above.  It
20  is -- it's now -- it is now, after ten years, the
21  state of the art.  And -- and is it defective
22  because there may be something that -- that somebody
23  might do, you know, to -- that -- that might negate
24  it?  Well, you know, we will have to evaluate when
25  it comes.  But the advancement is -- is positive.

(Pages 162 to 165)                                        42

Page 166

```
1   BY MR. WALSH:
2        Q      Is there any reason the Saw Stop, in
3   your view, could not adopt a proprietary arbor that
4   would prevent people from, for example, mounting a
5   nonconducive saw blades, nonconducive saw blades, or
6   other blades that should not be on there because
7   they create a danger to the user?  Any reason they
8   couldn't do that?
9        MR. PACKIN:  I object to the form.
10       THE WITNESS:  Well, is there any reason
11  that they could not do it?
12  BY MR. WALSH:
13       Q      Yes.
14       A      Physically impossible?
15       Q      Uh-huh.
16       A      No, it is not physically impossible.
17  They may not have other reasons why they want to
18  build this machine with an arbor that has become
19  accepted as a -- a standard in the industry, and
20  their protection that they have provided is meant
21  for these standard blades.
22       Q      But all of the -- but all of the
23  dangers we talked about that they warn against are
24  all things that totally overcome that guarding
25  system; the nonconductive blades, the molding heads,
```

Page 167

```
1   the dado heads, the undersized, mounting backwards
2   are all things that they specifically say does away
3   with the protection of the new device entirely and
4   so don't do it.  Is there any reason why they
5   couldn't simply put some kind of proprietary arbor
6   on there in order to prevent people from putting
7   those kind of cutting attachments on?
8        MR. PACKIN:  I object again.  Asked and
9   answered.
10       But go ahead.
11       THE WITNESS:  Well, I think actually
12  they can take a dado head.  They have to do certain
13  things if I remember it correctly.  It is the
14  molding head that they can't take.  Dado head is
15  limited.  But I forgot the thrust of your question.
16  What is it?
17  BY MR. WALSH:
18       Q      Yeah.  All of the -- all of the things
19  we talked about as being potentially dangerous
20  attachments going on that saw are all things that
21  made -- that did away, overrode the safety device.
22  And so my question is simply was, is there anything
23  that, any reason why they couldn't simply put a
24  proprietary arbor on there and do away with that
25  risk?
```

Page 168

```
1        MR. PACKIN:  Same objection as before.
2        THE WITNESS:  Well, I don't think that
3   was the thrust of the invention, to -- in other
4   words, the fact that they could or couldn't, I don't
5   think they were going in that direction.  I think
6   what they were doing was -- was to take the
7   existing, and what's -- what's used and protect
8   against -- was mitigate the degree of injury.
9   That's what it does.  It doesn't prevent an injury.
10  It mitigates the degree of injury.
11  BY MR. WALSH:
12       Q      All right.  I don't think your -- I
13  don't think that responds to my question.  Is there
14  any reason why they couldn't have put a proprietary
15  arbor on the machine and prevented people from
16  overriding the mitigation of injury provided by
17  their new device?
18       MR. PACKIN:  Same objection.  This is
19  the last time I'll allow it.
20       Go ahead.
21       THE WITNESS:  You know, this is like,
22  is there any reason why you couldn't do it?  No.
23  There is no reason why they couldn't do it.  They
24  made a business decision to go this way.
25  BY MR. WALSH:
```

Page 169

```
1        Q      And in -- and in -- and that is true, I
2   take it, of every saw on the marketplace today that
3   uses a standard arbor, and that can be mounted, and
4   people can mount on those saws, cutting attachments
5   that are dangerous to be used on a particular saw;
6   correct?
7        MR. PACKIN:  What is true?
8   BY MR. WALSH:
9        Q      That they made a judgment to put the
10  arbor on there and that's -- that is the vast
11  majority of saws in the marketplace, is it not?
12       MR. PACKIN:  I object to the form.
13       You can answer it.
14       THE WITNESS:  Well, you -- you have a
15  situation where the danger -- let's just take a
16  nonconducive blade.  The danger of -- of installing
17  a nondeductive -- I'm sorry -- conducive --
18  conductive -- a nonconductive blade is no greater on
19  a Saw Stop than it is on any saw.  It is just that
20  it negates the injury mitigation feature.
21       MR. PACKIN:  Keep going.
22       THE WITNESS:  The same thing with
23  the -- with the molding head.  The same thing with
24  putting the blade in backwards.  Actually, the blade
25  in backwards is a little different.  It still works,
```

43                                          (Pages 166 to 169)

Page 170

```
1   but it may not work as effectively.  What you have
2   is it doesn't make the saw more dangerous.  It just
3   negates the effectiveness of the -- of the injury
4   mitigation system.  Now, certainly I would
5   anticipate that people who use Saw Stop rely upon
6   that injury mitigation system because that's what
7   sells the saw.  That's why they are getting it.  So
8   it doesn't make it more dangerous.  It just
9   eliminates it.
10  BY MR. WALSH:
11      Q    All right.  Well, let's go away from
12  the Saw Stop and take any wood-cutting saw that you
13  want.  Do you know of any wood-cutting saw where you
14  cannot mount blades that are -- that are --
15  shouldn't be on there and are dangerous for you
16  sawing it?
17          MR. PACKIN:  That -- that's been asked
18  and answer already.  We are just wasting time.
19          THE WITNESS:  You asked me that before.
20  You asked me that before.  You know, you want to ask
21  me the same questions over and over again, go right
22  ahead.  You know.
23  BY MR. WALSH:
24      Q    Are those saws defective in your mind
25  because they can be mounted with blades that should
```

Page 171

```
1   not be on there and are dangerous?
2           MR. PACKIN:  Asked and answered.  Last
3   time.  This is the last time.
4           Have you conducted an analysis of other saws?
5           MR. WALSH:  Let's not have speaking
6   objections.
7           MR. PACKIN:  That's the only way we are
8   going to get past the same question 17 times.
9   BY MR. WALSH:
10      Q    Are the saws generally defective
11  because they allow -- as wood saws, in general,
12  defective because they allow for the mounting of
13  blades that are dangerous that can be -- that
14  shouldn't be on there and are potentially dangerous?
15      A    Not necessarily so.
16      Q    Okay.  And -- and why not?
17      A    Because -- because they are made for a
18  cutting attachment.  There are a wide variety of
19  cutting attachments, and they are designed to
20  accommodate a certain variety.  It is not unlimited.
21  It is not going to the ends of the earth.  There is
22  a limitation.
23      Q    But can't every saw have a -- a
24  proprietary arbor that only allows it to take what
25  the manufacturer wants on it?
```

Page 172

```
1           MR. PACKIN:  Asked and answered already
2   today.  You are just going around in circles.  At
3   some point it becomes harassing, and it is about at
4   that point.
5           THE WITNESS:  Would you repeat the
6   question?
7           MR. WALSH:  Read it back to him,
8   please.
9           (The court reporter read back the
10  pending question as follows:
11          "Question:  But can't every saw have a
12  -- a proprietary arbor that only allows it to
13  take what the manufacturer wants on it? ")
14          THE WITNESS:  What saw?
15  BY MR. WALSH:
16      Q    Any one that doesn't have it, and that
17  -- and I believe we can agree, can we not, that
18  that's almost all of them.
19          MR. PACKIN:  I object to the form.
20  It's been covered before.
21          THE WITNESS:  You know, I'm sorry, but
22  I -- I -- you've got me confused.  I really don't
23  know what you are asking.
24  BY MR. WALSH:
25      Q    Okay.  There is a large universe of
```

Page 173

```
1   wood-cutting saws out there, some hand held and some
2   not; correct?
3       A    Yes.
4       Q    Okay.  The vast, vast, vast majority of
5   those saws do not have some type of proprietary
6   arbor; correct?
7           MR. PACKIN:  I object to the form.
8           THE WITNESS:  Yes.
9   BY MR. WALSH:
10      Q    The vast, vast majority of those saws
11  can be mounted with saw blades of types that should
12  not be on the saw; correct?
13          MR. PACKIN:  I object to the form.
14          THE WITNESS:  Oh, I suppose there are
15  some blades that shouldn't be on those saws, yeah.
16  Just wait a second, though.  But, you know, implicit
17  in this question is that there is a whole bunch of
18  saw blades out there that shouldn't go on the -- the
19  -- the machine.  Well, you know, maybe that
20  assumption isn't quite accurate.  Maybe there are a
21  few, a few, or like, you know, if you have, say, a
22  10-inch saw and you want to put a 12-inch saw blade.
23  Well, a 12-inch saw blade shouldn't go on there.
24  And you want to know something?  Most of the saws,
25  it won't go on.  So, yes, those saws have provisions
```

(Pages 170 to 173)                                                    44

Page 174

1  to prevent blades that are not -- that shouldn't go
2  on there. So, if that's what you mean -- is that
3  what you mean?
4  BY MR. WALSH:
5      Q      What now -- that wasn't my question.
6      My question is, it relates to any saw that a
7  blade can be put on there that is not designed for
8  that saw. Any blade.
9      MR. PACKIN: Is that a question? ·
10 BY MR. WALSH:
11     Q      For example, an abrasive wheel on a --
12 on a saw that it is not designed to go on, can be
13 dangerous?
14     A      What saw is not -- an abrasive wheel
15 not designed to go on?
16     Q      Let's say it is a -- it's a worm drive,
17 high torque machine used for cutting flooring or
18 something else. Should a -- all right -- and you
19 have an abrasive wheel not designed for that kind of
20 torque or application that somebody puts on there.
21 Dangerous?
22     MR. PACKIN: I object to the form.
23     THE WITNESS: Perhaps.
24 BY MR. WALSH:
25     Q      Anything on that machine to prevent

