UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

```
                                 .
Robert McGee, et al.,            .      Docket #08-CV-520 (MLC)
                                 .
        Plaintiffs,              .
                                 .      United States Courthouse
            vs.                  .      Trenton, New Jersey
                                 .      April 16, 2012
STIHL Incorporated, et al.,      .      10:09 p.m.
                                 .
        Defendants.              .
..........................................................
```

TRANSCRIPT OF DAUBERT HEARING
BEFORE THE HONORABLE MARY L. COOPER
UNITED STATES DISTRICT COURT JUDGE


APPEARANCES:

For The Plaintiff:              Barry M. Packin, Esq
                                Nagel Rice, LLP
                                103 Eisenhower Parkway
                                Roseland, NJ 07068

For the Defendant:              James Walsh, Esq.
                                McGuire Woods, LLP
                                One James Center
                                901 East Cary St.
                                Richmond, VA 23219

                                Stephen A. Rudolph, Esq.
                                Monte & Rudolph, PA
                                800 The Plaza
                                Sea Girt, NJ 08750

Audio Operator:                 Antonio Giaquinto

Transcribing Firm:              Writer's Cramp, Inc.
                                6 Norton Rd.
                                Monmouth Jct., NJ 08852
                                732-329-0191


Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

2

Index

|  | Direct | Cross | Redirect | Recross | Further Redirect |
|---|---|---|---|---|---|

Witnesses For The:
 Plaintiff:

| Dr. Kalsher | 8 | | | | |
|---|---|---|---|---|---|
| Dr. Kalsher (cont'd) | 125 | | | | |

Witnesses For The
 Defendant:

MOTIONS:

| EXHIBITS: | | Marked | Received |
|---|---|---|---|
| P-E | Kalsher CV | 9 | |
| P-1 | Book-"Warnings and Risk Communication" | 30 | 31 |
| P-2 | Book-"Handbook of Warnings" | 32 | 33 |
| P-3 | Kalsher CV From Motion Papers | 44 | 45 |
| P-4 | Kalsher Expert Report | 55 | 55 |
| P-5 | Blowup-Preface ANSI B7.5-1990 | 82 | 83 |
| P-6 | Blowup-ANSI Z535.4-2002 | 96 | 96 |
| P-7 | Blowup-Yellow Warning Label | 101 | 101 |
| P-8 | Exemplar Stihl TS 400 Cut-Off Saw | 103 | 103 |
| P-9 | Blowup-Page of TS 400 Owner's Manual | 146 | 147 |

1           THE COURT:  Good afternoon everyone.

2           ALL:  Good morning.

3           THE COURT:  Okay, we'll begin by taking appearances.

4           MR. PACKIN:  Good morning, Your Honor.  Barry Packin

5      from the law firm of Nagel Rice representing the Plaintiffs

6      McGee.

7           MR. WALSH:  Jim Walsh from the law firm of McGuire

8      Woods representing Stihl.

9           MR. RUDOLPH:  Good morning, Your Honor.  Steve

10     Rudolph, Rudolph and Kayal, local counsel for Stihl.

11          THE COURT:  All right, thank you.  Be seated.  I

12     have spent as much time as I physically could going over the

13     materials filed with this particular motion.  Unfortunately, I

14     was not able to get to all 14 hours of Dr. Castro's deposition

15     simply because it just didn't occur to me that it could have

16     been a 14-hour affair, and nor have I read the corresponding

17     amount of material for the Stout case in which Dr. Kalsher

18     evidently was deposed at comparable length.  But I am very

19     conversant with what is going back and forth in the issues

20     here.  I have reread the briefs, I have reread the expert

21     report.  I'm aware of the credentials.  I have read two of the

22     three days of the depositions, and I have read the tail-end of

23     the third day of deposition when counsel for Oldham asked two

24     questions and Mr. Packin asked one question.

25          I gave the opportunity for this hearing basically at the

1    Plaintiff's request so that the Plaintiff could put something

2    on the record about the expert and his qualifications before I

3    decide this motion.  I do think that we can accomplish putting

4    this hearing on the record today.  Is Oldham still in the

5    case?

6              MR. PACKIN:  No, Ma'am.

7              THE COURT:  Okay, fine.  So Mr. Packin, how long do

8    you propose to go with your witness?

9              MR. PACKIN:  To answer that question, I certainly

10   understand what Your Honor has just told us about your

11   familiarity with the materials.  That being said --

12             THE COURT:  I'm being very up front with you, as you

13   can see.

14             MR. PACKIN:  Yes.  And so I want to respond equally

15   up front.  Since Dr. Kalsher has been challenged on every

16   aspect of the case, his qualifications, his background, his

17   experience, his opinions, his reasoning, I'm prepared to go

18   through all of that and at least establish on the record, for

19   example, things about why many of his writings evidenced the

20   methodologies that were applied in this case, and where from

21   the materials reviewed critical facts were determined, and

22   that is a lengthy process both --

23             THE COURT:  How long do you expect you need if I

24   give you all the time you think you need?

25             MR. PACKIN:  If I were to do it in that manner,

1   probably would get close to three hours.  I don't --

2           THE COURT:  I can do three hours.  I can do three

3   hours.

4           MR. PACKIN:  And then there are issues to address

5   that were raised in their motion papers as well, which is also

6   part of the purpose --

7           THE COURT:  What do you mean?

8           MR. PACKIN:  -- of the hearing.  Well, I mean,

9   there's some things that are claimed that will address in our

10  presentation.  So I would say it's about three hours on our

11  end.

12          THE COURT:  All right.  So it's 10 o'clock now --

13  it's 10:15.  That would take us to about 1:30, right?

14          MR. PACKIN:  Or thereabouts, yes, Ma'am.

15          THE COURT:  Thereabouts.

16          MR. PACKIN:  I mean, it could run shorter, it could

17  run a little longer but that's an estimate.

18          THE COURT:  About.  Okay.  I could give three hours

19  to the other side and we'd be done by 5:30.

20          MR. PACKIN:  I might need redirect, I suppose, but I

21  don't know.  I don't want to burden the Court with unnecessary

22  testimony and time being used up.  My feeling about the Motion

23  to Disqualify is well documented in our papers.  On the other

24  hand, since it is there, I have to make my record, so --

25          THE COURT:  I think we can get this accomplished

1   today.

2           MR. PACKIN:  I do as well.

3           THE COURT:  Mr. Walsh?

4           MR. WALSH:  Your Honor, as long as the time is

5   divided fairly, and I think Your Honor has indicated that it

6   would be, we are flexible enough to go with whatever.  I would

7   suggest, I mean, one consideration you may want to do, since

8   Mr. Packin raises the possibility of redirect, I'm sure as the

9   Court's familiar, generally on a Daubert Motion the cross

10  examining people go first, and then the presenter of the

11  witness follows up.

12          THE COURT:  That hasn't been my experience, but go

13  ahead.

14          MR. WALSH:  Okay.  Well, our experiences differ.

15  But that would be --

16          THE COURT:  You've already had 14 hours.

17          MR. WALSH:  I understand, but that would be one way

18  to eliminate the need for a redirect.  But I'm not suggesting

19  we do that, I just offer it as one possible way of approaching

20  it to save time.

21          THE COURT:  What I will do is I will entertain oral

22  argument on this hearing after today.  And with that, you can

23  rely on your 14 hours of deposition, as well as whatever comes

24  forth today.  So please don't feel, at least on the

25  Defendant's side, that you have to get in absolutely

1    everything that you've already obtained in deposition.

2         As I said, the reason that I granted this evidentiary

3    hearing was at the Plaintiff's request because they said that

4    all the questioning was done during deposition, as it

5    customarily is, by the challenger.  Okay, let's go.  When you

6    need any kind of a little short break for any reason, just ask

7    for it.

8              MR. PACKIN:  Does Your Honor prefer whether I work

9    from the lectern or my table?

10             THE COURT:  Whatever's convenient for you.

11             MR. PACKIN:  Okay.

12             THE COURT:  Just so you know, we are using a tape

13   recording system, digital recording system.  The operator here

14   will be replaced by his fellow staff members seamlessly so

15   that we can just keep going.  And I take notes on my laptop,

16   and they're just notes, but they're very thorough.

17             MR. PACKIN:  Thank you, Your Honor.

18             THE COURT:  Okay.  It doesn't mean that I'm not

19   listening.  It means I am listening intently and I will deal

20   with objections just like that.  So don't hesitate to raise

21   objections.  Okay, go ahead.

22             MR. PACKIN:  I call Dr. Michael Kalsher.

23             MICHAEL KALSHER, PLAINTIFF'S WITNESS, SWORN

24             THE CLERK:  Please state and spell your full name

25   for the record.

Kalsher - Direct                    8

1              DR. KALSHER:  Michael John Kalsher, K-A-L-S-H-E-R.

2              THE COURT:  I'll let you know when I'm ready.  It'll

3    just take me a second.

4          (Pause in proceedings)

5              THE COURT:  Mr. Rudolph, are you going to be doing

6    much questioning today?

7              MR. RUDOLPH:  No, Your Honor.

8              THE COURT:  Would you be our timekeeper, please?

9              MR. RUDOLPH:  I'm sorry?

10             THE COURT:  Be our timekeeper, please.

11             MR. RUDOLPH:  Sure.

12             THE COURT:  Thank you.  Wait a minute.  We won't

13   start until I'm ready to listen.

14         (Pause in proceedings)

15             THE COURT:  You may proceed, Counsel.

16             MR. PACKIN:  Thank you, Your Honor.

17                       DIRECT EXAMINATION

18   BY MR. PACKIN:

19   Q.  Dr. Kalsher, good morning.

20   A.  Good morning, sir.

21   Q.  Do you have your Curriculum Vitae available before you?

22   A.  Yes, sir.

23             MR. PACKIN:  Okay.  And Your Honor, for the record,

24   that is Exhibit-E attached to the certification of Stephen

25   Rudolph in connection with this motion.

1          (Plaintiff's Exhibit-E previously marked for

2     identification)

3     BY MR. PACKIN:

4     Q.  Dr. Kalsher, on your CV it lists two offices, one at the

5     Department of Cognitive Science at Rensselaer Polytechnic

6     Institute, and one in Rensselaer, New York.  Could you tell us

7     what you do at the university office?

8     A.  Yes.  At my university office I do the normal activities

9     expected of a faculty member at a college such as Rensselaer

10    Polytechnic Institute.  I meet with students there.  I have my

11    teaching materials there.  I organize a lot of the research

12    programs that I have; I file systems there.  It's where I do

13    my business as a university professor.

14    Q.  And what do you teach at Rensselaer?

15    A.  I teach a number of topics.  As you know, my Doctorate is

16    in industrial organizational psychology.  I also had a

17    specialization in behavioral community psychology and some

18    other --

19         THE COURT:  Just a second.  Could you just tell us

20    what you're currently teaching?

21    A.  Yes, Ma'am.

22         THE COURT:  By the way, testify out to the room.

23    I'm taking notes.  I can hear every word if you just testify

24    right out to --

25    A.  Yes, Your Honor.

1            THE COURT:  -- whoever is questioning you.

2    BY MR. PACKIN:

3    Q.  What are you teaching?

4            THE COURT:  What are you currently teaching?

5    A.  Currently I teach our experimental methods and statistics

6    courses at the undergraduate and graduate level.

7    BY MR. PACKIN:

8    Q.  Okay.  And what other courses have you taught at

9    Rensselaer?  How long have you been at Rensselaer?

10   A.  I've been at Rensselaer since the fall of 1988.

11   Q.  And what other courses have you taught there?

12   A.  I have taught general psychology as part of my other parts

13   of writing as a professor, producing an introductory

14   psychology textbook.  I have taught human factors and design,

15   which is our introductory course to human factors.  I've

16   taught our advanced human factors course, which typically was

17   taken by students who are very interested in the topic of

18   human factors after taking the introductory course or for

19   graduate students.  I've taught a course called Consumer

20   Behavior and Design for the Lally School of Management also at

21   --

22           THE COURT:  Consumer what?

23   A.  Consumer Behavior and Design, which is the application of

24   psychological principles to management and marketing issues.

25   And the reason they asked me to teach it was also that I could

1    incorporate into that features of human factors and design of

2    consumer products as an add-on to the normal course that they

3    teach.  I've taught a variety of other --

4             THE COURT:  Design of what?  Add-on of --

5    A.  To the normal --

6             THE COURT:  -- design of consumer products?

7    A.  Yes, Your Honor.

8             THE COURT:  I just didn't hear the words.

9    A.  Yes.  Ordinarily, a faculty member in the School of

10   Management teaching that course would not also incorporate

11   topics from human factors area that would relate to consumer

12   products and their marketing.  I taught other courses as well.

13   For example, I started a two-series course that relates to a

14   more forensic set of topics within psychology.  For example,

15   one course was called Psychology and the Law.  The second

16   follow-up course was called Forensic Psychology.  They both

17   dealt with primarily issues that would be on the civil side of

18   the law.  And since I created those, another faculty member

19   has gone on to embellish those to include more criminal kinds

20   of issues in those courses.  I've taught a course called

21   Personality and Adjustment.  I've taught courses, many of them

22   independent studies in areas of my expertise that include

23   behavioral psychology.

24             THE COURT:  That's enough.

25   A.  I can't think of others.  Okay.

1   BY MR. PACKIN:

2   Q.  Doctor, what is human factors?  It's one area in which

3   you've taught.  Would you tell us what is the definition of

4   the field of human factors?

5   A.  Human factors, it's also referred to as ergonomics

6   primarily in Europe, is a blended area of study that involves

7   the investigation issues at the interface between people and

8   products, equipment and technology.  It draws on a number of

9   areas --

10            THE COURT:  Face between people?

11   A.  Between people.  The interface between people, their

12   behavioral and cognitive strengths and limitations, and

13   products, equipment, technologies, and so on.

14            THE COURT:  Okay, thank you.

15   A.  It typically is inhabited by professionals largely that

16   are either psychologists or different kinds of engineers.

17   BY MR. PACKIN:

18   Q.  And does the field of human factors get involved in any

19   way with the issue of product warnings?

20   A.  Yes.  There are a number of human factors professionals

21   that are involved in doing a variety of activities that are

22   related to product and equipment warnings.

23   Q.  And can you just briefly tell us how the field of human

24   factors relates to the field of warnings?

25   A.  Right.  In order for warnings to be effective on products,

1   we need to think about what measures of effectiveness are.

2   It's generally accepted in my field that there are several

3   measures of effectiveness to consider for warnings.  One is

4   whether or not they inform people of hazards that they need to

5   look out for.  Another is that the warnings be able to remind

6   people at a time when they are going to come into contact with

7   a hazard.  And then of course an important criteria for

8   effectiveness of warnings is whether or not people actually

9   comply with a directive that could be to do behavior to avoid

10  harm, or to cease doing a behavior in order to avoid harm.

11  Q.  Is there any --

12          THE COURT:  What do you mean by comply again?

13  A.  To do certain behaviors that would either eliminate the

14  possibility that you might not be -- that you would be hurt,

15  or to take some sort of precautionary behavior, such as put on

16  personal protective equipment or operate the equipment or work

17  with the product in a safe way.

18  BY MR. PACKIN:

19  Q.  Now, is there any national professional organization in

20  the field of human factors?

21  A.  Yes.  The primary one in the United States is called Human

22  Factors and Ergonomic Society.  It has a number of different

23  areas of interest in it that are symbolized by about 21

24  different technical groups, or birds of a feather that are

25  interested in different topics within the field of human

1    factors.   The two that deal most primarily with the issue of

2    risk communication and warnings are in the Safety Technical

3    Group, the Forensics Professional Group, and the Product

4    Design Group.

5              THE COURT:  Give me those three words again.  You

6    said there were two, and then you listed three.  The two of

7    the 21 tech groups dealing mostly with risk communication and

8    warnings are --

9    A.  I'm sorry, I misspoke, Your Honor.  The primary ones are

10   the Safety Technical Group and the Forensics Professional

11   Group.  But there are also individuals within a third called

12   the Product Design Group that also deal with that.  And I

13   would just, not to test your patience, but as medical --

14             THE COURT:  The Product Design Group?

15   A.  Product Design Group, yes.  There is a relatively newer

16   technical group called Health Care that deals with issues of

17   human factors within the medical field, and there are

18   individuals that are in that group that also deal with risk

19   communications and warnings as it relates to medical devices

20   and equipment.

21   BY MR. PACKIN:

22   Q.  And are you a member of the Human Factors and Ergonomics

23   Society?

24   A.  Yes.  I've been a member since about 1991.

25   Q.  Have you served in any capacity on the Safety Technical

1    Group?

2    A.  Yes.

3    Q.  Tell us what you've done there in brief, please, because

4    we do want to make sure we keep this within our three hours

5    today.

6    A.  Yes.  I've served as technical program chair, which has

7    the primary responsibility for taking in papers that are

8    submitted for presentation at the annual meeting and then

9    publication in the meeting proceedings.  I have served --

10            THE COURT:  So this is a peer review committee?

11   A.  Yes, Your Honor.

12            THE COURT:  For prospective papers?

13   A.  For prospective papers that are submitted to the annual

14   meeting.  I have served as the chair of that technical group

15   which works with the program chair but has other kinds of

16   duties as well, such as attending the annual meeting to attend

17   the Council of Technical Groups which has a meeting of all of

18   the chairs from the various technical groups to share

19   information and common concerns about the technical groups.

20   BY MR. PACKIN:

21   Q.  Okay.  Have you served in any capacity on the Forensic

22   Professional Group?

23   A.  Yes.  In that technical group I have served as chair of

24   the Forensic Professional Group.

25   Q.  And very briefly, what type of subjects does the Safety

1  Technical Group deal with?

2  A.  It deals with the issues that are related to safety

3  general from a human factor's perspective; that is, to take

4  principles from psychology and engineering in order to

5  understand how to make products safer, easier to use, things

6  such as that.

7  Q.  Okay.  And how about the Forensic Professional Group?

8  What is their general involvement?  What are the topics they

9  deal with?

10 A.  The Forensic Professional Group deals with human factors

11 issues as they relate to standards of care and accountability

12 in legislative, regulatory and judicial areas.  The idea is to

13 take scientifically derived findings to apply to human factors

14 issues in those areas.

15 Q.  Okay.

16        THE COURT:  So this would encompass legislation?

17 A.  Legislative, regulatory --

18        THE COURT:  Regulatory and litigation.

19 A.  -- and judicial.

20 BY MR. PACKIN:

21 Q.  Again, briefly, does the Human Factors and Ergonomics

22 Society, particularly these sections that you're involved in,

23 do they get involved in any way in developing any standards or

24 guidelines in the field of warnings and product safety

25 communication?

1   A.  Yes, they do, in at least two ways.

2   Q.  What are those two ways, sir?

3   A.  One was is through the research that individuals in those

4   two technical groups -- and just as an aside, you don't have

5   to be a member of those two technical groups in order to

6   submit a paper for presentation at the meeting and publication

7   of the proceedings.  And many human factors, individuals, and

8   sometimes people outside the Society will, in fact, do

9   research, publish their papers, and present them at the human

10  factors meeting.  So I want to make sure that you understand

11  that it's not a restrictive thing --

12  Q.  Okay.

13  A.  -- in terms of doing research and publishing papers.

14  They're also involved in --

15          THE COURT:  Just a second, please.  Okay.  So the

16  question, though, was how does the Society, particularly these

17  two sections, get involved in developing standards and

18  guidelines.  And then you said, well, people from outside the

19  Society can seek to present papers.  What's the answer to the

20  question how to get involved in developing standards and

21  guidelines --

22  A.  Yes, Your Honor.

23          THE COURT:  -- in at least two ways?

24  A.  Yes.  So the research findings that emerged out of human

25  factors research are reflected in standards such as the Z535

                           Kalsher - Direct                      18

 1   series of standards that are established to set up design

 2   parameters for the design and development of warnings.

 3   BY MR. PACKIN:

 4   Q. Okay --

 5            THE COURT:  And what's that term?  Z what?

 6   A.  Z535.

 7            THE COURT:  Without a space in between or a hyphen?

 8   A.  Either, either.  It's typically hyphened.

 9            THE COURT:  Z --

10   A.  535.

11            THE COURT:  -- 535.  Series, right?

12   A.  Yes.

13            THE COURT:  What, standards?

14   A.  Of standards.  The main --

15            THE COURT:  Put out by whom?  Issued by?

16   A.  The American National Standards Institute.

17            THE COURT:  Okay.  Known as ANSI?

18   A.  Yes, Your Honor.

19            THE COURT:  Thank you.

20   BY MR. PACKIN:

21   Q.  Dr. Kalsher --

22   A.  I --

23            THE COURT:  I don't think you let him finish his

24   sentence.

25   A.  I didn't finish my answer.

1          MR. PACKIN:  I'm sorry.

2   A.  The second way is that there are members of the Human

3   Factors and Ergonomics Society that serve on those kinds of

4   committees.  For example --

5          THE COURT:  I believe you.  Go ahead.

6   A.  I serve on the ANSI Z535 Committee, as do other members of

7   the Human Factors and Ergonomics Society.  They also serve on

8   other kinds of standards like that.

9   BY MR. PACKIN:

10  Q.  Okay.  Does the Human Factors and Ergonomics Society

11  publish any type of journal or periodical on any regular or

12  recurring basis?

13  A.  Yes.

14  Q.  And have you published in the Human Factors and Ergonomics

15  Journal?

16  A.  I've published in the Proceedings of the Human Factors and

17  Ergonomics Society.  There is the Human Factors Journal, and

18  there is another magazine that comes out of The Human Factors

19  Society that's called Ergonomics and Design that is intended

20  for more of a lay audience.  I have not published anything in

21  that.

22  Q.  Okay.  And briefly --

23         THE COURT:  But you have published in the journal?

24  A.  The Human Factors Journal, I don't think so, but certainly

25  many papers in the Proceedings of the Human Factors and

1    Ergonomics Society annual meeting.

2    BY MR. PACKIN:

3    Q.  What's the difference between the --

4            THE COURT:  Okay --

5    BY MR. PACKIN:

6    Q.  -- journal and the proceedings?

7            THE COURT:  -- has not published in the journal or

8    the mag, but has published papers in presentations to the

9    Society, right?

10   A.  Let me back up.  As you had indicated, as the program

11   chair, I was tasked with bringing in papers and sending them

12   up for peer review.  So the papers that are published in the

13   Proceedings of the Human Factors and Ergonomics Society are

14   peer reviewed.  It's one of the few journals that then allow

15   you to publish that information outside in other journals to

16   more widely disseminate it, and some of those publications

17   that occurred originally in the Proceedings then are also

18   published in the Human Factors Journal.

19   BY MR. PACKIN:

20   Q.  Okay.  Now, just briefly, what type of topics that would

21   be --

22           THE COURT:  I didn't get anything out of that.  You

23   have yourself presented one or more papers at one of these

24   Human Factors and Ergonomics Society meetings, whether an

25   annual meeting or a subgroup meeting, peer review paper by

1    you, yes?

2    A.  Yes.  It's at the annual meeting, and they're organized so

3    that sort of birds of a feather; there are a number of papers

4    that would be presented, for example, in a symposium with an

5    organizing title for a particular technical group.

6             THE COURT:  That's fine.  Have you presented a paper

7    at the annual meeting?

8    A.  Yes, many.

9             THE COURT:  Many.  Okay, many papers.  And these are

10   not just papers that you peer reviewed, these are papers on

11   which you are a named author?

12   A.  Yes.

13            THE COURT:  Okay.  And then those papers are

14   available for wider dissemination?

15   A.  Yes.

16            THE COURT:  Okay, fine.

17   BY MR. PACKIN:

18   Q.  And those proceedings become published, correct?

19   A.  Yes.

20   Q.  Okay.  Now, give us, just by topic or very brief general

21   description, some of the topics on which you published in

22   those proceedings that might be relevant to the field of

23   warnings.

24            THE COURT:  Referring to his CV that I am holding?

25            MR. PACKIN:  Which you may do as well, yes.

1          THE COURT:  Okay, if you'd just turn me to a page

2     and help me to check off a few of these that might be relevant

3     to our case?

4     A.  Yes, Your Honor.  I would start on page 2.  The main topic

5     that is titled "Refereed Articles or Chapters in Books."

6          THE COURT:  Yes.

7     A.  I have a paper under review with colleagues that deals

8     with evaluating symbols for the Globally Harmonized System

9     Hazard Communication.

10         THE COURT:  I see seven on that page.  How far down

11    is it?

12    A.  I'm sorry, I have a more current version of my vitae.  I

13    apologize, Your Honor.

14    BY MR. PACKIN:

15    Q.  Okay.  Would you like me to give you the copy that I have

16    here?

17    A.  Sure, that might be better.

18         THE COURT:  You can keep going though.  While you're

19    waiting for that, tell me another one on this list.

20    A.  Okay.  There's Williams, Kalsher and Wogalter in press.

21    These may be too current for the copy that you have.  I'll

22    start with the one that was marked.  Kalsher and Wogalter in

23    press is, I think, the one that you have.  Human Factors Basis

24    for Labeling on Medical Devices --

25         THE COURT:  Okay.

1   A.   -- It was a chapter that I wrote with my colleague,

2   Michael Wogalter, for inclusion in an edited book related to

3   topics on medical devices.  And ours had to do with human

4   factors aspects including markings and warnings.  The next

5   one, Kalsher and Wogalter in 2007, Hazard Control Methods and

6   Warnings for Caregivers and Children.  Again, it was a chapter

7   that I wrote with my colleague, Mike Wogalter, for inclusion

8   in an edited book related to ergonomics for children, and the

9   focus of our chapter was on warnings and risk communication.

10  Kalsher and Wogalter 2006, Influence of Presentation Modality

11  on Communication of Pharmaceutical Risk Information in Direct-

12  to-Consumer, or DTC, Television Commercials was an article

13  that we wrote that was published in the Proceedings of the

14  Triennial International Ergonomics Association.  And that

15  dealt with how one communicates risks regarding prescription

16  drugs in television ads, and it was done as part of something

17  called an incidental exposure paradigm, but it dealt with the

18  issue of risk communication for prescription drugs.  Kalsher

19  and Williams was a book chapter entitled Behavioral Compliance

20  and Methodology.  That was published in an edited book by my

21  colleague, Mike Wogalter, in The Handbook of Warnings.  I have

22  brought that book with me which is sitting here.  It's a 64-

23  chapter volume that addresses issues associated with warnings.

24  This particular chapter dealt with the topic of behavioral

25  compliance and methodologies associated with studies of

1    warnings and risk communication.

2    BY MR. PACKIN:

3    Q.  Hold on one second, Doctor.  I want to focus a little bit

4    here.  I was asking you about the publications in the Human

5    Factors and Ergonomics Society publications.  You told the

6    Court many of those have been published that you've authored

7    or co-authored, correct?

8    A.  Yes.  Do you want me just to stick with the Proceedings

9    articles?

10   Q.  Well, just for the moment.  The next question that I had -

11   - because we will go back to these.  Just for the moment, in

12   the field of warnings and human factors, are the published

13   Proceedings of the Human Factors and Ergonomics Society

14   considered to be publications that are relied upon and used in

15   that field of expertise?

16   A.  Yes, they are.  And in fact, there have been at least two

17   issues of compilations of articles that have been published in

18   annual meeting proceedings that cover different ranges of

19   time.

20   Q.  Okay.  And have any of your articles been in those

21   compilations?

22   A.  Yes.

23   Q.  Now, the other aspect -- and we're going to go back to

24   your publications -- the other aspect that you said that the

25   Human -- you said the Human Factors and Ergonomics Society has

1    two functions in helping to establish standards in the

2    warnings field.  One is by what they publish.  Did I state

3    that accurately?

4    A.  Yes.

5    Q.  So that represents a body of literature and knowledge and

6    research?

7    A.  Yes.

8    Q.  And then the other one you mentioned was contribution to

9    the ANSI Z535 series of standards, correct?

10   A.  Yes.  And actually, if I may, there would actually be at

11   least a third function, which is many individuals that would

12   serve in that capacity would also do consulting in business

13   and industry and also in litigation contexts such as we find

14   ourselves today.

15   Q.  Okay.  Now, I believe you mentioned, if I'm wrong you can

16   certainly correct me, that you have, in fact, participated,

17   sat on those ANSI committees?

18   A.  Yes, I currently sit on the ANSI Z535 Committee.

19   Q.  All right.  Explain for the Court, please, just briefly

20   what is the ANSI Z535 series as you've described it?

21   A.  Yes.  The ANSI Z535 series is established in part to

22   provide a uniform way of presenting, labeling warnings and

23   instructions on products in particular, but to establish a

24   uniform system for that.  The Z535 standard actually is

25   divided into sub-parts that deal with different parts of that.

