UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

```
                              .
Robert McGee, et al.,         .     Docket #08-CV-520 (MLC)
                              .
      Plaintiffs,             .
                              .     United States Courthouse
           vs.                .     Trenton, New Jersey
                              .     April 17, 2012
Stihl Incorporated, et al.,   .     9:33 a.m.
                              .
      Defendants.             .
.......................................................
```

TRANSCRIPT OF DAUBERT HEARING
BEFORE THE HONORABLE MARY L. COOPER
UNITED STATES DISTRICT COURT JUDGE

APPEARANCES:

```
For The Plaintiff:        Barry M. Packin, Esq
                          Nagel Rice, LLP
                          103 Eisenhower Parkway
                          Roseland, NJ 07068

For the Defendant:        James Walsh, Esq.
                          McGuire Woods, LLP
                          One James Center
                          901 East Cary St.
                          Richmond, VA 23219

                          Stephen A. Rudolph, Esq.
                          Monte & Rudolph, PA
                          800 The Plaza
                          Sea Girt, NJ 08750

Audio Operator:           Antonio Giaquinto

Transcribing Firm:        Writer's Cramp, Inc.
                          6 Norton Rd.
                          Monmouth Jct., NJ 08852
                          732-329-0191
```

Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

2

## Index

|  | Direct | Cross | Redirect | Recross | Further Redirect |
|---|---|---|---|---|---|

**Witnesses For The Plaintiff:**

Dr. Kalsher (cont'd)                 4        247

**Witnesses For The Defendant:**

**MOTIONS:**

| EXHIBITS: | | Marked | Received |
|---|---|---|---|
| D-3 | Stihl TS 400 Owner's Manual | 95 | 98 |
| D-4 | Stihl TS 400 Safety Manual | 35 | * |
| D-16 | ANSI Z535.4-2002 | 7 | 10 |
| D-22 | ANSI B175.4-2006 | 11 | 12 |
| D-73 | Chapter 23-"Handbook on Warnings" | 89 | 151 |
| D-74 | Kalsher Article-1995 | 135 | 139 |
| D-75 | Kalsher Article-1998 | 144 | 144 |
| D-78 | Kalsher Article | 167 | 168 |
| D-79 | Kalsher-Jumper Cable Study | 171 | 172 |

* indicates admitted in a previous proceeding

1              THE COURT:  Good afternoon everyone.

2              ALL:  Good morning.

3              THE COURT:  Counsel, could I see you at the side

4  just to talk about our proceeding today.  You may be seated,

5  sir.

6      (Sidebar on the record)

7              THE COURT:  How is everybody?

8              ALL:  Fine, thanks.

9              THE COURT:  I'm not going to do a fashion check of

10  anybody this morning.

11      (Laughter).

12              THE COURT:  The only thing I have to say here at the

13  side is that to the degree that any of the cross examination

14  of this witness is already covered in the deposition

15  transcripts, I will certainly afford the Defendant the

16  opportunity to submit deposition excerpt citations rather than

17  have to go through the exact same drill that is already on

18  paper in the depositions, subject of course, to completeness,

19  such as it is; designations.  So, if that assists anybody in

20  any way this morning, that's where I stand.

21              ALL:  Thank you.

22      (Sidebar ends)

23              THE COURT:  Okay.  We're ready to proceed with the

24  cross, yes?

25              MR. WALSH:  The witness remains under oath, correct?

1          THE COURT:  Of course.  Dr. Kalsher, was there

2     anything that you testified to yesterday that you thought

3     about last night and would change or amplify?

4          DR. KALSHER:  No, Your Honor.

5          THE COURT:  Okay, fine.  You may cross examine.

6      MICHAEL KALSHER, PLAINTIFF'S WITNESS, PREVIOUSLY SWORN

7                       CROSS EXAMINATION

8     BY MR. WALSH:

9     Q.  Good morning.

10    A.  Good morning, Mr. Walsh.

11    Q.  I want to turn first to a couple of things that you were

12    discussing yesterday, ANSI Standard Z535 was discussed in

13    great detail.  In 1991, when the standard was enacted, you

14    were not on the Standards Committee, were you?

15    A.  No, sir.

16    Q.  When it was revised in 1998, you were not on the Standards

17    Committee?

18    A.  Correct.

19    Q.  In 2002 when it was revised, you were not on the Standards

20    Committee?

21    A.  I believe that's correct.

22    Q.  And it is the 2002 standard that would be applicable if it

23    is applicable at all, is that correct?

24    A.  Yes, I believe that that would be the version of the

25    standard that is applicable in this case.

1  Q.  You mentioned yesterday that you served on a Z535.3

2  subcommittee?

3  A.  Yes, sir.

4  Q.  It's a fact, is it not, that you have never attended a

5  meeting of that subcommittee?

6  A.  I have not gone to the subcommittee meeting, that's true.

7  Q.  And the way you get on those subcommittees, I think the

8  Judge directed a question to this yesterday, you volunteer for

9  them, do you not?

10  A.  You do volunteer, but not everybody is accepted onto those

11  committees.

12  Q.  Okay.  It's a volunteer process, though, is it not?

13  A.  It's a volunteer and selection process.

14  Q.  All right.  Now, Z535, nothing mandatory about it, is

15  there?

16  A.  It is, in fact, a voluntary standard that over time has,

17  in fact, been adopted generally speaking and incorporated into

18  other ANSI standards, although I don't have the list of those

19  --

20  Q.  Okay.

21  A.  -- that is has been incorporated into.

22          THE COURT:  But other ANSI standards are also

23  voluntary?

24  A.  Yes.

25  BY MR. WALSH:

1   Q.  It's a voluntary standard without any kind of binding

2   force and effect, is that correct?

3   A.  It's my understanding that there's no --

4   Q.  Go ahead.

5   A.  -- legal binding effect to it, but it does --

6   Q.  Do you know if it has ever been adopted into the Cut-Off

7   Machine Standard?

8           MR. PACKIN:  Your Honor, just as a matter of

9   procedure, I would ask that he be permitted to finish his

10  answer.

11          THE COURT:  Yes.  Also, Mr. Walsh, I notice that

12  you're wandering from the mic.  Do you have a --

13          MR. WALSH:  I have the --

14          THE COURT:  Okay.

15          MR. WALSH:  I have this microphone.

16          THE COURT:  Then you can --

17          MR. WALSH:  Thank you, Ma'am.

18          THE COURT:  -- pace around all you want.

19  BY MR. WALSH:

20  Q.  Were you finished with your answer?  I'm sorry.  I didn't

21  mean to interrupt you.

22  A.  I kind of have lost the train of what the question was.  I

23  think it had something to do with the -- I'm sorry --

24  Q.  Yeah.

25  A.  -- for losing the train.

Kalsher - Cross                    7

1   Q.  My followup question was, to your knowledge, has the ANSI

2   Z535 ever been adopted by the Cut-Off Machine Committee?

3   A.  Not formally, to my knowledge.

4   Q.  All right.  When you say formally, it hasn't been adopted

5   at all, has it?

6   A.  Well, the only way that we would know that would be its

7   incorporation into the document itself.

8   Q.  And it's not in the most recent version of the Cut-Off

9   Machine Standard, the 2006, it has not been adopted, it's not

10  called out in that standard at all, is it?

11  A.  Well, once again, as I discussed at great length

12  yesterday, there's no requirement for any voluntary ANSI

13  Standard Committee to adopt anything.

14  Q.  Well –

15            THE COURT:  Is it cited?  Is the Z535 cited as

16  authoritative in the recent version of the Cut-Off Machine

17  ANSI?

18  A.  To my knowledge, it's not cited.

19            MR. WALSH:  All right.  And, in fact, Mr. Rudolph,

20  if I could have Defendant's Exhibit #16 that I could pass to

21  the witness, please?  Would you give a copy to Barry?   May I

22  approach the witness, Your Honor?

23       (Defendant's Exhibit-16 previously marked for

24  identification)

25            THE COURT:  You may, in general, approach the

1   witness.

2          (Mr. Walsh approaches the witness)

3              MR. WALSH:  Thank you.

4              THE COURT:  So we'll spare the record that.

5   BY MR. WALSH:

6   Q.  Take a look at what has been marked as Defendant's

7   Exhibit-16.  Can you identify that as a copy of ANSI Z535.4-

8   2002?

9   A.  Yes, sir.

10  Q.  All right.  This is the standard yesterday you said

11  applied to on-machine labeling, correct?

12  A.  I said it applies to on-product labeling.

13  Q.  All right.  Will you turn in that to the Notice and

14  Disclaimer in the second or third page inside the cover?

15  A.  Yes, sir.

16  Q.  All right.  It reads, "The information in this publication

17  was considered technically sound by the consensus of persons

18  engaged in the development and approval of the document at the

19  time it was developed.  Consensus does not necessarily mean

20  there is unanimous agreement among every person participating

21  in the development of this document.  NEMA" -E-M-A

22  "standards," and NEMA is, is it not, the sponsoring

23  organization for the standard?

24  A.  That's correct.

25  Q.  "NEMA standards and guideline publications of which this

1    document contained herein is one, are developed through a

2    voluntary consensus standard development process.  This

3    process brings together volunteers and seeks out the views of

4    persons who have an interest in the topics covered by this

5    publication.  While NEMA administers the process and

6    establishes rules to promote fairness in the development of

7    the consensus, it does not write the document, and it does not

8    independently test, evaluate, or verify the accuracy or

9    completeness of any information or the soundness of any

10   judgments contained in the standards and guideline

11   publications."  Did I read that accurately?

12   A.  Yes, you did.

13   Q.  All right.  If you go down -- I'm going to go down to the

14   fourth paragraph in here.  "Anyone using this document should

15   rely on his or her own independent judgment or, as

16   appropriate, seek the advice of competent professionals in

17   determining the exercise of reasonable care in any given

18   circumstances."  Did I read that correctly?

19   A.  Yes.

20   Q.  And then is says, "NEMA has no power, nor does it

21   undertake to police or enforce compliance with the contents of

22   this document."

23   A.  I'm sorry, you missed a sentence.

24   Q.  I skipped down to the last paragraph.

25   A.  I think that the sentence that you missed is actually

1    important.

2    Q.   Okay.  Why don't you read it, then?

3    A.   "Information and other standards on the topic covered by

4    this publication may be available from other sources, which

5    the user may wish to consult for additional views of

6    information not covered by this publication."  Which is

7    consistent with my testimony that in addition to information

8    contained in ANSI, that there also is scientific literature in

9    the area of risk communications and warnings that would

10   constitute the kinds of information that is referred to here.

11   Q.   Is it true that NEMA has no power nor does it undertake to

12   police or enforce compliance with the contents of the

13   document?

14   A.   That's true with any voluntary standard, sir.

15   Q.   All right.  Turn over to -- on Page 1, Section 2.2.1.  Do

16   you see that?  Do you have that section?

17   A.   Yes.

18           THE COURT:  Counsel, at this point, I'm going to

19   suggest you offer D-16 into evidence, because we are reading

20   from it.

21           MR. WALSH:  Yes, Ma'am.  I'd do that, please.

22           THE COURT:  Okay.  Any objection?

23           MR. PACKIN:  No, Ma'am.

24           THE COURT:  D-16 into evidence.

25        (Defendant's Exhibit-16 admitted into evidence)

 1   BY MR. WALSH:

 2   Q.  2.2.1 says, "There are a number of existing American

 3   National Standards which are recognized for particular

 4   industries or for specific uses.  Compliance with such a

 5   standard may be considered for the particular industry or use.

 6   It is not the intent of this ANSI Z535.4 standard to replace

 7   existing standards or regulations which are uniquely

 8   applicable to a specific industry or use.  It is the intent to

 9   encourage adoption of the standard in subsequent revisions of

10   other standards and regulations."  Now, you previously told me

11   that this standard had never been adopted into the Cut-Off

12   Machine Standard, correct?

13   A.  That's correct.

14   Q.  And, in fact, the current standard for cut-off machines,

15   enacted in 2006 -- and if I could have Exhibit number 22,

16   please?  I'm going to hand you a copy of that standard.

17        (Defendant's Exhibit-22 previously marked for

18   identification)

19             THE COURT:  What's the number of it?

20             MR. WALSH:  It is Defendant's Exhibit-22.

21             THE COURT:  Are you offering it in evidence?

22             MR. WALSH:  I am.

23             THE COURT:  Any objection?

24             MR. PACKIN:  No, Ma'am.

25             THE COURT:  In evidence.

1        (Defendant's Exhibit-22 admitted into evidence)

2   BY MR. WALSH:

3   Q.  Do you understand this to be the -- this is entitled

4   "Portable Hand-Held Internal-Combustion-Engine-Driven Cut-Off

5   Machines Safety Requirements."  Do you see that?

6   A.  Yes.

7   Q.  If you look to the back --

8            THE COURT:  What's the cite, sir?  ANSI what?

9            MR. WALSH:  It is ANSI B, as in Bravo, 175.4-2006.

10  BY MR. WALSH:

11  Q.  Do you see if you turn to the back pages of this standard,

12  sir?

13  A.  Which back page?

14  Q.  Annex F.

15  A.  I'm sorry, which?

16  Q.  The last two pages.  Annex F.

17            THE COURT:  F as in Frank?

18            MR. WALSH:  Frank, yes, Ma'am.

19  BY MR. WALSH:

20  Q.  You see there are front and back, there are what is styled

21  Recommended Symbols.  Do you see that?

22  A.  Yes.

23  Q.  All right.  The first recommended symbol is a book.  Is

24  that book in the same symbol on the Stihl cut-off machine?

25  A.  It appears to be similar, although I have a black and

1   white copy of this.

2   Q.  All right.  And it calls for, as we progress, it gives you

3   various ways to look at the symbol for eye, ear, and hear

4   protection.  It gives you alternatives.  Is the symbol at the

5   bottom of page 35 representing hearing protection, eye

6   protection, and a hard hat?  Is that symbol also on the Stihl

7   cut-off machine?

8   A.  Yes.

9   Q.  And then the symbol about dust warnings.  Is that on the

10  Stihl machine?

11  A.  Yes.

12  Q.  And if we turn over, the warning on fire, is that on the

13  Stihl machine?

14  A.  Yes.

15  Q.  And the warning on kickback.  Is that on the Stihl

16  machine?

17  A.  I don't believe that it says kickback, sir.  It says,

18  symbol 10 --

19  Q.  Rotational forces.

20  A.  -- rotational forces.

21  Q.  Okay, it uses the term rotational forces does it not?  Is

22  that on the machine?

23  A.  Yes.  But once again, you indicated Annex F --

24  Q.  I don't have a question pending, sir.

25  A.  Very well.

1   Q.  If you turn to the body of the standard, does this

2   standard address warnings to go on cut-off machines?

3   A.  I don't know where you're directing me to, sir.

4   Q.  Okay.  The body of the standard.  Let me get the page cite

5   for you.  All right.

6           THE COURT:  Page?

7   BY MR. WALSH:

8   Q.  This is Page 17, Section 8.2.

9           THE COURT:  Let him get there.  At some point, I may

10  ask for copies of these exhibits into evidence, but right now

11  you may continue.

12          MR. WALSH:  Yes, Ma'am.  We'll supply all of these.

13          THE COURT:  That's not the point.

14          MR. WALSH:  Oh, you mean you want one right now,

15  yes.  We can certainly do that.

16          THE COURT:  But I'm not asking for that.

17          MR. WALSH:  Okay.

18          MR. WALSH:  Right now.

19  A.  Which specific point do you want me to focus on?

20  BY MR. WALSH:

21  Q.  Basic Markings, 8.2.  Do you see that?

22  A.  Yes.

23  Q.  It says, "Every machine shall" --

24          THE COURT:  Basic Markings?

25          MR. WALSH:  Basic Markings.

1              THE COURT:  Is that the heading?

2              MR. WALSH:  That's the heading.  8.2, Basic

3    Markings.

4              THE COURT:  Okay.

5    BY MR. WALSH:

6    Q.  And then it follows, "Every machine shall be marked with

7    at least the following words or by symbols.  The

8    manufacturer's name, trade name, or other recognized symbol,

9    model, or type identification, the manufacturer's

10   identification, the serial number or lot number, the maximum

11   symbol speed, limitations on wheel diameter, mounting arbor,

12   hole, and thickness, start-stop device, fuel cap filling,

13   choke/prime or purge control, and heated handle switch,

14   respirators, if necessary, hearing and eye protection as

15   required, eye protection should comply with ANSI Z87.1, a mark

16   indicating the direction of wheel rotation, a prominent or

17   suitable mark stating warning, read and follow all safety

18   precautions in the Owner's manual, failure to follow these

19   instructions could result in serious or fatal injury, a

20   warning that the machine may create sparks when in use, a

21   warning about the risk of reactive forces, a warning not to

22   use circular saw blades."  Do you see that?

23   A.  I see that, and I agree that what you've read said that it

24   must be marked with at least --

25   Q.  Okay.

Kalsher - Cross                                    16

1  A.  -- the following words or symbols, and it did not specify

2  what the warning would be for creating sparks when in use,

3  about the risk of reactive forces, or about not to use

4  circular blades.

5  Q.  What position in that list of required markings does the

6  notation about circular saw blades appear?

7  A.  It's far down on the list, which is unfortunate in light

8  of what --

9  Q.  It's the last item on the list, is it not?

10  A.  It's unfortunate in light of what was known at the time by

11  Stihl about the nature of their product as it operates out on

12  the field.

13  Q.  The prior --

14         THE COURT:  Counsel, let me just instruct the

15  witness that we're going to move along as efficiently as we

16  can today.  If you can't answer a question completely with a

17  yes or no, then you can say I can't answer it completely with

18  a yes or no.  But if the question calls for a yes or no, even

19  if you have further explanation, you should not offer it.  Mr.

20  Packin can follow up on redirect.

21  A.  Okay.  I'm sorry, could I get just --

22  BY MR. WALSH:

23  Q.  All right now, I want to go back to Exhibit-16 --

24         THE COURT:  Just a second.  He has a question.

25  A.  I want to make sure that I'm following the procedure that

1   you dictate, so if I can't answer the question yes or no, I

2   should say I can't answer the question yes or no?

3              THE COURT:  Right.  Yes.

4   A.  Okay.

5              THE COURT:  And then you may be invited to give an

6   explanation --

7   A.  Okay.

8              THE COURT:  Or you may be just passed by with that

9   question and not have to answer it.  The reason I bring this

10  up right now is that the question from counsel was the warning

11  not to use circular saw blades is the last item on this

12  enumerated list in ANSI.  And you said, "That's right."  And

13  then you added, "This is unfortunate in view of what we know

14  about" --

15  A.  I understand.

16             THE COURT:  -- "the risks" and so, that was

17  surplusage.

18  A.  I understand.  Thank you.

19  BY MR. WALSH:

20  Q.  I want you to turn back to Exhibit-16, which is ANSI

21  Z535.4, 2002, and I want you to turn to Page 8 of that

22  standard.

23             THE COURT:  Are we back to D-16?

24             MR. WALSH:  Yes, Ma'am.

25             THE COURT:  D-16, what page?

1           MR. WALSH:  It's Page 8 in Section 10.2.2.

2    A.  Yes.

3    BY MR. WALSH:

4    Q.  Called Replacements.  Do you see that?

5    A.  Yes.

6    Q.  Yesterday you gave testimony about the missing label on

7    the Stihl TS 400 machine being using by Mr. McGee, did you

8    not?

9    A.  Yes.

10   Q.  And you talked about it violating in some fashion Z535

11   because not staying on for the expected life for the machine,

12   if I understood you.  Is that your testimony?

13   A.  Just let me look at what he's referring to, if I may?  No,

14   I don't think that that's what I was testifying to.

15   Q.  Okay.  Did you give testimony yesterday about the label

16   coming off and there being a requirement in ANSI Z535.4 for

17   the label to last for the reasonable expected life of the

18   machine?

19   A.  That's what I did testify to.

20   Q.  Okay.

21   A.  In fact, I see it in Expected Life and Maintenance --

22   Q.  All right.

23   A.  -- in Section 10.

24   Q.  And that's the Section 10.2.1 which is directly above the

25   section I've just called your attention to, 10.2.2, correct?

1   A.  No, 10.1 was first in the list, which I just referred to,

2   and now we're at 10.2.2 --

3   Q.  Okay.

4   A.  Which is Replacement.

5   Q.  Okay.  All right.  And it says, does it not, this Section

6   10.2.2 says, "Product safety signs and labels should be

7   replaced by the product user then they no longer meet the

8   legibility requirements and safe viewing distance as described

9   in Section 8.2."

10            THE COURT:  Should be replaced by whom?

11            MR. WALSH:  By the product user.

12  BY MR. WALSH:

13  Q.  "In cases where products have an extensive expected life,

14  or where exposed to extreme conditions, the product user

15  should contact either the product manufacturer or some other

16  source to determine a means for obtaining replacement signs or

17  tablets."  Do you see that?

18  A.  Yes.

19  Q.  So the ANSI standard anticipates that under some

20  conditions of use, and some life expectancies of machines,

21  that there will be replacement labels needed, and imposes that

22  requirement on the product user, does it not?

23  A.  I would agree that yes --

24  Q.  All right.

25  A.  -- and that it's the fourth item in that list.

1  Q.  All right.  And, in fact, in this case, the record shows

2  that Jingoli, McGee's employer, did in fact, have on hand

3  replacement labels for its many cut-off machines, did it not?

4  A.  Yes.

5  Q.  All right.  ANSI Z535.4 does not require the use of a

6  pictorial or any symbol, does it?

7  A.  It makes no requirements.

8  Q.  It doesn't require -- it doesn't even suggest that you

9  have to use a symbol or pictorial, does it?

10  A.  That's not true.

11  Q.  Will you show me where in here in the standard it imposes

12  a requirement of a pictorial or symbol?

13  A.  That's not the question that you asked me.

14          MR. PACKIN:  Your Honor, I object --

15          THE COURT:  You were asked to -- actually your next

16  to the last question, Counsel, was hard to answer because you

17  said it doesn't suggest a requirement for --

18          MR. WALSH:  Okay.

19          MR. PACKIN:  Thank you.

20          MR. WALSH:  Let me rephrase the question.

21  A.  May I answer that question first?

22  BY MR. WALSH:

23  Q.  Is there any requirement in ANSI Z535.4 for using a

24  pictorial or symbol?

25  A.  There is no requirement.

1    Q.  Okay.  If you use a pictorial or symbol without text, is

2    there a requirement that it be comprehension tested?

3    A.  There's a requirement as it is for -- yes, comprehension

4    testing.

5    Q.  And the comprehension testing, it must be tested in front

6    of a target audience of likely users to an 85% comprehension

7    rate, and no more than 5% critical misunderstandings,

8    correct??

9    A.  That's correct.

10   Q.  So in order to use a pictorial at all under Z535.4, you

11   have to test it with a user group?

12   A.  Correct.

13   Q.  Is there any requirement in the standard that a textual

14   message be tested?

15   A.  There's no requirement in ANSI Z535.4 that says that.

16   Q.  Is there any testing protocol --

17          MR. PACKIN:  Again, just ask that the witness be

18   allowed to finish so we don't have voices over on the tape

19   recording.

20   BY MR. WALSH:

21   Q.  Is there any testing protocol set out in the standard for

22   testing text messages as opposed to pictorials?

23   A.  There's no testing procedure per se that outlines that.

24   Q.  Okay.  And there's no requirement, for example, that using

25   a text message that you have convened a user group and test

1   the comprehension of the message written in text, is there?

2   A.  As you've stated the question, that's correct.

3   Q.  All right.  Under the protocol for testing pictorials

4   provided by the standard, what is the sample, the number of

5   people that is suggested for convening to test the

6   comprehension of the pictorial?

7   A.  It has been 50 people.

8           THE COURT:  At least 50?

9   A.  At least 50 people.

10  BY MR. WALSH:

11  Q.  At least 50 people.  And the reason that that protocol is

12  set in the standard is because pictorials are subject to

13  misunderstanding, are they not?

14  A.  That's part of the reason.

15  Q.  And another part of the reason it's suggested is because a

16  pictorial misunderstood can be dangerous, is that not correct?

17  A.  That's again, part of the reason.

18  Q.  Okay.  So you don't want untested pictorials that may be

19  dangerous and may mislead people used according to the Z535.4

20  standard, correct?

21  A.  According to any standard.

22  Q.  Well, what other standard do you know that imposes that?

23  A.  A standard of care that would be dictated by the warnings

24  literature, but --

25  Q.  Well --

1   A.  You question was whether or not Z535.4 --

2   Q.  Don't tell me about the standards literature.

3           MR. PACKIN:  Your Honor, again, I asked not to

4   interrupt the witness while he's still speaking.  That's just

5   --

6           THE COURT:  That's the fourth time --

7           MR. WALSH:  I thought the witness was finished.  I'm

8   sorry.

9           THE COURT:  He wasn't.  Now, you may be under time

10  pressure, but you have to allow breathing room.

11          MR. WALSH:  Understood.

12  BY MR. WALSH:

13  Q.  Did I interrupt your answer?

14  A.  I'm fine.

15  Q.  Okay.

16          THE COURT:  I'm not fine.  I wasn't able to follow

17  it.

18          MR. WALSH:  All right.

19  A.  Would you re-ask the question, sir?

20  BY MR. WALSH:

21  Q.  Yeah.  Let me see if I can remember the question.  What I

22  don't want is a reference to the literature.  If you are

23  referring to specific things in the literature, I'd like you

24  to call my attention to what they are, not just some amorphous

25  literature --

1           MR. PACKIN:  Your Honor --

2    BY MR. WALSH:

3    Q.  Where is it?

4           MR. PACKIN:  I object to the colloquy.  If there's a

5    question, I have no problem with it.

6           THE COURT:  Counsel, I can handle this.

7           MR. WALSH:  Okay.

8    BY MR. WALSH:

9    Q.  Where is it in the literature?  What is it?  What

10   articles?  What writings that say that you should test

11   pictorials?

12          THE COURT:  Okay, Counsel?

13          MR. WALSH:  Yes.

14          THE COURT:  To you, let me say that you cannot move

15   to strike an answer as non-responsive if Dr. Kalsher says this

16   is well established in the literature.  We're not going to go

17   by those ground rules today.

18          MR. WALSH:  Okay.

19          THE COURT:  If he can be more specific, you can ask

20   him, "Can you be more specific?"

21          MR. WALSH:  Understood.

22   BY MR. WALSH:

23   Q.  Can you be more specific about what you're referring to in

24   the literature that calls for testing of pictorials because

25   they might be dangerous if not tested?

1          THE COURT:  I think let's move on.  He's

2     acknowledged that this ANSI standard says you should test for

3     pure pictorials.

4          MR. WALSH:  Okay.

5     BY MR. WALSH:

6     Q.  I want to shift gears for just a minute.  I want to go

7     back and pick up some of the background.  As I understand your

8     testimony, you graduated from undergraduate school in 1988 --

9     your PhD in 1988?

10    A.  Yes.

11    Q.  You went immediately to Rensselaer?

12    A.  Yes, shortly after that.

13    Q.  Okay.  And at some point in time, you opened a consulting

14    business, correct?

15    A.  To be accurate with the answer, I had been doing

16    consulting all along.  At one point in time, I set up a DBA

17    that was called Behavioral Ergonomics as an organizing factor

18    for my consulting activities, and at a later date, I formed an

19    LLC called Kalsher and Associates, again for the purpose of

20    separating my consulting activities from my university

21    activities.

22    Q.  Am I correct that when Kalsher and Associates came into

23    existence is about the time that you got into litigation

24    consulting?

25    A.  It may have been close, but it wasn't the intended --

1   Q.  Okay.

2   A.  -- purpose of doing that.

3   Q.  Can you recall any case you consulted for in litigation as

4   Behavioral Ergonomics?

5   A.  I don't recall any.

6   Q.  Okay.  And is it called Kalsher and Associates, or is it

7   called Kalsher LLC?

8   A.  Kalsher and Associates.

9   Q.  Are there any associates?

10  A.  Not yet.

11  Q.  Well, have there ever been any associates?

12  A.  No.

13  Q.  Where is it?  It operates out of your house?

14  A.  I do have an office in my house.

15  Q.  Okay.  Is there any other business location of Kalsher and

16  Associates?

17  A.  No, sir.

18  Q.  Rensselaer, I think, is noted for its engineering

19  programs.  You don't teach in the Engineering School, do you?

20  A.  Rensselaer is noted for a variety of things.  Certainly

21  the Engineering School and its programs are important.  And am

22  I an engineer?  I'm not an engineer.

23  Q.  You don't teach in the Engineering School?

24  A.  No.

25  Q.  At Rensselaer?  You're not an engineer, you've never taken

1    an engineering course, I think you said yesterday, is that

2    correct?

3    A.  That's correct.

4    Q.  All right.  Mr. Packin asked you questions yesterday about

5    your credentials being accepted by judges.  How many times

6    have you actually testified at a trial?

7    A.  I don't remember precisely, but it's a fairly low number,

8    two or three.  I don't remember precisely.

9    Q.  Two or three?  Did any of those cases involve testifying

10   about warnings on any kind of power product?

11           THE COURT:  Those two or three?

12           MR. WALSH:  Yes.

13   A.  Oh, in those two or three?

14   BY MR. WALSH:

15   Q.  Yes.

16   A.  I don't believe so.

17   Q.  Can you remember what cases they were and what they

18   involved?

19   A.  I remember one of the cases had to do with an accident

20   that occurred at a uranium enrichment facility in Paducah,

21   Kentucky, I think, is one of them.

22           THE COURT:  Can't hear you.

23   A.  In Paducah, Kentucky that involved an accident involving a

24   crane and worker.

25   BY MR. WALSH:

1    Q.  Were warnings involved in that?

2    A.  Yes.  There was a case --

3            THE COURT:  Just a second.  Was your testimony

4    regarding warnings or something else?

5    A.  It was --

6            THE COURT:  Generally.

7    A.  Generally, it would be human factors.  I believe there

8    would be a warnings and risk communication component, there

9    usually is, but I -- it's a while ago.  I don't remember the

10   details.

11           THE COURT:  Okay.  I don't want to get bogged down

12   here, but human factors is sometimes used to refer to what we

13   call biomechanics, which is how a person's body interacts with

14   machinery.  You don't testify in that field, do you?

15   A.  No, Your Honor.

16           THE COURT:  Okay.  Go ahead, Counsel.

17   BY MR. WALSH:

18   Q.  But you do testify in what you call human factors; for

19   example, where fencing occurs in relation to a Little League

20   ballpark?

21   A.  Yes.

22   Q.  So, you don't view human factors as necessarily

23   biomechanical, but that where you put a fence in relation to a

24   Little League ballpark has nothing to do with warnings, does

25   it?

1            MR. PACKIN:  Your Honor, he never finished the

2    answer to the question about the two or three cases and what

3    they involve.

4            THE COURT:  Well, he recalls one of those cases, and

5    then counsel moved off that subject, so that's all right.

6    BY MR. WALSH:

7    Q.  Can you answer my last question?

8    A.  Which one was it, sir?

9    Q.  That the testimony of human factors, testimony you

10   provided about the location of fencing at a Little League

11   park, you remember providing that information in a case, do

12   you not?

13   A.  In a deposition, yes.

14   Q.  In a deposition, not a trial.  That's a pure human factors

15   assessment having nothing to do with warnings, correct?

16   A.  Actually, thinking back to the question that you asked me

17   about trials, there was actually a trial I was involved in

18   that did involve warnings on a clip-in pedal that did involve

19   warnings and miscommunications.

20   Q.  We're gonna talk about, that's the Chesek case?

21   A.  Yes, sir.

22   Q.  We're gonna talk about that case in a little bit.  And is

23   that the only case you can --

24           THE COURT:  I'm sorry, I lost you because he didn't

25   answer your question.  He answered a prior question.  What's

1    the name of that case?  <u>Chesek</u>?

2            MR. WALSH:  <u>Chesek</u>, C-H-E-S-E-K, Your Honor.  I

3    think that's correct.

4    A.  Yes.

5            THE COURT:  It had to do with warnings on what?

6            MR. WALSH:  Clipless pedals on a bicycle.  C-L-I-P-

7    L-E-S-S, clipless.

8            THE COURT:  Okay.  So we'll come back to that.  Now,

9    let's pose a new question.  Or you can ask whether testimony

10   regarding location of fencing at a Little League park involved

11   what the witness calls human factors, but didn't involve

12   warnings.  Do you want an answer to that?

13   BY MR. WALSH:

14   Q.  Yes, I don't know if we've gotten an answer to that, but

15   at the possibility of being repetitive, did your Little League

16   fence location case, was that purely a human factors

17   assessment or did it involve anything to do with warnings?

18   A.  It was a human factors case.

19   Q.  Okay.  So, as far as we know, the clipless pedal case is

20   the only case you've testified at trial about a warning on a

21   product, is that correct?

22   A.  It may be, but as I sit here, I can't recall --

23   Q.  Okay.

24   A.  -- all of the trials.

25   Q.  All right.  Now let me ask you this.  Never in your

1   career, other than in the context of <u>Stout</u> and <u>McGee</u> in

2   litigation, never have you been retained by anybody to assess

3   or develop warnings for a hand-held gasoline-powered cut-off

4   machine, is that correct?

5            THE COURT:  Engaged to assess?

6   BY MR. WALSH:

7   Q.  To assess the warnings or to develop warnings?

8   A.  By --

9            THE COURT:  Two questions.

10  BY MR. WALSH:

11  Q.  To assess the warnings, first of all?

12  A.  Well, the first question is retained by whom?  I have been

13  retained in this case and I did assess the warning system for

14  this power saw.

15  Q.  And that's why I said, outside of <u>Stout</u> and <u>McGee</u>, the two

16  cases Mr. Packin has hired you in.  Outside of those two

17  cases, have you ever been retained to assess the warnings in

18  any capacity on a cut-off machine?

19  A.  No.

20  Q.  Have you ever been retained by anybody to develop warnings

21  for a cut-off machine?

22  A.  Other than <u>Stout</u> and --

23  Q.  I'm excluding <u>Stout</u> and <u>McGee</u>.

24  A.  Then that's correct.

25  Q.  Okay.  Now, do you recall that you were retained by Mr.

1    Packin for <u>Stout</u> and for <u>McGee</u> at the same time in October

2    2008?

3    A.  I don't recall precisely when I was retained in the two

4    cases.  I don't think they were at the same time.

5    Q.  Were they close proximity to each other?

6    A.  I don't recall.

7    Q.  You were working both cases at --

8              THE COURT:  Close in time, close in time, sir?

9              MR. WALSH:  Close in time.

10             THE COURT:  Do you recall that?

11   A.  I don't recall what the length of time was before being

12   retained on the second case.

13             THE COURT:  Okay.

14   BY MR. WALSH:

15   Q.  There was an overlap in the cases, though.  You were

16   working both at the same time, were you not?

17   A.  I believe that that's true.

18   Q.  Okay.  Do you recall how long a period of time you were

19   working both cases?

20   A.  Across both of them, several years.

21   Q.  Okay.  Now, when you developed your candidate warnings in

22   <u>Stout</u>, you were aware of the fact situation in <u>McGee</u>, were you

23   not?

24   A.  I may have been.

25   Q.  Okay.  And in <u>Stout</u> the facts were that someone was using

1    a cut-off machine with a carbide-tipped blade to cut boards

2    hanging off the back of a pickup truck that were essentially

3    either above his head or forehead level, correct?

4    A.  I believe that was part of it, although I think that there

5    was some disagreement about what you're depicting as cutting

6    over his head.

7    Q.  And in McGee, the scenario was that Mr. McGee was crouched

8    between two closely spaced HDPE pipes, high density

9    polyethylene piping, is that correct?

10   A.  In fact, that was what Mr. McGee was, in fact, cutting the

11   HDPE pipe.

12   Q.  Okay.  I'm going to put a blowup up there.  This has not

13   been marked by a number.  This came out of Dr. Hayes', you

14   know, you've met Dr. Hayes or know who he is?

15   A.  I have not met him.  I know generally who he is.  He's

16   another expert in this case, but I do not know him.

17   Q.  Okay.  He's an expert testifying on behalf of the

18   Plaintiff, is he not?

19   A.  That's my understanding.

20   Q.  Okay.

21            THE COURT:  What was his name?  I just didn't hear

22   it.