Page 175

1  them from doing it?
2      A      Well, it should be certainly -- not
3  that I know of.
4      Q      Okay. All right. Another thing you
5  mentioned during the last deposition was, and I
6  think this was somehow in connection with a break, I
7  don't know, but a de-clutching device. Do you
8  remember mentioning that?
9      A      Oh, perhaps, yes.
10     Q      Have you -- have you seen any cut-off
11 machine or any gasoline hand-powered tool that uses
12 a de-clutching device?
13     A      Well, these do. They have a
14 centrifugal clutch.
15     Q      Is that what you mean by a de-clutching
16 device, a centrifugal clutch?
17     A      No.
18     Q      What do you mean --
19     A      When I was -- I was talking about a
20 combination clutch/brake, which is a -- which is a
21 standard mechanical design. It exists in a -- a
22 whole variety of machines. It is well known. It's
23 been around for 50/100 years, whatever. In other
24 words, the -- you simultaneously -- when it is
25 actuated, you simultaneously de-clutch or disconnect

Page 176

1  the power driven -- the power source and you apply
2  the brake to the -- to the rotating element.
3      Q      So you have -- do you know of any
4  hand-held gasoline power tool that uses a brake and
5  a de-clutching device?
6      A      No.
7      Q      Have you done --
8      A      Well -- well -- well, actually,
9  probably chainsaws, in effect. That's -- that's not
10 the -- quite arrangement of them, but, in effect,
11 they do.
12     Q      Can you -- can you tell me what the --
13 the only thing on a chainsaw is the centrifugal
14 clutch; correct?
15     A      Well, no. Not the only thing. And
16 then there is the brake.
17     Q      Yeah. There is nothing on -- there is
18 no de-clutching mechanism that works with the brake,
19 is there, on a chainsaw?
20     A      No, but I said in effect. In other
21 words, if you have a situation where you -- where
22 the brake is applied, and you -- you begin to halt
23 the -- the chain, if you let go of the trigger, the
24 clutch -- the clutch disengages when it drops down
25 to the slowest speed.

Page 177

1      Q      Okay. Well, what I'm trying -- is that
2  what you are talking a de-clutching device --
3      A      No.
4      Q      -- the normal action of the centrifugal
5  clutch?
6      A      No. You asked me a -- you know, one
7  of -- one of your general, broad,
8  reaching-out-to-the-ends-of-the-earth question, so I
9  gave you a general, broad,
10 reaching-out-to-the-ends-of-the-earth answer.
11 That's why I said what I said, in effect it happens.
12 In other words, in effect, it does, you know, but
13 that's not what I meant.
14     Q      Okay. Do you know of any hand-held
15 gasoline-powered tool that uses a de-clutching
16 device of the kind you were talking about before?
17 Not just a normal activation of the clutch in the --
18 in the mechanism, using a de-clutching device in a
19 brake. Any gasoline hand-powered hand tool that you
20 know of?
21     A      No. But as I said before, that is a
22 common configuration, mechanical configuration that
23 exists in numerous mechanisms, devices, machines.
24 It is nothing new.
25     Q      Have you ever seen it in a

45                                                (Pages 174 to 177)

Page 178

1   gasoline-powered tool?
2           MR. PACKIN:  Don't answer it again.
3   Don't answer it again.  You already answered it
4   twice.  Don't answer it again.
5           MR. WALSH:  Well, he keeps saying it is
6   a common tool and it -- I want you to name every
7   gasoline-powered tool that you've seen that
8   combination used in.
9           MR. PACKIN:  He's answered that.
10          MR. WALSH:  He hasn't answer that.
11          MR. PACKIN:  He said none.
12          MR. WALSH:  None; correct?
13          MR. PACKIN:  Is that correct?
14          THE WITNESS:  Correct.
15  BY MR. WALSH:
16      Q     All right.  The -- have you done any
17  kind of design work, drawings of -- of a
18  de-clutching device for a hand-held gasoline-powered
19  tool?
20      A     No.
21      Q     Have you done any prototypes of a
22  de-clutching device for any kind of a gasoline
23  hand-powered tool?
24      A     No.
25      Q     Have you done any testing of a

Page 179

1   de-clutching device for any gasoline hand-powered
2   tool?
3       A     No.
4       Q     Have you published --
5           MR. PACKIN:  Gasoline-powered,
6   hand-held --
7   BY MR. WALSH:
8       Q     Yes.  Gasoline -- right.
9           Have you published the concept anywhere for
10  peer review?
11      A     No.
12      Q     Have you done any patent search to see
13  if any such device tests exists in the patents
14  world?
15      A     Yes, I did.
16      Q     Did you find any?
17      A     No.
18      Q     Did you -- have you gone to any of the
19  standards organizations or anybody else to find out
20  if anybody has designed, developed, or tested that
21  kind of device for a hand-held power tool?
22      A     No.
23      Q     The -- do you know of any support in
24  the engineering literature for the design or
25  development of a de-clutching device for a hand-held

Page 180

1   gasoline-powered tool?
2           MR. PACKIN:  I object to the form.
3   You can answer it.
4           THE WITNESS:  I don't think so.
5   BY MR. WALSH:
6       Q     Do you know of any standards applicable
7   to hand-held gasoline-powered tools that suggest or
8   recommend the use of a de-clutching device with a
9   brake?
10      A     No.
11      Q     Have you -- have you done anything on
12  your de-clutching concept other than think about it?
13          MR. PACKIN:  I object to the form.
14          THE WITNESS:  I started -- you asked me
15  this last time, actually.  And I started to do
16  calculations, yes.
17  BY MR. WALSH:
18      Q     You started to do calculations of what?
19      A     Maximum energy available, you know.
20  What do you anticipate?  Et cetera, et cetera.
21      Q     And that was in connection, I think,
22  when we had that discussion, that was in connection
23  with a brake; correct?
24      A     Yeah.
25      Q     All right.  And let me ask you this --

Page 181

1       A     And then I think I -- I think I told
2   you that that led me to consider an alternative,
3   which would be -- use the same mechanism, but
4   actually -- no.  I'm sorry.  Not the same -- similar
5   mechanism, but instead of braking the wheel, you
6   would just shoot a blade guard, like what's on --
7   shooted to encompass and enclose the blade.  In
8   other words, that's an alternate design.
9       Q     All right.
10      A     In other words, instead of stopping the
11  blade, you would -- you could shoot a guard out and
12  it would guard the blade.  In other words, you would
13  achieve the same effect, which would be you would
14  prevent the spinning blade from contacting flesh.
15  In one way you do it -- the actuation is the -- you
16  stop the blade.  The other way is you shoot the
17  guard out, as the guard becomes the barrier between
18  the spinning blade and the flesh.
19      Q     And -- and the same series of questions
20  and, I mean, the -- have you -- have you actually
21  done any design drawings on such a guard?
22      A     No.
23      Q     Have you done -- developed prototypes
24  of such a guard?
25      A     No.

(Pages 178 to 181)                                    46

Degnan & Bateman, Inc.
(856) 232-7400

1    Q      Have you done any testing of such a
2  guard?
3    A      No.
4    Q      Have you -- do you know of anybody in
5  the world who has done such testing of that kind of
6  guard on a cut-off machine?
7    A      Well, actually, when you talk about
8  testing, this is how I think we got into the Power
9  Tool Institute study on guarding of circular saw
10  blades.
11    Q      Okay.
12    A      So, in other words, there is the
13  write-up of testing that was done on that type of
14  device.  It is currently -- it is current
15  technology.  And there is no reason why it can't be
16  adopted to this.
17    Q      The -- all of the -- the study you are
18  talking about was all -- none of those were
19  gasoline-powered cut-off machines, were they?
20    A      No.  But they had a rotating blade with
21  teeth, and the intention was to prevent the teeth
22  from contacting flesh.  You know, so now we have the
23  same situation here.  We have a bigger blade with
24  rotating teeth, and when -- when it contacts flesh
25  while it is rotating, it causes severe injury or

1  death.
2    Q      What was your --
3            MR. PACKIN:  Let him finish.  Let him
4  finish.
5            Were you done?
6            THE WITNESS:  Yes.
7  BY MR. WALSH:
8    Q      What was the largest blade tested by
9  the Power Tool Institute?
10    A      I -- I think they were in an eight-inch
11  blade.
12    Q      And what was the biggest saw,
13  power-wise, tested by the Power Tool Institute?
14    A      I don't remember.
15    Q      Were there any gasoline-powered tools
16  tested by the Power Tool Institute at all?
17    A      No.  But that doesn't mean that that --
18  that safety device isn't adaptable.  It is
19  transferable.  You know, it is immaterial of the
20  power source.  What it is focusing on is the
21  rotating blade.  It is not focusing on whether it is
22  an electric motor that is spinning, or a gasoline
23  engine, because that device does not turn the
24  electricity off, would not turn the gasoline engine
25  off.