1  For example, the Z535.1 subcommittee deals with safety colors.
2  We usually think about the color red associated with a signal
3  word "Danger," for example.  The .2 standard deals with
4  environmental signs, meaning signs that would be used for
5  facilities on highways, things that might be a little larger
6  and seen at a distance.  The .3 part of the standard deals
7  with symbols that might be used as part of warnings and risk
8  communication, and as part of that substandard, there are
9  specific ways that one might use and present symbols and it
10  includes a methodology as part of one of the annexes for how
11  one does some testing of symbols.
12  Q.  When you say symbols, is that what in some of the papers
13  have been described as pictograms or pictographs?
14  A.  Yes.
15  Q.  Okay.  And the other components of the ANSI Z535 series,
16  sir?
17  A.  .4 is the part of the standard that deals with product
18  labeling.  It was actually the first part of the standard.  .5
19  deals with temporary --
20         THE COURT:  This is product labeling, .4?
21  A.  Product labeling, yes, Your Honor.  .5 deals with
22  temporary tags and labels.  And the newest part of the
23  standard is the .6; that deals with ancillary kind of material
24  such as owner's manuals, instruction manuals, and so on.
25  BY MR. PACKIN:

1    Q.  And what ANSI subcommittees have you participated in

2    either as a member or contributor, consultant?  Please tell us

3    that.

4    A.  Sure.  Well, I'm a member of the main body of the ANSI

5    Z535 Committee, but I'm also a member of the .3 subcommittee

6    that deals with symbols, pictograms, pictographs.

7    Q.  How long have you been involved in professional activities

8    with ANSI?

9    A.  My best recollection is about at least five or six years.

10   Q.  And how about with the Human Factors and --

11          THE COURT:  How do you get to be on ANSI?

12   A.  On the ANSI Committee?  In my case, I was recommended by

13   colleagues, the two individuals that were the main

14   representative, and then there's an alternate.

15          THE COURT:  In other words, it's not like the

16   American Bar Association where if I'm a lawyer I can just send

17   in my dues and join a section and now I'm a member of the

18   litigation section?

19   A.  No, you must be approved for admission to the committee.

20          THE COURT:  It's by recommendation?

21   A.  Yes.

22          THE COURT:  It's by invitation, in other words.

23   A.  Usually what happens is you will be recommended.  For

24   example, not to take too long on this, but the alternate at

25   the time, Kenneth Laughery, who's a well known person in

1   warnings and risk communication, wanted to rotate off, and I

2   was invited to be the alternate, and then I had to be

3   confirmed by the larger body, the Standards Committee, as a

4   full member, full voting member.

5          THE COURT:  Okay, got it.  Thank you.

6   BY MR. PACKIN:

7   Q.  And do the ANSI standards, the ANSI Z535 standards, as

8   have been published, in your field are they considered

9   reflective of the science and thought in the field of warnings

10  and risk communication?

11  A.  In part.  Some of the most important findings from

12  warnings and risk communication research have been embodied in

13  the recommendations that are made in the various sub-parts of

14  the ANSI Z535 standard.

15  Q.  Okay.  Now, we've discussed the publications of the Human

16  Factors and Ergonomics Society and their work.  We've

17  discussed ANSI Z535 series.  Are there any other aspects in

18  the field of warning science where we would see the thought,

19  the research, the state of that science besides those two?

20         THE COURT:  Other authoritative?

21         MR. PACKIN:  Authoritative --

22         THE COURT:  -- is that what you mean?

23         MR. PACKIN:  -- yes.

24         THE COURT:  Sources, information re: -- what did you

25  say, warnings and science?

1          MR. PACKIN:  Warnings science, risk communication.

2          THE COURT:  That's your term.  Ask him if that's a

3     term he uses.

4     BY MR. PACKIN:

5     Q.  Is that a term you use, sir?

6     A.  Risk communication and warnings, yes.

7     Q.  Okay.  Well, any other areas?

8     A.  You're asking me where we would find that information?

9     Q.  Yes.

10    A.  It would be embodied in books such as those I brought with

11    me.  I have a 1999 edited book by Michael Wogalter, David

12    DeJoy, and Kenneth Laughery, all well-known people within the

13    Human Factors Committee and well known for their work in risk

14    communications and warnings, that put together an edited book

15    describing many topics related to warnings and risk

16    communication and, in fact, helped to move the field forward

17    by integrating those around a model that takes into account

18    generally accepted theoretical frameworks from other areas.

19    And just by way of briefly explaining what that is, that

20    involves taking a model from the communications literature,

21    which obviously would be related to risk communication and

22    warnings, as well as the basic information processing model

23    that's well established in the field of psychology.  And what

24    that organizing framework did was to provide a way of

25    organizing the then-known findings from the science of

1   warnings and risk communication to understand how they may

2   relate to what the criteria for effectiveness of warnings

3   would be.  For example, I had indicated earlier whether or not

4   they are informing people of important things they need to

5   know about products and environments that may be dangerous, so

6   that involves noticing a warning, and that ties into many of

7   the generally accepted factors that contribute to noticing,

8   comprehension, memory, and then obviously motivational kinds

9   of issues to comply with a directive.

10  Q.  Now, the other book you brought here you said is Handbook

11  of Warnings?

12  A.  Yes, Handbook of Warnings.

13          THE COURT:  Could we possibly mark those?  Just the

14  cover page --

15          MR. PACKIN:  Yes.

16          THE COURT:  -- the title page and the table of

17  contents so we see what the name of the book is, who published

18  it, name of the author.

19          MR. PACKIN:  Let's do the one you just discussed,

20  Warnings and Risk Communication.

21          THE COURT:  Do you have a numbering system going?

22          MR. PACKIN:  I haven't, based on the discussion we

23  had in our phone conversation, so I apologize for that, but

24  this would be P-1.

25          (Plaintiff's Exhibit-1 marked for identification)

1            THE COURT:  P-1.  Any objection, Mr. Walsh, if we

2    just do that?

3            MR. WALSH:  No objection.  I would ask that we also

4    mark the chapter that he participated in since there are 64

5    chapters and there's one chapter that he contributed to.

6            THE COURT:  Fine.  And the whole book will be an

7    exhibit, but I think we would stipulate that we will just

8    excerpt the relevant pages for our Court exhibits, and the

9    witness will take back his book.  Is that all right?

10           MR. WALSH:  Thank you.

11           MR. PACKIN:  It's actually, yes, Ma'am, three

12   chapters and not in that book, in this book.

13           THE COURT:  Okay, so we've got P-1.  What's the name

14   of it?

15           MR. PACKIN:  Warnings and Risk Communication.

16           THE COURT:  And that is -- who's the lead author?

17           MR. PACKIN:  Wogalter, W-O-G-A-L-T-E-R.

18           THE COURT:  Okay, P-1 in evidence.  Thank you.

19       (Plaintiff's Exhibit-1 admitted into evidence)

20   BY MR. PACKIN:

21   Q.  Dr. Kalsher, have you contributed to that book directly?

22   A.  I did not author any of the chapters in that book,

23   although work that I have performed in my research is cited in

24   that book.

25   Q.  Okay.  So you're cited in bibliography type material in

1    the book?

2    A.  I'm cited within the text and that appears in the

3    references.

4    Q.  Okay.  Have you authored any articles in the field of

5    warnings that are reflected in your CV with Mr. Wogalter?

6    A.  Yes.

7    Q.  And let's mark as P-2 one you identified before, Handbook

8    of Warnings.  And in this book I think you've indicated that

9    you contributed to or co-authored three chapters?

10   A.  Yes, sir.

11   Q.  All right.  What I'm going to do is I'm going to give you

12   the book after it's marked by the Clerk as P-2 and ask you to

13   identify the three chapters in which you were an author or co-

14   author, and give the title as well.

15         (Plaintiff's Exhibit-2 marked for identification)

16             THE COURT:  Start with the title.

17             MR. PACKIN:  The title of the book is Handbook of

18   Warnings.

19   BY MR. PACKIN:

20   Q.  Would you go to the three chapters and please identify

21   them by number and the title, and then we'll will have them

22   marked in that order.

23   A.  There it is, Chapter 23 is entitled Behavioral Compliance:

24   Theory, Methodology and Results.

25             MR. PACKIN:  We'll mark that Chapter 23 as P-3.

1           THE COURT:  Behavioral Compliance:  Theory --

2    A.  Methodology and Results.  The second chapter that I

3    contributed to as a co-author is Chapter 49, entitled

4    Allocation of Responsibility For Injuries.

5           THE COURT:  So you actually co-authored these

6    chapters?  You weren't just editing other people's work?

7    A.  Correct.  On the first chapter that I noted, I was the

8    first author.  On the chapter that I just cited, Chapter 49, I

9    was a co-author.  And the third one is Chapter 50, entitled

10   Jury Decision Making in Civil Litigation: Compensatory and

11   Punitive Awards.  I'm sorry to add things in, but I thought

12   part of the question was how I had contributed or how human

13   factors individuals had contributed other than the methods

14   that you told me, and that's one of the reasons why I cited

15   these two books.

16          MR. PACKIN:  Okay.

17          THE COURT:  P-2 in evidence.  The contents that will

18   be excerpted should be stipulated between the parties.

19      (Plaintiff's Exhibit-2 admitted into evidence)

20          MR. PACKIN:  Okay, we can do that right now.

21   BY MR. PACKIN:

22   Q.  So if I understand correctly, we have the publication such

23   as Human Factors and Ergonomics Society produced, ANSI

24   standards and textbooks such as the two we've marked here,

25   correct?

1   A.  Yes.

2   Q.  Do those represent the authoritative publications and

3   state of the art, so to speak, in the field of warnings and

4   risk communication?

5           THE COURT:  Talking about the United States.

6   BY MR. PACKIN:

7   Q.  In the United States.

8   A.  I would say that these two textbooks are relied on

9   heavily, and they're very informative for the purposes of

10  explaining many of the issues involved in developing risk

11  communications and warnings.

12  Q.  Together with the other --

13          THE COURT:  The question was the three sources.

14          MR. PACKIN:  Correct.

15          THE COURT:  These handbooks here, textbooks,

16  whatever they are, plus the ANSI process, including its

17  committees and its standards, plus the Society and its

18  proceedings and its peer reviewed publications.

19  A.  Yes, and --

20          THE COURT:  Those are the three sources that the

21  question included.

22          MR. PACKIN:  Yes.

23  A.  Those were three.  And I don't want to leave it -- for

24  reasons of completion, The Human Factors and Ergonomics

25  Society and its publications are not the only journals, peer

1   reviewed journals, that publish this kind of information.  It

2   appears in other human factors related or perhaps psychology

3   related journals.

4   BY MR. PACKIN:

5   Q.  All right.  So, but the three areas we've identified,

6   would you consider those significant parts of the

7   authoritative information in the field of warnings and risk

8   communication?

9   A.  Yes, they would be three significant parts.

10  Q.  And could you tell us one or two additional publications

11  that are used and relied upon regularly in the field of

12  warnings and risk communication, one or two?

13  A.  Sure.  There's one from 2006 which was written by Kenneth

14  Laughery that lays out --

15          THE COURT:  Spell it.

16  A.  L-A-U-G-H-E-R-Y.  It's actually Senior because he has a

17  son that does work in this area as well.  It was an article

18  written in 2006 that lays out a lot of the issues associated

19  with risk communications and warnings in a way that not just

20  professional researchers in this area, but a variety of people

21  could benefit from.

22  BY MR. PACKIN:

23  Q.  I don't want specific articles.  Give the Court the name

24  of one or two journals.  We have the Human Journal that the --

25  or Proceedings that are published by the Human Factors and

1    Ergonomics Society.  One or two others in your field of

2    warnings and risk communication that are regularly read, used,

3    relied upon by experts in your field, if there are other

4    journals.

5              THE COURT:  Well, he mentioned psychology journals.

6              MR. PACKIN:  Right.

7              THE COURT:  You know, we find it sprinkled through

8    those, and there are many of those.

9    A.  Yes.

10              MR. PACKIN:  Okay.

11   BY MR. PACKIN:

12   Q.  Have you contributed to any of those literature?

13   A.  Sure.  We could go through my CV if you would like.

14   Q.  I just asked if you've contributed to them at the moment.

15   A.  Yes.

16   Q.  Okay.  And any others?  Any other journals?

17   A.  There are many journals that the work shows up in --

18   Q.  Okay.

19   A.  -- but I don't know that I can detail all of them.

20   Q.  All right.  Now, you have three degrees:  Bachelor of

21   Science and Psychology according to your CV, correct?

22   A.  Yes.

23   Q.  Master's of Science and Applied/Experimental Psychology?

24   A.  Yes.

25   Q.  And in the briefest of terms, tell us if that area of

1    study relates at all to warnings or risk communications, and

2    if so, how?  But in the briefest of terms.

3              THE COURT:  You're talking about all three of his

4    degrees?

5              MR. PACKIN:  No, the Applied and Experimental

6    Psychology, the Master's.

7    A.  My Master's Degree?

8    BY MR. PACKIN:

9    Q.  Yes.

10   A.  It very much would because it dealt with topics of

11   perception, motivation, learning and behavioral principles;

12   many of the things that underscore elements that are likely to

13   make a warning effective or ineffective.

14   Q.  You have a Ph.D. in Industrial/Organizational Psychology.

15   Did that degree, did that study involve any areas that are

16   pertinent to warnings and risk communication?

17   A.  Yes.  Industrial/Organizational Psychology generally has

18   to do with the application of psychological principles

19   regarding behavior and cognition as it relates to people in

20   the workplace.  The majority of the research that I did in my

21   Ph.D. program, which is common to most Ph.D. programs like

22   that that have an experimental focus, was in behavioral and

23   community psychology, which deals with important principles

24   that would be directly related to risk communication and

25   warnings.

1              THE COURT:  What's it called?  Main research

2    projects were in behavioral and --

3    A.  Behavioral and community psychology.  For example, some of

4    the projects that I've worked on had to do with developing

5    strategies, techniques, interventions for getting people to

6    increase their safety belt usage.  There are several

7    publications in my CV that reflect my participation in those

8    studies.

9              THE COURT:  Okay, thank you.  I get it.

10   A.  Okay.

11   BY MR. PACKIN:

12   Q.  Now, your CV also mentions a home office.  What type of

13   professional activities, if any, do you do out of your home

14   office?

15   A.  I have set that up primarily to set apart my consulting

16   activities from the activities of my work as a professor at

17   Rensselaer Polytechnic Institute.  So anything that I do on a

18   consulting basis I would do out of my home office.

19   Q.  In what field have you done consultative or consulting

20   work?

21             THE COURT:  Can I just ask you what percentage of

22   your time in the past year, of your work time, work time, do

23   you allocate to the home office and the academic scene?

24   A.  Right.  As a matter of what I'm supposed to do for RPI,

25   we're generally given about one day a week that we can do

1    activities like this in the course --

2              THE COURT:  Are you full time on staff at the

3    university?

4    A.  I'm a full-time tenured faculty member at RPI, yes.

5              THE COURT:  Okay.  And so you're still working full

6    time?

7    A.  Yes.

8              THE COURT:  Academically.

9    BY MR. PACKIN:

10   Q.  And briefly, what type of consultative work do you do?

11   A.  In the last few years the vast majority had been related

12   to consulting in the litigation field, but in the past I've

13   done other things as well.

14   Q.  Briefly, such as?

15   A.  For example, I did work as a psychometrician for a

16   business in Albany, New York, that worked to get the contracts

17   with the State of New York for different kinds of exams; for

18   example, a certification examination for optometrists.

19   Q.  Okay.  Does this have anything to do with warnings, that

20   work?

21   A.  That work only tangentially in that it dealt with research

22   methodology and statistics, but it's indirectly related.

23   Q.  Okay.  And besides litigation consultation, what other

24   consultation work have you done?

25   A.  I've done consultation work for Carolina Health Care

1   Systems.  It's a medical facility, and they were interested in

2   human factors perspectives on some of the safety systems

3   there.  I did a similar consulting job at Hershey Medical

4   Center that also had a warnings component to it.  They were

5   interested in having somebody consult on a project for a

6   warning for their NICU unit that I helped with.  I've also

7   done consulting for Dominos Pizza in the late 1980s through

8   early 1990s, where we were helping them to develop training

9   programs for their drivers who deliver pizzas.  And in fact, I

10  wrote a training program, training manual for them for their

11  drivers and participated in making a film that was supposed to

12  be an adjunct for that.

13  Q.  Okay.  And in you consultative work in litigation, has it

14  been limited to just Plaintiffs, just Defendants in any way?

15  A.  I don't make any limitations at all.  I don't advertise

16  that I'm an expert witness.  People just call me.  As it turns

17  out, the vast majority of the cases that I've been asked to

18  consult on have been by plaintiffs' attorneys.  I've consulted

19  with at least two defense attorneys on cases, but I don't hold

20  myself out as a plaintiff's expert.

21  Q.  Now, you've also submitted in this matter a list of cases

22  in which you testied or participated in testimony either by

23  way of deposition or trial testimony, is that correct?

24  A.  Yes.

25  Q.  And the one that was submitted in this case had 18 matters

1   in which there was testimony given, is that correct?

2   A.  I believe that's correct.

3   Q.  Were those all in the capacity of an expert witness?

4   A.  Yes.

5   Q.  Were those all in the field of warnings and/or risk

6   communication?

7   A.  I think most, if not all, have been on risk communications

8   and warnings.

9   Q.  In any of those matters has --

10             THE COURT:  This is deposition and/or trial?

11   A.  Yes.

12             THE COURT:  And all had to do with warnings?

13   A.  Primarily with issues of risk communication and warnings.

14   BY MR. PACKIN:

15   Q.  In any of those matters, has any Court not accepted your

16   qualifications as an expert witness in the field of warnings

17   or risk communication?

18   A.  No.

19   Q.  On your CV, if we go back to the publications, you list,

20   by my count, 35 refereed articles or chapters in books.

21   You've given us some of them, the ones on page 2, some of them

22   in there.  There's one, International Journal of Industrial

23   Ergonomics on page 2, evaluating latex glove container

24   warnings in a realistic setting.  By the way, these are all

25   peer reviewed?  When you say refereed, does that mean peer

1   reviewed?

2   A.  Yes, sir.

3   Q.  All right.  And that was a peer reviewed article in the

4   field of warnings, correct?

5   A.  Yes.

6   Q.  And just in the briefest of terms, what aspect of warnings

7   were looked at there?

8   A.  Yes.  What we were doing is comparing the actual labeling

9   found on containers of latex gloves that were being sold at

10  that point in time as compared to two alternatives for that.

11  Q.  Okay.  And recognizing that I'm skipping through these,

12  the Court has indicated to us that the CV is available and has

13  been read, but I just want to talk about a few of them

14  randomly.  If you look on page 3 --

15          THE COURT:  Counsel, I think we need to mark an

16  exhibit because you seem to have a more up-to-date version

17  than the one that was in the motion papers.  Can we mark it P-

18  3?

19          MR. PACKIN:  Yes.  It should be the same.  Can I

20  have the one here from the motion papers?

21          THE CLERK:  Sir, if you're going to speak between

22  that microphone and that microphone you need to wear this

23  (indiscern.) mic.

24          MR. PACKIN:  Okay.

25          THE COURT:  Ms. Heffner, hand counsel the copy that

                        Kalsher - Direct                    43

    1    I have extracted from the motion papers.  He can compare it

    2    with what he's using.

    3            MR. PACKIN:  It looks identical.

    4            THE COURT:  Have him identify it as his current

    5    version then and we can mark it.

    6    BY MR. PACKIN:

    7    Q.  Is the CV that I've handed you an accurate CV at the time

    8    it was submitted in this litigation when you submitted your

    9    expert report?

   10    A.  Yes.

   11            THE COURT:  Is it current now?

   12    A.  No.

   13            THE COURT:  That's the question.

   14    BY MR. PACKIN:

   15    Q.  Okay.  Have there been additional articles and

   16    publications?

   17    A.  Yes, I started to tell the Judge a couple of them.  That's

   18    when we decided that my most current one wasn't exactly -- but

   19    it would differ only in terms -- I do it in terms of the most

   20    current things are higher up on the list, so those would be

   21    the differences.

   22            MR. PACKIN:  So the one he's working from, Your

   23    Honor, is identical to the one that you have from the motion.

   24    A.  Yes, I put the newer one aside.

   25            THE COURT:  Okay.  Could we just mark your copy,

1    Counsel, P-3 so we know for sure which one we were looking at

2    today?  Any objection, Mr. Walsh?

3         (Plaintiff's Exhibit-3 marked for identification)

4              MR. WALSH:  No, Your Honor, but I would like to

5    receive a copy of it.

6              THE COURT:  This is the one that's in the motion

7    papers, no change.

8              MR. WALSH:  It's already in the motion papers?

9    Okay.

10             MR. PACKIN:  I took it right out of your motion.

11             THE COURT:  Do you have a copy of that?

12             MR. WALSH:  I would have, if it's attached to our

13   motion papers, I would have it.  I just haven't seen it.  I

14   didn't know what we were talking about.

15             THE COURT:  Do you need a copy?

16             MR. WALSH:  No, no, I'll find it.

17             THE COURT:  Let us know and we'll give you one.

18             MR. WALSH:  May I ask Mr. Packin a question?

19             THE COURT:  Off the record.

20        (Off the record)

21             THE COURT:  Back on the record.  P-3 in evidence is

22   Dr. Kalsher's curriculum vitae as current at the time that it

23   was attached to the motion papers in this case.  If he has

24   additions to that, they're not included in P-3.  P-3 in

25   evidence.  Okay.

Kalsher - Direct                    45

1       (Plaintiff's Exhibit-3 admitted into evidence)

2           MR. PACKIN:  Thank you, Your Honor.

3           THE COURT:  You can continue, Counsel.

4   BY MR. PACKIN:

5   Q.  On page 3, for example, there's a refereed article, Hazard

6   Level Perceptions of Warning Components and Configurations in

7   The International Journal of Cognitive Ergonomics.  Just

8   generally and briefly, what did that article deal with?

9   A.  Can you point me to where you're looking?

10  Q.  Page 3.

11  A.  Yes.

12  Q.  The fifth article down.

13  A.  Oh, Hazard Level Perceptions, yes.  What we were doing is

14  working with the person who actually does produce warnings to

15  go on products and machines to look at alternative

16  configurations of components and figures that might be used to

17  enhance the effectiveness of different kinds of warnings, such

18  as color or alternative signal words.

19          THE COURT:  Which article is that?

20          MR. PACKIN:  It's the fifth one down on page 3.

21          THE COURT:  Thank you.  That's enough.

22  BY MR. PACKIN:

23  Q.  On the bottom of page 3, the last article, Behavioral

24  Compliance With Warnings: Effects of Voice Context and

25  Location in the publication Safety Science.  You were a co-

1   author in that one, correct?

2   A.  Yes, sir.

3   Q.  And would you briefly describe what that article dealt

4   with?

5   A.  Yes.  That is one of several that I investigated with my

6   colleague, Mike Wogalter, in this case, Bernadette Racicot, to

7   use a setup to look at the factors that might contribute to

8   behavioral effectiveness, meaning compliance to a warning.

9   And it was set up in a guise in which there is a realistic

10  looking chemistry mixing experiment.  And the reason that we

11  have to do these is that you cannot expose people in these

12  studies to real harm, but you need to set up a guise that

13  would make it believable, or as realistic as possible.  In

14  this particular study, we were looking at the effects of

15  spoken warning, the context in which it was found, and the

16  location of the warning, whether, for example, it would be on

17  a poster nearby where they were going to do the mixing

18  experiment or located in a set of instructions.

19  Q.  Okay.  And you also listed on your CV, beginning on page

20  4, by my count, 51 refereed Proceedings articles.  By

21  refereed, again, does that mean peer reviewed?

22  A.  Yes.

23  Q.  And those are articles that were published as a result of

24  proceedings where you made presentations or contributions?

25  A.  Yes.  Almost universally, if you submit a paper and it's

1   accepted for publication in the Proceedings, it's typically

2   presented in the context of either a symposium with group

3   papers around the theme, or sometimes now they're presented as

4   posters because some authors feel like you get more

5   interaction by a more informal setting to talk to people about

6   your work.

7   Q.  All right.  For example, if we go to page 5, the sixth

8   article down, Applications of Warnings Research: Consumer

9   Industry and Forensic issues.  Just in the briefest of terms,

10  please, how did that relate to the field of warnings and risk

11  communication?

12  A.  It was to discuss more general issues in the context of a

13  more relaxed presentation in which each of the contributors to

14  the paper would discuss issues of how warnings are applied in

15  different kinds of situations and some of the issues involved

16  with those warnings.

17  Q.  Okay.  And the fourth from the bottom on page 5,

18  Evaluating Choking Child Pictorial Symbols in the Proceedings

19  of the International Ergonomics Association and the Human

20  Factors and Ergonomics Society Congress.  Just in the briefest

21  of terms, how did that relate to warnings and risk

22  communication?

23  A.  Yes, in this case, pictorials are often used to augment

24  warnings or sometimes serve on their own.  In this case, we

25  were looking at pictorials directly directed towards conveying

1    or connoting a choking hazard.  One of the co-authors on that,

2    Jennifer Wolf, has a talent, an artistic talent, and she

3    devised many alternative pictographs to depict that.  And we

4    went through a process of trying to identify which one

5    individually might best depict a choking hazard.  And then

6    later, in this and related research then, what we did was pick

7    a tact to find out how people would select these if in case

8    you were trying to depict a choking hazard in which case

9    normal events in human life have a beginning, a middle, and an

10   end.  And it was interesting that we found that sometimes the

11   pictographs chosen for different parts of the story weren't

12   necessarily those that received the highest ratings when they

13   were rated individually.

14   Q.  And does your CV as it was submitted in connection with

15   the motion in this case, which at that time consisted of 25

16   pages, accurately reflect the publications and presentations

17   that you had been involved with in the field of warnings and

18   risk communication as of that time?

19   A.  Yes, sir.

20   Q.  Okay.  On the last page of that CV, it indicates five

21   different professional societies in which you had been a

22   member or are currently a member, is that accurate?

23   A.  Yes, sir.

24   Q.  Okay, and --

25               THE COURT:  You mentioned something about evaluating

Kalsher - Direct                              49

1   civil juries.  Is that on your CV?

2   A.  I participated in research in which we look at how

3   different configurations of warnings and how different

4   entities in the chain that lead from the manufacturer,

5   sometimes through a distributor, an employer to an end user,

6   might affect how participants viewed as mock jurors might

7   attribute blame to the various entities that are involved in

8   either the development or the distribution of the warning as a

9   function of different kinds of factors, such as the quality or

10  presence of a warning.

11          THE COURT:  Is that a published article?  Is that in

12  your CV somewhere?

13  A.  Yes, somewhere in there.

14          THE COURT:  Somewhere in there.  Okay.  You'll let

15  us know.  Keep going, Counsel.

16          MR. PACKIN:  Thank you.

17  BY MR. PACKIN:

18  Q.  And you received a number of grants that are listed on

19  your CV in your field, correct?

20  A.  Yes.

21  Q.  Do those accurately reflect the grant work and grant

22  research that you had been commissioned to do as of the time

23  the CV was submitted?

24  A.  What page are you on, sir?

25  Q.  Starting on page 11, 15 grants.

1    A.  Yes, that would reflect that.

2    Q.  Your CV indicates you have made approximately 115

3    conference presentations in the field of warning or safety or

4    risk communication in your career as of that date.  Is that

5    accurate, sir?

6    A.  Most, if not all, would be related to either the general

7    area of safety or risk communications and warning.

8    Q.  And you've run, according to your CV, approximately 35

9    workshops in your field, is that correct?

10   A.  Yes.

11   Q.  And do those titles as contained on that exhibit

12   accurately reflect the subject matter?

13   A.  Let me get to that page.  Yes.

14   Q.  All right.  On your CV, it indicates you co-authored a

15   study entitled The Influence of Location and Pictorials on

16   Behavioral Compliance to Warnings.  Is that accurate, sir?

17   A.  Where are you again, please?

18   Q.  In one of your studies, sir.

19          THE COURT:  What page, Counsel?

20          MR. PACKIN:  I'm going to have to find that.  Page

21   7.

22   A.  And can you repeat what you were asking me?

23   BY MR. PACKIN:

24   Q.  Yes.  Let me go to that page.  It's the one, two, three,

25   it's the fifth from the bottom, The Influence of Location and

1    Pictorials on Behavioral Compliance to Warnings, published

2    with Mr. Wogalter, who you mentioned before, and somebody

3    named Racicot.

4    A.  Yeah.

5    Q.  Proceedings of the Human Factors Society.  Just generally,

6    what did that involve?

7    A.  Yes, again, that was part of the series that I described

8    earlier in which we're using the fictitious but hopefully

9    realistic appearing chemistry mixing task in order to identify

10   factors that might contribute to, again, effectiveness

11   measures of warnings as measured by things like seeing the

12   warning, recalling the warning, and complying with the

13   warning.