23            MR. WALSH:  Hayes, H-A-Y-E-S.

24            THE COURT:  Mr. Hayes.

25   BY MR. WALSH:

1   Q.  This document I put up, and we'll need to get it marked,

2   and we'll mark it in a few minutes, but this came out of his

3   report in which he depicts how Mr. McGee was positioned

4   between the pipes when he was cutting.  This being one pipe,

5   this being a second pipe, and this being the cut-off machine.

6   Do you see how he has encroached with the machine under one

7   pipe?

8   A.  Yes.

9   Q.  Okay.  Not the first time you've seen this figure, is it?

10   A.  No.

11   Q.  All right.  And do you have any information at all that

12   would contradict how Dr. Hayes has positioned Mr. McGee under

13   the back pipe and his leg touching the front pipe as he

14   crouches down to try to make the cut?

15   A.  I don't have an opinion.

16   Q.  Okay.  Do you know what any of these distances were

17   between these pipes?

18   A.  I have what was in the discovery provided to me.  There

19   seemed to be disagreements about it, but generally I think it

20   was certainly less than 2 feet from what I recall.

21   Q.  Okay.  Do you recall 18 inches?

22   A.  I think that I remember that number --

23   Q.  All right.

24   A.  -- from the testimony.

25   Q.  Now --

1          THE COURT:  Are you adopting that number, or you

2     just remember that as one of the numbers from the testimony?

3     A.  I remember that as one of the numbers.

4          THE COURT:  Okay.

5     BY MR. WALSH:

6     Q.  You have testified in the case about the co-workers in

7     both Stout and McGee and how they did not know about putting

8     carbide-tipped saw blades on, correct?

9     A.  I testified that they weren't aware that it was a misuse

10    to apply a carbide-tipped blade to the saw.

11    Q.  Yesterday, when you went through the list of depositions,

12    as I count, how many of the people did you read off from

13    Jingoli actually used cut-off machines?

14         THE COURT:  Are we going back to page one of his

15    expert report?

16         MR. WALSH:  Yes, this would be --

17         THE COURT:  Let's look at it.

18         MR. WALSH:  This would be Plaintiff's-4 from

19    yesterday.

20         (Plaintiff's Exhibit-4 previously marked for

21    identification)

22         THE COURT:  P-4, page 1, list of  deps reviewed.  In

23    which case?

24         MR. WALSH:  This would be in the McGee case.  It

25    would be Items 4 and 5.

1   BY MR. WALSH:

2   Q.  How many of those people --

3           THE COURT:  Just a second, 5 is the Stout case.

4           MR. WALSH:  Yes, you're right.  It's Item 4.

5           THE COURT:  Okay.

6   BY MR. WALSH:

7   Q.  In Item 4, how many of the people listed at Jingoli

8   actually used cut-off machines?

9   A.  From my recollection?

10  Q.  Yes, sir.

11  A.  And this may not be all of them, but Antonio Rivero

12  (phonetic), Robert McGee, Stephen Caldwell, I think were the

13  ones that I was certain of.

14  Q.  Okay.  So those three actually used cut-off machines.

15  A.  Those were the three that I can recall.

16  Q.  All right.  And do you remember Mr. Rivero -- did Mr.

17  Rivero use carbide-tipped saw blades on cut-off machines?

18  A.  Yes.

19  Q.  Do you recall his testimony about what tool he used to cut

20  HDPE pipe with?

21  A.  I thought I --

22          THE COURT:  Just a second.  That's a different

23  question, right?

24          MR. WALSH:  Yeah, well, it's a followup.

25  BY MR. WALSH:

Kalsher - Cross                    37

1   Q.   Do you recall Mr. Rivero testifying that he used chainsaws

2   to cut HDPE pipe, not cut-off machines?

3   A.   I believe he testified that he did that, but I think I

4   remember testimony in this case -- or discovery materials in

5   which Mr. Rivero reportedly was using that same saw earlier

6   that day.

7   Q.   All right.  Let me ask you this.  You named three people

8   from Jingoli that used cut-off machines and used a carbide-

9   tipped saw blade, correct?

10  A.   Three that I can remember --

11  Q.   Okay.

12  A.   -- and three that used a carbide-tipped blade on the

13  subject saw.

14  Q.   All right.  Jingoli's a huge construction company with

15  many crews, is it not?

16  A.   It's a large construction company, yes.

17  Q.   Many machines?

18  A.   Yes.

19  Q.   Do you know anybody else in the company that used a

20  carbide-tipped saw blade on a cut-off machine?

21  A.   I don't personally know.

22  Q.   Okay.  Let's go to Stout.  Another huge construction

23  company, correct?

24  A.   Tilcon, I believe.

25  Q.   Tilcon.  Multistate?

1   A.  Yes.

2   Q.  Even international?

3   A.  I don't know about that, but I know it's a large company.

4   Q.  A lot of cut-off machines?

5           THE COURT:  I'm sorry.  What's the name of that

6   company?  This is Stout, his employer?

7           MR. WALSH:  Yes.  Tilcon, T-I-L-C-O-N.

8   BY MR. WALSH:

9   Q.  Big employer, lots of machines?

10  A.  Do they have or do they own?

11  Q.  Did they at the time that you investigated that accident,

12  did they own a lot of cut-off machines?

13  A.  I don't remember how many, but yes, they did own a lot of

14  machines.

15  Q.  How many people can you name from Tilcon in that company

16  with all those machines that used a carbide-tipped saw blade

17  on a cut-off machine?

18  A.  Again, I'm here to testify specifically about the facts of

19  McGee.  I used the Stout material certainly as background, but

20  I don't recall specifically how many individuals that were

21  deposed in that case and given to me actually used it beyond

22  Mr. Stout.

23  Q.  So you don't recall, even though you have testified about

24  Stout and used Stout in your report, you do not have a

25  recollection of anybody else using the cut-off machine with

Kalsher - Cross                                    39

1    the carbide-tipped saw blade?

2              THE COURT:  I'm not going to permit that question

3    because I'm --

4              MR. WALSH:  I'll --

5              THE COURT:  -- not going to required of Dr. Kalsher

6    that his memory be perfect about a case that he's not here to

7    opine on.  If you want to give him time to pour over those

8    kinds of records, that would be fair.

9    BY MR. WALSH:

10   Q.  Okay.  Do you have any idea in the United States, every

11   day, how many Stihl TS 400 cut-off machines have been in use?

12   A.  I can't answer that question as you phrased it.

13   Q.  Do you have any idea on work sites across the country how

14   many cut-off machines are in use on work sites in America?

15   A.  Again, per Your Honor's instruction, I can't answer that

16   question --

17   Q.  Okay.

18   A.  -- as you've asked it.

19   Q.  Well, tell me what it is I need to ask you so that you can

20   answer it.  What is it --

21             THE COURT:  Well, let's move through that.  At his

22   deposition, correct me if I'm wrong, he said he doesn't know

23   of any such statistics.  He does not know of any such

24   statistics.

25   A.  Yes.

1            THE COURT:  Is that your answer?

2    A.  Yes.

3    BY MR. WALSH:

4    Q.  Okay.  Have you checked the NEISS data, N-E-I-S-S?

5    A.  Not for this product.

6            THE COURT:  N-E-I-S-S?

7    BY MR. WALSH:

8    Q.  NEISS data is the National Electronic Injury Surveillance

9    System, correct?

10   A.  Yes.

11   Q.  And it records exactly from hospitals and emergency rooms

12   various accidents and categorizes them by tool and type, does

13   it not?

14           MR. PACKIN:  I object to the form.

15   A.  I agree and disagree.

16   BY MR. WALSH:

17   Q.  Okay.  What do you disagree about it?

18   A.  I think it is --

19           THE COURT:  Tell us what you think it has.

20   A.  I think Mr. Walsh asked me that it accurately -- I don't

21   remember the precise working, but that's what troubled me.

22   NEISS basically collects a sampling of data from hospitals on

23   injuries of certain kinds that occur and for people who go to

24   those hospitals.  It's a sampling system.

25   BY MR. WALSH:

1   Q.  Okay.  And it collects, among things like power tools,

2   does it not?

3   A.  It does collect that information.

4   Q.  All right.  Did you check with OSHA?

5   A.  No.

6   Q.  Did you check with the CPSC?

7   A.  No.

8   Q.  Was there any question asked in discovery of this case of

9   Stihl or anybody else about injuries with cut-off machines?

10           MR. PACKIN:  Objection to form.

11           THE COURT:  Just a second.  I've lost you.  Did not

12   check with NEISS or OSHA, or who else?

13           MR. WALSH:  C-P-S-C, Consumer Product Safety

14   Commission.

15           THE COURT:  C-P-S-C for such stats.  Okay, what was

16   your next question, sir?

17   A.  I can't answer the question the way that you've asked it

18   to me.

19           THE COURT:  Well --

20           MR. WALSH:  Let me try to --

21           THE COURT:  But I've stopped him because I need him

22   to place the question again.

23   BY MR. WALSH:

24   Q.  Let me try to rephrase the question.  Anywhere in the

25   discovery record did you come across evidence of other

1   accidents with cut-off machines?

2   A.  In the discovery --

3          THE COURT:  This case.

4   A.  This case.

5   BY MR. WALSH:

6   Q.  Anything you reviewed.  All the depositions.

7   A.  Right.

8   Q.  Including the depositions of Linsbauer and others,

9   anything you may have reviewed -- have you come across any

10  information?

11  A.  About other accidents?

12  Q.  Yes, sir.

13  A.  No.

14  Q.  Is it correct that the only two accidents in the world

15  that you're aware of happening with a Stihl TS 400 cut-off

16  machine and a carbide-tipped blade are Mr. Stout and Mr.

17  McGee?

18         MR. PACKIN:  Object to the form.

19         THE COURT:  I don't think there's anything wrong

20  with the form.

21  A.  Well, I can't answer --

22         MR. PACKIN: My problem is with the -

23  A.  -- that with yes or no.

24         THE COURT:  Just a second.  Wait.  Stop.

25         MR. PACKIN:  My problem is with the "in the world"

1    part.  It gives some implication to the question as if he

2    searched the world.  These are the only two accidents he knows

3    of.  I think that's the proper question.

4            THE COURT:  I think that's a little too detailed of

5    an objection.  I can understand the question.  I'm sure the

6    witness can, too.  He may not be able to answer it, but I

7    think that there's nothing wrong with the form of the

8    question.

9    A.   I'll --

10           THE COURT:  Happening with a carbide-tipped blade

11   and one of these cut-off saws, right?

12   A.  I'm personally aware of those two from the large amount of

13   information I had in these two cases.  I'm not personally

14   aware, but I'm aware from reading, for example, another

15   expert's report in this that lists other cases involving

16   accidents, although I don't have personal knowledge of the

17   details of those.  I also have personal information about

18   another accident involving a Stihl cut-off saw in my local

19   area.

20   BY MR. WALSH:

21   Q.  And is that something that recently you've acquired?

22   A.   I've acquired that over, say, the last five or six months,

23   yes.

24   Q.  All right.  And what Stihl cut-off machine?  Do you know

25   the model?

1   A.   I don't recall.

2   Q.   Do you know any of the circumstances of the accident?

3   A.   Generally, but you asked me the question, I'm just telling

4   you what --

5   Q.   Do you know what --

6   A.   -- my awareness is.

7   Q.   -- cutting attachment was on it?

8   A.   I believe it was one of the authorized blades.

9   Q.   Okay.  Not a carbide-tipped saw blade?

10  A.   No.

11  Q.   All right.  When you questioned all the reading that you

12  did, and you've testified to this yesterday, all the reading

13  you did, the thousands of pages, I think Mr. Packin put it, of

14  depositions on two giant construction companies, Jingoli and

15  Tilcon --

16  A.   Large, do you mean?

17  Q.   I'd prefer the term giant.  Do you have a problem with

18  that?

19           THE COURT:  Don't interrupt the questioning.

20  A.   I'm sorry.

21  BY MR. WALSH:

22  Q.   Did you come across another single construction worker

23  that had been injured with a cut-off machine using a carbide-

24  tipped saw blade?

25           MR. PACKIN:  Asked and answered, Your Honor, I mean

                         Kalsher - Cross                    45

1    --

2    A.  I didn't see any --

3         THE COURT:  Yes, that's been asked and answered.

4    BY MR. WALSH:

5    Q.  All right.  Do you know how many years of combined

6    experience the people that you were talking to at these

7    construction companies had in the construction trades?

8    A.  I wouldn't want to venture a guess.

9         THE COURT:  You mean man years?

10   BY MR. WALSH:

11   Q.  Yes.

12   A.  I would have no way of venturing a guess on that.

13   Q.  Were all of them, to your knowledge, experienced

14   construction workers who had spent years in the construction

15   trades?

16   A.  I would agree with you that most of them had worked for a

17   number of years in the construction trades.

18   Q.  Could --

19        THE COURT:  You're talking about the Deponent

20   workers in this case or Stout?

21        MR. WALSH:  Both.  In both cases.

22   A.  Yes.

23   BY MR. WALSH:

24   Q.  Did any of them even have knowledge of someone else

25   injured with a cut-off machine and a carbide-tipped saw blade?

1          MR. PACKIN:  Object to the form.

2          THE COURT:  I'll permit it.

3          MR. PACKIN:  It lacks a foundation that they were

4    even asked those questions.

5          THE COURT:  I'll permit it.  From your review, did

6    you see any of them providing any knowledge of similar

7    accidents?

8    A.  I didn't see any in the discovery that I reviewed that I

9    recall.

10   BY MR. WALSH:

11   Q.  Okay.  Now, I want to go back to where we were a few

12   minutes ago and you told me Stout and McGee were the cases

13   where you had been retained to assess warnings on a cut-off

14   machine.  Is there any other occasion -- have you ever been

15   retained, litigation or otherwise, to assess warnings on any

16   kind of hand-held gasoline-powered equipment?

17   A.  Other than these two cases, no.

18   Q.  How about any kind of hand-held power equipment, gasoline-

19   powered or not?

20   A.  No.

21   Q.  How about any type of gasoline equipment, whether or not

22   hand held?

23   A.  No.

24   Q.  How about any kind of electrical equipment --

25   A.  No.

                              Kalsher - Cross                    47

1   Q.  -- whether or not hand held.

2   A.  I'm sorry, I didn't let you finish your question.

3   Q.  How about any kind of electrical equipment whether or not

4   hand held?

5   A.  No.

6   Q.  That would include no warnings for things like chainsaws,

7   correct?

8   A.  Correct.

9   Q.  Any kind of lawn and garden equipment?

10  A.  Correct.

11  Q.  Any kind of wood-cutting saws?

12  A.  Correct.

13          THE COURT:  Counsel, he's already answered this

14  question.  Please.

15          MR. WALSH:  Okay.  All right.

16          THE COURT:  And these litany questions are already

17  on paper in the deposition.

18          MR. WALSH:  I understand.

19          THE COURT:  Which you are free to designate.

20  BY MR. WALSH:

21  Q.  Now, have you designed a warning manual or assessed a

22  warning manual for any of that kind of equipment?

23          THE COURT:  Compound.

24  BY MR. WALSH:

25  Q.  Have you ever assessed a warning manual for any kind of

Kalsher - Cross                              48

1   hand-held gasoline-powered equipment outside of McGee and

2   Stout?

3              THE COURT:  Did you understand the question?

4   A.  Yes.  I'm thinking back, and again, I don't know that I'm

5   prepared to comment on this for all of my cases, but I'm sure

6   in the cases that I've been retained in and I've given some

7   testimony that I have looked over, have assessed owner's

8   manuals, product information associated with the products that

9   I've testified about.

10  BY MR. WALSH:

11  Q.  What --

12             THE COURT:  No, the question is limited to that --

13  if you don't mind my saying, that long list of power-type

14  tools.

15  A.  As it relates to the power tools, no.

16  BY MR. WALSH:

17  Q.  Okay.  Have you ever designed or developed an owner's

18  manual for anything?

19  A.  No.

20  Q.  Am I correct that the only time you have designed a

21  warning for any kind of machinery sold commercially was in

22  Ranpak, the case you identified yesterday?  And that's R-A-N-

23  P-A-K, Your Honor.

24  A.  Yes.  I did design the warning for that commercially

25  available product.

1   Q.   And that was what, 10 years ago, approximately?

2   A.   Roughly.

3   Q.   Before Kalsher and Associates?

4   A.   Again, I don't recall how that was juxtaposed with the

5   transition from --

6            THE COURT:   And that's the only warning that you've

7   been hired to design in industry?

8   A.   Correct.

9            THE COURT:   Okay.

10  BY MR. WALSH:

11  Q.   And that was what I'll refer to as a paper-crumbling

12  machine, correct?

13  A.   I don't remember if I referred to it that way in my

14  deposition testimony, but I think I was trying to get a

15  general idea so that you and the other people at the

16  deposition would understand generally what the machine did.

17  Q.   Okay.  The machine you put -- it crumbled up paper that

18  was used as packing material, correct?

19  A.   That's correct.

20  Q.   All right.  So, you put paper in, it crumbled it up.  It

21  was used as packing material.  You designed a single warning,

22  did you not?

23  A.   It was a single warning that went on the shoot on the

24  machine.

25  Q.   And it was basically, keep your hands out of the shoot?

1   A.  That's a good summary of it.

2   Q.  Okay.  In developing the warning you tested it?

3   A.  Yes.

4   Q.  You did candidates and then you tested?

5   A.  Yes, I first developed candidates.  I then subjected it to

6   informal testing at the university to pare down the number of

7   candidates.  And then I tested again the final candidates with

8   a group of construction workers or blue-collar workers.

9   Q.  Machinists, I think you said?

10  A.  Yes.

11  Q.  So, you went out and you found machinists and you tested.

12  Did you use the Z535 protocols for testing in some fashion, or

13  how did you test?

14  A.  I don't recall, because it's 10 years ago, exactly what I

15  did.

16  Q.  All right.  And then, since that time, you have not had

17  any occasion to be asked to design a warning for any type of

18  equipment sold commercially?

19  A.  That's correct.

20  Q.  All of your warnings that you referred to yesterday have

21  occurred in the context of things that you and your students

22  have done as part of studies or research?

23  A.  My colleagues and students and I, yes.

24  Q.  All right.  Now, have any of your studies looked at any

25  product-specific warning?

1           THE COURT:  Any of his studies?

2           MR. WALSH:  Yes.

3           THE COURT:  Are you confining this to published

4     results of studies or are you talking maybe about --

5           MR. WALSH:  That's --

6           THE COURT:  -- seminars in classrooms.

7     BY MR. WALSH:

8     Q.  Well, let's start with that.  Published studies.  Mr.

9     Packin went over a number of published studies with you

10    yesterday.  In any of your published studies, did you look at

11    any product-specific warnings of any sort?

12    A.  Well, each of the warnings that I would have developed

13    would be for a particular product or a situation, so I don't

14    know if you're asking me if I designed them for a particular

15    commercially available product.  There would certainly be

16    different guises, for example, glue was a product used in the

17    study where we were looking at borders.

18          THE COURT:  Looking at borders?

19    A.  At the effect of borders and other enhancement features to

20    test warning effectiveness.  They would all involve something

21    like that.

22    BY MR. WALSH:

23    Q.  Did any of your studies include any type of gasoline-

24    powered tool?

25    A.  No.

1   Q.  Did any, and that's either hand held or not hand held,

2   correct?

3   A.  Well, I think I need to finish my answer on the first one,

4   I think.

5   Q.  Oh, I'm sorry.

6   A.  Were we talking about published studies?  Is that --

7   Q.  That's what we're talking about.

8   A.  Okay, then I have not done any published studies, unless

9   we count the work that I've done in Stout and --

10  Q.  Okay.

11  A.  -- McGee as published.  I've written those out.  But in

12  peer-review journals, if that were the criteria, I have not

13  done that.

14  Q.  You have not, by the way, you have not subjected anything

15  you've done in Stout or McGee any of the warnings that you

16  developed as your candidates -- you have not subjected those

17  to peer review in any way, have you?

18  A.  I have not subjected those to peer review, if we're saying

19  to send that out to people that might be peer reviewers for a

20  journal, but I certainly subjected them to testing that I

21  described yesterday.

22  Q.  And the testing is comparing what you did to the written

23  standards as you interpret them from Z535.4?

24  A.  And to recommendations derived from the empirical

25  literature on warnings.

1   Q.   Literature.  I understand.  You have not done any kind of

2   empirical testing at all, have you?

3   A.   In terms of setting up a formalized study to test Stihl's

4   warnings?

5   Q.   Yes.

6   A.   I have not done that.

7   Q.   You have not tested Stihl's warnings, and you've not

8   tested your candidate warnings, either one?

9   A.   I have not done that.  Not yet.

10   Q.   Okay.

11   A.   Just to clarify, I produced those warnings at your

12   request.

13   Q.   Well, let's talk about that a little bit.  The --

14          THE COURT:  Let me see counsel at the side, please.

15          MR. WALSH:  I'm sorry?

16          THE COURT:  At the side.  And since I'm taking you

17   to the side, we can take a five-minute recess.

18       (Sidebar on the record)

19          THE COURT:  I notice in the depositions that there's

20   a lot of discussion of what Dr. Kalsher refers to as candidate

21   drafts of warnings in the Stout case and in this case, and it

22   appears that he contends that there was this one deposition,

23   maybe in the Stout case, where he was dispatched to a separate

24   room and left there for a couple of hours and told to come up

25   with some designs to fix what he said was wrong with the

1   warnings in that case.  And then he continued to refine those

2   in preparation for future depositions where some of those were

3   discussed until, at some point in the three transcripts of

4   deposition in this case, he said my lawyer; namely, Mr.

5   Packin, not his lawyer, but Mr. Packin, has instructed me not

6   to do any more work on my candidate warnings.  So far, have I

7   got that about right?

8           MR. RUDOLPH:  Up to the last statement.

9           MR. PACKIN:  Magistrate Goodman instructed me to

10   instruct him to do no further work on candidate warnings and

11   to perform no testing of them.

12           THE COURT:  Fine.

13           MR. PACKIN:  I will note that at the time that was

14   entered, I didn't know that the Defense was going to go ahead

15   and take them from the point they were and submit them to

16   testing.  So they were permitted to.  I was not prohibited

17   from.

18           THE COURT:  Well, we'll take that up later.

19           MR. PACKIN:  Okay.

20           THE COURT:  My question is to what degree does

21   either side believe it appropriate to get into this whole

22   issue of candidate warnings at the trial, assuming this

23   witness is permitted to testify?  And if that's a huge issue,

24   so be it, but if the Plaintiff is not planning to use {quote}

25   "candidate warnings" from Kalsher, I'm not sure I would allow

1    cross examination to delve into that and the testing that was

2    done of his draft candidates.

3             MR. PACKIN:  It would --

4             THE COURT:  I'm just trying to cut through this --

5             MR. PACKIN:  Understood.

6             THE COURT:  Because I can foresee we could spend and

7    hour and a half today to no avail on this topic with the

8    witness.

9             MR. PACKIN:  My probable -- although I certainly

10   haven't sat down with trial strategy yet, but having done this

11   in Stout, my probable intention would be to use some aspects

12   of the candidates as illustrative of some of the concepts that

13   he is talking about; however, they were never intended to be

14   final products.  But in the same vein a little bit, I mean, my

15   day is blocked out.  But as far as my hearing of what's been

16   going on, which is fine, maybe 95% of it is verbatim from the

17   briefs and the deposition transcripts.

18            THE COURT:  That's a whole other question.

19            MR. PACKIN:  Yeah, I have no problem with Mr. Walsh

20   doing what he feels he needs to do, but it's there already.

21   Well, I mean, we've got that.  I'm never going to argue that

22   if he doesn't cross examine on it today, it's not in the

23   depositions or it's not in the briefs.

24            THE COURT:  That's a different question.

25            MR. PACKIN:  But probably --

1          THE COURT:  Mr. Walsh, you can respond.  What about

2    these candidate warnings?

3          MR. WALSH:  We think the --

4          THE COURT:  If they are contemplated to be used at

5    all in this case --

6          MR. WALSH:  We think the candidates absolutely

7    illustrate the incompetency of this witness in designing

8    anything.  They're the best proof we have, in a sense, of why

9    he shouldn't be allowed to testify.  What he did was -- well,

10   without -- I can tell the Court what he did, or I can show it

11   through the witness, but basically, he ginned up a series of

12   warnings that once he got to this case and realized that he

13   had made them case specific, he changed again and kept

14   changing, and when you test those things, they test to a

15   comprehension rate of about 26%.  So here's a guy -- and he

16   declared in his deposition that every one of them was

17   adequate.  Every one was adequate, even though untested, and

18   that he would be able to tell by looking at them, essentially,

19   that they were adequate, because he would design them

20   according to Z535.  And they're miserable.

21         MR. PACKIN:  Without all the editorial comment,

22   there are a number of inaccuracies in what Mr. Walsh has said.

23   He was asked to draft candidates.  He stated quite clearly and

24   quite extensively at his deposition, as did I, that to sit in

25   a room with a pencil and paper and try to draft candidates was

1    impossible and demeaned the science of what he does.  He went

2    back -- the deposition was adjourned.  It was late in the day

3    when this occurred.  The deposition was --

4            THE COURT:  This was in Stout?

5            MR. PACKIN:  Correct.  It was adjourned, and when he

6    returned, he presented to me more formalized-looking

7    candidates, with the statement to me that this was an endeavor

8    to try to respond to the request that was made of him, and

9    that they better represented what he would have sketched out

10   in the room.  Now, I had one of two options.  I could have

11   either not disclosed that he had done those to counsel, or

12   disclose them.  And I thought the appropriate thing to do was,

13   and it's on the transcript there, say look, he did these.  I

14   didn't ask him to do it.  He did it, and here they are.  And

15   that led to a bunch of questioning, and then we have what we

16   have here.  The questioning of him was, at his deposition, was

17   whether he thought they were better, and that's a concept I've

18   addressed in our papers.  And this is -- there's nothing here

19   in these statements that aren't the moving papers and in the

20   depositions, but what I pointed out was, he made it clear, he

21   never intended these to be the final product.  He never tested

22   them for that reason.  They required further refinement.  They

23   were meant to be representative of what he was going to do.

24   Now, we come to an important part.  We get precluded -- they

25   move to preclude him from testing them at the same time we

1   don't know that in the background in they were surreptitiously

2   having them tested themselves.  Then they served us a report

3   we didn't know was coming of the tester, and I take his

4   deposition.  And if we go down this route, we're gonna spend a

5   lot of time this afternoon.  We can testify why Mr. Dorris'

6   methodology was fatally flawed.  His methodology was clearly

7   designed to reach the conclusions they wanted him to reach

8   based on the money they paid him to do it.  And he was

9   (indiscern.) about that issue.

10          THE COURT:  I've heard enough.  Mr. Walsh, you have

11   the floor.  You can go into whatever you want.  I do urge you,

12   though, to consider using the alternative of designating

13   portions of the depositions.  Mr. Packin, you are going to

14   have to be allowed some latitude in redirect.

15          MR. PACKIN:  Thank you.

16          THE COURT:  Okay, let's take five minutes.

17          MR. PACKIN:  Just so we're clear, if we do go down

18   that route, because it will require some significant redirect,

19   then we have to make sure we make enough time for that today -

20   -

21          THE COURT:  Yes.

22          MR. PACKIN:  Otherwise, if we don't go down that

23   route, it would limit the amount of redirect I might need,

24   because right now I don't need much, based on what we've done

25   so far.

1            THE COURT:  Well, Mr. Walsh, if you'll just rejoin

2    us.

3            MR. WALSH:  Sorry.

4            THE COURT:  I am not prepared at this moment to

5    think through the chain of consequences of this whole area,

6    but what occurs to me is if this character named, and I mean

7    no disrespect obviously, Mr. Dorris, who has been deposed,

8    right?

9            MR. PACKIN:  Yes, Ma'am.

10           THE COURT:  If he's a perspective witness, and if

11   Dr. Kalsher has not -- I don't know whether Dorris is a doctor

12   also, but anyway --

13           MR. PACKIN:  He is.

14           THE COURT:  Okay, Dr. Dorris.  If Dr. Kalsher has

15   not been permitted to present a rebuttal expert report in

16   response to Dr. Dorris, and if that hasn't been covered by the

17   Magistrate Judge, then I could just see this going on and on.

18   But as I say, I'm not prepared to say where the cutoff line is

19   here.

20           MR. WALSH:  The reason why there was an order is

21   because we came from a period of time from the time that the

22   candidates were produced in Stout until they were attached to

23   the report in November, 9 months later, to the time we deposed

24   him several months after that --

25           THE COURT:  In Stout?

1          MR. WALSH:  No, in McGee.  They were originally

2     produced in McGee --

3          THE COURT:   Stout.

4          MR. WALSH:  -- then when he filed his report in -- I

5     mean in Stout, then when he filed his report in McGee, he

6     attached them to his report.  Then when we got to the

7     deposition of McGee, he provided us a new set, none of which

8     had been tested and well outside the period for submitting

9     expert reports.  Because he said and testified that even

10    though he considered them to be adequate, he intended to test

11    them to refine them even more.  We approached the Magistrate

12    and said, look, the time for filing expert reports is well

13    past for them.  They had the deadline months ago, and he's had

14    these candidates for a year and a half, and we get to the

15    deposition and he says that he has new ones, for the first

16    time, we're seeing today, a year and a half after the fact,

17    and he says he's gonna go out and do more work on them after

18    the deposition's over.  So that shouldn't be permissible.  The

19    Magistrate agreed with us and said that is not permissible.

20    We still had open time for our experts to respond, and so we

21    sent it to an outside agency, Dorris, who sits on the Z535

22    Committee, and had them run a test that was designed to see

23    what would happen with those if you had a non-English-speaking

24    or illiterate worker, which makes up a large amount of the

25    workforce, if they were confronted without the text on it,

1   which they couldn't read anyway, what would be the result of

2   these untested pictorials?  It came back the comprehension

3   rate is dangerously low.

4           THE COURT:  And do you have that as available

5   evidence in this case?

6           MR. WALSH:  We do.

7           THE COURT:  Per the Magistrate Judge's ruling?

8           MR. WALSH:  We do.

9           MR. PACKIN:  I'm not so certain about that, Your

10  Honor.  But what my point is, it seems to me highly

11  disingenuous to move to bar the witness from testing the

12  candidates at the same time you know you're going to undertake

13  to do that same testing and submit an expert report.

14          THE COURT:  Have you rehearsed this entire argument

15  with Judge Goodman?

16          MR. PACKIN:  No.

17          MR. WALSH:  Yes.

18          MR. PACKIN:  No, we have not.  I also don't know if

19  it's actually accurate that they were still within time for

20  their expert reports, I don't --

21          MR. WALSH:  They were served --

22          MR. PACKIN:  Excuse me.  I don't know.  But in any

23  event, my point is, and somewhat is described, I don't know if

24  Your Honor gleaned that from what Mr. Walsh just described, he

25  described some of the aspects as to why Dorris' testing

1   methodology was fatally flawed, but the bottom line is, all of

2   that would get only to the issue of the weight a jury might

3   give to the opinions that this witness has offered, not his

4   qualification to offer them, but --

5            THE COURT:  Well, you have a disagreement there.

6            MR. PACKIN:  Right.  I'm sure we do.

7            THE COURT:  Did you ask the Magistrate Judge, did

8   you, the Plaintiff, ask the Magistrate Judge for permission to

9   submit a rebuttal report by Dr. Kalsher when the report of Dr.

10  Dorris came out?

11           MR. PACKIN:  No.  Because I believe from what we

12  have from his deposition, my only hope is that they do call

13  him as a witness.  I can deal with him on cross examination.

14           THE COURT:  Okay, well, it seems to me, then, that

15  we should not ask Dr. Kalsher to go beyond the four corners of

16  his expert report, and whatever he testified to in the 14

17  hours of deposition.  Even though the Plaintiff didn't get a

18  chance, obviously, to lay out what Dr. Kalsher would say in

19  those depositions, I don't see any reason why I should permit

20  the Plaintiff to redirect about the deficiencies in Dorris'

21  testing.  You can use Dr. Kalsher.  If you get to keep him as

22  an expert, you can use him to inform you how to cross examine

23  Dorris and tear apart Dorris' work.

24           MR. PACKIN:  If counsel questions about the Dorris

25  testing, it would be my position that it would be improper to

Kalsher - Cross                                63

1    preclude me from asking him redirect questions about that

2    testing.  I mean, that has a fearness implication.  Or I would

3    make the application that at this point we should be permitted

4    to not only have him testify, but submit such a report,

5    because to allow them to rely on the testing and tell me I

6    can't cross examine it is similar to allowing them to do the

7    testing but there's an order that says he can't.

8           THE COURT:  I would have to direct you back to the

9    Magistrate Judge to carry on that discussion.  But I'm not

10   going to allow anything in this hearing to support the

11   position of either side on how far this search and destroy of

12   the Dorris testing should go.

13          MR. WALSH:  Okay.

14          THE COURT:  So no matter, Mr. Walsh, whatever you go

15   into, I'm not allowing anything that goes on here to inform

16   what the Magistrate Judge would --

17          MR. WALSH:  No, I understand.

18          THE COURT:  -- be confronted with to decide whether

19   some formal response by Kalsher to Dorris is proper.

20          MR. WALSH:  Understood.

21      (Sidebar ended)

22          THE COURT:  Five minutes.

23      (Court in recess)

24          THE CLERK:  Please rise.

25          THE COURT:  Okay, back in session.  Go right ahead,

1    counsel.

2                    CROSS EXAMINATION (CONT'D)

3    BY MR. WALSH:

4    Q.  Dr. Kalsher, have you ever in your career published a peer

5    review article or study on any power tool warnings?

6    A.  I believe that I have published a paper that was related

7    to a warning that we developed for testing on a circular saw,

8    certainly.

9    Q.  Okay.  And that warning that you're talking about, this

10   was the birdhouse study?

11   A.  There were more than one, but yes --

12   Q.  Okay.

13   A.  That was the setup for the experiment.

14   Q.  And what you --

15            THE COURT:  You have to keep your voice up, sir.

16   Even though he's only that far away, we have to project into

17   the room.

18   A.  Okay.

19   BY MR. WALSH:

20   Q.  And it was a study set up to look at a warning that said,

21   essentially, wear appropriate, protective equipment, correct?

22   A.  Yes.

23   Q.  Okay.  So you had a single warning, and the guise that was

24   chosen for that was to tell people coming in that they would

25   be trying to improve assembly instructions, and then putting

1   the warning using a circular saw to either put the warning on

2   or off and see what they did in response to that warning to

3   wear personal protective gear?

4   A.  Mostly correct.  It's called an incidental exposure

5   paradigm.

6   Q.  Right.

7   A.  And, in addition, we tested out several features,

8   characteristics of the warning --

9   Q.  Okay.

10  A.  -- and assessed various measures of warning effectiveness.

11  Q.  But that warning to wear personal protective gear could

12  have been done on any kind of product.  The fact that a

13  circular saw was chosen had nothing to do with the warning

14  itself; you just needed something that might provide a hazard,

15  correct?

16  A.  Mostly correct, but the warning did have to, in fact, be

17  crafted to be relevant to the hazards associated with that

18  product, but you're correct in that the guise was set up so

19  that we could --

20  Q.  Okay.

21  A.  -- test the warning in that situation.

22  Q.  Okay.  There was no attempt to devise any other more

23  elaborate warnings for that circular saw, it was just wear

24  protective equipment?

25  A.  That was what the warning was designed to do.

1    Q.   Okay.  And so, you weren't trying to assess all of the

2    hazards associated with it and design a warning system

3    appropriate to all of the hazards associated with the saw,

4    correct?

5    A.   No, that was not the purpose --

6    Q.   All right.

7    A.   -- of the study.

8    Q.   And is there any other paper you've ever published that

9    has anything to do with power tools as part of the study?

10   A.   Not that I can recall.

11   Q.   Okay.  You talk in terms of warning systems, do you not?

12   A.   Yes, sir.

13   Q.   Not warnings?

14   A.   Oh --

15   Q.   Not warnings in and of themselves?

16   A.   I talk about both.

17   Q.   Okay.  Warning systems, as you use that term, refers to

18   everything that might provide safety information about a

19   product, as I understand it, am I correct?