1    Q      Have you seen that kind of guard used
2  on any cut-off machine, hand-held gasoline-powered
3  cut-off machine ever sold anywhere in the world?
4    A      Gasoline-powered?
5    Q      Yes, sir.
6    A      Seems to me those guards are on 14-inch
7  saws and 16-inch saws, hand-held circular saws.
8    Q      Electrically powered?
9    A      Yes.  Yes.
10    Q      Wood-cutting saws?
11    A      We got wood-cutting blades.  That would
12  be appropriate.
13    Q      The saws -- the saws you are talking
14  about are things like Big Foot and so on that are
15  used for cutting wood?
16    A      Yes.
17    Q      Okay.  They are not used for cutting
18  concrete.  They are not used for cutting asphalt.
19  They are not used for cutting metal, that type of
20  thing?
21    A      Technology is transferable.  What you
22  are cutting has no bearing on the technology.  The
23  technology is the initiation of the movement of
24  the -- the guard that protects the cutting teeth
25  from contacting the flesh.  That part of that is --

1  is immaterial whether the motor force is an
2  electric, or is gasoline-powered, or diesel powered,
3  or pneumatically powered, or -- or whatever.
4    Q      You haven't attempted to make the
5  transfer and -- and demonstrate with the prototype
6  or any other type of testing that that kind of guard
7  is feasible and could work on a hand-held
8  gasoline-powered cut-off machine, have you?
9    A      No, I have not.
10    Q      Do you know of anybody who has?
11    A      No.
12    Q      Do you know of any hand-held
13  gasoline-powered cut-off machine anywhere in the
14  world that uses them?
15    A      No, I do not.
16    Q      Do you know of any standard that calls
17  for it?
18    A      No.
19    Q      Do you know of any professional
20  literature anywhere in the world that has suggested
21  that the kind of guard you are suggesting would be
22  feasible work, and would make safer a hand-held
23  gasoline-powered cut-off machine?
24    A      No, I do not.
25    Q      Do you know of any other person in the

Degnan & Bateman, Inc.
(856) 232-7400

Page 186

1   world, other than yourself, who has suggested that
2   that kind of guard is feasible, would work, and
3   would make a hand-held gasoline-powered cut-off
4   machine safer?
5        MR. PACKIN:  I object to the form.
6        THE WITNESS:  No, I do not.
7   BY MR. WALSH:
8        Q     Have you gone to any of the standards
9   organizations and -- and determined -- and tried to
10  determine if they believe that it would make a
11  cut-off machine safer to incorporate that kind of
12  guard?
13       A     No.  I have not gone to any of the
14  standards organizations.
15       Q     Does the -- does OSHA regulations which
16  mandate the type of guards that must be on a
17  hand-hand gasoline-powered cut-off machine call for
18  that kind of lower blade guard?
19       A     No, it does not.
20       Q     The -- all right.  Now, the -- I want
21  to go back to a -- a question, when you were talking
22  about a brake, you have not done any testing of
23  brakes for cut-off machines or attempted to adopt
24  any sort of brake to a cut-off machine, have you?
25       A     Testing, no.

Page 187

1        Q     And you haven't developed any
2   prototypes of a brake?
3        A     Right.
4        Q     Do you know of anybody who has tested a
5   brake on a hand-held gasoline-powered cut-off
6   machine?
7        A     No, I do not.
8        Q     Do you know of any standard that calls
9   for a brake on a hand-held gasoline-powered cut-off
10  machine?
11       A     I think you asked me that question
12  before.
13       Q     If I did, I apologize.  But I -- it is
14  -- because we've gone over multiple days, you are
15  right, we may get repetitive, and I apologize for
16  that.
17       A     You are repetitive within the past 15,
18  20 minutes.
19       Q     Perhaps.  But I don't -- I -- I don't
20  remember it, so why don't we just give a go at it
21  and see how it works?
22       A     What was the question?
23       MR. WALSH:  Read it back, please.
24            (The court reporter read back the
25       pending question as follows:

Page 188

1            "Question:  Do you know of any standard
2       that calls for a brake on a hand-held
3       gasoline-powered cut-off machine?")
4        THE WITNESS:  I know you asked me that
5   question before.  I will give you the same answer.
6   No.
7   BY MR. WALSH:
8        Q     All right.  The -- when you did your
9   calculations, you did your -- do you have those
10  calculations with you, by the way, that you say that
11  you started on on what you would -- what energies
12  you would need to brake on a cut-off machine?
13       A     I don't know if I have them with me or
14  not.
15       Q     All right.  The -- and you calculated
16  that based on the horsepower of the engine?
17       A     Yes.  The stop at the max.  That's the
18  most you can get out of it.  Whatever the engine
19  can --
20       Q     What mass of the wheel did you use as
21  -- as the mass of the wheel in your calculations?
22       A     I was going to use a -- a -- a -- a
23  typical diamond steel wheel with diamond on it.
24       Q     Do you know how the mass of a diamond
25  wheel compares to the mass of an Oldham

Page 189

1   carbide-tipped saw blade?
2        A     I'm just trying to remember if the -- I
3   know I have measured the thickness of the -- of an
4   Oldham blade, and I believe I have measured the
5   thickness of the DeWalt blade, and I don't remember
6   what it is right now.
7        Q     How about just the overall mass, the
8   weight?
9        A     Well, they are -- they're -- I -- I
10  don't know at this point in time.
11       Q     How did you -- did you -- did you get
12  around to accounting for the stored energy in the
13  blade when you calculated braking power?
14       A     Yeah.  You would have to.  Yeah, you
15  would have to.
16       Q     How did you calculate the stored energy
17  in the blade?
18       A     Well, you would use the inertia of the
19  rotating blade, and that would give you the stored
20  energy.
21       Q     What's the -- what's the formula you
22  used?
23       A     It is -- it's out of Marks handbook.
24  It is Baumeister & Marks is the one I have.  It is
25  also in Shigley and it's also in -- I have a couple

(Pages 186 to 189)

48

Page 190

```
1   of -- three different reference books that I -- that
2   I have.  And it is also in a -- a brake -- a couple
3   of brake books that I have.
4       Q     What is it?
5       A     I don't remember off the top of my
6   head.
7       Q     Do you have any references with you?
8       MR. PACKIN:  Well, he said he might.
9   BY MR. WALSH:
10      Q     Do you have them with you?
11      A     I know those books that I mentioned, I
12  don't.
13      Q     Okay.  The calculations that you did,
14  do you have those with you?
15      A     I would have to look.
16      Q     Take a look.
17      MR. WALSH:  Instead of looking through
18  there now, let's continue with the questions because
19  we're a little short of time, and we will ask you if
20  maybe, Mr. Packin, if you'll send those calculations
21  to us.
22  BY MR. WALSH:
23      Q     The -- but did you decide -- did you
24  decide how much braking power, if that's a correct
25  term, would be required in order to brake a Oldham
```

Page 191

```
1   14-inch, carbide-tipped saw blade on a TS400?
2       A     I made -- I started, but I don't
3   remember exactly how far I got.
4       Q     Okay.  The -- the brake, the
5   de-clutching device, conceptually, how would it be
6   activated?  What would activate it?
7       A     Well, you would use a -- you asked me
8   this last time, because I referred to it as a paddle
9   and you referred to it as a hand-grip guard.
10      Q     Hand guard.
11      A     Hand guard.  Right.  By paddle, I mean,
12  it is -- it's a trigger.  You know, whether it is in
13  the shape of a hand guard or whatever.
14      Q     It is a mechanical activation?
15      A     Right.
16      Q     So the operator would have to
17  mechanically activate it?
18      A     Well, it is based on kickback, you
19  know.  You need this thing when you get a kickback,
20  because this machine will flip in the air and come
21  back, so you have that amount of time to stop
22  something.
23      Q     Okay.  But, I mean, does the operator
24  have to physically and consciously activate it, or
25  how does it work?
```

Page 192

```
1       A     Well, like a chain -- like a chainsaw.
2   You would use the same mechanism.  In other words,
3   during the kickback, you depend upon the -- the
4   trigger hitting the operator's hand.
5       Q     Okay.  Is that -- is that how you think
6   a chain brake activates on a chainsaw, the -- the --
7   the front hand guard hits the operator's guard?
8       A     Well, this is -- this is the way that I
9   envision that this would be on -- on this machine.
10      Q     Okay.  So on this machine, you would
11  have a mechanical activation that sometime during
12  the rotation it would hit the -- it would hit the
13  hand of the operator and activate; correct?
14      A     Yeah, yes.
15      Q     Okay.  One thing I want to be clear on,
16  what -- what is it that you contend -- what
17  combination of things, what single things do you
18  contend must be on a hand-held gasoline-powered
19  cut-off machine in order for the machine to be
20  appropriately safe?  We've mentioned -- you've
21  mentioned lower guards.  You mentioned brakes.  You
22  mentioned de-clutching devices.  You mentioned
23  proprietary arbors.  Do all of those things have to
24  be on there?  Which of them have to be on there?
25      A     Well, the -- the arbors, those are
```

Page 193

```
1   alternate designs.  In other words, the larger
2   arbor, the shaped arbor, the pin drive.  Those are
3   variations.  Okay.  So --
4       Q     You could use any of those?
5       MR. PACKIN:  I object to the form.
6       THE WITNESS:  Yeah.  You may have a
7   preference.  My preference is for the larger design,
8   larger one.  That would preclude the installation of
9   the blade.  Now, if you didn't want to do that,
10  well, now you are faced with a -- a kickback.  In
11  other words, how are you going to control the
12  kickback?  So then that leaves you with, do you stop
13  the blade from rotating, or do you guard the blade
14  from rotating while it is rotating?  I'm sorry.
15  During a kickback, right, do you stop the blade or
16  do you guard the spinning blade?  Those are
17  alternates.
18      In other words, if you are not going to use
19  one -- in other words, if you are not going to do a
20  proprietary arbor, well, then, you've greatly
21  increased the potential, the probability of somebody
22  sticking one of these blades on this saw and having
23  it kick back because the teeth contact wood, or
24  plastic, or whatever.
25      So now that you -- you admitted that you are
```