14   Q.  In your career, have you participated in testing

15   pictorials or pictograms in conjunction with the ANSI testing

16   protocols that you alluded to earlier?

17   A.  Yes, I published one paper with Shelley Deppa in which we

18   evaluated a set of pictorials.  It was kind of a pickup on an

19   earlier project that she had done with another colleague, Curt

20   Braun, in which we wanted to --

21   Q.  All right, I just want --

22   A.  Yes.

23   Q.  -- a more general reference.

24   A.  Yes, we did that.

25              THE COURT:  Is it on here?

                        Kalsher - Direct                    52

 1              MR. PACKIN:  Yes.  It is in the deposition taken in

 2      Stout matter on December 16th, 2008.  It's not specifically

 3      addressed on the CV because it has to do with tests he was

 4      asked about testing.

 5              THE COURT:  Oh, okay, it's on testing.

 6              MR. PACKIN:  Right.

 7      BY MR. PACKIN:

 8      Q.  In your CV, there's a mention -- strike that, strike that.

 9      Dr. Kalsher, do you own any hand-held power tools?

10      A.  Yes.

11      Q.  What do you own?

12              THE COURT:  Okay, Counsel, before we get there, I

13      think we could use a five-minute break.

14              MR. PACKIN:  Okay.

15      A.  Thank you, Your Honor.

16              THE COURT:  Once I declare a break, everybody --

17         (Court in recess)

18              THE COURT:  Back in session.

19              MR. PACKIN:  Thank you, Your Honor.

20                      DIRECT EXAMINATION (CONT'D)

21      BY MR. PACKIN:

22      Q.  Dr. Kalsher, in reaching the opinions that you arrived at

23      in this case as embodied in your report, which we will mark in

24      a moment, and your deposition testimony, did you draw upon

25      your education --

1   A.  Yes, sir.

2   Q.  -- readings, publications, background, and experience in

3   the field of warnings and risk communication as contained in

4   your CV and as described here in your testimony today?

5   A.  Yes, sir.

6   Q.  In reaching your opinions in this case, did you measure

7   the warnings and the risk communication system, the warning

8   system that Stihl used with this product, against generally

9   accepted standards in the field of warnings and warning

10  science or your own personal standards?

11  A.  Against established standards, yes.

12  Q.  Now, where we left off, do you own any power tools?

13  A.  Yes.

14  Q.  What type of power tools do you own?

15  A.  I own two lawn mowers, I own --

16          THE COURT:  Two power lawn mowers?

17  A.  Two power lawn mowers.  I own a Stihl brush cutter or

18  hedge trimmer, I own a string grass trimmer, I own a circular

19  saw, I own a reciprocating saw.  I now own a Stihl cut-off

20  machine that I purchased off the internet for use in assisting

21  me with this case.

22          THE COURT:  So you have a reciprocating saw and a

23  circular saw?

24  A.  Yes.

25          THE COURT:  And then you have your non-functional,

                              Kalsher - Direct                    54

```
 1   second-hand --
 2   A.  Yes, and I also --
 3           THE COURT:  -- model of this.
 4   A.  I own a chainsaw.
 5           THE COURT:  Okay.
 6   A.  A sander.
 7           THE COURT:  And you got this used, non-functional
 8   model of the machine in question?
 9   A.  Yes.
10   BY MR. PACKIN:
11   Q.  The power tools other than the cut-off saw that you
12   mentioned, do you use those on a regular basis in your
13   everyday life?
14   A.  Yes.
15   Q.  And I believe according to the papers, at one time you
16   rented a Stihl cut-off saw, correct?
17   A.  Yes.  Also, I own a snow thrower.  I don't know if we're
18   done with that or not.
19   Q.  Okay, go ahead.  Sorry.
20   A.  Probably a few other things that I may not be thinking
21   about, but yes, I rented a Stihl cut-off saw from my local
22   dealer.
23           THE COURT:  And when we say Stihl, we're talking
24   about the brand name?
25           MR. PACKIN:  Yes, Ma'am, S-T-I-H-L.  Okay.
```

1          THE COURT:  When you use the word Stihl in any other

2    way, please let us know.

3    A.  Yes.

4          THE COURT:  S-T-I-H-L is what we will instruct the

5    transcriber to say unless you tell us otherwise.

6          MR. PACKIN:  Your Honor, I'm going to offer for

7    marking as, I think we're up to P-4 --

8          THE COURT:  Yes.

9          MR. PACKIN:  -- a copy taken directly from the

10   Defendant's moving papers of Dr. Kalsher's report dated

11   November 6, 2009, which is Exhibit-A in the certification of

12   Stephen Rudolph in support of the Defendant's motion.

13         THE COURT:  P-4 is his expert report dated --

14         MR. PACKIN:  November 6.

15         THE COURT:  -- November 6, 2009.  Any objection if

16   we mark that in evidence for this hearing.

17         MR. WALSH:  None, Your Honor.

18       (Plaintiff's Exhibit-4 marked for identification)

19       (Plaintiff's Exhibit-4 admitted into evidence)

20         THE COURT:  Counsel, just let me assure you that

21   anything marked in evidence at this hearing is a hearing

22   exhibit only.  I'm making no rulings about their evidentiary

23   admissibility in any trial.

24         MR. PACKIN:  Understood.  Thank you.

25   BY MR. PACKIN:

1   Q.  Do you have a copy of that in front of you, Dr. Kalsher?

2   A.  Yes.

3   Q.  In that report, on the first page you, in 12 numbered

4   paragraphs, set forth some materials that were available to

5   you before you wrote your report, is that accurate?

6   A.  Yes.

7   Q.  Briefly, what did the Falls Township police report

8   provide?  What type of information did that provide you

9   specific to this case?

10          THE COURT:  If you recall.

11  BY MR. PACKIN:

12  Q.  Yes, if you recall.

13  A.  Sure.  It provided me with factual information about the

14  date that it occurred, the day that it occurred, generally who

15  was there.  There were many pictures that I was able to look

16  at associated with that, including a picture of the Stihl saw

17  without the yellow sticker on it.  There were a variety of

18  things that allowed me to see more contextual information

19  about where the accident took place.

20  Q.  Okay.  Do you also have the JJS -- and by JJS, you're

21  referring to Joseph Jingoli and Sons, Mr. McGee's employer?

22  A.  Yes.

23  Q.  You had the JJS incident/accident reports.  What type of

24  information did that provide you with with respect to this

25  accident?

1   A.  Again, provided me with more background information,

2   again, about who was at the scene, contextual information, a

3   description of the accident, things of that nature.

4   Q.  Okay.  It indicates in item 2 you had a TS 400 owner's

5   manual.  By TS 400, we're referring to the cut-off saw model

6   that was involved in this accident, correct?

7   A.  Yes.

8   Q.  Okay.  And did you read that owner's manual?

9           THE COURT:  Just a second.  Let's just get that for

10  the record.  Model?  It's a what?

11          MR. PACKIN:  TS 400 is the model of cut-off saw that

12  was involved in this accident.

13          THE COURT:  So, it's a Stihl cut-off saw?

14          MR. PACKIN:  Yes, ma'am.

15          THE COURT:  Model?

16          MR. PACKIN:  TS, capital T, capital S, 400.

17          THE COURT:  You agree?  Sir, do you agree?

18  A.  Yes, yes, Your Honor.

19          THE COURT:  Okay, fine.  Go ahead.

20  BY MR. PACKIN:

21  Q.  And did you read that owner's manual in total?

22  A.  Yes, I did.

23  Q.  What type of information did the owner's manual provide

24  you with?

25  A.  It gave me actually a lot of background information.  It

1  gave me information about what the product is, what it's
2  designed to do.  It gave me a lot of background information on
3  what the nature of the hazards are associated with this.  It
4  gave me an idea of what the manufacturer thought were hazards,
5  which, in effect, served the purpose of the hazard analysis to
6  identify those for me.  It gave me an idea of the kinds of
7  warnings that they had in those pages about the device.
8           THE COURT:  And an idea -- of course you can see the
9  warnings that they had?  It set forth the warnings --
10 A.  Yes, Your Honor.
11          THE COURT:  -- contained in the manual.
12 BY MR. PACKIN:
13 Q.  Did the manual provide you with any information as to what
14 types of environments the saw was intended to be used in?
15 A.  Yes.  It gave me an idea that it would be used outside.
16 Given that my understanding of the saw is that it essentially
17 grinds or cuts things, there are two primary kinds of blades
18 that are used on it, a composite blade that's used to grind
19 cement, stone, several different kinds of metal, a diamond
20 blade that is used to cut through concrete, things like that.
21 It also gave me an idea that --
22          THE COURT:  Two basic kinds of blades would be the -
23 - what did you call it?
24 A.  That are intended --
25          THE COURT:  That you made --

1   A.  They're intended for use on the saw that you can cut

2   various kinds of material.

3              THE COURT:  Okay.  And those are?  You just

4   mentioned them.  It's a --

5              MR. PACKIN:  If I can help, composite and diamond.

6              THE COURT:  Corrosive?  What is it?

7              MR. PACKIN:  Composite and diamond is what he said.

8              THE COURT:  Composite grinding?

9   A.  A composite grinding blade and a diamond cutting blade.

10             THE COURT:  Go ahead.

11  BY MR. PACKIN:

12  Q.  Did the manual provide you with any information as to the

13  types of people, or types of users?

14  A.  Oh, I'm sorry, I didn't completely --

15  Q.  Okay.

16  A.  -- complete my answer.  If I may?

17  Q.  Yes.

18             THE COURT:  Right.

19  A.  Along the lines that you asked me the question about the

20  environments, and it gave me information about the fact that

21  it would be used outside, it would be used to grind things

22  that perhaps would become dirty.  There is a feature on the

23  saw that allows for the connection of a water hose in case

24  there's a lot of dust that would help you bring the dust down,

25  and that would create a condition that was relevant to, you

1   know, my research in this case that would suggest that when

2   they get dirty, you have to be concerned about things like

3   getting the machine dirty, covering up the labels, being able

4   to clean those machines.  And so it gets into issues again

5   relevant to my opinion, such as the durability of the labels

6   and so on.

7   Q.  Okay.  Did the manual provide you with any information as

8   to the type of individuals who would be expected to be users

9   of this product?

10  A.  Yes, it gave me a general idea that it would be primarily

11  people that work in construction trades, although it's my

12  understanding that other people such as me could buy it, but I

13  think it gave me the idea that primarily it would be people in

14  construction that would be grinding or cutting metal, that

15  would be grinding cement and other kinds of stone.

16          THE COURT:  Primarily by persons in the construction

17  setting, right?

18  A.  Yes.

19          THE COURT:  But you said something about other

20  people?

21  A.  Yeah, there's no prohibition against the distributor

22  selling it to lay people such as myself.

23          THE COURT:  The question is what does the label say?

24  The manual, rather.

25  A.  The manual is generally intended for use in construction.

1  BY MR. PACKIN:

2  Q.  And would there be any significance to you as evaluating

3  the warning system as to a tool primarily intended to be used

4  in construction trades versus, for example, tools used by

5  consumers?

6          THE COURT:  I'm sorry, Counsel, since we don't have

7  a Court Reporter, if I don't get the question, I need to ask

8  it to be repeated.  It's not that easy to just play it back.

9          MR. PACKIN:  Not a problem.

10         THE COURT:  Okay.  Ask the question again, please.

11 BY MR. PACKIN:

12 Q.  From your perspective as an expert in the field of

13 warnings and risk communication, is it of any significance

14 that this is a tool intended to be used by construction

15 workers as distinguished from a consumer product, one which a

16 homeowner might purchase and use at home?

17 A.  Yes.

18 Q.  In what way would that be of significance to you in

19 evaluating a warning system?

20 A.  Well, one way is that you could reasonably assume that the

21 people that would be using it wouldn't necessarily be the

22 people who purchased it, nor would they be the people that

23 would repair it.  And so it's reasonable to assume that not

24 every user would get a copy of the manual.

25 Q.  Item 4 lists deposition transcripts, a number of

1    deposition transcripts.  Did you read each one of those

2    deposition transcripts?

3    A.  Yes.

4    Q.  And who were the -- in descriptive terms, who were the

5    individuals whose deposition testimony was available to you

6    and you read before reaching your opinions in this case?

7    A.  Well, first I read all of the deposition transcripts that

8    were given to me.

9    Q.  Yes.

10   A.  And they gave me a lot of important information that was

11   relevant to my opinion.

12   Q.  But just before we get to that, who were these people?

13   They fall into different categories, do they not?

14   A.  Yes.

15   Q.  Who were these different people?  What categories did they

16   fall into?

17           THE COURT:  As you look over this list now.

18           MR. PACKIN:  Right.

19           THE COURT:  As you recall.

20   A.  Okay.  As I look over the list, you have different

21   categories.  For example, there were the regular users.  Is

22   that what you're asking me?

23   BY MR. PACKIN:

24   Q.  Yes, yeah.

25   A.  For example, Mr. Rivera was a user of those, Mr. McGee was

1   a user of the machine.

2          THE COURT:  Talking about the --

3   A.  The Stihl TS 40 cut-off saw.

4          THE COURT:  Are you talking about the Mr. McGee who

5   was injured?

6   A.  Yes, yes.  He was a user of it.  Steve Caldwell was a

7   user.  Then we have, as another example of types of people

8   involved with this, you have Stefan Hoffmaster and George

9   Brown, who are involved in doing maintenance.  One example of

10  how Mr. Hoffmaster served a bit different function was he was

11  the one that ordered in new labels, the yellow sticker that's

12  intended to go on the side of the Stihl cut-off machine.  He

13  would do that.  As I look through this, let's see who else I

14  have here.  Mr. Kilker was in a different category in that he

15  worked for Sanders Equipment, the company that sold the cut-

16  off saw to the Jingoli Construction Company that ended up

17  putting that to work at their construction sites.

18         THE COURT:  What do you mean sold it?

19  A.  The cut-off saw that is in question, along with others,

20  were purchased from Sanders Equipment.

21         THE COURT:  So Kilker is a Sanders rep?

22  A.  Sanders rep, Sanders employee.

23         THE COURT:  Sanders employee, which is the seller.

24  A.  Is the seller, yeah, the distributor.

25         THE COURT:  Distributor.  Yes, go ahead.

1    A.  Mr. Spiritosanto, I believe, was one of the police

2    investigating the accident.  Ron Brown --

3            THE COURT:  S-P-I-R-I-T-O-S-A-N-T-O is an officer,

4    right?

5    A.  Yes, Your Honor.

6            THE COURT:  Police investigating officer.

7    A.  Ron Brown, I believe, was a supervisor at the time.

8            THE COURT:  Not the same as --

9    A.  George Brown is different.

10           THE COURT:  Oh, okay.

11   A.  George Brown --

12           THE COURT:  George Brown is maintenance.

13   A.  Correct.

14           THE COURT:  Right?

15   A.  Correct.

16           THE COURT:  Ron Brown is a supervisor?

17   A.  A supervisor.  Joseph Rafolo (phonetic) I believe was a

18   person who did ANSI kinds of training for Jingoli Sons.

19           THE COURT:  Rafolo does training?

20   A.  Does training, ANSI related training.  And who am I

21   missing?

22           THE COURT:  And is he an employee?

23   A.  I think he works on a consulting basis, although I can't

24   be certain on that.

25           THE COURT:  At Jingoli though, right?

1    A.  At Jingoli, yes.  And Mr. Linsbauer, of course I read

2    that, is a manufacturer or works for the Stihl Company.

3           THE COURT:  Stihl employee?

4    A.  Stihl.

5    BY MR. PACKIN:

6    Q.  In what capacity?

7    A.  I can't remember if he is the CEO or President, but I

8    don't recall, as I sit here, exactly what his title was.

9    Q.  All right.  Do you remember --

10   A.  I believe that he was the designer of the machine.

11   Q.  Okay.  You refer in item number 5 to some additional

12   depositions that were taken from the <u>Stout</u> matter.

13   A.  Yes.  Again, Mr. Linsbauer, who's the designer, and Thomas

14   Elsner, who also was an employee of Stihl who was involved in

15   design aspects of the machine, including, I think, some of the

16   warnings that were found on it.  And those were also important

17   in helping me to form my opinion in this case.

18   Q.  Okay.  Now, you were, as the papers disclose, also the --

19          THE COURT:  Mr. Elsner, what's his role there?

20   A.  He's a Stihl employee.

21          THE COURT:  Okay, they both are.

22   A.  Yes.

23          THE COURT:  Linsbauer and Elsner.  Okay.

24   BY MR. PACKIN:

25   Q.  And Mr. Elsner is the one you identified as being involved

1  with the development of their warnings, correct?

2  A.  Yes.

3  Q.  Now, in mentioning the Stout case, you were also

4  Plaintiff's expert on warnings in the Stout matter, correct?

5  A.  Yes.

6  Q.  Did you have depositions in the Stout matter as well of

7  co-workers of Mr. Stout, of managerial personnel from his

8  employer?

9  A.  Yes.  I had a similar array of depositions.  As I sit

10 here, I can't remember the total number, but there were quite

11 a few.

12 Q.  All right.  It would appear, and correct me if I'm wrong,

13 from the depositions in McGee that are enumerated here and the

14 depositions in Stout as well, would it be accurate that you

15 had thousands of pages of sworn deposition testimony from

16 witnesses that fall into those categories that you described

17 from both cases?

18 A.  Yes.

19 Q.  What type of information, in general terms, did those

20 thousands of pages of depositions inform you about in

21 connection with your investigation and formulating of opinions

22 in this case?

23 A.  Yes, as briefly as I can.

24 Q.  Yes.

25 A.  The testimony from the Stihl employees, Messrs. Linsbauer

1   and Elsner, told me that Stihl recognized that in fact

2   mounting a toothed blade on the TS 400 was a common misuse of

3   the product and, in fact, dangerous.  It gave me essentially

4   the basis for what should have been a hazard analysis and

5   clearly articulating that was a hazard.  And staying on that

6   for a moment, there was a lot of information that I got from

7   the different deponents in the case that told me about how the

8   users -- we sort of divided up the deponents in this case, the

9   users, or supervisors, or maintenance people.  The hundreds of

10  pages that I read on people who actually used the machine gave

11  me a lot of information on what their expectations are and

12  what their behaviors were vis-a-vis the Stihl cut-off saw and

13  how they used it.  For example, one of the things that became

14  clear was that none of them either in this case or in the

15  previous case actually had read the manual or could say where

16  the manual was.  They hadn't been given a manual.  Another

17  thing that came out of it was that none of them, either in the

18  current case or the past case, knew that it was an

19  inappropriate use to mount a toothed blade onto a cut-off saw.

20  And so that, paired with other information that I got from

21  them, that it actually could be viewed as an affordance

22  offered to people the fact that --

23          THE COURT:  A what?

24  A.  An affordance, A-F-F-O-R-D-A-N-C-E.  It's a generally

25  accepted term in human factors and the perception literature

1   that when the concept is applied it means that it is for.  So

2   for example, as it relates specifically to this case, as I

3   mentioned earlier, there are two kinds of authorized types of

4   wheels to go onto the TS 400, the composite blade and the

5   diamond tip blade, both of which are to be mounted on a 20

6   millimeter arbor; that is, that's what drives the saw blades.

7   Both of them can be mounted with the use of, for example, a 20

8   millimeter reducing bushing, if that's necessary, and that's

9   quite similar to the hole that would be found in a toothed

10  blade.  You could easily mount it on it as well.  So there's

11  nothing intuitive about the machine itself that would prevent

12  a person from knowing that that's an unauthorized use.  That's

13  another example of information that I was able to glean from

14  the depositions.

15  BY MR. PACKIN:

16  Q.  Now, the depositions of Mr. Linsbauer and Elsner, you told

17  us substantively one of the things that you drew from that

18  about it was a common misuse to put saw blades on these saws,

19  did they indicate in that testimony -- did that testimony

20  provide you with any information as to whether they were aware

21  of that at the time Mr. McGee's saw was manufactured?

22  A.  Yes, I think that it clearly states that they were aware

23  of that, and I think that is also supported by the fact that

24  they included a warning about that in the manual; that if you

25  look at Stihl's website for the cut-off tool itself, that's

1   the only hazard that they warn about on every single page in

2   the sections on cut-off saws, including marketing ones inside

3   a bolded border around that.

4   Q.  Okay, we'll get to the website in a moment.  Did the

5   deposition testimony of Mr. Linsbauer and Elsner inform you in

6   any way as to whether they felt that that misuse of the saw

7   was dangerous at the time this saw was manufactured?

8   A.  Yes, it was very clear that they said that it was a common

9   misuse and it was dangerous.

10  Q.  And known to them at that time?

11  A.  And known to them at that time.

12  Q.  Now, when someone in your field of expertise is consulted

13  to design a warning system for a product, would you typically

14  have --

15          THE COURT:  Just a second.  I'm sorry to interrupt

16  you.  I only do it when I must.  You just testified, sir, it

17  was very clear from all this material that you reviewed that

18  Stihl said it was a common misuse, putting this wrong blade

19  on?

20  A.  Yes.

21          THE COURT:  And dangerous to do that?

22  A.  Yes.

23          THE COURT:  And that this was known to Stihl at that

24  time?  Counsel, what time are we talking about?  2003, when

25  this machine is sold, or 2007, at the time of the accident?

1          MR. PACKIN:  I specifically focused on 2003 at the

2     time it was sold.

3          THE COURT:  Okay.  Keep going.

4     BY MR. PACKIN:

5     Q.  Did the deposition testimony of Mr. Linsbauer indicate

6     whether these same criteria were known to them at the time the

7     TS 400 --

8          MR. WALSH:  Your Honor, I am going to object.  I

9     think what we're doing here is we're summarizing.  I don't

10    think that's what the testimony says at all, and I would ask

11    that if Mr. Packin is going to summarize it, that he produce

12    the deposition he's referring to.  I think it says something

13    very different from that.

14         MR. PACKIN:  Your Honor --

15         THE COURT:  Sir, you can continue with your

16    interrogation.  You're asking what Dr. Kalsher recalls from

17    what he reviewed.

18         MR. PACKIN:  Thank you, Your Honor.

19         THE COURT:  And that's as much as this testimony

20    means right now, Mr. Walsh, to answer your objection.

21    BY MR. PACKIN:

22    Q.  Was there any indication as to whether this information

23    was known to Mr. Linsbauer at the time the TS 400 model was

24    actually designed?

25    A.  I think that he did indicate that it was known at the time

1   when they designed it that this was a common misuse that was

2   dangerous.

3   Q.  Now, I think you indicated that's consistent with what you

4   saw in the manual and on the website, correct?

5   A.  Yes.

6   Q.  Okay.  Now, when someone in your field of expertise is

7   called upon to design a warning system for a manufacturer or

8   to analyze a manufacturer's warning system, would you

9   typically have as much information as was available to you in

10  this case through these thousands of pages of deposition

11  testimony from users, purchasers, supervisory personnel, and

12  designers?

13          MR. WALSH:  Objection.

14          THE COURT:  Over-long, compound.

15          MR. WALSH:  Objection.  It also lacks foundation.

16          THE COURT:  Well, let's hear another question.  I'm

17  allowing you to remain seated.  We wouldn't normally do that,

18  but if you're more comfortable and it moves you along, you may

19  do that.

20          MR. PACKIN:  Thank you, Your Honor.

21  BY MR. PACKIN:

22  Q.  In your field, when you do an evaluation or analysis of

23  warnings, and you've indicated also in some cases you've been

24  asked to prepare warnings, correct?

25  A.  Yes.

1  Q.  Have you ever had deposition testimony, hundreds of pages

2  of deposition testimony of actual users regarding their

3  experience with the product?

4  A.  No.

5          MR. WALSH:  Objection, Your Honor.  Lacks

6  foundation.

7          THE COURT:  Well, he's had a lot of testimony from

8  users, overruled.  What it says, we shall see.

9  BY MR. PACKIN:

10  Q.  Have you ever had available to you the deposition

11  testimony as to how users have interfaced with the warning

12  system of a product when you've done your evaluations, other

13  than the litigation context?

14  A.  No.

15  Q.  Have you ever had -- strike that.  In doing your

16  evaluations in your field of expertise not in the litigation

17  context, would you have available to you deposition testimony

18  from people who designed the product?

19          THE COURT:  I'm sorry, that question is unclear.  We

20  have much published material listed in the CV.  The aspect of

21  actually Dr. Kalsher designing a warning hasn't really been

22  covered except fleetingly.

23  BY MR. PACKIN:

24  Q.  Okay, have you designed --

25          THE COURT:  I know what it is because it was in the

1   dep, but --

2   BY MR. PACKIN:

3   Q.  You have designed warnings, have you not?

4   A.  Yes.

5   Q.  Tell me for what types of products you've designed

6   warnings, please.

7   A.  I've designed warnings in my research for a number of

8   different products.  For example, in a series of studies that

9   I was looking at behavioral compliance, and we used a warning

10   that would be placed on a circular saw that was never really

11   operated, but again, the point was to produce a realistic

12   situation in which they could see it.  So I developed a

13   warning for that.

14              THE COURT:  But these are basically behavioral

15   studies?

16   A.  The one I just mentioned, yes.

17              THE COURT:  Right.  With the exception of that.

18   A.  If I just may add on, Your Honor, when I say behavioral

19   studies, there are actually several different indices that we

20   look at:  noticing, comprehension, recall and behavioral

21   compliance.  I'm grouping those just for purposes of

22   efficiency that I will call those behavioral.

23              THE COURT:  But these are made up warnings that

24   don't leave the lab?

25   A.  The ones I'm describing to you are ones that I would

1    research and that I would publish in a paper, so they would --

2              THE COURT:  Right.

3    A.  -- actually get outside the laboratory in terms of a peer

4    review publication.

5              THE COURT:  Right, but they don't get into the

6    industry.  In other words, these are not warnings on products

7    or desks in workplaces, they are designed studies.

8    A.  Yes, that's true.

9              THE COURT:  And then you publish the result of your

10   designed study?

11   A.  Yes, Your Honor.

12             THE COURT:  Good.  Okay.  So we know what that is.

13   A.  Right.  I have designed a warning that actually was placed

14   on a machine.  It was designed to address the hazard of a

15   cutting hazard for a machine manufactured by the company

16   Ranpak.  They hired me to go --

17             THE COURT:  R-A-N --

18   A.  P-A-K.

19             THE COURT:  -- P-A-K.  This is a cutting machine?

20   A.  Yes.

21             THE COURT:  Okay.  And that was a pictorial?

22   A.  It was a warning.  It was not a pictorial, it was a

23   warning to go on the machine itself to warn -- it did have a

24   pictorial in it, but it was a complete warning.

25             THE COURT:  And that was not in the context of

 1    litigation.  This is the manufacturer asked you to design that

 2    label for them?

 3    A.  Yes, Your Honor.

 4              THE COURT:  That warning.  So it was text and

 5    pictorial, right?

 6    A.  Yes.

 7    BY MR. PACKIN:

 8    Q.  You had also mentioned earlier that you were retained to

 9    prepare training materials for Dominos Pizza?

10    A.  Yes, sir.

11    Q.  When you say training materials, what are you referring

12    to?

13    A.  Again, I kind of alluded to it earlier, it was for driver

14    safety training, so it was a multi-chapter manual that was

15    used as part of their training programs for their drivers.

16              THE COURT:  Okay, Counsel, let's go on to this case.

17    BY MR. PACKIN:  Now --

18              THE COURT:  I think the theme was when he evaluates

19    warnings or prepares warnings, has he had such a large volume

20    of material from the workplace.

21    BY MR. PACKIN:

22    Q.  From the various sources that you've identified, those

23    types of sources.

24    A.  No.

25    Q.  Did having those materials in any way add to your ability

1   to evaluate the warning system in this case?

2   A.  Yes.

3   Q.  You list further on the report that you had Jingoli's cut-

4   off saw orientation and their health and safety manual.  What

5   were those, briefly said, and what did they provide you with?

6   A.  Sure.  They provided me with a brief introduction to the

7   kinds of safety related information that they would put out.

8   They were both relatively brief, general instructions for

9   them.

10  Q.  What was your understanding, if you had one, as to the

11  chronology of that cut-off saw orientation document?

12  A.  It's my understanding that that was produced after this

13  accident.

14  Q.  To your understanding, was there any such orientation

15  document in existence at Jingoli before Mr. McGee's accident?

16  A.  It's my understanding that it was not.

17  Q.  You also had a topographical map of GROWS landfill.  What

18  did that provide you with by way of information?

19  A.  Again, just some background information on the context in

20  which the accident occurred.

21  Q.  You had some information from Sander Power Equipment

22  that's referenced.  What did that provide you with?