20   A.   Generally, yes.

21   Q.   Okay.  That could be on-machine labeling?  That could be

22   one component of it?

23   A.   Yes.

24   Q.   It could be manuals?

25   A.   Yes.

1   Q.  It could include basic education?

2   A.  It could.

3   Q.  It could include web page information?

4   A.  Yes.

5   Q.  It could include training?

6   A.  Yes.

7   Q.  It could include any number of factors that go into the

8   overall system that make up the safety information related to

9   the machine whether or not it actually comes from the machine

10  manufacturer?

11  A.  It could -- yes, it's potentially true.

12  Q.  Okay.  Now, have you ever done a study of how construction

13  workers react to any warning?

14  A.  Okay, now I want to make sure I understand the question

15  correctly.  When you say "study," I've certainly studied a lot

16  of material in the Stout matter and in the McGee matter that

17  relates to the question that you've asked.  I've done that.

18  Have I published a peer-reviewed paper, I have not.

19  Q.  Okay.  You told me there were three people you could

20  remember in McGee that had used the machine and you couldn't

21  remember beyond Stout anybody in Stout, correct?

22  A.  I couldn't remember any particular person's name.

23  Q.  Okay.

24  A.  I know that there were more than Mr. Stout who had used

25  the cut-off saw.  I can't, as I'm sitting here, remember those

1    names or how many there were.

2    Q.  Do you remember how many had used it and used it with a

3    carbide-tipped saw blade?

4    A.  I do not recall --

5    Q.  Okay.

6    A.  -- as I'm sitting here.

7    Q.  But beyond what you've done in connection with these two

8    cases, any reading you may have done in these two cases, have

9    you done any type of compliance, comprehension, or

10   noticeability testing with a target group of construction

11   workers?

12   A.  Certainly, we did some of that testing with the Ranpak

13   sign, but I don't recall 10 years ago exactly what I did for

14   that, but it would have involved those components.

15   Q.  Those machinists?

16   A.  Correct.

17   Q.  In that case.  All right.  Have you done anything with,

18   for example, heavy highway construction?

19   A.  Do you mean, have I developed any warnings or tested

20   warnings?

21   Q.  Yes.

22   A.  No.

23   Q.  How about plumbers?

24   A.  Not to my knowledge.

25   Q.  Steel workers?

1   A.  No.

2   Q.  Heavy construction workers?

3   A.  No.

4   Q.  Brick layers?

5   A.  If brick layers were part of the group that was at either

6   of these two sites, they certainly would have been among the

7   target population that I had information about, but not as a

8   specific trade.

9   Q.  Okay.  Pipe fitters?

10   A.  I would give the same answer.

11   Q.  Pipe layers?

12   A.  Same answer.

13   Q.  You said yesterday you know partially from reading the

14   Stihl materials and case materials who uses cut-off machines,

15   who is it that you know from those readings uses cut-off

16   machines?

17   A.  Certainly the employees at Jingoli and Tilcon used those

18   machines, based on my reading of the discovery materials.

19   Q.  What business was Jingoli in, and what business was Tilcon

20   in?

21   A.  Tilcon was a large construction company.  I believe that

22   they did a lot of road work.  Jingoli, as far as I know, did a

23   lot of different things.  What I focused on in particular was

24   the pipe laying in the GROWS Landfill.

25   Q.  Okay.  Can you name me the trades that use cut-off

1   machines as regularly and routinely?

2   A.   I don't know if I could name specific trades, but

3   certainly the construction workers that were at both of those

4   companies would be considered construction workers that would

5   have maybe special expertise in each of those layers.

6   Q.   Okay.

7   A.   In each of those areas, such as people who deal with

8   concrete, people who are carpenters, and so on.

9   Q.   All right.  You have not done any empirical studies

10  involving specifically targeting construction workers.  Do you

11  know of any studies in the literature where somebody has used

12  a targeted group from the construction trades, choose any of

13  them; highway construction, steelworkers, pipe layers, brick

14  masons, stone masons, electricians, plumbers, where they have

15  targeted and looked at in a compliance, noticeability, and

16  comprehension way, at representative groups from those and

17  looked at the effects of warnings?

18  A.   I don't know for certain that those were targeted groups,

19  although many studies have been done that have looked at, as

20  you have called them, community volunteers, or other studies

21  that maybe I'm not remembering now that would include those

22  people, but the way that you asked the question was so general

23  that I am -- assuming that there would be people from those

24  trades that would be in those studies.

25  Q.   I'm talking --

1             THE COURT:  Just a second, please.  I notice a

2      pattern where the answer is 3 or 4 times longer than the

3      question, and I don't think that's very helpful here.  The

4      question was, do you know of any studies in the professional

5      warnings literature where a target group from any of these

6      specific trades has been studied regarding notice,

7      comprehension, and compliance in relation to the effects of

8      warnings?

9      A.  I can't think as I sit here of any specific study that

10     targeted those groups.

11     BY MR. WALSH:

12     Q.  Have you done any study that has looked at the warnings as

13     interpreted in OSHA-regulated work sites?

14     A.  Not specifically.

15     Q.  Do you know of any study that has looked at warnings as

16     they might affect workers in OSHA-regulated work sites?

17     A.  Not specifically.

18     Q.  Have you done any work to look at warnings as they might

19     affect union workers?

20     A.  No, there would be no reason to do that.

21     Q.  Do you know of anything in the literature that has looked

22     at the effect of warnings and how they might be interpreted by

23     unionized workers?

24     A.  Once again, there's an assumption that union workers

25     somehow, as a group, are different from people generally.

1    Certainly, there are going to be characteristics of people

2    that would be more prevalent in a particular group than

3    others, but the purpose of doing warnings research is to

4    develop warnings that are useful for people generally.

5    Q.  Does experience --

6            THE COURT:  Just a second.  The purpose of

7    developing warnings is to be effective for people generally?

8    A.  People generally, given what I've laid earlier, Your

9    Honor, as characteristics of people as opposed to specific

10   kinds of trades.  They're very different things.

11           THE COURT:  Let me just -- Counsel, I'm going to

12   stop, because I don't want this to veer off into too much

13   vagueness.  I believe you have testified, Dr. Kalsher, that in

14   evaluating the effectiveness of warning for any given product,

15   one of the considerations is what's the prospective user or

16   users of the product?

17   A.  That's correct.

18           THE COURT:  Okay.  So, it's not people generally.

19   It's not, you know, somebody sitting out on a, you know,

20   mountain top somewhere, it is -- you're going to try to

21   identify who might realistically be using this product?

22   A.  Yes --

23           THE COURT:  Right?

24   A.  Your Honor.  That's what I meant by a particular set of

25   characteristics.

1              THE COURT:  So it's not people generally, it's

2   anticipated user --

3   A.  Yes, Your Honor.

4              THE COURT:  -- in a broad sense?

5   A.  Yes, Your Honor.

6              THE COURT:  Okay.  Counsel, with that, you may

7   continue.

8              MR. WALSH:  Thank you.

9   BY MR. WALSH:

10  Q.  And ANSI Z535 anticipates that in the labeling messages

11  that go to, for example, professional workers, that the

12  messages do not always have to contain the hazard, the notion

13  of what the consequences may be, and how to avoid it, as long

14  as the language used in the label indicates to the user group

15  those three things, is that correct?

16  A.  No.

17  Q.  That may not be artfully worded, but essentially, you

18  could use shorthand methods when dealing with professional

19  groups if the professional groups recognize the message?

20  A.  I don't believe that's correct.

21  Q.  You do not believe Z535 allows that?

22  A.  As you stated it, what my understanding is ANSI -- well,

23  I'll let you read whatever you're going to read.

24  Q.  Let me find it.

25       (Pause in proceedings)

1   Q.  All right.  Do you still have Defendant's Exhibit-16 in

2   front of you?  It's the Z535.4 2002.

3   A.  I don't think I have that any more -- oh, wait a minute.

4   Yes, I do, sir.

5   Q.  All right.  And if you would turn to page 15, please?  Do

6   you have it?

7   A.  Page 15, yes.

8   Q.  Yes.  Take a look at Section B, as in Bravo, 3.1, The

9   Content of the Word Message.

10            THE COURT:  B3.4?

11            MR. WALSH:  3.1.

12  BY MR. WALSH:

13  Q.  And it reads, "The word message on a product safety sign

14  typically communicates information to an observer on the type

15  of hazard, the consequences of not avoiding the hazard, and

16  how to avoid the hazard.  Many factors must be considered when

17  determining whether to admit consequence, avoidance, or type

18  of hazard information in the word message.  Factors to

19  consider include whether the message can be inferred from a

20  symbol, other text messages, user training, or the context in

21  which the safety sign is used."  Do you see that?

22  A.  Yes.

23  Q.  Did I read that accurately?

24  A.  Yes.

25  Q.  Okay.  Now, does that say that one or more of those

1    elements can be omitted, depending on the circumstances in

2    which the warning is to be used?

3    A.  Yes.

4    Q.  Okay.

5    A.  I -- did you read the last sentence there, "Factors to

6    include?"  I don't recall if you read that.

7    Q.  I did.

8    A.  Okay.

9    Q.  "Factors to consider include whether the message can be

10   inferred from a symbol, other text messages, user training, or

11   the context in which the safety sign is used."

12   A.  Yes.

13   Q.  All right.  Now, I have here a blowup of the warning, so

14   for ease of reference on the warning label that's on the TS

15   400, let me ask you this.  You commented yesterday, in Mr.

16   Packin's direct exam, about the sequencing of information and

17   which of those sequences did or did not contain references to

18   consequences and avoiding harm, etc., etc.  Have you done any

19   study that would tell you what a professional user of cut-off

20   machines would infer from something that says, "A maximum

21   spindle speed of 5350 rpms" underneath the reference to

22   warning?

23          MR. PACKIN:  Object to the form.  I don't know what

24   the term "professional" user means.

25          MR. WALSH:  Somebody who earns a living with it.

1            MR. PACKIN:  If it's limited to that, that's fine.

2            THE COURT:  Okay.

3    BY MR. WALSH:

4    Q.  Do you have any idea --

5            THE COURT:  A worker user.  How's that?

6    BY MR. WALSH:

7    Q.  What somebody in the construction trades familiar with

8    cut-off machines, have you done any tests to determine what

9    their comprehension of maximum spindle speed 5350 rpms would

10   be?

11   A.  If the question is have I done any study of it --

12   Q.  Uhm-hum.

13   A.  -- as we've defined, no, I've not published any study on

14   that.

15   Q.  Do you know of anybody who has done a study to see what

16   interpretation is placed on a reference like that on a warning

17   label on a hand-held machine like this?

18   A.  No, I don't know of anybody, and I know that Stihl has not

19   tested that either.

20   Q.  Do you know when any of these references -- and by the

21   way, this is a requirement of the B175.4 Cut-Off Machine

22   Standard to include that, is it not?

23   A.  I'm sorry?

24   Q.  That there is a requirement in the B175.4 Cut-Off Machine

25   Standard to include that reference, is there not?

1    A.  Yes, if we're assuming that B175.4 was the appropriate

2    standard in place relating to this accident.

3    Q.  Well, it was required in conjunction with the predecessor

4    standard for cut-off machines also, was it not?

5             MR. PACKIN:  Object to the form.

6    A.  I've already talked about --

7             THE COURT:  There's an objection, so --

8    A.  Oh, I'm sorry.

9             THE COURT:  -- let's pause.  What I glean here is

10   that this cut-off saw ANSI standard essentially expired in the

11   year 2000, and it wasn't reissued until, what 2006?  So, at

12   the time the machine was made, it wasn't in force.  At the

13   time of the accident, the reissue may have been in force.

14            MR. WALSH:  Well, there's two things.

15            THE COURT:  And so, I'm going to ask counsel to

16   address this --

17            MR. WALSH:  Yes --

18            THE COURT:  -- before you can ask him.

19            MR. WALSH:  You want sidebar, or --

20            THE COURT:  Yes, let's do that.

21       (Sidebar on the record)

22            THE COURT:  I mean, the cut-saw ANSI, I can't

23   remember the citation, but the cut-saw ANSI.

24            MR. WALSH:  7.5.

25            THE COURT:  I still don't (indiscern.).

1           MR. PACKIN:  Until it starts to haunt you.

2           MR. WALSH:  As it does me.

3           THE COURT:  All right.  So there was this gap.  But

4    people could still look at it, even if it wasn't effective?

5           MR. PACKIN:  No doubt.

6           MR. WALSH:  There's not a -- well, here's what the

7    record reflects.  The record reflects that administratively,

8    the standard was administratively withdrawn by ANSI in 2000

9    because there was a changeover in the sponsoring groups that

10   sponsored it.  They changed, fell between the cracks.  As one

11   group got up to speed, the other group dropped out.  It was a

12   separation between the grinding wheel people and the machine

13   manufacturing people, and it gapped.  But, it never ceased

14   being used as the standard, and UL, which certifies these

15   machines as compliant with the ANSI standards, continued to

16   issue the compliance standard all through that period.  The

17   (indiscern.) machine had the ANSI UL certification on it

18   certifying that it complied with ANSI B7.5.

19           THE COURT:  Okay.  So, is there no issue, then,

20   between the two sides, that the 7.5 was guidance to the

21   industry, even though it wasn't officially in a state of

22   promulgation during 2003?

23           MR. PACKIN:  My position is there is no reason for

24   people to ignore the former existence as an in-force ANSI

25   standard.  When I say in force, it's not in force at all, but

1   the correspondence from ANSI simply states in 2000 it was

2   withdrawn because of failure to review it and update it as

3   required every 10 years.  So, our position is --

4           THE COURT:  And then it's issued in 2006?

5           MR. PACKIN:  It's six years later.  Six years later.

6   So, our position has been, in Stout and in our expert reports,

7   we haven't gotten to that expert today, he's not here today,

8   and our position has been certainly it existed.  It was there,

9   even if administratively withdrawn.  UL continued to certify

10  products --

11          THE COURT:  Okay, but --

12          MR. PACKIN:  -- but I'm not sure why.

13          THE COURT:  You're not answering my question.  Is

14  there any disagreement between the two sides as to whether we

15  should look at the ANSI Standard 7.5 and say, you know, let's

16  consider that to be useful guidance for what's adequate?

17          MR. PACKIN:  I have no position that we shouldn't

18  look at it.  My objection was because we shouldn't refer to it

19  as in conjunction with, as if there's somehow a bridging of

20  that gap.  The simple fact is, there was no in-effect ANSI

21  standard in 2003 for cut-off saws (indiscern.).

22          THE COURT:  If you go before a jury, does it make --

23  so what?  Does it make any difference?

24          MR. PACKIN:  It does, because 2000, when this one

25  was withdrawn without having been reviewed, it was at least

1   12-15 years old in terms of what it reflected in technology,

2   because to be enacted in 1990, it had to be in the enactment

3   process in the late 80s.

4              THE COURT:  Okay.  So --

5              MR. PACKIN:  In 2006, it's 18-20 years old.

6              THE COURT:  By 2006, is it reissued in a newer and

7   better form, or --

8              MR. PACKIN:  It's modified.  There are changes, yes.

9              MR. WALSH:  And this machine's compliant with it,

10  with the 2006, even though the machine was sold in 2003, the

11  machine is compliant with the 2006 standard.

12             MR. PACKIN:  Well, you all didn't certify it in 2003

13  as compliant with the standard that hadn't been enacted yet.

14             THE COURT:  No, they certified it -- compliant with

15  the old (indiscern.).

16             MR. PACKIN:  I understand that.  And that's --

17             THE COURT:  This is not something that I think we

18  want to -- whatever situation we have with experts -- if we

19  get into this at trial, I'm going to expect to hammer out some

20  kind of a statement so that the jury is not told about this.

21             MR. PACKIN:  That's fair.  That's reasonable, yes.

22  I'm sure you can --

23             THE COURT:  You can ask about any version you want,

24  sir.

25             MR. WALSH:  Thank you.

1            THE COURT:  You both can.

2       (Sidebar ended)

3            THE COURT:  Incidentally, we will take a lunch

4    recess at 1, and we will have just a brief recess whenever

5    anybody wants to have one between now, which is 11:20, and 1.

6            MR. PACKIN:  Just from our official timekeeper, if

7    we take a lunch recess at 1 for an hour, how much time will we

8    be going in the afternoon before we would get to redirect?

9    And right now, I can indicate my redirect appears to be

10   relatively brief, based on what's occurred so far.

11           MR. WALSH:  Well, he went for an hour --

12           THE COURT:  You can consult with each other about

13   that during our next recess.

14           MR. PACKIN:  Okay.

15           THE COURT:  Let's go back.

16           MR. WALSH:  I'm sorry, was there a question pending

17   when we excused the witness?

18           THE COURT:  I don't think that the operator can

19   answer that --

20           MR. WALSH:  Oh, okay.

21           THE COURT:  -- but I can tell you where we were.  Is

22   that all right?

23           MR. WALSH:  That would be very helpful if you would.

24           THE COURT:  Okay.  The last answer that you got was

25   looking at this yellow label, has Dr. Kalsher done any study

1    to tell what a construction worker user of this saw would know

2    and comprehend by what is meant by this item #1 --

3         MR. WALSH:  Right.

4         THE COURT:  -- maximum spindle speed.  And he said,

5    no, I haven't done such a study, and Stihl has not tested that

6    kind of comprehension question either.  And then you brought

7    up the ANSI 7.5 standard and we went to the side.

8    BY MR. WALSH:

9    Q.  Each of these on this warning label that goes on the guard

10   of the machine, each of these first one, two, three, four,

11   five -- five items are all required by the ANSI 175.4 standard

12   enacted in 2006, correct?

13   A.  Yes, as part of the standard.

14   Q.  Okay.  Now, yesterday you were critical of the formatting,

15   but let me ask you a couple of things about this.  First of

16   all, people usually think of things as a beginning, middle,

17   and end, do they not?

18   A.  I have said that, yes.

19   Q.  Yes.  Okay.  And this follows a beginning, middle, and

20   does it not, in the sense of it tells you what you need to do

21   about the wheels that go on the machine, and progresses to a

22   series of things that you do as you get ready to use it and

23   use it?

24   A.  I don't see it that way.

25   Q.  People are used to looking at things in book fashion, left

1   to right -- up and down, left to right, correct?

2   A.   That's generally the case --

3   Q.   Would you --

4   A.   -- when reading a book.

5   Q.   Would you agree with me that this is set up in book

6   fashion, columns read up and down, left to right?

7   A.   Generally speaking, it is set up like a book.

8   Q.   All right.  Would you agree with me that #8 sits at the

9   very top of the second column on the page?  It is not 20 lines

10  down in text.  It's the first warning in the second column?

11          MR. PACKIN:   Object --

12  A.   I partly agree with you.

13  BY MR. WALSH:

14  Q.   What part don't you agree with?

15  A.   I agree with you that #8 appears at the top of the second

16  column, but consistent with what you were saying, that it's

17  written in a book form and people tend to read left to right

18  and up to down, then in fact, it would be further down the

19  list by your logic of how a person would go through that

20  material.

21  Q.   I want you to focus.

22          THE COURT:  Just the position of it, though, is at

23  the top of the second column?

24  A.   I agreed with that.

25          THE COURT:  Okay.

1   BY MR. WALSH:

2   Q.  I want you just to focus on #8 for a moment.

3   A.  Yes.

4   Q.  Just the language.  Is there anything in there that if Mr.

5   McGee had taken the time to read the label, that he would not

6   have known about the dangers or the inappropriateness of

7   putting a carbide-tipped saw blade on this machine?

8            MR. PACKIN:  Your Honor, I object only because that

9   question, or line of questioning, could have no relevancy to

10  the issues we're here about, which is his qualification to

11  testify or the sufficiency and methodology of his experience.

12  It goes to other issues that may be important in the case, but

13  not to what we're here about.

14           THE COURT:  Oh, it's directly relevant, sir.  I

15  don't agree.  He has testified in his report and on direct

16  that the comprehensibility of this paragraph and other

17  paragraphs is, in his view, not good, and also that the format

18  and the organization of the label is not good, including item

19  8 in terms of comprehension.  So, this can be inquired into.

20           MR. PACKIN:  With all due respect, he testified

21  yesterday that because of Mr. McGee's education, he would

22  assume that if he had read it, he probably would have been

23  able to understand it.  It's that nothing made it conspicuous

24  enough to draw his attention to it.

25           THE COURT:  Well, the record will speak for itself.

1    I think this is certainly within the fair scope of direct.

2              MR. PACKIN:   Okay.

3    BY MR. WALSH:

4    Q.  Anything if he'd taken the time to read it, anything that

5    he would not have known about the inappropriateness of using

6    the carbide-tipped saw blade on this machine?

7    A.  I'm assuming that if we have this separate thing, separate

8    from all of the other comments --

9    Q.  I just hand it to you --

10   A.  -- that I made about it --

11   Q.  -- on a piece of paper and say read it, anything he would

12   not have known?

13   A.  I don't know what he would have understood or not, but I

14   have testified that the term "reactive forces" is very

15   general, and I don't know that Mr. McGee or anyone else would

16   understand that that term implied kickback.  There are a

17   number of reactive forces associated with this machine,

18   including the gyroscopic and so, that is incorporated into the

19   reactive forces.

20   Q.  That is something that you could have asked Mr. McGee,

21   could you not?

22   A.  That's something that any party to this litigation could

23   have asked him.

24   Q.  But you're an expert providing opinions.  You were

25   providing them on behalf of Mr. McGee.  Did you ever speak

1   with Mr. McGee?

2           MR. PACKIN:  Object to the form.

3           THE COURT:  That's been covered and covered.

4   BY MR. WALSH:

5   Q.  You never spoke with him, you never asked him whether he

6   knew what reactive forces were or weren't --

7           MR. PACKIN:  Objection.  Asked and answered.

8   A.  I think I've already testified that, that I have never

9   spoken to him.

10  BY MR. WALSH:

11  Q.  Okay.  Have you done any sort of test with any type of

12  construction trades to determine how they interpret reactive

13  forces or how they interpret kick back?

14  A.  I haven't done such testing to determine whether they do

15  or do not understand it nor, it's my understanding, has

16  anybody else, including Stihl, done such testing.

17  Q.  Have you done any empirical testing on this label to

18  measure noticeability, comprehensibility, or compliance?

19  A.  I, as I testified, have tested many features of the

20  warning system against the criteria that I've spoken --

21  Q.  Okay.

22  A.  -- a lot about --

23          THE COURT:  Counsel.  Excuse me.  Dr. Kalsher,

24  that's not responsive, because he's asking you whether you've

25  done or are aware of any empirical studies, and that means

Kalsher - Cross                          87

1   behavioral studies.  Not just what you call testing, which is

2   comparing with the literature and with ANSI.

3   A.  I know of no peer reviewed behavioral studies of this.

4   BY MR. WALSH:

5   Q.  Okay.  And that's something that you could have done,

6   correct?  You could have tested this with a group to determine

7   its noticeability, its comprehensibility, and compliance

8   factors.  You could have done those tests?

9   A.  Not just me, but any of the experts in this case could

10  have --

11  Q.  Okay.

12  A.  -- probably done that.  Or still.

13  Q.  But you are the one testifying against it.  You didn't

14  test it.  You could have tested it?

15  A.  It's possible, yes.

16          MR. PACKIN:  Objection to form.

17  BY MR. WALSH:

18  Q.  And you could have tested this language.  You could have

19  pulled out this language from #8 and tested that also, could

20  you not?

21  A.  Sure.

22  Q.  All right.  Now, is it not a fact --

23          THE COURT:  Let's not go quite that blithely through

24  this.

25          MR. WALSH:  Okay, sorry.

Kalsher - Cross                         88

1   BY THE COURT:
2   Q.  For this.  Sir, you have your academic training,
3   background, and experience in behavioral studies of warnings,
4   right?
5   A.  Yes, Your Honor.
6   Q.  You could design a behavioral study to test the
7   effectiveness of any warning with any type of group?
8   A.  Yes.
9   Q.  You could design a group, you could design a test?
10  A.  Yes.
11          THE COURT:  Okay.   Now you can go ahead.
12  BY MR. WALSH:
13  Q.  And you frequently do that with students and others that
14  you have readily accessible to you, even if you didn't get to
15  the construction trades, correct?
16  A.  Once again, yes, I could set up such and experiment.
17  Q.  All right.  Now, the --
18  A.  I'm sorry, just to finish, I could set up and carry out
19  such an experiment.
20  Q.  And carry out.
21          THE COURT:  And conduct, okay.
22  BY MR. WALSH:
23  Q.  Now, is it not a fact that within the literature that you
24  have referred to repeatedly, it is known that the presence of
25  a warning will reliably raise compliance above a non-warning

 1   control?

 2   A.   Taken on its face, the idea of a main effect versus an

 3   interaction of multiple contributing factors, yes, I agree.

 4   Q.   Okay.  Well, let's look at, if we could -- let's look at

 5   the chapter that you referred the Court to yesterday, which if

 6   I can get -- let Mr. Rudolph know what I want.  Steve, it is

 7   Exhibit-73, please.

 8        (Defendant's Exhibit-73 previously marked for

 9   identification)

10           THE COURT:  Could we go through some formalities

11   before you ask your first question?

12           MR. WALSH:  Just one, unless the Judge wants one.

13   BY MR. WALSH:

14   Q.   I'm going to hand you what's been marked as Defense

15   Exhibit-73, Dr. Kalsher, and ask if you're able to identify

16   that as the chapter from the book that you brought in here

17   with you yesterday, or one of the chapters that you co-

18   authored with the book, Handbook on Warnings?

19   A.   Yes, sir.

20   Q.   Okay.  As I --

21           THE COURT:  Which chapter is it?

22           MR. WALSH:  Chapter 23.

23           THE COURT:  Okay, thank you.

24   BY MR. WALSH:

25   Q.   By the way, have you ever published a paper, a study, as

1   you as the sole author?  Have you ever published a peer review

2   or otherwise anything under your own name, solely?

3           THE COURT:  Other than his Ph.D. thesis?

4   BY MR. WALSH:

5   Q.  Other than your Ph.D. thesis?

6   A.  Yeah, certainly my Master's thesis, my Doctoral thesis.

7   Q.  Right.  Anything else?

8   A.  No.

9   Q.  Anything else has always been co-authored with someone?

10  A.  Yes.

11  Q.  This chapter, as I understand it, the work started around

12  2004?

13  A.  Again, I don't recall exactly when it was started.

14  Q.  Published in 2006?

15  A.  Yes.

16  Q.  So, does that time period seem right, 2004 to 2006 was

17  when you were putting together this material?

18  A.  Well, when you say putting together the material,

19  certainly it was published in 2006.  I don't remember when the

20  formal work on this started.

21  Q.  All right.

22  A.  As for gathering material, I gather material all of the

23  time, so that would have been ongoing much before that.

24  Q.  Okay.  First of all, I want to direct your attention to

25  the early part of this article.  I'm sorry, I'm having a

1    little trouble finding it.  I apologize.

2              THE COURT:  This is the Chapter 23?

3              MR. WALSH:  Chapter 23.

4              THE COURT:  Yes.

5    BY MR. WALSH:

6    Q.  Okay.  If we look on Chapter 23, first page, turn to the

7    very next page in Chapter 23 where we have this little chart

8    at the top; it's page 314 in the book.  Do you see that?

9    A.  Yes.

10   Q.  Okay.  And in the second column, under the title "Presence

11   Versus Absence of Warnings," the second column, do you see

12   that?   "Presence Versus Absence of Warnings."

13   A.  Yes, sir.  I'm with you.

14   Q.  And if you come down in the first paragraphs after

15   discussing compliance literature, you say, "The results show

16   that the presence of a warning" --

17   A.  I'm sorry, could you show me where you are specifically?

18   Q.  Right at the --

19   A.  Yes.

20   Q.  "The results show that the presence of a warning reliably

21   leads to greater compliance than with the absence of a

22   warning."

23   A.  Yes.

24   Q.  Okay.  Now, and then if you turn a little deeper into the

25   chapter -- and that statement, do you believe that to be

1   correct?  That the presence of a warning reliably leads to

2   greater compliance than non-warning?

3   A.  Sure, assuming that the warning is a reasonable warning

4   and not a defective warning.

5   Q.  All right. But that's talking about any warning does that,

6   right?  Arguably leads to greater compliance than a non-

7   warning situation?

8   A.  No, there's an assumption on my part that it's a

9   reasonably well-designed warning, not any warning.

10  Q.  Is there anywhere in the chapter that says that?  Or is

11  there anything in the studies that you cite there that has

12  anything to do with the quality of warning as a control?

13  A.  Not as a control, but since I wrote the book chapter, and

14  I've looked at many, many behavioral studies, I can't remember

15  too many that did that -- didn't at least have a reasonably

16  well-constructed warning.

17  Q.  Turn over to 325.  Page 325.  First row under the heading

18  "Problems Associated with Studying Behavioral Intentions in

19  Compliance."

20          THE COURT:  Okay, just a second.  Problems --

21          MR. WALSH:  Associated with Studying Behavioral

22  Intentions and Compliance.

23  A.  Yes.

24          THE COURT:  Intentions?

25          MR. WALSH:  Intentions.  I'm sorry.  Yes, Ma'am.

1                THE COURT:  And Compliance.  Okay.

2    BY MR. WALSH:

3    Q.  And the first sentence says, "Behavioral compliance is

4    arguably the most important criteria of warning

5    effectiveness."  Do you see that?

6    A.  Yes.

7    Q.  Do you still believe that to be true?

8    A.  Yes, it's arguably the most important criteria, but as I

9    stated on the record yesterday, it's not the only criteria,

10   and the previous criteria are necessary in order for that

11   final component to take place.

12   Q.  Okay.  Well, let me ask you this.  You do not know, do

13   you, what the compliance level with the label and the other

14   safety systems associated with the Stihl cut-off machine are?

15               THE COURT:  Compliance level?

16               MR. WALSH:  Yes.

17               THE COURT:  With warnings?

18   BY MR. WALSH:

19   Q.  We have a safety system that's comprised of on-machine

20   labeling, manuals, web pages, other information.  Do you have

21   any means of telling me what the level of compliance with that

22   safety system is in terms of keeping carbide-tipped saw blade

23   off?

24               THE COURT:  Sorry, sorry.  The question is way too

25   complex --

1            MR. WALSH:  Let me rephrase it.

2            THE COURT:  And if you're talking about delivery to

3     the worker, you need to include that in your question.

4     BY MR. WALSH:

5     Q.  Have you attempted to measure in any fashion, first of

6     all, what degree of compliance is brought about by the warning

7     label that's on the guard of the TS 400?

8     A.  I can't answer that question as you've phrased it.  There

9     are a number of things that you could mean by compliance and

10    behavioral compliance --

11            THE COURT:  Have you tried to measure it?

12    A.  I have not.

13            THE COURT:  No, okay.  Next.

14    BY MR. WALSH:

15    Q.  Okay.  All right.  How about have you tried to measure the

16    compliance created by the pictorial strip on the TS 400?

17    A.  I have not, and I don't know anybody that has.

18    Q.  Have you tried to measure the compliance levels with the

19    warning manual that comes with the TS 400?

20            THE COURT:  The owner's manual?

21            MR. WALSH:  Yes, Ma'am.

22    A.  I would give the same answer.

23    BY MR. WALSH:

24    Q.  How about the safety manual?

25    A.  I would give the same answer.

Kalsher - Cross                              95

1              THE COURT:  Owner's manual?

2              MR. WALSH:  Owner's manual, and then safety manual.

3     It's two separate manuals.

4              THE COURT:  We didn't know that.

5     BY MR. WALSH:

6     Q.  You're aware there are two separate manuals, are you not,

7     that Stihl makes available?

8     A.  Yes, we discussed those yesterday, sir.

9              THE COURT:  I wasn't aware of that yesterday.

10             MR. PACKIN:  It was discussed, Your Honor.

11             THE COURT:  Okay.

12             MR. WALSH:  Could --

13             THE COURT:  I just missed it, then.

14             MR. WALSH:  Could I have, please, exhibit numbers 3

15    and 4?

16         (Defendant's Exhibit-3 previously marked for

17    identification)

18         (Defendant's Exhibit-4 previously marked for

19    identification)

20    BY MR. WALSH:

21    Q.  These are obviously copies and not originals, but I'm

22    going to hand you what's been marked as Defendant's Exhibit-3

23    and ask you if you can identify that as the TS 400 Cut-Off

24    Machine Manual?

25    A.  Shall I keep --

1  Q.  You can keep that with you, if you would, or I can take it

2  out of your way if you want to --

3  A.  Sure.

4  Q.  -- just lay it here, and we can refer to it later.  Number

5  3 is --

6          THE COURT:  Mr. Packin, you're with us here?

7          MR. PACKIN:  Yes, Ma'am.

8          THE COURT:  Okay.  So you don't have any objection

9  to these two -- additions of these manuals?

10          MR. PACKIN:  Well, I don't have any objections.  The

11  Safety Manual, I don't believe, was distributed with the saw.

12  The owner's manual was.  As long as we're clear on the record

13  with that.

14          THE COURT:  We're not clear at all in my mind.  D-3

15  is what?  Safety manual?

16          MR. WALSH:  That's the owner's manual.

17          THE COURT:  Okay.

18          MR. WALSH:  And then D-4 is the Cut-Off Machine

19  Safety Manual.

20          THE COURT:  And counsel, you are representing that

21  these are the two manuals that are associated with the 2003

22  manufactured Stihl TS 400?

23          MR. WALSH:  That is correct?.

24          THE COURT:  Okay.  So, Dr. Kalsher, you can take

25  those representations as correct.

1    A.  Thank you, Your Honor.

2    BY MR. WALSH:

3    Q.  Now --

4              THE COURT:  Now, shall we mark these in evidence?

5              MR. WALSH:  Yes, please.

6              THE COURT:  Okay.  Any objection, Mr. Packin?

7              MR. PACKIN:  As long as the Safety Manual is

8    properly identified as where it comes -- in other words, we

9    don't have identification or representation by Mr. Walsh,

10   although I know what the discovery shows, as to whether that

11   is part of the product safety literature distributed with the

12   machine, or whether it's available through other sources,

13   which is what I know to be the case.

14             THE COURT:  Well, okay.

15             MR. WALSH:  I will represent to the Court that the

16   safety manual is a manual that is available free, either

17   downloaded from the website or from any Stihl dealer, in as

18   many copies as anybody wants.  It's put out there specifically

19   for multi-user situations.

20             MR. PACKIN:  Your Honor, that's testimony.  I'm only

21   asking for identifying it so that we understand what we're

22   doing here.  It's not distributed with the machine.

23             THE COURT:  Okay.  I'm not going to resolve,

24   needless to say, any difference that you may have.  I'm

25   allowing in D-3 in evidence as the owner's manual that relates

1   to this machine, and D-4 is the safety manual that relates to

2   this machine, as the manuals existed in 2003 when the machine

3   was made.  Now, how they got, or whether they got into the

4   hands of anybody is not our concern right now.

5           (Defendant's Exhibit-3 admitted into evidence)

6           (Defendant's Exhibit-4 admitted into evidence)

7               MR. WALSH:  Okay.

8   BY MR. WALSH:

9   Q.  Now, look at Defendant's Exhibit-3, the owner's manual,

10  please.  Yesterday, if I recall, you testified that that

11  manual was approximately 43 pages long before it went into the

12  Spanish-speaking portion of it.  Do you remember that?

13  A.  I don't believe I testified to that.  I remember Mr.

14  Packin asked me if that was my recollection that it was about

15  that length.

16  Q.  Okay.  What is the length of the safety section of the

17  manual?

18              THE COURT:  Just a second.  The safety section of

19  the owner's manual?

20              MR. WALSH:  Of the owner's manual.

21              THE COURT:  Looking at it, okay.

22  A.  Do you mean any safety information, or is there a specific

23  one --

24  Q.  Well, there is a --

25  A.  -- there's nothing --

1   Q.  There is a safety section in the manual.  First thing in

2   the manual, is it not?

3            MR. PACKIN:  Again, please let him finish speaking

4   before he's interrupted.