Degnan & Bateman, Inc.
(856) 232-7400

Page 194

1   not going to preclude the installation of one of
2   these blades, then you have to do something to
3   safeguard the person when one of these blades are on
4   the saw and they are using it in the prohibited,
5   reasonably foreseeable misuse of cutting wood or
6   plastic with a tooth -- carbide-tooth wood-cutting
7   saw blade.
8       So then, what does that leave you?  Well, that
9   leaves you, once again, either the brake or the
10  guard.  Actually, I probably prefer the guard.
11  BY MR. WALSH:
12      Q    All right.  So if I understand you
13  correctly, if you put a proprietary arbor on the
14  machine, that in and of itself would be enough;
15  correct?
16      A    Yeah.  That would -- that would, in
17  essence, give you sufficient safeguarding against
18  the saw blade ever getting on the machine.
19      Q    And then, alternatively, if you didn't
20  use a proprietary arbor, either the lower guard or a
21  brake, and you would prefer the lower guard?
22      A    Yeah. I think that would probably work
23  better.
24      Q    All right.  The -- and -- and then,
25  does the brake, in your view, does the brake have to

Page 195

1   be coupled with a de-clutching device or is -- or
2   not?
3       A    Yes.  Yeah.  Yeah.  Yeah.  Because you
4   would want to disengage the power source
5   simultaneously as you are applying the brake.
6       Q    So that would be part of the brake
7   design?
8       A    Yes.
9       Q    And how would that be -- how would the
10  de-clutching device be activated?
11      A    Well, one of the ways would be to --
12  through linkage.  You would modify your centrifugal
13  clutch so that it would have some kind of an
14  activation arm sticking out, and when the brake was
15  -- was activated, the -- linkage would just
16  touch this and disengage the clutch.
17      Q    Okay.
18      A    The -- the -- the distance of movement
19  is very small.
20      Q    The -- I want to go back to a question
21  now about 2003 again, focusing on the year 2003.
22      What companies were manufacturing cut-off
23  machines in 2003; do you know?
24      MR. PACKIN:  It's been asked and
25  answered also.

Page 196

1       Go ahead.
2       THE WITNESS:  I think at that time,
3   Stihl, Makita, Husqvarna.  There were a couple,
4   Asian companies.  Target, I think, had one at that
5   time.  There is one I did a case on a couple of
6   them.  Homelite.  I think Homelite was still in the
7   business at that time.  I'm not a hundred percent --
8   I'm not sure when they -- if they were still around.
9   Yeah, 2003.  Yes, yes, 2003, they were.
10  BY MR. WALSH:
11      Q    You think Homelite was still making
12  cut-off machines in 2003?
13      A    I think so, yes.
14      Q    Let me ask you this.  Do you know what
15  warnings were on cut-off machines, any brand of
16  cut-off machines in 2003?
17      MR. PACKIN:  It's been asked and
18  answered, too.
19      THE WITNESS:  I know that I had looked
20  at cut-off -- a couple of cut-off machines by the
21  year 2003, and I don't remember what -- at this
22  point, sitting here, I don't remember what the
23  warning said.
24  BY MR. WALSH:
25      Q    What -- what -- what cut-off machines

Page 197

1   could you date to 2003 or earlier?
2       MR. PACKIN:  This was asked and
3   answered.
4       THE WITNESS:  Homelite.
5   BY MR. WALSH:
6       Q    Homelite?  Homelite?
7       A    Yes.
8       Q    And what years were the Homelite saws
9   that you dealt with?
10      A    I believe one was prior to 2000 and the
11  other one was probably 2001 was when I dealt with
12  it.  I don't know what the year of the saws were.
13      Q    Well, I'm not talking about the year
14  you dealt with the case.  I'm asking the -- the date
15  of manufacture of the machines themselves.  Do you
16  know what they were?
17      A    No.
18      Q    Okay.  Do you have a recollection of
19  what warnings were on the machines?
20      A    I think you just asked me that.
21      MR. PACKIN:  You did.
22  BY MR. WALSH:
23      Q    I did, and -- and -- and I'm -- I'm not
24  clear on what the answer is.  Did --
25      A    Aren't you listening?  Aren't you

(Pages 194 to 197)                                              50

Page 198

1  listening? Why do you ask the questions and then
2  you don't listen? How about listening to what I
3  say, you know, and then not asking me the same
4  question over and over again? You know, it would be
5  helpful.
6      Q    Mr. Growney, do you have a recollection
7  of what warnings were on those two machines or any
8  other machine that you think you can date to 2003 or
9  earlier?
10     A    Is this the last time you are going to
11 ask me that question?
12     Q    I'm going to have to be the judge of
13 that. It depends on the answer.
14          MR. PACKIN: I can tell you it is.
15 It's going to be the last time he is going to ask
16 you that question.
17          THE WITNESS: I have no recollection.
18 BY MR. WALSH:
19     Q    Okay. Do you have records that would
20 let you determine that?
21     A    I don't, no.
22     Q    Do you know what manuals -- did you see
23 the manuals for the machine?
24     A    That, I don't know.
25     Q    Do you know -- do you have any

Page 199

1  recollection -- well, if you don't know, I guess you
2  have no -- am I correct in assuming that you don't
3  have a recollection of what may have been in any of
4  the manuals?
5      A    You're right. You know, if I can't
6  recall whether I saw the manuals, not likely I'm
7  going to recall what was in them.
8      Q    Do you know of any cut-off machine
9  manufacturer anywhere in the world that, in 2003,
10 had a better warning system than Stihl?
11          MR. PACKIN: I object to the form.
12 Also asked and answered.
13          THE WITNESS: You know, I have seen at
14 least three versions of the yellow warning on
15 that -- the yellow decal that is commonly -- that --
16 that Stihl installs on its guard. I've seen at
17 least three versions of it. And at this point I
18 can't recall whether all of them were before 2003 or
19 no. In addition to that, I have seen a -- variety
20 of pictograms on the machine, and I don't know
21 whether they were before 2003 or not.
22 BY MR. WALSH:
23     Q    Do you -- do you -- are you able to --
24 to say that there was any cut-off machine
25 manufacturer in the world that had a warning against

Page 200

1  the use of carbide-tipped saw blades on its machine
2  and in its manual in 2003 other than Stihl?
3          MR. PACKIN: I object to the form.
4      You can answer.
5          THE WITNESS: I mentioned to you the
6  Homelites that I saw that I have no recall of what
7  the warnings are, and I have no recall whether or
8  not I saw manuals. Other than that, I have not had
9  the opportunity to see any other manufacturer's
10 warnings that were on the saw or on the manuals. So
11 I -- I really can't answer that.
12 BY MR. WALSH:
13     Q    Broadening the question, are you aware
14 of any power tool manufacturer in 2003 that had a
15 better warning system for its tools than Stihl?
16          MR. PACKIN: I object to the form.
17          THE WITNESS: I -- I can't answer that.
18 You know, I -- I -- I have seen so many warnings on
19 so many machines, power tools that -- and I cannot
20 place them in a particular amount of time without
21 actually going back and specifically looking at
22 them. I -- I don't think that's a fair question for
23 you to ask me sitting here, for me to say, in 2003,
24 who warned better than stihl.
25 BY MR. WALSH:

Page 201

1      Q    Did you, in connection with any of the
2  opinions voiced in your -- in your report, did you
3  make any attempt to determine what warnings cut-off
4  machine manufacturers were using in 2003?
5      A    It makes no difference. Stihl
6  cannot -- Stihl cannot take a position, well,
7  everybody was doing it this way, so we'll do it this
8  way. That's not what governs what you do. What
9  governs what you do is you analyze the potential
10 reasonable foreseeable misuses and you warn clearly
11 against them. The fact that somebody else doesn't
12 recognize them or warn them clearly is immaterial to
13 what you do. It is not like, well, if we all don't
14 do it, it's fine. That's not the way it goes.
15     Q    Is the answer, you did not take --
16 did -- part of your analysis of the opinions in your
17 report did not include consideration of what other
18 cut-off machine manufacturers were doing
19 warning-wise; is that true or not?
20     A    That's true. And just as I said, it's
21 immaterial to what other people, how they, whether
22 or not they want to warn about their dangers. Your
23 obligation is to your ultimate user of your machine.
24 You've got to make sure he gets the message, the
25 buyer gets the message, and the ultimate user gets

Degnan & Bateman, Inc.
(856) 232-7400

Page 202

1  the message.  You got to do everything reasonably
2  possible to get that message to them.
3          MR. PACKIN:  How much time is remaining
4  for direct questioning?
5          VIDEO SPECIALIST:  22 minutes, 23
6  minutes.
7  BY MR. WALSH:
8      Q    Is it also true that, as part of the
9  consideration that went into your -- the basis of
10 your opinions in your report, that you did not take
11 into consideration what other manufacturers of power
12 tools were doing with regard to warnings in 2003?
13         MR. PACKIN:  Same objection.
14     You can answer.
15         THE WITNESS:  No, no.  No, no, no, no,
16 no, no.  I -- I have evaluated other machines, power
17 tools prior to 2003, and I have looked at warnings
18 that are on machines, power tools, and I've done
19 that.
20 BY MR. WALSH:
21     Q    Can you identify then, can you identify
22 any of them that you say you have looked at prior to
23 2003, that you think in 2003 or prior to that, had a
24 better warning system for their machines than Stihl?
25         MR. PACKIN:  That's been asked and

Page 203

1  answered so don't answer it.  Don't answer it.
2          MR. WALSH:  He just revised his answer.
3          MR. PACKIN:  No.  Wait a minute.  Don't
4  answer it.  Next question.
5          MR. WALSH:  Barry, he just revised his
6  answer.
7          MR. PACKIN:  We're going to disagree.
8          MR. WALSH:  There is -- there is no
9  basis for directing a witness not to answer a
10 question unless you are claiming privilege.
11         MR. PACKIN:  14 hours and repeat and
12 repeat and repeat is my basis.
13         MR. WALSH:  Well, I'm telling you there
14 is -- there is no basis.  We will file a motion.  We
15 will seek sanctions.
16         MR. PACKIN:  Do what you got to do.
17         MR. WALSH:  We will.  Believe me, we
18 will.  But there is no reason that that has to be
19 done because there is simply no basis, unless you
20 are claiming privilege, for directing a witness not
21 to answer.
22         MR. PACKIN:  Last time.  Give him the
23 same answer you gave him last time.
24         THE WITNESS:  What's the question?
25         MR. WALSH:  Please read it back.