23  A.  Generally, the information that I got that's related to

24  Sander Power Equipment was the kind of safety information that

25  was available through them.  For example, there was a pamphlet

1    that they had separately from the manual that they would

2    attach to the saw.  And they also had a DVD that outlines

3    technical information about the saw, how to use it, and it

4    includes a specific part that's directly relevant to what

5    we're talking about here, which is the issue of kickback.

6              THE COURT:  So these materials were not prepared by

7    the Stihl Company, they were prepared by the intermediary,

8    Sander?

9    A.  I'm not sure who prepared the brochure.  I'm not sure if

10   that was Stihl or Sander, but I think Sander is just the

11   distributor of these materials, not the developers of them.

12   BY MR. PACKIN:

13   Q.  Did you see the DVD?

14   A.  I did see the DVD.

15   Q.  Physically as a DVD.  And did you also watch it?

16   A.  Yes, I did.

17   Q.  Okay.  According to what the DVD indicated facially, who

18   manufactured or distributed that DVD?

19   A.  Stihl.

20             THE COURT:  Two questions.

21   BY MR. PACKIN:

22   Q.  Who manufactured the DVD?

23   A.  Stihl.

24   Q.  To your understanding in this case, was that DVD something

25   that was supplied with the TS 400 as part of the risk

1    communication materials?

2    A.   No.

3              THE COURT:  When you say the TS 400, are we talking

4    about the machine as it was distributed in the marketplace at

5    the time this particular machine was sold?

6    BY MR. PACKIN:

7    Q.   In 2003, when this particular machine was sold, to your

8    understanding, was that DVD made part of the materials, the

9    information and warning materials distributed with it by

10   Stihl?

11   A.   No.  I think the evidence in the case shows that it was an

12   accessory that could be purchased for about five bucks.

13   Q.   And --

14             MR. WALSH:  Objection, Your Honor.  We are again

15   misstating what the record is.  There's no indication in this

16   record that DVD was available in 2003.

17             MR. PACKIN:  Your Honor --

18             THE COURT:  Okay, thank you.

19             MR. PACKIN:  -- if I may say, objections that would

20   be appropriate for cross examination but don't have a

21   foundation as objections just are using up time we need to

22   keep this concise.  I mean, that's a contested point.

23             THE COURT:  Mr. Packin, if there's a question

24   without a basis in the record, that's a suitable ground for

25   objecting, even during your so-called direct which of course

1   we're allowing you to proceed very much by leading questions

2   in order to save time.

3           MR. PACKIN:  Understood.  But as I understood that

4   objection, it was that there's a disagreement as to when the

5   DVD was produced.  That's something that's a subject for cross

6   examination.

7           THE COURT:  Overruled.

8   BY MR. PACKIN:

9   Q.  Was there -- strike that.  You indicated various black and

10  white and color photographs.  What did those materials provide

11  you with in the way of information about this case.

12  A.  Sure.  I had a variety of photographs about the accident

13  site, the saw itself, about the label, the general accident

14  site, what was happening at the time.  There was a lot of

15  background information.

16  Q.  Okay.  And you list in --

17          THE COURT:  Let's move on, Counsel.  You just

18  covered something you already covered, so I'm just urging you

19  to move on.

20          MR. PACKIN:  I'm not sure what I had already

21  covered.

22          THE COURT:  Dr. Kalsher had already been asked by

23  you what photographs he reviewed, and he cited the police

24  report and a few other sources of photographs, and now your

25  same question was asked and he gave the same answer.

1              MR. PACKIN:  Okay.  I'm sorry if there was some

2    confusion.

3    BY MR. PACKIN:

4    Q.  Were these photographs in addition to the police

5    photographs?

6    A.  Yes, I had more.

7    Q.  Okay.  Taken by whom, to your understanding?

8    A.  I don't recall who they were taken by.

9    Q.  And you list in item #11 information presented at Stihl's

10   website, correct?

11   A.  Yes.

12   Q.  Okay.  How did you obtain that information?

13   A.  I went on the internet and looked at the site.

14   Q.  All right.  Did you have any printed material from the

15   Stihl website that had been printed before you did that?

16   A.  I have my file.  I don't recall if I had that in my file

17   or when.  I don't remember.  I did look at the Stihl website.

18   Q.  And just briefly speaking, how did that material inform

19   you in terms of this case?

20   A.  Well, in several ways.  One, and parallel to what I've

21   already testified about as to the owner's manual, there's

22   information that's associated with the cut-off saws.  And the

23   specific thing that strikes me that stood out was the fact

24   that on all of the pages regarding the cut-off saw, the only

25   hazard that is explicitly warned about is what we're talking

1   about, the inappropriate mounting of toothed saw blades onto

2   the TS 400 or on the cut-off saws.

3   Q.  And you list various ANSI standards in item #12 that you

4   had to review.  Why did you review those and what did those

5   inform you about with regard to this case?

6   A.  Well, these were standards that pertained to cut-off saws.

7   If we look at B7.5-1990, and then I got the one that actually

8   came out in 2006 just to look at it, but there were a couple

9   of things about the B7.5 standard that were important to my

10  opinion.  One was it's a 1990 standard that it's my

11  understanding was withdrawn by ANSI in 2000 because they

12  hadn't updated the standard per ANSI's requirement.  Just by

13  way of a quick diversion, for the ANSI Z535 standard, we

14  regularly revise and update it.  It was first published in '98

15  and revised in 2002, and so on.  Secondly, what was important

16  about that as it relates to my opinion is that like many

17  voluntary standards, when you look at the foreword of that, it

18  clearly --

19          THE COURT:  When you look at the --

20  A.  The foreword to it.  It clearly articulates that voluntary

21  standards don't have the force of law, but they also don't

22  restrict the use of maybe more detailed kinds of information

23  that would be relevant to safety kinds of concerns.

24          THE COURT:  In other words, they don't set the

25  ceiling either?

Kalsher - Direct                              82

1    A.   Correct.  They establish, as many consensus standards do,

2    they basically cite what is going to be agreeable to the whole

3    committee.  For example, the Z535, there are more than 30

4    people on that, and so it's a consensus standard.  So it's the

5    minimal kinds of requirements that that group can agree to.

6            MR. PACKIN:  Your Honor, I'm going to ask permission

7    to mark as P-5 a blowup of the preface page from ANSI B7.5.

8            THE COURT:  What are you marking this?

9            MR. PACKIN:  I believe we're up to P-4.  It might be

10   P-5.

11           THE COURT:  Just a second, please.  We are at P-5.

12   Do you want to mark it P-5?

13           MR. PACKIN:  Yes, Ma'am.

14      (Plaintiff's Exhibit-5 marked for identification)

15           THE COURT:  Okay.  And although you have a blowup on

16   the board, I assume you'll provide us with a paper copy as

17   well?

18           MR. PACKIN:  Yes, Ma'am.

19           THE COURT:  Okay, P-5.  Any objection, Mr. Walsh?

20           MR. WALSH:  May I take a quick look at it, Your

21   Honor?

22           THE COURT:  Take a look.

23           MR. PACKIN:  That's the whole page photocopied and

24   enlarged.

25           MR. WALSH:  No objection, Your Honor.

1          THE COURT:  Okay.  So just for the record, this is

2     preface page to what ANSI standard?

3          (Plaintiff's Exhibit-5 admitted into evidence)

4          MR. PACKIN:  That would be B7.5.

5          THE COURT:  B7.5?

6          MR. PACKIN:  Yes, Ma'am.  And 7.5-1990.

7     BY MR. PACKIN:

8     Q.  And Dr. Kalsher, I'll just hold up the paper copy from

9     which it was made.  Same page, correct?

10    A.  Yes.

11    Q.  Okay.  And can you read for us the language you're

12    specifically referring to that you just mentioned a moment

13    ago?

14    A.  Yes.  Starting on the fourth line, "The existence of an

15    American National Standard does not in any respect preclude

16    anyone, whether he has approved the standard or not, from

17    manufacturing, marketing, purchasing, or using products,

18    processes or procedures not conforming to the standard."

19    Q.  Thank you, sir.  Now, I believe you've indicated that your

20    research in this case showed that this standard -- by the way,

21    for the record, the title of this B7.5-1990 was Safety Code

22    for the Construction, Use, and Care of Gasoline Powered Hand-

23    Held Portable Abrasive Cutting-Off Machines.  I believe it was

24    your testimony that your research in this case disclosed that

25    that standard had been withdrawn by ANSI.

1                MR. WALSH:  Objection.  Leading.

2                THE COURT:  He's just recapping.  It's already been

3   testified here.

4   A.  Yes.

5                THE COURT:  Dr. Kalsher said in the year 2000 this

6   particular standard was withdrawn by ANSI because it hadn't

7   been updated in the regular cycle.

8   A.  Yes.

9                THE COURT:  Is that what you said?

10  A.  That's correct.

11  BY MR. PACKIN:

12  Q.  Was there ever a successor to it, from your research, that

13  was enacted or published?

14  A.  It's my understanding there was one published in 2006.

15  Q.  Okay.  That would be three years after this particular

16  machine was sold?

17  A.  Yes.

18  Q.  All right.

19  A.  That's my understanding.

20  Q.  To your understanding, was there any ANSI standard

21  specific to hand-held cut-off saws between 2000 and 2006?

22  A.  No.

23  Q.  Now, that's the information that you've listed in this

24  matter, correct?

25  A.  Yes, sir.

1   Q.  And your involvement in the Stout case preceded this case,

2   is that correct?

3   A.  Yes.

4   Q.  And in the Stout case, was the cut-off saw that was

5   involved in Mr. Stout's accident the same make and model of

6   cut-off saw?

7   A.  Yes.

8   Q.  Was the blade that was on the cut-off saw the same make

9   and model of blade; that is, an Oldham 14-inch 24 tooth

10  carbide tip saw blade?

11  A.  Yes.

12  Q.  And did both accidents involve, as you understood it, a

13  kickback scenario?

14  A.  Yes.

15  Q.  And did both result in facial injuries?

16  A.  Yes.

17  Q.  Did you rely upon materials that you had from the Stout

18  case, as well as the research and work you had done in the

19  Stout case, when you formulated your opinions in this matter?

20  A.  Yes, because although there were certainly differences in

21  what they were doing at the time, they both involved the same

22  model of saw, the same model of blade, and it involved, for

23  the most part, the same general kind of hazard, which is a

24  potential for kickback.

25              THE COURT:  Because of the general similarities, in

1    other words, right?

2    A.  Yes.

3              THE COURT:  With recognition that there were some

4    differences?

5    A.  Yes.

6    BY MR. PACKIN:

7    Q.  When you undertook to write your report in this case, did

8    you feel that from the materials submitted to you in this

9    case, together with the materials you had from the Stout case,

10   as well as your background, education, and training in the

11   field of warnings and risk communication, that you had

12   adequate material to analyze the warning system and reach

13   opinions?

14   A.  Yes.

15   Q.  If you had not, would you have undertaken to issue your

16   report, formulate your opinions and issue your report?

17   A.  No.

18   Q.  Now, you've testified already that in this case, the

19   yellow label that was intended to be on the blade cover of Mr.

20   McGee's TS 400 was missing, correct?

21   A.  Yes.

22   Q.  Did you have any photographs of Mr. McGee's accident saw

23   that showed that it was missing?

24   A.  Yes.  I've already stated that earlier.

25   Q.  Okay.  Now, in the materials you had to review, did you

1   have available to you a representation or facsimile of what

2   that label contained, had it been on the saw?

3   A.  Yes.

4   Q.  And did you also have that information from the Stout case

5   as well?

6   A.  Yes.

7   Q.  Now --

8           THE COURT:  When you started working on this case,

9   sir, was the Stout case still an open file in your office or

10  do you remember?

11  A.  I don't remember when that one settled, to be honest with

12  you.

13          THE COURT:  It's not an open file in my office, I

14  can tell you that.

15          MR. PACKIN:  There are lucky breaks.

16          THE COURT:  This is the case we have.

17  BY MR. PACKIN:

18  Q.  What components of Stihl's warning system did you evaluate

19  in this case?

20  A.  We talked about some of them already.  Obviously, I looked

21  at the warning labels, the labels intended to serve as

22  warnings on the product.  I looked at the material contained

23  in the manual that was supposed to come with it.

24          THE COURT:  The contents of the manual?

25  A.  Contents of the manual.  I evaluated the DVD, the

1   presentation of the information that would come on the DVD.  I

2   evaluated the Stihl website and the information contained at

3   the Stihl website as the primary components of the warning

4   system.

5   BY MR. PACKIN:

6   Q.  Did you evaluate them both individually and collectively,

7   individually as units of the system and collectively as the

8   system itself?

9   A.  Yes.

10          MR. PACKIN:  Now, Your Honor, were we in the

11  presence of the jury and presenting this case, I would ask him

12  to go through the individual opinions that he's rendered in

13  this case and tell the jury what those opinions were.  Since

14  we are here in a different context, we all know what the

15  opinions are.  They're in his report, his report is in

16  evidence.  So what I would like to do is just go to the

17  opinions, what otherwise would be a leading question if there

18  was a jury here, and ask him about his basis of arriving at

19  each one of those.  It'll save us a significant amount of

20  time.

21          THE COURT:  Any objection?

22          MR. WALSH:  No objection, Your Honor.

23          THE COURT:  Okay, fine.  Let's do it that way.  This

24  is a 12-page report.  Most of it is under the category

25  "Findings and Opinions," starting on page 2.  Mr. Packin, I'll

1    give you latitude to do what you want.  I think the first

2    question would be, "Do you adopt this as your report today?

3    Is there anything that you would add or change about the

4    report?"

5            MR. PACKIN:  Fair enough.

6            THE COURT:  And then you can hit the highlights

7    without having to basically have us do verbatim the whole

8    report.  And in the process you can demonstrate through your

9    questioning what the witness says is the basis for these

10   highlighted conclusions.

11           MR. PACKIN:  Thank you.

12           THE COURT:  Is that all right?

13           MR. PACKIN:  Yes, Ma'am.  And fortunately, because

14   Oldham is no longer in the case, there are portions of those

15   12 pages that don't apply to this hearing.

16           THE COURT:  Okay.  Reviewing the expert report

17   content.

18   BY MR. PACKIN:

19   Q.  Dr. Kalsher, I believe your report of November 9, 2009 was

20   marked as P-4, is that correct?

21           THE COURT:  It's P-4 in evidence.  Let me just

22   double check that, Counsel.

23   BY MR. PACKIN:

24   Q.  Do you have it in front of you?  Oh, I'm sorry, I have it.

25   Yes, P-4.  Do you have a copy of it in front of you, sir?

Kalsher - Direct                                90

 1   A.  Yes.

 2   Q.  It's dated November 6, 2009 and consists of 12 pages, 12

 3   numbered pages, 11 and a half of content?

 4   A.  Yes.

 5   Q.  Does that report fairly and accurately represent the

 6   opinions you arrived at in this matter after reviewing the

 7   materials we've already discussed at length and based upon

 8   your education, experience, and training in the field of

 9   warnings and risk communication?

10   A.  Yes.

11   Q.  Any opinions you would delete from that report?

12   A.  No.

13   Q.  Any opinions you would add to that report?

14   A.  Not necessarily, no.

15   Q.  Let's go then to some of the opinions you've reached or

16   expressed.  In your report on page 5, you indicate that ANSI

17   Z535, first published in 1992 with other revisions --

18   A.  1991.

19   Q.  1991, I'm sorry.

20          THE COURT:  Are we on page 5?

21          MR. PACKIN:  Yes, Ma'am.

22          THE COURT:  Okay.

23   BY MR. PACKIN:

24   Q.  Reflects principles derived from the research and writings

25   and warnings.  Is that accurate, sir?

1    A.  Yes.

2    Q.  And what do you base that on?  What do you base the

3    statement that the ANSI Z535 reflects that?

4    A.  For example, there are ideas in it that suggest ways to

5    format the warning and the information that should be

6    contained in a warning.  For example, it should clearly state

7    what the hazard is, what the likely consequences are and the

8    severity, and what one would need to do to avoid the hazard.

9    Q.  Did ANSI -- strike that.  Even were ANSI B7.5-1992 had

10   still been in effect in --

11            THE COURT:  {Dash} 1990?

12            MR. PACKIN:  Yes, ma'am.

13            THE COURT:  You said 1992.

14            MR. PACKIN:  No, ANSI B7.5-1990 is the standard.

15            THE COURT:  You misspoke and you said 1992.

16            MR. PACKIN:  Oh, I'm sorry, I'm sorry.

17   BY MR. PACKIN:

18   Q.  Even were ANSI B7.5-1990 to have been in effect in 2003

19   when this saw was sold, did B7.5-1990 preempt in any way the

20   applicability of Z535?

21   A.  No.

22   Q.  And what do you base that on, sir?

23   A.  Because first of all, as we looked at earlier on your

24   display, the foreword clearly indicates that it doesn't

25   preclude such a thing.  The other thing I would point to is

1    that the ANSI standard clearly indicates that the goal of the

2    ANSI Z535 Committee is to provide a uniform design for how one

3    designs and presents warnings on labels on products.  And it

4    also indicates that it's hoped that the recommendations in

5    ANSI will be adopted by other ANSI standards and, in fact,

6    nationally.

7    Q.  On page 11 of your report you state that it's Stihl's

8    reliance, based on the documents we've reviewed, only or

9    primarily on ANSI B7.5-1990 or B175.4-2006 for its warnings,

10   ignores the significant body of warning science reflected in

11   ANSI's Z535.  What's your basis for that statement, sir?

12            THE COURT:  I'm sorry, I lost you.  What page are we

13   on?

14            MR. PACKIN:  On page 11.

15            THE COURT:  Counsel, when I'm taking notes, it's

16   helpful if once you give the witness your reference, you pause

17   for a second, look up, make sure that I'm not still shuffling

18   papers or finishing my note from the last answer.

19            MR. PACKIN:  Will certainly do that.

20            THE COURT:  And that will avoid us having to burden

21   the record with this kind of a little speech from me.  Okay,

22   are we looking at page 11?

23            MR. PACKIN:  Yes, Ma'am.

24            THE COURT:  Ask your question again.

25   BY MR. PACKIN:

1    Q.  You state that Stihl's reliance only or primarily on B7.5

2    and B175.4 ignores the significant body of warning science

3    reflected in ANSI Z535.  What is your basis for that

4    statement, sir?

5    A.  Right.  There have been many studies done to indicate, for

6    example, that there are a variety of factors that will

7    increase the chances that somebody will notice the

8    information.  Highlighting features, such as color, size,

9    highlighting, are all factors that are important things for

10   getting people to first notice a warning, and then there are

11   other things that are also incorporated into Z535 on the

12   earlier question that you asked, such as recommending the way

13   that a warning is formatted so that warning messages are

14   generally short, they define the hazard, the consequences, and

15   what people need to do to avoid the hazard.  There are

16   formatting characteristics such that if there are multiple

17   hazards warned about, such as on the yellow label, that they

18   should be organized with the most severe hazards presented

19   first.  There's information derived from the literature and

20   embodied in the ANSI Z535 standard that gives recommendations

21   for the size of lettering under favorable and unfavorable

22   conditions.  So there's a variety of things from the

23   literature in terms of the physical characteristics of

24   warnings that would be important.  There's also other things

25   from the literature that would suggest that there are other

1   considerations that are important as well that would not have

2   been reflected in the B7.5 standard, such as how one might

3   locate the warning so that it's prominent at the time somebody

4   was going to be exposed to the hazard.  The literature that

5   has arrived has been developed since then also talks about

6   factors that are generally accepted in my field that are

7   things to watch out for that might blunt the effect of a

8   warning, such as cost of compliance or things like perceived

9   risk.  It turns out that cost of compliance is an important

10  concept since it tends to blunt the effects of warnings, and

11  perceived risk is an important concept because that --

12          THE COURT:  Is this in your report?

13  A.  My --

14          THE COURT:  Cost of compliance?

15  A.  I think he was asking me about the principles that I

16  referred to in my report.

17  BY MR. PACKIN:

18  Q.  Yes.  Could you explain to the Court briefly what cost of

19  compliance means?

20          THE COURT:  I think we're getting too detailed here.

21          MR. PACKIN:  Okay, okay.

22  BY MR. PACKIN:

23  Q.  By the way, again, we're operating from the premise that

24  B7.5 was not in effect at that time.  However, you read B7.5,

25  correct?

Kalsher - Direct                                              95

1    A.  Yes.

2    Q.  And you read it because the testimony, and correct me if

3    I'm wrong, of the Stihl representatives was that that's what

4    they relied on in their warnings and constructions --

5    A.  Yes.

6              MR. WALSH:  Object.  Lack of foundation.

7              MR. PACKIN:  Is that what --

8              THE COURT:  Well, he read it, he read it.  Go on.

9    BY MR. PACKIN:

10   Q.  Does B7.5 address the issue of warnings on a cut-off saw?

11   A.  They address prominently locating safety related

12   information but they --

13   Q.  In any detail?

14   A.  No.

15   Q.  Now, you've indicated in your report, you rendered the

16   opinion that Stihl's reliance on B7.54, the design of its

17   safety communication system, was a defect in their safety

18   communication system.  On what did you base that opinion, sir?

19   A.  Yes, because as I indicated in my report, there was other

20   information available to better design warnings for a variety

21   of applications, including this one, including Z535, that was

22   available at this time, and other information that could be

23   found in the research on warnings.

24   Q.  So you were referring to the empirical research and Z535?

25   A.  Yes.

1    Q.   Okay.  You mentioned a few moments ago that Z535 provides

2    some enumerated criteria for a properly prepared warning?

3    A.   Yes.

4    Q.   Okay.  Which Z535 are you referring to in that regard?

5    A.   All of them would have similar kinds of recommendations,

6    but because of where this happened in time, I was referring

7    specifically to Z535 that was published in 2002.

8    Q.   Okay.  Is that .4?

9    A.   Yes.

10            MR. PACKIN:  Okay.  I'm going to ask to mark as P-6

11   a blowup of, and we will provide the smaller version, of those

12   criteria.  And I will indicate I typed them, my office typed

13   them, but they're taken directly from Z535.4.

14        (Plaintiff's Exhibit-6 marked for identification)

15            THE COURT:  You're offering this as P-6?

16            MR. PACKIN:  Yes, ma'am.

17            THE COURT:  Any objection?

18            MR. WALSH:  No objection, Your Honor.

19            THE COURT:  Subject to you have to double check it

20   to proofread it to make sure that it's right.

21            MR. PACKIN:  Yeah.

22            THE COURT:  P-6 in evidence is a page from ANSI

23   Z535.4 effective 2002.

24        (Plaintiff's Exhibit-6 admitted into evidence)

25            MR. PACKIN:  That's the 2002 version actually, yes.

1   BY MR. PACKIN:

2   Q.  Are those the criteria that you were referring to a moment

3   ago?  You don't have to read them all into the record, but are

4   those the criteria?

5   A.  Yes.

6   Q.  In your report, you render the opinion on page 2 --

7          THE COURT:  Page 2, okay.

8   Q.  -- that manufacturers have a duty to warn end users about

9   the hazards of their products, the likely consequence of

10  encountering those hazards, and the steps to take to avoid

11  them.  Where do you draw upon for that conclusion, sir?

12  A.  Just generally that manufacturers have a duty to warn

13  about the hazards of their products, in combination with the

14  recommendations that are embodies in ANSI Z535.

15  Q.  Okay.  Is that concept reflected in the warnings

16  literature, as well as Z535?

17  A.  Very much so.

18  Q.  You indicate going forward on page 4 of the report --

19          THE COURT:  Page 4, thank you.

20  Q.  -- that the components of the warning system should be

21  well designed in appearance and content and tested to

22  determine if they communicate safety-related information

23  effectively and in a way most likely to result in correct

24  behavior.

25          THE COURT:  Hold on just a minute.

1   A.   Where are you at on page 4, sir?

2           MR. PACKIN:   That's page 4.

3   A.   Oh, I see.

4           THE COURT:   Yes.

5   A.   I'm with you.  I see it.

6           THE COURT:   Components of a warning system?

7           MR. PACKIN:   It's the third block of material on

8   page 4, and it starts about four or five lines down.

9           THE COURT:   One moment.  I'm going to type this into

10  my notes and then we can discuss it.  I'll tell you when I'm

11  ready.

12      (Pause in proceedings)

13          THE COURT:   I'm not winning any speed test today.

14      (Pause in proceedings)

15          THE COURT:   Okay.  So you had that quote.  Go ahead.

16  BY MR. PACKIN:

17  Q.   On what did you base that opinion that you've rendered

18  about them being well designed in appearance and content and

19  tested to determine if they communicated --

20  A.   Sure.  One of those --

21  Q.   I'm sorry, communicate effectively.  Go ahead.

22  A.   Yes.  One of them has to do with testing these against

23  recommendations made in standards such as Z535.  For example,

24  as I've already said, there's guidance in there for how one

25  would construct a message, the use of an appropriate signal

1    word, the use of color, the use of pictorials, how one would

2    organize the information, how one would construct the specific

3    statements and the messages, other kinds of physical

4    characteristics such as the use of color, size, contrast in

5    order to accommodate where people would be seeing this and so

6    on.  And also based on the findings and the literature for

7    other kinds of characteristics known to increase the

8    effectiveness of warnings, and I refer to that as in

9    behavioral research that incorporates the various functions of

10   a warning.  For example, that it needs to inform people, it

11   needs to tell people about the hazard at the time it's most

12   critical, and to remind them about it, those kinds of things

13   that we talked about earlier.  And there was evidence in the

14   literature to suggest that there were recommendations for

15   doing this in order to increase the effectiveness of warnings.

16   Q.  On page 3 you render the opinion that hazards associated

17   with the use of cut-off saws have been known for many years.

18   On what did you base that statement and conclusion?

19   A.  From the testimony of Messrs. Linsbauer and Elsner, it was

20   clear that they had known about this specific hazard for a

21   number of years, certainly before these accidents occurred.

22   Q.  On page 2 of your report you render the opinion --

23             THE COURT:  Be right there.  Page 2?

24             MR. PACKIN:  Yes, Ma'am.

25             THE COURT:  Uhm-hum.

1    BY MR. PACKIN:

2    Q.  That Mr. McGee's misuse of the saw by mounting a carbide

3    tip saw blade on it and cutting plastic pipe with it was

4    reasonably foreseeable and actually foreseen.

5    A.  Yes.  Again, that come --

6    Q.  Excuse me.  On what did you base that statement?

7    A.  Again, that comes from the deposition testimony of Mr.

8    Linsbauer and Elsner that suggested that it was well known to

9    them at the time that people were commonly misusing their saws

10   and it was a dangerous practice by mounting them with --

11   Q.  Was it based --

12   A.  -- toothed blades.

13   Q.  Was any part of that opinion based on the content of the

14   manual?

15   A.  Sure.

16            THE COURT:  Based on what?

17            MR. PACKIN:  The content of the manual.

18   A.  Yes, the manual clearly outlined that the use of carbide

19   saws on these -- carbide tip blades on these saws was a

20   dangerous misuse.

21   BY MR. PACKIN:

22   Q.  Did the inclusion of that in the manual give you any

23   indication that it was foreseen by Stihl at the time this saw

24   was made?

25   A.  Yes, otherwise I don't think that they would have spent as

1    much time and effort on putting that specific warning across

2    several different pages.  And in fact, if you go to the

3    website, and we're not on that yet, it's the only warning

4    that's on every page of the cut-off saw portions of their

5    website.

6    Q.  All right.  Now, we know from your report and from the

7    materials there was an item addressing that wood cutting saw

8    blade or toothed saw blade use on the label that was missing

9    from the saw at the time of the accident, correct?

10   A.  Yes.

11   Q.  Did that indicate to you in any way -- was that in any way

12   supportive of your conclusion that this misuse was reasonably

13   foreseeable and actually foreseen?

14          THE COURT:  Okay, this yellow label, just for the

15   record, what does it show?  Do you have one handy?

16          MR. PACKIN:  May I mark that as P-7, Your Honor?

17          THE COURT:  Go right ahead.

18      (Plaintiff's Exhibit-7 marked for identification)

19          THE COURT:  Is that it, Mr. Walsh?  Do you object?

20          MR. WALSH:  We have no objection.  Mr. Packin showed

21   it in my direction.  It appears from here to be correct.

22          THE COURT:  Okay, P-7 in evidence is a blowup of the

23   yellow label.

24      (Plaintiff's Exhibit-7 admitted into evidence)

25   BY MR. PACKIN:

1   Q.  Now, Dr. Kalsher, just to point my finger over to the left

2   side of the Courtroom, that yellow label that you see on the

3   cover of the exemplar machine that's on counsel table, your

4   understanding that P-7 is a blowup of that?

5   A.  May I take 10 seconds to look at it?  I just want to --

6   Q.  I'll bring it over.

7   A.  I want to be sure.

8           THE COURT:  Actually, Counsel, for safety purposes -

9   -

10  A.  May I see that?

11          THE COURT:  -- would you please represent for the

12  record what you're holding and what condition it's in?