5   A.  There's a section entitled "Safety Precautions" that is in

6   the Table of Contents as beginning on Page 3 and ending on

7   what would be page 17, since page 18 is the start of the

8   section entitled "Assembling the Bearing and Guard."

9   Q.  Okay.  So the actual safety precautions occur in pages 3

10  through 17, correct?  And you can verify that if you'd like.

11  A.  I would agree with you that there is information presented

12  on pages 3 through 17 in that section entitled "Safety

13  Precautions."

14  Q.  All right.

15            THE COURT:  "Safety Precautions" is the name of it?

16  A.  Yes.

17            THE COURT:  Okay.  Go ahead, Counsel.

18  BY MR. WALSH:

19  Q.  And throughout this manual, in those pages, there are a

20  variety of hazards spoken to, both in text and in pictorials,

21  is that correct?

22  A.  I would agree that there is a presentation of some

23  hazards, safety information generally.

24  Q.  Okay.  Now, let me do this.  This is one of the warnings

25  that appears in the manual.

1          MR. PACKIN:  Would you show me which one so I can

2     find it?

3          MR. WALSH:  It's page 6, I think, Barry.

4          THE COURT:  Page what?

5          MR. WALSH:  6 of the manual.  I'll verify that.  I

6     believe that to be true.

7          MR. PACKIN:  It's correct.

8     BY MR. WALSH:

9     Q.  I'm going to have to hold this up, because it won't fit on

10    our -- I can hold it for you here.  Can you look on page 6 of

11    your manual and verify that this warning appears on page 6

12    under the "Safety Precautions" in the manual?

13         (Pause in proceedings)

14    A.  Yes, that appears to be an accurate representation --

15    BY MR. WALSH:

16    Q.  All right.

17    A.  -- of what's on page 6 of the manual.

18    Q.  Have you done any comprehension testing, noticeability

19    testing, or compliance testing, behavioral testing of that

20    warning?

21    A.  My understanding is that none has been done, and I have

22    not done any.

23    Q.  Reading this, if Mr. McGee had taken the time to read that

24    warning, is there anything you contend he would not have known

25    about the inappropriateness of using carbide-tipped saw blades

1    on the machine?

2    A.  Had Mr. McGee read that, he probably would have understood

3    that it was inappropriate to put wood-cutting blades or tooth

4    blades of any nature on the machine.

5    Q.  Okay.  Now, later, the manual deals with --

6           THE COURT:  Just a second.  Can I just take a look

7    at that text before you cover it up, sir?

8           MR. PACKIN:  Judge, do you want a copy of the manual

9    that they're referring to?

10          THE COURT:  Not right this minute, thank you for the

11   offer, though.

12          MR. WALSH:  Can you read it from --

13          THE COURT:  Yes.  I get it.

14          MR. WALSH:  All right.

15   BY MR. WALSH:

16   Q.  If you would turn in the manual to page 13 --

17          THE COURT:  D-3?

18          MR. WALSH:  This is D-3, yes, Ma'am.

19   BY MR. WALSH:

20   Q.  And confirm for me that this warning appears on page 13 of

21   the manual?

22   A.  Yes, that seems to be an accurate representation of this.

23   Q.  All right.  Have you done any compliance, noticeability,

24   comprehensibility, behavioral testing, of this warning?

25   A.  I would give the same answer as I did to the last one you

1    put up, which is I don't know that any such testing has been

2    done, and I certainly haven't done behavioral testing of it.

3    Q.  I'm not gonna as you the next question for just a moment,

4    because I want to continue with the next warning that follows

5    in the manual on page 14.

6        (Pause in proceedings)

7            THE COURT:  Well, that's -- is that --

8            MR. WALSH:  And is --

9            THE COURT:  Is that a blowup of all of page 14?

10           MR. WALSH:  This is a blowup of page 14 in the

11   manual.

12           THE COURT:  In its entirety?

13           MR. WALSH:  Yes, Ma'am.

14           THE COURT:  Okay, fine.

15   BY MR. WALSH:

16   Q.  Okay?  Now, it says, "Pull away, climbing, pinching, and

17   rotational forces," in this left-hand column, it says, "The

18   most common reactive forces are pull away and climbing.  If

19   the contact is at the bottom of the wheel, a cut-off machine

20   will try to pull away from the operator, pull away.  If the

21   contact is at the front of the wheel, the wheel may attempt to

22   climb the object being cut, climbing.  Pinching occurs when

23   the piece being cut closes on the wheel.  If the wheel is

24   severely pinched at the front, especially in the upper

25   quadrant, the wheel may be instantly thrown up and back toward

1   the operator with great force in a rotational motion.  The

2   greater the force generated, the more difficult it will be for

3   the operator to control the cut-off machine.  Any of the

4   reactive forces can, in some circumstances, cause the operator

5   to lose control of a cut-off machine, allowing a rotating

6   wheel to come in contact with the operator.  Severe personal

7   injury or death can result."  Did I read that accurately?

8   A.  Yes, and I just want to point out that I noticed that this

9   depiction actually is spread across to page 15.  That last

10  column is actually not on page 14.

11  Q.  Okay.  Well, we'll have page 15 following here in a

12  minute.  I thought we had copied one page.  I think you're

13  right.  I think column -- you're right.  This column actually

14  goes over on page 15.  The last one.  Thank you for that.

15          THE COURT:  So we've got three columns of text with

16  its illustrations.

17          MR. WALSH:  With its illustrations.

18  BY MR. WALSH:

19  Q.  And we have a pictorial illustration of a machine with

20  kick back, and we have an illustration of how to properly

21  support a work piece there on that same page, do we not?

22  A.  I would mostly agree, but I would disagree with your

23  editorial about kickback.  It doesn't say kickback there.

24  You're assuming that that's what that depicts.

25  Q.  Okay.

1   A.  Or someone --

2   Q.  I am assuming that depiction.

3   A.  -- would interpret as such.

4   Q.  You did not understand it in that fashion?

5   A.  I didn't say that I didn't, because I have so much

6   involvement in this case.

7   Q.  You don't think somebody reading this column that I just

8   read, looking at that, would have difficulty understanding it?

9          THE COURT:  Could you rephrase your question?  I'm

10  not sure where we are.

11         MR. WALSH:  Yes.

12  BY MR. WALSH:

13  Q.  The -- do you think somebody --

14         THE COURT:  What would the person have understood?

15         MR. WALSH:  I'm sorry.

16  BY MR. WALSH:

17  Q.  Do you think somebody having read the column that I just

18  to read to you --

19         THE COURT:  Column 1?

20  BY MR. WALSH:

21  Q.  Yes, column 1 on page 14, would have difficulty in

22  understanding that pictorial?

23  A.  In the context of the text that applied to it, they may

24  get most of it.  One of the problems is that there is never

25  the word kick back associated with it, which from the many

1    depositions that I've read in both cases seems to be the

2    common terminology that the individuals tend to use for the

3    particular kind of reactive force that we're talking about in

4    this case.

5    Q.  Okay.  When this says, "The" --

6    A.  And I'm not quite done.

7    Q.  I'm sorry.  Go ahead.

8    A.  And really, when you first asked the question, the main

9    problem I had was maybe adjusting it to say the pictograph

10   that's intended to depict kickback.

11   Q.  All right.  Where this column says, "The wheel may be

12   instantly thrown up and back toward the operator with great

13   force in a rotational motion."  Anything that somebody you

14   think would not understand about that?

15   A.  It would depend on who that is.  There's quite a range of

16   people, as I understand it, that will be using the saw, and

17   although Mr. McGee had a high school degree and some college,

18   I would expect that some of the workers, maybe a significant

19   proportion of them, may not even be high school graduates, and

20   so, without testing that, it's not clear to me that the people

21   that would be intended to use this would understand all of the

22   terms in that language.

23   Q.  And you haven't tested it?

24   A.  It's my understanding that it has not been tested, and I

25   certainly didn't do any.

1   Q.  And let's focus on Mr. McGee for a moment.  He's an

2   Assistant Superintendent for a very large construction

3   company, correct?

4   A.  Yes.

5   Q.  He has two years of college education?

6   A.  That's my understanding, yes.

7   Q.  He's worked in the construction trade at the time for 13

8   years?

9        MR. PACKIN:  This has all been asked and answered

10   today.

11        THE COURT:  Yes.  McGee has the demographics that

12   have been established on the record.

13        MR. WALSH:  Okay.

14   BY MR. WALSH:

15   Q.  Now, this warning in the manual goes on to tell people how

16   to reduce the risk of reactive forces, and among other things,

17   it continues here in the third column, going over to the

18   fourth column on the next page that we produced, "Use only

19   cutting attachments authorized by Stihl.  Never used chipped,

20   abrasive wheels, circular saw blades, carbide-tipped blades,

21   rescue blades, or wood-cutting or tooth blades of any nature

22   with a cut-off machine.  The use of such wheels or blades will

23   greatly increase the risk of loss of control and severe

24   personal injury or death from reactive forces since the

25   chipped section of an abrasive wheel or the teeth of a saw

1    blade may catch in the material being cut and generate

2    substantially greater reactive forces.  Cut-off machines are

3    designed for use with abrasive wheels in good condition only.

4    The machines designed for use with wood-cutting or other tooth

5    blades use different types of guarding systems which provide

6    the protection necessary for those types of blades.  Machines

7    such as cut-off machines, which are designed for use with

8    abrasive wheels, require a different guarding system which is

9    not designed to provide protection against all dangers

10   presented by circular saw blades, carbide-tipped blades,

11   rescue blades, or wood-cutting or tooth blades of any nature."

12   Did I read that correctly?

13   A.  Almost.  Middle sentence, you added the plural machines.

14   Machines such as cut-off machine, comma.  It seems to be a

15   typo in the --

16   Q.  Thank you for that correction.

17   A.  -- manual.

18   Q.  Otherwise, did I read it correctly?

19   A.  Yes.

20   Q.  All right.  Anything in that, do you believe, that Mr.

21   McGee, if he had bothered to read this, that he would not have

22   known about the inappropriateness of using carbide-tipped saw

23   blades on a machine, or the dangers of severe personal injury

24   or death if he did so?

25               THE COURT:  This is McGee, himself?

1          MR. PACKIN:  Object to the form.

2          THE COURT:  Yes, Ma'am.

3     A.  I'm sorry, what?

4          MR. PACKIN:  I objected to the form.

5          THE COURT:  McGee, if he read this, would he not

6     understand?

7          MR. PACKIN:  If that was how the question was

8     posited, I would have no objection.  It's the "bothered" that

9     I would object.

10         THE COURT:  Can you rephrase?  Simplify it.

11    BY MR. WALSH:

12    Q.  If Mr. McGee had read this warning, is there anything he

13    would not have known about the inappropriateness of using a

14    carbide-tipped saw blade or the possibility of severe injury

15    or death of he did so?

16    A.  I think Mr. McGee, given his educational level, would have

17    understood most of that, although I can't testify he'd

18    understand it completely or accurately, but --

19    Q.  You raise an interesting question to me, and that is, kick

20    back.  You've used that term kickback.  Have you done any

21    study among construction workers to see their understanding

22    and comprehensibility of the terms "kickback" verus "reactive

23    forces?"

24    A.  I've done no such study.  I merely commented that it was a

25    common theme from reading the deposition transcripts of the

Kalsher - Cross                               109

1    Tilcon employees and the Jingoli employees that that seemed to

2    be the term.  I'm not done yet.

3    Q.  Okay, go ahead.

4    A.  It seems that I don't ever recall hearing the term

5    "reactive forces" or "rotational forces" in any of the

6    deposition testimony of those people.

7    Q.  Well, you heard me use the term in deposing them, reactive

8    forces, many times, did you not?

9    A.  Yes, but I -- so it was elicited on your part.

10   Q.  Anybody have trouble understanding my questions when I

11   asked them about reactive forces as opposed to kick back?

12           MR. PACKIN:  Objection, Your Honor.

13   A.  What you're assuming is --

14           THE COURT:  Discuss.

15   A.  I'm sorry.

16           THE COURT:  I'll permit this.

17           MR. PACKIN:  Well, if I may?  In these depositions,

18   he asked the witnesses if they would agree that when he used

19   the term reactive forces, that he was referring to kick back.

20   So he defined it for them in the beginning.  That's how the

21   depositions proceeded.  I think the transcripts will reflect

22   that.

23           THE COURT:  Okay.  Well, let's not refresh Dr.

24   Kalsher's recollection of that.

25           MR. WALSH:  It's also inaccurate.

 1            MR. PACKIN:  No, it's not.

 2            THE COURT:  Well, what time is it?

 3            MR. WALSH:  Let me -- could I just ask this

 4  question?

 5  BY MR. WALSH:

 6  Q.  Kick back.  Do you know what the term kick back means to

 7  workers who use woodworking tools?

 8  A.  I don't know specifically, if you're asking what the wood

 9  workers would think of it, no.

10  Q.  Well, have you --

11            THE COURT:  Are you talking about trade carpenters?

12  BY MR. WALSH:

13  Q.  Carpenters or anybody who might be using a wood-cutting

14  saw.  Do you know what kick back means to them?

15  A.  I think the general understanding is that it means that

16  the machine will go upward to them in a circular force toward

17  their face.

18  Q.  Have you heard of the term kick back used when the work

19  piece itself, the piece of wood, is kicked back toward the

20  operator when using a wood-cutting saw?

21  A.  Yes.

22            THE COURT:  Upward toward face in the way of the saw

23  moving that way?

24  A.  The saw --

25            THE COURT:  Just a second.

Kalsher - Cross                              111

1  A.  -- and saw blade.

2          THE COURT:  I'm sorry.  We're just -- I think we

3  need to take a break.  Because I could picture a wood-cutting

4  saw that's a table saw -- it would be difficult for the table

5  saw to itself come up and hit you in the face.  I don't know.

6          MR. PACKIN:  Hopefully.

7          MR. WALSH:  That why kickback is used differently

8  among those people.

9          THE COURT:  What five minutes?  Ten?

10          MR. WALSH:  The Court's pleasure.

11          ALL:  Whatever Your Honor wants.

12          THE COURT:  It's ten.

13      (Court in recess)

14                  CROSS EXAMINATION (CONT'D)

15  BY MR. WALSH:

16  Q.  When we broke, I was asking you a question whether you

17  know among the construction trades that use wood-cutting saws,

18  circular saws, bench saws, miter saws, radial arm saws?

19          THE COURT:  I'm just trying to follow this question.

20          MR. WALSH:  Oh, okay.  (Laughs)

21          THE COURT:  Picture these things.

22  BY MR. WALSH:

23  Q.  Do you know what the term kick back or how the term kick

24  back is used in those trades?

25  A.  Yes, we sort of got to it, generally understood the

1   concept that a piece of wood or something you're cutting came

2   -- kicked back.

3   Q.   Okay.

4   A.   But that goes to the issue that kick back can be used in

5   different ways in different sub-populations --

6   Q.   Okay.

7   A.   -- of construction workers.

8   Q.   And do you know within how many of those sub-populations

9   that view kick back as meaning the work piece is ejected from

10  the machine use cut-off machines?

11  A.   I don't know that that's knowable.

12  Q.   Okay.  You assume some do?

13  A.   Some do what?

14  Q.   Some of those trades use cut-off machines?

15  A.   Some may.

16  Q.   Okay.  And do you know of any trade where reactive forces

17  is used for anything other than to indicate machine movement,

18  machine dynamics?

19  A.   By the --

20  Q.   By the --

21  A.   -- manufacturer or --

22  Q.   By the tradesmen who work in it.

23  A.   I don't know of any other -- if there is such a thing, I

24  don't know that they use the term reactive forces as opposed

25  to something else.

1   Q.  All right.

2           THE COURT:  So you don't know whether this term

3   reactive forces is known in the field?

4   A.  Correct.

5           THE COURT:  On the ground?

6   A.  Correct.

7           THE COURT:  In the construction workplace?

8   A.  Yes, Your Honor.

9   BY MR. WALSH:

10  Q.  All right.  I'm continuing with the owner's manual now,

11  and I put another blowup of the next page, which I believe to

12  be 16, in which --

13  A.  I'm sorry.  I don't know that I answered the question

14  accurately, Your Honor.

15          THE COURT:  Try again.

16  A.  Your reaction to what I said was that people on the

17  ground, and I'm differentiating people who might be using the

18  kind of saw that we're talking about here, in the concept of

19  kick back, as opposed to some of the other definitions of kick

20  back meaning a fastened-down machine that might kick back a

21  piece of wood.  It's the same word, but applied to two very

22  different events.

23          THE COURT:  The question was.  Do you know in

24  construction work -- the question was, do you know of any

25  trade where the term reactive forces is used by the tradesmen,

1    by the worker, to indicate anything other than movement of the

2    machine?  And you -- I think your answer was I don't know

3    whether this term reactive forces means anything to people --

4    A.  Yes.

5            THE COURT:  -- working in the construction work

6    place?

7    A.  Yes, Your Honor.

8            THE COURT:  You don't know one way or the other

9    whether reactive forces means anything to them?

10   A.  To them, yes.

11           THE COURT:  Okay.

12   BY MR. WALSH:

13   Q.  I have now put a blowup of the next page in the owner's

14   manual, I believe it's 16.  Let me just grab the manual and

15   verify that.  It's actually 15, I'm sorry.  So, page 15, and

16   it continues --

17           THE COURT:  We're still in D-3, right?

18   BY MR. WALSH:

19   Q.  Yes, D-3, 15, and it carries over to page 16.  So this has

20   two columns that come from 15, the first two columns, and then

21   the third column continues on page 16.  And it has pictorials

22   and other things on the page as well, but it's a warning, "To

23   reduce the risk of injury from reactive forces and/or loss of

24   control" and it goes through a sequence of 13 things you can

25   do to reduce the risk of injury.  Can we agree on that?

1              THE COURT:  In other words, what's on the page?

2              MR. WALSH:  Yes, Ma'am.

3    A.  Yes, I would agree with that's on the page.

4    BY MR. WALSH:

5    Q.  And among there -- it says, for example, "Hold the machine

6    firmly, maintain good balance, position the machine so your

7    body is clear, do not cut above shoulder height, do not cut

8    wood or other material for which the abrasive wheel is not

9    authorized."  And then it says, "Never use circular saw

10   blades, carbide-tipped blades, rescue blades, wood-abrasive

11   blades, or toothed blades of any nature.  Their use increases

12   the risk of injury from reactive forces, blade contact, and

13   thrown tips."  And then it goes on to go through the remaining

14   list of things you can do.

15             THE COURT:  It increases the risk of what?

16             MR. WALSH:  "Increases the risk of injury from

17   reactive forces, blade contact, and thrown tips."

18   BY MR. WALSH:

19   Q.  Did I read that correctly?

20   A.  Yes, sir.

21   Q.  All right.  So now, in the manual itself, in several

22   places starting on page 6 and continuing through the chapter,

23   there are warnings against the use of saw blades and multiple

24   warnings on reactive forces, how to reduce the risk of injury

25   from them, and what they are, correct?

1   A.  Yes, I didn't catch the last part, including what they're

2   for.  I didn't know what you meant by that.

3   Q.  Including what they are.

4   A.  Oh, what they are.

5   Q.  Yes.

6   A.  Yes.

7   Q.  Okay.  Now, is there anything in those warnings, if Mr.

8   McGee had read it, that he would not have understood and known

9   about the inappropriateness of using a saw blade on the TS 400

10  and the potential for severe or fatal injury if he did so?

11         MR. PACKIN:  Just for the record, I make the same

12  objection as before and add to it that since the comparative

13  negligence issue has been removed from the case, I don't know

14  what relevance this could have to the inquiry here today.

15         THE COURT:  It has to with whether the warnings are

16  adequate.  That's our topic today.

17         MR. PACKIN:  That would be if the warnings were

18  analyzed subjectively, which we were told not to do under the

19  case law.

20         THE COURT:  I'll permit it.

21  BY MR. WALSH:

22  Q.  Do you need the question back?

23  A.  If you don't mind rephrasing it, sir?

24  Q.  It's the question we've -- it's the all-encompassing

25  version of the question we've asked about individual ones.

1    Looking at the manual as a whole, if Mr. McGee had read it, is
2    there anything that he would not have known about the
3    inappropriateness of using a carbide-tipped saw blade on a TS
4    400 or the possibility of severe or fatal injury if he did so?
5    A.  All right, in the context of all of the preceding
6    information, I'd say that if he had read all of that material
7    that we've discussed, that he might have a pretty good idea.
8    Q.  Okay.  Are those adequate warnings?
9    A.  Are they accurate?
10   Q.  Adequate.
11   A.  Adequate warnings.  They have a lot of the information
12   that one would need to protect themselves.  I would only say
13   that -- and I have said this repeatedly, that some of the
14   terminology such as reactive forces may not be understood by
15   the population that we're talking about, but in the context of
16   the manual, since there is other information to support it, in
17   that context, and given the fact that the pictorials that
18   we've talked about are surrounded by text, it's probably a
19   pretty good chance that he would understand some of this
20   material.
21   Q.  Is the warning adequate?
22           THE COURT:  You have to answer the question.  But it
23   has to be adequate to the population of expected users, not
24   just to Mr. McGee.  I think that's what you mean by your
25   question, isn't it?

1              MR. WALSH:  It is.

2    A.  Right.  And I'm not ready to say that it was adequate

3    because Mr. McGee had a high school degree and two years of

4    college, and there are likely to be users of this that don't

5    quite have that level of education.  They may not have the

6    level of experience that Mr. McGee had, and so on.  They may

7    have just come to work at Jingoli from the union, as it's my

8    understanding that happens, and under that situation,

9    notwithstanding the fact that they may not have gotten it,

10   there may be people that work in there, and I would assume

11   that there are, that this wouldn't be adequate for.  But if

12   we're talking about Mr. McGee, given what I know about his

13   background education and his experience, he probably would

14   have gotten the information he needed out of this.

15   BY MR. WALSH:

16   Q.  Okay.

17              MR. PACKIN:  Your Honor.

18              THE COURT:  So you --

19              MR. PACKIN:  I'm sorry.

20              THE COURT:  Yes, sir.

21              MR. PACKIN:  Just so we're not going down the wrong

22   road, I don't believe his report says the manual's warnings

23   are inadequate, so I'm not sure why we're going down this

24   road.  We're talking about the on-product warnings and some

25   other issues.

Kalsher - Cross                                    119

1    BY MR. WALSH:

2    Q.  Now --

3             THE COURT:  But his answer is, as to the broader

4    population of reasonably expected users, he has his doubts --

5             MR. PACKIN:  Right.

6             THE COURT:  -- whether this warning would be

7    adequate because of education deficits.  Is that right?

8    A.  Yes.

9    BY MR. WALSH:

10   Q.  And is it fair for me to say that you would have the

11   ability -- you could have tested the warning and determined

12   with behavioral testing whether it was adequate or not, in

13   your view?

14            MR. PACKIN:  Asked and answered.

15   A.  Again, I have the same answer, which I had the capability

16   to do so, but I was not asked to do that in this case.

17   Q.  I understand, but you would be, under your definition of

18   adequacy, you would be able to confirm it if you had done the

19   testing?

20   A.  I would have the same answer.

21   Q.  Okay.  Now, you were first retained in this case in the

22   fall of 2008, correct?

23   A.  I don't remember the specific date.

24            THE COURT:  You can suggest it to him.  Assume.

25   BY MR. WALSH:

1   Q.  Assume that you were retained in McGee and Stout in

2   October 2008.

3              THE COURT:  Both cases?

4              MR. PACKIN:  Then I have a problem with it, Your

5   Honor.  One case preceded the other by a few years.

6              MR. WALSH:  Yeah, but you changed experts.

7              THE COURT:  Don't speak to each other on the record.

8              MR. WALSH:  Yes, Ma'am.

9              THE COURT:  You can speak to each other off the

10  record if it would help.

11             MR. PACKIN:  I have no problem if he shows him some

12  documentation.

13             MR. WALSH:  Well let me do this.  Let's just focus

14  on McGee.

15  BY MR. WALSH:

16  Q.  Assume you were retained by McGee in 2008.

17  A.  Yes.

18  Q.  Do you recall that your report was issued in November,

19  2009?

20  A.  Yes.

21  Q.  November 6th, 2009.

22  A.  Yes, I believe that's correct.

23  Q.  All right.  Do you recall that you were deposed in, I

24  believe it was May of 2010?

25             MR. PACKIN:  Correct.

1    BY MR. WALSH:

2    Q.  That you were deposed in May of 2010?

3           THE COURT:  In this case?

4    BY MR. WALSH:

5    Q.  In this case?

6    A.  Yes.

7    Q.  Okay.  When you filed your report -- and all during that

8    time, at least from October 2008 under that hypothetical,

9    until you were deposed in May, 2010, you had all of this

10   information available?  You had the Stihl manuals.  You had

11   the benefit of the on-product warnings.  You had the safety

12   manuals.  You had the web page.  You had reviewed a DVD.  All

13   of that?

14   A.  Yes.

15   Q.  And is it fair to say that there was nothing preventing

16   you from testing any of it up until the Magistrate's order

17   which was after, subsequent to, your deposition in May of

18   2010?

19   A.  I mostly agree with you, except I want to bring this back

20   to the fact that I objected strenuously to the exercise that

21   you asked me to do.  I did that at your request, to start the

22   -- and I don't want to relive all of that stuff.

23   Q.  I'm talking about the candidates.

24   A.  But it wasn't -- yes, I understand.

25   Q.  I took --

Kalsher - Cross                         122

1    A.  But it wasn't that the behavioral testing that you're

2    talking, yes, I could design such testing, but it wouldn't

3    have changed my opinion.

4    Q.  Okay.  Do you know -- you told me you do not know what

5    level of compliance with, let's just take Warning 8 on the

6    machine, which says --

7            THE COURT:  Item 8 on the yellow sticker --

8            MR. WALSH:  Yes.

9            THE COURT:  -- for the machine?

10   BY MR. WALSH:

11   Q.  "Use only abrasive wheels, including abrasive diamond

12   wheels.  The machine is not a circular saw.  It's not equipped

13   with the guarding appropriate for a circular saw, and it's not

14   designed to cut wood.  Never use carbide tips, wood cutting,

15   or other metal blades.  They can cause severe or fatal

16   personal injury from reactive forces, blade contact, or thrown

17   tips."  Now, all of that was information that you had from the

18   beginning of the case, correct?

19   A.  Yes.

20   Q.  Could that -- I'm not talking about the candidates you

21   developed.  We'll get to those in a minute.  But the warnings

22   provided by Stihl could have been tested by you at any time

23   you so desired?

24   A.  They could have been tested by anybody, including Stihl

25   and I.

1   Q.  All right.

2   A.  And no one had tested those in the way that you're talking

3   about.

4   Q.  And because you have not tested them, you cannot tell me

5   what the level of compliance with, let's just pick out Warning

6   8 on the (indiscern.), what that compliance level is with the

7   current Stihl warnings system?

8   A.  I don't think that's a -- that's not a knowable thing, to

9   know what the level of compliance is without understanding

10  some of the concept that you talked about earlier, as in, how

11  many are out there?  How many people are using those?  One

12  could design a study to get a sample to look at compliance,

13  and if, and only if, you defined what you meant by compliance.

14  Q.  Not putting a carbide-tipped saw blade on the machine.

15  A.  Sure.  One could do a field study like that.

16  Q.  Okay.  And it hasn't been done?

17  A.  To my knowledge, by no one.

18  Q.  Okay.  And certainly not by you?

19  A.  Correct.

20  Q.  All right.  So you don't know, as we sit here, you cannot

21  tell me whether compliance with that is 99%, 75%, 10%.  You

22  don't know what the compliance is?

23  A.  I don't think anybody knows that.

24  Q.  Okay.  You do know of however many machines are out there,

25  take your -- you know, however many -- thousands, tens of

1    thousands, hundreds of thousands, whatever they are, you don't

2    have any indication -- you don't personally have any knowledge

3    of any accidents involving a carbide-tipped saw blade on those

4    machines except the two cases you've been involved in?

5              MR. PACKIN:  Asked and answered several times.

6    BY MR. WALSH:

7    Q.  Correct?

8    A.  Correct.  I've answered that before.

9    Q.  Okay.  And the answer was, that's the two you know about?

10   A.  Those are --

11             THE COURT:  He's already answered it.

12             MR. PACKIN:  Your Honor, that actually wasn't his

13   answer, but --

14             THE COURT:  Right, right, right.  He's already

15   answered it.

16   BY MR. WALSH:

17   Q.  Do you have any statistics that indicate to you that there

18   is a problem with people putting carbide-tipped saw blades on

19   cut-off machines?

20             MR. PACKIN:  Object to the form.

21   A.  Statistical.

22             THE COURT:  I'll permit it.

23   A.  I can't answer the question exactly as you've -- I can't

24   answer it yes or no because what you're getting to is whether

25   or not the frequency with which the prohibited behavior may

1   occur relates to the problem itself.  It's more a problem that

2   we know without any statistical inferences that the severity

3   is such that even though it may be low probability in

4   frequency, and I would agree with that, there's no question

5   that the severity of the injuries that can occur from this are

6   dramatic.

7   Q.  Okay.  Are they any more dramatic than the injuries that

8   can occur from fire?

9   A.  It could be.

10  Q.  Do you know?

11  A.  I don't know.

12  Q.  Do you know what kind of fire injuries can occur --

13  intuitively, do you know that fire can cause severe personal

14  injury or death?

15  A.  Well, I can made some inferences from the material that

16  was given to me, including the warnings that are put at the

17  website, in the manual, and on the saw.  In all those

18  instances you've talked about at the website, the only hazard

19  warned about that is brought out by itself in a black box at

20  every page of STIHL's website regarding cut-off saws, it's the

21  only one that's called out.  With respect to the manual, we

22  spent a lot of time going through the manual, and the section

23  entitled, "Safety Precautions," in which you pointed out

24  multiple places in that, that went from pages 3 to 17, there

25  were numerous pages that called attention to aspects of the

1    hazards that we're talking, as compared to some of the other

2    things on the saw.  As it relates to the yellow sticker that's

3    on the cut-off machine, and we talked about this yesterday, so

4    I'll only mention it briefly, that particular admonition

5    that's listed in point 8 at the top of the second column, is

6    the only warning that mentions severe injury and death, and

7    none of the other ones do.  So, I can make a reasonable

8    inference from that information that certainly the hazard that

9    we're talking about here today is one of the most important in

10   terms of the level of severity.

11   Q.  Okay.  Is it fair to say that severe personal injury or

12   death can result from fire?

13   A.  It could.

14            THE COURT:  Counsel.  This is really -- let's not go

15   into this.  Your question was, do you have any statistics

16   indicating, the way you put it, whether there's a problem with

17   people putting toothed blades on these cut-off machines.  The

18   answer to that was, five minutes' worth of recap of what we've

19   already heard.

20            MR. WALSH:  Okay.

21            THE COURT:  Except that there are no statistics.

22   BY MR. WALSH:

23   Q.  Based on your reading of the materials, is it clear that

24   there are a variety of hazards associated with the use of the

25   machine that could result in severe personal injury or death?

1   A.  I suppose they could, although I would defer to a certain

2   extent to the manufacturer to make their users aware of it in

3   the materials that they provide with this piece of equipment.

4   Q.  And generally, you have many times testified that in order

5   to develop warnings for equipment, you would have to work with

6   the manufacturer in order to be able to properly develop the

7   warnings, is that not correct?

8   A.  I don't think that accurately captures my testimony.

9   Q.  Well, let's take a look then.  Before we actually look at

10  that, can we agree on this?  That in the development of

11  warnings, your view is that testing is important?

12          THE COURT:  Counsel, what's the question?

13  BY MR. WALSH:

14  Q.  That in his view of the development of warnings, testing

15  is important?

16  A.  The concept of testing is important.

17  Q.  Yes.  And that --

18          THE COURT:  There's an inherent ambiguity here

19  because Dr. Kalsher uses the word testing to refer to the body

20  of general principles found in the warnings literature.

21  BY MR. WALSH:

22  Q.  Okay.  Let me -- it's also your view, is it not, that in

23  proper development of warnings, repeated, iterative,

24  behavioral testing is important?

25  A.  As part of it, I want to make sure that we're clear on

1    what I meant by this, which is that certainly during the

2    development of a final warning, you mentioned the word

3    iterative, and I have said that several times during my

4    deposition testimony that once candidates are developed, then

5    iterative testing should take place.  That takes a number of

6    different forms.  One, is there can be some informal testing

7    to reduce the total number for some subsequent testing, and I

8    did some of that in terms of testing the candidates that I

9    developed against the existing standards and the body of

10   literature to which I have referred.  Before any of my

11   warnings, if they were to be used on the machine, yes, I would

12   want to work in conjunction with the manufacturer to do some

13   final testing and tweaking on them to make them not just

14   adequate, but maximally effective.

15   Q.  Do you still --

16            THE COURT:  What kind of testing would you use if

17   you were going to affix a warning to a machine?

18   A.  It would require some systematic behavioral testing that

19   would involve all of the elements that I've been speaking

20   about yesterday and today that meant, are they noticed?  Are

21   they comprehended accurately by the people they're intended

22   for?  Does it support correct beliefs, or offset or correct

23   misbeliefs about it?  And then, do they motivate safe

24   behavior.

25            THE COURT:  And so systematic behavioral testing

1    using live people?

2    A.  Yes.

3              THE COURT:  Right.

4    A.  Before it went on the saw commercially.

5              THE COURT:  So that would be your ultimate step?

6    A.  Yes.

7    BY MR. WALSH:

8    Q.  Do you have your report in front of you?  It was marked, I

9    think yesterday, as one of the Plaintiff's --

10             MR. PACKIN:  4.

11   BY MR. WALSH:

12   Q.  Plaintiff's 4.  Is that still available to you?

13             MR. PACKIN:  I can give him this one.

14   BY MR. WALSH:

15   Q.  Here, Mr. Packin has provided a copy.  Would you turn to

16   page 11 of that report, please?

17   A.  Yes.

18   Q.  On page 11, the first paragraph under the reference to the

19   Oldham blade warning, it starts off and it says, "To determine

20   whether the warning materials associated with the Stihl cut-

21   off saw and Oldham blade, particularly the on-product

22   labeling, are noticeable and comprehensible, and meet other

23   important effectiveness criteria, including whether these

24   materials produce accurate beliefs and motivate safe behavior,

25   prototype versions should be tested using a representative

1    sample of potential users of the product.  If testing

2    indicates that some or all of the safety-related materials

3    fail to meet one or more of the above-mentioned criteria,

4    these materials should be redesigned and retested until

5    satisfactory levels of these criteria are reached.  Systematic

6    testing of the safety-related information provided with the

7    subject saw and blade would provide the manufacturers with

8    necessary information for use in ensuring the accuracy of the

9    respective safety-related materials and labeling."  Now, is

10   that what your report says?

11   A.  Yes.  I don't know whether you said adequacy or accuracy.

12   Q.  Where is that?  Which is it supposed to be?

13   A.  "Systematic testing of the safety-related information

14   provided with the subject saw and blade would provide the

15   manufacturers with necessary information for use in ensuring

16   the adequacy."

17   Q.  Oh.

18   A.  And I think you said accuracy.

19   Q.  Thank you for that correction.  All right, now --

20   A.  I think that more artfully restates what I just stated --

21   Q.  Okay.

22   A.  -- on the record.

23   Q.  You didn't do any of the testing you've suggested there on

24   any of the Stihl warnings, did you?

25   A.  As I indicated, when I was asked to do this case, I

1   compared those against accepted standards in the literature

2   and against the body of empirical literature in the warnings

3   research area.

4   Q.  You have not done any behavioral testing?

5   A.  No, and --

6   Q.  Of any of the warnings?

7   A.  I've done the testing that I talked about, but neither

8   Stihl nor I have done the --

9   Q.  Okay.

10  A.  -- behavioral testing according to that.

11  Q.  And this report says, "To determine whether the materials

12  are noticeable and comprehensible and meet the other criteria

13  prototype, you have to do that."  You're saying in that

14  paragraph, are you not, that you don't know whether they do or

15  they do not unless the testing's done?

16  A.  You can't determine with certainty, yes, with a

17  statistical probability the level compliance, but what I was

18  asked to do with developing my candidates was to show the

19  process through which I would go.  If I were to do the

20  systematic testing that you're talking about, yes, I would do

21  this, and part of the reason that I wrote this in there is

22  that I would expect that Stihl, on their own, would have done

23  the same thing, and it's my understanding that no such testing

24  has been carried out by Stihl.