Page 204

1          (The court reporter read back the
2  pending question as follows:
3          "Question:  Can you identify then, can
4  you identify any of them that you say you
5  have looked at prior to 2003, that you think
6  in 2003 or prior to that, had a better
7  warning system for their machines than
8  Stihl?")
9          THE WITNESS:  They were all lousy.
10 BY MR. WALSH:
11     Q    That's your answer?
12     A    Yeah.
13     Q    All right.  From a -- from a standpoint
14 of -- are you familiar with so-called rescue saws?
15     A    To a limited extent.
16     Q    Okay.  What is a rescue saw?  What --
17 how do you -- what does -- what does that term mean
18 to you?
19     A    Well, it's what fire departments use
20 to -- to get into buildings -- that's -- during a
21 fire emergency.  And they -- most of them, as far as
22 I know, are 12 inch.  I don't know if there is a 14
23 inch.  There may be a 14-inch version.  I know there
24 is 12 inch.  They run at a slower speed.
25     Q    A slower speed than what?

Page 205

1      A    Than these do.
2      Q    Than hand-held gasoline-powered cut-off
3  machines?
4      A    Yeah.
5      Q    Is a Partner cut-off machine, for
6  example, is that used as a rescue saw?
7      A    There is a version of it, yes.  I'm not
8  exactly sure what they -- what they do to make it a
9  rescue saw.
10     Q    Have you -- have you ever seen one
11 that's a rescue -- that's denominated as a rescue
12 saw?
13     A    I've seen pictures, but that's it.
14     Q    All right.  Do you -- do you know
15 whether they use carbide-tipped saw blades on the
16 rescue saws?
17         MR. PACKIN:  Who is they?
18         MR. WALSH:  Partner, and anybody who is
19 selling a rescue saw to fire and police departments.
20         THE WITNESS:  I'm not -- I'm not
21 certain.  My search is inconclusive.
22 BY MR. WALSH:
23     Q    Have you made -- do you know of -- you
24 said you think they run slower.  Do you know of any
25 other modifications made by people who are selling

(Pages 202 to 205)                                          52

Page 206

1  saws as rescue saws to -- to fire departments and
2  others?
3        MR. PACKIN:  I object to the form.
4        THE WITNESS:  Well, Partner has a kit.
5  Some kind of a kit that they -- I don't know all the
6  ingredients in them.
7  BY MR. WALSH:
8        Q      Do you know who makes blades for rescue
9  saws that are sold to fire and rescue units?
10       A      I do not.
11       Q      Do you know how many of those blades
12  are -- any way they can be purchased?
13       MR. PACKIN:  How many of those blades
14  what?
15  BY MR. WALSH:
16       Q      Come into the country, or are in the
17  country and available, and where they can be
18  purchased.
19       MR. PACKIN:  I object to the form.
20       THE WITNESS:  I believe they can be
21  purchased through distributors of fire fighting
22  equipment.
23  BY MR. WALSH:
24       Q      To your knowledge, any limitation on
25  who can go to those sources and buy them?

Page 207

1        A      No.
2        Q      Is there any difference in those
3  so-called rescue blades from any carbide-tipped saw
4  blade?
5        MR. PACKIN:  Object to the form.
6        THE WITNESS:  I have not had my hands
7  on a rescue blade, so I -- I can't tell you for
8  certain.
9  BY MR. WALSH:
10       Q      Do you know what arbor sizes rescue
11  blades are available in?
12       A      No.
13       Q      The -- do you know whether rescue
14  blades were available in 2003?
15       A      I don't know for certain.
16       Q      Do you know -- do you know whether
17  the -- do you know how many different outlets there
18  are for that type of blade in the -- in the US?
19       MR. PACKIN:  I object to the form.
20       THE WITNESS:  No.
21  BY MR. WALSH:
22       Q      Do you -- can you get them off the
23  internet?
24       A      Well, I don't know if you can get the
25  total, but, I mean, I have gone through a number of

Page 208

1  them on the internet.
2        Q      Okay.  And have you ordered any of the
3  blades from them?
4        A      No.
5        Q      Have you ordered any of the machines
6  from them?
7        A      No.
8        MR. WALSH:  How much time you got, Jim?
9        THE WITNESS:  17, 18 minutes.
10       Let me take a quick break.  I'll be right
11  back.
12       (Brief recess.)
13       VIDEO SPECIALIST:  Back on.
14  BY MR. WALSH:
15       Q      Mr. Growney, you are a member of the
16  American Society of Mechanical Engineers?
17       A      Yes.
18       Q      What's required for membership?
19       A      Graduate from an accredited mechanical
20  engineering school, certain level of academic
21  standing, recommendation.
22       Q      No test to pass?
23       A      No.
24       Q      Did you ever -- do you attend meetings?
25       A      I have in the past.

Page 209

1        Q      When was the last time you attended a
2  meeting?
3        A      Oh, four or five years ago.
4        Q      Have you ever held a position of
5  authority within the group?
6        A      No.
7        Q      You ever published in any of their
8  publications?
9        A      No.
10       Q      You ever received any kind of honor or
11  recognition?
12       A      No.
13       Q      American Society of Safety Engineers,
14  anything required for membership there other than an
15  application and pay your membership fee?
16       A      I think you have to have references.  I
17  think somebody has to vouch for you, that you are --
18       Q      I'm sorry.  Were you finished?
19       A      Vouch for your capabilities as a -- as
20  a safety engineer.
21       Q      You attend meetings?
22       A      I have attended meetings representing
23  American Society of Safety Engineers.
24       Q      Okay.  National meetings?
25       A      No.

53                                          (Pages 206 to 209)

Page 210

```
 1      Q       Any -- ever been an officer in the
 2  organization?
 3      A       No.
 4      Q       Any -- ever published in their
 5  publications?
 6      A       No.
 7      Q       Ever received any honors or
 8  recognition?
 9      A       Well, I'm recognized as their -- one of
10  the delegates to the American ANSI O1.1.
11      Q       Anything else?
12      A       That's all I can think of.
13      Q       Human Factors and Ergonomics Society,
14  what's required there other than application and pay
15  a membership fee?
16      A       Have to be recommended by a -- a
17  member.
18      Q       You go to national meetings?
19      A       Haven't yet.
20      Q       Go to any meetings?
21      A       Tried to.  I tried to get the local
22  chapter going.  The relevant -- the chapter chairman
23  wasn't interested.
24      Q       Have you been an officer in the
25  organization?
```

Page 211

```
 1      A       No.
 2      Q       You published in any of their
 3  publications?
 4      A       No.
 5      Q       Received any honors or recognition from
 6  them?
 7      A       No.
 8      Q       National Safety Counsel, what's
 9  required there to be a member?
10      A       National Safety Counsel only takes
11  firms as membership.  Make an application.  I don't
12  remember.  It's been such a long time ago.
13      Q       You ever -- are you still a member?
14      A       Yes, I am.
15      Q       You attend any national meetings?
16      A       Well, like I said before, I represent
17  them in ANSI committee meetings.
18      Q       Okay.  How about at National Safety
19  Counsel itself, any meetings you attend?
20      A       No.
21      Q       Ever been an officer or person of
22  authority?
23      A       No.
24      Q       Ever published in any of their
25  publications?
```

Page 212

```
 1      A       No.
 2      Q       Ever received any honors or
 3  recognition?
 4      A       Well, once again, I said I'm recognized
 5  by them, have been recognized as one of their
 6  representatives to the ANSI committee.
 7          MR. WALSH:  David.
 8  BY MR. KOTT:
 9      Q       Mr. -- Mr. Growney, are there things
10  known as stationary cut-off saws that use or are
11  intended to use abrasive wheels?
12      A       Yes.
13      Q       Have you ever had any involvement with
14  those, either in litigation, work involvement or
15  otherwise?
16      A       Yes, I had work involvement.
17      Q       And, generally, do they look like a
18  miter saw in the sense that it has a handle that you
19  bring the cutting attachment down to a stationary
20  work piece?
21      A       Yes.
22      Q       At the time this Oldham blade was sold,
23  who were the manufacturers of stationary abrasive
24  cut-off saws that would take 14-inch cut-off
25  attachments?
```

Page 213

```
 1          MR. PACKIN:  Any kind of 14-inch
 2  attachments?
 3  BY MR. KOTT:
 4      Q       Yes.
 5      A       Well, if I stop and think long enough,
 6  I'll remember the name.
 7      Q       If I remove the 14-inch from that --
 8      A       well, yeah.  Let me just -- I'm trying
 9  to remember.  It is on the tip of my tongue.  Go
10  ahead.  I'm sorry.
11      Q       Okay.  Did Makita make a stationary
12  abrasive cut-off saw that would take a 14-inch
13  cutting attachment?
14      A       Oh, that's possible.
15      Q       How about Milwaukee?  Did they make a
16  stationary cut-off saw that would take a 14-inch
17  cutting attachment?
18      A       I don't have a recollection of
19  Milwaukee making one of those.
20      Q       Calling your attention to what we
21  marked as Growney-64, page 133.  Can you see what
22  I'm referring to?
23      A       Yes.
24      Q       Is that a cut-off -- a stationary
25  cut-off saw that would take an abrasive cutting
```