13          MR. WALSH:  Your Honor, since that is an exhibit we

14  brought, that is an exemplar TS 400.  It is in new condition.

15          UNIDENTIFIED SPEAKER:  (Indiscern.).

16          MR. WALSH:  I'm sorry?

17          UNIDENTIFIED SPEAKER:  (Indiscern.).

18          MR. WALSH:  I'm sorry.  It is an exemplar TS 400.

19  It is in new condition.  It does not have gas or oil in it.

20  It is an operable machine, if it was fully fueled, but

21  otherwise it's not, and it is equipped with a composite wheel,

22  cutting wheel, which should provide no essential hazard to

23  anyone.

24          THE COURT:  Okay.  Are we going to stipulate to let

25  this machine into evidence as P-8 in evidence?  Do you mind?

1            MR. WALSH:  I don't know if it was being offered in

2    evidence.  Was it?

3            THE COURT:  Well, anything in the Courtroom that we

4    are testifying --

5    A.  I just wanted to take a quick --

6            THE COURT:  Just a second, sir.

7    A.  Oh, I'm sorry.

8            THE COURT:  If there's going to be testimony at all

9    in the Courtroom it's just handy to have a label on it.

10           MR. WALSH:  We can mark it.

11           THE COURT:  Okay, P-8 in evidence.  And now we'll

12   give --

13       (Plaintiff's Exhibit-8 marked for identification)

14       (Plaintiff's Exhibit-8 admitted into evidence)

15           MR. WALSH:  Can I suggest that --

16           THE COURT:  -- Dr. Kalsher --

17           MR. WALSH:  Can we mark that on the bottom or

18   someplace so that if we use it or have to re-mark it for trial

19   that we don't have a lot of labels on it?

20           THE COURT:  Perfectly fine.  Now, you said yes,

21   there is a notation at the bottom of this blown up exhibit, P-

22   7.  It says A. Stihl, S-T-I-H-L, 2000.  And then it has some

23   serial number after that.

24           MR. WALSH:  I can represent to the Court what I

25   believe that will refer to.  A. Stihl would be Andreas Stihl,

1   which is a German company that is the designer and

2   manufacturer of the machine.  The serial number is probably,

3   and I'm guessing here, it's probably a part number for the

4   label is my guess, but I'm not sure.  The 2000 date is

5   probably the release date of that particular part.

6           THE COURT:  Thank you, sir.

7           MR. PACKIN:  Just for the record, I just checked,

8   both the actual size label that's on the saw we marked and the

9   blowup have the same 2000 release date.  The only difference

10  in the serial number is the one on the blowup, the last two

11  numbers or letters are XX, and on the one that's on the saw,

12  instead of the XX it's SD.

13          THE COURT:  You may proceed.

14  BY MR. PACKIN:

15  Q.  On page 2 you render the opinion that the use of a cut-off

16  -- excuse me.  Going back to the portion of page 2 we were

17  just referring to, where did you get the -- what was your

18  basis for reaching the conclusion that using the carbide tip

19  saw blade to cut plastic pipe was something that was foreseen

20  by Stihl?

21          THE COURT:  Where are we now?

22          MR. PACKIN:  Page 2, the same portion we were on

23  when we started marking this.

24          THE COURT:  Okay, just a second.  Using a saw to cut

25  plastic pipe was a foreseen use, right?

1            MR. PACKIN:  Yes.

2            MR. WALSH:  Where is that here?  I'm sorry.

3            MR. PACKIN:  Page 2.  It says --

4        (Pause in proceedings)

5            MR. WALSH:  Your Honor, I may be missing it, but I

6    don't see anything in there that indicates the cutting plastic

7    pipe -- referencing cutting plastic pipe.  Maybe I'm missing

8    it.

9            THE COURT:  All right.

10           MR. PACKIN:  I don't want to spend too much time on

11   that, so I'll withdraw that for the moment, the plastic pipe

12   aspect of it.

13           THE COURT:  Okay.

14   BY MR. PACKIN:

15   Q.  In the materials you reviewed in this case, did you see

16   any information or indication that Stihl anticipated their

17   tool, the TS 400, being used to cut plastic pipe?

18   A.  I believe on page 21 of the owner's manual there is a

19   reference to plastic underneath the discussion of the two

20   different kinds of blades that can be used on the machine,

21   that are authorized for use on the machine.

22   Q.  On page 2 of the report, you offered the opinion that

23   there is an increased risk or potential for kickback when a

24   cut-off saw is used with a carbide tip saw blade.

25           THE COURT:  What page are we on?

1          MR. PACKIN:  2, Ma'am.

2          THE COURT:  Okay.

3    A.  Could you point me exactly where we're at, Mr. Packin?

4          MR. WALSH:  Your Honor, I'm going to voice a general

5    objection here.  We have a report that just has a finding and

6    opinions section and then has a general narrative.  Much of

7    what Mr. Packin is styling in his questions as opinions are

8    not opinions this witness is qualified to provide, such as

9    whether there is an added risk.  That may be information he

10   read, but he's not been presented as an engineering expert,

11   he's not been presented to give opinions on the dynamics of

12   the machine.  So by having a narrative rather than focusing on

13   actual discreet warnings opinions, what we're doing, I think,

14   is turning what are really not opinions on the part of this

15   witness, not ones he's qualified to give in any event.  And so

16   I think we need to do this a little differently, and we may

17   have to go back and ask this witness exactly what his opinions

18   are, as opposed to taking excerpts from a narrative in a

19   report.

20         THE COURT:  It's a long report.  I note your

21   objection, but at least from the standpoint of a somewhat

22   educated hearing officer, educated by what I have read so far,

23   I can understand this in context, and I do know where the line

24   of his asserted expertise is drawn.  But I'll keep that in

25   mind.

1          MR. WALSH:  Very well.

2    BY MR. PACKIN:

3    Q.  Perhaps I can ameliorate it a little bit by saying the

4    conclusion or the statement that you render that there's

5    increased risk or potential for kickback when a cut-off saw is

6    used with a carbide tip blade as indicated in the last block

7    of writing on page 2, where did you draw from in the record or

8    the materials in this case to reach that conclusion?

9    A.  Right.  In the manual it states that either a chip blade

10   that is authorized or the teeth of a cutting blade such as

11   we're talking about here can get caught in the material being

12   cut and thereby increase the chance for kickback.

13   Q.  So from the materials in the actual owner's manual?

14   A.  Yes.

15   Q.  Published by Stihl?

16   A.  Yes.

17          THE COURT:  But to the degree that we can move along

18   to the actual opinions regarding the warnings, that would be

19   good.

20          MR. PACKIN:  Yes.

21   BY MR. PACKIN:

22   Q.  On page 5 -- strike that, strike that.  After making --

23   yes, on page 5, after making reference to that yellow label

24   that's on the easel being missing at the time of Mr. McGee's

25   accident, you state that Section 10 of ANSI Z535.4-2002

1  addresses expected life and maintenance of warning labels, is

2  that correct?

3  A.  Yes.

4  Q.  So in reaching opinions in this case regarding the missing

5  label, did you rely in part upon what's reflected in ANSI's

6  Z535.4?

7  A.  Yes, because what is stated in there, and I'll just read

8  it into the record, "Product safety signs and labels shall

9  have a reasonable expected life with good color stability,

10 symbol legibility, and word message legibility when viewed at

11 a safe distance.  A viewing distance reasonable expected life

12 shall take into consideration the expected life of the product

13 and the foreseeable environment of use."  And embodied in the

14 materials that Stihl itself presented, as well as from the

15 deposition testimony and other information I read in the case,

16 it's my understanding that the saws are used in dirty

17 environments.  They're sometimes used with the hose attachment

18 that could cake on elements that have been grinded, and they

19 need to be washed and power washed.  And in this instance, it

20 seems like that was a foreseeable use because that's an

21 expected environment in which the saw will be used.  And so

22 the label, at least according to the recommendation, should

23 take that kind of environment and use into account, including

24 the likelihood that people will steam clean or use power

25 washers to clean the machines.

1  Q.  Okay.  And what was your understanding as to the age of

2  this machine at the time of Mr. McGee's accident when this

3  label was missing?

4  A.  I believe it was about three years old at the time.

5  Q.  What was your understanding as to whether three years was

6  beyond the expected life of this machine?

7          MR. WALSH:  Objection.  Lack of foundation.

8          THE COURT:  So noted.

9  A.  Because it's designed to be primarily a commercial or

10  industrial tool I would expect that it would last three years

11  or more.

12  BY MR. PACKIN:

13  Q.  Was there any indication in the record of materials that

14  you could see that it was not used in its anticipated

15  environment?

16  A.  No.

17          MR. WALSH:  Objection.  Lack of foundation.

18          THE COURT:  Just a second.  Overruled.  Just a

19  minute, please.  Let me see you at the side briefly, Counsel.

20  Sir, if you'd just excuse us, I'm going to talk to them for a

21  minute.

22  A.  May I (indiscern.)?

23          THE COURT:  Yes, you may.  Sure.  Yeah, go ahead.

24      (Sidebar on the record)

25          THE COURT:  The one thing about the missing label, I

1   can understand his testimony about the adequate -- the thing

2   about the missing label -- step back.  Okay.  It is not clear

3   to me what his opinion really is within the area of his

4   expertise when you talk about the fact that this label had

5   fallen off this machine.  I do understand that he's got

6   opinions about where the labels should be placed on the

7   machine and what they should look like, but I don't see an

8   opinion coming from him that connects up the fact that the

9   label has fallen off with what was inadequate about the fact

10  that it was attached the way it was.  I just don't understand

11  that he really draws an opinion on the absence of the label.

12          MR. PACKIN:  I believe that the report indicates

13  that based upon the criteria set forth in ANSI, and the fact

14  that this was a three-year-old machine used under what in his

15  opinion were reasonably anticipated conditions of use and

16  cleaning, that the absence of that label, and he says it later

17  in the report, left him at the time of the accident with no

18  warning on the machine at all --

19          THE COURT:  Well, that's true.

20          MR. PACKIN:  -- regarding this hazard.

21          THE COURT:  But what does he say is wrong with the

22  machine in that the label fell off?  I guess what I'm asking,

23  this is a physical problem.  It is not a textural problem,

24  it's not a conspicuousness problem.

25          MR. PACKIN:  Okay.

1            THE COURT:  It's a physical problem.  I mean, am I

2    supposed to use Gorilla Glue, welding --

3            MR. PACKIN:  I get the point.  Okay.

4            THE COURT:  -- and he's not a glue or a welding guy.

5            MR. PACKIN:  Correct.

6            THE COURT:  He's not here.

7            MR. PACKIN:  Correct.

8            THE COURT:  So I want you to be very clear on how

9    much you draw out of him --

10           MR. PACKIN:  Okay.

11           THE COURT:  -- as to what his opinion is on this,

12   and then it'll be open to cross examination.  But I wanted to

13   alert you to this.

14           MR. PACKIN:  Okay, okay.

15           THE COURT:  That missing label, I see it in a

16   slightly different category than content of labels.

17           MR. PACKIN:  Okay.  Fair enough.

18           THE COURT:  Or even placement of labels on the

19   machine.

20        (Sidebar ended)

21           THE COURT:  You can pick up, Mr. Packin, from right

22   where we were at the top of page 6.

23           MR. PACKIN:  Okay.

24           THE COURT:  And where else do you want to go on that

25   topic in the report.

1   BY MR. PACKIN:

2   Q.  Now, just for the record, do you hold yourself out as an

3   expert on glues or adhesives?

4   A.  No.

5   Q.  Your area of expertise is warnings and product safety

6   communication, correct?

7   A.  Yes.

8   Q.  Now, the Z535 standard that you've cited here, Z535.4-

9   2002, that is part of the series on which you sit on the

10  committee, correct?

11  A.  Yes.

12  Q.  Do the people who are involved in the warnings field such

13  as yourself concern themselves with the adhesive or glue

14  that's used to affix a label to a machine?

15  A.  Well, certainly to the extent that it would impact the

16  effectiveness of risk communications and warnings.

17  Q.  Okay.  But not as physical science in terms of evaluating

18  the efficacy of a glue or adhesive, correct?

19  A.  No.

20  Q.  That's correct?

21  A.  That's correct.

22  Q.  Okay.  So when you look at a label being missing, would it

23  be correct that your focus is whether it was missing under

24  expected conditions of use and at a time when a machine was

25  not of advanced age?

1            MR. WALSH:  Objection.  Leading.

2            THE COURT:  Yes, that's too leading.

3    BY MR. PACKIN:

4    Q.  What factors do you look at if you're not looking at the

5    glue?

6    A.  Sure.  As I indicated in my opinion, the point is whether

7    or not it is going to be on the machine as you expect it under

8    the expected conditions of use.

9    Q.  Okay.  In this particular case, from the materials that

10   you reviewed, was Mr. McGee's accident saw at the time of his

11   accident the only experience that Joseph Jingoli and Sons had

12   had with this particular label being missing on Stihl

13   products?

14   A.  No.  I talked about that earlier during the day, that in

15   fact Hoffmaster had testified that they kept stacks of them

16   because they kept coming off.  So it was a common occurrence,

17   from my understanding of the testimony.

18   Q.  How did that factor into your evaluation of the missing

19   label?  Recognizing that you don't have the expertise to

20   evaluate glues or adhesives, how did that total of information

21   impact upon the opinion you rendered?

22   A.  Well, it's important because, again, I've talked about

23   some of this earlier, looking from the manufacturer's duty to

24   warn end users about the product given that they were selling

25   this primarily for use in construction and the trades, really

1   the only warnings that they could rely on to actually reach

2   the end users for some of the reasons I cited earlier, that

3   it's reasonable to expect that in a construction site when

4   people don't buy the machines or maintain the machines

5   themselves, they may not have access or get an owner's manual.

6   It can't be expected that they're going to look for specific

7   information on the internet for a specific tool when they

8   probably use dozens of different kinds of tools.  And so it's

9   important that the actual warning that will be on the machine

10  when it's going to be used, that it's designed such that it

11  can reasonably be expected to be there when the person's going

12  to use it over the predicted life of the machine.

13  Q.  And was then the opinion that you reached one drawn just

14  upon the experience with Mr. McGee's saw or did it draw upon

15  all of the information you had available to you?

16          MR. WALSH:  Objection.  Leading.

17          THE COURT:  I'll permit it.

18  A.  Well, we've already, again, we've already talked about the

19  fact that I had a myriad of information from both the Stout

20  case and in the McGee case, so there was a lot of information

21  I had available to me for this particular subject.

22  BY MR. PACKIN:

23  Q.  Okay.  From the materials that you had to review,

24  particularly photographs and deposition testimony, was there

25  any portion of that label that remained on the blade cover,

1    either the label itself or any of the material that had been
2    used to affix it to the blade cover?
3    A.  No, it didn't appear that there was any residual glue or
4    parts of a label left on the side.
5    Q.  All right.  And then on page 6, in that same line of
6    writing, you state that, "The fact that the label was missing
7    from the accident saw, coupled with the fact that it was
8    missing from other TS 400s owned by Jingoli, illustrates the
9    failure on the part of Stihl to make this warning label
10   sufficiently durable to withstand foreseeable conditions of
11   use."  On what did you base --
12             MR. WALSH:  Where is he reading?  Where are you
13   reading?
14             THE COURT:  Yes, it's in the middle of the second --
15             MR. PACKIN:  Yes.
16             THE COURT:  -- paragraph, which is the first full
17   paragraph.
18             MR. PACKIN:  Yes, Ma'am.  About eight, nine lines
19   down, "The absence of the yellow sticker," that's the
20   sentence.
21   A.  Okay.
22             THE COURT:  And the one before it.
23             MR. PACKIN:  Yes, Ma'am.  May I proceed?
24             THE COURT:  Yes, you may.
25   BY MR. PACKIN:

1   Q.  And I understand we may have covered part of this, on what

2   did you base that conclusion?

3   A.  Sure.  I based that on the recommendation in the ANSI

4   standard that such a label is expected to have an expected

5   life under reasonable conditions of use.  And it's

6   corroborated by the many depositions that I read that in fact

7   it came off routinely off of those saws.  That's in violation

8   of that recommendation.

9   Q.  Now, you go on on page 6 to state --

10          THE COURT:  Just a second.  We're looking at --

11   there is an exhibit, there's a blowup of the Z535

12   recommendations.

13          MR. PACKIN:  We're looking at an exhibit that is a

14   blowup of the warning label.

15          THE COURT:  Go back to P-6, please, that blowup.

16          MR. PACKIN:  Yes.

17          THE COURT:  It's the ANSI that you typed.

18          MR. PACKIN:  This one is -- let me go back to the

19   microphone.  This ANSI blowup, P-6, is not from the standard

20   that addresses the affixation of labels.  This addresses the

21   content and format of labels.  I did not blow up the one that

22   addresses how they're affixed because it's relatively short

23   and it's quoted verbatim in Dr. Kalsher's report, if you read

24   it.

25          THE COURT:  Thank you, Counsel.  You may move along.

1          MR. WALSH:  Your Honor, may I raise an issue here?

2          THE COURT:  Yes.  Do you want to talk about our

3     timetable?

4          MR. WALSH:  I do want to talk about our timetable.

5          THE COURT:  Okay, go ahead.

6          MR. WALSH:  We're approaching 1 o'clock, and on our

7     timetable, I'm not sure exactly where that leaves us, but it

8     leaves us pretty close to the three hours.  I don't know if

9     Mr. Packin has kept track of time or not, but I do want to,

10    you know, remind him, because otherwise we're going to run out

11    of ability to cross examine this witness today.

12         MR. PACKIN:  I am running a little longer.  There

13    have been a number of factors.  One is I just didn't predict

14    totally accurately, but also, and this is not a criticism in

15    any way, there are certain factors that slow it up a little

16    bit, such as, you know, allowing Your Honor the opportunity to

17    find the pages and whatnot.  I'm a little behind but I --

18         THE COURT:  Okay, let's take five minutes.

19         MR. PACKIN:  -- I've cut out substantial portions to

20    get to where we are.

21         THE COURT:  Let's take five minutes recess and you

22    come back and tell us what you currently estimate is what you

23    need in order to finish, and then I'll see what about a lunch

24    break.  Let's take the five minutes so that you can think.

25         MR. PACKIN:  Okay.

1              THE COURT:  I always believe in that.  Then we'll

2     come back.  But I will let you have lunch at some point.

3              MR. PACKIN:  Thank you.

4              THE COURT:  Soon.

5          (Court in recess)

6              THE COURT:  Thank you.  Mr. Packin --

7              MR. PACKIN:  I will --

8              THE COURT:  -- what's your thought?

9              MR. PACKIN:  -- provide the Court with my thought

10    and analysis of that issue that we left on, and of course Mr.

11    Walsh will weigh in on it as well.  But I will say that we've

12    had some discussion collaboratively in the hallway.  What I've

13    advised counsel is that I have, in the earnest hope of

14    finishing today, actually taken significant portions out of my

15    anticipated questioning, yet we are at a point, can't -- and I

16    don't think there's been much in the way of repetition;

17    there's been some, but not a lot.  And so we are at a point

18    where I would say I'm -- and I've estimated for counsel that I

19    might need an hour to an hour and a half beyond what I had

20    originally predicted.  If we factor in a lunch break, to which

21    I think everyone is reasonably entitled, it gets us into the

22    3:30 to 4 o'clock range.  I am the first to say that the

23    Defense should have as much time to cross examination as is

24    appropriate, and certainly commensurate with the direct

25    examination.  And my own personal feeling, for what it's

1    worth, is it would be an undue burden upon the Court, the

2    Court staff, the witness, me, and co-counsel to be here 'til 8

3    o'clock at night trying to finish this.

4              THE COURT:  All right, let me hear from Mr. Walsh.

5              MR. PACKIN:  But --

6              THE COURT:  Oh.

7              MR. PACKIN:  Just we had originally had discussions

8    about it being two days, and perhaps that was more realistic,

9    given the breadth of material that needs to be covered, as the

10   Court knows from the breadth of material that was submitted on

11   the motions, as well as the many pages of depositions.  So my

12   suggestion is that we take a lunch break, although if Your

13   Honor says we're not, we won't, and that I'll finish up this

14   afternoon at what is more traditionally a reasonable hour, and

15   we'll do his cross at another day.  It doesn't sound like it

16   will be tomorrow based on availability of certain of us, as

17   well as perhaps the Court, but we can do it.  And I recognize

18   that we may then be staggered because we have other witnesses

19   already scheduled, but we're all pretty bright people, and I

20   think we can keep track of which one we're on.  I think the

21   Hayes hearing will be a one-day; his opinions are relatively

22   brief, his scope in the case is relatively brief.  Growney is

23   likely to be more like this one.  I think we have a lot to

24   cover, and it's important to get it done and have the

25   appropriate record for Your Honor and for the parties.

1           MR. WALSH:  Your Honor, we all came down here
2   knowing what time constraints the Court had imposed on the
3   hearings, and it is somewhat incumbent, I think, to deal with
4   that.  The notion -- this hearing has been put off a couple of
5   times.  What that does each time, there's a massive amount of
6   material, as Your Honor knows.  When weeks go by between
7   sessions, I'm no longer of retaining that weeks behind, so
8   what you do is you end up re-prepping every time you do it and
9   dragging out all the material and re-prepping, which simply
10  adds to the cost of this litigation, which already is
11  extremely expensive.  We all came in here knowing what we were
12  supposed to do, what time limits we had, and it seems to me
13  more appropriate to simply adhere to those time limits and
14  press on.  Mr. Rudolph can't be here tomorrow, he's off of a
15  trial to be here today.  If the Court was available tomorrow,
16  I can make accommodations and be here tomorrow, but I would be
17  without Mr. Rudolph, who has to resume his trial that he's
18  taken a day off.  So I think the options are we either adhere
19  to the time limits, or we try to reschedule tomorrow, or we do
20  as Mr. Packin suggested and try to get another day, and I
21  think that's the -- from my standpoint, that's the least --
22          THE COURT:  How about Dr. Kalsher?  What's his
23  availability for tomorrow?
24          MR. KALSHER:  I can see if I can get out of things
25  that I have to do at the University and child care.  I hadn't

1    planned on this, I concede.

2              THE COURT:  Let's take a 45 minute lunch recess.

3              MR. PACKIN:  If I may just --

4              THE COURT:  Is 45 minutes enough?

5              MR. PACKIN:  It is for me.  If I may just give some

6    brief response.  I mean, originally these were --

7              THE COURT:  I really think we're -- this becomes a

8    scheduling problem.  I'm sorry for the expense and all that,

9    but I just don't want to spend our time discussing scheduling

10   on the record, if we can help it.  So if you'll work with your

11   witness, see if you can show up tomorrow morning.  Let's see

12   whether that's an option.

13             MR. PACKIN:  All right.

14             THE COURT:  And that we would work through and get

15   some work done in the afternoon today.  And Mr. Rudolph, we'd

16   have to --

17             MR. RUDOLPH:  I'll make calls --

18             THE COURT:  -- carry on.

19             MR. RUDOLPH:  I'll make calls over the lunch break

20   as well.

21             THE COURT:  All right.  And it would start early,

22   first thing tomorrow morning, 9 o'clock.  And we'd go today

23   until 5 of 5:30, you know, whatever you can endure.  And you

24   can take a shorter lunch break if you want.

25             MR. WALSH:  I don't know that much about Trenton and

1    where I can go other than the basement --

2            THE COURT:  Off the record.

3        (Court in recess)

4            THE COURT:  As far as our time clock is concerned

5    and where we proceed from there, do we have suggestions?

6            MR. PACKIN:  It appears from the discussions I've

7    had with counsel and Dr. Kalsher that we could all return

8    tomorrow morning and complete this, as long as it's

9    satisfactory with the Court, in which case, for the benefit of

10   all, I would -- because I guess I'm going to end somewhere

11   close to 4, based on our timing.  And maybe we stop at that

12   point since tomorrow's going to provide ample time for them to

13   do what they need to do?

14           THE COURT:  So you would think to finish your direct

15   examination of Dr. Kalsher and then we'd adjourn for the day.

16           MR. PACKIN:  Right.

17           THE COURT:  How's that?

18           MR. WALSH:  That's fine, Your Honor.  And I think

19   even Mr. Rudolph has managed to finagle another day, so.

20           MR. PACKIN:  I might need time to get Dr. Kalsher

21   another shirt for tomorrow, I'm told, but other than that --

22           MR. WALSH:  There's no rule against wearing --

23           THE COURT:  We have some downstairs actually.

24           MR. WALSH:  I hope there's no rule --

25           MR. PACKIN:  Shirts?

1          MR. WALSH:  -- against wearing the same suit two

2     days in a row.

3          MR. PACKIN:  The shirts aren't orange are they with

4     large letters on the back?

5          (Laughter)

6          MR. PACKIN:  One other -- just so it's clear, I

7     mean, I have -- in reliance obviously on Your Honor's

8     indication that you have read the reports and the CV and the

9     depositions, I have not gone into every single sentence of

10    every single paragraph, in fairness to everyone here.  Not

11    that I'm waiving that, it's there, it's in the materials, and

12    it's discussed in our moving papers.

13         THE COURT:  That's fine.  This is a Daubert Hearing,

14    this is not a 14-hour deposition, nor is the full dress

15    trial --

16         MR. PACKIN:  Thank you.

17         THE COURT:  -- on the merits, when as and if we get

18    to that.  It's a Daubert Hearing.  And the fact that you had

19    the report here verified by Dr. Kalsher and that you are

20    taking him through some of the testimony that highlights what

21    he has to say there and why, I think that's sufficient for a

22    hearing, and you're not being foreclosed from further inquiry

23    if you should find you need it.

24         MR. PACKIN:  Thank you.

25         THE COURT:  Now, Mr. Walsh, you will have the

1    opportunity to take over the floor tomorrow morning at -- what

2    hour would you like?

3              MR. RUDOLPH:  9 o'clock is --

4              MR. WALSH:  9 o'clock, whatever suits the Court

5    but --

6              THE COURT:  9 o'clock is fine.

7              MR. WALSH:  -- be we can be available by 9 o'clock

8    certainly.

9              MR. PACKIN:  If it doesn't inconvenience everyone, I

10   don't -- (indiscern.).

11             UNIDENTIFIED SPEAKER:  No.

12             MR. PACKIN:  Because I have about an hour, hour and

13   a half drive total to get here.

14             THE COURT:  Okay, let's start promptly at 9:30.

15             MR. PACKIN:  That would be great, thank you.

16             THE COURT:  On Defendant's side of the case.

17             MR. PACKIN:  Correct.

18             THE COURT:  And we'll do equal time for them

19   tomorrow and any redirect that you need.  And then we'll talk

20   about how you get to present your closing arguments and when.

21   But let's just get the testimony in tomorrow.  Okay?

22             MR. PACKIN:  Thank you.

23             THE COURT:  And you do have a little bit of leeway

24   this afternoon since we're not on a breakneck --

25             MR. PACKIN:  Thank you.

1           THE COURT:  -- pace.  Thank you one and all.

2           MR. PACKIN:  Thank you, Your Honor.

3                  DIRECT EXAMINATION (CONT'D)

4   BY MR. PACKIN:

5   Q.  Where we had left off was on page 6 of your report, where

6   you had indicated that even if the yellow label that was

7   missing had been present, it was defective in format and

8   content, to use your words, correct?

9   A.  Yes.

10  Q.  Okay.  Now, why, first of all, did you address the issue

11  of its format and content if, in fact, it was not on the

12  machine at the precise time of the accident?

13          THE COURT:  That label we're talking about?

14          MR. PACKIN:  Yes, Ma'am.  The one that is --

15          THE COURT:  The yellow one.

16          MR. PACKIN:  Yes.  I will remove the other.

17          THE COURT:  The reason I ask the question, Counsel,

18  is that the exact quote from the opinion letter on page 6, the

19  last sentence of the first full paragraph, {quote} "However,

20  even if the yellow sticker had been present, the labeling

21  still would have been defective."  So I think you should ask a

22  foundation question.  We're talking about a yellow label or

23  something more.

24  BY MR. PACKIN:

25  Q.  And in you were stating in that line of your report that

1   the labeling still would have been defective, is one of the

2   elements of the labeling you're addressing the missing yellow

3   label, which we have blown up there as P-6?

4   A.  Yes.

5       (Plaintiff's Exhibit-6 previously marked for

6   identification)

7   Q.  And why did you address that if it, in fact, wasn't

8   present at the time of the actual accident?

9   A.  Because based on my reading of the materials and the

10  testimony in this case, it was clear there wasn't just one saw

11  that was purchased and used by Jingoli put to use, but there

12  were many.  It also was the case that since the label could

13  have been on a machine at a point in time that Mr. McGee or

14  his co-workers were working with it, it's possible that it

15  would have been on while he or others were using it.