25  Q.  But in order, you say, in order to make these

1    determinations, the testing is required, do you not?

2    A.  In order to reach a statistical conclusion.  That's

3    different from determining whether those candidates are

4    adequate from the standpoint of comparison to existing

5    standards associated with warnings and what's known in the

6    empirical literature on what makes a warning effective.

7    Q.  Where does statistical appear in that paragraph?  Or in

8    the report, for that matter?  Can you point that out to me?

9    A.  I don't believe that I may have used it, but you asked me

10   the question.  I'm trying to answer it the best that I can.

11   Q.  What standard --

12          THE COURT:  Can I just take the questioning away for

13   a second?

14          MR. WALSH:  Sure.

15          THE COURT:  Just for a second.  This ANSI Z535 says,

16   if you're using pictorials, those should be comprehension

17   tested before they are put on a product?

18   A.  By themselves, yes.

19          THE COURT:  Right.  If they're a standalone

20   pictorial?

21   A.  Yes.

22          THE COURT:  Now, I believe you testified somewhere

23   in the depositions that it's a good thing to do behavioral

24   testing when you have text and pictorials?

25   A.  Yes.

1          THE COURT:  But ANSI has not gone to that standard

2     yet?

3     A.  Yes.

4          THE COURT:  Okay.  But some in the ANSI community

5     aspire to that standard?

6     A.  Yes.  We talked about it as a consensus committee.  What

7     ends up in the standard is the lowest level that can be agreed

8     upon.

9     BY MR. WALSH:

10    Q.  Has the State of New Jersey adopted ANSI Z535 with respect

11    to (indiscern.)?

12    A.  I don't have any way of knowing one way or the other.

13    Q.  What is the standard of adequacy you were using to measure

14    the warning system for Stihl TS machines?

15         MR. PACKIN:  Asked and answered.

16         THE COURT:  We've been through this.

17         MR. WALSH:  No, I don't think we have, Your Honor.

18         THE COURT:  Not here, but in the deposition.

19         MR. WALSH:  Okay.

20    BY MR. WALSH:

21    Q.  Do you know the legal standard for adequacy of a warning

22    in New Jersey?

23    A.  Since my depositions, I have a general understanding of

24    what it is.

25    Q.  Okay.  Prior to your reports, prior to your opinions,

1    prior to your deposition, did you know the legal standard for

2    adequacy in New Jersey?

3    A.  No, because it wasn't relevant to the evaluation that I

4    employed.

5    Q.  You did not do your evaluation of adequacy in reference to

6    the legal standard for adequacy under the Law of New Jersey,

7    is that correct?

8    A.  I'm not here to represent myself as an attorney.  I don't

9    know the law.  I'll leave that to you and Mr. Packin.

10   Q.  Is that correct, in making --

11            MR. PACKIN:  Please don't interrupt the witness

12   while he's talking.

13   BY MR. WALSH:

14   Q.  In making your determinations about --

15            MR. PACKIN:  Can we have some acknowledgment that

16   counsel won't continue to do that?

17            THE COURT:  I will perform the necessary function

18   here.

19   BY MR. WALSH:

20   Q.  In making your determination on opinions of adequacy in

21   this case, you did not do so with reference to the legal

22   standard of the adequacy in the State of New Jersey, is that

23   correct?

24   A.  I've already stated how I did my analysis and writing my

25   report.

1   Q.  And you did not -- you were not trying to determine

2   adequacy under the standard established by New Jersey law,

3   were you?

4   A.  No.

5   Q.  We have a series of articles.  All of those referred to

6   yesterday by you.  Mr. Packin called them to your attention.

7   And I want to discuss some of these with you.  But let me ask

8   you this general, introductory question.  Testing sometimes

9   produces surprises, does it not?

10             THE COURT:  What kind of testing?

11  BY MR. WALSH:

12  Q.  Testing of, for example, in studies you do testing of

13  warnings, whether it's for comprehensibility, compliance,

14  noticeability, and sometimes hypotheses are not proven when

15  you engage in testing, is that correct?

16  A.  Sometimes in -- I would restate that, that when one does a

17  research study, that the results may not be consistent with

18  what you expected or hypothesized at the beginning, and that

19  might be for a variety of reasons.

20  Q.  Okay.  And for example, let's take a look, if I could hand

21  you Defendant's Exhibit-74, which is one of the articles that

22  Mr. Packin had you specifically reference from your CV

23  yesterday.

24      (Defendant's Exhibit-74 previously marked for

25  identification)

1    A.   Yes.

2              MR. PACKIN:  Can I have a copy?  Thank you.

3              THE COURT:  Could I see you at the side, please?

4         (Sidebar on the record)

5              THE COURT:  I'm just curious to know where this line

6    of questioning is going, because you just elicited the

7    testimony that ultimately, before putting a label on a manual

8    or a machine, he would expect -- it would be good practice to

9    do behavioral testing.  He didn't do it here.  The

10   manufacturer didn't do it here.  Now, you're introduction

11   question was, isn't it a fact that sometimes the testing

12   produces unexpected results, which is fine, except if we're

13   not in a realm of testing any of these warnings, why should we

14   be challenging whether the testing is dependable or not?

15             MR. WALSH:  That's really -- I probably gave a very

16   bad question.  What this is, is a series of articles that show

17   a variety of things such as, he was doing testing with

18   pictorials that have no effect.  Color has no effect.  Strobe

19   lights have no effect.  Borders have no effect.  And a fight

20   ongoing within the ANSI Z535 Committee using symbols in the

21   standard that can't pass their own comprehension test.

22             MR. PACKIN:  Aside from --

23             THE COURT:  Well, how does that get us some

24   enlightenment about his qualifications or his report?

25             MR. WALSH:  He testified yesterday that all these

1    enhancements are necessary to the process, and that by not

2    including these enhancements in some fashion, Stihl has

3    inadequately prepared it.  So, it goes to his qualifications

4    in the sense --

5            THE COURT:  Not just qualifications.  To the

6    substance of his opinions.  You're allowed to inquire into

7    that.

8            MR. WALSH:  But, I mean, he's been testifying for

9    two days that there's problems because we didn't engage in

10   enhancements.  He said --

11           THE COURT:  It's not conspicuous.  It's not

12   organized right, that kind of thing.

13           MR. WALSH:  Right, right.  And he's got study after

14   study that shows that the things that he's talking about show

15   no effect in many of the studies.

16           MR. PACKIN:  Besides the lack of any accuracy to

17   those statements, it goes -- none of that would go -- in other

18   words, for example, the case law that says if a Judge

19   determines that an expert's opinions are not strong, the Judge

20   disagrees with them, that's not the criteria.  This might be

21   excellent cross examination in front of a jury in terms of the

22   weight to give to those opinions.  He's told us, there's

23   always discussion in the field about what effects are, and we

24   could spend hours here going through these articles, and what

25   he will tell you, I anticipate, about what those articles

1    truly say, but at the end of the day, since the inquiry is,

2    has he applied, has he drawn on the facts in the case, applied

3    reliable principles and methodology, and they fit the facts of

4    the case.  I mean, then are we really talking about whether

5    there's controversy in the field?  Whether there's other --

6    that goes to the weight the fact finder would ultimately give

7    the opinions.  But, I mean, I'm here -- however, Mr. Walsh

8    wants to use his time is fine, but it just doesn't seem to be

9    appropriate in this context.

10         THE COURT:  It seems to me that the studies you're

11   about to bring out -- I'm just thinking out loud here -- don't

12   necessarily undermine the general principles that the industry

13   espouses, the warnings industry espouses.  They just show that

14   applying those principles to individual situations requires

15   some trial and error.  In other words, we thought this thing

16   was conspicuous enough.  It turns out it didn't call itself to

17   people's attention for whatever reason.  It doesn't mean the

18   thing shouldn't be conspicuous.  It's just this didn't

19   succeed.

20         MR. WALSH:  Well, for example, this gentleman has

21   placed great reliance on Z535.  To the extent Z535

22   incorporates principles that are not supported in the

23   literature, and then incorporates in its own format,

24   pictorials which can't pass its own comprehension test as

25   acceptable, it seems to me that it casts significant question

1    on his reliance on this standard.

2            THE COURT:  Okay, that is clearly stated.  You can

3    do a representative sampling, which I'm sure is all you have

4    in mind.

5            MR. PACKIN:  Hopefully.

6        (Sidebar ended)

7        (Pause in proceedings)

8    BY MR. WALSH:

9    Q.  All right, the first article that I handed you is

10   Defendant's Exhibit-74, which is an article that you are named

11   on, in addition to Michael Wogalter and Marilyn Spunar and

12   Blair Brewster.  This is a peer review article that you wrote,

13   correct?

14   A.  Yes.

15   Q.  This was a time period before you were on any of the Z535

16   committees?

17   A.  Yes.

18   Q.  And in the article, a number of things are stated.

19           THE COURT:  Could we just mark that in evidence?

20           MR. WALSH:  Yes.

21           THE COURT:  Do you mind?

22           MR. WALSH:  Your Honor, we'd offer it in evidence.

23       (Defendant's Exhibit-74 admitted into evidence)

24           THE COURT:  At trial, you can cross examine someone

25   with their own material without marking it in evidence, but

1    let's do it here.

2            MR. WALSH:  Should we --

3            THE COURT:  I'll just listen along for the moment.

4         (Counsel confer)

5    BY MR. WALSH:

6    Q.  All right.  In this, you were actually examining three

7    different warning systems, ANSI, and that was referring to

8    Z535, correct?

9    A.  Yes.

10   Q.  It's also Westinghouse and FMC.  Those were two other

11   systems for formatting and designing warnings, were they not?

12   A.  Yes.

13   Q.  Are they still?

14   A.  The document still exists, but we've sort of moved past

15   that with the different versions --

16   Q.  All right.

17   A.  -- of ANSI over the years.

18   Q.  In column two on this first page of Exhibit-74, it says,

19   "Interestingly, most of the design features described in the

20   standards and guidelines."

21           MR. PACKIN:  I'm sorry, which page?

22           MR. WALSH:  First page.  Column 2.

23           MR. PACKIN:  Okay.

24   BY MR. WALSH:

25   Q.  "Interestingly, most of the design features described in

1   the standards and guidelines --

2            MR. PACKIN:  I'm sorry, which page?

3            MR. WALSH:  First page.

4            THE COURT:  Okay.

5            MR. PACKIN:  Okay.

6   BY MR. WALSH:

7   Q.  "Interestingly, most of the design features described in

8   the standards and guidelines are not based on empirical

9   research.  Thus, it is possible that some of the

10  specifications do not produce the best kind of warnings.

11  Alternate designs that make use of different signal words,

12  other color combinations, and include well-designed icons and

13  pictorials might better signal hazardous conditions."  Did I

14  read that correctly?

15  A.  Yes.  But I think what you're mischaracterizing is they

16  are not based on empirical research.  What I meant by that was

17  there is no empirical research done specifically for the

18  standard.

19  Q.  All right.  Okay.  Not on the standard.  And then over in

20  the discussion section, you find that your study that was set

21  up here confirms some things in the ANSI standard but not

22  others, correct?

23            THE COURT:  Read the sentence.

24  A.  Yes, please.

25  BY MR. WALSH:

1   Q.  Under Discussion.  "Some of the findings confirmed the

2   specifications of the existing ANSI standards (e.g. DANGER

3   received higher hazard ratings than WARNING or CAUTION),

4   whereas others do not.  For example, the standards specify

5   that WARNING be used for greater level hazards than CAUTION;

6   however, the results do not fully confirm this.  While the

7   non-students appear to differentiate between WARNING and

8   CAUTION, the students did not.  Most research to date suggests

9   little or no differentiation between the two terms or their

10  associate colors."  Dropping down now.  "Direct comparison

11  between the different formats suggests that the warning sign

12  Z535.2 configurations are perceived more hazardous than either

13  the warning label standard Z535.4 or the proposed format.

14  This does not mean that either of the latter two systems are

15  inferior to the sign system, because the main issue is whether

16  people discriminate separable hazard levels from the terms and

17  configurations within each set.  All three systems are

18  adequate in this regard, except between WARNING and CAUTION."

19  "Overall."  And I'm dropping down.  "Overall, the results

20  suggest the need for additional systematic testing of warning

21  configurations to determine people's impressions." --

22          THE COURT:  Suggest need for what?

23  BY MR. WALSH:

24  Q.  "Overall, the results suggest the need for additional

25  systematic testing of warning configurations to determine

1   people's impression of them, whether they understand the

2   meaning intended, and their level of effectiveness in

3   eliciting appropriate compliance behavior.  These and other

4   studies could facilitate the development of effective

5   warnings."  Okay.  Was that the conclusion in that?

6   A.  You've read what you read correctly.

7            MR. PACKIN:  Your Honor, I have an objection on a

8   conditional basis.

9            THE COURT:  Do you want to come to the side, or not?

10           MR. PACKIN:  I can do it here.

11           THE COURT:  Okay, fine.

12           MR. PACKIN:  The study's almost 20 years old.

13           THE COURT:  I'm sure.

14  BY MR. WALSH:

15  Q.  Dr. Kalsher, was there a followup study done to this a few

16  years later?

17           THE COURT:  Is this an article in the CV?

18           MR. WALSH:  Yes.

19           THE COURT:  What's the date of it?

20           MR. WALSH:  It should be, let me --

21           MR. PACKIN:  It is --

22           MR. PACKIN:  1995.

23           MR. WALSH:  -- the Annual Meeting of Human Factors

24  and Ergonomic Society, 1995.

25  BY MR. WALSH:

Kalsher - Cross                                144

1   Q.  Was there a followup before the '98 revisions to Z535?

2   A.  I don't recall if we did the followup to that.

3   Q.  Let me see if we can pull it out for you.

4       (Defendant's Exhibit-75 previously marked for

5   identification)

6       (Counsel confer)

7   Q.  Okay, take a look at --

8               MR. PACKIN:  May I see that one, too, please?

9               THE COURT:  D-75, you're offering into evidence?

10              MR. WALSH:  We are.

11              THE COURT:  Any objection?

12              MR. PACKIN:  I need a moment to look at it, Your

13  Honor.

14              THE COURT:  Do you have it?

15              MR. PACKIN:  It was just given to me.

16              THE COURT:  Is this one of your papers, Doctor?

17  A.  Yes, Your Honor.

18              MR. PACKIN:  Other than the similar objection, this

19  one's 15 years old.

20              THE COURT:  Well, D-75 into evidence.  And what date

21  is it?

22                  (Defendant's Exhibit-75 admitted into evidence)

23              MR. PACKIN:  1998.

24              THE COURT:  Thank you.  Go ahead, Counsel.

25              MR. WALSH:  I would note in response, Your Honor,

1   that the machine is nine years old.

2            THE COURT:  What machine?

3            MR. WALSH:  The TS 400 that this indicates was done

4   in 2003, so we're getting pretty close to the time period.

5   BY MR. WALSH:

6   Q.  Okay.  Is this a followup study performed in 1998?

7   A.  It's a similar study, yes.

8   Q.  Similar study.  Different people involved?  Or some

9   different people involved?

10  A.  Yes.

11  Q.  And again, it notes on page 124 of the article of this

12  three-year later date.  "It's noteworthy that most of the." --

13

14  A.  Could I take just a minute, because you're just giving

15  this to me, so I just want to at least --

16     (Pause in proceedings)

17  A.  Yes. Okay.  I'm ready.

18  Q.  All right.  I says, "It is noteworthy that most of the

19  design characteristics described in published standards and

20  guidelines (American National Standards Institute, 1991)."

21  A.  What page are you?

22            MR. PACKIN:  Where are we?

23            MR. WALSH:  I'm on page 134, the first page of the

24  article.

25            THE COURT:  134, or --

1          MR. PACKIN:  The first page is 123.

2          THE COURT:  124?

3          MR. WALSH:  It's 124 --

4          MR. PACKIN:  The first page is --

5          MR. WALSH:  I'm sorry.

6   A.  Okay.

7   BY MR. WALSH:

8   Q.  "It is noteworthy that most of the design characteristics

9   described in published standards and guidelines, that ANSI,

10  FMC, Westinghouse, are not based on empirical research."

11          MR. PACKIN:  Can we read it accurately with the

12  years of those three studies, if we're reading it into the

13  record, since they are 1991, '85, and '81?  I don't think that

14  omission was -- I think that omission is significant.

15          MR. WALSH:  Yes, I think it shows how many years you

16  had studies where nobody was doing any empirical research.

17          MR. PACKIN:  Well, without the editorial comments.

18          THE COURT:  Okay, stop the colloquy right now.

19          MR. PACKIN:  He just left it off.

20          THE COURT:  Counsel, stop the colloquy, both of you.

21  And now we're in recess for lunch.

22          MR. PACKIN:  Thank you.

23      (Court in recess)

24          THE COURT:  Back to work.

25          MR. PACKIN:  Judge, just quickly, before we go on

```
 1   the record --
 2            THE COURT:  Sure, oh, before we go on --
 3            MR. PACKIN:  By my rough calculations --
 4            THE COURT:  Well, let's go on the record.
 5            MR. PACKIN:  Okay.
 6            THE COURT:  We put all our time table on the
 7   records.  Okay.  Yes, Mr. Packin?
 8            MR. PACKIN:  Yes, by my rough calculation, which we
 9   can confirm with Mr. Rudolph, we probably did about three
10   hours of testimony.  We were at it from about 9:35 to 1
11   o'clock, less three short breaks.  So based on what we did
12   yesterday, that would leave about an hour and a half for this
13   afternoon, by my calculation, 4½ hours.
14            MR. RUDOLPH:  All right, there's been about 2 hours
15   and 45 minutes of questioning.  There have been some breaks.
16   I don't know the exact time from yesterday.  It was almost
17   five hours yesterday, total, with Mr. Packin.
18            THE COURT:  So we've done 2½ today?
19            MR. RUDOLPH:  Yeah, 2 hours 45 minutes.
20            MR. PACKIN:  I'm not sure how that -- I mean, I'm --
21            THE COURT:  Okay, Mr. Rudolph, I appointed you
22   timekeeper --
23            MR. RUDOLPH:  Yeah.
24            THE COURT:  -- and I expect a proper reckoning of
25   this at the next break.  Let's continue.
```

1           UNIDENTIFIED SPEAKER:  Thank you.

2           THE COURT:  And I appreciate your taking that duty.

3           MR. WALSH:  Do you have 75, or do I still have that?

4      Oh, I've got it here.

5                   CROSS EXAMINATION (CONT'D)

6      BY MR. WALSH:

7      Q.  When we broke, Dr. Kalsher, I had given you the 1998

8      article that we had marked as Defendant's Exhibit 75 and we

9      had just started to talk about that.  Do you still have it in

10     front of you?

11          (Defendant's Exhibit-75 previously marked for

12     identification)

13     A.  Yes, sir.

14     Q.  All right, it starts off much the same way as the '95

15     article did, saying that standards haven't been based on much

16     empirical research, can we agree on that?

17     A.  In the context of when these were written.  For example,

18     the first one was written in 1995.

19     Q.  Right.

20     A.  And at that point it was fairly early in the development

21     of Morning's research, and 1998 was about the time of the

22     first revision of the ANSI standard.

23     Q.  Well, let's take a look at that.  You still have a chapter

24     and book in front of you from The Handbook on Warnings still?

25     A.  No, no.  Did I -- hang on.

1  Q.  Oh, here it is, here it is.  Is it fair to say that this

2  book, published in 2006, your chapter on behavioral compliance

3  was trying to --

4            UNIDENTIFIED SPEAKER:  Mr. Walsh?  We need to check

5  batteries.

6            MR. WALSH:  I'm sorry.

7            UNIDENTIFIED SPEAKER:  We need to switch the

8  batteries on the (indiscern.) mic.

9            UNIDENTIFIED SPEAKER:  (Indiscern.).

10           MR. WALSH:  Meanwhile --

11           THE COURT:  Okay, you're referring to -- is this

12  book issued an exhibit number?  I think it's in evidence.

13           MR. WALSH:  What's the exhibit number on it?

14           THE COURT:  P --

15           MR. WALSH:  It's 73, Your Honor.

16           THE COURT:  Wait a minute.

17           MR. WALSH:  Defendant's 73.

18  BY MR. WALSH:

19  Q.  This chapter was published in 2006, I think you said.

20  A.  Yes.

21  Q.  And --

22           THE COURT:  Wait, Counsel.  I don't think we dealt

23  with a D-73 so far.  You started in with 74, by my reckoning,

24  and it may be that this book to which you refer is already in

25  evidence as a P exhibit.

1          MR. WALSH:  Well --

2          THE COURT:  If it's not, let's give it --

3          MR. WALSH:  Yeah.

4          THE COURT:  -- a number and describe it.

5          MR. WALSH:  This is a D-73.  This is a copy of the

6    chapter that Dr. Kalsher identified earlier in the morning,

7    and we may --

8          THE COURT:  Chapter 23?

9          MR. WALSH:  It's Chapter 23 of the handbook of

10   warnings, marked as Defendant's Exhibit-73.

11         THE COURT:  And you'd like that in evidence just for

12   convenience now?

13         MR. WALSH:  Yes, Ma'am.

14         THE COURT:  I think the book itself was in evidence

15   yesterday.

16         MR. PACKIN:  Yes, Your Honor, had asked that we copy

17   these chapters, but this has saved us that effort.

18         THE COURT:  Is this just Chapter 23?

19         MR. WALSH:  It is.

20         THE COURT:  Well, it's all very clear now.

21         MR. WALSH:  Okay.

22   BY MR. WALSH:

23   Q.  Dr. Kalsher, when published in 2006, your chapter was

24   intended to be a good perusal of the science, if you will, and

25   the major studies reflecting on that science up to that point?

Kalsher - Cross                          151

1   A.  Up to that point with respect to behavioral compliance.

2   Q.  Oh, compliance.

3   A.  That is, we had talked about several, over yesterday and

4   today, several different measures of effectiveness of which

5   behavioral compliance is just one.

6   Q.  Okay.  I want you to look on, for example, on the studies

7   that you cite on page 316 of that chapter.

8   A.  Yes.

9   Q.  And if we go first, the first study is 1993, then 1994,

10   then 1993, then 1987, then 1992, then 1986, 1995, 1987, 1992,

11   1998, and 1994, correct?

12   A.  Yes.

13   Q.  So all of the studies that you cited at least in that

14   segment of it, and we can go over -- I don't think you can --

15   it's self explanatory and the dates are there, but all of

16   these were from the '80s and '90s that you were citing in 2006

17   --

18   A.  Yes, sir.

19   Q.  -- as the relevant studies, correct?

20   A.  Yes.

21   Q.  Okay, so now when we come back to the article in 1998 --

22          THE COURT:  I just want to make sure that we've

23   marked D-73 in evidence.  Any objection?  No.  In evidence.

24       (Defendant's Exhibit-73 admitted into evidence)

25          MR. PACKIN:  I just -- and for completion, I want to

Kalsher - Cross                          152

1   make sure that I've stated for accuracy the behavioral

2   compliance, which was the focus of this particular chapter is

3   one of several measures of warning effectiveness.

4           MR. WALSH:  I understand.

5   BY MR. WALSH:

6   Q.  And what we're dealing with in 1998, you're still, though,

7   saying that at least up through '98, the major standards out

8   there, ANSI, FMC and Westinghouse, have not been based on

9   empirical research.  That statement was true in May, I take

10  it.

11  A.  FM --

12  Q.  FMC, ANSI 91, FMC 85, Westinghouse 81, still not based on

13  empirical evidence, correct?

14  A.  Empirical evidence specifically for ANSI, yes.

15  Q.  Right.

16          THE COURT:  I'm not able to hear you, sir.  You're

17  speaking only as far as the counsel questioned you.

18  A.  Okay, I will pick up my voice.

19          THE COURT:  So ANSI, as of 1998, it's not clear to

20  me, are we talking about the 1998 version, or just before ANSI

21  1998 came out?

22          MR. WALSH:  Let me clarify that.

23  BY MR. WALSH:

24  Q.  This study was being done just before and while the

25  revisions to the '98 standard in ANSI were going into effect,

1   is that correct?

2   A.  Yes.

3           THE COURT:  Referring to D-74?

4           MR. WALSH:  D-70 --

5           THE COURT:  5.

6           MR. WALSH:  -- 5, yes.

7   BY MR. WALSH:

8   Q.  And, in fact, at the conclusion of this, after this study,

9   you wrote, or Mr. Wogalter wrote a letter to the ANSI

10  committee indicating that there were discrepancies in what

11  ANSI was suggesting in some respects, and suggesting revisions

12  to the standards, correct?

13  A.  Yes.

14  Q.  And those revisions were not made in the '98 standards,

15  were they?

16  A.  That's correct.

17  Q.  They continued, despite what your study was showing as

18  discrepancies in colors and signal words and various elements

19  of the standards, they continued to use what had been in the

20  standards?

21  A.  Let me back up here.  With both of these studies, and this

22  is consistent with what I said yesterday, no given individual

23  study develops a field.  These were two individual studies

24  that focused primarily on very specific elements.  For

25  example, we're talking about signal words and the suggestion

1   was that perhaps there are other ones that we consider, for

2   example, deadly is something, or a certain kind of icon, and

3   also suggested that a move to consolidate the header format

4   that used to be associated with Z535.2 that had a different --

5            THE COURT:  Counsel, you're going to have to stand

6   over there --

7            MR. WALSH:  Yes.

8            THE COURT:  -- because you are drawing all the sound

9   over to --

10            MR. WALSH:  I am creating a problem.

11            THE COURT:  -- past the jury box.

12   A.  It had a different configuration and was harmonized for

13   the reason of making a general layout.  There was a decision

14   to be made on the part of the ANSI committee as to whether or

15   not they would incorporate those changes.  As we have talked

16   repeatedly, ANSI is a consensus standard that tries to agree

17   on, as much as they can, on what's advancing in the field.  In

18   this particular instance we were focused on very discrete

19   kinds of analyses.  For example, in Defendant's Exhibit-74,

20   the first study that was published in 1995 about hazard level

21   perceptions of current proposed warning sign and labels, we

22   did a specific study that yielded a specific result, and as a

23   function of that, Mike wrote a letter, I signed the letter

24   that was sent to them indicating that here are some things

25   that you should consider.  They weighed that against the idea

1    that there should be a uniform layout with the idea towards

2    harmonization with other standards, such as the International

3    Standards Organization version of this, or parallel, which is

4    3864.

5           Similarly, with the one that we're talking about with 75,

6    and I suppose we'll get into it in some detail, it's a similar

7    kind of thing that suggests that there may be some

8    alternatives that we can consider.  In particular, in both

9    studies that I've been involved in with this, there seems to

10   be a consistent finding that the hazard level, connoted by the

11   signal word "danger" is consistently higher than for "warning"

12   and "caution".  Warning and caution reliably produce very

13   small differences in terms of their connoted hazard.  The

14   committee decided, for purposes of standardization, that they

15   wanted to have three levels of hazard words so that they can

16   connote three different levels.

17   BY MR. WALSH:

18   Q.  All right.

19          THE COURT:  So you start with "danger"?

20   A.  "Danger", reliably in the literature, provokes the highest

21   levels of perceived hazardness.  "Warning" is stated to be the

22   second level, but it doesn't reliably come out to be

23   significantly different than the signal word "caution" in

24   terms of perceived hazardness ratings.

25   BY MR. WALSH:

1   Q.   Okay, but the theory is that "danger" is to be used when

2   death will result if you don't avoid a hazard, correct?

3   A.   Yes.

4   Q.   And "warning" is to be used when severe personal injury or

5   death may occur if you don't avoid the hazard?

6   A.   Yes.

7   Q.   And then "caution" is for lesser levels?

8   A.   Yes.  And just like any other field, and I'm being

9   responsive to your question, there was an idea that the word

10  "caution" may be used with or without an alert symbol

11  preceding it in order, to continue, to connote lower level

12  personal injuries as opposed to property damage only.

13  Q.   Okay.

14  A.   So as we move forward, those kinds of changes take place.

15  Q.   Okay.  Now, going back to the article, the '98 article

16  that we marked, I think, as 74, 73?

17          UNIDENTIFIED SPEAKER:  75.

18  A.   75.

19  BY MR. WALSH:

20  Q.   75.  It goes on to say, in the same paragraph, it says

21  they are not based on empirical research.  It says alternative

22  warning designs that make use of non-traditional signal words,

23  color combinations and configurations might better signal

24  hazardous conditions.  In addition, the availability of

25  alternative configurations have in similar hazard connotations

 1   as existing warnings, may be useful in retarding habituation

 2   resulting from repeated exposure to similar warning designs.

 3   A.  Could you tell me what page you're on, sir?

 4   Q.  Yeah, I'm on page 124, same page we were looking at a

 5   moment earlier, same paragraph.

 6   A.  Let me catch up to you, if I may.

 7           THE COURT:  I think I'm losing the flow of this, so

 8   if I could have a copy of D-75, I'll try to catch up.

 9           MR. WALSH:  Do you have a copy there, Steve?  We're

10   on page 124, Your Honor, which if you open that first page you

11   should be looking at, and it's at the top of the page in the

12   first full paragraph.

13           THE COURT:  Okay, let me just see what it's talking

14   about.  I hear the words, but they don't yet --

15           MR. WALSH:  I understand.  It's --

16           THE COURT:  -- sink in.

17      (Pause in proceedings)

18           THE COURT:  It's kind of a lot of big words, but I

19   get it now.

20           MR. WALSH:  Okay.

21           THE COURT:  So you read down to the end of the first

22   full paragraph on page 124?

23           MR. WALSH:  I didn't read everything in that

24   paragraph; I read the majority of the first full top portion

25   of it, and then skipped down to -- or no, I did, I'm sorry, I

1   thought I -- I was in that first paragraph; I read that first

2   paragraph.

3            MR. PACKIN:  Actually, there was a portion that was

4   omitted.  It starts, "When the standards and guidelines were

5   compiled."  I highlighted what was read; it was the sentence

6   that started "It is noteworthy," and the sentence that started

7   "Alternative designs," and the sentence that started, "In

8   addition".

9            MR. WALSH:  Okay.

10  BY MR. WALSH:

11  Q.  Can we skip over to the general discussion section on the

12  paper, Dr. Kalsher, on page 141.

13           THE COURT:  141?

14           MR. WALSH:  Yes, Ma'am.

15  A.  If I could have just a moment, sir.

16           THE COURT:  Under general discussion?

17           MR. WALSH:  Yes, Ma'am.

18           THE COURT:  Okay, give us a moment.

19           MR. WALSH:  And I'm gonna be focusing on the portion

20  that starts at the bottom of the first page, a general

21  discussion that starts, "It is worth noting."

22           THE COURT:  Okay, thank you.  Give us a moment.

23      (Pause in proceedings)

24           THE COURT:  Okay, you may continue.

25  BY MR. WALSH:

1    Q.  Dr. Kalsher, at the bottom of page 141, the paragraph, it

2    starts, "It is worth noting that these findings were

3    submitted," that is, findings of certain discrepancies between

4    the standards and what the study showed, "were submitted to

5    the ANSI Z535 revision committee to help improve the current

6    standard system.  A forthcoming revision of the standards,

7    however, does not include the recommendations provided by

8    these results, nor other research showing discrepancies in

9    people's understanding of signal words (warning and caution),

10   and colors (orange and yellow).  A common argument put forth

11   by advocates of the current signal word hierarchy is that

12   industry workers are familiar with these terms.  Clearly it's

13   beyond the scope of this research to address this possibility

14   directly."  And then it goes on to say, "However, it is worth

15   noting that the data collected from industrial workers mirror

16   the data found with the general on-train population.  Although

17   people might not readily differentiate between warning and

18   caution, we do not believe that one of these two terms, or the

19   colors orange and yellow, should be dropped from use.  Rather,

20   it should be acknowledged that they are synonymous and that

21   they can be used interchangeably."  And he finishes the

22   paragraph, and I'm skipping a little here, "Clearly the design

23   of these materials, which have an important role in preventing

24   acts and injuries, should be based on empirical data, not

25   armchair thinking or tradition, as has been the case

1    heretofore."  Did I read that correctly?

2    A.  Yes, but I think you missed a very important part by

3    skipping over a sentence that you missed.  "This, of course,

4    means that the number of levels of hazard is actually two

5    rather than three.  If three distinct level of hazard desired,

6    then the term deadly, and possibly others, should be

7    considered.  Other research has scaled additional terms that

8    could also be considered."  So --

9    Q.  All right.

10   A.  -- again, I don't see anything that's inconsistent with my

11   opinion so far.  It was one study where we reported some

12   findings, and we wrote a letter to report them.  The ANSI

13   committee decided as a group not to do that, and one of the

14   reasons that they gave is that industrial workers, from their

15   experience, and a number of the members on the ANSI committee,

16   do represent manufacturing interests, and so that is a

17   consideration that when people are familiar with terms, it may

18   be important for consistency purposes.

19       And third, and I think this is an important one, where

20   the mistake is made, it's between warning and the lowest

21   connoted level of hazard --

22   Q.  Okay.

23   A.  -- which is caution, and not between warning and danger.

24   Q.  I am more interested in the general, rather than the

25   specific of this study.  The notion and the acknowledgment

1   that the Z535 standards were not the product, at least through

2   this date, of empirical data, and that empirical research was

3   needed to confirm whether the standards, in fact, were proven

4   or not.  Is it generally true that there was no empirical, or

5   very little empirical data supporting the Z535 standards, at

6   least through this date?

7   A.  I think to a certain extent, that's true, but I don't

8   think that it -- it may have been an overstatement in this

9   article, and Mike -- I'm not trying to run away from my

10   responsibility as I participated in the study, but Mike

11   Wogalter was the first author on this, and he was the person

12   that initiated the letter that you referred to.  I signed onto

13   it because I felt it's important to inform the ANSI committee

14   when we have new findings that might inform them for how they

15   might change their practices.  But I don't see anything

16   inconsistent with what I've been talking about.  This is the

17   results of two small studies.

18   Q.  A statement in a peer review -- this was a peer reviewed

19   paper, was it not?

20   A.  Yes.

21   Q.  A statement in a peer review paper that the standards

22   should be based on empirical data, not armchair thinking, is a

23   pretty strong statement to be something of chance, is it not?

24   A.  That might have been an unfortunate term on Mike's part,

25   and I don't necessarily catch every little thing that happens

1   in these articles.  It's something that can slip by me.

2   Q.  Was there anybody who wrote something in a peer reviewed

3   literature that said you, Mike Kalsher, and you, Mike

4   Wogalter, are full of whatever, that this is not true, there's

5   all kinds of empirical data out there?

6   A.  No.  What I'm saying, and again, it's consistent with what

7   I've been suggesting, is that no empirical testing has been

8   done on the ANSI standard per se, but the recommendations in

9   there do reflect what's known not just from the human factors

10   literature, but the psychology literature in terms of such

11   things as factors that increase conspicuity.

12           THE COURT:  Just a second, you lost me there.  No

13   empirical testing has been done on ANSI standards, per se, but

14   the studies --

15   A.  But the recommendations and the standard itself does

16   reflect what we know from not just the human factors

17   literature, but from the literature such as psychology and

18   communication generally, or even basic fundamental sensory

19   capabilities of people.  For example, I had indicated

20   yesterday that my training in education is in psychology.  One

21   of my jobs has been to write a general psychology textbook

22   that focuses on all of the major areas within the field of

23   psychology.  One of them in --

24           THE COURT:  You are writing what?

25   A.  An introductory psychology textbook.

1            THE COURT:  Uhm-hum, yourself?

2    A.  With a colleague, Robert Barron.  One of the --

3            THE COURT:  Intro psychology?

4    A.  Yes.

5            THE COURT:  Okay.

6    A.  One of the chapters in that book for which I was

7    responsible is on the topic of sensation perception, basically

8    how people detect information from the environment through our

9    various senses, and then how that information is processed by

10   our brain and nervous systems.  Independent of any particular

11   warnings research, it's well established in the field of

12   psychology that conspicuity enhancing features, such as color,

13   shape, size, highlighting and so on, are consistent with the

14   cognitive processing of human beings.