(Pages 210 to 213)                                                           54

Page 214

1  attachment?
2       A      Can I see the catalog?
3       Q      Yes.
4       A      Yes, it would take an abrasive --
5  14-inch abrasive wheel.
6       Q      Okay.  Hold that.  What -- what -- what
7  is that exhibit, please?
8       A      64.
9       MR. PACKIN:  Can I see that for a
10  second, that page?
11  BY MR. KOTT:
12       Q      Okay.  And do you know whether Core Cut
13  made a stationary cut-off saw that would take a
14  14-inch abrasive wheel?
15       A      It is possible.
16       Q      Let me call your attention to Exhibit
17  Growney-65, page 76.
18       Does that show some Core Cut stationary saws
19  that would take a 14-inch abrasive wheel?
20       A      This is a -- these are a little
21  different than what you had described.
22       Q      Okay.  On these, the ones pictured on
23  page 76, do they take a 14-inch abrasive wheel?
24       A      Yes.
25       Q      Do they have the type of guarding that

Page 215

1  a miter saw has?
2       A      No.
3       Q      Do you know anything about the RPMs of
4  those saws?
5       A      I would have to look through the
6  catalog to see what the specifications are.
7       Q      Okay.  Is it safe to use a wood-cutting
8  carbide-tipped saw blade on the cut-off machine
9  shown on page 76?
10       A      Well, why don't we identify the model?
11       Q      Any of those models.
12       A      Well, because the CC555M-8 gas-powered
13  saw, I don't see where it says 14 inch.
14       Q      Okay.  Let's deal deep with -- how
15  about the lower left-hand corner, is that a 14 inch?
16       A      Yes, it is.  CC400M.
17       Q      Is it safe to use a wood-cutting blade
18  such as the Oldham blade on that model?
19       A      No.
20       Q      And why is that?
21       A      The guard is not sufficient.
22       Q      And would you also need to determine
23  the RPMs to determine whether the RPMs make it safe
24  or unsafe to use the wood-cutting blade on that
25  model?

Page 216

1       A      Yes.
2       Q      And can I just look for one moment?
3  The two that are shown on the right of bottom
4  -- the right bottom of page 76, they also use
5  14-inch cutting attachments?
6       A      The CC425M-E1 and the CC455M-H?
7       Q      Right.
8       A      Yes.
9       Q      And is it safe to use a wood-cutting
10  blade such as the Oldham blade on that -- those two
11  models?
12       A      Can I see the catalog?
13       MR. PACKIN:  Oh, sure, sure.  That's a
14  different page.  I lost your page.
15  BY MR. KOTT:
16       Q      76.
17       A      Speedy Cut.  Look at that.  There is
18  another name you were asking about before.
19       What is your question, please?
20       Q      Is it safe on those models, the two at
21  the bottom of that page, to use a wood-cutting
22  blade?
23       A      No.
24       Q      For the same reasons, lack of adequate
25  guarding?

Page 217

1       A      Yes.
2       Q      And a potential issue with the RPM?
3       A      Yes.
4       Q      Now, in that catalog on one of the
5  pages there was a -- pictured on page 74, a Speedy
6  Cut.  Is that correct?
7       A      Yes.
8       Q      Is that a 14-inch gasoline-powered
9  cut-off machine?
10       A      I don't know at this moment.  I would
11  have to look at the catalog.
12       Q      Okay.  Can you take a look at the
13  catalog and see whether that Speedy Cut on either
14  page 73 or 74 will take a 14-inch cutting
15  attachment?
16       A      Well, we got a 12 inch, a 14 inch and a
17  16-inch.
18       Q      Thank you.
19       A      The SC7314 is the 14 inch.
20       Q      Calling your attention -- attention to
21  Growney-63.  Growney-63, page 140, that shows a
22  cut-off saw that's a Makita; is that correct?
23       A      Let me see.  Yes.
24       Q      It is a 14-inch cut-off saw that is
25  intended to be used with an abrasive blade; is that

Degnan & Bateman, Inc.
(856) 232-7400

Page 218

1  correct?
2      A     Yes.
3      Q     Is the guarding on that saw, the type
4  of guarding that you would need on a wood-cutting
5  saw?
6      A     No.
7      Q     Okay.  Is it safe?
8      A     That's a model H2157.
9      Q     Thank you.  Is it safe to use a
10 carbide-tipped wood-cutting blade like the Oldham
11 blade on that model, that Makita model?
12     A     No.
13     Q     Is that because of the guarding?
14     A     Yes.
15     Q     Is that also because of the RPMs?
16     A     I don't know if it has the RPMs here.
17     Q     Okay.
18     A     It don't state the RPMs.
19     Q     If the RPMs on all of the stationary
20 cut-off machines we are talking about were greater
21 than 5,000, would that mean it would be unsafe as
22 far as RPMs are concerned to use the Oldham blade on
23 those machines?
24     A     Nominally, yes.  Yes.
25     Q     Calling your attention to Growney-64,

Page 219

1  which is the Milwaukee, there is a -- on page 134,
2  there is a model 6184-21 which is a hand-held
3  cut-off machine; is that correct?
4      A     Yes, it is.
5      Q     Does that come in a 14-inch diameter?
6      A     Yes, it does.
7      Q     And that is an electric machine;
8  correct?
9      A     Yes.
10     Q     Is it safe to use the Oldham blade,
11 carbide-tipped saw blade on that?
12     A     No.
13     Q     And that one is electric.  Do the risk
14 of injury by using the Oldham blade increase as far
15 as it relates to electrical risks?
16     A     Well, little difficult to say.  This is
17 probably -- typically these machines have a
18 universal motor.  And let me see if we have
19 something here.  It doesn't have a maximum speed.
20 And so -- universal motor -- no load RPM.  4350.  It
21 does.  Okay.  So we are below the speed at which it
22 would throw its teeth, supposedly.
23     Q     Yeah, but I was asking about, does it
24 increase the risk of an electrical injury by using a
25 wood-cutting blade as opposed to a composite blade

Page 220

1  on it?
2      A     I'm not sure what you are asking me, to
3  tell you the --
4      Q     Yeah.  There is a risk of an electrical
5  injury on electrical products; correct?
6      A     Yes.
7      Q     And that product is intended to use an
8  abrasive blade; correct?
9      A     Yes.
10     Q     If one were to use an Oldham
11 carbide-tipped blade, would it increase the risk of
12 an electrical injury?
13     A     Oh, that's hard to say because, I mean,
14 you know -- okay.  That's --
15     Q     Did you do any research to determine
16 whether there had been injuries on stationary
17 cut-off machines that were -- that somebody had put
18 a wood-cutting blade on?
19     A     My research did not produce any of
20 that.  That doesn't mean it didn't occur, but it
21 didn't --
22     Q     Did you look for it?
23     A     It's possible I may have come across it
24 and it just didn't stick with me.
25     Q     No.  My question was, when you went and

Page 221

1  did whatever research you did, did you intentionally
2  do research to determine whether there had been
3  accidents on stationary abrasive cut-off machines
4  where people had used a wood-cutting blade on them?
5      A     No.
6      Q     Did you cut -- were you done?
7      A     No.  Yeah.  But I'm just trying to
8  remember the manner or method in which I went about
9  it.  I'm trying to remember whether it revealed any
10 and I just can't recall them.  It is possible.
11 That's possible.
12     Q     Is a risk of using a wood-cutting blade
13 on these stationary cut-off machines that there will
14 be a kickback?
15     A     Is there a risk?
16     Q     Yes.
17         MR. PACKIN:  This has been covered.
18         MR. KOTT:  Not on stationary cut-off
19 machines.
20         MR. PACKIN:  Sure, it has by you.
21         MR. KOTT:  When?
22         MR. PACKIN:  Today and the last time.
23         MR. KOTT:  Okay.  You are wrong.
24         MR. PACKIN:  Whoa, whoa, whoa, whoa.
25 You don't remember talking about work pieces kicking

(Pages 218 to 221)                                    56

Page 222

1   back?
2                MR. KOTT:  On stationary cut-off
3   machines?
4                MR. PACKIN:  Yeah, yeah, yeah.
5                MR. KOTT:  On stationary cut-off
6   machines, not hand-held.
7                MR. PACKIN:  Yeah.
8                MR. KOTT:  That are designed for the --
9   forget it.
10              We will put a bet on the record later,
11  Mr. Packin, payable to Community Legal Services, and
12  it will be a large bet.
13               MR. PACKIN:  It might be.  It might not
14  be.  I don't bet on anything.
15  BY MR. KOTT:
16       Q      You told me that on the stationary
17  cut-off machines that we've identified, that it is
18  unsafe to use the wood-cutting blades; correct?
19       A      Yes.
20       Q      Is the risk of injury, a blade contact?
21       A      Yes.
22       Q      Is the risk of injury also that the
23  work piece being cut will be thrown?
24       A      Well, typically, these are manufactured
25  -- as a matter of fact, if you look through the