16  Q. Okay.  And what criteria did you use?  In other words, what

17  criteria did you use when reaching the conclusion that the

18  label, P-6, was defective in format and content?  And I'm not

19  asking you at this moment, we'll get into it, for the specific

20  deficiencies, but what did you measure it against?

21  A.  I measured the format and content of this warning against

22  two primary things:  One was the ANSI standard in terms of its

23  recommendations for how one would design the format and

24  content of a warning; and also from my understanding of the

25  literature, the warning's literature and what it would

1   indicated needed to be on the sign in terms of its content and

2   format.

3   Q. Okay.

4              THE COURT:  So you're referring to ANSI Z535?

5   A.  Yes.

6              THE COURT:  And the literature --

7   A.  Yes.

8              THE COURT:  -- in the field.  Okay, thank you.

9   BY MR. PACKIN:

10  Q.  Now, looking at page 6 of your report, it appears to be

11  the bottom third of the page where you begin to specify the

12  enumerated deficiencies in form and content of the label

13  that's on the easel in front of you, correct, sir?

14  A.  Yes.

15  Q.  Okay.  Let's talk about the first one please.  You state

16  that the organization of the information is likely to lead

17  users to believe the purpose of the label is to convey

18  technical information.  And I would ask you on what do you

19  base that opinion, and how does that relate to a deficiency in

20  that form and content of that label.

21  A.  Yes.  On that part, we're looking, focusing on the left

22  side of the label where you're indicating that.  When we talk

23  about the design of warnings, they're in response to --

24  {cough} excuse me -- one or more hazards to point out what the

25  hazards are, their severity and likely consequences, and

1   avoidance information that would be relevant to that.  Having

2   that as a  basis, then what you see following the signal word

3   warning and the admonition, general admonition to read and

4   follow the safety precautions in the owner's manual is a

5   presentation of the maximum spindle speed, which is

6   highlighted in red font, 5,350 RPM.  But for a warning, one

7   would expect there to be more information to tell a user why

8   that's important information in the context of a warning; that

9   is, what is the hazard, what are the likely consequences of

10   not maintaining -- of somehow violating the maximum spindle

11   speed as it relates to the information that comes in the

12   subsequent number, such as "Use only wheels marked with

13   maximum operating speed equal to or greater than the spindle

14   speed of this machine,"  what the maximum wheel diameter is

15   and .4 -- well, we'll get to that in a minute, but what that

16   tells me is there's -- they're giving technical information

17   without any what I would call warnings information that would

18   point out the specific hazard and the consequences.

19   Q.  Okay.  In those first three items that you just read,

20   items 1, 2 and 3, do any of them -- did any of them indicate

21   to you what, if any, danger was associated with any one of

22   those three?

23   A.  Well, on the face if it, if I were just to look at that

24   sign, it wouldn't give me any indication of that.  Of course,

25   since I've read a lot of information in this case, I know the

1   rest of the story from having read the manual and read the

2   testimony and so on.

3   Q.  All right.  What you've indicated here, would it be fair

4   to say that's approaching it as one would as a first time

5   reader of it, without that information?

6   A.  Yes.

7   Q.  Okay.  Item 3, for example, does that -- when you read

8   that, did that appear to you to be in any way a warning or

9   danger alert giving the maximum wheel diameter, nominal arbor

10  hole and maximum wheel thickness?

11  A.  No.

12  Q.  What, as a interpreter -- as a expert in the field,

13  rather, of warnings and safety communication did that indicate

14  to you was being conveyed there?

15  A.  Because it doesn't tell me what the specific hazard of

16  that is.  And I'll refer back to the precursor, which is the

17  signal word in the general admonition to read and follow all

18  safety precautions in the owner's manual, that other than

19  that, plus there's a general, again, statement that improper

20  use can cause serious and fatal injury, but there's not enough

21  specific information to understand what the nature of the

22  hazard is for that independent -- the specific information.

23  Q.  From you standpoint as a warnings expert, what happens if,

24  in a situation such as this, if a reader sees a signal word

25  warning and begins to read and does not see information that

1    appears to be addressed actually to warnings, what happens?

2    A.  Well, it's likely that -- there are a couple of things

3    that would happen.  First of all, the signal word is written

4    in a large and colored font, which is likely to attract a

5    person's attention.

6              THE COURT:  The what is?

7    A.  The signal word "Warning."

8              THE COURT:  Oh, the signal word, you used that term

9    signal word.

10   A.  The signal word "Warning" with the signal alert symbol

11   after it is followed immediately by the general admonition to

12   "Read and follow all safety precautions in the owner's manual

13   - improper use can cause serious or fatal injury."  Then

14   there's a little bit of a space before the enumerated bulleted

15   points from 1 through 12.  So when you get to the next couple

16   of points, talking about maximum spindle speed, use only

17   wheels marked with, and then the rest of that, and the maximum

18   wheel diameter, it's reasonable to assume that a person would

19   see that first warning as a warning about general precautions

20   and no specific precautions, and now we're moving on to more

21   technical information about the saw itself.

22   Q.  All right.  Would that, in your opinion, in any way affect

23   the person's likelihood of reading this label completely?

24   A.  Yes, for a couple of reasons.  One is if the person

25   doesn't see that information as relevant to them or relevant

1   to their personal safety, then they may be dissuaded for that

2   reason from not finishing off.  The basis for that is

3   information in the literature that talks about the processes

4   of processing information from the beginning when a warning or

5   something in the environment is detected to switching that

6   information to actually focusing on it so that one can read

7   it, remember it and so on.  It doesn't hold one's attention

8   from that perspective.  When you see that there's all of the

9   rest of the information that's listed, delineated and numbered

10  statements that are continuous in two columns, that unless

11  there is something specific that you're looking for for

12  yourself, you're likely to be dissuaded from doing that, and

13  the basis from that is the generally accepted principle of

14  cost of compliance.  The general acceptance is that the cost

15  of complying with the even reading a warning does not have to

16  be that great before people are dissuaded from doing it.

17          THE COURT:  What did you call that, dissuaded?

18  A.  Dissuade.

19          THE COURT:   Now, what's this concept?

20  A.  Cost of compliance.

21          THE COURT:  Dissuade reading to the end, right?

22  A.  Yes.

23          THE COURT:  Cost of compliance.  In other words, I

24  can't be bothered reading to the end because I'm busy.  Is

25  that what you mean by cost of compliance, or do you mean --

1    A.   Yes, there's always competing interests a person has in

2    their busy day, and if a person does not perceive that there

3    is an immediate hazard, they have used something like this

4    cut-off saw for many times without experiencing any injury or

5    any negative consequences -- there's another term that is used

6    to refer to that, "benign experience" -- they'll be less

7    likely to look for safety related information if they don't

8    perceive that there is a risk to them in the immediate future.

9           THE COURT:   Background of benign experience, okay.

10   BY MR. PACKIN:

11   Q.   And focusing, Doctor, on your specific conclusion that

12   this initial information on this label would be likely to lead

13   users to believe the purpose is to convey technical

14   information, we've talked about 1, 2 and 3; how about #4?

15   A.   Again, this gets a little bit closer to the beginning of

16   an instruction, which is "Always inspect the guard and flanges

17   for damage after any wheel breakage on the machine," which is

18   quite reasonable.   The problem is, again, it doesn't tell the

19   reader what the hazard is and the likely consequences of not

20   following that directive.

21   Q.   Does it tell the reader if there's any hazard?

22   A.   No.

23   Q.   How about #5?

24   A.   That one states, "Use only composite wheels marked high

25   speed, reinforced or diamond wheels that are approved for use

1    on hand-held portable cutting-off machines and meets the

2    requirements of ANSI B7.1.

3    A.  Okay.

4    Q.  Again, there's no hazard or consequences information

5    stated for that.  Also, it's not clear whether an end user

6    would understand what the requirements of ANSI B7.1 are, nor

7    would they be aware, as of the point in time that we're

8    talking about for this accident, that ANSI B7.1 had actually

9    been withdrawn by ANSI as a standard.

10   Q.  How about #6?

11   A.  #6, "Only Stihl branded wheels or other wheels approved by

12   Stihl or authorized.  Unauthorized wheels may break and cause

13   serious personal injury."  Now, this is reasonable because now

14   it's in the format of what one could consider as an ANSI style

15   kind of a warning because it states what the potential

16   consequences are.  But again, the problem here is that it's

17   unlikely that a typical user would understand what the wheels

18   were that were approved by Stihl that are authorized.

19   Q.  And is it this type of material that your -- I'm sorry,

20   was it these items on which you based the conclusion in the

21   way you've just expressed?

22   A.  Yes, in part.

23   Q.  And what else contributed to the conclusion that the

24   organization of information would likely lead the users to

25   believe the purpose was to convey technical?

1   A.  Oh, I'm sorry, I thought I was answering another question

2   --

3   Q.  Okay.

4   A.  -- so I'm done.

5   Q.  Now, you also state on page 6 in that same section of

6   bulleted items that one of the deficiencies was unless users

7   are replacing or adjusting the blade prior to use, they might

8   not see the label.  And we do have the exemplar that we marked

9   on the table before you, so if you want to use that.

10          THE COURT:  What's the topic, placement now?

11          MR. PACKIN:  That unless users are replacing or

12  adjusting the blade they are -- prior to use, they may not see

13  the label.

14  BY MR. PACKIN:

15  Q.  Explain why that was a deficiency in the format and

16  content and how so, the basis for your conclusion.

17  A.  Right.  If you're not replacing the blade, and I found

18  from my own experience when I rented it, when you're going to

19  operate the saw, you're usually standing behind it.  And you

20  use the choke, you make sure that you're going to turn the

21  switch on and you pull the chord to start it up, and you're

22  ready to operate it like that.  That's also consistent with

23  another general concept in my field, which is the idea that

24  people generate scripts for their behavior.  So in this case,

25  the script would be unless there's some reason to change the

1   blade out, one wouldn't necessarily be in a position to see

2   that label, particularly if you were going to inspect the

3   wheel, which is a reasonable thing to expect people to do.

4   The label isn't on both sides.  So unless you were looking for

5   that or if you looked on the other side, if you weren't

6   looking for that or you looked on the other side, you wouldn't

7   come into contact with that information.  The script is if I'm

8   not going to change the wheel, I'm going to merely check to

9   make sure that there's no checks.  The script says I'm going

10  to start it and do my job.  And so it's not in a position to

11  interrupt that script, and there is research in the literature

12  to suggest that there are ways to break that script, based on

13  location and placement of a warning.

14  Q.  All right, now --

15          THE COURT:  Just so that we have something on the

16  record about the location of whatever label you're talking

17  about, I see on the prototype, the new one -- it's not a

18  prototype, it's a real machine.  You have a yellow label

19  there, and it's on one side of the blade guard, right?  Is

20  that the location you're talking about?

21  A.  Yes.

22          THE COURT:  Okay, thank you.

23  BY MR. PACKIN:

24  Q.  I was actually just going to cover a little bit of that on

25  the record.  Is it your understanding that the operator would

1   operate the machine as I'm generally holding it, from standing

2   behind it and having the machine off to one side?

3   A.  Yes, that last point was very important that you added.

4   Q.  Okay.  Now, the label, the warning label that we're

5   talking about, as the Court has pointed out, is on one side of

6   the blade cover, correct?

7   A.  Yes.

8   Q.  Which side of the tool is it your understanding is the

9   side from which the blades or wheels would generally be

10  replaced?

11  A.  It would be from the other side.

12  Q.  From the opposite side or from this side?

13  A.  Bring it up and maybe I -- may I point to it?  yes, see,

14  you'd actually take this off, unscrew that to take it off.

15  Q.  Okay.  Just for the record, he was pointing to the nut or

16  bolt that's on the same side as the label.  So that's what

17  you're talking about, then, about the user looking at it or

18  having it in the line of sight if changing --

19  A.  Yes, if they were changing the blade, it's more likely

20  that they're changing the blade that they could come into it.

21  But if they weren't changing the blade, they were merely going

22  to operate it, it's less likely they would come into contact

23  with the sticker.

24  Q.  All right, so when it's being held by the user as I'm

25  holding it now, what is the orientation of the user vis-a-vis

1   the label?

2   A.  You're above and behind it and on the other side.

3           MR. WALSH:  Your Honor, I'm going to object to this

4   whole line of questions.  Mr. Packin either intentionally or

5   inadvertently is holding the machine left-handed --

6           MR. PACKIN:  Because I'm left --

7           MR. WALSH:  -- which is not the way the machine is

8   held in use, and there are specific instructions and warnings

9   in the manual and otherwise not to hold it in that direction.

10  It is held and used in the position he now has it.

11  BY MR. PACKIN:

12  Q.  All right, so since I'm left-handed, and that's why I

13  picked it up as a lefty.  Now I'm holding it right-handed.

14  Does that change any of the orientation?

15  A.  No, Mr. Packin is quite correct that it clearly says in

16  the owner's manual that you operate with your right hand, but

17  it doesn't change it because still you're above and behind.

18  And we'll probably get to this point as we go along, but a lot

19  of these points are interactive.  One of the points that what

20  you just said is relevant to is the size of the font that the

21  information is printed on.  One of the problems with

22  presenting displays like this in this context is while we all

23  want to be able to see what's on it, it may give a false sense

24  of how big it is as opposed to the actual label, where the

25  print size is about an 8 point font.  And so from that

1    distance away, it's unlikely that people would be able to read

2    what's on it, other than perhaps notice that there's a yellow

3    sticker there.

4    Q.  Okay --

5              THE COURT:  Just a second.  8 point font, does that

6    refer to, not by name, but with the next bullet point, or is

7    it just a related item?  The next bullet point is that the

8    yellow sticker is text heavy.

9    A.  That's a slightly different point.

10             THE COURT:  Okay, thank you.  8 point font is hard

11   to read from you're standing, right?  From where the user is

12   standing holding the machine.

13   A.  Yes, the guidelines in the ANSI Z535.4 standard suggest

14   that for favorable reading conditions that the font size

15   should be a minimum of an 8 point font when the safe viewing

16   distance is a foot.  It goes up to an 8.5 or 8.4 font size for

17   unfavorable viewing conditions at that level.  And then if you

18   were to go up to two feet and so on, it would increase the

19   recommended size for the font.

20   Q.  Does ANSI Z535 suggest that or state that?

21   A.  It states that.

22   Q.  Now, the next point is that the label is too text heavy,

23   with the subject warning, being the one about wood cutting

24   blades, located in the second column, more than 20 lines into

25   the text where it is not likely to be noticed or appreciated

1    as being an important safety warning in such context.  On what

2    did you base that, both factually and in terms of the warnings

3    and safety communication science?

4    A.  Well, a couple of reasons.  In the ANSI standard, it does

5    permit that you warn about multiple hazards on the same label,

6    but give some directions for how one should do that.  If you

7    use multiple warnings, it suggests that there should be some

8    organization to that, with the most significant hazards or

9    dangers presented first.

10   Q.  Suggests or states?

11   A.  States.

12           THE COURT:  Is this ANSI and the literature?

13   A.  This is the ANSI standard.

14           THE COURT:  Is to organize with highest priority,

15   right?

16   A.  Highest priority as it relates to, yes, the severity of

17   the hazard.

18           THE COURT:  And what else?

19   A.  I didn't say anything else.

20           THE COURT:  Okay.

21   A.  I'm sorry, I might have lost my train of thought.

22   BY MR. PACKIN:

23   Q.  Now, what in the materials that you reviewed led you to

24   conclude that -- and what you're talking about is item #8,

25   correct --

1   A.   Yes.

2   Q.   -- on the label.  And for the record, that's -- the

3   label's oriented in two columns of text, approximately 20

4   lines per column?

5   A.   That's my understanding, yes.

6   Q.   And that was reflected by your review and looking at the

7   format --

8   A.   Yes.

9   Q.   -- of the label?  And item #8, the one we're dealing with,

10  is in the second column, correct?

11  A.   Yes.

12  Q.   So more than 20 lines in?

13  A.   Yes.

14  Q.   Now, what, if anything, led you to conclude that the

15  subject warning of item #8 had a hazard level such that it

16  should not have been located at that point in the text of the

17  label?

18  A.   Well, we should probably read through this so we'll get to

19  that point.  It states, "Use only abrasive wheels, including

20  abrasive diamond wheels.  This machine is not a circular saw.

21  It is not equipped with the guarding appropriate for a

22  circular saw and is not designed to cut wood.  And if you use

23  carbide tip wood cutting or other metal blades, they can cause

24  severe or fatal personal injury from reactive forces of blade

25  contact or thrown tips."  As it relates to my earlier point,

1   which is ANSI's statement to put priority to the highest level

2   of severity in terms of the hazards, that indicates that, from

3   my reading of that warning, that's the only one on there that

4   specifically says the consequence is severe or fatal personal

5   injury.

6   Q.  And was there anything else in the materials that you

7   reviewed in this case that led you to conclude that this

8   particular hazard had a high hazard level or a high priority

9   level?

10  A.  Well, certainly we visited that earlier when we were

11  talking about Mr. Linsbauer and Mr. Elsner, who testified that

12  they understood that this was a common misuse, using carbide

13  tipped or wood cutting blades on it, that they knew it was

14  dangerous and it was a common misuse.

15  Q.  You mentioned earlier today about the website materials.

16  Did that inform you in any way?

17  A.  Well, yes, we talked about that earlier, but maybe it's

18  good to mention that here, which is at the website, Stihl's

19  website, the section that deals with cut-off saws, this is the

20  only warning, the hazard warning, that is present on every

21  page at the Stihl website.

22  Q.  What, if anything, did you conclude from that that was

23  pertinent to the conclusion that this warning was not located

24  in the appropriate position on this label?

25  A.  Well, one, we've said that this is the only specific

1    hazard that has that level of consequence associated with it,

2    I talked about the testimony of Mr. Elsner and Linsbauer, and

3    -- could you say that -- somehow I just lost my train of

4    thought and I apologize for that.

5    Q.  Yes, what about the fact that -- what about what you just

6    testified to, seeing this as the only specific hazard warned

7    of on every section of the website, led you to conclude that

8    that had a bearing on the hazard level of this particular

9    issue, in addition to what you've already told us?

10   A.  Right.  That also is corroborated by at least these two

11   cases in terms of the severity of the injury that occurred in

12   the Stout case and in the McGee case.

13   Q.  Now, further on in those bulleted points you say the

14   subject warning is presented as #8 in the 12 items of text,

15   despite the fact that the consequences of using such a blade

16   arguably poses one of the most immediate warnings and severe -

17   - one of the most immediate and severe hazards.  How does

18   that, if at all, expand upon what we've just discussed?

19   A.  Could you tell me where you're at?  Somehow --

20   Q.  Yes.

21   A.  -- I'm not with you now.

22   Q.  We may have run over onto page 7 --

23            THE COURT:  We're on page 6, the last bullet.

24   BY MR. PACKIN:

25   Q.  Actually, we're on the top of page 7, sorry.

1          THE COURT:  Okay.  What were you reading from them?
2          MR. PACKIN:  The very first lines.
3          THE COURT:  Read it please.
4   BY MR. PACKIN:
5   Q.  "The information relevant to the hazards of using carbide
6   tipped, wood cutting blades is presented as statement #8,
7   despite the fact that the consequences of using such a blade
8   on Stihl's cut-off saws arguably poses one of the most
9   immediate and severe hazards to users.  This is supported by
10  the fact that this hazard is present on every Stihl webpage
11  that deals with cut-off saws."  Is the numbering of it as item
12  #8 in the list of 12 a factor in any way additional to what we
13  were just talking about, about it being in the second column
14  after 20 lines of text?
15  A.  Yes, if it's the only hazard that's singled out with that
16  level of consequence, it arguably should have been towards the
17  front, one of the first items mentioned in the sequence.  Or,
18  as I've indicated in previous depositions, it could be
19  separated out to highlight that information and separate it
20  from the other text.  In fact, I had developed some candidate
21  warnings that did just that.
22  Q.  Okay.  You indicate on page 7 that there -- one of the
23  deficiencies in the format and content of this label is that
24  there's nothing to draw the user's attention to item #8 of the
25  label, it is in the same font size and font type as all other

1    information on the label, therefore lacking necessary

2    conspicuity to attract the user's attention.  On what did you

3    base that opinion, both factually and in the field of warning

4    science?

5    A.  Yes, as it relates to the ANSI Z535 Standard, information

6    that you wish to be set out needs to use conspicuity enhancing

7    features, such as size, color, location and so on to make it

8    stand out from the background.

9    Q.  Okay.  And were you then measuring the adequacy or lack

10   thereof of this warning against that standard?

11   A.  Yes.

12   Q.  Is that supported anywhere in the warnings literature,

13   aside from ANSI?

14   A.  Yes, there is a significant body of literature that

15   suggests that some of the measures of warning effectiveness,

16   and again, there are several levels of that from noticing to

17   reading to recalling and compliance, that suggests that

18   conspicuity enhancing features can be very effective at

19   increasing the effectiveness of a warning.

20   Q.  Okay, when you say suggests, you're leaving me a little

21   bit vague about it.  Does it state that or does it suggest

22   that?

23   A.  The conclusions of research indicate or state -- maybe

24   it's just a layperson's language being in a legal environment.

25   The research supports that the use of these conspicuity

1    enhancing features can have a significant impact on warnings -
2    - measures of warnings effectiveness.
3    Q.  And what type of conspicuity features should have been
4    used with this warning, this particular one, #8, in terms of
5    format and content -- format and placement?
6    A.  Well, one thing is it could have been placed -- it should
7    have been placed either at the head of the column or very near
8    the head of the column.  It could have been placed separately.
9    It should have been highlighted with a pictograph, such as the
10   one that's included in Stihl's owner guide that has the
11   prohibition symbol around a toothed saw image.  It could have
12   been highlighted by candidate warnings and pictographs that
13   I've developed for this case, including the pictograph that
14   indicates a cut-off saw coming up towards person, ostensibly
15   to hit them in the face.
16   Q.  All right.  You indicate along those same lines on page 7,
17   "Stihl should have included a comprehension tested version of
18   the prohibited toothed blade pictogram" --
19              THE COURT:  You're going to fast.
20              MR. PACKIN:  I'm sorry.
21              THE COURT:  Should have included a what?
22   BY MR. PACKIN:
23   Q.  "Comprehension tested version of the prohibited toothed
24   blade pictogram contained in the Stihl owner's manual or a
25   similar symbol to increase the likelihood that users would

1  notice and comprehend the intended message."  You've mentioned

2  to us before that you saw in the owner's manual such a

3  pictogram used by Stihl in connection with a verbal warning

4  about -- a written warning, I should say, about this hazard,

5  correct?

6  A.  Yes.

7         MR. PACKIN:  I'm going to ask to mark a blowup of

8  that as the next exhibit, which I think is P-8.

9     (Pause in proceedings)

10         MR. PACKIN:  Shall I proceed even though we don't

11  have someone here to mark it at the moment?

12         THE COURT:  Yes, please.  You can just put it in

13  pencil, P-8.  Any objection to this item?

14         MR. RUDOLPH:  What is it, Barry?

15         MR. WALSH:  Can I see it, please, quickly, in the

16  manual?  That's fine, no objection.

17         THE COURT:  Okay.  We already have a P-8.

18         MR. PACKIN:  P-9 then.  Should I just write on it in

19  ink, or --

20         THE COURT:  In pencil.

21         MR. PACKIN:  Pencil?  I don't have a pencil.

22         THE COURT:  Mr. Walsh, no objection?

23         MR. WALSH:  No objection, Your Honor.

24         THE COURT:  Thank you, Counsel, P-9 in evidence.

25     (Plaintiff's Exhibit-9 marked for identification)

1      (Plaintiff's Exhibit-9 admitted into evidence)

2           MR. WALSH:  Your Honor, while we're marking that, I

3    would make a request that I assume that all of these exhibits

4    will be here tomorrow for use also, correct?

5           UNIDENTIFIED SPEAKER:  (Indiscern.).

6    BY MR. PACKIN:

7    Q.  Looking at P-9, is that an enlargement of the page of the

8    TS 400 owner's manual that you were referring to?

9    A.  Yes.

10   Q.  Now, looking at that, on the top right of the page is

11   where Stihl has a textual warning about use of the carbide

12   tipped toothed saw blades, correct?

13   A.  Yes.

14   Q.  Generally speaking, similar to the one that's on the label

15   as item #8, correct?

16   A.  Yes.

17   Q.  Now, in this exhibit, there is a pictorial that's used,

18   correct?

19   A.  Yes.

20   Q.  When you reviewed this matter -- when you rendered the

21   opinion that they should have used a pictorial to enhance the

22   likelihood that this warning would be noticed and understood,

23   a pictorial you say such as in the manual, is this the

24   pictorial you were referring to?

25   A.  Yes.

1   Q.  When you --

2           THE COURT:  Just a second, Counsel, there are two

3   pictorials on that page, as well as couple of warning

4   triangles, so which one are you referring to?

5           MR. PACKIN:  I was about to get to that, about to

6   get to that.

7   BY MR. PACKIN:

8   Q.  This one in the uppermost right, is that the one you're

9   referring to?

10  A.  Yes.

11  Q.  And what did that pictorial represent to you?

12  A.  Represented the prohibition of using a toothed blade.

13  Q.  Okay.  And to the left, in the center of the page, there's

14  another prohibition pictorial, correct?

15  A.  Yes.

16  Q.  What did that represent to you?

17  A.  It's a prohibition of using a cracked or damaged blade.

18  Q.  All right.  By the way, the one in the center, the

19  prohibition symbol against using a cracked or damaged blade,

20  was that used by Stihl on the saw?

21  A.  Yes.

22  Q.  Okay.  There was a string of pictographs -- pictograms on

23  the side of the saw, correct?

24  A.  Yes.

25  Q.  And looking at P-8, do you see that same pictogram there?

1    A.  Yes, it's the second one from the right.

2    Q.  So the cracked blade pictogram from page 6 was used on the

3    machine?

4    A.  Yes.

5    Q.  And was it used on the McGee machine as well?

6    A.  Yes.

7    Q.  Is the toothed blade prohibition pictorial used on the

8    McGee saw?

9    A.  No.

10   Q.  On this one here that we have in Court?

11   A.  No.

12   Q.  Were you able to reach any conclusion or basis that would

13   support Stihl using the cracked blade pictogram on the saw but

14   not using the saw blade pictogram?

15   A.  No.

16   Q.  Did Stihl's failure to use the toothed blade pictogram,

17   yet use of the cracked blade pictogram, factor in in any way

18   to your conclusions or reasoning in the case or indicate

19   anything to you about that?

20   A.  Yes, it appeared that they should have used the candidate

21   -- or the prohibited toothed saw on -- they should have used

22   that on the saw, in addition to the cracked symbol, and they

23   did not.

24   Q.  Okay.  How would use of the toothed blade prohibition

25   pictogram in connection with the different placement of item

1   #8 and the use of different color and size, how would those

2   altogether have, in your opinion, affected the conspicuity and

3   the likelihood that this would be noticed and understood?

4   A.  Well, the combination of pictogram and other enhancement

5   features, such as color, highlighting, location, would have

6   increased its conspicuity characteristics and made it more

7   likely that somebody would notice it.

8   Q.  Okay.  Now, from the materials you reviewed in this case

9   in terms of the factual underpinnings of that opinion, from

10  the materials you reviewed in this case, did any of the

11  workers in the McGee case testify that they had ever noticed

12  that toothed saw blade warning on this label?

13  A.  No.

14  Q.  Did any of them --

15          THE COURT:  Just a second, Counsel.  Oh, you're

16  talking about the text?  The carbide tipped blades, is that

17  what you're asking about?

18          MR. PACKIN:  The only reason I'm pausing is I'm away

19  from the mic.

20  BY MR. PACKIN:

21  Q.  In terms of P-7, the label that is on the blade cover, in

22  the testimony of the workers who used this machine in the

23  Stout -- in the McGee case, did any of them acknowledge having

24  ever noticed item #8 on that label?

25  A.  Mr. McGee did testify that he noticed some of the

1    pictograms on the machine.

2    Q.  No, no, I'm talking just about this label --

3    A.  Okay.

4    Q.  -- the yellow label.  Did any of the workers in this case

5    ever testify that they had ever noticed the admonition in item

6    #8 on the label?

7    A.  No.

8    Q.  Okay.  Did any of them testify that they were aware that

9    there was a prohibition against using toothed blades or a risk

10   or danger associated with that?

11   A.  No.

12   Q.  How about in Stout, did any of them testify to being aware

13   of the presence of that #8 in the second column of that label?

14   A.  Prior to the accident?

15   Q.  Yes.

16   A.  No.

17   Q.  Did any of them testify to an awareness that toothed

18   blades were prohibited from use on this saw and created a

19   danger?