15           THE COURT:  Okay.

16   BY MR. WALSH:

17   Q.  Okay.  You --

18           THE COURT:  Just a second.  All right, I understand

19   your answer.

20   BY MR. WALSH:

21   Q.  You have engaged in a number of studies, have you not,

22   that have looked at the effects of enhancement such as

23   pictorials, strobe lights, color, location, on warnings, have

24   you not?

25   A.  Yes.

Kalsher - Cross                                        164

1              THE COURT:  What's that list?  Strobes --

2              MR. WALSH:  Color --

3              THE COURT:  -- color --

4              MR. WALSH:  -- pictorials, strobe lights, location.

5              THE COURT:  On warnings.

6              MR. WALSH:  On warnings.

7     BY MR. WALSH:

8     Q.  And you have participated -- have you ever participated in

9     a study where the addition of pictorials actually enhanced,

10    showed up as a significant factor in the enhancement of a

11    warning?

12    A.  Mostly, yes.  I'm agreeing with you and I know which

13    studies that you're referring to.  Yes, statistically -- they

14    were not statistically significant, but again, they're one

15    study -- I need to finish my answer.  I'm just --

16    Q.  No, I'm listening, I'm listening.

17    A.  Okay.

18    Q.  Go ahead.

19    A.  One in particular that I'm talking about is where we

20    looked at pictorials in combinations with --

21             THE COURT:  Just a second, finish your sentence.

22    Mostly you found not statistical significance --

23    A.  I'm in agreement that --

24             THE COURT:  -- but --

25    A.  -- it was not --

1              THE COURT:  -- some significance --

2    A.  -- but there was some --

3              THE COURT:  -- of a different nature.

4    A.  Yes, and in particular, in one of the studies that Mr.

5    Walsh is referring to, we looked at as one of several

6    different factors that we were investigating was pictorials.

7    In that particular study we found that when we analyzed those

8    data statistically, and because we were talking about

9    frequency data with respect to compliance, compliance means

10   they complied or they did not, so they get a zero or a one.

11   Frequency data in my field is analyzed using something called

12   a non-parametric statistic called a chi squared.  It

13   essentially looks at whether or not what you observed in terms

14   of the frequencies in each of several categories are

15   significantly different than what you would expect by chance

16   alone, meaning equal numbers --

17             THE COURT:  Correct, uhm-hum.

18   A.  -- in each if nothing is going on.

19             THE COURT:  Right.

20   A.  By that metric --

21             THE COURT:  Results versus chance.

22   A.  Yes.  By that metric, which would be an error rate it my

23   field, and the accepted level is less than a 5% chance of

24   making what is called a Type 1 error, meaning you accept as

25   true the results or a difference when, in fact, it may be due

1    to sampling error.  We use that traditionally.  By that

2    particular metric for that analysis, it showed that the

3    statistical difference was not significant.  However, when you

4    look at what those actual means were for compliance, they were

5    both fairly high.  From my recollection one was 69%, the other

6    one was 81%.  You also have to take into account --

7            THE COURT:  The numbers for compliance --

8    A.  Compliance, where --

9            THE COURT:  In other words, you had a warning.

10   A.  We had a warning.

11           THE COURT:  Were both high in actual numbers.

12   A.  Correct.

13           THE COURT:  With or without a pictorial?

14   A.  With, for that part of the analysis.  There were other

15   factors that we also looked at in there.  This was what was

16   called a between-subject study, meaning that the purposes of

17   looking at this systematically, we randomly assigned people to

18   receive one of the configurations, and then we did our

19   testing.  One of the problems with -- not a problem, but one

20   of the characteristics of a between-subjects design, where a

21   person is in one and only one experimental condition, as

22   compared to a repeated measures or a within-subjects design

23   where every person is in every condition, then you need more

24   subjects in the between-subjects design to demonstrate the

25   significant effect.  The reason is in the calculations --

1          THE COURT:  You need a larger sample size.

2    A.  You need a larger sample size, yes, because there's more

3    error variance or between subjects, variability.

4          THE COURT:  Okay, just a second.  I'm concerned

5    that, you know, this is a level of detail that's not called

6    for.  I know that you're trying to convey these points of

7    information.  You have participated in a study where addition

8    of pictorials was studied, and it didn't produce, at least for

9    the parameters of that study, a statistically significant

10   difference as without pictorials, but you saw that --

11   A.  There was a --

12         THE COURT:  -- warning with and without were, on an

13   actual real count, pretty high.

14   A.  They were both high, and the trend, in terms of the

15   difference, was in the right direction.

16         THE COURT:  Okay, thank you.

17         MR. WALSH:  I will ask to be offered into evidence

18   Defendant's Exhibit #78, which is an article entitled The

19   Influence of Location and Pictorials on Behavioral Compliance

20   to Warnings, which Mr. Packin had the witness testify to

21   yesterday.

22         (Defendant's Exhibit-78 previously marked for

23   identification)

24         THE COURT:  Okay, just a second.  Do you have a

25   number for that?

1              MR. WALSH:  Defendant's 78, Your Honor.

2              THE COURT:  I would like a copy at this point, and

3    are you offering it into evidence?

4              MR. WALSH:  I am.

5              THE COURT:  Any objection?

6              MR. PACKIN:  It looks like it's an accurate copy.

7              THE COURT:  Okay, in evidence, D-78.

8         (Defendant's Exhibit-78 admitted into evidence)

9              MR. WALSH:  Your clerk's not --

10             THE COURT:  You can just toss it right -- thank you.

11             MR. WALSH:  Oh, I'm sorry.

12   BY MR. WALSH:

13   Q.  And I'm just -- in an attempt to -- you can read whatever

14   you want, but it cites in the first column on the

15   introduction, it says, "A second purpose of the study," and

16   I'm adding the terms "of the study."  "The second purpose was

17   to examine whether adding pictorials to a warning influences

18   compliance.  Jane and Bowles reported greater compliance when

19   pictorials were added to a warning in a set of task

20   instructions.  However, Wogalter reported no beneficial effect

21   of pictorials when added to a posted sign."  Was that one of

22   the purposes -- was that a second purpose of this study?

23   A.  What page are you -- oh, I see, I see where you're at now.

24   Q.  First page.

25   A.  Yes.

1  Q.  Okay, and if we then go to the general -- if we go to the

2  discussion section on page 1033 of the last page of the study.

3  Are you on the last page?

4  A.  Yes.

5  Q.  Okay.  It says at the top of that page, "The study failed

6  to find a significant benefit of pictorials, although there

7  was a positive trend of greater compliance when pictorials

8  were presented in the within instruction warning.  However,

9  this trend was non-existent for the questionnaire measures and

10 for all measures comparing to posted sign warning conditions."

11 Do you see that?

12 A.  No, I'm not -- I am very --

13         THE COURT:  It's the paragraph just above general

14 discussion.

15 A.  Oh, above.  Yes, I see now, now I understand where you're

16 at.

17 BY MR. WALSH:

18 Q.  Okay, and then under general discussion, second paragraph,

19 it says, "Interestingly, no effect of pictorials was seen in

20 experiment 2.  Though it does not confirm Jane's and Bowles'

21 finding, it does support a failure to find pictorial effects

22 in other behavioral compliance research," citing Wogalter.

23 And then you say there was a slight trend of higher compliance

24 when the pictorials were included in the task instructions.

25 You see that?

1    A.  Yes.

2    Q.  Okay.

3    A.  And you didn't finish the rest, which is also important to

4    this.  If I may.

5    Q.  Go ahead.

6    A.  "A pictorial effect might have been found had a larger

7    sample of participants been included," which is relevant to

8    what I was talking about with the between-subjects design.

9    "Nevertheless, the failure to find an effect of pictorials

10   should not be taken as evidence pictorials are not a

11   potentially important component of warnings.  For example,

12   pictorials have an important function for populations unable

13   to read verbal commands such as, for example, the illiterate

14   and children.

15   Q.  Okay.

16   A.  I'd also point out that, once again, consistent with what

17   I've been saying, the primary dependent measure of interest

18   here was behavioral compliance, and I've talked about

19   repeatedly the factors that tend to blunt that effect.  There

20   have been a number of other studies that have looked at

21   pictorials or other measures of effectiveness, such as

22   noticeability and attention maintenance.

23   Q.  You yourself have conducted other studies with pictorials,

24   have you not?

25   A.  Yes.

1   Q.  Have you ever conducted a study with pictorials where your

2   conclusion from your study was that the study itself supported

3   the notion that pictorials enhance a warning's effectiveness?

4   A.  Yes, when I did the battery cable jumping experiment, we

5   compared a warning that did have pictorials although it was

6   not the only component, against no warning and against a

7   manufacturer's warning, which was all text.

8   Q.  And your --

9            THE COURT:  What's this called, study?  What was it

10  called?

11           MR. WALSH:  It's a battery connection.  I will get

12  it for Your Honor in just a second.

13  A.  It's titled Connecting Jumper Cables: --

14           UNIDENTIFIED SPEAKER:  It's 79.

15  A.  -- The Effectiveness of Pictorial Warnings.

16           THE COURT:  Jumper cables.  Okay, so --

17  BY MR. WALSH:

18  Q.  I'm going to hand you what's been marked as Defendant's-

19  79.

20     (Defendant's Exhibit-79 previously marked for

21  identification)

22           MR. PACKIN:  Could I have a copy, please?  Thank

23  you.

24           MR. WALSH:  And we will offer this into evidence

25  also.

1            THE COURT:  Any objection?

2            MR. PACKIN:  Just one second, I'm just taking a

3    quick look.  This one I would just ask, give the witness a

4    second to see if it looks complete to him.

5            THE COURT:  Okay.

6            MR. PACKIN:  Because I can't ascertain that.  It

7    looks to me, but I can't know for sure.

8        (Pause in proceedings)

9    BY MR. WALSH:

10   Q.  Have you had a chance to look at it, Dr. Kalsher?

11   A.  Yes, sir.

12   Q.  And --

13           MR. PACKIN:  I'm assuming that means it's an

14   accurate copy.  So Dr. Kalsher, does it look to be an accurate

15   copy?

16   A.  Yes.

17           MR. PACKIN:  Then I have no objection, Your Honor.

18           THE COURT:  Okay, D-79 in evidence.  And what year

19   is this thing?

20       (Defendant's Exhibit-79 admitted into evidence)

21           MR. PACKIN:  The last one was 1992, actually.  We

22   didn't discuss that.  This one is --

23           THE COURT:  Copyright 1999?  I don't know.

24   BY MR. WALSH:

25   Q.  One of the enhancements you made to this warning was to

1    use --

2              THE COURT:  Just a second, Counsel.  It looks like

3    it's copyright 1999.  It's a chapter in a book that was

4    copyrighted 1999, it looks like, from the last page of this

5    excerpt that you're giving us.  Can you verify that, sir?

6    A.  I'm looking through my curriculum vitae.

7    BY MR. WALSH:

8    Q.  The --

9              THE COURT:  Just a second.  It may be that this last

10   page has no relationship to the exhibit at all.  That's my

11   concern, Counsel.

12             MR. PACKIN:  I think the witness and I are both at

13   the same time checking his CV to find it.  That will give us a

14   date.

15             THE COURT:  We're not going to continue until I see

16   what this is lifted out of.

17             MR. WALSH:  I don't know.  This is just something

18   that's --

19   BY MR. WALSH:

20   Q.  Is that the study you're referring to?

21             UNIDENTIFIED SPEAKER:  Jim, which one is that, that

22   battery cable one?

23             MR. WALSH:  Yeah.

24   A.  I think it's 1999.

25             THE COURT:  But what was it in?  It's Chapter 10 of

1   something.

2   A.  Yeah, I think it's in H.J.G. Zwaga, T. Boersema, and H.

3   Hoonhout Editor's Visual Information for Everyday Use: Design

4   and Research Perspectives.  It's a London, published as a

5   Taylor & Francis --

6              THE COURT:  As a what?

7   A.  Taylor & Francis is the publisher.

8              MR. PACKIN:  What page of the CV is that on, Dr.

9   Kalsher?

10             UNIDENTIFIED SPEAKER:  3.

11  A.  Page 3, I think is the right one.

12             MR. PACKIN:  I can't hear you.

13  A.  The title doesn't match.  I may have it wrong in my CV.

14             UNIDENTIFIED SPEAKER:  It's three, Barry.  I think

15  near the top, third one down.

16  A.  Seventh.

17             MR. PACKIN:  But it doesn't --

18  A.  The title in my CV doesn't match, but it's the correct

19  pages.  I think I made a mistake in my CV.

20  BY MR. WALSH:

21  Q.  Okay.

22  A.  With the title.

23  Q.  One of the enhancements made to the label that you were

24  studying was to use saturated bright yellow as a color,

25  correct?

1    A.  Yes.

2    Q.  And saturated bright yellow is one of the colors that when

3    you looked at the ANSI caution, for example, caution colors,

4    ANSI used orange as a higher level of hazard communication

5    than yellow, but your study actually show that yellow was

6    perceived as showing a higher hazard level than orange,

7    correct?

8    A.  Yes.

9    Q.  So yellow is one of the really good warning colors, is it

10   not?

11   A.  It's one that can provide certainly good contrast when

12   it's placed on a color that it contrasts with.

13   Q.  And it connotes a hot --

14            THE COURT:  Sir, could I ask you to remove what you

15   have in your mouth?

16            MR. WALSH:  I don't have anything in my mouth.

17            THE COURT:  Oh, I'm sorry.  It sounded like there

18   was a sound that's getting picked up from your --

19            MR. WALSH:  It must be the paper.

20            THE COURT:  Okay, thank you.

21   BY MR. WALSH:

22   Q.  It connotes a higher -- all the studies have shown it

23   shows a higher level of hazard communication than would the

24   ANSI commanded orange color, correct?

25   A.  I would agree with you that it's a conspicuity factor.

 1   Q.  All right, and obviously orange --

 2            THE COURT:  You're not necessarily agreeing that

 3   that color of yellow tells the viewer hazard, you're just

 4   saying it more jumps out at you to look at it?

 5   A.  Correct.

 6   BY MR. WALSH:

 7   Q.  But --

 8            THE COURT:  In other words, your questioning and

 9   answering is passing in the --

10   BY MR. WALSH:

11   Q.  All right, your study, your ANSI study demonstrated --

12   that we just talked about a few minutes ago, said that yellow

13   -- and your study demonstrated with Mike Wogalter, that yellow

14   was the higher hazard communication color rather than orange,

15   correct?

16   A.  Again, in that one study.

17   Q.  In that one study.

18   A.  Correct.

19   Q.  Okay.  Do you have any study that shows that not to be

20   true?

21   A.  As I sit here, I can't think of a specific one.

22   Q.  All right.

23   A.  But I am not admitting that there isn't one.

24   Q.  All right.  Red, the color red, that is the color that, in

25   the studies, shows the greatest connotation of hazard

1   communication, is it not?

2   A.  Yes.

3   Q.  Okay.

4   A.  Yes.

5           THE COURT:  In this study, or other studies?

6   BY MR. WALSH:

7   Q.  Generally, correct?

8   A.  It connotes the highest level of hazard, yes.

9   Q.  Right, and --

10          THE COURT:  Studies confirm that red is it, right?

11  A.  Red usually receives the highest hazard connotation

12  ratings, yes, that is true.

13  BY MR. WALSH:  And a black print on a yellow field also shows

14  up in the studies as one of the most effective communicators

15  of hazard?

16  A.  And it may be in the one study that we did when we were

17  looking at just configurations, devoid of messages, that came

18  out like that.  We talked about that; it's one study with many

19  factors.

20  Q.  Do you know of any contrary information?

21          MR. PACKIN:  Please let him finish speaking.

22  BY MR. WALSH:

23  Q.  Do you know of any contrary information?

24  A.  Again, I don't know, as I'm sitting here, a specific one I

25  could cite.  I'm not admitting to that there aren't others.

1   I'm agreeing with you in that one study that that was one of

2   the findings.

3   Q.  And I'm asking you --

4             THE COURT:  The black box, or what?

5             MR. WALSH:  No, the blank print --

6             THE COURT:  Black print.

7             MR. WALSH:  -- on yellow background.

8             THE COURT:  Was good?

9             MR. WALSH:  Yeah.

10  BY MR. WALSH:

11  Q.  So all of the colors that are used in the Stihl on-product

12  labeling, yellow, black on yellow, and red, are all colors

13  that have tested as being extremely good hazard communicators,

14  correct?

15  A.  Yes, if we go back through the testimony that I've given

16  in this case, I never faulted Stihl for using the color yellow

17  for that sticker.  Even though it's inconsistent with the

18  specific design recommendations for ANSI, I never faulted

19  Stihl for using yellow.

20  Q.  And, in fact, the machine itself is basically an orange

21  machine, so orange on orange might not be a very good

22  recommendation to make, would it?

23  A.  That's not quite correct.  If there was contrast between

24  the outside of the warning label, meaning it were a white

25  label, that would provide plenty of contrast, and then inside

1   if you wanted to use the color of orange, there would be no

2   problem with that.

3   Q.  Does the ANSI standard call for outlining the boxes in

4   different colors than the background?

5   A.  No, I'm just saying the color of the label that it's

6   printed on.

7   Q.  Okay.  When you reached any of your opinions in this case,

8   were you aware, or are you aware today, of what warnings

9   manufacturers of cut-off machines were using in 2003?

10  A.  Could you ask that again, please?

11  Q.  Are you aware today or were you aware when you reached

12  your opinions, what warnings any manufacturer of a cut-off

13  machine was using in 2003?

14          MR. PACKIN:  Other than Stihl, I assume.

15          MR. WALSH:  Yes.

16  A.  Other than Stihl.  I remember, again, looking at Neil

17  Growney's pictures and fully when I would have been on my own,

18  and I don't remember, I think that there were a variety of

19  different colors, but I didn't systematically study that,

20  because my focus was on the Stihl saw.

21  BY MR. WALSH:

22  Q.  You couldn't even read from the photographs the warnings

23  on the other machines, could you?

24  A.  No.

25  Q.  And you didn't know what years those machines were from;

1   you didn't know if they were 2010 or 2008, you didn't know if

2   any of them were from 2003, did you?

3   A.   None of my studies were calculated to be comparative.

4   Q.   Okay.

5   A.   And I've stated that repeatedly both in my deposition and

6   yesterday and today.  It was not intended to be comparative.

7   And I think when you originally asked me the question about

8   this study that I brought up, you asked me have I ever

9   authored a paper that showed an effect of a warning that had

10  pictorials in it, and then we kind of --

11  Q.   Right.

12  A.   -- drifted off to other areas.  And I want to just make a

13  point that we did publish this study in which we did use those

14  features in there, and when you use --

15          THE COURT:  I'm not following you.  You did publish

16  a study in which you used what features?

17  A.   Pictorials that we were talking about, in the context of

18  other conspicuity enhancement features and --

19          THE COURT:  Of other --

20  A.   Conspicuity --

21          THE COURT:  Right.

22  A.   -- enhancement features, and when we compared that to what

23  we found is the existing language on a manufacturer's label

24  for a battery, we found that compliance, in terms of the

25  directives outlined in both warnings, was significantly

1   greater in the tag warning that we had so designed with those

2   features.  That --

3              THE COURT:  So this is from your jumper cable study?

4   A.  Yes, and I --

5              THE COURT:  The one that we have in evidence?

6   A.  Yes, Your Honor.  This was in direct response to counsel's

7   question of whether or not I had published a paper in which a

8   warning that contained pictorials had come out to be

9   significant in terms of a warning effect in this matter.

10             THE COURT:  Okay, just a second.

11  BY MR. WALSH:

12  Q.  And you --

13             THE COURT:  You found that pictorials helped in that

14  study?

15  A.  That a warning that contained pictorials and other

16  conspicuity enhancing features such as counsel suggested,

17  bright colors, and on the back you could consider the diagram

18  in which it shows two batteries and the illustration of the

19  cable connectors on them to be a pictograph approach to

20  providing them instruction.

21             THE COURT:  Okay.

22  BY MR. WALSH:

23  Q.  Two points.  One, this is exactly the kind of study you

24  could have done but did not do on the Stihl warnings, is that

25  correct?

1            MR. PACKIN:  Asked and answered.

2            THE COURT:  I'll permit it.

3    BY MR. WALSH:

4    Q.  Is that correct?

5    A.  It would be possible for me --

6    Q.  Okay.

7    A.  -- to design such a thing.  I was not asked to do that.

8    Q.  All right, and the other point, in your study you say, and

9    I'm referring to --

10   A.  I'm not quite done with my answer to the last one, which

11   is you asked me if I could have done it, and I answered yes,

12   but I didn't need to do that in this particular case that I'm

13   involved in.

14   Q.  Okay.

15   A.  Because --

16   Q.  That's for somebody else to decide.

17           MR. PACKIN:  Well, he's interrupting his answer and

18   giving an editorial response.  He was still speaking.

19           MR. WALSH:  Your Honor, what's happening here --

20           THE COURT:  Yes, no, counsel I don't need comment,

21   but you didn't need to do that in this case, period.

22           MR. WALSH:  All right.

23           THE COURT:  And you can take that up on redirect.

24   Make a note.

25   BY MR. WALSH:

 1   Q.  The other thing you note in this study, and you say under

 2   --

 3              THE COURT:  D-79?

 4              MR. WALSH:  Yes, Ma'am.

 5   BY MR. WALSH:

 6   Q.  -- 10.4 on the discussion, the third point is that while

 7   we were able to facilitate proper connection with the enhanced

 8   tag warnings --

 9   A.  Hold on, let me catch up to you.  What page are you on?

10   Q.  The last page of the study, under discussion.

11   A.  Discussion.  Okay.

12   Q.  Down here.

13   A.  Okay, you're down further than I am.

14   Q.  The third point is that while we were able to facilitate

15   proper connection with the enhanced tag warnings, the

16   percentage of correct connections were not as high as desired.

17   Is that one of the conclusions you reached in the study?

18   A.  Sure.

19   Q.  All right.

20   A.  We would always want to strive for 100%.

21   Q.  Okay.

22   A.  But that doesn't mean that it wasn't statistically

23   significant.  And going back to the main point that you were

24   trying to ask me about was whether or not I had published a

25   study that involved pictographs that had a positive effect on

1    compliance.

2    Q.   Okay.   Is there any standard of achieving compliance or

3    achieving comprehension or achieving noticeability that you

4    can state for us indicate adequacy of a warning?

5            THE COURT:   A numerical standard?

6            MR. PACKIN:   Object to the form.

7            MR. WALSH:   I'm sorry?  No, just any percentage, any

8    percentage.  For example, to be adequate, what degree of

9    compliance must be achieved?

10           THE COURT:   So you want a number?

11           MR. WALSH:   Yes.

12   A.   I don't --

13           MR. PACKIN:   I'm going to object to the form of the

14   question, Your Honor, because -- I mean, I could say it at

15   sidebar.  I mean, it's mixing apples and oranges.  It's

16   equating compliance with adequacy, and we've had testimony --

17           THE COURT:   Sounds compound to me.

18           MR. WALSH:   All right.

19   BY MR. WALSH:

20   Q.   Let's take it in parts, then.  Is there any percentage of

21   a subject group, a target group, that would have to notice a

22   warning in order for you to say, on a notice standpoint, the

23   warning is adequate?

24   A.   No, that's not the point of my research.

25   Q.   Okay.

1   A.  The point of the research is to design experiments to

2   systematically test to find out which colors, which other

3   kinds of features are going to enhance the ability of a person

4   to notice something or to remember there's something as

5   compared to something else, in my studies.

6   Q.  Is there any percentage of comprehensibility, any

7   percentage of people in a target group who would have to

8   comprehend a message in order for it to be declared adequate?

9           THE COURT:  Ditto, re: comprehension.

10  A.  I don't know how I would answer that question, other than

11  to say that better is always -- higher recognition or higher

12  levels of noticing is always better than less.

13  BY MR. WALSH:

14  Q.  Right, but is there --

15          THE COURT:  Of comprehension?

16  BY MR. WALSH:

17  Q.  Is there some --

18  A.  Yes.

19  Q.  Is there some minimum point, minimum percentage where it

20  becomes adequate?

21  A.  Not necessarily, because what you're now trying to do is

22  suggest that a particular characteristic is going to carry the

23  day in terms of what I would judge the effectiveness of a

24  warning or a warning system on.  Color is one part that could

25  contribute to it, and certainly we would want to find the best

1   color that reliably shows that it attracts people's attention.

2   Similarly with pictographs or with any kind of enhancement

3   feature, you would want those to be as high as possible.  But

4   that's always going to be couched in terms of the other

5   factors that are known in the literature that tend to

6   facilitate more blunt compliance.  It's a confluence of

7   factors that are important in terms of determining whether

8   something is adequate.

9   Q.  Okay.

10  A.  And I would judge the adequacy of a warning against the

11  totality of those features as I did in my report.

12  Q.  Okay, so if we designed a warning that contained all the

13  features that you considered important, and we tested it and

14  it raised compliance zero, would it still be adequate?

15  A.  It could be, yes, because when we compare it against the

16  effectiveness criteria that I've described, that are known in

17  the field of human factors and from the ANSI standard to be

18  effective, then I could make a judgment that it's met adequacy

19  from the standpoint, in terms of testing them against that

20  criteria.

21  Q.  Okay.

22  A.  When you introduce -- excuse me.  When you introduce the

23  compliance question, then that sort of -- and it depends

24  things.  For example, in the field there could be compliance

25  levels higher than you would expect that may not be due to

1   what you've done in terms of introducing the warning.  So I

2   couldn't say that there is --

3            THE COURT:  It's more subjective compliance?

4   Compliance is more subjective with the individual?

5   A.  Well, I was going to say in the field when you introduce a

6   warning out there, then it could meet the requirements for

7   adequacy that I've defined, which means that it --

8            THE COURT:  I understand so far.

9   A.  Yes.

10           THE COURT:  But finish your sentence.  When you

11   introduce the compliance feature --

12   A.  Right, then --

13           THE COURT:  -- that you're trying to measure --

14   A.  Right, then unless it were --

15           THE COURT:  And so what is the problem there?

16   A.  The problem is that the level of compliance does not

17   necessarily affect or tie directly to adequacy, because

18   compliance --

19           THE COURT:  Is not necessarily directly tied to

20   adequacy?

21   A.  To the adequacy criteria that I've described.  There are a

22   number of reasons why people may demonstrate compliance

23   behavior.  For example, as we relate to this case, there may

24   be many people, we may have 95% compliance in terms of people

25   not putting a tooth blade on the saw.  I don't know if that's

1   because they saw your sign, or because, as you stated earlier,

2   maybe they had a certain level of education that taught them

3   to do it.  Maybe they're just really careful people, or

4   whatever.  But you can't tie directly level of compliance to

5   an assessment of the effectiveness of warning against the

6   criteria that I've described.

7   BY MR. WALSH:

8   Q.  Okay.  I want to ask, if we designed the warning with all

9   the features that you believe are important, and it didn't

10  raise noticeability at all over baseline, would it still be

11  adequate?

12          MR. PACKIN:  Object to the form.

13  A.  Under what conditions?

14  BY MR. WALSH:

15  Q.  Under the conditions of being in a field.  You test it

16  with a representative group, you put all the bells and

17  whistles that you think should be there, and it doesn't have

18  any greater noticeability as tested than the baseline one.  Is

19  it still adequate?

20          MR. PACKIN:  Your Honor, without knowing what the

21  baseline is, I don't know how we can make that determination.

22          THE COURT:  They're comparatory.

23          MR. PACKIN:  No, I understand it's comparatory, but

24  comparatory to what, no warning?  An adequate warning?

25          MR. WALSH:  The warning that's on there.

1              THE COURT:  Okay, just a second.

2              MR. PACKIN:  I thought that was a general question,

3    not specific to this.

4              THE COURT:  Well, let me hear another question.

5    BY MR. WALSH:

6    Q.  If you design it with everything that you believe should

7    be on it --

8              THE COURT:  It, a label.

9              MR. WALSH:  A warning.

10             THE COURT:  Let's just say a label.

11             MR. WALSH:  A warning.  You design --

12             THE COURT:  A warning.

13             MR. WALSH:  A warning.

14    BY MR. WALSH:

15    Q.  And you test it with a representative group and it doesn't

16    show any greater noticeability or comprehensibility, is it

17    still adequate?

18    A.  Well, again, against what?  But I can't imagine a

19    situation in which, when you put such a thing together, that

20    it would produce a result.  I find that to be kind of

21    fantastic to assume something like that.

22    Q.  Assume what?

23    A.  Assume what you're saying, that if you put all of the

24    bells and whistles, that it's not going to have an impact on

25    noticeability against nothing.  Let's say that we had a

1   warning that had none of those features as the baseline, and

2   you put all of the features on.  I can't imagine the situation

3   in which that would occur.  I've never seen it in the

4   literature that I've read.

5   Q.  Well, have you not done studies where color didn't

6   increase comprehension or noticeability?

7   A.  There have been studies like that.

8   Q.  Have you dealt with strobe lights where it didn't raise

9   comprehension or noticeability?

10  A.  In a particular study?  There are many such studies, and

11  that's why there's always a dialogue and an ongoing

12  progression in the warnings literature, because each small

13  study is not -- should not be taken as the be all evidence for

14  the state of the science.  Each little study is designed to do

15  a particular thing or set of things and it should stand on its

16  own merits.

17  Q.  Have you done studies where location did not make a

18  difference in terms of comprehensibility and noticeability?

19  A.  We may have.  I know that location has, in fact, had a

20  significant effect, so it depends upon what the manipulation

21  is for location.  For example, we have shown that when

22  warnings information is posted nearby a task, as compared to

23  location being the location of the warning within a set of

24  instructions, that that is generally better.  But all of this

25  is depending on a specific experimental context.

Kalsher - Cross                          191

1   Q.  And so your ability to measure changes in either
2   comprehensibility, visibility, or compliance is very situation
3   oriented?  It depends on the situation it is, it depends on
4   the target audience, it depends on what things are, all of
5   which can be tested for, but none of which have been tested
6   for in this case?
7           MR. PACKIN:  Object to the form, because of its
8   multiple compound levels.
9           THE COURT:  Yes.
10  A.  Yeah, I don't quite understand the question.
11          THE COURT:  It's been asked and answered.
12          MR. WALSH:  All right.
13          THE COURT:  Have you done that in this case.
14          MR. WALSH:  Yeah.
15  BY MR. WALSH:
16  Q.  Now, just so I'm crystal clear on this, in coming up with
17  your opinions in this case, you have took no regard for what
18  any other manufacturer, not just of cut-off machines but of
19  power tools were doing with the warnings and warning systems
20  in 2003, correct?
21          MR. PACKIN:  Asked and answered.
22  A.  I didn't say that.  I said that obviously I have tools of
23  my own; may of those tools have different warnings.  I said
24  that in my deposition testimony.  In the case of the materials
25  that I've had, I've looked at those things.  But my focus on

1   this was evaluating the materials associated with the Stihl

2   cut-off saw.

3   BY MR. WALSH:

4   Q.  That wasn't my question.  My question was did you take any

5   warnings of any other manufacturer from 2003 of another power

6   tool into account when considering the warnings in the Stihl

7   system?

8   A.  Not specifically, it's not --

9           THE COURT:  Are you talking about other, what do you

10  call them, cut-off machines?

11          MR. WALSH:  Cut-off machines, or any kind of power

12  tool.  Any kind of power tool.  Do you know what warnings in

13  2003 any manufacturer of a power tool was providing?

14          THE COURT:  Okay.

15          MR. PACKIN:  Now I don't know which question is out

16  there.

17          THE COURT:  I'm going to ask the question, if I may.

18          MR. PACKIN:  That's fine with me.

19          THE COURT:  Then you can object.  Other than some

20  pictures you may have seen from Mr. Growney's materials, or

21  things that you've sort of looked at, machines that you may

22  own, or see at the store for sale, have you made any

23  comparison of the labels on this machine, as of 2003, with the

24  labels on any other handheld power tools?

25  A.  No, it would be inappropriate for me to do that because I

Kalsher - Cross                          193

1   didn't have the plethora of material available to me to do

2   such a thing that I did in this case.

3            THE COURT:  That's the answer.

4   BY MR. WALSH:

5   Q.  Did you look at any manuals for any power tool from 2003

6   to compare them to the manual in Stihl?

7   A.  No.  Once again, obviously I've seen many manuals, I own

8   many manuals for my things, but it wasn't a comparative

9   exercise that I took on.

10  Q.  Do you have anything from 2003?

11  A.  I may, I have quite a few tools.  I don't know if I do or

12  I don't without looking through my storage.

13  Q.  Do you know of any cut-off machine manufacturer in 2003

14  that had a better warning system than Stihl?

15           MR. PACKIN:  Object on two bases, Your Honor.

16  Better is not any legal criteria, and I don't know by what

17  parameters we're talking about better.  It's one of those, you

18  know, when did you stop feeding your dog questions.

19  BY MR. WALSH:

20  Q.  Let me rephrase the question.  Do you know of any

21  manufacturer of cut-off machines in 2003 that had a warning,

22  had on-machine warnings, or a warning system more effective

23  than Stihl's?

24           MR. PACKIN:  Same objection.  Same objection.

25           THE COURT:  I'm going to permit this.

1   A.   That was more effective.   I didn't undertake a comparative

2   analysis.   Once again, I compared the Stihl warning system

3   against the criteria that I've talked about repeatedly.

4   BY MR. WALSH:

5   Q.   Do you know of any power tool manufacturer in 2003 that

6   had a more effective on-machine warnings, or more effective

7   warning system than Stihl?

8   A.   I would give --

9        MR. PACKIN:   Object to the -- excuse me, compound

10   and partially just asked and answered.

11        THE COURT:   Look, if he didn't do any comparison,

12   then he's not made any judgment about superiority of other

13   warning systems, is that right?

14   A.   Yes, that's correct.

15        THE COURT:   Thank you.

16   BY MR. WALSH:

17   Q.   Okay.   Do you recall testifying in a case entitled <u>Pardue</u>

18   <u>vs. Bell</u>?

19   A.   Yes.

20   Q.   <u>Pardue vs. Bell</u> involved a Trek 520 touring bicycle, did

21   it not?

22   A.   From my recollection.   Again, that case was quite a while

23   ago.

24   Q.   Okay.   Your testimony actually was, what, in 2005, was

25   that correct?

1   A.   I certainly don't have that file or any of the materials

2   associated with me.

3   Q.   2003, I'm sorry.  It's one of only --

4              THE COURT:  Okay, expert testimony provided?

5              MR. WALSH:  Yes.

6              THE COURT:  In Court or in a dep, right?

7              MR. WALSH:  In deposition.

8   BY MR. WALSH:

9   Q.   It is a case --

10             THE COURT:  In 2005?

11             MR. WALSH:  2003, it looks like.

12             THE COURT:  '03, and the name of it is, Trek --

13             MR. WALSH:  The name is --

14             THE COURT:  Pardue?

15             MR. WALSH:  -- Pardue vs. --

16             THE COURT:  Spell it.

17             MR. WALSH:  P-A-R-D-U-E.

18             THE COURT:  -- v. Trek?

19             MR. WALSH:  -- vs. Bell Sports Corporation.

20             THE COURT:  Thank you.

21   BY MR. WALSH:

22   Q.   And the case involved a Trek 520 touring bike that the

23   rider was seriously injured and suffered extreme cognitive

24   deficits, correct?

25   A.   Generally speaking, but I want to go careful on this,

Kalsher - Cross                               196

1    because it was almost 10 years ago now.

2    Q.  I understand, but you've been asked about this case in

3    Stout, you've been asked about the case in McGee, you've been

4    asked about the case in other cases you've testified in, so

5    you get asked about it and testify about it periodically, do

6    you not?

7    A.  I do.

8    Q.  Okay.  It's one of only two cases in which you have

9    appeared as a expert for a Defendant, correct?

10   A.  That's true, but it's important to point out, and I did

11   yesterday, that I don't have any kind of a bias.  I don't

12   advertise.  I take on cases for which people call me.

13   Q.  I'm not accusing you of biases, I'm just stating a fact.

14   A.  Just want to make sure that --

15   Q.  It's one of two cases, correct?

16   A.  I just want to be sure that we're clear on why that is.

17   Q.  One of two cases?

18   A.  Yes.

19   Q.  In both cases -- the other case was a case called Fink's,

20   wasn't it, where the Plaintiff was named Fink?