Page 223

1   catalogs, you will usually see a vice.  You are
2   usually provided with a vice.  And so you usually
3   clamp the piece in the vice.  And so, assuming that
4   you are going to use the vice and clamp it --
5                MR. KOTT:  Can I see that one for a
6   moment?
7                MR. PACKIN:  This?
8                MR. KOTT:  Yeah.
9   BY MR. KOTT:
10       Q      Calling your attention to page 73 of
11  Growney-65, that is a stationary cut-off machine
12  that takes an abrasive; is that correct?
13       A      This machine appears to have a
14  carriage.
15       Q      Right.  But just -- just --
16               MR. PACKIN:  Let him finish.
17  BY MR. KOTT:
18       Q      Can we identify the machine?  Is it
19  a --
20       A      You are talking about this one, here?
21       Q      Yeah, the lower left one, is that a
22  stationary --
23       A      Let me just see if I can pick that.
24  There may be a better picture of it, because it
25  certainly appears that the -- the cutting head has a

Page 224

1   head that pivots and it has some kind of counter
2   balance spring.  Apparently the operator pulls it
3   down.  But also it appears as if it has a carriage
4   that you -- you rest the material to be cut on the
5   carriage and push it in.  And I can't tell from the
6   picture, but if I look at the picture to the right
7   of it, you have -- it looks like you have a stop
8   that you set the piece against as opposed to a vice.
9       Q      Right.  And is the operator cutting a
10  brick in that photo?
11       A      It looks like a brick, yeah.
12       Q      Okay.  Is one of the risks of using the
13  carbide-tipped saw blades on that machine or on
14  these machines and cutting concrete or brick, that
15  the tips will break off and hit somebody?
16       A      If you were using carbide-tipped
17  blades?
18       Q      Yeah.
19       A      Sure.
20       Q      Did Grizzley at the time that this
21  blade was sold to Jingoli, did Grizzley make 14-inch
22  blades, carbide-tipped saw blades?
23       A      I think Grizzley is a - a retailer.  So
24  I -- I don't think they made it.  They probably
25  had -- it could be a private label or they could be

Page 225

1   reselling somebody else's.
2       Q      Right.  I will tell you where I got
3   that from.  Calling your attention to exhibit --
4                MR. PACKIN:  You are out of time so
5   this will be the last question.
6                MR. KOTT:  There is no more time left?
7                MR. PACKIN:  Nope.
8                MR. KOTT:  Is that right?  Okay.
9   BY MR. KOTT:
10       Q      Calling your attention to Growney-63 --
11  you know what, let me ask you a different question.
12              The Amana blade you talked about that had in
13  some place, either on the internet or someplace
14  else, the pictorial, do you know when Amana put that
15  on, the pictorial on?
16       A      Not without trying to find a copyright
17  date on something.
18       Q      Okay.  That's what you need to do to do
19  that?
20       A      Yeah.
21               MR. KOTT:  Okay.  Thank you.
22  BY MR. PACKIN:
23       Q      I just have a couple.  Mr. Growney, in
24  Growney-65, the diamond products equipment catalog
25  that was marked on page 74, they show a power tool;

Degnan & Bateman, Inc.
(856) 232-7400

Page 226

1  correct?
2      A      Page 74, you said?
3      Q      Yes.
4      A      Yes.
5      Q      And is that what defense counsel has
6  been describing as a gasoline-powered, hand-held
7  portable cut-off machine?
8      A      Yes.
9      Q      what -- the model that's listed on
10  page 75 as SC7314, is that the 14-inch tool?
11      A      SC7314 is the 14-inch; correct.
12      Q      And that's the machine you told
13  Mr. Kott is designed to be used with abrasive wheels
14  or diamond wheels, not carbide-tipped blades;
15  correct?
16      A      Correct.
17      Q      In its catalog, does Speedy Cut call
18  that cut-off machine or cut-off saw?
19      A      Speedy Cut calls it a cut-off saws --
20  cut-off saw.
21      Q      And it is a 21-pound tool; is that
22  correct?
23      A      Yes, it is.
24      Q      And it has an arbor -- it will accept
25  blades with one-inch or 20-millimeter diameters;

Page 227

1  true?
2      A      Yes.  Either one.
3      Q      And under accessories, what's the first
4  listed accessory item that's made available for sale
5  with that machine?
6      A      20-millimeter to one-inch arbor
7  adapter.  The thing we have been calling a bushing.
8      Q      Was, in your opinion, was Mr. McGee's
9  use -- was his use of the TS400 to cut HDPE plastic
10  pipe a reasonably foreseeable purpose to use that
11  tool for?
12          MR. WALSH:  Object to form.
13          THE WITNESS:  Yes, it was.
14  BY MR. PACKIN:
15      Q      And what do you base that on?
16      A      well, first off, these machines can cut
17  and have been used to cut concrete pipe, cast iron
18  pipe, and so now you have a pipe that isn't -- is
19  made of a material that is not as -- as tough as
20  concrete or cast iron, steel.  And so it certainly
21  is reasonable that a person who uses one of these
22  saws could say, well, I got something that's easier
23  than concrete or easier than cast iron or steel, so
24  there's no reason why I can't cut that.  It is an
25  easier job.

Page 228

1      Q      Is HDPE plastic pipe a type of material
2  that in your experience is found on construction
3  sites?
4      A      Yes.
5      Q      Is using the TS400 -- was Mr. McGee's
6  use of the TS400 to cut this HDPE pipe with a
7  14-inch carbide-tipped saw blade on it, in your
8  opinion, a reasonable foreseeable manner in which he
9  used it?
10          MR. KOTT:  Object to the form.
11          MR. WALSH:  Object to the form.
12          THE WITNESS:  Yes.
13  BY MR. PACKIN:
14      Q      And what would you base that on?
15      A      well, a -- there is a couple of things.
16  One is that a reasonable engineering designer would,
17  once he's made his design, do an analysis for the
18  reasonably foreseeable uses or the manner in which
19  it is used, his product would be used.  And if he
20  had done -- if a -- if a reasonable engineer had
21  done such a reasonable engineering analysis for its
22  intended use, he would have seen that there are
23  misuses which are reasonably foreseeable.
24          The other thing was that there has been
25  experience in the field that this has been -- this

Page 229

1  has been done over, and over, and over again.  So
2  the -- the analysis would have to take into effect
3  what he was cutting and the way he was going about
4  it.
5      Q      In your report, did you, in fact,
6  criticize the wording of the warning on the Oldham
7  blade?
8          MR. KOTT:  I object to the form.
9          THE WITNESS:  Yes, I did.
10  BY MR. PACKIN:
11      Q      When you were questioned on June 15th,
12  I think, but I'm not correct -- I'm not clear in my
13  recollection because it was a while ago, that you
14  testified that you did not know of any manufacturers
15  of carbide-tipped saw blades who included a
16  pictorial on the blade such as the one or similar to
17  the one you've proposed in this case.  Is that
18  correct?
19          MR. KOTT:  I object to the form.
20          THE WITNESS:  No.  That's not correct.
21  Amana, AEG Amana used that pictorial.
22  BY MR. PACKIN:
23      Q      Was that in your discussion with
24  Mr. Kott earlier today?
25      A      Yes, yes, yes.  That's the type of

(Pages 226 to 229)

58

Page 230

1  pictorial that's appropriate.
2              MR. KOTT:  Are you saying they used it
3  on the blade?
4              MR. PACKIN:  His testimony is what it
5  was earlier.  That's why I referred to it.
6              MR. KOTT:  Well, his testimony was
7  earlier --
8              MR. PACKIN:  Don't interrupt me while
9  I'm questioning.  You can do whatever you want when
10 it is your turn.
11             MR. KOTT:  Okay.
12 BY MR. PACKIN:
13     Q     Also, I'm not sure if I heard you
14 testify correctly on the 15th of June.  I thought
15 you said you don't know what warnings were on the
16 accident saw blade; is that correct?
17             MR. KOTT:  I object to the form.
18             THE WITNESS:  Well, by that I mean that
19 I didn't see the accident saw blade.  In other
20 words, the one that actually was involved in the
21 accident.  So I don't really know what was on it.
22 I've seen exemplars.
23 BY MR. PACKIN:
24     Q     So would it be fair to say you know
25 what was on it when it was originally manufactured?

Page 231

1              MR. KOTT:  I object to the form.
2              THE WITNESS:  Yes.  What should have
3  been on it.
4  BY MR. PACKIN:
5      Q     And is that what's cited in paragraph
6  6.145 in your report where you quote it?
7              MR. KOTT:  I object to the form.
8              THE WITNESS:  Yes.
9  BY MR. PACKIN:
10     Q     Is the blade -- is the model and
11 vintage of blade that was involved in Mr. McGee's
12 accident, the same model and vintage that was
13 involved in Kyle Stout's accident?
14     A     Yes.
15     Q     What did you mean on June 15th when you
16 said that you skimmed some of the deposition
17 transcripts that were sent to you?
18     A     Well, what I meant was that, a lot of
19 times in deposition there is a lot of extraneous
20 information that is not relevant to whatever we are
21 looking for.  And so I would go down through the --
22 through the transcript and look for things that I
23 was -- I would scan it and look for things that were
24 of concern on my part.  And then when I found one, I
25 might stay there and read it for comprehension, find

Page 232

1  out whether it supported anything or not.  And then
2  move on.
3      Q     You testified on June 15th regarding
4  your own lawn mower and other tools that you own
5  that you don't read the warnings that are on those
6  tools each time you use them.  Do you remember that
7  testimony?
8              MR. WALSH:  Object to the form.
9              THE WITNESS:  Yes, I do.
10 BY MR. PACKIN:
11     Q     What did you mean by that when you said
12 you don't read them each time you use them?
13             MR. WALSH:  I object to the form.
14             MR. KOTT:  I object to the form.
15             THE WITNESS:  Well, by that I mean,
16 I've read them, you know.  But I don't read them
17 every time I go to use the machine.  I don't sit
18 there and read this one, and read this one, and read
19 this one.  I mean, after a while, you know, through
20 that repetition, I'm going to understand what the
21 heck they are talking about.  But they are
22 positioned or placed in a manner where I see the
23 pictograms, the pictorials that accompany the text,
24 the warning text.  So the observance of the
25 pictorial reminds me, serves to remind me, it does

Page 233

1  remind me of the text on it.
2  BY MR. PACKIN:
3      Q     Does observing the pictorial require
4  the conscious act of reading?
5              MR. WALSH:  I object to form.
6              MR. KOTT:  I object to form.
7              THE WITNESS:  No, it does not.
8  BY MR. PACKIN:
9      Q     Are you familiar with the engineering
10 principles that go into the design of a cut-off saw?
11     A     Well, yes.  The engineering principles
12 are engineering principles, and they just are
13 adapted to various different things.
14     Q     Were there any engineering principles
15 that you encountered in your analysis in this case
16 with which you were unfamiliar?
17     A     No.
18     Q     From an engineering standpoint, do you
19 have to have designed a particular piece of
20 equipment to understand the engineering principles
21 and design criteria for that equipment?
22             MR. WALSH:  I object to the form.
23             THE WITNESS:  No.  No.  If you are a --
24 a trained engineer and you understand the
25 engineering principles, no, you don't have to.