20   A.  No.

21   Q.  Did that testimony from those various users of the saw

22   have any bearing on your conclusions in this case?

23   A.  Yes, because it corroborates what I had found from my own

24   evaluation of the materials.

25   Q.  Okay.  Now, did you use their testimony to conclude that

1    there were defects in the warning system or just to

2    corroborate it?

3    A.  To corroborate, because my testing was as it was, but it

4    provided a reliability check.

5    Q.  Okay.

6          THE COURT:  You say testing, your own evaluation of

7    these --

8    A.  Materials.

9    BY MR. PACKIN:

10   Q.  Okay, and as you stated at the outset of this section,

11   they were measured by you against the body of literature and

12   research, as well as ANSI Z535, correct?

13   A.  Yes, I testified to that already.

14   Q.  Okay.  Now you mentioned in the paragraph we've just been

15   discussing from your report that a comprehension tested

16   version of the toothed blade prohibition symbol that's on page

17   6 of the manual should have been used.  Briefly stated, what

18   does comprehension testing mean in your field, where is it

19   contained?  And in that regard I'll put one of the former

20   exhibits up.  And that exhibit is P-6.

21        (Plaintiff's Exhibit-6 previously marked for

22   identification)

23   A.  Are you asking about comprehension testing?

24   Q.  Yes, just for the benefit of the Court --

25   A.  Right --

1  Q.  -- what is comprehension testing and where, if anyplace,

2  is it codified?

3  A.  Comprehension testing is a procedure used to ascertain the

4  level of comprehension of a pictogram or symbol to a

5  representative set of people who might be exposed to it.

6  There are at least a couple of different approaches to doing

7  that comprehension testing, the most widely accepted is called

8  Open Comprehension Testing in which to provide a context in

9  which the symbols would be found to the users that you will be

10 testing, then ask them to tell you what they think it means.

11 The ideal or goal of which is to determine whether it meets

12 the established criteria for passing, meaning in terms of

13 comprehension of 85% correct comprehension, with fewer than 5%

14 critical confusions, which means opposite meanings or meanings

15 that could lead to somebody being injured.

16 Q.  Okay.  And where, if anywhere, is that 85% comprehension

17 with less than 5% -- no more than 5% critical confusions

18 embodied?

19 A.  It's in an annex of the ANSI Z535.3 standard.

20 Q.  Okay.  And where is that drawn from?

21 A.  Where is which drawn from?

22 Q.  Where did ANSI come up with that?

23 A.  Well, the reasoning is that in order to use a pictograph

24 or a symbol alone, you want to ensure that it's going to --

25             THE COURT:  Or a symbol.

1    A.  Or a symbol to be appropriately understood by the people

2    to whom you're going to expose it so that they'll understand

3    it.

4    BY MR. PACKIN:

5    Q.  All right, if I understood correctly from what you just

6    said, then that testing applies for pictorials that are used

7    as standalones, is that correct?

8    A.  That's correct.

9    Q.  When they're used in conjunction with text, in other

10   words, you've indicated in this particular part of your report

11   that they should have augmented the textual portion of the

12   label that was on the machine with a pictogram, correct?

13   A.  Yes.

14   Q.  When they do that, would it actually have to be tested if

15   it's partnered with text, as it was in the manual?

16   A.  No, there's no requirement.  ANSI allows you to supplement

17   textual information with pictograms that have not been tested

18   or have not been -- have not passed the 85% comprehension

19   criteria.

20   Q.  Was there any reason based in warnings, risk communication

21   or logic that you could find for Stihl having used this

22   pictogram of the saw blade with the prohibition symbol in the

23   manual with the text, but not on the saw with the text?

24   A.  No.

25   Q.  And was that one of the elements that you were speaking of

1    when you identified the defects in form and content of this

2    label?

3    A.  Yes.

4    Q.  You indicated on page 7 that expected users -- one of the

5    deficiencies in form and content was that expected users may

6    not understand the term {quote} "reactive forces" {close

7    quote} as opposed to kickback, and there you're referring to

8    words used in warning #8, correct?

9    A.  Yes.

10   Q.  And what did you mean, what was the basis for your opinion

11   that expected users might not understand reactive forces

12   versus kickback?

13   A.  Based on my review of the materials in this case,

14   including material presented in the owner's manual and so on,

15   indicates that -- if I can have a drink.  I'm having a hard

16   time --

17           THE COURT:  Reactive forces.

18   A.  -- for some reason -- reactive forces.

19   BY MR. PACKIN:

20   Q.  Versus kickback.

21   A.  Right.  Indicates that reactive forces is kind of a

22   general term, and it really is not synonymous with what

23   actually happened in this case, which is the saw kicked back,

24   and so therefore is not likely to be understood by the type of

25   end users that would use this saw.

1  Q.  In the --

2            THE COURT:  But you have literature?

3            MR. PACKIN:  That was going to be my next question.

4            THE COURT:  Okay, go ahead.

5  BY MR. PACKIN:

6  Q.  In the materials that you reviewed, did you see -- for

7  example, the depositions of the various users, did you see how

8  they described this type of event that caused Mr. McGee's

9  injury, what term they used to describe it?

10  A.  Well, in the deposition testimonies, they typically would

11  refer to this as kickback.

12  Q.  Okay.

13  A.  Or that it jumped out, something like that.  But I never

14  heard the term "reactive forces" used by any of the end users.

15  Q.  You also indicate that the label was defective in that it

16  lacks information regarding position of the cutoff saw blade

17  vis-a-vis the material being cut as it relates to the

18  direction of kickback.  Would you explain to us the basis for

19  that conclusion?

20  A.  Yes.  Again from my reading of the materials in this case,

21  it's my understanding that the direction that the saw will

22  move depends on the position of the saw blade with respect to

23  the material that's being cut.  If it's being cut on the upper

24  part of the blade, then the kickback will go back toward the

25  person.  If the material being cut is being cut with the

1   bottom of the saw blade, it's more likely to be pulled away

2   from the operator.

3   Q.  These various deficiencies, defects, in the warning label

4   that was intended to be on the guard but missing at the time

5   of the accident, were all of those enumerated items based upon

6   the warnings science that you've told the Court about earlier

7   today, as well, as we have indicated, principles embodied in

8   ANSI Z535?

9   A.  Yes.

10  Q.  Were each of those deficiencies ones that were

11  substantiated by the case materials you had to evaluate,

12  whether it be depositions, photographs, the owner's manual or

13  the actual on-product labeling of the saw itself?

14  A.  Yes.

15  Q.  When you reached the conclusion you told us about earlier

16  that the deposition testimony of these various users in <u>McGee</u>

17  and <u>Stout</u> was corroborative of your conclusions, did you reach

18  any opinion -- strike that.  You state in your report that you

19  concluded that they were a group of typical users, and their

20  reporting that they did not recall ever having read that

21  portion of the label was information you saw as from a group

22  of typical users.  Why did you conclude that this was a group

23  of typical users?

24  A.  Because Stihl itself --

25              MR. WALSH:  I would object to the questions as

1    completely muddled and at least leading.

2              MR. PACKIN:  I'll rephrase it.

3    BY MR. PACKIN:

4    Q.  You state in your report that the deposition testimony

5    provided you with corroboration by a group of typical users,

6    correct?

7              THE COURT:  Where is that please?

8              MR. PACKIN:  This is on page 7, Your Honor.

9    BY MR. PACKIN:

10   Q.  That would be in the -- I have to switch glasses, I'm

11   sorry.

12             THE COURT:  Yes, the fact that Mr. McGee and his co-

13   workers --

14             MR. PACKIN:  Right.

15             THE COURT:  This is sort of two-thirds of the way

16   down in the first block paragraph.

17             MR. PACKIN:  Yes, Ma'am.

18             THE COURT:  Could not recall the sticker, et cetera,

19   is corroborated by a group of typical users.  Okay, so who's

20   that group?

21             MR. PACKIN:  These are the deponents, the various

22   deponents --

23             THE COURT:  Ask him.

24             MR. PACKIN:  Oh, I'm sorry.

25   BY MR. PACKIN:

1    Q.   Who were these people that you're referring to?

2    A.   The people I'm referring to are Mr. McGee and his co-

3    workers that actually used the saw.

4    Q.   How about in the Stout case, were you --

5    A.   In the Stout case --

6    Q.   -- including those?

7    A.   -- it was the same thing.

8    Q.   Okay.  And how did you conclude -- on what basis did you

9    conclude that they were typical users?

10   A.   Because they were working in the construction industry,

11   which is commensurate with what Stihl suggests the primary

12   users of their saw will be.

13   Q.   From the deposition testimony of these typical users, as

14   you've identified them, could you determine whether their

15   exposure level to Stihl TS 400 cut-off saws was rare,

16   significant, moderate, on some level of a continuum of that

17   type?

18   A.   From the deposition testimony, it was clear that they used

19   them a lot.

20   Q.   And as we stated before, none were ever aware or testified

21   to any awareness of item #8 on that label or its content?

22            MR. WALSH:  Objection, leading.

23   BY MR. PACKIN:

24   Q.   Is that correct?

25   A.   Yes.

1            THE COURT:  I'll permit it.

2    BY MR. PACKIN:

3    Q.  On page 7, you reached or you offered the opinion that if

4    the missing warning label had the proper format and content

5    and included a pictograph, it is reasonably probable that Mr.

6    McGee would have been aware of the danger from prior uses of

7    this or other TS 440s?

8            THE COURT:  What have you just quoted from?

9            MR. PACKIN:  That would be --

10           THE COURT:  What page?

11           MR. PACKIN:  Page 7, the next to last bulleted

12   point.

13           THE COURT:  Okay.

14   A.  What was the question?

15   BY MR. PACKIN:

16   Q.  The question is on what did you base the opinion that you

17   offered that had the proper format and content -- had the

18   warning label that we've been talking about, the one on the

19   blade cover, the one that was missing, had it had the proper

20   format and content and included a pictograph, it is reasonably

21   probable that Mr. McGee would have been aware of the danger

22   from prior uses of this or other TS 400s, what did you base

23   that conclusion on?

24   A.  Right.  The warnings literature indicates that conspicuity

25   enhancing features will make it more likely that people will

1   notice and read the materials, and we know that those kinds of

2   -- those factors are also related to subsequent compliance to

3   the directive.

4   Q.  Okay.  Now, you've told us that the item #8 on this label

5   is in the second column, over 20 lines in, the same type font,

6   same type size, same color as all the other text, correct?

7   A.  Yes.

8   Q. And that some of the items of text, at least facially,

9   appear to not be warnings but specifications information?

10  A.  Yes.

11  Q.  How many different -- when you add the components that

12  you've suggested here, that you've advocated here, size,

13  color, placement, pictogram, how many different conspicuity

14  concepts have you added to what is not on this label?

15  A.  Have I personally?

16  Q.  In other words, you've talked about color, that's one --

17  A.  Yes.

18  Q.  -- correct?  Size, that's two.

19  A.  Yes.

20  Q.  Placement, location?

21  A.  Yes.

22            MR. WALSH:  Objection, leading.

23            MR. PACKIN:  We found this in the record.

24            THE COURT:  It's summary.  Color, what?

25  BY MR. PACKIN:

1   Q.  Size --

2   A.  Color, size --

3   Q.  -- color --

4   A.  -- location --

5   Q.  -- location.

6   A.  Highlighting.

7   Q.  And pictograms, correct?

8   A.  Yes.

9   Q.  Okay.  So those are, by count, at least five conspicuity

10  enhancing features, correct?

11  A.  Yes.

12  Q.  And is it based on that that you concluded that it would

13  be more probable -- that it would be probable that he would

14  have noticed that warning?

15          MR. WALSH:  That is leading, Your Honor.

16          THE COURT:  Yes.

17  BY MR. PACKIN:

18  Q.  Were those factors considered by you in reaching the

19  opinion that it was reasonably probable that he would have

20  noticed it?

21  A.  Yes, in part, and additional evidence comes from the fact

22  that there's no evidence to suggest that he wasn't a safe

23  worker, he was reasonably well educated, so he could

24  understand them if they had been formatted correctly.  So

25  taken together, I think it's more likely than not that he

Kalsher - Direct                              163

1    would have gotten the information he needed to make a correct

2    decision.

3    Q.  Okay, and you next, on page 7, you state that

4    notwithstanding its inadequacies, the absence of the label

5    from the blade cover at the time of accident left Mr. McGee

6    devoid of any specific warning of this danger at the time of

7    the accident.  Presumptively you based that on the fact that

8    the record indicates it was missing, correct?

9    A.  Yes.

10   Q.  What, if any, is the significance in a warnings analysis

11   of the fact that the label is missing at the time of an

12   accident?

13   A.  Because the person would have no information to guide

14   their behavior in that particular situation.  We've already

15   talked about other factors.  I've said repeatedly that we talk

16   about warning systems.  But we've already visited that this

17   morning, that in this group of users, since they didn't

18   purchase or maintain the machines, it's reasonable to expect

19   that they won't necessarily have access to an owner's manual,

20   so devoid of the on-product labeling, they're without any

21   information to guide their safety decisions.

22   Q.  Okay.  You state on page 5 that the only -- just let me

23   pause a moment for the Court.

24              THE COURT:  Sir, you've used the concepts -- we

25   haven't gone over them in the testimony today, but you've used

1    the concepts of the process of informing, and then explaining,

2    and then warning and then reminding, and you use it sort of in

3    a sequence.  What are those words?

4    A.  Yes, the general goals of the warning are to inform people

5    about hazards in their environment, to --

6            THE COURT:  To inform, okay.

7    A.  To inform people about hazards in their environment, to

8    tell them about the likely consequences associated with those

9    hazards and their severity, and to give them information on

10   how to avoid being injured.

11           THE COURT:  And then you used the term "remind."

12   A.  Yes, and that's a final one, to remind people at a time

13   when it's closest to when they might come into contact with

14   the hazard.

15           THE COURT:  Okay.  I didn't mean to take words out

16   of your mouth, but you've been referring to these concepts all

17   along --

18   A.  Yes.

19           THE COURT:  -- I just wanted them in one place.

20   A.  Yes.

21   BY MR. PACKIN:

22   Q.  If somebody's read a warning label at one time, if they

23   have, hypothetically speaking, why is the reminder function

24   necessary?

25   A.  Because as we talked about earlier today, life is

1    sometimes busy.  You may have read the material, you may have
2    read the material in the owner's manual, but we tend to forget
3    these things, so it might not be on your mind.  We talked
4    about scripts of behavior; if you're not going to change the
5    blade and your script is I start up the machine and use it,
6    you need something to remind you at that point in time that
7    you need to take actions to protect yourself in that
8    situation.
9    Q.  Okay.  You indicate on page 5 that the only on-product
10   safety information on the saw at the time of the accident was
11   the strip of seven pictograms and the general admonition to
12   follow safety precautions in the owner's manual.
13   A.  Yes.
14   Q.  Okay. Now, the machine that we've marked as P-8 that's in
15   front of you on the table has that strip of seven pictograms,
16   correct?
17   A.  Yes.
18   Q.  As located on the side of the housing of the machine we
19   have here in Court, is that the same location as the McGee
20   machine, based on the McGee photographs?
21   A.  Yes.
22   Q.  In terms of the general admonition to read the owner's
23   manual, is that the textual decal you see in the lower right
24   on that side of the machine?
25   A.  I'm sorry, could you -- I don't know what you -- oh, I

1  thought you were talking about the strip of symbols, I'm

2  sorry.

3  Q.  (Indiscern.).  Does that have any of that precaution, this

4  little textual one on the (indiscern.) --

5  A.  Yes, this one basically provides that the general

6  admonition -- no, this says "Warning, for safe operation,

7  follow all safety precautions in owner's manual," yes.

8  Q.  Okay.  So let's talk first about the pictograms, and then

9  the general admonition.  You state in your report on page 8

10 that there are deficiencies in the format and content of that

11 strip of seven pictographs.  The first one you say is that a

12 comprehension tested version of a pictograph warning against a

13 use of saw blades such as in the manual should have been on

14 the saw with these seven other pictographs.

15           THE COURT:  Are we on page 8?

16           MR. PACKIN:  Yes, Ma'am.  It's the very first

17 bulleted item.  The second sentence.

18           THE COURT:  "A comprehension tested version of this

19 pictograph should have been included directly on the saw."

20           MR. PACKIN:  Yes.

21           THE COURT:  Oh, you're talking about the one

22 pictograph that's in the manual that says don't used a toothed

23 blade?

24           MR. PACKIN:  Correct.

25           THE COURT:  Right?

Kalsher - Direct                        167

1   BY MR. PACKIN:

2   Q.  Dr. Kalsher, you're referring there, are you not, to the

3   pictograph on the upper right of P-9, the reproduction of page

4   6 in the manual?

5   A.  Yes, sir.

6   Q.  Okay.

7            THE COURT:  Okay.

8   BY MR. PACKIN:

9   Q.  And what you're stating there is that should have been

10  included in that stip of pictographs, the seven pictographs

11  that's on that side of the saw, correct?

12  A.  Yes, and I also added that it should be also included, as

13  I refer to in my report, and adjacent to a revised version of

14  the text message on the label that we've talked about

15  previously.

16  Q.  That we just covered so I don't want to --

17  A.  Okay.

18  Q.  -- duplicate that.  Now you're also indicating that it

19  should be added to the strip of seven pictographs, correct?

20  A.  Yes.

21  Q.  Okay.  Now, first of all, is there physical room on the

22  machine to do that?

23  A.  Yes.

24  Q.  Why do you feel -- what was your basis for concluding that

25  a pictograph for this hazard should be among the strip of

1    seven that already existed on the machine?

2    A.  Right, because of the testimony of Mr. Linsbauer and

3    Elsner that the use of toothed blades is a common and

4    dangerous use because of the information presented at Stihl's

5    own website where the prohibition against the use of toothed

6    saw blade is the only thing that's singled out on the website,

7    because of the multiple warnings in the product manual itself,

8    and because of the information contained in #8, although we've

9    already talked about why I think the presentation of that is

10   defective.  It's reasonable because of the level of severity

11   associated with this that it should have been given a danger

12   priority just as high as some of the other things that are

13   indicated by the use of pictographs on the side.

14   Q.  Looking at those seven pictographs, going left to right,

15   what do they depict?

16   A.  The first one on the left is --

17            THE COURT:  Six?

18   BY MR. PACKIN:

19   Q.  Is it six or seven?  Are there six or seven?

20   A.  There are six here.

21   Q.  I'm sorry, I misspoke.  What is the first one, going from

22   left to right?

23   A.  I'm going from left to right.  The first one on the left

24   is a red triangle surrounding an exclamation point printed in

25   black on a white format.

1   Q.  Which means --

2   A.  It's a --

3   Q.  -- what?

4   A.  It's a general symbol for alerting.

5   Q.  Okay.  What's the next one?

6   A.  The next one is a depiction of an open book that I know

7   the meaning, the intended meaning, to be read the owner's

8   manual.

9   Q.  Okay.  Next one?

10  A.  The next one is -- it's a blue circle encasing in a white

11  color personal protective equipment that includes safety

12  goggles, hearing protection and a helmet.  The next one across

13  is a red triangle surrounding what is on the left side inside

14  the bottom part of the triangle presumably a spinning cut-off

15  saw blade that is spewing debris and sparks indicating that

16  that could ignite flammable material as indicated by the part

17  of the icon indicating a flame as a symbol.

18  Q.  Okay.

19  A.  The next one is the prohibition against using a damaged or

20  cracked authorized blade.  It has the circle slash symbol

21  through it.  And the last one is a red triangle encasing a

22  person presumably breathing in dangerous fumes, indicating

23  that that is a hazard.

24  Q.  Now, when you reached the conclusion you addressed a

25  moment ago that based on the -- I think you said website

1  manual, deposition testimony, that a pictograph of the

2  specific hazard were involved with here, toothed blades belong

3  on the saw, did you consider the relative hazard level of the

4  -- represented by the pictographs on there vis-a-vis that one

5  you have testified should have been on the saw?

6  A.  Yes, and I think I've already indicated that it should

7  have been given a priority at least as high as the other ones,

8  based on the information that we talked about just a minute

9  ago.

10  Q.  You stated on page 8 further that had such a pictograph

11  been included on the saw -- we're just talking now about a

12  pictograph added to the strip of pictographs that's already on

13  there, and we've already discussed on in connection with text.

14  Had a pictograph been included on the saw it would have been

15  highly likely that Mr. McGee and others at Joseph Jingoli and

16  Sons would have been aware of the prohibition preventing this

17  accident.  On what did you base that?

18  A.  There are actually several parts to this.  The pictograph

19  and the warning aren't just for Mr. McGee, it's for anybody

20  that's going to come into contact with it.  And so if the

21  warning had been adequate, I believe it would have alerted if

22  not Mr. McGee, somebody in the chain that would have passed

23  the word along that this is a prohibited and dangerous use.

24  Q.  Is there anything in the warnings literature or warnings

25  research that addresses the issue of pictographs and their

1   effectiveness?

2   A.  Sure.  There are studies that show that pictographs are

3   effective at getting people to notice information, to encode

4   that information, and there's at least a study or two that

5   suggests that they can have an effect on compliance.  For

6   example --

7   Q.  Go ahead.

8   A.  You want me to go on?

9   Q.  Yeah.

10  A.  Although, again, and I suppose we'll get to this some

11  point, although compliance studies are sometimes challenging

12  to do, there's at least one study that I know of that suggests

13  that pictograms can be effective in achieving compliance with

14  a warning directive.

15  Q.  Does it suggest that or state it?

16  A.  It states that.  The results of the experiment state that.

17  Q.  Now, does a pictograph have any different role than text

18  in the function of reminding?

19  A.  Sure.  It can remind people at a time when they're about

20  to become involved with or be exposed to the hazard.  It can

21  also be useful for indicating hazards to people who may not be

22  English speaking, if that's the only language that textual

23  information is written into.  Or people who may be not well

24  educated.

25  Q.  Okay.  I take it a textual warning requires some

1   determination on the viewer's part to focus on it and read it?

2   A.  Yes.

3   Q.  Does a pictogram have that same component?

4   A.  No, they're designed -- they're actually designed to be

5   recognizable instantaneously to communicate a message.

6   Q.  Now, then the other one we mentioned just a moment ago is

7   the general admonition in that little textual label that's in

8   the lower right on that side, and the open book pictogram to

9   follow the safety precautions in the owner's manual.  And you

10  have indicated in your report on page 9 --

11            THE COURT:  Go ahead.

12  BY MR. PACKIN:

13  Q.  -- that it is foreseeable that users of the TS 400 may not

14  have access to the owner's manual as they are not often the

15  owners.  Without necessarily repeating anything we've covered

16  earlier today, on what did you base that determination?

17  A.  Well, again, I say some of it in my opinion, that because

18  this is intended primarily to be used by people working in

19  construction, then it's reasonable to assume that the people

20  who will actually use those won't be the purchasers or people

21  who perform the maintenance on them, and so it's reasonable to

22  expect that they may not access to an owner's manual, or even

23  if they did, given that people are busy, they probably work

24  with a variety of tools, that they may not read the manual

25  completely or they many not remember the information that they

1    read at a point in time when they're confronted with the
2    hazard.  So that's why it's important to have on-product
3    information.
4    Q.  Are those issues or limitations, my word, in the
5    communication function of manuals recognized anywhere in the
6    warnings literature, safety communication literature?
7    A.  I'm not sure what you're asking me, sir.
8    Q.  In other words, you've indicated that with some products,
9    a manual is not likely to get to the end user.
10   A.  Right.
11   Q.  Or the end user may not likely have time to read it.  Has
12   that been recognized or discussed in the warnings literature?
13   A.  Yes, that it's important to have on-product labels for
14   that specific reason.
15   Q.  Okay.  And is that importance different between consumer
16   products where the purchaser is the owner versus commercial
17   products where the purchaser may not, in fact, likely be the
18   owner?  I mean, in other words, the purchaser may not actually
19   be the user.
20   A.  Yes, if someone purchases a consumer product, for example,
21   some of the tools that I have, I buy it with the owner's
22   manual and I'm able to keep that and read it myself.
23   Q.  And in your experience, how many owner's manuals generally
24   come with a product?
25   A.  Typically one.

1   Q.  All right.  From the testimony in this case, how many

2   owner's manuals came with the TS 400?

3   A.  One manual.

4   Q.  You indicate on page 9 that even if the user was given

5   access to the TS 400 manual, he or she would not likely be

6   provided by the employer with time to read it.  On what did

7   you base that?

8   A.  Because if they were to take the time to read every manual

9   with every piece of equipment that they had, it's unlikely

10  that they would get anything done.

11  Q.  Now, in this case, the owner's manual for the TS 400, I

12  think we can stipulate, the end of the English portion is 43

13  pages, was that consistent with your reading of the manual?

14  Or without having to commit to 43 exactly, close to it?

15  A.  I think close to it, I --

16          THE COURT:  So the manual is 43 pages long in

17  English, yes?

18          MR. PACKIN:  Correct.

19  BY MR. PACKIN:

20  Q.  Then there's an additional section in Spanish, but some 43

21  pages, correct?

22  A.  That sounds about right.  I'll assume that you're correct

23  because you have it in front of you.

24  Q.  Now, in discussing that issue, you stated in that page 9

25  that even if the manual was provided to a user of a tool such

1   as this and was read cover to cover, that issues such as --

2   there would be issues such as how long the information was

3   retained.  What do you base that on and is there any support

4   for that in warning science?

5   A.  Well, there's support for that not just in warning

6   science, but it's a basic generally accepted principle in

7   psychology that people can't retain a lot of information that

8   they've read over a large period of time without repeated

9   interaction with it and so on.

10  Q.  Okay.  You state in that same page that if it is assumed

11  that the user of a tool such as this was provided with the

12  manual and provided with the opportunity to read the manual,

13  that one would have to assume that the user would be provided

14  with manuals for all the tools at that workplace and read all

15  the manuals.  What do you base that on?

16  A.  Well, it's just a reasonable real-life kind of an

17  expectation that if this poses a danger, there are arguably

18  other pieces of equipment that are going to be used at a

19  construction site that also have hazards associated with them.

20  Q.  Would your experience indicate that construction workers

21  typically would be provided with and be reading all these

22  different manuals for all these different tools?

23  A.  I don't think that that would be a reasonable expectation

24  under any circumstances.

25  Q.  Okay.  Based upon all of what we've discussed so far in

Kalsher - Direct                               176

1   the record and what's contained in your report that's been
2   marked in evidence for purposes of this hearing, are these
3   both the factual bases and the bases in warning science
4   literature and the standards on which you reached the
5   conclusion that the labeling on the product was defective --
6   A.  Yes.
7   Q.  -- in this case?  You state on page 5 --
8           THE COURT:  So 10 is -- page 10 is now moot, right?
9           MR. PACKIN:  Largely so, yes.
10          THE COURT:  Okay.  I'll be right with you.
11          MR. PACKIN:  Yes, Ma'am.
12          THE COURT:  Back to page 5, okay.
13  BY MR. PACKIN:
14  Q.  You state on page 5 the opinion that if the on-product
15  labeling on the TS 400 had been adequate, it is reasonable to
16  expect that at least one of the many people at Joseph Jingoli
17  and Sons would have been aware that this configuration,
18  meaning a wood cutting toothed blade on this machine, was
19  unauthorized and dangerous and the practice would have been
20  prohibited.  On what do you base that conclusion?
21  A.  Can you show -- again, I'm having a hard time keeping up
22  with where you're jumping around to, if you don't mind.
23  Q.  Page 5 --
24  A.  Yes.
25  Q.  -- the second full paragraph.  Second block of writing.

1    It's the second sentence in that paragraph.

2    A.  Yes, because there were so many people that had interacted

3    with that, from the time they got it in the shop, there were

4    people that were putting them together, repairing them and so

5    on that would have come into contact with that label.  There

6    were people that were using them.  It's likely that somebody

7    would have seen that, and assuming that people don't have a

8    death wish, then they would probably have read it and passed

9    that information along if it wasn't for themselves.

10   Q.  All right, now even after Mr. McGee was injured, the very

11   morning that that accident happened when he was struck in the

12   face and sustained the injuries that we've seen, from your

13   review of the materials, was the cut in the pipe that he was

14   cutting at the time of the accident completely by another co-

15   worker?

16   A.  Yes, I believe Steve Caldwell took the same saw with the

17   same blade and finished the cut following the accident.

18   Q.  Okay.  So the materials you reviewed indicated that even

19   after the accident, Mr. Caldwell, moments later relatively

20   speaking, finished the cut with the same machine with the same

21   blade on it, correct?

22   A.  Yes.

23   Q.  In his deposition testimony, did he indicate that after

24   Mr. McGee's accident that he realized that the issue here had

25   been that there was a toothed blade on the machine and that

1   shouldn't be?