21   A.  Yes.

22   Q.  And that involved --

23              THE COURT:  F-I-N-K?

24              MR. WALSH:  F-I-N-K.

25   BY MR. WALSH:

1   Q.  And that case involved a cigarette lighter, correct?

2   A.  Yes.

3   Q.  The cigarette lighter had no warnings on the cigarette

4   lighter, no warnings in any literature, correct?

5   A.  To my recollection.  I vaguely recollect that.

6   Q.  Okay.  Trek had a manual for the bicycle, and it had one

7   online warning near the front sprocket of the wheel of the

8   bicycle that did not address the defect that was claimed by

9   the Plaintiff, correct?  Do you remember that?

10  A.  Vaguely.  Again --

11  Q.  Okay.

12  A.  -- I don't have the case in front of me, and just to be

13  clear, because of the way that you're characterizing this,

14  even though I get, as you had said, asked, primarily in the

15  depositions that you did with me, it's not something that I

16  routinely think about, and I don't have all of the facts of

17  the case with me.

18  Q.  Well, I'm going to give you your opinion letter and other

19  things in just a minute, but I just want to establish a couple

20  of things and see if --

21          MR. PACKIN:  Your Honor --

22  BY MR. WALSH:

23  Q.  -- see what we can recollect.

24          MR. PACKIN:  Might we have discussion at sidebar as

25  to why we're litigating other cases here on this particular

1    hearing?

2            THE COURT:   No.

3    BY MR. WALSH:

4    Q.  The problem that was alleged in Trek was that a new type

5    of braking system had been used on the bike, which created an

6    enhanced braking power, not necessarily noticeable to the

7    rider, which increased the so-called tip-over effect, in which

8    the rear wheel would come off the ground, and the rider would

9    go over the handlebars, correct?

10   A.  Let's be a little more specific about that, because the

11   touring bike, as you call it, as I recall the case, was

12   designed for people who wanted to go on longer rides where

13   they maybe could carry saddlebags full of things that they

14   might camp with or so on.  And so the design was set up to

15   accommodate the forces that that would need to stop as a

16   function of doing so.

17   Q.  Okay, I'm not asking you that.  I'm asking you whether the

18   allegations were that the brakes had a new sensitivity, not

19   necessarily known to the rider, which increased the danger and

20   the hazard of tip-over.  Was that essentially the allegations,

21   among other things, but was that essentially the allegations

22   in the complaint?

23   A.  That was one of the allegations was that it -- yes.

24   Q.  Okay.

25   A.  Yes, and I'll get to --

1   Q.  All right.

2   A.  -- other parts later, I suppose.

3   Q.  And it --

4           THE COURT:  Was it the brakes had been made more

5   powerful, right?

6   A.  Yes.

7   BY MR. WALSH:

8   Q.  Right.  And the expert on the other side, Dr. Kunitz,

9   said, among other things, the bike should have had an on-

10  bicycle warning about the enhanced sensitivity of the brakes

11  and the increased tip-over.

12  A.  Among other things.

13  Q.  Among other things.

14          THE COURT:  An on-product?

15          MR. WALSH:  Right.

16  BY MR. WALSH:

17  Q.  There was no warning on the bicycle itself about either

18  tip-over or enhanced sensitivity of the brakes, was there?

19  A.  I believe that you are correct, but again, I don't have --

20  Q.  Okay.

21  A.  -- all the facts of the case in front of me.

22  Q.  All right.  And the manual had a warning about tip-over on

23  page 11 or so of the manual, had a warning about tip-over, do

24  you recall that?

25  A.  Again, I don't have the manual and I haven't looked at it

1   in years.

2   Q.  And it had no warning, but on page 40 something of the

3   manual it did have a reference to more powerful brakes, even

4   though you deemed it an instruction, not a warning, remember

5   that?

6   A.  No.

7   Q.  Okay.  Your conclusion in the case was that the warnings

8   were adequate, even though none were on there, the only

9   warnings about either of these areas was in the manual and

10  there was no on-bicycle warning.

11           THE COURT:  The warning materials were adequate?

12  BY MR. WALSH:

13  Q.  You found that the warning system was adequate, correct?

14  A.  The warning system was adequate, and the reason for that,

15  and parts that you haven't discussed yet, was because from the

16  information in that case that was given to me, both Mr. Pardue

17  and his wife had indicated that they had purchased the product

18  themselves, which is quite different from the facts in this

19  case; they had the manual, which is quite different from the

20  testimony and the materials in this case.  Mr. Pardue had read

21  the instruction manual, which is different from the facts in

22  this case.  Mr. Pardue understood that over-braking could

23  result in tipping over.  Mr. Pardue said that he regularly

24  kept owners' manuals.  Mr. Pardue had ridden that bike for

25  several months, despite Dr. Kunitz' suggestion that it was a

1    new bike.  It was clear that Mr. Pardue had ridden that

2    regularly and had many opportunities to get, not necessarily

3    contact with something that he didn't know about that would

4    pop up and hit him in the face, but rather something that was

5    more a modulated kind of thing.  And what you haven't pointed

6    out was that, in the facts of the case that led up to when Mr.

7    Pardue was injured, he was following four more experienced

8    riders, from what I recall, that were in a longer part of that

9    -- I don't believe it was a race; it was some sort of an event

10   -- and he caught up to them.  They went over a hill, and what

11   happened was when they came over that -- as I remember it, I

12   don't know if I'm remembering it correctly, that when they

13   came over they had a very limited time in order to make a

14   decision on turning right.  The road that they were on was

15   basically straight.  The road that they wanted to make a

16   right-hand turn onto T'd into that, and the four riders in

17   front of him veered around, barely made the corner, and Mr.

18   Pardue unfortunately wrecked.  So from my recollection, and I

19   suppose if you let me look at the report, my recollection is

20   that factors that contributed to the tipping over accident

21   included him making this sharp turn.

22   Q.  Okay, so does the adequacy of warnings then depend on the

23   specific facts of a case?

24   A.  No.

25   Q.  Okay, so why are any of those facts relevant to your

1    determination that the warning system for the Trek bicycle was

2    adequate?

3    A.  Because in that case, Mr. Pardue had said that he had

4    access to it.  It was a consumer product where people are

5    likely to have the product manuals in front of him for their

6    use, and he did, in fact, read that.

7    Q.  Bicycles, consumer bicycles are bought, they are sold,

8    they're loaned, they're borrowed, they get traded.  Just

9    because a consumer might be -- the user may be an initial

10   buyer, doesn't mean that the ultimate person is going to end

11   up with a manual, does it?

12   A.  No, but I think the facts of this case, again -- or you're

13   trying to suggest that I change my opinions based on the case

14   for nefarious reasons or not founded reasons.

15   Q.  No.

16   A.  And what I'm saying is with that I think it's generally an

17   expectation that people who ride bicycles, and certainly had

18   ridden them as long as Mr. Pardue did, that when you squeeze

19   the front brake, that it can lead to tip-over.

20   Q.  What I'm asking is, does the adequacy of warnings depend

21   upon the situation or what the Plaintiff does, or do you judge

22   adequacy of warnings independent of what the Plaintiff does or

23   what the situation is?

24   A.  Well, certainly the information associated with Plaintiff,

25   just as in this case, and others around them who use the

1    product, is important contributing information.  But in that

2    case, I assessed that product on its own merits, given what

3    the hazards were, and made a decision about the opinion that I

4    rendered in that case.

5    Q.  All right.

6              MR. PACKIN:  Your Honor, whenever we get a chance

7    for a restroom break --

8              THE COURT:  Sure.  Okay, this is fine.  Before we

9    recess, let's see where we are on time.  Or as soon as we come

10   back.  What time do you have, Mr. Rudolph, on whatever machine

11   you're using?

12             MR. RUDOLPH:  He is at --

13             THE COURT:  No, what time of day do you have right

14   now?

15             MR. RUDOLPH:  I have 5 after 3.

16             THE COURT:  Okay.  Would you like five minutes?

17             MR. PACKIN:  That would be adequate for me.

18             THE COURT:  Okay, we will come back at Mr. Rudolph's

19   10 after 3.  No clock in this room agrees, I assure you.

20        (Court in recess)

21             THE COURT:  Okay, what's the report on our timing?

22             MR. RUDOLPH:  Mr. Packin yesterday was about 4 hours

23   and 45 minutes of questioning, and Mr. Walsh is currently at 4

24   hours of questioning.

25             THE COURT:  Thank you very much, Counsel.

 1                    CROSS EXAMINATION (CONT'D)

 2   BY MR. WALSH:

 3   Q.  I want to ask you about a couple of -- I'm going to read

 4   to you something from your deposition, a couple of excerpts

 5   from your deposition in Trek, or Pardue, and I want to ask you

 6   some questions about it.  I'm referring now to page 42 of the

 7   deposition that was taken of Michael Kalsher.

 8              MR. PACKIN:  Your Honor, are there copies for the

 9   witness and I to look at so we can follow context?

10              MR. WALSH:  There are copies you can have.

11              MR. PACKIN:  Thank you, and what page again?

12              MR. WALSH:  42.

13              THE COURT:  How about if, Mr. Packin, you indicate

14   when you're ready, and then the questioning may occur.

15              MR. PACKIN:  What line, Mr. Walsh?

16              MR. WALSH:  42, start --

17              THE COURT:  Beginning with.

18              MR. WALSH:  Beginning with line 5.

19              THE COURT:  Okay.  Are you going to go on to the

20   next page, or not?

21              MR. WALSH:  I'm going to read a period that goes

22   through line 17 on page 44.

23              THE COURT:  Okay, page 42 to 44.  Mr. Packin, let us

24   know when you're ready --

25              MR. PACKIN:  Yes, Ma'am.

1          THE COURT:  -- and I will assume that Dr. Kalsher

2     will likewise be ready then.

3          MR. WALSH:  And I would point out, Your Honor, that

4     this should be familiar reading.  This is something that this

5     witness has been questioned about in Mr. Packin defending him

6     before, so this is not new reading.

7          THE COURT:  I don't think they're surprised, but

8     we'll let them get refreshed.

9          MR. PACKIN:  I'm not surprised by the case.  It's

10    new reading to me in terms of I couldn't remember a single

11    thing about this at all.  So now I'd like to read it.

12         THE COURT:  Be assured that you may.

13       (Pause in proceedings)

14         THE COURT:  Ready, counsel?

15         MR. PACKIN:  I've read it.

16         THE COURT:  Okay, how about you, Dr. Kalsher?

17    A.  Yes, Your Honor.

18         THE COURT:  You all right?  Okay, Mr. Walsh.

19    BY MR. WALSH:

20    Q.  All right, starting on page 42, line 5, you were asked the

21    following question:  "So is it your opinion that Mr. Pardue,

22    even though he read the manual, that he probably didn't pay

23    much attention to what was in it, including pay attention to

24    the warnings because of his previous experience?"  Your answer

25    was, "No, that wasn't the point of that.  The point of that

1    was it was clear to me from reading those depositions that he

2    was a very careful person who read most of the things.  I

3    think that came out very clear, that even in his injured state

4    it came out that he was very careful.  His wife also seemed to

5    provide some reliability that he would read the owners and

6    instruction manuals for all the equipment he purchased.  So

7    what I'm saying here is probably we need to put this in the

8    context of Dr. Kunitz' report, which suggest the need for hang

9    tags or other kinds of things like that."

10            MR. PACKIN:  And other kinds --

11            THE COURT:  What's the question that you just read?

12            MR. WALSH:  It said, "So what I'm saying" --

13            THE COURT:  Okay, so that was part of the answer.

14            MR. WALSH:  Yeah, this is still part of the answer.

15            THE COURT:  So that suggests, okay, and the need for

16   hang tags or something.

17   BY MR. WALSH:

18   Q.  "So what I'm saying here is probably we need to put this

19   in the context of Dr. Kunitz' report, which suggested the need

20   for hang tags and other kinds of things like that.  The hope

21   is that warnings are more or less a third line of defense.

22   The first line of defense is if you can have people read the

23   more detailed information that's included in an instruction

24   manual or operator's manual, such as what Trek provided.

25   That's a good thing, because they're able to get more

1   information that's relevant to the safety related issues

2   associated with the product.  The point here is that hopefully

3   people, after having read such information and had experience

4   on their own, will understand what the safety related issues

5   are and perform accordingly.  Subsequent to that, particularly

6   for people who have the experience, a benign experience, that

7   is, over time they ride the bike, in this case, for example,

8   successfully without any sort of problems, are going to be

9   less inclined or less likely to notice or see or read similar

10  kinds of warnings in the future.  For example, if there was a

11  hang tag or on-product warning, something like that.  But the

12  point" --

13              THE COURT:  Be less likely to?

14              MR. WALSH:  Less likely.

15              THE COURT:  To do what, read --

16  BY MR. WALSH:

17  Q.  "Less likely to notice or see or read similar kinds of

18  warnings in the future.  For example, if there was a hang tag

19  or on-product warning, something like that.  But the point

20  also to me was that by reading that, and through his

21  experience, I believe that he understood what the risks are as

22  they relate to this particular accident."  And then the

23  question was asked, "Well, I understand your answer, but how

24  does the familiarity effect have any bearing whatsoever in

25  this particular case as it pertains to Keith Pardue?"  You

1   answer, "Again, Dr. Kunitz has" --

2            THE COURT:  What's the effect?

3            MR. PACKIN:  Familiarity.

4   A.  Familiarity.

5            MR. WALSH:  Familiarity effect.

6   BY MR. WALSH:

7   Q.  The answer was, "Again, Dr. Kunitz has suggested that the

8   warnings were inadequate in a number of ways, and one of the

9   ways was there was needed to be an on-product warning.  And

10  I'm suggesting, because of the factors that I told you

11  already, that Mr. Pardue was familiar with the safety related

12  features of the bicycle, how to ride a bicycle correctly, what

13  some of the hazards were, including overuse of the front

14  brakes, that the addition of those kind of features to a

15  warning probably would not have made a difference to Mr.

16  Pardue in terms of him either learning something new or being

17  reminded of something he already knew."

18       Now, am I correctly surmising from that that in that case

19  --

20            THE COURT:  Just read the last few lines, would

21  probably not have what?

22            MR. WALSH:  Let's see, probably would not have made

23  a difference to Mr. Pardue in terms of him either learning

24  something new or being reminded of something he already knew."

25  So is it fair to me to surmise from that testimony that in

1   that case you said a couple of things:  One, that it was

2   better to have the more detailed information in the owner's

3   manual, and that once having read that type of information, it

4   was unlikely that an experienced bike rider in that case,

5   machine operator in this case, would go back and notice or

6   read similar warnings in the future?

7            MR. PACKIN:  Object to the compound --

8   A.  There are similarities.

9            THE COURT:  I can't understand that question.

10           MR. PACKIN:  Thank you.

11           THE COURT:  Sorry.

12           MR. WALSH:  Okay, let me try it again.

13  BY MR. WALSH:

14  Q.  You said in that, if I'm interpreting you correctly, that

15  it was better to have the more detailed information available

16  in the owner's manual, correct?

17  A.  I would say that the consistency between this case and the

18  other is I've never said --

19  Q.  Please answer my question first.

20  A.  I am trying to answer it, sir.

21           MR. PACKIN:  Your Honor, please.  Interrupting I

22  don't think is appropriate.

23           THE COURT:  Right.  Right.

24           MR. PACKIN:  And it doesn't seem to be deterred.

25           THE COURT:  Are you saying that it was better to

1  have the more detailed information in the owner's manual in

2  that case?

3  A.  In that case and in this case.  It's important to have a

4  detailed owner's manual.  It's not inconsistent.

5  BY MR. WALSH:

6  Q.  Well, you said in this case it was the first line of

7  defense, is you can have people read the more detailed

8  information that's included in the owner's manual.

9  A.  Sure, and that--

10  Q.  Okay.

11  A.  -- it's still consistent.  Let me put some perspective on

12  how that relates to what I've been talking about.

13          THE COURT:  Just a second.  I think we need short

14  answers at this point.

15  A.  Okay.  We talked about the hazard control hierarchy, and

16  what I'm saying is that the best way to do it is design and

17  guard and finally warn.  Within the warning part of that,

18  we've talked about a warning system.  I've said that and we've

19  talked about that repeatedly.  As part of the warning system,

20  certainly an owner's manual, because of its size and general,

21  the way it's -- you can have much more, and much more detailed

22  information in it.  I'm not debating that; I agree with that.

23  BY MR. WALSH:

24  Q.  Is it the first line of defense?

25          MR. PACKIN:  He's still talking.  Please.

1   A.  It's in there --

2   BY MR. WALSH:

3   Q.  That was my question, whether it's the first line of

4   defense in the warning system.

5            THE COURT:  Just a second, please.  Dr. Kalsher, the

6   hour is late.  It's understandable that we're all getting kind

7   of worn out here.  When you have finished your answer, would

8   you please indicate that by your tone of voice?  We're going

9   to let you answer the question in full.

10  A.  Okay.

11           THE COURT:  But do not repeat.

12  A.  Okay.

13           THE COURT:  And don't go through unnecessary

14  explanation.  Just answer the question as directly as you can,

15  and then, by your tone of voice, indicate you're done.

16  A.  Yes, Your Honor.

17           THE COURT:  And until then, Mr. Walsh is not allowed

18  to ask you another question.

19  A.  Okay.

20           THE COURT:  Okay.  "An owner's manual, because of

21  its size and extent, can have an essential -- an important" --

22  A.  More, and more detailed information.  That's consistent

23  across both of these cases, and so I would suggest that, yes,

24  in the case where -- in either case an owners' manual is a

25  good thing to have.  As I pointed out previously, in the

1    Pardue case, he had the manual; he purchased the product, he

2    had the manual.  In the present case, we have a product that

3    is purchased by the employer that has one owner's manual with

4    it and many users.  The corroborating evidence in the case

5    suggests that the Plaintiff in the current case did not have

6    an owner's manual, nor did many of his coworkers.  It's a very

7    different set of facts.

8    BY MR. WALSH:

9    Q.  Is there any indication to you anywhere in the record that

10   Robert McGee believed that an owner's manual was not available

11   if he asked for it?

12   A.  I think that he did know it was available, and I think he

13   testified that he knew it was available if he thought he

14   needed to check it out for some reason.

15   Q.  Okay, so he did know it was available?

16   A.  I think he testified that he would look at the owner's

17   manual if he had a question.

18   Q.  Okay, now please try to answer my question that I'm asking

19   you.  Is, in your view, the owner's manual the first line of

20   defense in the warning system?

21             THE COURT:  In what warning system?

22   BY MR. WALSH:

23   Q.  In any warning system.

24   A.  Well, in the --

25             THE COURT:  Can you answer that question?

1   A.  Yes.  It is, in the case at that time, I don't remember

2   what the year was here.

3           THE COURT:  The time of the Trek accident?

4   A.  Yeah, I'm trying to find the date on my deposition here.

5   BY MR. WALSH:

6   Q.  The deposition was 2003.

7   A.  2003.

8           THE COURT:  Yes, but the Trek accident.

9   A.  Right.  In terms of first line of defense, back at that

10  point it was a little less prevalent for people to have as

11  much information on the internet.  But having said that,

12  certainly an owner's manual is an important piece of

13  information to have for any product or piece of equipment.

14  BY MR. WALSH:

15  Q.  Is it the first line of defense?

16  A.  I said it in that deposition testimony.  It may not have

17  been as artful, but I would say, now sitting here, that it's

18  an important part of a warning system.

19  Q.  Okay.  Are you retracting your testimony that it was a

20  first line of defense, or are you in agreement that it is the

21  first line of defense?

22  A.  I'm saying that I may have inartfully said that in the

23  context of a deposition, I'm sure I say many things not quite

24  correctly.  What I'm telling you is in this case, and in that

25  case, I would not disagree that an owner's manual is a very

1    important part of the safety system.

2    Q.  But this was a deposition that lasted for 90 pages, and

3    this was on 43, and I still haven't -- I don't believe I've

4    gotten an answer to my question, is it a first line of

5    defense?

6    A.  I think I've answered as best --

7              MR. PACKIN:  Your Honor, it's been asked --

8              THE COURT:  Permit, I'll permit it.

9    A.  I'm agreeing with -- again, an owner's manual is important

10   for anything, and in that context, it was the first line of

11   defense.

12   BY MR. WALSH:

13   Q.  All right, and so whether or not it's a first line of

14   defense depends on the situation?

15             MR. PACKIN:  Object to the form.

16             THE COURT:  I'll permit it.

17   A.  I'm sorry, I got sidetracked.  What was the question?

18   BY MR. WALSH:

19   Q.  So whether or not the manual is the first line of defense

20   --

21             THE COURT:  The first line?

22   BY MR. WALSH:

23   Q.  -- the first line of defense, depends on the situation?

24   A.  No.  You've asked me if I'm retracting my testimony.  I'm

25   not.  I'm saying I did say those words.  I'm telling you how

1    I'd consider this, that an owner's manual is an important

2    piece of a warning system.

3    Q.  And my question remains, is it the first line of defense,

4    as you testified in Trek?

5    A.  It's an important line of defense.  I can't answer the

6    question any differently.

7    Q.  More important than on-machine warnings?

8    A.  No.  I intend that to mean that there is a greater amount

9    and a higher level of information associated with that, so

10   maybe this is a way to explain it, is certainly going from the

11   manufacturer down to the end user, an owner's manual is an

12   important part of that line of defense against accidents and

13   injury.  Certainly on-product information that we're talking

14   about is important as well, but I'm not debating that owner's

15   manuals are very important.

16   Q.  And then maybe we can explain -- go to page 70 in the

17   deposition.

18           THE COURT:  Okay, just a second.  Page 70?

19           MR. WALSH:  And I'm going to be looking at, Your

20   Honor, from line 1 page 70 through line 3 page 71.

21           THE COURT:  Okay, let them read it.  Mr. Packin,

22   we'll wait for you to say ready.

23       (Pause in proceedings)

24           MR. PACKIN:  Okay.

25           THE COURT:  Question?

 1    BY MR. WALSH:

 2    Q.  All right.

 3    A.  Okay.

 4    Q.  And page 70 line 1, "Well, I'm just asking you generally.

 5    It would seem to me that obviously you need to be able to see

 6    a warning at the time you need to be able to make a decision

 7    on what to do.  I mean, if you didn't have the warning, if the

 8    warning comes too late after you've done something."  Answer,

 9    "Right."  Question, "Then it wouldn't be an effective

10    warning."  Answer, and this is your answer, "I see what you're

11    saying.  But, for example, a warning can be effective if it's

12    embedded in the context of, for example, in this case, what I

13    deem to be a pretty good instruction manual.  Is that present

14    at the time when somebody is riding the bicycle?  No, but does

15    it serve a useful purpose for accomplishing some important

16    goals of warnings?  I would say that, yes, it does.  It

17    informs people of what the hazard is and tells them what they

18    need to do to avoid the hazard.  You know, we could go through

19    what different physical characteristics of warnings are.  For

20    example, they need to be attention-getting, and all that sort

21    of thing.  That is an example where a warning could be deemed

22    effective, but it doesn't meet the requirement of being

23    instantaneously available exactly when the hazard is going to

24    confront someone."  Now, do I understand you correctly to be

25    saying that even though there was no reminder element to this

1   warning in Trek, that it was nevertheless effective, and an

2   effective warning embedded in an owner's manual is okay, even

3   if not instantaneously available to the user prior to the

4   accident?

5           MR. PACKIN:  Object to the compound aspects of the

6   question.

7           THE COURT:  Yes, I can't follow it.  Do you mean

8   that an effective warning can be embedded in the manual and

9   does not need to be available to the user at the moment of

10  decision, is that the question?

11          MR. WALSH:  Yes.  In other words, doesn't have to be

12  on the product, but can be embedded in a manual.

13  A.  That's not what I was saying.

14          THE COURT:  Can you answer the question?

15  A.  Yeah, I'm trying to read the context around this, Your

16  Honor.

17          THE COURT:  Okay, take your time.

18      (Pause in proceedings)

19  A.  Yes, for that part of the warning system, that part of the

20  warning system being the instruction manual, that could be

21  deemed effective in terms of identifying the hazard, likely

22  consequences, and severity when somebody needs to do --

23          THE COURT:  I can't hear you.  Deemed effective --

24  A.  Deemed effective in terms of --

25          THE COURT:  -- in terms of identifying the hazard --

1   BY MR. WALSH:

2   Q.  But you were being --

3           MR. PACKIN:  He's still speaking.

4           MR. WALSH:  Oh, I'm sorry.

5           THE COURT:  He's not done.

6   A.  The likely consequences --

7           THE COURT:  I'm sorry, for that part of the warning

8   system, which is the manual, it could be deemed effective --

9   A.  Deemed effective.

10          THE COURT:  -- in terms of identifying the hazard --

11  A.  Hazards, the likely consequences, and severity, and what

12  people need to do to avoid injury.

13  BY MR. WALSH:

14  Q.  But you were being asked this question in the context of

15  saying doesn't the warning have to be on the product in order

16  to be effective so that it's there as a reminder, and your

17  answer was, well, that would be a good thing, essentially, but

18  a good warning embedded in the manual is okay.

19  A.  Well, in that context it's different.  I'm not saying that

20  warnings are designed depending on the particular situation,

21  per se, except that when you consider the differences in this

22  case, and I've said this repeatedly, that in this case Mr.

23  Pardue was the purchaser, he had the manual, he read the

24  manual, and based on the facts of the case in which the

25  ultimate cause of this accident wasn't necessarily tied to the

1   fact there wasn't an immediate warning on the product, but

2   that he had to make a turn too quickly, and so I think my

3   final conclusion on that was that it wouldn't have made a

4   difference in the outcome.

5   Q.  But you rendered an opinion that the warnings were

6   adequate, did you not?

7   A.  As it relates to this case, yes.

8   Q.  Okay, and earlier, on page 69, line 5 through 17, please

9   take a look at that.

10            THE COURT:  What page are we on now?

11            MR. WALSH:  69, Your Honor, lines 5 through 17.

12  A.  Yes.

13            MR. PACKIN:  Let me read it first.

14  A.  Oh, I'm sorry.

15       (Pause in proceedings)

16            MR. PACKIN:  Okay.

17  BY MR. WALSH:

18  Q.  Line 5, the question, "Well, do you believe in order to be

19  an effective warning, the warning has to be present so that

20  you'll be able to see it and you'll be able to read it when

21  you need to?"  Answer, "If it's possible.  Certainly that's a

22  good thing to do if it's possible, but I can imagine instances

23  in which the presence of something like that might be

24  distracting, or might interfere.  You know, I'd have to think

25  about it for a while, what the specific circumstances are, but

1    I guess I couldn't make a blanket yes, I agree with everything

2    in here for every situation."  Did you testify in that manner?

3    A.  Sure, and I would stick by that, that I can think of

4    situations where if somebody was in the middle of operating

5    the device, as in riding a bike, and if you had something

6    hanging in a position that drew your attention away from

7    focusing on the road, that that wouldn't be an effective

8    warning; in fact, it would contribute to unsafety.

9    Q.  Well, this just wasn't a hang tag that was suggested, it

10   was other warnings that were on-bike, even though they didn't

11   address the tip-over circumstance, they weren't hang tags,

12   were they?

13   A.  But I'm telling you, you read that context and I'm saying

14   I can imagine instances of that.

15   Q.  All right.  Let's go over to page 77 -- I'm sorry, 76,

16   line 13, where you're being questioned about a supplement that

17   was being added to the manual, and if you'll read from there

18   through line 15 on the next page.

19   A.  What line am I starting on again, sir?

20   Q.  I'm sorry, it's page 76 --

21   A.  Yes.

22   Q.  I'm sorry, it's --

23   A.  Just the line.  I didn't hear you.

24   Q.  Yeah.

25           MR. PACKIN:  I didn't find it either.

                        Kalsher - Cross                    221

1   BY MR. WALSH:

2   Q.  On page 77 --

3   A.  Start page 77?

4   Q.  No, I'm sorry, start with page 76, line 6.

5   A.  Okay.

6   Q.  And read down to 77, page 25.

7           THE COURT:  Line 25.

8   BY MR. WALSH:

9   Q.  Line 25.

10      (Pause in proceedings)

11          MR. PACKIN:  I'm not sure I understand the way it

12  stops at line 15 on page 77.  It's hanging in the middle of

13  something, so I'm not sure if that's where counsel intended to

14  stop.  And if it is, that's where I've read to.

15          MR. WALSH:  What line did I give you?

16          MR. PACKIN:  You said 77, line 15.

17          MR. WALSH:  Yeah, that's all I need right now.

18          MR. PACKIN:  'Cause there's a question with no

19  answer.

20          MR. WALSH:  Yeah, I know.

21          THE COURT:  Well, don't read a question with no

22  answer from a dep.

23          MR. WALSH:  Well, the answer has nothing to do with

24  what I'm going to ask the question about the content of that.

25  It just simply refers to a page in the manual that I want to

1   refresh his recollection of where information appeared in the

2   manual.

3              THE COURT:  All right, go ahead.  Okay, go ahead,

4   read.

5   BY MR. WALSH:

6   Q.  Okay.  And, by the way, as we start this, do you see right

7   above there, real quickly on page 75, lines 21 through 24, the

8   Trek manual had not done -- there'd been no study to see how

9   effective the Trek manual that you were relying on was, is

10  that correct?

11             THE COURT:  Not been subjected to empirical studies?

12             MR. WALSH:  The quote is, "And do you know if Trek

13  had done any type of study to see how effective their manual

14  is?"  Answer, "I'm not sure what they've done on that."

15  BY MR. WALSH:

16  Q.  All right, going back to --

17  A.  I think it's important to take into context what I said

18  just before that, line 13, "But given that it's not always

19  possible to do that, that's why guidelines like the ANSI

20  standard were developed, so that manufacturers would have some

21  guidelines, you know, to ensure that the warning systems they

22  develop at least conform to a set of standards that we know

23  from a lot of different studies now are likely to make an

24  effective warning."

25  Q.  Okay.

1          THE COURT:  Okay, just a second.  You were adding --

2    this is page 75, line what?

3    A.  Line 13.

4          THE COURT:  13 dash -- from 13 to where?

5    A.  To line 20.  That's the preceding paragraph which

6    indicates, consistent with what I've been testifying to, "why

7    guidelines like ANSI are important so that manufacturers will

8    have some guidance or guidelines to ensure that the warning

9    systems they developed at least comport to a set of standards

10   that we know from a lot of different studies, now we're likely

11   to make an effective warning."  An effective warning as

12   compared against the criteria that I've been discussing in

13   this case.

14         THE COURT:  I'm sorry, this is tough to --

15   A.  I'm sorry.

16         THE COURT:  It's very difficult to make a transcript

17   of this.  Read your quoted language, sir, please, starting

18   with line 15.

19   A.  With 15?

20         THE COURT:  Uhm-hum.

21   A.  "Standards were developed so that manufacturers would have

22   some guidelines, you know, to ensure that the warning systems

23   that they developed at least conform to a set of standards

24   that we know from a lot of different studies, now we're likely

25   to make an effective warning."

1            THE COURT:  Okay.  You may continue, Mr. Walsh.

2            MR. WALSH:  All right.

3     BY MR. WALSH:

4     Q.  Back over on page 76 you're being asked about the manual

5     for the bicycle, and then starting on line 17 you're asked

6     this question about an instruction that's been added to the

7     manual.  Question, "There is an instruction that was in this

8     particular manual.  Have you seen the instruction?"  Answer,

9     "I do have a copy of that someplace."  Question, "Is that an

10    effective way to basically communicate information to the

11    ultimate users, to put a supplement into a manual like this?"

12    Answer, "Is this exactly what's provided, or is this a Xeroxed

13    copy of what's provided?"  Question, "This, from my

14    understanding, is exactly what was provided in the manual."

15    Answer, "Okay, it's not optimal, but I guess I would have to

16    talk to the Trek people to find out what they're trying to

17    communicate."  Question, "Okay."  Answer, "Certainly from a

18    format standpoint it's not impressive, but whether it's

19    functional or not, I would need to do a little bit more

20    investigation."  And then the next sentence --

21            THE COURT:  I would need to communicate with Trek --

22    back up -- to find out --

23    BY MR. WALSH:

24    Q.  "I would need to talk to the Trek people to find out what

25    they were trying to communicate."  "Okay."  And then he says,

Kalsher - Cross                    225

1   "Certainly, from a format standpoint it's not impressive, but

2   whether it's functional or not, I would have to do a little

3   bit more investigation on that."  And then this question is

4   asked, "And as far as the bicycle owner's manual, under

5   braking, if you look, I believe it's in the 40's, let's see, I

6   believe it's under page 43, see under the section of Direct-

7   Pull Levers."

8            MR. PACKIN:  Direct-Pull Brake Levers.

9   BY MR. WALSH:

10  Q.  Brake levers.  Does that refresh your recollection as to

11  where in the Trek manual information on the direct-pull brake

12  levers was located?

13           THE COURT:  Direct pulled?

14           MR. WALSH:  Direct-pull.

15           MR. PACKIN:  Pull.

16           THE COURT:  Spell it.

17           MR. WALSH:  P-U-L-L.

18           THE COURT:  Direct, D-I --

19           MR. WALSH:  Direct-pull.

20           THE COURT:  -- dash pull, okay, levers.

21           UNIDENTIFIED SPEAKER:  Brake levers.

22           MR. WALSH:  Brake levers.

23  BY MR. WALSH:

24  Q.  Does that refresh your recollection where that reference

25  appeared in the manual?

1    A.  Yes.

2    Q.  Okay, page 43?

3    A.  Oh, I thought you were sending me to page 43.

4    Q.  No, is --

5    A.  Yeah, that's what it says --

6    Q.  Okay.

7    A.  -- is page 43.

8    Q.  And then look down on page 78, if you would, and read, if

9    you --

10              THE COURT:  Page 78?

11              MR. WALSH:  Yes.

12   BY MR. WALSH:

13   Q.  And read line 8 through line 6 on 79.

14       (Pause in proceedings)

15              MR. PACKIN:  I've read it.

16   BY MR. WALSH:

17   Q.  All right, on page 78 --

18   A.  I'm not ready.  I'm sorry.

19       (Pause in proceedings)

20   A.  Yes.

21   Q.  All right.  You're being questioned about the location on

22   page 43 of this brake lever material, correct?

23   A.  Yes.

24   Q.  And the question is, "Okay, is there anyway you feel like

25   it could be more effectively stated or more effectively

1   brought to the attention of the cyclist as to the increased

2   leverage and the hazard associated with that of a direct-pull

3   braking lever other than what's stated herein this particular

4   section?"  Answer, "Sure.  There information, I suppose, could

5   be put in a different part of the manual, if it fit there, but

6   it seems to fit in the context of where it is right now.

7   Certainly could use different techniques to highlight that

8   information, whether use bolding or things like that.  There

9   are a number of things one could do to increase the

10  conspicuity and comprehensibility and so on, and I've rarely

11  come across any warning that couldn't be improved."  And --

12          THE COURT:  There are other things that could be

13  done --

14  BY MR. WALSH:

15  Q.  "There are a number of things that one could do to

16  increase" -- well, let's see.  "Certainly" -- yeah, "There are

17  a number of things that could be done to increase the

18  conspicuity and comprehensibility and so on, and I've rarely

19  come across any warning that couldn't be improved."  So am I

20  correct that even though this information was on page 43 of

21  the manual, that you determined that rather than having it

22  more up front or in a different location, it was okay in

23  context on page 43?

24  A.  Well, first of all, I think I've said things, and they're

25  consistent with what I've said already.  It was on page 43,

1    and I did say that you could move it to a different section of

2    the book if it fit, but it fit in the context there.  And we

3    don't have the manual here, so I don't know exactly why I said

4    put it there, but I'm sure it was because it fit in that

5    context, in my opinion.  When asked if it could be enhanced, I

6    said that there are a number of things that can be done to

7    increase conspicuity and comprehensibility, as I've said

8    repeatedly.  I rarely come across a warning that couldn't be

9    improved.  And then what you didn't point out is that a little

10   bit later on down there, I think it also says, "It's obvious"

11   -- I'm on line 14.  "It's obvious in other places that

12   overusing" --

13            THE COURT:  In other places?

14   A.  -- "in other places that overusing the front brakes

15   generally is a problem."  And again, going back to his initial

16   discussion, I think that that was the main point for this

17   case.