59                                                    (Pages 230 to 233)

Page 234

BY MR. PACKIN:

1  BY MR. PACKIN:
2       Q    In ANSI B175, you were asked some
3  questions about a list -- I'm sorry.  B7.5, 1990,
4  you were asked some questions about -- and it might
5  have been the other one, as well -- about a list of
6  hazards to be warned against.
7       A    Yes.
8       Q    In your understanding, is that list
9  presented in any type of hierarchy or order?
10            MR. WALSH:  I object to the form.
11            MR. KOTT:  I object to the form.
12            THE WITNESS:  No, it absolutely is not.
13  There is -- there is nothing that indicates the
14  first one is the most severe and then the -- the
15  greater degree of severity decreases as you go down
16  the list.  There is absolutely nothing that says
17  that.  This is just a compilation of hazards.
18  BY MR. PACKIN:
19       Q    From your looking at that list, are
20  there some hazards that occur more frequently than
21  others?
22            MR. WALSH:  I object to the form.
23            THE WITNESS:  Yes, I believe so, yeah.
24  BY MR. PACKIN:
25       Q    Are there some that have potentially

Page 235

1  more severe consequences than others?
2            MR. WALSH:  Object to the form.
3            THE WITNESS:  Yes.
4            MR. PACKIN:  I don't have anything
5  else.
6            MR. KOTT:  I do, but you first?
7  BY MR. KOTT:
8       Q    With respect to the Amana blade, did
9  you also call it an AGE?  I don't remember.
10       A    I can't remember if it's AEG or AGE.
11       Q    Is AEG the same thing as Amana?
12       A    There is some kind of business
13  connection, and I don't -- I don't know exactly what
14  it is.
15       Q    On either the Amana or the AGE, are you
16  able to state that it actually has an on-product
17  pictorial not to use the blade on a cut-off machine?
18            MR. PACKIN:  On-product, meaning the
19  blade?
20  BY MR. KOTT:
21       Q    Yeah.
22       A    That's what I thought, although, you
23  know, sitting here right now, I -- I don't have a
24  clear recollection of it.
25       Q    Okay.  Is there something you could

Page 236

1  look at to determine if that's the case?
2       A    Go back on the website.  It is on the
3  website.
4       Q    Well, would the website tell you
5  whether the warning is actually on the blade itself?
6       A    I don't know.
7       Q    Okay.  Did you ever buy that blade to
8  see whether it was actually on the blade?
9       A    No, I did not.
10       Q    Why didn't you buy the blade?
11       A    It didn't occur to me.
12       Q    Is there any reason -- withdrawn.
13  Would you be able to buy that blade and bring
14  it to the courthouse and show the jury the
15  on-product warning if it is there?
16       A    If -- if Mr. Packin wants me to do
17  that, I -- I could.
18            MR. KOTT:  Okay.  No further questions.
19  BY MR. WALSH:
20       Q    Mr. Packin made reference to ANSI
21  standards B7.5 1991 and what he referred to as the
22  other one, which I think he intended to be 175 2006
23  and the list of warnings.  You recall him asking you
24  about that?
25       A    Yes.

Page 237

1       Q    You have never sat on an ANSI committee
2  that had either the B7.5 or the B175 committee, have
3  you?
4       A    Have I sat on the ANSI B175 committee?
5       Q    Yes.  Or the B7.5 committee.
6       A    No.
7       Q    Have you ever made -- have you ever
8  been part of the group that is asked to comment on
9  either of those standards?
10       A    No.
11       Q    Have you ever made a comment on either
12  of those standards to the -- to the sponsors or to
13  ANSI itself?
14       A    No.
15       Q    Have you ever talked to anybody on the
16  committee about what their -- what their intent was
17  in the list of hazards they provided in the
18  warnings?
19       A    No.
20       Q    Have you ever talked to a -- a
21  manufacturer about the intent -- anybody -- anybody
22  on either the technical committee or the canvas
23  committee for either of those standards about what
24  the intent was with regard -- whether it was
25  hierarchal or not?

(Pages 234 to 237)

Degnan & Bateman, Inc.
(856) 232-7400

Page 238

1    A    No. Based on my experience on ANSI
2  committees, I know that on an ANSI committee, that
3  if you intend something to be hierarchal, you write
4  it out. In the ANSI committees that I have sat on,
5  we have lists of hazards and they are not
6  necessarily hierarchal.
7    Q    What ANSI committees have you sat on
8  that has a list of hazards?
9    A    I sat on ANSI 01.1. I sat on ANSI B65
10  177.1. And ANSI B65 177.2. All of those standards
11  we have laid out warnings requirements, and we have
12  listed out and have listed various dangers. We
13  have not at any one of those standards identified a
14  hierarchy.
15    Q    Is it your testimony that in the three
16  standards you just identified, that there is a
17  listing in them of -- of a standard -- of warnings
18  to go on machines?
19    A    There are some -- we had a discussion
20  on this.
21    I'm sorry. I would have to refer to them
22  right now. I can't -- I can't recall. It may be
23  because it is late in the day.
24    Q    We can agree that the standards in the
25  -- in the cut-off machine standard are a list of

Page 239

1  hazards that must go on the machine; correct?
2    A    Yes.
3    MR. WALSH: All right. I don't have
4  any further questions.
5    MR. PACKIN: Okay. Go to my office.
6    On these documents here, if you guys want
7  complete copies, meaning these catalogs and the
8  notebook, you are going to have to give me some
9  affirmative written thing that you want them and
10  that you will pay for the copying of them. If you
11  don't want them, tell me that, too, and I will
12  return them to --
13    MR. WALSH: We want them and we will
14  pay you for them.
15    MR. KOTT: Same here. What do you want
16  with the catalogs?
17    MR. RUDOLPH: Do you want copies of the
18  whole catalogs, as well?
19    MR. KOTT: I want them, as well.
20    In addition, Mr. Packin, in my letter to you,
21  two letters, I had asked Mr. Growney to produce the
22  warnings articles that he read since -- since his
23  last deposition of McGee. He produced a number of
24  Timothy Rhoades articles where Rhoades was the
25  author or coauthor, but not the others.

Page 240

1    MR. PACKIN: Yes, he did. The notebook
2  -- I pointed out that there are other articles in
3  there that are not authored or coauthored by
4  Rhoades.
5    MR. KOTT: My impression from what he
6  said in the deposition was that there were others
7  that he reviewed that were not in that notebook.
8    MR. PACKIN: I didn't get that
9  impression, but I will check with him.
10    MR. KOTT: I would like to know from
11  you what the witness says the size of the lettering
12  was on the Oldham blade.
13    MR. PACKIN: Whatever you want, put it
14  in a letter.
15    MR. KOTT: I'm going to put it here and
16  then I'll put it in a letter.
17    I would also like to know where -- whether he
18  contends the size of the lettering violated the ANSI
19  standard, the chart that I went through with him on
20  ANSI Z535 2000, 535.4 2002, the charts in the
21  appendix.
22    MR. PACKIN: I'm not being rude. Just
23  put whatever you want on the record and then put it
24  in a letter to me.
25    MR. KOTT: I would like to know where

Page 241

1  he says that the warning was on the Amana or AGE
2  product, meaning was it in the packaging, was it on
3  the blade, or was it on the website, or was it
4  somewhere else.
5    I would like to know when the Amana warning,
6  according to this witness, was put on there, and by
7  that, I'm referring to the pictorial.
8    That's it.
9        **********

61                                        (Pages 238 to 241)

Page 242

C E R T I F I C A T I O N

STATE OF NEW JERSEY

                ss.

COUNTY OF GLOUCESTER

     I, Jean B. Delaney, a Certified Shorthand Reporter and Notary Public of the State of New Jersey, do hereby certify that I reported the deposition in the above-captioned matter; that the said witness was duly sworn by me; that the reading and signing of the deposition were waived by said witness and by counsel for the respective parties; that the foregoing is a true and correct transcript of the stenographic notes of testimony taken by me in the above-captioned matter.

     I further certify that I am not an attorney or counsel for any of the parties, nor a relative or employee of any attorney or counsel connected with the action, nor financially interested in the action.

             Jean B. Delaney, CSR #XI01556
             Notary Public #2044912 Exp. 6/19/13

Dated: September 1, 2010
      D E G N A N & B A T E M A N, I N C.