2   A.  Yes, that's consistent with the deposition testimony of a

3   lot of the individuals that, until the accident they were

4   largely unaware that it was a prohibited use.

5   Q.  Well, what I'm asking you is even after the accident that

6   day, did he realize that it was an unauthorized and dangerous

7   use?

8   A.  No.

9   Q.  And on page 5, you say that this lack of notice of the

10  admonition on the label or the on-product labeling provides

11  clear and converging evidence of the inadequacy of the on-

12  product labeling.  What did you mean by that, what did you

13  base that on?

14  A.  Well, the fact that both in the Stout case and the McGee

15  case, the fact that none of the workers that were using the

16  saw appeared to understand that it was an unauthorized use

17  converges on the fact that the warning did not achieve its

18  job, which is conveying the hazards associated with the

19  inappropriate use of a toothed saw blade on the saw.

20  Q.  And again, that was used, you said before, by you as

21  corroboration, not as the basis for your conclusion, correct?

22  A.  That's correct.

23  Q.  Going to page 4 and a different subject but one we've

24  touched upon briefly.  You say Stihl had available a DVD --

25          THE COURT:  Page?  Sorry.

1            MR. PACKIN:  I'm sorry, I'm sorry, Your Honor, 4.

2     And I'm going to move the machine so that it's not in the

3     witness' way at the moment.

4            THE COURT:  Could I just have an update on your

5     estimated timing?

6            MR. PACKIN:  Maybe a half an hour.

7            THE COURT:  Five minutes now.

8            MR. PACKIN:  Okay, thank you, Your Honor.

9        (Court in recess)

10           THE COURT:  We're going to make it today.

11           MR. PACKIN:  Thank you, Your Honor.  We already had

12    some discussion earlier today about the DVD issue, I don't

13    want to repeat that, I just have a few additional questions.

14                    DIRECT EXAMINATION (CONT'D)

15    BY MR. PACKIN:

16    Q.  You stated on page 4 of your report that Stihl had

17    available a DVD demonstrating safe operation of the TS 400 at

18    the time it was manufactured.  I want you to assume

19    hypothetically that if Stihl didn't have such a DVD at that

20    time, was such a DVD makeable, could it have been made, did

21    the technology exist?

22           MR. WALSH:  Objection, Your Honor, outside the scope

23    of the report.

24           THE COURT:  I don't think we need that background.

25           MR. PACKIN:  Okay.

Kalsher - Direct                            180

1              THE COURT:  So this DVD was available as an

2    accessory for $5 and it shows how to use the machine?

3              MR. PACKIN:  Right.  You watch --

4              THE COURT:  Is that right?

5              MR. PACKIN:  Yes, Ma'am.

6              THE COURT:  Sir?

7    A.  I'm sorry?

8              THE COURT:  Is that right?

9    A.  Yes.

10   BY MR. PACKIN:

11   Q.  Now, you've indicated that you've watched the DVD,

12   correct?

13   A.  Yes.

14   Q.  Okay.  And you've indicated it shows how to operate it,

15   correct?

16   A.  Yes.

17   Q.  Does it address safety issues?

18   A.  Yes.

19   Q.  Does it address the safety issue of the use of wood

20   cutting blades?

21   A.  Yes.

22   Q.  Does it address the safety issue of kickback?

23   A.  Yes.

24   Q.  You indicate on page 4 that because of the importance of

25   the DVD as part of a warning safety system, it should have

1    been included as part of the materials distributed with every

2    TS 400, the saw having a cost of $800, correct?

3    A.  Yes.

4    Q.  And what do you base that on?

5    A.  Well, relative to the cost of the saw, it's relatively

6    low, and given the severity of the hazards that we're talking

7    about today, it would be an important safety component because

8    of some of the factors that we've talked about already, that

9    because this is a group of construction workers that don't

10   actually purchase the machines but are purchased and

11   maintained by the company, they may not get access to the

12   owner's manual for that.  They're left with, then, the on-

13   product safety information, but the DVDs certainly could be

14   used to supplement that in a number of different ways; the

15   users themselves could watch them, they could use that as part

16   of training that they are doing at the construction site.  It

17   would be an easier way for people to get the information that

18   they need.

19   Q.  Also on page 4, you offer the opinion that operators of

20   the TS 400 may reasonably assume that the wheel guard is

21   designed to protect them against inadvertent contact with the

22   moving blade.  On what did you base that statement, that

23   conclusion?

24   A.  Because again going back to that idea of -- by the way,

25   can you tell me where you're looking?  Because sometimes I --

1   Q.  Yes.

2   A.  -- can't --

3   Q.  Page 4.

4   A.  Yes.  Oh, I see where you're at now, I'm sorry.  It's the

5   idea of an affordance, or things that might prevent you from

6   coming into contact with a hazard.  From a layperson's

7   perspective, when you have a guard around something that's

8   moving like that, a reasonable assumption would be that you

9   would not come into contact with the blade where in fact the

10  cover is covering the blade.  But in fact, if you look at

11  Stihl's owner's manual, it indicates a quite different

12  purpose, it's to direct debris away from the operator, other

13  people and to prevent sparks from flying.

14  Q.  Okay.  Now, certainly that --

15          THE COURT:  You said from a layperson's perspective.

16  What's your basis for that?

17  A.  That it's going back to the idea of an affordance; that

18  is, if something looks like it does something, people are

19  reasonably expected to interpret it that way.

20          THE COURT:  Okay, just -- the concept is what,

21  affordance?

22  A.  Affordance.

23          THE COURT:  Is a concept of what?

24  A.  Essentially, it means, for shorthand, is for -- so if you

25  have a guard against something that's moving, it's sort of

1    obvious that that will prevent you from coming into contact,

2    in this case, with a moving blade, whether it's a composite

3    blade, a diamond tipped blade or a toothed blade.  The blade

4    in this case is movable, and the purpose as stated in the

5    owner's manual is to allow you to adjust it to direct the

6    debris away from you.

7              THE COURT:  So this concept of affordance is the

8    concept that conveys to the subject that something that looks

9    like to be for something is what that thing is for?

10   A.  That's what the person's --

11             THE COURT:  I've really gotten so tongue-tied.

12   A.  That's what the person's interpretation is likely to be.

13   And if you read the owner's manual for this cut-off saw, you

14   get a completely different idea; it's not intended for that at

15   all, but instead, as I had said, to direct things being

16   grinded away from the operator.

17   BY MR. PACKIN:

18   Q.  Now, certainly to some degree the cover would prevent

19   access to certain parts of the rotating blade, correct?

20   A.  Yes.

21   Q.  So what your indicating is the manual indicates that the

22   primary function is not that, however.

23   A.  Yes.

24   Q.  You state on page 4 that Stihl should have expressly

25   addressed that issue, that the wheel guard is not designed to

1   protect against inadvertent blade contact in the manual and

2   the on-product warnings.  On what did you base that

3   conclusion?

4   A.  Well, to offset misbeliefs that are likely to happen

5   because of the reasons I just described.

6   Q.  Now, these various opinions, without -- withdrawn.  These

7   various concepts that you've discussed throughout the day,

8   conspicuity, size, location, color, pictographs, use of

9   different media to convey warnings, affordance, benign

10  experience, all those -- and I'm sure I left some out.  Any of

11  those concepts, any of those theories that you relied on in

12  this case or employed in this case, are there any that have

13  not been published in the warnings and human factors

14  literature in peer review form?

15  A.  No, all of these concepts have been presented in one form

16  or another, and they're certainly encapsulated in higher level

17  summary books such as the ones I brought today.

18  Q.  And I believe you had indicated some of them have actually

19  been put into standard form by ANSI in various aspects of the

20  Z535 series that you've testified to, correct?

21  A.  Right, and we've already talked about those, so I hesitate

22  to re-plow that ground.

23  Q.  And we don't want to.  Is any warning optimal, meaning

24  100% successful all the time with all users in all situations?

25  A.  No, that would be too large of a burden on something that

1   really is intended to persuade people, and if we look at it in

2   the context of where it fits, there's a well knows safety

3   hierarchy called the hazard control hierarchy, among other

4   things, that suggests that the first step in addressing --

5   Q.  Suggests or states?

6   A.   States that with respect to eliminating hazards from a

7   piece of equipment or a product, the first approach, or the

8   first line of approach, is to design the hazards out or if an

9   alternative or a reasonable substitute is available, to do so.

10  If there's still residual hazards after that process has taken

11  place, then to provide guarding, either a physical guard or

12  sometimes metaphorical in terms of administrative controls

13  that can be put into place.  Warning's a really third line of

14  defense to warn about residual hazards that haven't been

15  eliminated from the product or system through those first two

16  approaches.

17  Q.  Okay.

18  A.   And so with that sort of as setting the basis for the

19  answer to your questions then, because warnings are intended

20  to persuade people, and you're dealing with human behavior,

21  human cognition, the fact that none of us are perfect, it

22  can't be expected to be 100% effective under any

23  circumstances.

24  Q.  Have you, at any time, advocated in this case that Stihl's

25  warnings had to be perfect or optimal?

1   A.  No.

2   Q.  These various different theories and concepts that you've

3   discussed today that I enumerated a few moments ago, have they

4   received general acceptance in the scientific community that

5   deals with warnings and risk communication?

6   A.  Yes.

7           THE COURT:  You've already asked that.

8           MR. PACKIN:  Okay.  I'm sorry.

9           THE COURT:  If you're talking about these concepts,

10  you asked that.  Unless you want to add the words, "generally

11  accepted."

12          MR. PACKIN:  That's where I was going, yes.

13  BY MR. PACKIN:

14  Q.  So we know they've been peer reviewed published, ANSI Z535

15  contains many of them, and based on your involvement in this

16  field, have they received general acceptance --

17  A.  Yes.

18  Q.  -- in the warnings and risk communication community?

19  A.  Yes.

20  Q.  Now, by general acceptance, do you mean that every author,

21  every authority in warnings and risk communication agrees with

22  every one of these concepts and theories?

23  A.  No, there are debates on many issues within the empirical

24  literature on warnings or people that investigate warnings and

25  risk communication.

1   Q.  Certain theories, though, or concepts ultimately over time

2   reach general acceptance in the community?

3   A.  Yes.  I mean, some examples are that the concept of benign

4   experience, I can't remember anybody wanting to debate that

5   that, in fact, exists.  Or the idea that cost of compliance

6   tends to blunt the effectiveness of a warning, I can't

7   remember the last time I heard somebody say that that wasn't

8   well accepted or generally accepted within the risk

9   communication warnings audience.

10  Q.  Does the fact that some authors might have disagreement

11  with some aspects of some theories in a given science mean

12  that they're not generally accepted?

13  A.  No, because the goal is to always move the ball forward in

14  any area of science, and so is true of the area of warnings

15  and risk communication.

16  Q.  And how does the ball get moved forward?  What kinds of

17  dialogue or debate causes that to happen?

18  A.  Right.  Any study that's done, including mine, they're

19  calculated to do just a few things; that's enough to try and

20  accomplish in one study.  Any study that you do usually leaves

21  questions, right?  Sometimes it leads to a lot of different

22  questions that then the next set of studies will take up.  And

23  as these studies accumulate over time, that's what leads to

24  general acceptance of certain concepts with any scientific

25  discipline.

1   Q.  Does your discipline of warnings and risk communication

2   welcome dialogue, debate, articles that analyze or questions

3   certain aspects of what is or what has been generally

4   accepted?

5   A.  Absolutely.  We see each other regularly, at least once

6   every year at the Human Factors and Ergonomics Society, where

7   we all attend similar papers, and we have discussions about

8   this all the time.

9   Q.  There was a warnings expert offered in this case by Oldham

10  when they were in it, and Mr. Timothy Rhoades, do you know Mr.

11  Rhoades?

12  A.  Yes.

13  Q.  How do you know him?

14  A.  I know Mr. Rhoades --

15          THE COURT:  Can you just spell that for me please?

16          MR. PACKIN:  R-H-O-D-E-S.

17  A.  R-H-O-A-D --

18          MR. PACKIN:  Sorry.

19  A.  -- E-S.  I know Tim first from our both attending the

20  annual meeting of the Human Factors and Ergonomics Society,

21  but I also know him from my role on the ANSI Z535 Committee.

22  BY MR. PACKIN:

23  Q.  Okay.  There is a individual who performed some testing on

24  candidate warnings that you prepared in this case, a Mr.

25  Doris, do you know him?

1    A.   Yes, I know Nathan Dorris.

2    Q.   How do you know him?

3    A.   Again, I know Nathan primarily from our -- from us both

4    sitting on the Z535 Committee, but I see him from time to time

5    at the annual meeting of the Human Factors and Ergonomics

6    Society as well.

7    Q.   Stihl has put forward as an expert in this case a Jane

8    Welch.  Do you know Ms. Welch?

9    A.   I do not know Ms. Welch -- Dr. Welch.

10   Q.   Have you ever seen her at a Human Factors and Ergonomics

11   Society meeting?

12   A.   Not to my knowledge.

13   Q.   Have you ever seen anything she's published in the

14   warnings literature?

15   A.   No.

16   Q.   Have you ever heard her name referenced by any of your

17   colleagues in the field of warnings?

18   A.   No, not until this litigation.  I hadn't heard of her

19   until this litigation.

20   Q.   Okay.  There's an individual that has rendered some

21   opinions regarding warnings by Stihl, a Vincent Morabit.  Have

22   you ever heard of Mr. Morabit?

23             THE COURT:  Spell his name.

24             MR. PACKIN:  M-O-R-A-B-I-T.

25             MR. WALSH:  Your Honor, I'm not sure what any of

1   this questioning has to do with a Daubert Hearing, considering

2   the credentials and work of this witness.  This seems far, far

3   afield.

4            MR. PACKIN:  Your Honor, the line of questioning was

5   started because -- to indicate that there is a limited group

6   of people who have worked extensively in this field, and this

7   witness is familiar with virtually all of them.

8            MR. WALSH:  Well, if that's the goal, that certainly

9   is a strange way of getting to it, by asking questions about

10  specific individuals that have appeared in this case.  And

11  what --

12           THE COURT:  Okay, look, I think we don't need this

13  any further.  Thank you.

14           MR. PACKIN:  Thank you, Your Honor.

15           THE COURT:  So the objection is sustained, but the

16  testimony stands.

17           MR. PACKIN:  Thank you, Your Honor.

18  BY MR. PACKIN:

19  Q.  Does the fact that Mr. McGee had approximately 13 years

20  experience in the construction trades at the time of his

21  accident have any bearing on the analysis in this case, or how

22  does that factor into the analysis in this case?

23  A.  Well, it's not just his experience, but also the

24  experience of his co-workers; they'd all been working in and

25  around the construction trades for may years, and by his

1    testimony and other testimony, they had had significant

2    experience with the cut-off saw and many other kinds of power

3    tools and so on.

4    Q.  And how did that factor in here?  I mean, if the gentleman

5    has 13 years of experience and thought he knew how to use a

6    cut-off saw safely, how, if at all, does that factor in?

7    A.  Well, it corroborates some of the other testimony that

8    I've given today that it was the misuse, the placement of

9    toothed blades on the saw, was a misuse that was known to

10   Stihl representatives, and they've known to be a common and

11   dangerous misuse of that.  That analysis also suggests that

12   because, again, of the concept of an affordance, where a

13   toothed blade can fit on the saw, just as the recommended

14   blades, which are the composite blade, and the diamond tip

15   blade, sometimes with the assistance of a reducing pusher --

16   reducer pushing, which would give a person without the

17   information that it's prohibited the idea that in fact you can

18   put that on there.  So it's corroboration that that's what I

19   would expect with a person who had used the saw in that

20   capacity, even though he had mounted it with a prohibited

21   blade, if he never experienced the kind of injury that he did

22   as a function of this accident.  It's not surprising to me,

23   and it's explained by the concept of benign experience.

24   Q.  Okay, and that concept, benign experience, meaning

25   experience with a product that has benign -- explain it for us

1    please, I don't want to --

2    A.   Yes.   Benign experience, it's also tied to well known

3    concepts in a related discipline of behavioral psychology that

4    I talked about earlier, and it suggests that we all learn in

5    our life as a function of certainly the information that we

6    get, and we also learn based on consequences, operant

7    psychology, and it goes back to the early 1900s in terms of

8    all of the research that was done to support those

9    contentions.   You know it as a parent, you know in your own

10   life that we learn based on consequences.   If the consequences

11   for having used a piece of equipment like this with a

12   prohibited blade is that I get the job done more efficiently.

13   So, for example the facts of the case in this suggest that

14   they found that they could cut through certain materials very

15   quickly --

16   Q.   Suggests or states, sir?

17   A.   State that they indicated that they could cut through

18   different kinds of material.   In this case, it was high

19   density polypropylene piping that was different from their

20   experience with using a composite blade, which had some

21   problems.   They suggested that it melted it and caused other

22   problems.   So it's not surprising, when you add up the

23   confluence of factors in this case, that even a person that

24   had many years of experience would actually exacerbate the

25   problem because he had gone for so many years no knowing that

1   this was a prohibited use and probably didn't think about it

2   would make him less likely to look for information, whether

3   it's in an owner's manual or an on-product warning.

4   Q.  You're not a mechanical engineer, correct?

5   A.  No.

6   Q.  You have no training in mechanical engineering, is that

7   correct?

8   A.  No.

9   Q.  When you said no --

10  A.  It's correct --

11  Q.  Okay.

12  A.  -- that I don't have any training in mechanical

13  engineering.

14  Q.  Did the fact that you are not a mechanical engineer and

15  don't have training in engineering affect or impair in any way

16  your ability to perform the warnings analysis that you

17  performed in this case?

18  A.  No.

19  Q.  Why is that, sir?

20  A.  Because my focus is on risk communications and warnings.

21  Much of the information pertaining to the specific operational

22  characteristics of this machine were provided to me in the

23  many depositions of Stihl employees who were responsible for

24  the design development of the warnings, from the many

25  individuals who used the equipment and so on, from the owner's

1  manual that I read, from the DVD, from the website, from the

2  on-product and -- the warnings that were on there, my own use

3  of a rental saw to get a handle on it, and then purchase of a

4  saw all gave me enough information to understand that.  What

5  was at question for me wasn't that there was a hazard, that

6  was made patently clear from the Stihl employees themselves,

7  Mr. Linsbauer and Mr. Elsner indicated they knew that this was

8  a dangerous misuse of the saw.  So the question was whether or

9  not the warnings that were designed to address that hazard

10  were adequate.

11  Q.  Now, also is it correct you have no particular background

12  in construction trades yourself personally?

13  A.  No.

14  Q.  Correct?

15  A.  That's correct.

16  Q.  Or, other than your home use, in the use of commercial

17  power tools, is that correct?

18  A.  That's correct.

19  Q.  Did that make any difference in your analysis of the

20  warnings and warning systems in this case?

21  A.  No.

22  Q.  And for what reasons?  And if they should be the same as

23  the reasons pertaining to the engineering, you don't need to

24  repeat that per se.

25            MR. WALSH:  Your Honor, I'm going to object to this

Kalsher - Direct                                    195

1   witness being asked to self-aggrandize his work.  He's not an

2   engineer, he admits that.  He has never worked in

3   construction, he admits that.  How that may have influenced

4   what he could or could not do I suggest is not for him to say,

5   and it serves little purpose having the witness say even

6   though I'm not qualified in these areas, in my opinion it did

7   not affect what I was able to do.

8               THE COURT:  I think this is just a series of wrap-up

9   questions.  I think we're almost finished.

10              MR. PACKIN:  Right, and designed to direct some of

11  the very issues that the Defense has raised as well.

12              THE COURT:  You mean to anticipate some of the cross

13  and deal with it at least up front?

14              MR. PACKIN:  Right, and we'd be ignoring the

15  elephant in the living room if we didn't know some of the

16  issues that were raised in their papers and --

17              THE COURT:  Well, we're going to hear about that

18  from them.  So overruled, but let's just move along.  The fact

19  that you don't have experience in construction work does not

20  impair your ability to opine as to warnings in this case, is

21  that your view, sir?

22  A.  Yes.

23              THE COURT:  Okay.  Next.

24  BY MR. PACKIN:

25  Q.  Have you ever seen a cut-off saw being used?

1    A.   I think I've stated in my testimony that before this case,

2    I hadn't seen one used until I'd looked at the DVD, I operated

3    it myself.  After that I remember testifying at one of the

4    depositions, and I don't remember whether it was Stout or this

5    case, that I had seem somebody in Troy, New York using one to

6    cut the asphalt on a road near RPI.

7    Q.   Okay.  Did you, prior to rendering your opinions in this

8    case, do whatever factual research you felt you needed to do

9    to familiarize yourself with the use and operation of a cut-

10   off saw?

11   A.   Yes.

12   Q.   Would you have written the opinions in the analysis you

13   performed in this case had you not done so?

14   A.   No.

15   Q.   Do you -- from the materials that you had available in

16   this and the Stout case, did you become aware in fact of how

17   cut-off saws are used?

18   A.   I couldn't say that I know what all the uses are, but I

19   became familiar with some of the uses based on my reading

20   materials in the case, and then looking at the materials that

21   I've already talked about in terms of the DVD and so on, and

22   reading the owner's manual.

23           THE COURT:  So you don't know -- you wouldn't know

24   how to take it and attack your driveway with it?

25   A.   I probably could at this point because of all of the

1    information I've gleaned from it, but I wouldn't say that I'm

2    a trained user of --

3            THE COURT:  Physically, no, you haven't done it?

4    A.  Physically, no, I haven't done it, right.

5    BY MR. PACKIN:

6    Q.  From the review of the materials in this case, did you

7    become aware of the environments in which these tools are

8    used?

9    A.  Again, not all environments, but yes, I became aware of

10   some of the environments.

11   Q.  Would you have any way to determine how often cut-off saws

12   are used in the United States, is that a knowable piece of

13   information?

14   A.  I don't know how anyone would know that.

15   Q.  Are you aware of the existence of accident statistics that

16   are specific to cut-off saws?

17   A.  No.

18   Q.  Are you aware of the existence of accident statistics

19   specific to kickback injuries resulting from cut-off saws?

20   A.  No.

21   Q.  Were such statistics to exist, would they have any impact

22   upon your analysis and opinions in this case regarding the

23   adequacy of Stihl's warnings?

24   A.  No, because the information that I needed to start with

25   was provided by the Stihl representatives themselves.  They

1    had identified this as a hazard that was dangerous, that could

2    result in severe consequences.  It was evident there, it was

3    evident in their owner's manual, given all the warnings that

4    they had for the kickback hazard for the material that we find

5    on the saw, and the material presented in the DVD.

6    Q.  Okay, and going to that, you mentioned earlier today that

7    that provided -- and if I'm misstating it, please feel free to

8    restate your --

9              THE COURT:  Counsel, this is becoming repetitive and

10   it would be fine if we just see what the cross brings and then

11   you can do a little redirect.

12             MR. PACKIN:  But there are a few topics, Your Honor,

13   I do wish to address briefly, very briefly.

14   BY MR. PACKIN:

15   Q.  You didn't perform a formal hazard analysis, correct, in

16   this case?

17   A.  No.

18   Q.  Correct?

19   A.  That's correct.

20   Q.  Why not?

21   A.  Again, because I had been provided with the information

22   that a hazard analysis is usually calculated to yield.  There

23   are a number of different approaches to hazard analysis,

24   they're all typically designed to determine what the residual

25   hazards are associated with a product or piece of equipment

1   after the process that we've talked about has been undertaken;

2   that is, engineering people should do what they can to do to

3   design out the hazards if there are any residual hazards, to

4   do the guarding and so on.  So the hazard analysis, for me,

5   was partially done by Stihl itself by indicating that this, in

6   fact, was a serious hazard that could have very serious

7   consequences, including serious injury or death.

8   Q.  Have you been involved in cases where hazard analysis is

9   at issue where a manufacturer says this is not something that

10  needed to be warned against?

11          THE COURT:  Move on, Counsel.

12  A.  It's possible --

13          MR. PACKIN:  Okay.

14  A.  -- as I'm sitting here --

15          THE COURT:  No, no --

16  A.  -- I can't think of a specific example.

17          THE COURT:  -- don't answer.

18  BY MR. PACKIN:

19  Q.  You haven't spoken to either Mr. McGee or Mr. Stout

20  directly, is that correct?

21  A.  That's correct.

22  Q.  Do you feel there was a need to do that in this case?

23  A.  No, I had ample opportunity to look at the complete

24  deposition of Mr. McGee and Mr. Stout in that case, and the

25  co-workers around them provided me with quite a lot of

1    detailed information about them.

2    Q.  Did you review warnings on any other cut-off saws that

3    were manufactured in or around 2003?

4    A.  I think I've already testified that I have taken a look at

5    them at various websites, and I had looked at photographs

6    provided by Mr. Growney of various kinds of cut-off saws and

7    some warnings.

8    Q.  Would the warnings given by other manufacturers of cut-off

9    saws have any bearing on your determination as to whether the

10   Stihl warning system was adequate or not adequate?

11   A.  No.

12   Q.  Why is that?

13   A.  Well, partly what I looked at the pictures for was to find

14   out the actual design characteristics of the different saws to

15   see where warnings could be located, not necessarily their

16   operating characteristics since that's not my expertise.  But

17   more to the point as it relates to warnings, my evaluation

18   would be comparing this specific warning system against the

19   criteria that I've stated earlier, which is abiding to ANSI

20   Z535 and also in the warnings literature to determine whether

21   or not it met the criteria for effectiveness or for adequacy.

22   Q.  Just briefly, sir, why did you prepare candidate warnings

23   in this case?

24   A.  I was asked to.

25   Q.  By whom?

1    A.  Mr. Walsh at one of the depositions in the first case.

2              MR. WALSH:  Objection, Your Honor, that grossly

3    misstates the record.  The --

4              THE COURT:  Okay, please don't interrupt the

5    witness.  Sorry.

6              MR. PACKIN:  Thank you, Your Honor.

7              THE COURT:  He's going to give his answer.  He

8    prepared candidate warnings in the Stout case, is that what

9    you're saying, sir?

10   A.  I was asked to go into a room outside where I was being

11   deposed after --

12             THE COURT:  In the Stout case?

13   A.  In the Stout case, after strenuous objection to that,

14   stating that to do so would be unprofessional because it's not

15   how I would approach developing a warning, to sit in a room

16   with pencils and a piece of paper.  And to do that I was told

17   that I had to do it for this case, and so I struggled with

18   that the best I could for a couple of hours, after which there

19   was some arguments and I was called back to the next

20   deposition.  During the intervening time, I thought that what

21   Mr. Walsh was looking for was what I would actually do to

22   prepare my idea of what a prototype or candidate warning would

23   be, and I brought those back with me to the subsequent

24   deposition in that case.

25   BY MR. PACKIN:

1  Q.  Dr. Kalsher, were those candidate warnings ever intended

2  by you to be final end products of what you would put on a

3  cut-off saw?

4  A.  No.  Again, I was asked -- and I want to make sure that

5  I'm accurately stating what the record is is that I was asked

6  to draw what I would see, and I took that to mean that they

7  wanted my best effort.  And so I developed what would be

8  reasonable candidates based on an evaluation of that to what

9  I've been suggesting for the warnings in this case, which is

10  the Z535 criteria and what I know from literature on warnings

11  and risk communication.

12  Q.  And have you ever performed any actual statistical testing

13  of those warnings?

14  A.  No.

15  Q.  And why is that?

16  A.  I haven't been asked to do that.  In fact, I was asked to

17  stop doing any work on those.

18  Q.  Okay.  By whom?  Who were you told to stop doing work by?

19  A.  I thought I was -- that you had indicated to me that the

20  Judge in the case had told me to stop any further work on

21  them.  Am I misunderstanding that?

22  Q.  Would you test them before they got into a form where you

23  were considering -- strike that, withdrawn.

24      (Pause in proceedings)

25          MR. PACKIN:  If I may have one more moment, Your

1   Honor, I think I may be finished.

2            THE COURT:  Look it over.

3       (Pause in proceedings)

4            MR. PACKIN:  That's all I have.  Thank you, Dr.

5   Kalsher.  Thank you, Your Honor.

6            THE COURT:  Thank you everyone.  I especially want

7   to thank everyone for making the extreme sacrifice of agreeing

8   to continue tomorrow rather than breaking.  So we are done for

9   today.  If counsel would just join me at the side, I had a

10  question about one document.

11           MR. KALSHER:  Do you need me to leave?

12           THE COURT:  You may step down, watch your step

13  please.  This is off the record.

14      (Off the record discussion)

15      (Court adjourned)

16

17                    CERTIFICATION
18  I certify that the foregoing is a correct transcript from the
19  electronic sound recording of the proceedings in the above-
20  entitled matter.
21
22  S/Lewis Parham                        5/4/12
23  _____     _____
24  Signature of Transcriber              Date