18   BY MR. WALSH:

19   Q.  Okay.  But you found in this case, despite the location,

20   despite the ways that you could increase conspicuity and

21   comprehensibility, that the warnings were adequate, correct?

22   A.  Well, again, without having the whole instruction manual

23   in front of me, I do have a general recollection why I thought

24   it was a reasonable manual.  It was one of the few at that

25   point in time that had actually incorporated many of the

1    conspicuity enhancing factors that would be consistent with

2    ANSI guidelines.  So I think I was not completely in love with

3    it, but I pointed out where I was critical of it.

4    Q.  You said it could be improved, but it was adequate.

5    A.  I don't know that I used -- did I use the --

6             THE COURT:  Talking about warning system, or the

7    manual?

8             MR. WALSH:  The manual.

9    A.  The manual.

10            THE COURT:  About the manual.

11   BY MR. WALSH:

12   Q.  You don't use the term adequate --

13   A.  I don't think I used the term adequate.

14   Q.  No, you don't use it there, but you found the warnings for

15   the machine, and the only warnings for the machine were the

16   manual, correct?

17   A.  Again, I don't have the complete report, or I would have

18   to have the manual as well to look at to reconstruct what I

19   did and why I did it.

20   Q.  Well, everything we read here, the fight was between

21   Kunitz who said you should have an on-machine warning, you who

22   said you don't need it, the manual is not perfect, but it's

23   good, the warnings are adequate, correct?

24   A.  But I also said that there were --

25            MR. PACKIN:  Object to the form, compound.

1          THE COURT:  I'll permit it.  Can you answer it?

2     A.  I kind of lost track of what he said, I'm sorry.  If you

3     can repeat it.

4          THE COURT:  That the whole difference of opinion

5     between your expert side and the other expert side was there

6     should be something on the bike, is that what you were saying,

7     sir?

8          MR. WALSH:  Warning on the bicycle.

9     BY MR. WALSH:

10    Q.  You said that it was fine in the manual.  The manual

11    wasn't perfect, but it was adequate.

12    A.  Right.  Again, in my opinion, I don't recall if I said

13    that it wasn't needed, or whether if one was there, it

14    wouldn't have made a difference.  I don't remember.

15    Q.  Let me ask you this.  Z535, do you have any idea in 2003

16    what percentage of manufacturers were using Z535 as a warning

17    system?

18    A.  I don't know that's knowable.  I don't know the answer to

19    that.

20    Q.  Okay.

21    A.  I don't know if anybody does.

22    Q.  All right.  Do you know which, if any, cut-off machine

23    manufacturers in 2003 were using Z535?

24    A.  I want to be as accurate as I can on the previous

25    question, how many manufacturers.  I know at least the

1    manufacturers that are members of the Z535 committee used

2    those, and I know from my interactions with those people at

3    the meetings that there are other companies.  So I just want

4    to be accurate --

5    Q.  All right.

6    A.  -- to state that.  Now --

7    Q.  Do you know --

8    A.  I've answered that.  Now to the last question, I've

9    forgotten what it was.

10   Q.  Do you know how many people, manufacturers are members of

11   the Z535 committee?

12   A.  I don't know specifically, but it's at least 20.

13   Q.  All right.  Do you know if 1% of manufacturing population

14   was using it, do you know if 30%?

15         THE COURT:  Counsel, before you go on with your

16   question --

17         MR. WALSH:  Yes, Ma'am.

18         THE COURT:  You know, manufacturers make everything

19   from rubber bands to rocket ships.  So that question is too

20   broad.

21   BY MR. WALSH:

22   Q.  Well, everybody, basically every product has warnings on

23   it, regardless of whether it's rubber bands or rocket ships,

24   basically, in this day and age, does it not?

25   A.  Many do.

1   Q.  Yeah.  There's very, very few products that don't come

2   accompanied with some formal warnings, correct?

3   A.  Yes, as one example, the clipless pedals, I believe, did

4   not come with any warning.

5   Q.  Right, and that was true in 2003 also, was it not?

6   A.  There were many products that would have warnings on them.

7   Q.  Okay.  Let's confine; how many handheld power products

8   manufacturers were using Z535 in 2003?

9   A.  I would have no way of knowing.

10  Q.  Do you know if it was a majority or less than a majority?

11  A.  I would say there were probably less then than there are

12  now.  I think there's an increasing number of manufacturers

13  that do use ANSI guidelines.  As just in my informal

14  interactions with the world, and --

15  Q.  Do you know what the --

16  A.  I'm not done with my answer.

17  Q.  Okay.

18  A.  And going shopping for products of my own, such as looking

19  at lawn mowers and things like that, they increasingly have

20  warnings that follow an ANSI style.

21  Q.  Do you know what percentage of manufacturers today,

22  whether a majority of manufacturers today use ANSI or some

23  other system?

24  A.  I would have no way of estimating that, other than from my

25  informal interactions suggesting that I see more and more

1    products that have ANSI style warnings on them.

2    Q.  Okay.

3          THE COURT:  Okay, now just a second.  I know time is

4    limited.  ANSI style.  When UL, Underwriters Lab, puts its

5    approval on some product, there's been a suggestion, not, I

6    don't think, to you, but at the side, that UL picks up and

7    makes reference to some ANSI standard.  Are you aware of that?

8    A.  I'm not sure whether that's ANSI Z535 or not.  They are

9    separate entities.

10         THE COURT:  Okay, so the question that Mr. Walsh

11   asked you, how many, you know, handheld power machine makers

12   then or now use Z535, and your answer was you see increasingly

13   warnings on machines use ANSI style.  That's not the same as,

14   necessarily, Z535, is it?

15   A.  Yes, I meant that to be synonymous, that use ANSI Z535

16   type warnings on their products.  I'm sorry if it was

17   inartfully stated.

18         THE COURT:  ANSI Z535 type warnings.  But without

19   citing ANSI Z535?

20   A.  Yes.

21   BY MR. WALSH:

22   Q.  Do you have any idea whether it's a majority or less than

23   a majority of manufacturers?

24   A.  No, just generally that it has increased over time.

25   Q.  Do you have any data, statistics, information that would

1    suggest that there are less accidents with machines using ANSI

2    style warnings than machines using other style warnings?

3    A.  I think that's too broad for me to answer.  I don't know

4    what kind of accidents with which kind of products.

5    Q.  Any kind of accident.  Do you have any data that would

6    suggest that when you use an ANSI Z535 warning, that somehow

7    accident rates go down when compared to the same products, or

8    using different style warnings.

9            THE COURT:  Are there any studies of that issue, to

10   your knowledge?

11   A.  I vaguely remember that somebody may have dipped their toe

12   in that, but as I sit here I can't remember any specific study

13   that has done that.

14           THE COURT:  Okay.

15   BY MR. WALSH:

16   Q.  Do you have any information that would suggest that

17   accident rates fall at all when somebody goes to a Z535

18   system?

19           MR. PACKIN:  Object, too broad, too all

20   encompassing.

21           THE COURT:  I think it's repetitive.

22           MR. PACKIN:  We're at 45 minutes, Your Honor.

23           THE COURT:  Okay.

24   BY MR. WALSH:

25   Q.  Would you agree that good compliance with warnings is

1    anything that raises compliance above baseline levels of no

2    warnings?

3             MR. PACKIN:  Objection, as before, and asked and

4    answered.

5             THE COURT:  That's too vague.  Don't understand it.

6    BY MR. WALSH:

7    Q.  Well, we've been talking about compliance a lot, and there

8    is a baseline that can be established for a no-warning

9    condition, and a baseline of compliance that can be

10   established by testing for a warning condition, correct?

11   A.  Correct.

12   Q.  Would you say that good compliance is anything that raises

13   compliance above whatever baseline you're measuring from?

14   A.  Certainly more compliance is better than less compliance,

15   but I think you're asking me for some sort of a threshold or a

16   thermometer.  I can't give you that.

17   Q.  Well --

18   A.  We've covered this before in that I said that just because

19   one could observe that the majority of people using a

20   particular product are using it safely, that they're complying

21   with not putting it on there, it may not have a relationship

22   to the characteristics of the warning or the warning system

23   vis-a-vis the criteria that I've been talking about for two

24   days now.

25   Q.  Okay, let me just look at something here.

1        (Pause in proceedings)

2    Q.  Well, I can't find the reference, so we'll move on.  The -

3    -

4             MR. PACKIN:  Your Honor, are we going to stop?

5             THE COURT:  Mr. Walsh, what's your intentions, sir?

6             MR. WALSH:  Well, Your Honor, obviously I'm guided

7    by what you want to do.  I certainly have more information.  I

8    can't finish it, and I won't even attempt to and won't ask to.

9    I would like five minutes to sort of confer with Mr. Rudolph

10   and see if there's any additional last questions, and then

11   we'll wrap up.

12            THE COURT:  Thank you very much.  Let's take five

13   minutes, and I once again express that either party can

14   designate from the body of depositions in this case, not the

15   Stout case, but this case, any additional portions that you

16   want to have us specifically consider on the motion.  Five

17   minutes.

18        (Court in recess)

19            MR. WALSH:  Judge, I have just a couple of

20   additional questions.  We have some other questions, I think

21   in the sense of everybody's sensibilities here, and with the

22   ability you have given us to use excerpts, we're just going to

23   ask very few questions.  Should take five or ten minutes, and

24   then we'll be done.

25            THE COURT:  I'll give you that.

1              MR. WALSH:  Thank you.

2                    CROSS EXAMINATION (CONT'D)

3    BY MR. WALSH:

4    Q.  Dr. Kalsher, I noticed yesterday when you were testifying

5    for Mr. Packin and going over the testimony of the depositions

6    you had read from the Jingoli employees, you did not mention

7    Ed Kuhn.

8              THE COURT:  Spell it.

9              MR. WALSH:  K-U-H-N.

10   BY MR. WALSH:

11   Q.  You do remember reading Mr. Kuhn's deposition; you list

12   him in your report.

13   A.  Yes, sir.

14   Q.  Okay.  Mr. Kuhn was the safety director --

15   A.  Yes.

16   Q.  -- for Jingoli?

17   A.  Yes.

18   Q.  And Mr. Kuhn testified that he, as Jingoli Safety

19   Director, was aware that you should not use carbide tipped saw

20   blades on Stihl cut-off machines, did he not?

21   A.  Yes.

22   Q.  Okay.  Was it just an oversight that you didn't mention,

23   when you said that you hadn't read any depositions where

24   anybody at Jingoli knew that you shouldn't use carbide tip saw

25   blades?

1   A.  No, it was an oversight, because I do remember that he

2   said that, and I also remember that Mr. Kuhn made no attempt

3   to tell any of the employees that it was, in fact, a common

4   misuse of that, because I think I'm correct in saying that he

5   didn't know it was happening.

6   Q.  Yeah, he was the safety director; he was well aware of it,

7   and --

8   A.  No, what I was saying is I think I'm correct in recalling

9   him testifying, that he didn't know that mounting,

10  inappropriately mounting the toothed blade saws on the cut-off

11  saws was occurring.

12  Q.  Right.

13  A.  I think I have that correct.

14  Q.  He didn't know the employees were doing it, but he knew

15  they shouldn't be doing it.

16  A.  Yes.

17  Q.  And do you know what his source of information was for

18  that, how Mr. Kuhn as safety director for Jingoli knew that

19  you shouldn't be using carbide tip saw blades on cut-off

20  machines?

21  A.  I think it's related to his experience.  I don't remember

22  if he was part-time or as another job that he worked as a

23  volunteer firefighter, and so used, not necessarily that saw,

24  but similar saws for those kinds of applications.  I believe

25  that's where that came from.

1   Q.  All right.  Now, is it fair for me to say that when you

2   were retained for this position of looking at the warnings,

3   that you were asked to focus on the warning dealing with

4   carbide tipped saw blades?

5   A.  I thought I was retained to look at the warning system for

6   the Stihl cut-off saw generally, as well as prior to them

7   dropping off, also the warning on the toothed blade.

8   Q.  Well, do you recall testifying differently than that?

9            THE COURT:  Just a second, what is your answer,

10  toothed blades and other warnings, or primarily on -- I call

11  it toothed blades.

12  A.  Primarily, or to evaluate the warning system for Stihl, as

13  well as the warning.  The warning system meaning the warning

14  on the toothed blade and the packaging of the toothed blade.

15           THE COURT:  Oh, wait a minute, we're getting

16  confused here.

17           MR. WALSH:  No.

18           THE COURT:  And we don't want that to set in at the

19  last minute.  When you were retained for this case, were you

20  asked to focus on the Stihl warnings?

21           MR. WALSH:  No, no, no, let me rephrase the

22  question.

23           THE COURT:  Regarding not using toothed blades on

24  this saw?

25           MR. WALSH:  Yeah, let me rephrase the question.

1    BY MR. WALSH:

2    Q.  When you were retained in the case, you were retained,

3    were you not, to focus on the warning relating to the use of

4    carbide tipped saw blades on the Stihl cut-off machine?

5    A.  It's possible.  That may have been the primary reason for

6    bringing me in.  That may be possible.

7    Q.  All right, well, do you remember testifying in a

8    deposition taken on May 11th, 2010?

9              MR. PACKIN:  Page and line, please.

10             MR. WALSH:  159, starting at line 23, and continuing

11   over to 160.

12   A.  I don't have a copy of this, so --

13             MR. WALSH:  Well, you don't need a copy for this

14   purpose.

15             MR. PACKIN:  Well, can I have a moment to read it?

16   May I have a moment to read it?

17             THE COURT:  Just a second.

18             MR. PACKIN:  And the witness as well?

19             THE COURT:  The witness' dep, May 11th?

20             MR. WALSH:  May 11th, 2010.

21             THE COURT:  2010.  Page?

22             MR. WALSH:  159, starting at line 23.

23             THE COURT:  To where?

24             MR. WALSH:  Through line six on page 160 for this,

25   and then there's going to be two or three other references in

 1   here, the same type of --

 2   BY MR. WALSH:

 3   Q.  But do you recall these questions --

 4              MR. PACKIN:  Hold on.  I think the witness has the

 5   right to see the testimony.

 6              THE COURT:  He doesn't, but you do.

 7              MR. PACKIN:  And I have, and my position is, at 4:20

 8   now, we're reading testimony that's not even contradictory.  I

 9   mean, I don't know what we're doing with this.

10   BY MR. WALSH:

11   Q.  Do you recall the following question --

12              THE COURT:  I'll let you ask.

13   BY MR. WALSH:

14   Q.  Do you recall the following questions being asked, and you

15   providing the following answers:  Question, "Okay, have you

16   done a hazard analysis or participated in a hazard analysis of

17   a cut-off machine in that broader sense, looking at the

18   broader spectrum of hazards associated with use of the

19   machine?"  Answer, "Not formally, because that wasn't the

20   majority of the information that was given to me.  Most of it

21   focused on a particular hazard that led to the accident."

22        And then I want to direct your attention -- do you recall

23   those question and answers?

24   A.  I was deposed for three eight-hour days, so I generally

25   remember that, pulling a couple lines out of three days of

1   testimony.

2   Q.  Well, let's pull a couple more out and see.  Let's look

3   at, if we would then, let's go to page 164, just a couple of

4   pages up.

5           MR. PACKIN:  Lines, please.

6           MR. WALSH:  It's going to start with line 11, page

7   164 line 11, and they go through 165 line 5.

8   BY MR. WALSH:

9   Q.  And do you recall --

10          MR. PACKIN:  Hold on, hold on.

11          THE COURT:  Well, Mr. Packin, you tell us.

12      (Pause in proceedings)

13          MR. PACKIN:  I've read it.  Again, I don't

14   understand where we're going at 4:20.

15          THE COURT:  Go ahead.

16   BY MR. WALSH:

17   Q.  Do you recall the following questions being asked and

18   answers being given by you:  Question, "Okay, many more.  My

19   question has nothing to do with the number of cases that you

20   know about, it simply has to do with do you know of data that

21   would compare the severity of injury from one hazard to a

22   different hazard on a cut-off machine?"  Witness, "Again, the

23   results of the hazard analysis" --

24          MR. PACKIN:  There was an objection to form that's

25   been skipped.

1          MR. WALSH:  There was an objection to form.

2          THE COURT:  Do you know of studies comparing -- what

3    was it you said?

4    BY MR. WALSH:

5    Q.  No, my question is, it simply has to do with do you know

6    of data that would compare the severity of injury from one

7    hazard to a different hazard on a cut-off machine.  Mr. Packin

8    then objects, and then the witness is allowed to answer.  And

9    he answers, "Again, the result of the hazard analysis, if they

10   did one, would be the final product, which is the hazards they

11   would warn about on the machine and in the manual.  And

12   because of the facts in this case, it's not really critical to

13   me to think about those other ones, other than thinking about

14   how to make the warning for this particular accident that

15   occurred, the hazard that's associated with that more salient

16   in a way that people would be affected by it, would be able to

17   get access to the information, be likely to notice it,

18   understand it, and act on it."  Now, was that testimony true,

19   that your concern was not with other hazards, but with making

20   this hazard, the hazard associated with this accident, more

21   salient?

22   A.  I think what I was trying to say there was that the

23   primary focus of this accident was on looking at the hazards

24   associated with mounting a toothed saw blade on the cut-off

25   saw.  However, saying that, I don't remember ever suggesting

1    that the information come off, but rather indicating by my

2    work and, in fact, you know, I had done another set of

3    candidate warnings that retained the information, the complete

4    set of information on the saw, but reorganized it to reflect

5    that, in fact, all of that information was important, but to

6    call out from #8 in the second column, a hazard that was

7    clearly warranted by the totality of the facts that Stihl has,

8    as the only hazard that it calls out in its website, that it

9    spends many pages in its booklet warning about.  That it has

10   that as the only hazard on that yellow sticker that has the

11   severity of serious injury and death, suggested that that

12   particular warning be at least brought closer to the top or

13   relocated it.  So in the second set of candidates that I did,

14   I retained all the information for all of the others, and did

15   what I said I would do, which is to highlight that particular

16   hazard in a separate warning.

17   Q.  Did you make any attempt in highlighting that particular

18   hazard to determine what effect highlighting that hazard would

19   have on compliance, noticeability, or comprehensibility of the

20   warnings about other hazards?

21   A.  In effect, with these candidate warnings that I produced

22   at one of my depositions, I made an attempt to do just that so

23   that these were made to, in fact, have larger font than would

24   be present on the yellow sticker, that they would be grouped

25   in a reasonable way, consistent with what I've been talking

1    about in ANSI for multi-hazard kinds of warnings, where you

2    need to prioritize those in terms of injury severity and so

3    on.  I've done that.

4    Q.  No behavioral testing at all to determine what effect

5    highlighting one hazard has on compliance, comprehensibility

6    or noticeability of other hazards, correct?

7              MR. PACKIN:  This has been covered, Your Honor.

8    A.  We talked about the testing that I did up to this point,

9    which is testing the components of my warning system against

10   the ANSI standard, and the known body of literature out in the

11   field of human factors.

12   BY MR. WALSH:

13   Q.  No behavioral testing to determine --

14   A.  We've already -- I'm sorry, I'm not done with my answer.

15             THE COURT:  Well, finish.

16   A.  And you've already asked me, and several times I have said

17   I have not yet done behavioral testing on this, in part

18   because I wasn't asked to do so, and in part because I was

19   specifically asked to stop doing any more work on my candidate

20   warnings.

21   BY MR. WALSH:

22   Q.  And no attempt to behavioral test the effect of

23   highlighting one hazard on a compliance, comprehensibility or

24   noticeability on the other hazards, correct?  Yes or no.

25   A.  I don't know how to answer the question.  I have the

1    components that would be behaviorally tested that would have

2    all the components of that warning on it.

3    Q.  But you haven't tested it.

4    A.  I haven't done any testing except for --

5    Q.  Thank you.

6    A.  -- except for comparing the candidates that I have

7    prepared against the criteria for effectiveness that I have

8    described.

9    Q.  One final.  I think you testified yesterday that you do

10   not have any alternative warning that you are prepared to say

11   should go on the TS400, is that correct?

12   A.  What I can say to answer your question is that the

13   candidates that I have prepared, I believe, in my opinion,

14   meet the effectiveness criteria I've described, but before

15   they actually went on the saw, and again I've said this

16   several times, that it would be important to interact with the

17   manufacturer to do some additional refining on those before

18   they went on the saw.

19   Q.  And you have not behaviorally tested them to confirm your

20   belief that those would be adequate, correct?

21   A.  No, and I've been asked --

22           MR. PACKIN:  Asked and answered.

23   A.  No, and I've been asked not to do any further work on my

24   candidates.

25   BY MR. WALSH:

                              Kalsher - Redirect                    247

1   Q.  Okay, thank you.

2             MR. WALSH:  Your Honor, that's what we have for the

3   moment.

4             THE COURT:  Okay.  Would you like a short recess, or

5   just keep right on going, Mr. Packin?

6             MR. PACKIN:  My redirect is going to be brief; I

7   don't need the recess unless Your Honor would like it.

8             MR. WALSH:  Do you want this, Barry?

9             THE COURT:  Okay, just a second, please.

10  A.  Are we off the record, Your Honor?

11            THE COURT:  We are on the record.  Is there

12  something you need to ask, sir?

13  A.  I think it's not important.  I apologize.

14            THE COURT:  Okay, so this is redirect.  You may

15  proceed, Mr. Packin.

16            MR. PACKIN:  Thank you, Your Honor.

17                        REDIRECT EXAMINATION

18  BY MR. PACKIN:

19  Q.  And Dr. Kalsher, forgive me, I'm going to jump around a

20  little bit because I'm just going to hit a few topics and

21  hopefully be done quickly.  You were asked this morning by Mr.

22  Walsh if ANSI B7.5, the standard that was in effect from 1990

23  to 2000, expressly adopted Z535, do you remember that?

24  A.  Yes.

25  Q.  Does ANSI B7.5, in its express terms, in any way preclude

1   compliance with Z535?

2   A.  No.

3   Q.  Does the subsequent cut-off saw standard, B175 that was

4   adopted, I believe, in 2006, does that one in its language

5   expressly preclude compliance with Z535?

6   A.  No.

7   Q.  From your experience on the Z535 committee, is the

8   application of the Z535 considered to be precluded by the

9   existence of a machine's specific standard?

10  A.  No.

11  Q.  Does Z535 continue to represent generally accepted

12  principles in the field of warnings as per consensus between

13  experts and those involved in the industry?

14  A.  Yes, given the caveat at the end.

15  Q.  And does it so state --

16          THE COURT:  Consensus at what?

17          MR. PACKIN:  Consensus as to the generally accepted

18  principles in the field of warnings as determined by experts

19  in the field and those interested in the field of warnings,

20  such as manufacturers.

21  A.  In a consensus standard.

22  BY MR. PACKIN:

23  Q.  Okay.  So ANSI is a consensus standard.  The body of

24  literature represents work done by experts in the field as

25  well, correct?

1  A.  Experts, researchers, yes.

2  Q.  You were shown in the copy of ANSI -- I think it was

3  175.4.  Let me just check that.

4  A.  It should be one of these over here.

5  Q.  Z535.

6  A.  Isn't this it?

7          THE COURT:  Have you got an exhibit number?

8          MR. PACKIN:  Yes, Ma'am, Defendant's Exhibit-22.

9          THE COURT:  Is ANSI what?

10          MR. PACKIN:  Z175.4-2006.

11      (Defendant's Exhibit-22 previously marked for

12  identification)

13  BY MR. PACKIN:

14  Q.  Okay, first of all, just to establish context, this

15  document didn't come into existence until three years after

16  the saw was made, correct?

17  A.  Correct.

18  Q.  Notwithstanding, you were read by Mr. Walsh a list of

19  warranties, basic warranties that are set forth in 8.2 that

20  are recommended to go on a cut-off saw, correct?

21  A.  Yes.

22  Q.  Does it indicate anywhere in that list that they're

23  presented in any order of priority?

24  A.  No.

25  Q.  Is there anything contextual about it that indicates that

1    that list is presented in an order of priority?

2    A.  No.

3    Q.  You were asked by counsel, and I believe you were actually

4    asked by Judge Cooper as well, whether you could have designed

5    a behavioral compliance study regarding textual warning #8 on

6    the Stihl label, the label that was not on the saw at the time

7    of the accident, do you remember that?

8    A.  Yes.

9    Q.  Okay, and you said you could have, you do have the

10   capability, you have the expertise to do so, correct?

11   A.  Yes.

12   Q.  Is there any reason why you did not do so?

13   A.  Well, one reason is because I was asked to stop doing work

14   --

15   Q.  No, that was as to your candidate work.

16   A.  -- as to my candidates on that.

17   Q.  I'm asking about #8.  Is there any reason why, looking at

18   #8, you didn't do a behavioral compliance study?

19   A.  No, because it would be inconsistent with the conclusions

20   that I've drawn in this case that the information on that

21   sticker is defective, so I would not test it for that reason

22   until I redesigned it to be consistent with the criteria I've

23   been talking about.

24   Q.  Indicating what, that one -- would somebody in your field

25   perform a behavioral compliance study on a warning that's

1   facially inconsistent with the requirements of Z535, is that

2   what you're saying?

3   A.  Not if the point was to develop one that would meet the

4   requirements for effectiveness that I've talked about.

5   Q.  Okay.  Now, you were read many sections of the Stihl

6   owner's manual, correct?

7   A.  Yes.

8   Q.  TS 400 owner's manual.  This may sound self-evident, but

9   do the contents of a manual convey any information to a user

10  if the manual does not get to the user?

11  A.  No, it could not.

12  Q.  Okay.  Now, let's talk about that briefly in terms of the

13  Trek case.  The Trek case in which you were a defense expert,

14  you've indicated was a bicycle, correct?

15  A.  Yes.

16  Q.  Purchased by the user?

17  A.  Yes.

18  Q.  In your experience, is a bicycle considered a consumer

19  product or a commercial product?

20  A.  A consumer product.

21  Q.  The product in this case, you've indicated already, is

22  what you call a commercial or industrial use product, correct?

23  A.  Yes.

24  Q.  And you've told us that it is reasonable to expect that if

25  you --

1          MR. WALSH:  Your Honor, I'm going to object to the

2   blatant leading of the witness.  This is redirect.

3          THE COURT:  Okay, can you turn it around?

4   BY MR. PACKIN:

5   Q.  Just I would say --

6          THE COURT:  What kind of product is this?

7   BY MR. PACKIN:

8   Q.  What kind of product is this?

9   A.  This is a consumer product.

10         THE COURT:  No --

11  BY MR. PACKIN:

12  Q.  No, the TS 400.

13  A.  Oh, the Stihl.  I thought we were starting over.

14  Q.  Okay.

15  A.  This is deemed a commercial product, intended for use in

16  the construction industry.

17  Q.  Is there a difference between a case like Trek, with its

18  consumer product, and a case like McGee, an industrial

19  product, in terms of the reasonable likelihood that an owner's

20  manual will get to the end user?

21  A.  Yes, and I've talked about that repeatedly.

22  Q.  Now, in the Trek case you've told us as a consumer

23  purchaser, Mr. Pardue did get the manual, correct?

24  A.  Yes.

25  Q.  And he read it?

1   A.  Yes.

2   Q.  And he understood it?

3   A.  Yes.

4   Q.  And it was in that context that you evaluated the warnings

5   in that case?

6           UNIDENTIFIED SPEAKER:  Objection, we're back to

7   leading.

8           MR. PACKIN:  Your Honor --

9           THE COURT:  Okay --

10          MR. PACKIN:  -- what functional purpose would it

11  serve to go through the rubric of not leading after all of

12  this has been covered in the record?  I mean, if --

13          UNIDENTIFIED SPEAKER:  Well, if --

14          THE COURT:  Just a second.  I have enough basis to

15  evaluate whether Dr. Kalsher actually is being led to

16  something he does not himself think.  I don't think that's

17  happening here, so I'll give some leeway.

18          MR. PACKIN:  Thank you, Ma'am.

19  BY MR. PACKIN:

20  Q.  You mentioned for a few moments during your cross

21  examination the issues of frequency versus severity, do you

22  remember that?

23  A.  Yes.

24  Q.  Would you explain, 'cause it wasn't covered at any real

25  length, would you explain in terms of warnings what the issues

1   are, their frequency and severity?

2   A.  Sure, as it relates to warnings, one dimension that you

3   might want to look at in terms of hazards that you would want

4   to warn about in a warning system, and I won't get bogged down

5   into that, is the frequency of accidents that could be low to

6   moderate in terms of their severity.  Another dimension to

7   look at -- I mean, there could be frequency, and then there is

8   severity.  You could have frequent kinds of hazards that occur

9   that would expect to be encountered frequently that may

10  produce low to moderate kinds of injuries that might be worthy

11  of warning.  You might have very low frequency events that are

12  very severe, and despite the fact that they're not frequent in

13  nature, they warrant a warning.

14  Q.  In the field of warnings, are those factors that a

15  warnings expert would consider, that is, frequency and

16  severity?

17  A.  Yes.

18  Q.  And if I understand correctly, and correct me if I'm

19  wrong, the severity could well warrant a warning even though

20  frequency wasn't great.

21  A.  I've already testified that that's true, and in fact,

22  indicated that in ANSI Z535, for multiple hazard formats, that

23  in ordering them, the most severe should come first in the

24  list.

25  Q.  Is that the criteria you applied in making your

1    determinations in this case?

2    A.  Yes.

3    Q.  You were referred to the first paragraph on page 11 of

4    your report, where it said to determine whether the warning

5    materials associated with the Stihl cut-off saw and Oldham

6    blade, particularly on-product labeling, are noticeable and

7    comprehensible and meet other effectiveness criteria,

8    including whether the materials produce accurate beliefs and

9    motivate safe behavior, prototype version should be tested.

10   A.  Yes.

11   Q.  From reading the context, the express language of that

12   sentence, it appears you were addressing testing to determine

13   whether they're noticeable, comprehensible, and meet

14   effectiveness criteria, correct?

15   A.  Yes.

16   Q.  As I understand it --

17            THE COURT:  What were you quoting from, Counsel?

18            MR. PACKIN:  Page 11 of the report, Your Honor.  Mr.

19   Walsh --

20            THE COURT:  Of his own report?

21            MR. PACKIN:  Yes.  Mr. Walsh had talked to him about

22   those sentences.

23   BY MR. PACKIN:

24   Q.  You don't mention in that sentence adequacy.  Is that type

25   of testing you're referring to how you would test the adequacy

1    for warnings as distinguished from noticeability,

2    comprehensibility, and effectiveness?

3    A.  Well, we've talked about two types of assessment that one

4    might do.  You could compare the effectiveness of warnings

5    against the criteria that I've talked about, and then there

6    could be some more formal testing that would evaluate many

7    dimensions of the warning.

8    Q.  Is it theoretically possible for a warning to be

9    inadequate and have some effectiveness?

10   A.  I guess based on the summary statement from, for example,

11   my book chapter that, sure, you could have some compliance

12   from a not a great warning as compared to none, but it still

13   may not be adequate.

14           THE COURT:  Not a great what?

15   A.  Not a great -- not a terrific warning, but it still could

16   produce greater compliance than no warning but still not be

17   adequate.

18   BY MR. PACKIN:

19   Q.  Why, in assessing the adequacy or inadequacy of the

20   warnings in this case, did you not use the New Jersey statute

21   or New Jersey law as a standard?

22   A.  That wasn't the assignment that I was given.

23   Q.  When evaluating a warning, what standards or criteria do

24   you use?

25   A.  I've talked about them repeatedly.  I use effectiveness

1    criteria as spelled out in ANSI as an example, and I use

2    effective criteria as related to what is known in the warnings

3    research literature.

4    Q.  Would you --

5             THE COURT:  Okay, criteria established in your

6    field?

7    A.  In my field, yes.

8    BY MR. PACKIN:

9    Q.  Would you, for example, in any state in which you were

10   asked to evaluate warnings, make a study of the case book

11   interpretations of whatever product liability statutes that

12   jurisdiction had?

13   A.  No, I'm not a lawyer.

14   Q.  Okay.  Would it be correct, then, that you would present

15   your evaluation based on your field of expertise, and leave it

16   to the ultimate fact finder to make the determination as to

17   how that compares to the legal standard?

18   A.  That's what I have done.

19   Q.  Now, you were questioned about three particular articles,

20   one from 1992; that would be one year after the promulgation

21   of the first Z535, correct?

22   A.  Yes.

23   Q.  One from 1995, three years after the -- four years after

24   the promulgation, correct?

25   A.  Yes.

1    Q.  And one from 1998, correct?

2    A.  Yes.

3    Q.  And I believe you've told us in your testimony in this

4    case that the significant body of literature in empirical

5    research in warnings has been from, I think you said the late

6    1980s or 1990 to the present, correct?

7    A.  Correct.

8    Q.  Is warning signs a static science or an evolving science?

9    A.  It's an evolving science.

10   Q.  And that is all I have.

11           THE COURT:  What do you call this science?

12   A.  Risk communication and warnings.  Or more generally, human

13   factors.  It's an area within human factors.

14           THE COURT:  An area within human factors.

15           UNIDENTIFIED SPEAKER:  I did not hear his last

16   statement.

17           THE COURT:  An area within human factors.  Okay, any

18   other questions?

19           MR. PACKIN:  No, Ma'am, and just I have told your

20   Court personnel, I'll be sending somebody to pick up all this

21   stuff, hopefully tomorrow, and get it out of your Courtroom.

22           THE COURT:  Any recross, Mr. Walsh?

23           MR. WALSH:  No, Your Honor, I'll spare the Court and

24   all of us that.

25           THE COURT:  Okay.  Dr. Kalsher, thank you.

1           MR. KALSHER:  Thank you, Your Honor.

2           THE COURT:  Watch your step.  You can leave the

3    papers at the desk there.  Watch your step.  I say that from

4    experience.  That's a warning.

5        (Witness steps down)

6           MR. KALSHER:  Some of this is mine, so I'll separate

7    it out.

8           THE COURT:  Counsel, I would ask that you confer

9    with the Courtroom Deputy to make sure that the Courtroom

10    Deputy has an accurate list of the exhibits in evidence for

11    this hearing, and also that we have at least a complete bench

12    set of the exhibits.  You can take your own {quote}

13    "originals" of your exhibits back with you.

14           MR. WALSH:  If it hasn't, and just in case there's

15    something dangling out there, any of the exhibits we

16    identified and used with the witness, to the extent that they

17    haven't moved into evidence, we would move all of those into

18    evidence.

19           UNIDENTIFIED SPEAKER:  No objection.

20           UNIDENTIFIED SPEAKER:  Your Honor --

21           THE COURT:  In evidence.

22           UNIDENTIFIED SPEAKER:  -- and I hope it's okay to

23    call her by her first name, if Elizabeth could e-mail us --

24           THE COURT:  Ms. Hefner.

25           UNIDENTIFIED SPEAKER:  Ms. Hefner --

1           THE COURT:  On the record.

2           UNIDENTIFIED SPEAKER:  -- could e-mail us the list

3   she has, I'll check it against my recollection, and I'll send

4   copies of anything I have.

5           THE COURT:  We'll do that.  Liz, I don't have bench

6   copies of everything, but we can make a list up of what I

7   don't have bench copies of.  If you just remind me to do it.

8           UNIDENTIFIED SPEAKER:  I thank you and your staff

9   for the past two days.

10          THE COURT:  We thank you all very much for your hard

11  work and very good presentations.  We're still on the record.

12  At some point we need to talk about giving you the opportunity

13  to wrap up your argument on this motion.  But I don't think we

14  need to think about that today, okay?

15          MR. WALSH:  Thank you, Your Honor.

16          THE COURT:  We stand adjourned.  Safe travels.

17          ALL:  Thank you.

18      (Court adjourned)

19

20                      CERTIFICATION
21  I certify that the foregoing is a correct transcript from the
22  electronic sound recording of the proceedings in the above-
23  entitled matter.
24
25  S/Lewis Parham                      5/4/12
26  _____      _____
27  Signature of Transcriber              Date