UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

```
                                .
Robert McGee, et al.,           .      Docket #08-CV-520 (MLC)
                                .
     Plaintiffs,                .
                                .      United States Courthouse
          vs.                   .      Trenton, New Jersey
                                .      July 9, 2012
Stihl Incorporated, et al.,     .      9:44 a.m.
                                .
     Defendants.                .
.....................................................
```

TRANSCRIPT OF DAUBERT HEARING
BEFORE THE HONORABLE MARY L. COOPER
UNITED STATES DISTRICT COURT JUDGE

APPEARANCES:

For The Plaintiffs:          Barry M. Packin, Esq
                             Nagel Rice, LLP
                             103 Eisenhower Parkway
                             Roseland, NJ 07068

For the Defendants:          James Walsh, Esq.
                             McGuire Woods, LLP
                             One James Center
                             901 East Cary St.
                             Richmond, VA 23219

                             Stephen A. Rudolph, Esq.
                             Rudolph & Kayal
                             800 The Plaza
                             Sea Girt, NJ 08750

Audio Operator:              Antonio Giaquinto

Transcribing Firm:           Writer's Cramp, Inc.
                             6 Norton Rd.
                             Monmouth Jct., NJ 08852
                             732-329-0191

Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

2

## Index

|  | Direct | Cross | Redirect | Recross | Further Redirect |
|---|---|---|---|---|---|

**Witnesses For The Plaintiff:**

Dr. Hayes 7

**Witnesses For The Defendant:**

**MOTIONS:**

| EXHIBITS: | | Marked | Received |
|---|---|---|---|
| P-1 | Hayes CV | 5 | 6 |
| P-2 | Hayes Testimony Disclosure | 5 | 6 |
| P-3 | Hayes Report 11/3/09 | 5 | 7 |
| P-4 | Hayes Report 1/15/10 | 5 | 7 |
| P-5 | Photos-Color/Accident Scene | 6 | 7 |
| P-6 | Photos-Color/McGee Injuries | 6 | 7 |
| P-7 | Slide-3 Photos From P-6 | 63 | 64 |
| P-8 | Slide-Selection of Photos From P-5 | 76 | 77 |
| P-9 | Slide-Selection of P-5(31) And P-5(32) | 81 | 82 |
| P-10 | Slide-Vertical Distance From Ground | 87 | 87 |
| P-11 | Slide-Calculations for P-10 | 88 | 89 |
| P-12 | Slide Of P-5(32) With Calculations | 90 | 90 |
| P-13 | Slide-Photogrammetry Examples | 94 | 95 |
| P-14 | Slide-Photogrammetry Examples | 96 | 96 |
| P-15 | Slide-Peer Reviewed Publications | 100 | 101 |
| P-16 | Slide-Publication of Phtotgrammetry | 101 | 102 |
| P-17 | Slide-Pipe Spacing | 103 | 103 |
| P-18 | Slide-Figure 3 From Hayes Report | 110 | 114 |
| P-19 | Slide-Figure Between Pipes | 117 | 118 |
| P-20 | Slide-Anthropometric Modeling | 124 | 124 |
| P-21 | Slide-Use of HumanCAD Examples | 126 | 126 |

3

| P-22 | Slide-Use of HumanCAD Examples | 127 | 127 |
| P-23 | Slide-Publications/Anthropometric Modeling | 129 | 129 |
| P-24 | Slide-Accuracy of Anthropometric Modeling | 129 | 130 |
| P-25 | Slide-Progression of Photogrammetry/ Anthropometry | 133 | 133 |
| P-26 | Slide-Pattern of Injury V. Position | 146 | 146 |
| P-27 | Slide-Chart-Injury Corroboration | 146 | 147 |
| P-28 | Slide-Pipe Tension/Compression | 150 | 150 |
| P-29 | Slide-Human Figure and Pipe | 158 | 158 |
| P-30 | Diagram Drawn in Court-Hayes | 172 | |

4

```
 1              THE COURT:  Good morning counsel.

 2              ALL:  Good morning.

 3              THE COURT:  I'll have your appearances in the McGee

 4    case.

 5              MR. PACKIN:  Thank you, Your Honor.  Good morning.

 6    Barry Packin from the law firm of Nagel Rice, representing the

 7    Plaintiffs, McGee.

 8              MR. WALSH:  Jim Walsh from the law firm of McGuire

 9    Woods, representing Stihl.

10              MR. RUDOLPH:  Good morning, Your Honor, Steve

11    Rudolph, Rudolph & Kayal on behalf of the Stihl Defendants.

12              THE COURT:  Fine.  And we have Doctor Hayes this

13    morning, right?

14              MR. PACKIN:  Yes, Ma'am.

15              THE COURT:  Okay, you can call the witness and give

16    me a moment to just set up my files.

17              MR. PACKIN:  I would call to the witness stand

18    Wilson C. Hayes, PhD.

19          WILSON CARLYLE HAYES, PLAINTIFFS' WITNESS, SWORN

20              THE CLERK:  Please state and spell your full name

21    for the record.

22              DR. HAYES:  It is Wilson, W-I-L-S-O-N, Carlyle, C-A-

23    R-L-Y-L-E, last name is Hayes, H-A-Y-E-S, and that's PhD.

24              THE COURT:  I'll tell you when I'm ready.

25              MR. PACKIN:  Yes, Ma'am.
```

5

1      (Pause in proceedings)

2           THE COURT:  One moment, please.  Proceed, Counsel.

3           MR. PACKIN:  Thank you, Your Honor.  Your Honor,

4   just for the record, we pre-marked as Plaintiffs' Exhibit-1

5   Dr. Hayes' curriculum vitae.  As Plaintiffs' Exhibit-2, his

6   testimony disclosure.  As 3 --

7      (Plaintiff's Exhibit-1 previously marked for

8   identification)

9      (Plaintiff's Exhibit-2 previously marked for

10  identification)

11          THE COURT:  Just a minute.  What do you mean his

12  testimony disclosure?

13          MR. PACKIN:  The Rule 26 list of testimony that he's

14  given.

15          THE COURT:  You call that a testimony disclosure?

16  Okay, fine.

17          MR. PACKIN:  His --

18          THE COURT:  Just a second, please, counsel.  Go

19  ahead.

20          MR. PACKIN:  As P-3, his report of November 3, 2009.

21  As P-4 his report of January 15, 2010.

22     (Plaintiff's Exhibit-3 previously marked for

23  identification)

24     (Plaintiff's Exhibit-4 previously marked for

25  identification)

1            THE COURT:  15, 2010.

2            MR. PACKIN:  As P-5, the packet of color photographs

3     taken at the accident scene.

4        (Plaintiff's Exhibit-5 previously marked for

5     identification)

6            THE COURT:  How many in number, do you know?

7            MR. PACKIN:  I believe it's 35, but let me double

8     check.

9            THE COURT:  Approximately.  I'll leave it at that

10    for the moment.  Just so we move along.

11           MR. PACKIN:  I believe it's 35.

12           THE COURT:  Okay.

13           MR. PACKIN:  And P-6, a packet of color photographs

14    of the injuries to Mr. McGee's face and neck, and I believe

15    those are 11 in number.

16       (Plaintiff's Exhibit-6 previously marked for

17    identification)

18           THE COURT:  Okay.  Those are the pre-marked

19    exhibits?

20           MR. PACKIN:  Yes, Ma'am.

21           THE COURT:  In evidence by consent?

22           MR. WALSH:  Yes, Ma'am.

23           THE COURT:  So noted.  Thank you.

24       (Plaintiff's Exhibit-1 admitted into evidence)

25       (Plaintiff's Exhibit-2 admitted into evidence)

1        (Plaintiff's Exhibit-3 admitted into evidence)

2        (Plaintiff's Exhibit-4 admitted into evidence)

3        (Plaintiff's Exhibit-5 admitted into evidence)

4        (Plaintiff's Exhibit-6 admitted into evidence)

5             THE COURT:  I'll tell you when I'm ready.

6        (Pause in proceedings)

7             THE COURT:  I'm not ready yet.  The set you gave me

8   is here, but it's not marked, so I'm just going to make pencil

9   marks for the bench copy.  Go right ahead.

10            MR. PACKIN:  Thank you.  Does Your Honor prefer if I

11  examine from the table or the podium, or --

12            THE COURT:  It makes no difference to me.

13            MR. PACKIN:  Thank you.

14                      DIRECT EXAMINATION

15  BY MR. PACKIN:

16  Q.  Good morning, Dr. Hayes.

17  A.  Good morning.

18  Q.  On the curriculum vitae that we have marked as Plaintiff's

19  Exhibit-1, is that a current and accurate copy of your

20  curriculum vitae?

21  A.  Yes.

22  Q.  What are your areas of specialty, Dr. Hayes?

23  A.  I specialize most fundamentally and broadly in a field

24  called injury biomechanics.  I'm also a mechanical engineer.

25  I also have a Master's in Mechanical Engineering Design.  And

1   in support of my activities in injury biomechanics, I do what

2   is sometimes referred to as accident reconstruction, but also

3   event reconstruction or incident reconstruction.

4           THE COURT:  All the same thing?  Those three terms?

5   A.  They are used interchangeably.  Accident reconstruction

6   has come to be associated with motor vehicle accidents and

7   thus, I think it's better to use the event reconstruction or

8   incident reconstruction.

9   BY MR. PACKIN:

10  Q.  Dr. Hayes, could you define for us what is meant by injury

11  biomechanics?

12  A.  Yes, let me take the two terms.  Injury is our common

13  sense of the word.  We're hit with something in the head, we

14  have a concussion or --

15          THE COURT:  Counsel, would you please instruct Dr.

16  Hayes that my custom is to testify into the room, not to the

17  bench.

18          MR. PACKIN:  Okay.

19  A.  Thank you, Your Honor.

20          THE COURT:  Sure.

21  A.  You fracture a skull.  You have a concussion.  You fall

22  and break your hip.  Any of those changes to the anatomy where

23  pain occurs and is not normally there or the anatomic site no

24  longer functions appropriately, are common sense of an injury.

25  It works just fine.  Biomechanics is the combination of two

1    terms:  Biology and mechanics.  In a setting such as this,

2    we're really talking about the biology and anatomy related to

3    the musculoskeletal system, and since mechanics is the study

4    of the effects of forces on objects, really what we're about

5    in injury biomechanics is looking at how forces and motions of

6    objects can cause injury to the human body and to the

7    musculoskeletal system.

8    BY MR. PACKIN:

9    Q.  Does injury biomechanics involve in any way engineering

10   principles?

11   A.  It absolutely does.  Since mechanical engineering involves

12   forces on objects --

13            THE COURT:  Mechanical what?

14   A.  Engineering.  Involves forces on objects, how people fall,

15   how they position themselves, how they balance themselves, is

16   a direct application of mechanical engineering.  If something

17   breaks, just if I were to take a yardstick and bend it until

18   it broke, that's mechanical engineering on an engineered

19   object.  The same applies to a fracture of a bone -- long bone

20   of the body or fractures to the mandible and other parts of

21   the face and neck.

22   BY MR. PACKIN:

23   Q.  How, if at all, is accident reconstruction different from

24   injury biomechanics?

25   A.  I have mentioned already the use of accident

1   reconstruction associated with motor vehicle collisions.

2   We're not doing that here, of course.  Injury reconstruction

3   or injury biomechanics is the step after you first understand

4   how the incident occurs.  So, how is someone positioned?  How

5   do we have from scene --

6          THE COURT:  Just a second.  I lost you there.  I'll

7   be right with you.  Accident reconstruction refers these days

8   to motor vehicle, right?

9   A.  Yes.

10         THE COURT:  And incident reconstruction -- you were

11  explaining some distinction between the term incident

12  reconstruction and the term injury biomechanics.  Something

13  about how you know that the -- you know basically how the

14  accident occurred, but something else -- you're going to be

15  trying to determine.  I didn't follow that.

16  A.  Okay.  So the first step is we have to reconstruct the

17  event.  If it's an --

18         THE COURT:  So that's incident reconstruction?

19  A.  That is fine to call incident or event reconstruction.

20  How is a person positioned?  What is the environment around

21  that person?  The second part of the process one has to, in a

22  sense, connect that environment and the mechanics of, in this

23  case, a moving saw and saw blade.

24         THE COURT:  Mechanics of moving objects?  Is that

25  right?

1  A.  Moving objects or in this instance, a rotating saw blade

2  and a saw.  And connect it to the injuries that are actually

3  observed.  And I think an effective way to look at it is to

4  think of the injuries as a kind of signature to the event that

5  allow you to work back from the objective evidence of injury

6  to what caused it and how it occurred.

7         THE COURT:  Allow you to work back to the events of

8  the injury to determine how it occurred -- of the incident --

9  to determine how the injuries occurred?

10  A.  Yes.  And in this instance, we have a rather unique

11  situation where we have a --

12         THE COURT:  Just a second.  Let's get another

13  question.

14  BY MR. PACKIN:

15  Q.  And how does that apply -- the injury biomechanics and

16  accident reconstruction in this particular case?

17  A.  In this instance, we have a rather unique situation where

18  we have direct evidence on the scene of where the saw was at

19  the time that this incident initiated, and then we have direct

20  evidence on the face and neck of Mr. McGee as to how the saw

21  moved when it hit him.

22         MR. WALSH:  Your Honor, I'm going to object.  I

23  think we are well outside the report of this witness.  The

24  witness gave a report on three specific questions.  He was --

25  during his deposition, Mr. Packin made very clear he was not

1   being offered on anything except those three questions, and

2   none of this has anything to do with those three questions.

3            MR. PACKIN:  It most certainly does, Your Honor.

4            THE COURT:  Okay, it does.  Objection overruled.

5            MR. PACKIN:  Thank you.

6            THE COURT:  One moment, please, though.  I'll be

7   right back.  I just forgot something.

8        (Pause in proceedings)

9            THE COURT:  All set.

10  BY MR. PACKIN:

11  Q.  Dr. Hayes, you were explaining about the injuries being

12  the signature to the event.

13  A.  Yes, and so we have evidence from photographs --

14           THE COURT:  Just a second, please.  Let me see

15  counsel at the side.  I just want to see what the order of the

16  direct is so that I can follow the plan.

17       (Sidebar on the record - began at 9:58 a.m. and ended at

18  9:58 a.m., transcribed under separate cover)

19           THE COURT:  I don't need to direct you, counsel,

20  able, experienced, counsel, what to do, but if you're going to

21  go over any of Dr. Hayes's background and qualifications, I'll

22  hear about that now.  I'm fully familiar with the materials

23  that have been submitted on this motion, including his

24  original report, his supplemental report, and his deposition

25  in this case.  I have not taken it upon myself to read his

1   depositions in the Stout case.  Some of the photographs, I

2   don't think, were necessarily available to me, but -- in the

3   motion papers, but they're here in hearing evidence.  So, if

4   you just progress through in summary the qualifications if you

5   wish to bring that out, and then we'll talk about this case.

6   But the terms of our -- I think for the jury that would be

7   helpful.  I don't have much need to be informed about that.

8           MR. PACKIN:  Thank you.

9   BY MR. PACKIN:

10  Q.  Dr. Hayes, what is your educational background?

11  A.  I was a mechanical engineering student at Stanford

12  University from 1960 to 1964, graduating with a Bachelor's in

13  Mechanical Engineering '64.  I then took a Master's Degree in

14  Mechanical Engineering, also from Stanford University, in a

15  special program in Mechanical Engineering Design.  During that

16  program, I started working with people in the medical school,

17  decided I wished to go on in that field, and took a PhD in a

18  field that is essentially mechanical engineering at

19  Northwestern University, but it was a combined program between

20  both the Engineering School and the Medical School, and so I

21  took the basic science years of medical school; anatomy,

22  physiology, neurophysiology, along with medical students.  I

23  graduated from that program in 1970, did a PhD dissertation on

24  the effects of impact forces on cartilage, the lining surfaces

25  of our joints.

1   Q.   And were you awarded your doctoral degree, sir?

2   A.   Yes.   1970.

3   Q.   And from what institution?

4   A.   From Northwestern University.

5   Q.   Did your studies leading to your Bachelor's and Master's

6   Degrees in Mechanical Engineering at Stanford provide you with

7   any knowledge or education relevant to injury biomechanics?

8   A.   It did.   I started at the very first week studying a

9   course called Strength of Materials, which is a fundamental

10  tenet of how strong materials are, both in the body and

11  elsewhere.   I studied the effects of forces on objects and how

12  objects move.   And so, I had the basic understanding of

13  virtually all of what I do today in engineering physics as

14  part of my undergraduate degree in ME.

15  Q.   And your PhD in Theoretical and Applied Mechanics, did

16  that provide you with any knowledge or education relevant to

17  injury biomechanics?

18          THE COURT:   Just a second.   In 1966, when you got

19  your MS in Mechanical Engineering, and in 1970, when you got

20  your PhD in Theoretical and Applied Mechanics, was the term

21  biomechanics in common usage in scientific circles?

22  A.   It was just starting -- well, the term biomechanics

23  broadly was used for some decades before that.   Its

24  application in orthopedics and injuries to the musculoskeletal

25  system was an emerging field at that point in time.

1             THE COURT:  Okay.  So the -- you're saying the

2    emphasis in -- the degrees in Mechanical Engineering and

3    Theoretical and Applied Mechanics, the way that you took them,

4    did involve the human body as an important focus of what you

5    studied?

6    A.  I went to medical school, basically, without an intent to

7    become a physician, in order to learn the anatomy and

8    physiology.

9             THE COURT:  Go on, counsel.

10            MR. PACKIN:  Thank you.

11   BY MR. PACKIN:

12   Q.  Did you have any post-doctoral training or education?

13   A.  I did.  I spent one year at the Laboratory for

14   Experimental Surgery in Davos, D-A-V-O-S, Switzerland,

15   studying the mechanics of fracture healing and treatment.  I

16   spent a second post-doctoral year at the Department of

17   Orthopedic Surgery in the Main Orthopedic Hospital in

18   Stockholm, Sweden, where I returned to the subject matter of

19   my dissertation; the effects of impact forces on cartilage.

20   Q.  Did the research fellowship in the Laboratory for

21   Experimental Surgery provide you with any knowledge,

22   education, or training relevant to injury biomechanics?

23   A.  It did.  It allowed me to -- as a non-physician, non-

24   surgeon, to participate in live animal surgeries that were

25   under way in that institution, which was a valuable supplement

1   to my subsequent teaching responsibilities at Harvard, in

2   particular, teaching human anatomy, which was necessarily done

3   from human cadaver work.

4   Q.  Your training in the Department of Orthopedic Surgery in

5   Sweden, that was through the National Institutes of Health, is

6   that correct?

7   A.  It was N-I-H, National Institutes of Health, Special

8   Fellowship, was the last year that they offered such

9   fellowships to go overseas.

10  Q.  And did that fellowship training provide you with any

11  knowledge, education, or training relevant to the area of

12  injury biomechanics?

13  A.  It did.  I was required as part of that fellowship to

14  attend x-ray conferences every single day, along with

15  orthopedic surgeons, and my role there was really both to

16  learn their surgical procedures and required input as well as

17  to provide input on the biomechanics of the injury as well as

18  the mechanics of treatments that they were considering.  And I

19  subsequently did that same kind of x-ray round for the rest of

20  my academic career.

21  Q.  Have you held any faculty appointments?

22  A.  I have.  When I first returned from Europe, I took a

23  position as an Assistant Professor of -- again, the department

24  was called Theoretical and Applied Mechanics, a local name for

25  mechanical engineering.  I was an Assistant Professor in that

                          Hayes - Direct                    17

1    department as well as an assistant professor in the Division

2    of Orthopedic Surgery at Stanford Medical School.  I was in

3    that role from '71 to '76.  In 1976, I moved to the University

4    of Pennsylvania where my primary appointment was in the

5    Department of Orthopedic Surgery.  My secondary appointment

6    was in the College of Engineering in the Bioengineering

7    Department.

8              THE COURT:  I think that was 1971?

9    A.  '71 was --

10             THE COURT:  Look at your own CV.

11   A.  '71 was when I went to -- when I taught at Stanford -- '71

12   to '76.

13             THE COURT:  Would you look at your on CV, please?

14   Which is fine, you can consult your own CV.

15   A.  Well, if it says '67 to -- these dates have all been --

16   oh, I can see what happened, Your Honor.  If you move the

17   dates -- the top date that says Faculty Appointments and go

18   across, that's displaced upward, and if we move them down one,

19   we get the correct dates, and my apology.  I didn't notice

20   that.

21             THE COURT:  Down one -- move down one.  Move down

22   one line.  Thank you.  That clears that up.

23   A.  My apologies.

24             THE COURT:  Go right ahead.

25   BY MR. PACKIN:

1  Q.  Continue, Dr., regarding the faculty appointments that you

2  held.

3  A.  So it's -- in 1976 to 1979, I was at the University of

4  Pennsylvania, again with a joint appointment in Engineering

5  and Medicine.  And then in 1979, I was offered a position at

6  Harvard Medical School, and at the Beth Israel Hospital.  I

7  took that position in 1979 and was there at Harvard from 1979

8  to '98.  I was First Associate Professor of Orthopedic

9  Surgery, appointed a full Professor, I think, '85, and then to

10  an Endowed Chair in Orthopedic Surgery at Harvard in 1987.  I

11  was also made a member of the Faculty of the MIT Health

12  Sciences and Technology Program, and those academic

13  appointments also applied at MIT and was in that role from '83

14  to '98.  In 19 --

15          THE COURT:  It says here that you were the Maurice

16  Edmond Muller Professor of Biomechanics at Harvard Medical

17  School.

18  A.  That's correct, Your Honor.

19          THE COURT:  And -- are you saying that that

20  appointment was in about 1987?

21  A.  That appointment was 1987, yes.

22  BY MR. PACKIN:

23  Q.  Is that the Endowed Chair that you were referring to?

24  A.  That was the Endowed Chair, yes.

25          THE COURT:  Okay, so that was Chair in Biomechanics.

                              Hayes - Direct                        19

1    By now it's called biomechanics?

2    A.  Yes.

3              THE COURT:  Okay.  Thank you.

4    BY MR. PACKIN:

5    Q.  Did those -- have you finished with your faculty

6    appointments?

7    A.  And then I moved in 1998 to Oregon State University where

8    my administrative appointment was as Vice Provost of Research

9    for the entire university.  I had an appointment at the

10   Medical School in Portland; Oregon Health Sciences University

11   in the Department of Orthopedics, and I also had an

12   appointment in Health and Human Sciences in the Engineering

13   School at Oregon State.

14   BY MR. PACKIN:

15   Q.  How did --

16             THE COURT:  And Nutrition, it looks like.  And

17   Exercise.

18   A.  That is now what -- that's the department as opposed to

19   the college.

20   BY MR. PACKIN:

21   Q.  Okay.  As part of holding those faculty appointments, did

22   you have any teaching responsibilities?

23   A.  I did.  I taught --

24   Q.  What did you teach?

25   A.  Excuse me, counsel.  I taught Undergraduate Engineering

1    courses, mainline engineering Undergraduate and Graduate

2    courses.  I taught biomechanics from an engineering

3    perspective in the Engineering School.

4    Q.  At what university?

5    A.  At Stanford.  And I also taught Orthopedic biomechanics at

6    the School of Medicine at Stanford.  I taught the same course

7    that I had taught earlier as a graduate student when I was at

8    Northwestern University in the '60s.  A similar situation at

9    the University of Pennsylvania.  When I got to Harvard, my

10   teaching responsibilities changed in a sense, and I was asked

11   to be one of the three core faculty members of a course called

12   Human Functional Anatomy, which was the intense form of the

13   anatomy course at Harvard that was used for both MD and PhD

14   students interested in working in these combined fields.

15             THE COURT:  Let me ask a really simple question.

16   Why do doctors want to know what the mechanical forces were

17   that produced the injuries that the doctors are coping with in

18   the patients?

19   A.  A couple of examples.

20             THE COURT:  I mean, because you're teaching this to

21   medical students?

22   A.  I am.  Here's a straightforward example.  You've heard of

23   total hip replacements, of course?  If you lift your leg off

24   the bed by yourself after you've had a total hip replacement,

25   the forces across your hip are greater than the forces when

1    you get out of bed and walk.  And understanding that and

2    teaching physicians such that they realize that they're

3    putting huge forces on the body when they do it that way, is

4    one kind of interesting, crucial treatment.  Second, if you

5    look at an x-ray and it's a very simple fracture, let's say of

6    the femur, and then you look at a second x-ray where the

7    fracture is broken up into small pieces.  The term is called

8    comminuted.  That tells me that much more energy was

9    associated with the second fracture and is likely to cause

10   more soft tissue and vascular damage.  Thirdly, last example,

11   we're all told that grandma breaks her hip because she has

12   osteoporosis and doesn't take her osteoporosis drugs, doesn't

13   drink milk, you know, the milk ads, etc.  It turns out that

14   grandma breaks her hip far more because of the way she falls

15   and impacts the ground than anything to do with osteoporosis,

16   and if my academic and research contributions have made a

17   contribution, it's in the understanding that falls are a

18   determining factor in hip fractures more than the sense of

19   osteoporosis.  If you fall and land on your nose, you don't

20   tend to break your hip.  If you fall and land on your hip, you

21   almost always break your hip.

22            THE COURT:  Okay.  That's a helpful answer.  Thank

23   you.

24   BY MR. PACKIN:

25   Q.  You were speaking about your teaching responsibilities at

Hayes - Direct                          22

1    -- I think you were up to Harvard or MIT.

2           THE COURT:  I think we're through there.  I mean,

3    really.  I'm interested in moving along.

4           MR. PACKIN:  Okay.

5           THE COURT:  It's -- I just want to get this -- just

6    sort of the impression from this, I think, is all we need for

7    this hearing today.

8           MR. PACKIN:  Okay.

9           MR. PACKIN:  This is not full-dress testimony before

10   the jury.

11   BY MR. PACKIN:

12   Q.  Since they have challenged Dr. Hayes' qualifications, I

13   wanted to go through them, but I will follow Your Honor's

14   directive.

15          THE COURT:  He can have more scope to answer on

16   cross, and you may have an opportunity to come back at

17   redirect if you haven't been thorough enough.  Is that

18   acceptable, Mr. Walsh?

19          MR. WALSH:  It's acceptable to me, Your Honor.

20   BY MR. PACKIN:

21   Q.  Let's go, Dr. Hayes -- according to your CV, you developed

22   some courses at Northwestern in Orthopedic biomechanics?

23   Could you just tell us briefly what that was about?

24   A.  That was teaching --

25          THE COURT:  What page is that?

1            MR. PACKIN:  That might actually have -- well, Dr.

2    Hayes can tell us what page on his CV.  I think it's actually

3    taken from the Statement of Qualifications in his report.

4    There's a narrative statement of qualifications in the report.

5            THE COURT:  Okay.  All right.

6            MR. PACKIN:  I think it's in paragraph number four.

7            THE COURT:  I think we covered paragraph four.

8            MR. PACKIN:  Actually, it's in five -- five.

9            THE COURT:  I think you covered that, too.

10           MR. PACKIN:  All right.

11           THE COURT:  Did you, sir?

12   A.  I did mention teaching that course at Northwestern, and I

13   think I've talked about most of the courses that I have taught

14   over the years, as long as we understand it's been in both

15   Engineering and Orthopedics and Anatomy.

16           THE COURT:  Fine.

17   BY MR. PACKIN:

18   Q.  You mention in your report that you taught post-graduate

19   courses in biomechanics of the musculoskeletal system to

20   orthopedists, radiologists, and neurologists at Harvard

21   Medical School.  Could you tell us briefly what that teaching

22   involved?

23   A.  That involved injury biomechanics as well as some of the

24   topics that we've already discussed this morning to a more

25   advanced group, relating to graduate students and full-time

1    staff members who were interested in learning about this

2    field.

3    Q.  And while you held these academic and teaching positions,

4    did you hold any research appointments?

5    A.  I did.  I was Director of the Laboratory for Experimental

6    Mechanics at Stanford.  One relevant piece of work or activity

7    in that laboratory was a motor vehicle crash reconstruction

8    laboratory.  This is in the early '70s when we were worried

9    about the effects of shoulder belts on injuries to the human

10   spine.  We had a crash reconstruction laboratory including a

11   sled.  We had crash dummies.  We used human cadavers to look

12   at the issue of frontal collisions and whether or not you

13   would fracture your thoracic or dorsal spine when using those

14   seat belts, and thankfully we were able to contribute to the

15   knowledge base that they helped far more than they hurt.

16   Q.  What was your involvement in setting up that accident

17   reconstruction crash facility?

18   A.  I competed for funding to do so.

19          THE COURT:  Are we at a university with this

20   facility?

21   A.  We are.

22          THE COURT:  Which one?

23   A.   We're at Stanford University.  I bought the equipment,

24   set up the laboratory, obtained the cadaver specimens,

25   designed the research, conducted the experiments, and

Hayes - Direct                              25

1    evaluated and published them.

2    BY MR. PACKIN:

3    Q.  What other research projects were you involved in while

4    you were teaching?

5               THE COURT:  Well, he says he's principal or co-

6    principal investigator on 61 research grants, so you can lead

7    a little bit.

8    BY MR. PACKIN:

9    Q.  Can you pick some of the research grants that you think

10   are most indicative of your eventual work in injury

11   biomechanics and accident reconstruction?

12   A.  Roughly, perhaps 20% of my activities have been on injury

13   biomechanics to the spine.  Another aspect of our activities

14   is in the general field of ergonomics, or the study of human

15   work and forces on the human body.  I was funded for nearly 20

16   years by the National Institutes of Health to study the

17   effects of falls on hip fracture risk and the kinds of

18   mathematical models that were used in the McGee case were the

19   same sorts of -- the term is anthropometric, or anthropometry

20   -- anthropometric models that were used here to study this

21   particular case.

22   Q.  On you CV, it refers, for example, to work as Head of the

23   Biomechanics Section of the Department of Orthopedic Surgery

24   at the University of Pennsylvania.  What did that involve?

25   A.   That involved fundamental orthopedic biomechanical

1    research.  A lot of it, since the focus of the department was

2    on cartilage, the lining surface of our joints, again, I was

3    studying whether arthritis occurs from wear or tear or other

4    genetic and biological factors, for instance.  I also studied

5    the injury threshold of bone.  I studied the knee joint and

6    its replacements.  And these are all reflected in peer-

7    reviewed publications if you look at the time period that I

8    was there, it gives a kind of outline to the work that was

9    done.

10   Q.  Your CV also lists a number of grants that you were

11   awarded covering some 2-1/2 pages or more.  Just briefly, how

12   did you obtain such grants?

13   A.  If one is applying to Federal agencies, for instance, like

14   the National Institutes of Health, or the Centers for Disease

15   Control, you have to write a proposal, you submit that

16   proposal for national review, and in order to be funded, you

17   have to score highly enough to be within the -- for much of my

18   career, the top 10% of all grants submitted to the National

19   Institutes of Health.  If you get the money, you can then

20   proceed to do the research.  So it is a competitive, and

21   sometimes highly competitive process.

22   Q.  Does your CV reflect accurately the various grants you've

23   received over the years?

24   A.  It does.

25   Q.  One of the grants, and I believe you briefly mentioned it,

1    was Fall Biomechanics and Hip Fracture Risk.  When was that

2    done in point in time?

3              THE COURT:  Which one is this?

4              MR. PACKIN:  Fall Biomechanics and Hip Fracture

5    Risk.

6              THE COURT:  And can you find that on the CV?

7    A.  I can, Your Honor.  If you go to page six, and about three

8    or four lines down from the top, it says "National Institutes

9    of Health, Fall Biomechanics and Hip Fracture Risk."  And the

10   dates given are 1990-2007.

11             THE COURT:  Okay.  And what's the question, Mr.

12   Packin?

13   BY MR. PACKIN:

14   Q.  In terms of that particular grant, was that, as it appears

15   by the title, to have been a biomechanical study?

16   A.   It was injury biomechanics in all of its applications.

17   How did these fractures occur?  What are the forces associated

18   with these fractures?  Do people fracture their hips because

19   they fall, or for some other reason?

20   Q.  And --

21             THE COURT:  Can I just ask another simple question?

22             MR. PACKIN:  Absolutely.

23             THE COURT:  Sometimes, just out of curiosity I ask.

24             MR. PACKIN:  Absolutely.

25             THE COURT:  This is irrelevant.  When grandma falls

1   on the kitchen floor, breaks the hip, do you find that

2   sometimes it was because the hip disintegrated and caused her

3   to fall?

4   A.   Short answer, Your Honor.  Yes, but in a very small

5   percentage of cases.  Something less than 10%.  People will

6   report I was just walking along, my hip broke, and I fell

7   down.  That's certainly not the dominant mode.

8             THE COURT:  Okay, thank you.

9   BY MR. PACKIN:

10  Q.   In terms of that particular study, what type -- did you

11  use any form of mathematical or computer model?

12  A.   We did constantly, both the fundamental laws of physics,

13  meaning what sort of velocities does the body achieve as it

14  hits the ground and what forces does that impart or impose on

15  the hip?  We did testing in the laboratory or human hips in

16  all sorts of loading configurations -- used cadaver material,

17  broke the hips, and then compared the forces that are

18  associated with a fall and impact on the ground to the

19  strength of the hip.  Anthropometry, which is the study of

20  human size and shape --

21            THE COURT:  Let me just get that, please, in my

22  notes, because I saw that term in your report.  A-N-T-H-R-O-P-

23  O-M-E-T-R-Y is the study of human size and shape?  Yes?

24  A.   Yes.

25            THE COURT:  Period?

1   A.  Yes.

2            THE COURT:  Okay, go ahead.

3   A.  It turns out anthropometry is crucial to that particular

4   research question, as it is to the questions of this case in

5   that if you have a lot of padding over your hip, that tends to

6   act, if you want to think of it as a pillow, that absorbs

7   energy and prevents forces going through to the hip and the

8   causing fracture.  So, understanding people's size and shape

9   and distribution of body fat was a crucial part of that entire

10   research study.

11   BY MR. PACKIN:

12   Q.  Now, have you been honored, in your career, for any of

13   your research activities?

14   A.  Yes.  And I was hasten to say that these honors are the

15   consequence of collaborative efforts with students and faculty

16   members.  I was awarded the Kappa Delta Award, which is the

17   highest research honor, I suppose, of the American Academy of

18   Orthopedic Surgeons.  I think that was around 1987.  In 1995

19   or so, I was honored --

20            THE COURT:  This is from orthopedic surgeons?

21   A.  This is from the American Academy of Orthopedic Surgeons.

22            THE COURT:  Where is that on the CV?

23            MR. PACKIN:  Page 2, Your Honor.

24   A.  There is a section called "Honors and" --

25            THE COURT:  Sure.

1    A.  It's about the fifth or sixth one down.

2            THE COURT:  Yes, okay.  Kappa Delta?  Is that what

3    it is?

4    A.  Yes.

5            THE COURT:  Okay.

6    A.  Shall I continue?

7    BY MR. PACKIN:

8    Q.  Yes.

9    A.  And then, in 1995, I was awarded from the American Society

10   of Biomechanics the so-called Giovanni Borelli Award, and that

11   was for our work on falling and hip fractures.  The one after

12   that is a grant -- sorry, an award to our research laboratory

13   for Excellence in Research in Orthopedic Treatment that had to

14   do with understanding injuries, joint replacement, and

15   arthritic changes in the human knee.

16   Q.  In your professional activities, have you played any role

17   in setting any national research agenda in orthopedics?

18   A.  Yes, I have been asked to serve on, and in some instances,

19   direct subcommittees of the National Institutes of Health.

20   This is back in the early '90s, setting the research agenda in

21   orthopedics and orthopedic biomechanics for the next decade.

22   I did that for the National Institutes of Health, for the

23   Centers --

24           THE COURT:  So this is standard setting?

25   A.  No, this is not standards setting.  This is trying to map

1  out the directions research should take such that the National

2  Institutes of Health could release invitations to researchers

3  around the country as to what were important research

4  directions to pursue.  So I did that for the Centers for

5  Disease Control, mostly about injury issues.  I chaired a

6  workshop for --

7          THE COURT:  Why does the Centers for Disease Control

8  in Atlanta care about injury issues?

9  A.  Hip fracture is a multi-billion dollar, both scientific

10 and financial impact.  People with hip fractures are filling

11 more than 50% of orthopedics beds, and if hip fractures

12 continue to rise, it's fairly clear that we may not have

13 orthopedic beds for any other reason than hip fracture

14 patients, so it's a huge national problem.

15         THE COURT:  So hip fracture is considered disease?

16 Fractures are considered disease in your framework?

17 A.  I would say just the opposite.  They are in part a

18 consequence of the loss of bone --

19         THE COURT:  No, I'm just saying, the Centers for

20 Disease Control has a broader scope than just infections and

21 that kind of thing?

22 A.  It does.  Very much so.

23         THE COURT:  So hip fractures fall under its

24 umbrella?

25 A.  Yes, absolutely.

1             THE COURT:  Okay.

2    A.  And particularly if you realize that this -- it's called

3    the Centers for Disease Control and Prevention.

4             THE COURT:  Yes.

5    A.  And so, injury prevention was a big part of their mandate

6    when I was working with and for them.

7    BY MR. PACKIN:

8    Q.  Have you held any hospital or clinical appointments?

9    A.  I have.  In each of these situations, I was, in fact, had

10   a clinical appointment in the Department or Division of

11   Orthopedic Surgery where my responsibilities involved

12   attending x-ray rounds and providing the kind of input that I

13   have already talked about, and I did that for over 40 years.

14            THE COURT:  I can see that on page 2, the list of

15   medical school and hospital appointments.  I'm trying -- I've

16   never heard of this before.  I'm trying to picture how,

17   basically a PhD engineer type integrates with the doctors in

18   the clinical setting.  What do they do with you?  I mean, how

19   do they deal with you when you're there?

20   A.  Every single --

21            THE COURT:  I don't mean socially, of course.  I

22   mean professionally.

23   A.  Every single morning, orthopedic surgeons put up their

24   patient x-rays for the surgeries they're doing that day.  They

25   would go through those x-rays, talk about the patient.  I

1    would be asked, while looking at the x-rays, to interpret how

2    that particular injury is likely to have occurred and what

3    kind of consequences they could expect from that injury --

4              THE COURT:  When they get in there?

5    A.  When they get -- absolutely when they get in there.

6              THE COURT:  Okay.

7    A.  Or, as another example, let's say you have a fracture of

8    the main long bone of your leg, your femur.  Lots of

9    biomechanical work had been done on the relative advantages of

10   metal plates on the outside of the bone; what's called a

11   medullary rod down the shaft of the bone, and I would get

12   asked questions like, well, what's the biomechanical research

13   say in terms -- I have a noncompliant patient who's going to

14   go out and run around no matter what I do.  What's the best I

15   can do?  And they would ask questions like, from your

16   engineering perspective, what's the best surface of that bone

17   to put that plate on?  So it was a fascinating opportunity

18   both to learn and to provide input to patient care without

19   putting my hands on the patient.

20   BY MR. PACKIN:

21   Q.  Dr. Hayes, your CV consists of -- well, let me go forward

22   for a second.  You've talked a lot about medicine along the

23   lines of what the Judge just asked you.  You're not a

24   physician, is that correct?

25   A.  I am not a physician.  I am not licensed in any state.  I

Hayes - Direct                                34

1    don't treat patients.  That being said, I have had lots of

2    clinical experience, attended surgeries, constantly done the

3    kind of work I've described.

4    Q.  Briefly, what are peer-reviewed publications in your

5    field?

6              THE COURT:  Before we get to that, you have patents,

7    right?

8    A.  I do.

9              THE COURT:  But you do not hold an engineering

10   license in any state?

11   A.  I do not.

12             THE COURT:  Can you explain how those two facts

13   occur?

14   A.  Well, I'm not sure how the patent relates to being a

15   licensed engineer.

16             THE COURT:  Right.  Why would a person take out an

17   engineering license in a given state?

18   A.  In some instances, it allows them a kind of certification

19   that allows them to testify in Court.  In some states, it's

20   required.  Others -- most not, to be able to certify

21   engineering drawings, for instance.  I've never had the need

22   for, and have never stood for a professional engineering

23   license.  I have always relied on my background, training, and

24   experience and my PhD.  And the patent work, anyone can hold a

25   patent, of course.

1            THE COURT:  True, of course.

2    A.  You don't have to be a professional engineer, but my

3    background is in mechanical engineering and mechanical

4    engineering design with this clinical activities, and all the

5    anatomics.

6            THE COURT:  Thank you.

7    BY MR. PACKIN:

8    Q.  Briefly, what are peer-reviewed publications in your field

9    of expertise?

10   A.  Let's say a young woman in my laboratory is interested in

11   having her research work published.  She writes a manuscript

12   based on the research experiment or analysis we have done.

13   She sends that publication to a journal.  The editor of that

14   journal sends the submitted manuscript out to a group of

15   people knowledgeable in the field who make recommendations as

16   to whether it should be accepted, rejected, or returned for

17   revisions.  And because it goes through that kind of juried or

18   peer-reviewed process, it is the gold standard of academic

19   publications.

20   Q.  Have you authored any peer-reviewed publications in your

21   field of expertise?

22   A.  I have.

23   Q.  How many?

24           THE COURT:  Is this under heading of Refereed

25   Articles in the CV?

1   A.  Yes, Your Honor.

2           THE COURT:  That's the same thing as peer reviewed?

3   A.  It is.

4           THE COURT:  Okay.  It looks like the number of

5   authors of some of these things would serve as a referee

6   alone.  Go ahead.

7   A.  I think that, in fact, reflects, Your Honor, the

8   collaborative nature of multi-disciplinary work so that you

9   usually involve engineering students, engineering faculty, and

10  orthopedists in much of this research.

11  BY MR. PACKIN:

12  Q.  And approximately how many peer-reviewed articles have you

13  had published, either as an author or co-author?

14  A.  Just under 200, 198.

15  Q.  And what, in general, was the subject matter of these

16  peer-reviewed articles, not specifically each article?

17  A.  It all deals with biomechanics in one form or another.

18  Much of it having to do with injury biomechanics, strength of

19  the bone, hip fracture, spinal injury.  I've done work on the

20  mandible that's directly relevant to this -- or at least the

21  anatomy is.

22  Q.  How many chapters and proceedings have you published?

23  A.  I think it's over 60.

24  Q.  And in what field?  In what areas?

25  A.  Again, injury biomechanics over a broad range of topics; a

1   chapter that's widely cited on forensic injury biomechanics

2   dealing with the special requirements of testimony and

3   litigation related to injury biomechanics.

4   Q.  Is the forensic application of injury biomechanics

5   something that comes up with frequency?

6   A.  Absolutely.

7           THE COURT:  The forensic what?

8   BY MR. PACKIN:

9   Q.  Are the forensic aspects of injury biomechanics something

10  that comes up frequently?

11  A.  It's -- certainly given what I do and what our company

12  does, is the core of our activities and it's why I'm sadly on

13  the road so much.

14  Q.  Is it limited to just civil litigation?

15  A.  No.  I have testified in criminal Court on any number of

16  occasions about shooting, about recreating scenes associated

17  with shootings either by or -- the police or people at each

18  other.  I do a fair amount -- we've seen -- since I've studied

19  falls and why grandma -- and I should say, Your Honor, why

20  grandpa breaks his hip as well -- since we have studied falls

21  and published in that area in some detail, we get all the

22  cases when -- and this is horrible to speak about, but when

23  people throw their wives or throw their children off of

24  cliffs, using fundamental physics to look at the trajectory of

25  that throw and comparing it against facts of the case, I've

1    had way too many of those kinds of cases.  I also do patent

2    work because of my background in orthopedic biomechanics.

3              THE COURT:  What's the patent -- are you saying you

4    do patent testimony?

5    A.  I do patent testimony on invalidity, on -- you know,

6    whether a patent has -- I'm blocking on the word, I'm sorry.

7    But --

8              THE COURT:  Whether it has -- whether it's obvious

9    or not -- whether it's --

10   A.  I think validity and -- terrible --

11             THE COURT:  Infringement?

12   A.  Thank you.

13             THE COURT:  Infringement.

14   A.  I appreciate that.

15             THE COURT:  Right?

16   A.  So I do infringement and invalidity analyses.  I do --

17   I've done recently a royalty case in Federal Court about

18   whether an inventorship case, as to whether someone should be

19   added to a patent.

20   BY MR. PACKIN:

21   Q.  Have you published any books?

22   A.  I have.

23   Q.  How many?

24   A.  I've published --  I'm sorry?

25   Q.  How many?

1   A.   I've published one book on the issue of falling and hip

2   fractures that was published by the American Academy of

3   Orthopedic Surgeons, and a second textbook on what's called

4   Orthopedic Biomechanics that deals with many aspects of injury

5   biomechanics.

6   Q.   And has that text reached a second publication?

7   A.   It has gone through two publications while I was co-

8   editor-in-chief of that publication, and now I passed that on

9   to others, and it's, I think, in its fourth edition now.

10  Q.   Have you trained PhD students?

11  A.   I have.   I've trained 22 PhD students in this area of

12  biomechanics.   And I am working on what I expect to be my last

13  PhD student who has another six months to go.   And I have also

14  been mentor to, I think it's six MD dissertations done at

15  Harvard Medical School.

16  Q.   In what fields?

17  A.   Again, biomechinical --

18          THE COURT:   MDs have to do dissertations?

19  A.   They can do dissertations if they wish to.

20  BY MR. PACKIN:

21  Q.   In what field have you mentored or trained those PhD and

22  MD dissertation students?

23  A.   They are all in some aspect of orthopedic, musculoskeletal

24  science, almost always involving biomechanics.

25  Q.   Do you hold any patents?

1  A.  I do.  I hold 10 patents that range from -- and I've

2  mentioned some of these, a unique device for treating

3  fractures of the femur with intramedullary rods.  I hold a

4  patent for padding the hip to prevent hip fractures using a

5  kind of soft, gushy material that is soft when you sit on it,

6  but when you fall on it, it feeds the forces away from the

7  hip.  I have patents on implantable materials that can be used

8  to augment the skeleton and then resorb and are replaced by

9  bone.

10          THE COURT:  What is a tug-resistant link?

11          MR. PACKIN:  (Laughs).

12  A.  That was a patent that, if I have a material that's soft,

13  and I put it together in the right way, if you think about a

14  belt buckle almost, if I pulled that tug-resistant link

15  slowly, it'll come apart.  It'll stretch.  If I pull it

16  quickly, it stops and holds it cold.  So it was a very

17  general-purpose idea to create a link using these unique

18  materials that we had developed.

19          THE COURT:  Sounds like a Chinese finger puzzle.

20  A.  It is a little like that.  If you think of Silly Putty.

21  If you take Silly Putty and pull it apart slowly, no problem.

22  If you take Silly Putty and go really quickly like that --

23          THE COURT:  Yes it breaks it.

24  A.  It either breaks or gives very high resistance.

25  BY MR. PACKIN:

1   Q.  And you give us a representative indication of the

2   professional societies you belong to or have belonged to?

3   A.  I belong to the American Society of Mechanical Engineers,

4   the American Academy of Orthopedic Surgeons as an Associate,

5   which is what's allowed if you're not a physician.  I'm a

6   member of the Human Factors in Ergonomics Society.  I'm a

7   member of the -- and this is just a partial listing -- of the

8   Society of Automotive Engineers.  I'm a member of the

9   International Society, I think, of Safety Engineers.  I may

10   not have that term exactly correct.  But a broad range of

11   scientific societies.  The Orthopedic Research Society.

12   Q.  Have you held editorial and review positions yourself

13   where you have been part of the peer reviewing process for the

14   submissions of others?

15            THE COURT:  I think we covered that.

16            MR. PACKIN:  I'm saying where he would -- okay.

17            THE COURT:  Under Professional Activities, I'm sure

18   some of those are peer review boards, right?

19   A.  They are, but I think there is a special section on

20   editorial and review --

21            THE COURT:  Okay, page six.  I see that.  I've got

22   it.

23   BY MR. PACKIN:

24   Q.  And in what field have your editorial and reviewing

25   positions been?

1    A.  Orthopedic surgery on the one hand, mechanical engineering

2    on the other, and in fact, the Journal of Orthopedic Research

3    that I started sat squarely between the two.

4              THE COURT:  Tell me that again.

5    A.  So I have served in editorial positions, usually as a

6    member of an editorial board after being a reviewer for

7    journals as disparate as the American Society of Mechanical

8    Engineering all the way to the American Academy of Orthopedic

9    Surgeons, and in between, I was asked by the American Academy

10   of Orthopedic Surgeons to start a new journal in 1983 called

11   the Journal of Orthopedic Research.

12   BY MR. PACKIN:

13   Q.  And did you do that, sir?

14   A.  I did that for some 12 or 13 years and then passed that

15   burden on.

16             THE COURT:  But you say this journal of -- what was

17   the common ground into related disciplines that you just

18   described?  Orthopedics and biomechanics?

19   A.  Orthopedics and engineering more broadly, and yes,

20   biomechanics was a central focus --

21             THE COURT:  Okay.

22   A.  -- of all of the publications.

23             THE COURT:  Okay.  So biomechanics actually -- it's

24   not co-extensive with orthopedics and mechanical engineering,

25   but it draws significantly from both of those fields?

1   A.  Perfect.

2             THE COURT:  Okay.

3   BY MR. PACKIN:

4   Q.  Dr. Hayes, have you received any training or education in

5   accident reconstruction?

6   A.  I have.  I've taken post-graduate courses in accident

7   reconstruction.  Mostly, I have taught in those sort of

8   courses -- injury biomechanics, because of my background and

9   expertise.

10            THE COURT:  So this was in accident reconstruction?

11            MR. PACKIN:  Yes, Ma'am.

12            THE COURT:  Which, in the trade, has come to refer

13  to vehicular accidents, right?

14  A.  Yes.

15  BY MR. PACKIN:

16  Q.  Most -- I think he testified most commonly, but it does

17  still have a dovetail with injury biomechanics.  Is that

18  correct, sir?.

19  A.  Yes.  Oh, yeah.  I mean, every time we have a car roll

20  over, we have to look at how the person is hurt.  Is it

21  because the roof is bad?  Is it because they were ejected and

22  weren't seat belted?  That sort of thing.

23  Q.  Without going into detail at this point as to these

24  issues, are there computer programs and models and

25  mathematical programs that people such as yourself use in the

1   field of injury biomechanics and accident reconstruction?

2           THE COURT:  Okay, that's a big question.  Let me see

3   if I understand it.  What tools are typically used for

4   accident and incident reconstruction.  Is that your question?

5           MR. PACKIN:  Yes.  What kind of --

6           THE COURT:  Analytical tools --

7   BY MR. PACKIN:

8   Q.  Analytical tools, models, programs, things of that nature.

9   A.  And I think your question also included the injury

10  biomechanics --

11  Q.  Yes.  Yes, sir.

12  A.  -- piece as well.

13          THE COURT:  Okay, let's make sure the question is

14  clear.  Restate it, please.

15  BY MR. PACKIN:

16  Q.  What type, if any, of computer programs, models,

17  mathematical programs do people in the field of accident

18  reconstruction and injury biomechanics use and rely on to do

19  their work?

20  A.  We use sophisticated programs that can recreate, based on

21  sometimes photographs, based on direct crush measurements, for

22  instance --

23          THE COURT:  And now you lost me.  Sophisticated

24  programs -- then you lost me.

25  A.  That apply engineering physics to the study of collision

1   severity related to motor vehicles.

2           THE COURT:  I think the question -- well, see, your

3   question, Mr. Packin, was focused on the auto accident -- on

4   the vehicular accident as Dr. Hayes understood it.

5           MR. PACKIN:  Apparently so.

6           THE COURT:  That's why I was trying to get a clear

7   question.

8   BY MR. PACKIN:

9   Q.  In terms of injury biomechanics and accident

10  reconstruction -- or let's start with injury biomechanics.

11          THE COURT:  Well, if we could just leave automobiles

12  out of this -- leave vehicles out of this except as Dr. Hayes

13  needs to draw from that related area in order to explain

14  something.  So, if we could focus on -- and let's get our

15  nomenclature just clean for purposes of this hearing.  I know

16  that scientists use some terms interchangeable.  He said today

17  event -- just a second.  I'll be right with you.  You can take

18  injury biomechanics as a broad description.  Within that, he

19  has testified accident reconstruction has come to refer mostly

20  to vehicles, and the terms incident reconstruction and event

21  reconstruction will cover the rest of injury to the body.

22          MR. PACKIN:  So --

23          THE COURT:  So, I don't care how you put the

24  question, but if you use that vocabulary, we'll understand the

25  question.

 1    BY MR. PACKIN:

 2    Q.  In the field of injury biomechanics --

 3              THE COURT:  Okay.

 4    BY MR. PACKIN:

 5    Q.  -- incident reconstruction, event reconstruction, not in

 6    the automobile accident context, does your discipline -- does

 7    your profession use computer or mathematical models or

 8    computer programs?

 9    A.  We do.

10    Q.  What do you use?

11    A.  We use a variety of software to first, characterize the

12    scene of the event, if we're talking about event

13    reconstruction; where are -- and sometimes we're forced to

14    rely on pictures.  We can't directly examine the scene.  That

15    discipline is called, as we will see, photogrammetry; that is,

16    the study of physical objects from photographs primarily.

17              THE COURT:  Just a second.  P-H-O-T-O-G-R-A-M-M-E-T-

18    R-Y?

19    A.  Perfect.

20              THE COURT:  Is the study of what?

21    A.  It's the study of -- it's obtaining reliable measurements

22    from photographic evidence --

23              THE COURT:  Okay.

24    A.  -- I think is a simple --

25              THE COURT:  Obtaining reliable measurements from

1    photographic --

2    A.   Images.

3           THE COURT:  Okay.  And you use computers to help you

4    do that?

5    A.   We do.  Secondly, we use anthropometry, which we've

6    already -- I've already defined as the study of human size and

7    shape.  And you can put those two together to fit a person in

8    a scene.

9           THE COURT:  I understand.

10   A.   And then you can use the fundamental laws of physics to,

11   in a sense, bring that to life and look at the expected forces

12   and directions of objects in the scene, be they --

13          THE COURT:  Looking at forces and directions of

14   objects --

15   A.   Objects --

16          THE COURT:  -- in the --

17   A.   And just to take from a couple of examples.  If someone is

18   shooting, how does a particular bullet go through a victim?

19   Or part of the scene, for instance, would involve the

20   connection of those two disciplines.  Or this particular case,

21   exactly involves those two kinds of disciplines.

22          THE COURT:  What two kinds of disciplines?

23   A.   Photogrammetry and anthropometry.

24          THE COURT:  Those are techniques -- discipline --

25   Okay, that's fine.

1  BY MR. PACKIN:

2  Q.  Are those tools, photogrammetry and anthropometry,

3  something regularly used and relied upon in your field?

4  A.  They are used in my field as well as throughout our entire

5  culture.

6  Q.  We'll get into those in more detail.  How many times have

7  you given deposition testimony in your career as an expert

8  witness in your field since 2000?

9  A.  I'm turning to a Testimony and Analysis Binder in front of

10 me.  There's a tab, Testimony History, and I have given 319

11 depositions since 2000, and I have testified in 206 trials

12 since the year 2000.

13          THE COURT:  Would you call this part of a trial?  I

14 mean, here we are.

15 A.  I would call this a hearing.

16          THE COURT:  It's hearing, actually.  So, is your 206

17 number inclusive of hearings?

18 A.  I don't think so, no.

19          THE COURT:  Any hearings?  Have you done a hearing

20 such as this anywhere?

21 A.  I have done Daubert hearings galore.  I've done Frye

22 hearings.

23          THE COURT:  Okay, so that's -- that would be more.

24 A.  That would be --

25          THE COURT:  Appearances.  Separate from depositions

1   and trials, in your listing?

2   A.  That would.

3          THE COURT:  Okay.  Plus Daubert and Frye hearings.

4   Okay.

5   BY MR. PACKIN:

6   Q.  Have all of these been in the field of injury biomechanics

7   or mechanical engineering?

8   A.  Put that way, yes.  As long as patents, and to the extent

9   that comes up in patent litigation would be included as well.

10  Q.  Has any Court --

11         THE COURT:  Mechanical engineering, then, right?

12  BY MR. PACKIN:

13  Q.  Has any Court ever refused to accept your qualifications

14  to testify in your field?

15  A.  I think there are some Courts that have insisted that

16  injury causation can only be testified to by those holding an

17  MD.  And in those instances, in the vast majority of cases, I

18  have been allowed to testify on general causation as opposed

19  to specific causation of a particular person's injuries.

20  There was a case in Texas, the Acevedo (phonetic) matter where

21  the Judge came to the conclusion that biomechanics was not a

22  reliable scientific field, and I understand excluded both

23  sides' biomechanical experts on those grounds.  And the rest

24  fall under this idea of whether you have to be a physician in

25  order to testify as to causation.

1   Q.  Other than the Acevedo matter, the one case out of these

2   several hundred where the Judge determined that injury

3   biomechanics was not going to be accepted and both sides were

4   excluded, have your qualifications been accepted in all other

5   cases?

6   A.  Yes, in terms of those kinds of hearings, yes.

7   Q.  Now, Dr. Hayes, your CV runs some 23 pages, and it also

8   includes much more information about your faculty

9   appointments, hospital administrative appointments, honors,

10  awards, professional societies and activities, grants,

11  editorial and review positions, theses that you've supervised,

12  refereed articles, which itself goes on to list some 198,

13  chapters and proceedings, books, patents -- we've only touched

14  on some of them, and not to the derogation necessarily of

15  others, are all of those listings on the CV accurate and

16  current?

17  A.  I certainly hope so.  Except for the alignment of the

18  dates on the first page.

19          MR. PACKIN:  And Your Honor, on that basis, we have

20  offered Dr. Hayes in this case, and do offer him as an expert

21  in injury biomechanics, in orthopedics and mechanical

22  engineering --

23          THE COURT:  Just a second.  Injury reconstruction?

24          MR. PACKIN:  Injury biomechanics.

25          THE COURT:  Okay.

 1            MR. PACKIN:  We'll call it incident/accident

 2    reconstruction -- recognizing the limitation that Dr. Hayes

 3    has given to it.  And mechanical engineering, although I do

 4    honor my representation to Defense counsel that we have not

 5    offered Dr. Hayes in this case as an expert to evaluate the

 6    design of the saw itself.  We have not offered him for that

 7    purpose.  And in orthopedics to the extent there are some

 8    orthopedic injuries here.  And with the Court's permission,

 9    I'll proceed to the substantive aspects.

10            THE COURT:  Just a second.  Just a minute, Mr.

11    Walsh?

12            MR. WALSH:  Yes, Ma'am.

13            THE COURT:  I just have 1 small area of inquiry.

14            MR. PACKIN:  Yes, Ma'am.

15    BY THE COURT:

16    Q.  Dr. Hayes, most of your work has focused on skeleton,

17    cartilage, and obviously the musculoskeletal system, at least,

18    as we've heard this morning.  Most of the injuries here were

19    the physical entry of this blade into this person's flesh.  It

20    cut through nerves.  It cut through muscles.  It broke the

21    jaw.  Among other things.  Right?

22    A.  Yes.

23    Q.  Is that whole range of injury something that you consider

24    yourself to be qualified to discuss from the perspectives of

25    the professional fields for which you are being offered?

1    A.   I do, Your Honor.   I taught the head and neck -- parts of

2    the head and neck at Harvard for some 18 years.   It also --

3    the blade left a track through anatomic regions of the

4    mandible through the parotid gland through, as you say, nerves

5    and vessels, all of which I am familiar with the anatomy.   It

6    created -- I mentioned comminution.   That gives me a sense as

7    to the energy levels involved.

8    Q.   The comminution of the jaw fracture?

9    A.   Yes, the -- close to the temporomandibular joint is --

10   Q.   Okay.

11   A.   -- noted as highly comminuted.

12   Q.   Bones, nerves, the works, right?

13   A.   Though --

14   Q.   As well as the external injury?

15   A.   As well as the external injury.

16          THE COURT:   Okay, thank you.   That was my only

17   question.

18          MR. PACKIN:   Just a followup question along that

19   line.

20   BY MR. PACKIN:

21   Q.   Dr. Hayes, when you did your work, both clinical and

22   teaching in the area of orthopedic injuries and

23   musculoskeletal injuries, did those on occasion involve

24   lacerations and injuries to the soft tissue as well?

25   A.   They did, very much so, yes.

1   Q.  And was that part -- was part of your analysis and

2   evaluation and teaching -- did that also involve analysis of

3   those soft tissue injuries related to the orthopedic injuries

4   as well?

5   A.  It did.  Using, as I've said to the Court, the comminution

6   of bone has a kind of marker to what kinds of injuries we can

7   expect to the anatomy around the fractured bone.

8   Q.  Orthopedic injuries are sometimes caused by blunt trauma

9   that doesn't cause soft tissue injury, correct?

10  A.  Of course.

11  Q.  Sometimes by penetrating trauma that does cause soft

12  tissue injury?

13  A.  Yes.

14  Q.  Did your work involve both?

15  A.  Yes.

16  Q.  Does this particular case involve both?

17  A.  Yes.

18          MR. PACKIN:  Thank you.

19          THE COURT:  And comminuted means a -- you already

20  explained.  Means a scatter pattern of fracture rather than a

21  clean fracture?

22  A.  It means -- I think the easiest way to think of it is just

23  multiple fragments.

24          THE COURT:  Multiple fragment bone injury rather

25  than a clean --

1   A.  Yes, I could think of a bone breaking into two pieces with

2   a clean fracture and comminuted would mean many pieces.

3          THE COURT:  What's the opposite of comminuted in med

4   terms?

5   A.  Sometimes they're called simple.

6          THE COURT:  Oh.

7   A.  Just plain simple fractures.

8          THE COURT:  Okay, fine.  Thank you.

9   A.  Usually they're given a direction.  A transverse fracture

10  --

11         THE COURT:  Right.

12  A.  -- and oblique.

13         THE COURT:  Right.  Okay.  Mr. Walsh what is your

14  inclination here, sir?  Do you want to address me?

15         MR. WALSH:  Well, we can do it however Your Honor

16  wants.  I will note that on subjects such as offering him from

17  an orthopedic standpoint, well beyond the reports.  There is

18  nothing in the reports in which he discusses any orthopedic

19  basis for any of his opinions.  He recites some of the medical

20  history, but when he does his analysis, there is no discussion

21  of orthopedic elements to that discussion.  So we're --

22         THE COURT:  Okay.  That goes beyond qualifications,

23  though.

24         MR. WALSH:  It goes beyond qualification.  If Your

25  Honor will -- we can do it -- I can Voir Dire him now on his

1   qualifications, or I can -- Your Honor can reserve her ruling

2   on his qualifications -- you can let Mr. Packin finish, and I

3   can do everything at once.  It's up to you.

4           THE COURT:  Does it make a difference to you?

5           MR. PACKIN:  It does not make a difference to me --

6           THE COURT:  Okay.

7           MR. PACKIN:  -- as long as you reserve your ruling,

8   Your Honor.

9           THE COURT:  Sure.  Let's just move along with the

10  direct then, and I think we're due for a recess.

11          MR. PACKIN:  Thank you, Your Honor.

12          THE COURT:  Okay?  When I declare recess, everybody

13  gets up and mills around.  You don't just stand waiting for me

14  to depart.

15      (Court recessed)

16          THE COURT:  Okay.  On we go.

17          MR. PACKIN:  Thank you, Your Honor.

18                    DIRECT EXAMINATION

19  BY MR. PACKIN:

20  Q.  Dr. Hayes, your initial report in this case was authored

21  on November 3, 2009, correct?

22  A.  Yes.

23  Q.  And you were asked to address some particular issues in

24  that report.  You were asked by my office to address some

25  particular issues, correct?

Hayes - Direct                                56

1    A.  Yes.

2    Q.  Those are the issues that are set forth on page six in

3    paragraph 15?

4    A.  They are.

5    Q.  And the first issue, sir, was, please read into the

6    record.

7    A.  Would you like me to read it in?

8    Q.  Yes.

9    A.  Or give a --

10            THE COURT:  Just read it.  And there will be

11   followup questions.

12   A.  "The questions you've asked me to address to a reasonable

13   degree of engineering and biomechanical certainty are:  1) Was

14   there sufficient space between the two pipes such that Mr.

15   McGee could position himself between them, be properly

16   balanced, and complete the second cut in a biomechanically

17   safe manner?"

18   Q.  The second question, please?

19   A.  "2) Does the evidence in this case support a scenario with

20   Mr. McGee losing his balance, falling to the ground, and then

21   being struck in the face by the cut-off machine while on the

22   ground as --

23   Q.  Number 3.

24   A.  -- indicated in the Falls Township Police Incident

25   Report?"

1   Q.  And number 3 -- I'm sorry to have talked over you.

2   A.  And "3) Could the accident have been prevented by

3   supporting the pipe with a strap configuration attached to a

4   crane or a forklift?

5   Q.  Dr. Hayes, did you feel that those questions were within

6   your area of knowledge, education, training, and expertise?

7   A.  I did, and I do.

8   Q.  You were supplied with materials by our office to review

9   in this matter prior to rendering that November 3, 2009

10  report, true?

11  A.  Yes.

12  Q.  And those materials are listed by you in your report on

13  page 2, starting with paragraph 9, and running over to page 3

14  as well, correct?

15  A.  Correct.

16  Q.  Would you please go through those materials item by item

17  and give us generally how those items provided you with facts,

18  data, or information relevant to your inquiry in this case.

19  You don't have to give us, for example, with depositions,

20  every single fact that you learned, but just generally in

21  terms of each of those items?

22  A.  I had various pleadings.  I reviewed interrogatories by

23  both sides, which gave me information on birth date, on time

24  involved in this incident on the particular saw involved, and

25  as I recall, its model number.  I had a police report from

1    Falls Township which described without attribution various

2    witness statements made to the police department.  I had an

3    incident and accident report which told me some of the

4    witnesses and those who were on the scene.  It also gave me

5    information as to the timing of the incident.  I also got

6    information as to the blade involved, people who actually

7    witnessed the event, including Steve Caldwell (phonetic) and

8    Tony Rivera (phonetic).  Then I had background information on

9    the saw itself.  I had 38 black-and-white photographs of the

10   scene, which were subsequently followed up with 35 color

11   photographs of the scene, which allowed us through the use of

12   photogrammetry to characterize knowing the dimensions of the

13   pipe and the timing of the incident, the distances apart and

14   above the ground that the two involved pipes were.  I had a

15   set of 11 photographs of the Plaintiff himself, which allowed

16   me to directly connect the superficial injuries sustained to

17   the rest of the geometry of the scene.

18   Q.  By the way, just to interrupt for a second.  Are the 35

19   color photographs the packet that we've presented to the Court

20   as P-5?

21   A.  I believe so, although I don't have the exhibits that the

22   Court has in that form, but that's my understanding.

23   Q.  Are the 11 photographs the color photographs we presented

24   at P-6?

25   A.  Yes.

1  Q.  Okay.  Continue, please.

2  A.  Then I have depositions from the -- oh, sorry.  I have a

3  report from Dr. Mamoun, M-A-M-O-U-N, who has described, based

4  on a review of the medical record the actual injuries

5  sustained.  I have medical records that came in various

6  mailings that again provided detailed descriptions of the

7  injuries sustained, the treatment provided, which on occasion

8  gave me further information about the anatomy of the injuries.

9  I had radiographic progress notes that described the

10 radiology.  Then I had depositions from Mr. McGee, who

11 provided descriptions of the incident as he recalled it.  Also

12 produced some descriptions of the event as he was asked to

13 recreate it at the deposition itself.  I have depositions of -

14 - sorry.

15            THE COURT:  And a lot of witnesses' depositions?

16 A.  I have a lot of witnesses' depositions, including the

17 witnesses who were -- either saw the event or saw it in their

18 peripheral vision.  And those were important.  I have an

19 understanding from those depositions about roughly their

20 vantage point and their distance away from the event itself.

21 And I have a deposition of what I understand to be the person

22 most knowledgeable from STIHL as to his expertise and

23 understanding of the saw and its design.  And I think without

24 going into excruciating detail on each and every one of those,

25 those are the kinds of materials that I relied on and

1   typically rely on in situations such this one.

2   Q.  You have the deposition of an Anton Spiritosanto is that

3   correct?

4   A.  Yes.

5   Q.  He's a police officer who filled out that police report?

6   A.  Yes.

7   Q.  Falls Township police report, correct?

8   A.  Yes.

9   Q.  Did that inform you in any way?

10  A.  Yes, it informed me.  Also, I believe it required that we

11  address a question that he gleaned from the various interviews

12  that he conducted as to how this event occurred.  And that's

13  the motivation for your office, I believe, asking me about

14  question 2) --

15           THE COURT:  I understand.

16  BY MR. PACKIN:

17  Q.  By the way.  In that deposition, was he able to attribute

18  the description that he put in the police report to any

19  witness?

20  A.  He was not, in fact, able to attribute that description of

21  him falling and then being injured by the saw to anyone.

22  Q.  In the depositions of the many individuals who were at the

23  scene of the accident, did any of them claim to have seen it

24  occur that way as described in the police report?

25  A.  I don't think there's any support for that notion.

1    Q.  Okay.

2    A.  In fact, just the opposite.

3    Q.  Listed in your report is also the DVDs showing video

4    testimony of Robert McGee, is that correct?

5    A.  Yes.

6    Q.  So, you had the depositions both in typewritten and video

7    format?

8    A.  I did.

9    Q.  And did that include, in video format, the so-called

10   demonstration of how the accident happened that he was asked

11   to do?

12   A.  It did.

13   Q.  Now, you also were involved in a prior matter; the Stout

14   case, correct?

15   A.  I was.

16   Q.  That was not that long before this case came to your

17   office, is that correct?

18   A.  Best estimate just as I sit here, maybe 6 months to a year

19   before, something in that time frame.

20   Q.  And you had the materials from the Stout case as well

21   regarding that accident?

22   A.  I did.

23   Q.  As well as --

24   A.  And do.

25   Q.  I'm sorry?

1   A.  I did and do.

2   Q.  As well as the materials from that case involving the saw

3   and the blade?  Is that correct?

4   A.  Yes.

5   Q.  Was it your understanding that the make and model of the

6   saw were the same in both cases?

7   A.  It is my understanding, yes.

8   Q.  Is it your understanding that the make and model of the

9   saw blade was the same in both cases?

10  A.  That's my understanding, yes.

11  Q.  From your review of these various materials, what was your

12  understanding, generally speaking, of the nature, extent, and

13  location of the injuries sustained by Mr. McGee?

14          THE COURT:  Just -- I just didn't hear the question.

15  BY MR. PACKIN:

16  Q.  Okay.  From your review of the various materials, and in

17  your report you've set out a medical synopsis in paragraph 11,

18  12, 13, 14 -- what was your understanding as to the nature,

19  extent, and location of the injuries sustained by Mr. McGee?

20  And I understand you brought with you a slide that shows some

21  of those 11 photographs, so if you want to refer to that?

22  A.  I can.  Is that all right, Your Honor?

23          THE COURT:  Nature and extent of the injuries

24  Plaintiff sustained, right?

25          MR. PACKIN:  And location, Your Honor.  Nature,

1   extent, and location.

2              THE COURT:  Nature, extent, and location of his

3   injuries.  And what do you want to use?

4              MR. PACKIN:  Dr. Hayes has made a slide that

5   includes three of the pictures that are in P-6.

6              THE COURT:  Sure, as long as you show it to your

7   adversary before it's presented to me.  And for that matter,

8   if you have a bunch of slides, this is the time to share them.

9              MR. PACKIN:  We may not use them all, so --

10             THE COURT:  One by one, then?

11             MR. PACKIN:  Yes.  With counsel's consent, then,

12  we'll show that slide of the three images.

13             THE COURT:  Okay.  Could we just get a marking for

14  this slide?  It's a hearing exhibit.  I know it's

15  demonstrative, but I'm going to ask that you mark it as a P

16  Exhibit.

17             MR. PACKIN:  I can have it produced.  It's on a page

18  with two others that we're probably not going use, so I can

19  mark it on my copy and then have a single image produced

20  subsequent to the hearing and send it to everybody?

21             THE COURT:  That's fine, and we'll just make a cut

22  copy of it today so we have it.  The image.

23             MR. PACKIN:  I'll call this then P-7.

24        (Plaintiff's Exhibit-7 previously marked for

25  identification)

1              THE COURT:  P-7.  Any objection, Mr. Walsh?

2              MR. WALSH:  No objection.

3              THE COURT:  P-7 is demonstrative slide in evidence,

4    using -- how many of these photos?

5         (Plaintiff's Exhibit-7 admitted into evidence)

6              MR. PACKIN:  Three.

7              MR. PACKIN:  Okay fine.

8    A.  And in order to -- and this is a question, Your Honor, in

9    order to get to the specific slide, I need to put the slides

10   up and go through them.

11             THE COURT:  That's fine.  When you're ready, I will

12   look.  Are you ready now?

13   A.  Yes.

14             THE COURT:  Okay.

15   A.  This is a figure that is actually also reproduced in my

16   report of November 3rd, 2009 as Figure 2.  The first

17   indication as to the injuries can be seen from the scarring

18   that remains.  And if we look first to the left, he has from

19   the corner of the mouth going back in a curved pattern toward

20   the ear, a laceration that was characterized as starting from

21   anteriorly and moving to posteriorly and more superficial at

22   the front and deeper at the back.

23             THE COURT:  Described as deeper at the back, right?

24   A.  More superficial anteriorly and deeper as it went

25   posteriorly, crossed under the ear, and continued across the

1    neck.   There is secondly a roughly perpendicular laceration

2    that was to the side of his neck and went primarily vertically

3    creating a kind of crossed pattern.

4                THE COURT:  Running essentially vertically -- just a

5    second.  Would you show the point where the two cross

6    together?  It's directly behind the earlobe?

7    A.  Directly behind the earlobe, and I'll run my pointer from

8    the distal margin of that laceration upward.  That's the

9    primarily vertical, and this first laceration occurred

10   horizontally.

11               THE COURT:  I see.  Okay.

12   BY MR. PACKIN:

13   Q.  Now --

14               THE COURT:  Length?  They describe the length of

15   these two lacerations?

16   A.  As I recall, 14 cm and 9 cm.

17               THE COURT:  14 would be the mostly --

18   A.   Longer one.

19               THE COURT:  -- horizontal one?

20   A.  Yes.  As I recall.

21               THE COURT:  And 9 would be the vertical one?

22   A.  Yes.

23               THE COURT:  Okay.

24   BY MR. PACKIN:

25   Q.  I believe you mentioned earlier also that the mandible or

1   the jawbone was severed?

2   A.  I was going to move from superficial --

3   Q.  Okay.

4   A.  To deep, which is the way we traditionally go about this.

5   He had a transverse laceration through the masseter muscle,

6   and if you take your hands, put them by the side of the angle

7   of the mandible, your jaw, now grit your teeth.  That muscle

8   that you feel right there is the masseter muscle.

9           THE COURT:  For the record, we have to spell these

10  terms, because we are using a digital tape recording.  M-A-S-

11  S-E-T -- M-A-S-S-I-T-E-R?

12  A.  M-A-S-S-E-T-E-R.

13          THE COURT:  Thank you.  Okay.

14  A.  He also had --

15          MR. WALSH:  Your Honor, I am going to renew my

16  objection to discussions of anything except the scar pattern

17  which is the only thing discussed in the report by this

18  witness.  The others are simply summaries of hospital reports.

19  There is nothing in the analysis that relies on anything

20  interior to the injury for any of the analysis in this

21  witness's report.

22          THE COURT:  I'll see you at the side.

23      (Sidebar on the record - began at 11:35 a.m. and ended at

24  11:38 a.m., transcribed under separate cover)

25          THE COURT:  If you wish to place further argument on

1   the record during the recess, make a note, sir.  Just to

2   preserve your argument in its extent.

3           MR. WALSH:  I assume -- I just have a continuing

4   objection to this.  I don't want to interrupt the examination

5   by objecting, so I will have a continuing objection to this

6   line of questioning, please.

7           THE COURT:  Very well.  Okay, so we're talking about

8   pattern of injuries.  And I think that we had gotten to the

9   fact that as the laceration is explored through the medical

10  examination and treatment, this transverse laceration goes

11  through the masseter muscle, and that's when the objection

12  came.

13          MR. PACKIN:  Yes, Ma'am.

14          THE COURT:  So I've ruled on the objection.  You may

15  proceed.  But ask a new question.

16  BY MR. PACKIN:

17  Q.  And continue, if you would, with your description of the

18  injury as it went from superficial to more interior.

19  A.  And so I'm going from anterior to posterior at the next

20  level, went through the masseter muscle, went through the

21  parotid, P-A-R-O-T-I-D gland, which produces saliva.

22          THE COURT:  Okay.  This laceration -- next.  I'm

23  sorry to be slow, but it helps me to focus also when I take

24  the notes.  And watch, sir, whatever you do, do not back up.

25  Please.

1    A.  I do injury biomechanics, Your Honor.

2            THE COURT:  This laceration next went through the

3    parotid, P-A-R-O-T-I-D gland, right?

4    A.  Yes.

5            THE COURT:  Which is good for saliva?

6    A.  Which is what produces saliva.

7            THE COURT:  Okay.  Go ahead.

8    A.  In so doing, it lacerated the facial nerve and several of

9    the distal branches of the facial nerve that have resulted in

10   his longer-term inability to control parts of his face.

11           THE COURT:  He says he's missing four nerves?

12   A.  Yes.  All branches of the facial nerve.

13           THE COURT:  Okay.

14   A.  He -- also, if we move deeper, there was a fracture,

15   transverse and comminuted to the coronoid, C-O-R --

16           THE COURT:  Just a minute.  Sorry.  Transverse

17   comminuted fracture of the right side of the mandible?

18   A.  Yes, to two places in the right side of the mandible, the

19   coronoid, C-O-R-O-N-O-I-D process --

20           THE COURT:  Process?

21   A.  Yes.

22           THE COURT:  Go ahead.

23   A.  As well as the mandible itself where it enters the

24   temporomandibular joint.

25           THE COURT:  Where it enters the joint.

1   A.  Yes, and that is a highly comminuted --

2           THE COURT:  Right?

3   A.  Yeah, a little higher.  Where you --

4           THE COURT:  At the cheekbone?

5   A.  Yes.  And that is as I've indicated by earlier testimony,

6   direct evidence as to --

7           THE COURT:  Yeah, I interrupted you.  That is a

8   highly what?

9   A.  Comminuted --

10          THE COURT:  Right.

11  A.  -- fracture --

12          THE COURT:  Got it.

13  A.  -- that indicates the energy associated with this event.

14  And in the main, those are the most reflective of his

15  positioning at the time of the accident.

16          THE COURT:  What about this hole up and down scar

17  thing?  Without reaching conclusions, does this inform your

18  analysis of his position at the time of the accident?

19  A.  It absolutely informs my analysis, and I can demonstrate,

20  Your Honor, how the second vertical cut occurred as well.  If

21  you would like me to do so?

22          THE COURT:  I'm not going to solicit testimony

23  today.  Mr. Packin, it's up to you.

24  BY MR. PACKIN:

25  Q.  First, another question for you.  Did knowing the nature,

1   extent, and location of the injuries play any importance in

2   your analysis of any of the three questions that were posed to

3   you in this case?

4   A.  Yes, it was crucial to my understanding of his positioning

5   as well as my conclusions as to whether these injuries

6   occurred and caused his subsequent falling or the converse.

7   Q.  Okay.  Now, on this slide, it says injuries can be used as

8   a signature to the event, which I believe was stated in your

9   deposition, and I believe in your report as well.

10  A.  Yes.

11  Q.  What do you mean by that?  Explain to us what you mean by

12  that.

13  A.  In something that occurs as quickly as what is in lay

14  terms referred to as a kickback event where a saw or some

15  other object goes into a person's body, the geometry of these

16  lacerations and the deeper injuries that occur tell you how

17  that face had to be positioned with respect to the saw.  And

18  in this instance, if we know where it started, and we know

19  where it ended up, we can connect those dots.

20  Q.  Okay.

21  A.  What was potentially confusing about this is the vertical

22  --

23  Q.  And what did you determine regarding that?  The vertical?

24  A.  Your Honor, could I step down into the well?

25          THE COURT:  Sure.  The only problem being, you have

1   to take direction on how we can still pick you up on the

2   microphone.

3   A.   Oh, I can do it here.  I can do it here just fine.  It

4   saves the trouble.

5            THE COURT:  Okay.

6   A.   I'm standing and bending over, and I'm not trying to

7   produce the low -- the position of the lower part of my body,

8   but such that the Court can see I'm simply trying to produce

9   the interaction between this rotating 14-inch saw blade and

10  the face.

11           THE COURT:  You've got a paper plate?  A round paper

12  plate about 10 inches, 8 inches?

13  A.   I would say -- I'll go with that; 8 or 10 inches.  We know

14  from the medical records that it went from front to back,

15  anterior to posterior.  His face is, I believed, positioned

16  over the saw blade region at a location that matches the first

17  of these lacerations, back toward the ear.

18           THE COURT:  The transverse one?

19  A.   The transverse fracture.  So, I can produce that by simply

20  aligning the top of this plate between the corner of my lips

21  and the bottom of my ear.  Now, if I realize that this is then

22  a dynamic event where impact forces were imposed on the saw

23  and the saw moved such that it caused an impact force on his

24  face, note that if I have the --

25           THE COURT:  Just a second.  Knowing that this thing

1    is moving, right?

2    A.  Yes.

3          THE COURT:  This apparatus is moving.

4    A.  It is a moving object which, from the laws of physics,

5    tells me that it has what we call momentum.  It strikes his

6    face, creates these lacerations and injuries and knocks his

7    face back and to the left, and if we keep the saw moving in

8    this direction, it produces the rough alignment underneath the

9    ear and to the side of the neck.  So it's simply a consequence

10   of the dynamic motion of the face in response to being struck

11   by the saw.

12         THE COURT:  So, you're saying the striking of the --

13   the first strike of the saw to the face jolts the position of

14   the head?

15   A.  Perfect.

16         THE COURT:  Creating the head to jolt, right?

17   A.  Yes, back and to the left, and then produces the alignment

18   of the cut along the neck.

19         THE COURT:  In other words, the vertical cut?

20   A.  The roughly vertical cut, yes.

21         THE COURT:  I'm just trying to distinguish the two.

22   You've got the sideways cut which is transverse, and then the

23   -- you're saying that the vertical cut is second --

24   A.  Yes.

25         THE COURT:  -- in sequence?

1    A.  Yes.

2             THE COURT:  Go ahead, counsel.

3             MR. PACKIN:  Thank you.

4    BY MR. PACKIN:

5    Q.  In addition to the photographs of the injuries and the

6    medical description of the injuries, you had photographs of

7    the accident scene as it appeared after the accident and

8    before anything further was done to the scene or the pipes,

9    correct?

10   A.  Yes.

11   Q.  And those were among the 35 color photographs that we've

12   marked as P-5, correct?

13   A.  Yes.

14   Q.  And I understand you've prepared two slides with four

15   images from those 35 photographs showing -- demonstrating some

16   of the accident scene photographs that you used in your

17   evaluation in this case, is that correct?

18   A.  It is correct, although it would be my suggestion only to

19   use the second of those so we keep a consistent perspective

20   and view of the scene throughout all the photographs.

21   Q.  What -- that's fine.

22   A.  Or to the extent that we can.

23   Q.  All right.  Just -- before you put it up, then show me

24   which of these you're referring to and I'll show them to

25   counsel.

1  A.  It is the second of the two background accident scene --

2  it's simply this view.

3         THE COURT:  Counsel, before you proceed, are we

4  talking about P-5?

5         MR. PACKIN:  Yes, Ma'am.

6         THE COURT:  And the second of those photos is simply

7  a picture of the machine.

8         MR. PACKIN:  They're not in the same sequence.

9         THE COURT:  Right.

10        MR. PACKIN:  They're not in -- I can show you --

11  once it's up here, it'll be apparent.

12        MR. WALSH:  We have no objection, Your Honor.

13        MR. PACKIN:  Once it's up, it'll be apparent which

14  photographs they are.

15        THE COURT:  All right.  Well, I'm going to be, as

16  usual, troublesome, and since we've got P-5 marked as an

17  exhibit for purposes of this hearing, and we know, or we hope,

18  it's 35 photos in toto, we're going to pencil mark each one of

19  them, and then we're going to say that this -- whatever photo

20  we're using is P-5-6 or something.  Okay?

21        MR. PACKIN:  All right.

22        THE COURT:  Okay.

23        MR. PACKIN:  If you would put up that slide, Dr.

24  Hayes, and I'll find the photograph.  The one on the left,

25  Your Honor, would be the 20th photograph in the packet.  The

1   one on the right --

2        (Pause in proceedings)

3            THE COURT:  Can I see you at the side, please?

4            MR. PACKIN:  I'm sorry?

5            THE COURT:  I'd like to see counsel at the side,

6   please, for this exercise.

7        (Sidebar on the record - began at 11:52 a.m. and ended at

8   11:53 a.m., transcribed under separate cover)

9        (Court in recess)

10        (Sidebar off the record)

11            THE COURT:  Mr. Packin, you will reconstitute this

12   group of photographs that you believe to be a total of 35, but

13   for convenience right now, we're still within hearing Exhibit

14   P-5, and you have selected two photos that don't happen to be

15   until later in the group because you have some duplicates in

16   here.  So you have arbitrarily assigned them numbers 36 and

17   37 --

18            MR. PACKIN:  Yes, Ma'am.

19            THE COURT:  -- and we can see which ones they are,

20   and when you go back and fix up this exhibit, it'll have maybe

21   37 pages, but two of them will probably be intentionally left

22   blank so as to reduce this to the 35 photos that you know

23   exist.

24            MR. PACKIN:  Understood.

25            THE COURT:  Okay, fine.  Any objection, Mr. Walsh?

1            MR. WALSH:  No objection.

2            THE COURT:  Okay.  Thank you, sir.

3            MR. PACKIN:  May I continue?

4            THE COURT:  So yes, P -- just a second.  P-5(36) is

5      a closeup of a cut but not severed pipe.

6            MR. PACKIN:  P-8 --

7            THE COURT:  And P-5(37) is a landscape shot of two

8      pipes, right?

9            MR. PACKIN:  No.  This slide that's up, we would

10     call P-8 since it's the next slide in sequence.  The photo on

11     the left in P-8 is #31 in Your Honor's packet.  The photo on

12     the right is #36.

13         (Plaintiff's Exhibit-8 previously marked for

14     identification)

15           THE COURT:  In other words, you have a slide on the

16     screen --

17           MR. PACKIN:  Yes.

18           THE COURT:  And you're going to mark that P-8?

19           MR. PACKIN:  Correct.

20           THE COURT:  Okay.  Just a minute, please.  Just a

21     minute.

22         (Pause in proceedings)

23           THE COURT:  P-6 is slide containing 2 photos --

24           MR. PACKIN:  P-8, Your Honor.

25           THE COURT:  P-8.  Any objection to P-8 as a

1  demonstrative?

2          MR. WALSH:  No objection, Your Honor.

3          THE COURT:  Okay, P-8 in evidence.

4      (Plaintiff's Exhibit-8 admitted into evidence)

5          THE COURT:  And the two photos are from P-5, #31 --

6          MR. PACKIN:  Yes, Ma'am.

7          THE COURT:  -- in this faulty compendium, right?

8          MR. PACKIN:  Yes.  It's -- and the one on the left

9  is the landscape view, as Your Honor called it, number 31 in

10  your numbering, which is sequential.

11          THE COURT:  Just a minute.  It's page 31, so it's P-

12  5(31) at the moment, right?

13          MR. PACKIN:  Yes, Ma'am.

14          THE COURT:  And what's the other one?

15          MR. PACKIN:  And the one on the right --

16          MR. PACKIN:  Is the one I've tabbed at the top and

17  numbered 36 at the bottom.

18          THE COURT:  P-5(36).  Okay.  Thank you.  We're all

19  set.

20          MR. PACKIN:  Thank you, Your Honor.  Sorry for the

21  confusion.

22  BY MR. PACKIN:

23  Q.  So, getting back to where we were, Dr. Hayes, besides the

24  photographs of the injuries to Mr. McGee's face, you have

25  photographs of the accident scene as it appeared shortly after

1    and before the pipes were worked on further.  Is that your

2    understanding?

3    A.  Yes.

4    Q.  And P-8 is a slide you prepared with two of those

5    photographs as we've identified them for the Court?

6    A.  Yes.

7    Q.  What did the photographs, take them from left first, and

8    then right, provide you in the way of information relevant to

9    your investigation and evaluation in this case?

10   A.  This gave me background information on the placement and

11   path of the pipes, likely before, and then shortly after Mr.

12   McGee was injured, and allows me to describe in general terms

13   the sequence of events and their consequence on the paths of

14   these two pipes.

15   Q.  Was it your understanding that the photograph on the left

16   represented the two pipes as they appeared after the accident

17   and were photographed by the police at the scene?

18   A.  Yes.

19   Q.  And what was your understanding as to what was shown in

20   the photograph on the right, which is number 36 in the Court's

21   packet?

22   A.  The photograph on the right, which is a closeup of the cut

23   -- and let me amend that to say cuts, made by Mr. McGee on the

24   pipe.  It is a vertical, top-down view, and shows to the right

25   the -- what's left over from the first cut that he described,

                              Hayes - Direct                    79

1    and then shows to the left of that figure, a closeup of the

2    pipe, the second cut, the topmost region, and finally shows

3    the ligament, as I've referred to it, that remains between the

4    two cuts on the top side of the pipe.

5              THE COURT:  So you're saying the first cut is in

6    closed position, right?

7    A.  The first cut --

8              MR. PACKIN:  Open.

9    A.  -- is in open position.

10             THE COURT:  Right.

11   A.  With the kerf being the material removed by the saw blade

12   --

13             THE COURT:  Just a second.

14   A.  That's K-E-R-F.

15             THE COURT:  K-E-R-F.  Does kerf refer to the cut or

16   the material removed from the space where the cut is?

17   A.  They overlap a bit.  The kerf is really meant to describe

18   the -- if this was undisturbed by the internal stresses in the

19   pipe and there wasn't opening and closing, if we just had a

20   plain saw cut, we would call that open region the kerf.

21             THE COURT:  Kerf describes the cut, right?  And

22   sometimes includes to mean the material removed from the cut

23   kerf cavity.  No?

24   A.  That's fine.  The kerf, if we think of an undisturbed

25   piece of wood and we bring a saw down into it, take the saw

1    out, and we don't have issues of bending of the wood or

2    closing of any of this, that slot --

3              THE COURT:  Aha.

4    A.  I think slot's a good word, describes the kerf.

5              THE COURT:  Okay, that's fine.  So, we've got the --

6    you're showing the first cut, and you've labeled it "open

7    kerf," and then you've put an arrow to what you describe as a

8    second cut and call it a "closed kerf," and obviously the

9    photo shows the amount of opening or lack there of in each of

10   these cut slots?

11   A.  That's exactly right.  And tells us something about the

12   situation of those cuts before they were made.

13             THE COURT:  Sure.  Okay.  You can pick up.

14             MR. PACKIN:  Thank you, Your Honor.

15   BY MR. PACKIN:

16   Q.  You told us before what photogrammetry is.  Was

17   photogrammetry used in this case?

18   A.  Photogrammetry was used.

19   Q.  For what purpose did you use it in this case?  What did

20   you determine using photogrammetry, and then we'll go into how

21   you did it?

22   A.  I determined, based on known dimensions of the pipes

23   themselves, as well as a reliable analytical technique, the

24   distance between the two pipes and the distance that each of

25   the pipes was above the ground.

1    Q.  Were these photographs the photographs you used for that

2    purpose?

3    A.  Not the photograph on the right, but the photograph on the

4    left was the photograph used to determine the horizontal

5    distance between the two pipes.

6    Q.  Have you prepared a slide --

7              THE COURT:  Just a minute.  The photo on the right -

8    - excuse me.  We're talking about the left photo, the distance

9    shot, right?

10   A.  Yes.

11   BY MR. PACKIN:

12   Q.  But to make it simpler, did you prepare a slide showing

13   the photographs you used when you did your photogrammetric

14   analysis?

15   A.  I did.

16   Q.  Can we put that up please?  Let me show it to counsel

17   first.

18              MR. WALSH:  No objection.

19   BY MR. PACKIN:

20   Q.  So let's put up as P-9 --

21        (Plaintiff's Exhibit-9 previously marked for

22   identification)

23   A.  Is this the -- let me see which one you showed counsel.

24              MR. PACKIN:  Below that.  Nope.

25   A.  Further along?

1            MR. PACKIN:  That's it.

2    BY MR. PACKIN:

3    Q.  Are those two photographs -- first of all, for the Court's

4    purposes, the photo on the left is again photograph #31 in the

5    Court's packet.  The photo on the right is photograph #32.

6            THE COURT:  Okay, just a minute.  I'll be right with

7    you.  And P-9 is into evidence now.

8         (Plaintiff's Exhibit-9 admitted into evidence)

9            THE COURT:  Thank you, Mr. Walsh.  Shows two photos,

10   P-5(31) on left and P-5(38) did you say?  37?

11           MR. PACKIN:  The second one is 32.

12           THE COURT:  Oh, 32.

13           MR. PACKIN:   31 and 32 in your packet.

14           THE COURT:  Okay.  32 on right.  Okay.

15   BY MR. PACKIN:

16   Q.  Using P-9, would you explain to us how you applied

17   photogrammetry to determine as is indicated on the slide the

18   distance between the pipes where they were being cut and the

19   height of each pipe from the ground at the location where they

20   were being cut?

21   A.  Recalling that the definition of photogrammetry is

22   obtaining reliable dimensions from photographs, we simply took

23   advantage of the known dimensions of these pipes as 10 inches.

24           THE COURT:  This is the exterior circumference --

25   exterior diameter?

 1   A.  Yes.  It is.  Or just the diameter.

 2              THE COURT:  Exterior.

 3   A.  The diameter of the exterior of the pipe.

 4              THE COURT:  Pipe.  Yes.  Go ahead.

 5   A.  If that is 10 inches, we can scale using the -- and you're

 6   going to have to help me with the number, but using the

 7   photograph on the left, which is --

 8              MR. PACKIN:  31.

 9   A.  -- P-5(31) --

10              THE COURT:  Yes.

11   A.  -- we can determine directly the distance between the two

12   pipes in the horizontal plane as 18 inches.

13   BY MR. PACKIN:

14   Q.  And walk us through how that was done using

15   photogrammetry.

16   A.  You simply take the photograph --

17              THE COURT:  I'll be right with you.  Just a minute.

18   A.  You simply go into -- we used the software called

19   Photoshop.  You count the number of pixels that cross the

20   diameter of the 10-inch pipe.  You check that on the right-

21   hand side as well, and then you look at the distance between

22   the two pipes in terms of pixels, use your scale factor, and

23   back out the distance between the two.

24              THE COURT:  So you know about the 10 inches, so you

25   can count those pixels, right?

1    A.   Exactly.

2              THE COURT:   And that will give you a yardstick for

3    then measuring the distance between the two pipes?

4    A.   Absolutely.

5    BY MR. PACKIN:

6    Q.   And is that how that was done in this case?

7    A.   That's how that was done in this case.

8    Q.   Okay.   What are the references on the top to Bauer 2007,

9    Haun 2010?

10   A.   Those are simply photogrammetric references; one from our

11   own laboratory where we have used photogrammetry and published

12   in peer-reviewed journals.   Haun is another photogrammetry

13   paper, and I have a general discussion of the accuracy,

14   validity, error rates associated with photogrammetry that I'm

15   happy to speak through or -- these are techniques that are

16   widely used in many, many fields ranging from microscopy to

17   scenery construction to motor vehicle crush damage

18   reconstruction.

19             THE COURT:   Okay, thank you.   Okay, so we've got the

20   18 inches there.

21   BY MR. PACKIN:

22   Q.   So, using the pixel-counting method, you were able to

23   determine with the known diameter of the pipes the distance

24   between them?

25   A.   Correct.

1          THE COURT:  You placed your transverse arrow between

2     the two pipes at a certain location along the length of those

3     two pipes.  Is that the, as best you can determine, the

4     location of the incident?

5     A.  It is.  You can see the cut itself, and you can see a

6     small amount of distortion or buckling of the pipe that has

7     occurred in that location.

8          THE COURT:  Which of those two pipes is the one that

9     has been partially cut as of the time of the incident?

10    A.  The pipe on the right --

11         THE COURT:  Okay.  Let me just make a note of it.

12    A.  -- in the left-hand photograph.

13         THE COURT:  Thank you.

14         MR. PACKIN:  Your Honor, for the Court's purposes,

15    in the larger version of photograph number 31 that's contained

16    in P-5, you'll be able to see the cut where the arrow was

17    placed.

18         THE COURT:  That's fine.  Just trying to get

19    oriented.

20    BY MR. PACKIN:

21    Q.  Using the photograph on the right, which is P-5(32), can

22    you explain to us how using photogrammetry you determined the

23    height of each pipe from the ground at the location that the

24    pipe was being cut?

25    A.  In the photograph on the right, we take advantage of

1    additional information that was available, and that is that

2    this event occurred roughly at noontime, shortly thereafter,

3    and we have shadows from the sun that we can see in the scene.

4    And to orient the Court, we're now looking at this event from

5    the side where the first cut was made.  The first kerf or open

6    kerf that we described earlier.  It shows the position of the

7    sun.  We again used the 10-inch diameter of the pipe and

8    measurements down to the edges of the shadow, along with

9    simple trigonometry to determine that distance.  So we can

10   create a right triangle.  We're trying to determine the

11   distance of the vertical part of that triangle, knowing

12   something about its hypotenuse.  And we can thereby infer this

13   distance and the distance of the higher pipe.

14            THE COURT:  Trigonometry or geometry?

15   A.  Both.

16            THE COURT:  Okay, both.

17   BY MR. PACKIN:

18   Q.  And how is that calculation made?  What is done?  What was

19   done by you in this case?

20   A.  We simply counted pixels again, and I have a slide that

21   can show the methodology of using the sun angle and the

22   calculations made from it, but it is truly nothing more than

23   knowing where the edge of the shadow is, knowing that it's

24   cast by a sun that is in a particular position or close to

25   that position, and then using what we can measure between the

1    center of the pipe and the edge of the shadow to infer what we

2    need to know, which is the vertical distance from the

3    bottommost point on the pipe.

4    Q.  And was there any -- strike that.  You said you prepared a

5    slide that shows how you made the calculation in this case?

6    A.  Yes.

7    Q.  Could you put that slide up, and I'll show it to counsel?

8           MR. PACKIN:  Can we mark that as P-10, Your Honor?

9        (Plaintiff's Exhibit-10 previously marked for

10   identification)

11          THE COURT:  Sure.  Mr. Walsh, any objections?

12          MR. WALSH:  No objection.

13          THE COURT:  Okay.  Thank you very much.  P-10 in

14   evidence.  Slide showing how this vertical distance from the

15   ground was measured, right?

16       (Plaintiff's Exhibit-10 admitted into evidence)

17   A.  It's background for it.  It shows the angle of the sun

18   that we get from observatory data for that time of day.

19   BY MR. PACKIN:

20   Q.  You've indicated the U.S. Naval Observatory data.  Is that

21   what you consulted to reach that 51 degree angle?

22   A.  Yes.

23   Q.  Was that consistent with the times indicated in terms of

24   the incident reports and accident report?  That it was midday?

25   Somewhere after noon?

1   A.   It was certainly midday.  A little earlier than the police

2   and EMTs arrived on the scene, so we know it's an approximate

3   time.

4   Q.   Explain to us -- walk us through how you -- knowing that

5   angle and the diameter of the pipes and the pixels you were

6   able to make the calculation as to the height of each pipe off

7   the ground?

8   A.   So we know where the sun is.  We know how a circular cross

9   section projects a shadow onto the ground.  We can see those

10  shadows, and if we can measure -- if what we're interested in

11  is the distance from here down to the ground --

12          THE COURT:  Namely, the uncut pipe?

13  A.   Namely, the uncut -- either one, but --

14          THE COURT:  All I'm say is when you say from here,

15  your experience tells you that doesn't translate for purposes

16  of a transcript.

17  A.   You're absolutely right.  From the center of either of the

18  two pipes down to the ground, we know and can see from the

19  photographs the positions of the edge of the shadow.  We know,

20  again, the pixels for 10 inches.  And we can -- and I have a

21  second slide that shows the triangles that are created.

22          MR. PACKIN:  Show that please.  I'll show it to

23  counsel.  That would be P-11.

24      (Plaintiff's Exhibit-11 previously marked for

25  identification)

Hayes - Direct                                    89

1   A.  Yes.  And this --

2           THE COURT:  Mr. Walsh, are you able to allow this

3   in?

4           MR. WALSH:  I have no objection, Your Honor.

5           THE COURT:  Thank you, sir.  P-11 gives the

6   calculations, right?

7   A.  Yes.

8           THE COURT:  In evidence.

9       (Plaintiff's Exhibit-11 admitted into evidence)

10  A.  And gives us the information as to the desired height,

11  what can be directly measured from the photograph, and then

12  the trigonometric relationship that we derived that tells us

13  how we get one from the other.  It also --

14          THE COURT:  I hope there won't be a quiz.

15          MR. PACKIN:  (Laughs).

16  A.  Yeah, right before your call.  The -- we've also estimated

17  the error, and given its bounds, as less than 2 inches, and

18  ranges between 0% and 7%, depending on whether you're talking

19  about the distance of the pipe that's closest to the ground

20  and the pipe that's higher.

21          THE COURT:  Now, you call this your error margin?

22  A.  Yes.

23          THE COURT:  For calculation?

24  A.  And it's an attempt to maximize that.

25          THE COURT:  Yes.

Hayes - Direct                                90

1    A.   And then we can provide the results on the figures that

2    have already been provided.

3                THE COURT:   Which slide is this that you've just put

4    up?

5                MR. PACKIN:   I'm going to show it to counsel.   This

6    would be marked --

7                MR. WALSH:   It's on the screen.   I can see it.

8                MR. PACKIN:   P-12.   And that --

9         (Plaintiff's Exhibit-12 previously marked for

10   identification)

11               THE COURT:   Any objection, Mr. Walsh?

12               MR. WALSH:   No objection, Your Honor.

13               THE COURT:   Thank you.

14        (Plaintiff's Exhibit-12 admitted into evidence)

15               MR. PACKIN:   P-12, I believe, Your Honor, is #32 in

16   your packet with the derived measurements superimposed upon it

17   by Dr. Hayes.

18   BY MR. PACKIN:

19   Q.   Is that accurate, sir?

20   A.   That is.

21   Q.   Okay.

22               THE COURT:   And just what is the conclusion?

23   BY MR. PACKIN:

24   Q.   What were your conclusions regarding the height of each

25   pipe off the ground?

1            THE COURT:  Can we say the cut pipe and the other

2   pipe?

3            MR. PACKIN:  Very good.

4   A.  Perfect.

5   BY MR. PACKIN:

6   Q.  What was your conclusion as to the height from the ground

7   to the bottom of the pipe that Mr. McGee was cutting?

8   A.  It was -- the bottom of that pipe to the ground was 10

9   inches.

10  Q.  What was your conclusion as to the distance from the

11  bottom of the pipe he had not cut to the ground?

12  A.  22 inches.

13  Q.  The pipe that was 22 inches from the ground, was that, to

14  your understanding, was that pipe behind him when the incident

15  initiated?

16  A.  It was behind him when he was between the pipes and

17  performing the second of the two cuts, he was between the

18  pipes working on the inside of the lower of the two.

19  Q.  And so you established a 12-inch height differential

20  between them, correct?

21  A.  Correct.

22  Q.  Now, was the calculated error range for what you concluded

23  here within tolerances that are considered acceptable in your

24  field of accident reconstruction and injury biomechanics?

25  A.  Yes.  To my understanding and background, training, and

1    experience, especially given a situation where we have a human

2    body with soft tissue surfaces potentially interacting with

3    these pipes, these error bounds were well within what was

4    necessary to reliably characterize this scene.

5              THE COURT:  Acceptable margin of error, right?

6    A.  Yes.

7              THE COURT:  Look at the ground underneath there.  We

8    are in a landfill here.  And we're digging trenches for these

9    pipes to go into, right?

10   A.  Yes.

11             THE COURT:  Did you make any assumption about

12   whether the surface of the ground under these 18-inch-apart

13   pipes was more or less level at exactly the point where you

14   were measuring their respective height from that ground?

15   A.  We saw no evidence otherwise.

16             THE COURT:  Okay, that's all --

17   A.  We don't have --

18             THE COURT:  -- I need to know.

19   BY MR. PACKIN:

20   Q.  Now, when you say level, Dr. Hayes, are you talking about

21   level with a leveling device and the bubble is precisely

22   centered?

23   A.  No.  I'm talking about what I understood Her Honor's

24   question, is this roughly level, and --

25             THE COURT:  Let me refine it a little better.  I'm

1   not asking about whether the ground is falling off along the

2   length of those pipes.  That I'm not asking you.

3   A.  I understand.

4           THE COURT:  I am asking you whether if you go

5   transversely across the two pipes, and you're just measuring

6   the point underneath each pipe, whether there's any, you know,

7   difference in that vertical distance based upon a change in

8   the -- what do you call it?  The lay of the land?

9   A.  It is -- and I understood your question to be that.

10  Realize, however, that this entire reconstruction of the scene

11  is based on differences between local ground, as you described

12  it, and the pipe.  Now, if -- in the transverse direction.  If

13  I slightly tilt that -- I'm using my hands to recreate the

14  ground -- that's not going to influence my results, because

15  whether he's on a very small slope, that would just mean that

16  pipe is up a little higher, and so the entire scene moves with

17  the local slope of the ground.

18          THE COURT:  Enough.  Thank you.

19  BY MR. PACKIN:

20  Q.  Now, having arrived at those calculations as to the height

21  of the pipes and the 18 inches between them, you told us

22  before that photogrammetry is a technology that's used in

23  fields other than injury biomechanics.  Tell us what types of

24  situations and circumstances it's used and relied on?

25          THE COURT:  Do you have a slide?

1   A.   I do --

2              MR. PACKIN:   We do.

3              THE COURT:   What have you numbered it, counsel?

4   BY MR. PACKIN:

5   Q.   And I would like you to address the accuracy -- first give

6   us some examples of where it is used, and I'll show counsel

7   this first one.

8              MR. WALSH:   I can see up there if that's what you're

9   using.

10             MR. PACKIN:   Yes.   We'll call that P-13.

11        (Plaintiff's Exhibit-13 previously marked for

12   identification)

13             MR. WALSH:   Your Honor, I do think I have objections

14   as we get afield here.   None of this was anything included

15   within his report.   There was no discussion of fields using

16   photogrammetry.   There were certainly no -- there's nothing in

17   the report that discusses anything like this, so we're outside

18   the scope of the report again.

19             THE COURT:   Well, he's using the technique of

20   photogrammetry.   I take this to be a demonstration of just

21   that this is a concept and a technique that is a recognized,

22   reliable technique.   That's how I understand that.

23             MR. WALSH:   We're not challenging the reliability of

24   it.   We -- I accept at face value the spacing of the pipes as

25   he's found them.

1          THE COURT:  Oh, okay.

2          MR. PACKIN:  Just for purposes of the record, I

3    would like to go through this very quickly, because he did,

4    indeed, discuss some of these very issues in uses and

5    applications of photogrammetry at his deposition when asked by

6    Mr. Walsh's associate.  So if we could just briefly go through

7    it?

8          THE COURT:  I will allow you this leeway.  I am not

9    into making any rulings on admissibility for purposes of trial

10   should we get to that point.

11         MR. PACKIN:  That's an understanding I think we

12   have.

13         THE COURT:  All these hearing exhibits.

14         MR. PACKIN:  Yes.

15         THE COURT:  Okay, so you're allowed leeway.

16         MR. PACKIN:  Thank you, Your Honor.

17   BY MR. PACKIN:

18   Q.  Could you just briefly explain --

19         THE COURT:  P-13 in evidence.

20      (Plaintiff's Exhibit-13 admitted into evidence)

21   BY MR. PACKIN:

22   Q.  -- what P-13 demonstrates in terms of the examples of uses

23   of photogrammetry?

24   A.  Simply this slide demonstrates techniques that are used in

25   motor vehicle collision reconstruction, crime scene

1    reconstruction on the lower left.  A second example, we do a

2    lot of work with surveillance videos.

3              MR. PACKIN:  Before you proceed, that second example

4    we'll mark as P-14.

5              THE COURT:  Same objection, same ruling.

6         (Plaintiff's Exhibit-14 marked for identification)

7              MR. WALSH:  Your Honor, as long as there's -- as

8    long as we're understanding that this is simply for purposes

9    of this hearing and no rulings on admissibility at trial, I

10   really don't have any objection at all.

11             THE COURT:  Thank you very much.  So the first slide

12   that you showed had, I think, two motor vehicles and one

13   bedroom which you probably are going to say is a crime scene,

14   right?

15   A.  It was a crime scene, yes.

16   BY MR. PACKIN:

17   Q.  Would you go back to that slide, please?

18   A.  Which?  I am back at that slide.

19   Q.  Oh, sorry.

20             THE COURT:  He'll get there.  So anyway, are we

21   going to do P-14 next and then go back and forth?

22             MR. PACKIN:  Yes.  P-14 is next.

23             THE COURT:  Okay, P-14 in evidence.

24        (Plaintiff's Exhibit-14 admitted into evidence)

25   BY MR. PACKIN:

1   Q.  On P-13, just briefly, the references underneath Randalls

2   2010, Gonzalez Aguilar 2008, Mills 2005, what do they refer

3   to, sir?

4   A.  They simply refer to peer reviewed publications where

5   these techniques have been used.

6   Q.  So these three images that you've extracted and placed

7   upon this P-13 reflect images taken from peer reviewed studies

8   analyzing the reliability of photogrammetry?

9   A.  Use and reliability, yes.

10  Q.  Thank you.  And going back to that for just one second,

11  what's the image on the upper right that appears to be a

12  graph?

13  A.  That is a comparison between direct measurement of the

14  crush that we see on the car on the upper left, one done by

15  photogrammetry based solely on photographs, and the second

16  done by direct hand measurement by human beings and machines.

17  Q.  And in that study, what was the conclusion as to which was

18  more accurate, the photogrammetric measurement or the human

19  measurement?

20  A.  Actually, the photogrammetric measurement was more

21  accurate and reliable.

22  Q.  Okay.  And now to P-14, please.  What examples of

23  photogrammetry are we seeing in those five images -- actually

24  six images.

25  A.  We are seeing in the upper left and lower right images

1   from surveillance video of a murder scene showing how the

2   height of the person can be determined in ways very comparable

3   to what we used here.  Every time our eyes are scanned in

4   order to base identification on, we use applications of

5   photogrammetry.  And the bottom left is a published paper from

6   our laboratory using cross sectional MRI, or magnetic

7   resonance images, to determine distances and areas in a

8   medical application.

9           THE COURT:  In brain?

10  A.  It's actually on the -- that's the thigh.

11          THE COURT:  Oh, okay.  Right.

12  A.  So it's a cross section of the thigh.

13          THE COURT:  In human thigh, right?

14  A.  Yes.

15          THE COURT:  And what's the last one?

16  A.  The last one goes with the upper left.  It was a way to

17  calibrate the scene, the murder scene, that's shown in the

18  upper left.

19          THE COURT:  And the two eyes staring at us?

20  A.  The two eyes is the Hahn paper that is based on a

21  comparison of photogrammetry and anthropometry in a study of

22  facial features.

23          THE COURT:  Measured in anthropology?

24  A.  Anthropometry.

25          THE COURT:  What is anthropometry?

1   A.   That's the study of human size and shape that we were

2   talking about earlier this morning.

3            THE COURT:   Oh, okay.   I thought it was --

4   A.   I'm sorry.

5            THE COURT:   Because the -- I thought that the face

6   itself was being studied, but the features of the face are

7   included in the study of human size and shape.

8   A.   They are, exactly.

9            THE COURT:   Okay.   When you said size and shape, I

10  was just thinking of, you know, the body itself, not the

11  features of it.   Now I understand anthropometry better.

12  BY MR. PACKIN:

13  Q.   The references underneath those four sets of images, Russ,

14  Hahn, Bauer, and Russ, what do they refer to?

15  A.   They refer again to peer reviewed publications or

16  publications where they have been used and validated and show

17  a range of applications for the technique.

18  Q.   Who's Bauer?

19  A.   Dr. Jeremy Bauer is a Ph.D. -- has a PhD. from Oregon

20  State in biomechanics.   He works in my office, does most of

21  our image processing and photogrammetry in a wide variety of

22  cases.

23            THE COURT:   Tell me again his name.

24  A.   Jeremy Bauer, B-A-U-E-R, PhD.

25  BY MR. PACKIN:

1   Q.  And he is the author of this peer reviewed publication on

2   P-14?

3   A.  He's the first author.  I think I'm the senior or last

4   author.

5   Q.  So you published a peer reviewed article on the use and

6   accuracy of photogrammetry, is that correct?

7   A.  We did.

8   Q.  And did Mr. Bauer participate in the photogrammetic

9   analysis that was done in this case?

10  A.  He did under my direction, supervision, and control.

11          THE COURT:  He did the photogrammetry for your

12  report in this case?  Yes?

13  A.  Yes.

14          THE COURT:  Under your supervision and control.

15  A.  Yes.

16  BY MR. PACKIN:

17  Q.  Now, I believe you prepared two other slides depicting the

18  cover sheets of some peer reviewed articles on the accuracy of

19  photogrammetry, is that correct?

20  A.  Yes.

21          MR. PACKIN:  Let's call that P -- is it 16?

22          THE COURT:  We are at 15 now, by my count.

23          MR. PACKIN:  P-15?

24          THE COURT:  Yes, please.

25     (Plaintiff's Exhibit-15 marked for identification)

1   BY MR. PACKIN:

2   Q.  What is that?

3   A.  This is a paper that was the source of the graph that you

4   asked me to describe talking about comparing photogrammetric

5   versus direct measurement, basically coming to the conclusion

6   that photogrammetry was accurate and reliable for determining

7   crush of vehicles, a task that's considerably more complex

8   than the photogrammetric technique that we used here.

9   Q.  Is that a peer reviewed publication?

10  A.  Yes.

11          MR. PACKIN:  And you have another slide which I'd

12  ask be marked P-16.

13      (Plaintiff's Exhibit-16 marked for identification)

14          THE COURT:  You haven't introduced P-15.

15          MR. PACKIN:  I'm sorry.  I would offer the prior one

16  as P-15.

17          THE COURT:  Any objection?

18          MR. WALSH:  No objection, Your Honor.

19      (Plaintiff's Exhibit-15 admitted into evidence)

20          THE COURT:  Okay, P-15 is a slide simply showing the

21  cover page of the paper.

22          MR. PACKIN:  Yes.

23  BY MR. PACKIN:

24  Q.  And as a matter of fact, if we could go back, Dr. Hayes,

25  just so the record is clear, it's titled "Semi-Automated Crush

1    Determination Using Coated and Non-Coated Targets With Close

2    Range Photogrammetry."  And the next one, which I would offer

3    as P-16, which counsel has indicated no objection, is "The

4    Accuracy of Photogrammetry Versus Hands On Measurement

5    Techniques Used in Accident Reconstruction."  Could you tell

6    us generally what that article addressed?

7              MR. WALSH:  Before you start, one clarification.

8    Obviously my lack of objection is based on the prior statement

9    that we're making no rulings on the admissibility.

10             MR. PACKIN:  That will be understood.

11             THE COURT:  That's a continuing understanding.

12             MR. PACKIN:  That will be understood throughout.

13       (Plaintiff's Exhibit-16 admitted into evidence)

14   A.  And this is similarly a comparison of direct measurement

15   and photogrammetry in the field of crush determination in

16   motor vehicle collision analysis.

17   BY MR. PACKIN:

18   Q.  And finally, Dr. Hayes, there's one other slide you

19   prepared from one of the images that we've already had on the

20   screen where you've shown the spacing between the two 10-inch

21   pipes, and just for sake of completeness, let's put that up

22   and mark that one as well.  You showed the one with the height

23   off the ground, but this one is the spacing between them.

24   There we go.

25             MR. PACKIN:  And I would ask that that be marked.

1   That's in Your Honor's packet as P-5(31), but with the

2   measurements superimposed showing the 18-inch determination

3   between the two pipes and the 10-inch diameter of each pipe.

4        (Plaintiff's Exhibit-17 marked for identification)

5             THE COURT:  Any objection?

6             MR. WALSH:  No objection.

7             THE COURT:  Thank you, sir.  P-17 admitted.

8        (Plaintiff's Exhibit-17 admitted into evidence)

9   BY MR. PACKIN:

10  Q.  I take it from these peer reviewed articles,

11  photogrammetry then has been tested and subjected to peer

12  review and publication.

13  A.  It has.

14  Q.  Have there been assessments of the rate of error or

15  inaccuracy in this methodology?

16  A.  Most of these papers directly confront that issue of

17  validity and reliability.  Its error rates are known, error

18  rates related to mapping and many scene reconstructions.

19  There are standards for such measurements, and it's broadly

20  accepted within the scientific community and obviously used

21  outside of litigation.

22  Q.  And I believe you testified it's also used in criminal

23  matters, as you've shown in some of these slides?

24  A.  It is, and as I have used it as well.

25  Q.  And in this particular case you have already --

1          THE COURT:  So it's broadly accepted in science and

2    forensic science?  Is that what you're saying?

3    A.  Yes, exactly.  Exactly right.  I've testified on the basis

4    of photogrammetric reconstruction of cliffs that people have

5    been thrown over, for example.

6    BY MR. PACKIN:

7    Q.  And in this case you did, as you already told us, specific

8    error calculations that are specific to this case and

9    concluded that the range of error was within the acceptable

10   range in your field, correct?

11   A.  Yes.

12          THE COURT:  And of course always we're dealing with

13   a still photo, right?

14   A.  We are.

15          THE COURT:  It sits still on the page for you to

16   measure something.

17   A.  Or sits still on the screen so we can use pixels, yes.

18          THE COURT:  Right.

19   BY MR. PACKIN:

20   Q.  Are there standards controlling the application of

21   photogrammetry to a given scenario?

22   A.  Yes.

23   Q.  Who publishes those standards?

24   A.  They are published in part, and I have not made a

25   comprehensive review of all of these standards, but the

1    American Society for Photogrammetry and Remote Sensing has a

2    standards committee that in fact deals with photogrammetric

3    standards.

4    Q.  On how many occasions in your practice have you used

5    photogrammetry for one purpose or another?

6    A.  Many scores, so I would say well over 100 perhaps.  That's

7    a hard estimate to make.  But I've used it many, many times.

8    Q.  And in using it and performing error calculations and

9    applying your results have you found it to be accurate,

10   reliable, and consistent?

11   A.  I have.

12   Q.  Now, you mentioned also that you use -- so you use the

13   photogrammetry to determine the relative heights of the two

14   pipes involved and the distance between, correct?

15   A.  Yes.

16   Q.  And you had certain other information that was a known,

17   like the 10-inch diameter of the pipes, correct?

18   A.  Yes.

19   Q.  You mentioned before that you used in this case

20   anthropometry as well.

21   A.  I did.

22   Q.  For what purpose did you use anthropometry to address the

23   first of the three questions that was posed to you?

24          THE COURT:  Just a second.  Counsel, since we're

25   switching to the next technique, I suggest we give ourselves a

1   very brief lunch recess now.

2              MR. PACKIN:  That sounds fine.

3              MR. WALSH:  Your Honor, may I inquire as to what the

4   timing of this is because -- I mean, how much longer is Mr.

5   Packin --

6              THE COURT:  Yes, you may.

7              MR. WALSH:  -- going to be going and how much time

8   will we have left?

9              MR. PACKIN:  I'm estimating, since we covered a fair

10  amount, maybe an hour, or a little longer maybe.

11             THE COURT:  Okay.  Mr. Walsh, once you've heard it

12  all you can make your bid for how much time you think you

13  need.

14             MR. WALSH:  Thank you.

15             MR. PACKIN:  Should we return at 1:30, Your Honor?

16             THE COURT:  If you're back in half an hour, we can

17  get started even before that.

18             MR. PACKIN:  Thank you.  Will the Courtroom be open

19  during the break?

20             THE COURT:  Yes.

21             MR. PACKIN:  Thank you.

22         (Court in recess)

23             THE COURT:  Thank you.  Back in session.  You may

24  proceed.

25             MR. PACKIN:  Thank you, Your Honor.

1                    DIRECT EXAMINATION (CONT'D)

2   BY MR. PACKIN:

3   Q.  Doctor Hayes, when we left off, you told us what

4   anthropometry is.  Did you use anthropometry in this case in

5   addressing Question 1?

6   A.  Yes.  If we characterize Question 1 as could he fit, and

7   on the basis of the work that I've already described knowing

8   where the pipes were, the question is whether we can, using a

9   reflection of a human being of known -- of his size and shape,

10  whether it can be positioned within those pipes such that it

11  can be balanced, his words were "set and steady."

12  Q.  Okay.  And was part of your consideration in that regard

13  in whether the incident would produce injuries that fit the

14  signature of the injuries in this case?

15          THE COURT:  What was that?

16  BY MR. PACKIN:

17  Q.  And was part of your analysis from the anthropometric

18  standpoint to determine whether that positioning could result

19  in injuries that fit the signature of the injuries in this

20  case?

21  A.  Yes.  If the positioning that's found -- it has to produce

22  those injuries.

23  Q.  Now, what data did you use or rely on in applying

24  anthropometry in this case?

25  A.  We had from the medical records that Mr. McGee was 5'9"

1   tall, that he weighed 181 pounds, according to the medical

2   record.  His testimony was 175.  And based on very large

3   databases of various kind, figured out the size and shape of

4   his particular body.

5   Q.  Okay.

6           THE COURT:  His particular?

7   A.  Body.

8           THE COURT:  Body.

9   BY MR. PACKIN:

10  Q.  Did you have any body mass index for him as well?

11  A.  Yes, his body mass index, as I recall, was close to 27.

12  Q.  What does that indicate, a BMI of 27?

13  A.  Well, we start getting into an obese range of 30 and 35,

14  morbidly obese above 40.  But the real key here is that he's

15  about a 50th percentile male, and that would comport with his

16  height, his weight, and his BMI.

17  Q.  Now, what did you do, or how did you apply that

18  anthropomorphic --

19          THE COURT:  So he was --

20          MR. PACKIN:  Sorry.

21          THE COURT:  His BMI was consistent with a relatively

22  fit individual of his size and weight?

23  A.  Yes.

24          THE COURT:  Is that right?

25  A.  A 50% U.S. American male, 50th percentile meaning, you

1   know, someone of --

2           THE COURT:  Right.

3   A.  -- normal height and weight is 175 pounds and between 5'9"

4   and 5'10", and that's just where he was.

5   BY MR. PACKIN:

6   Q.  Now, how did you apply the anthropometric data in this

7   case to address Question 1?

8   A.  I created a model of his size and shape and then used an

9   anthropometric program called HumanCAD, all one word, last

10  three letters capitalized, C-A-D, model, which is one of many

11  anthropometric models available and we have used, to position

12  him between the two pipes such that he could be stable, such

13  that his position could comport with the testimony that he

14  provided and, thirdly, would produce the injuries sustained.

15          THE COURT:  Would, one, render him set and steady,

16  right?

17  A.  Yes.  His testimony was that he didn't start the cut down.

18  He was, I think his words were, "set and steady."

19          THE COURT:  And two would be consistent with the

20  pipe environment, pipe positions?

21  A.  Would fit between the pipe in a set and steady manner,

22  could produce the cuts.

23          THE COURT:  And three, could produce the injuries.

24  A.  And finally could produce the injuries based on physics.

25  BY MR. PACKIN:

1   Q.   And when you use an anthropometric model -- strike that.

2   Did that come into play at all with the photogrammetric

3   determinations that you made?

4   A.   Yes.   The positioning in the environment was created with

5   the photogrammetry.   We created the cross sections of the

6   pipes in three dimensions, and then placed the model within

7   those two -- between those two pipes corresponding with the

8   second cut.

9   Q.   Okay.   And did you produce in your report a graphic

10  representation of how you did that in combination with

11  photogrammetrics and anthropometrics?

12  A.   Yes.   Figure 3 of my first report is one view of his

13  positioning, along with a scale diagram of the saw and of the

14  pipes at the distances off the ground that we determined in

15  step 1.

16  Q.   All right.   Now, you have a slide which includes that

17  image, correct?

18  A.   I do.

19          MR. PACKIN:   Can you put that up, please, and we'll

20  ask to mark that as P --

21          THE COURT:   18.

22          MR. PACKIN:   -- 18.

23     (Plaintiff's Exhibit-18 marked for identification)

24  BY MR. PACKIN:

25  Q.   In that P-18, is the image on the left a reproduction of

1   Figure 3 from your report?

2   A.  It is.

3   Q.  And what -- walk us through, first of all, how is that

4   I'll call it spider web type representation of the --

5              THE COURT:  Are you offering this in evidence?

6              MR. PACKIN:  Yes.

7              MR. WALSH:  Your Honor, I have never seen the one on

8   the right.  I don't know where that came from.  It's certainly

9   not something that's in the report, so I don't know what that

10  is.  I have no objection to the one that is in the report on

11  the left.

12             THE COURT:  You know, if you want to be formal about

13  this, we shall obtain some foundation testimony about what's

14  on the right.

15             MR. WALSH:  Well, I would prefer to know what we're

16  looking at before --

17             THE COURT:  That's fine.  Okay, foundation

18  testimony.

19  BY MR. PACKIN:

20  Q.  Dr. Hayes, what is the --

21             THE COURT:  Let's hear about the item on the right.

22  BY MR. PACKIN:

23  Q.  What's depicted on the right, the image on the right?

24  A.  The right is simply a shaded view of the image on the left

25  shown in a different format.  The one on the left is just one

1   of the means we have to represent these figures that shows the

2   margins and the elements that are used to create the surface.

3   The one on the right simply is colored, is in exactly the same

4   position but is seen from a different viewpoint.

5           THE COURT:  It's also seen from a different angle

6   without the reference points of the two pipes.

7   A.  Correct.

8           THE COURT:  Do you want to inquire, Mr. Walsh?

9           MR. WALSH:  No, I'm just -- I am concerned about

10  that because I cannot tell if that figure is in the same

11  position because, as you say, the reference points are gone.

12  And I think these reference points are going to be pretty

13  important as we progress through this hearing.  I'm just not

14  sure what that figure represents.

15          MR. PACKIN:  Can I ask some questions further --

16          THE COURT:  Dr. Hayes, there is a cube in front of

17  this colored-in figure on the right side.

18  A.  Yes.

19          THE COURT:  What is that cube there for?

20  A.  That cube represents the -- or produces the center of

21  gravity of the saw and the contact points of the two hands.

22  And so the saw runs between the two hands that you can see on

23  both images.  It's just as if we're looking at it from the

24  back as opposed to from a side view, and is one of the

25  representations provided by the software.

Hayes - Direct                          113

1    BY MR. PACKIN:

2    Q.  How, Dr. Hayes, do you --

3            THE COURT:  Just a minute.  There are red arrows

4    extending downward from the hands depicted on the model on the

5    right.

6    A.  Yes.

7            THE COURT:  Are those red arrows supposed to be

8    something about the saw or are they measurements?

9    A.  No, those arrows are the forces assumed on his hands from

10   the saw.  So the gravitational attraction of the saw to the

11   center of the earth occurs at the center of gravity between

12   the two handles, and he's got one hand on the front handle, as

13   was described in the testimony, and his right hand on the rear

14   handle.

15           THE COURT:  With the gravity pulling straight down?

16   A.  Yes.  And if I have a, let's say as a rough estimate, a 25

17   pound saw, what is assumed here is that half of that goes

18   through the front end and half of it goes through the back.

19   BY MR. PACKIN:

20   Q.  How do you know from the generation of this image that the

21   body positioning in the right image is the same identical to

22   the left image?

23   A.  Because they were taken from exactly the same set.  We get

24   a three dimensional view that we can look from the top down,

25   from the side, from any angle we would like, and this is, I'm

1   testifying, just the same image with different colors.

2          THE COURT:  Anyway, if it's the same image, on the

3   right you've got a person wearing a white shirt and blue

4   trousers and some shoes of some sort.  That much we can see

5   corresponding to the figure, the model on the left.

6   A.  Yes.

7          THE COURT:  Okay.  But what about the cube and the

8   two red arrows, which are the things that are added on the

9   right side?  How do we get those?

10  A.  Those come from a mathematical representation that

11  reflects the position of the saw that you see on the left with

12  weight equally distributed between the two hands.

13         THE COURT:  Do those two red arrows come from the

14  same program that created the image on the left, or is it a

15  further calculation done in your office?

16  A.  No, it is -- well, it comes through the same software.

17  The calculation is simply dividing the weight of the saw by

18  two, one for each hand.

19         MR. WALSH:  All right, for purposes of this hearing

20  I don't have any objection, Your Honor.  I'll withdraw any

21  objections.

22         THE COURT:  Okay, fine.  Thank you very much,

23  Counsel.  P-18 in evidence for this hearing.

24      (Plaintiff's Exhibit-18 admitted into evidence)

25  BY MR. PACKIN:

1   Q.  And Dr. Hayes, would you explain to us what we're seeing

2   in the image on the left?  We have these what I call spider-

3   like human form because he's got the web type of things over

4   him.  Where did that come from?

5   A.  That comes from the same -- it used to be called

6   MannequinPRO.  It is now called HumanCAD.  It is a three-

7   dimensional anthropometric representation program that divides

8   body height and weight into different segment parts based on

9   large population studies, and then allows you to position that

10  figure in space in a way that is representative of the

11  anatomy.  In other words, it would not allow you to backwardly

12  bend your knee beyond range of motion of the human knee.  It

13  allows you to determine balance, whether the resultant force

14  on your body is between the feet, for instance, and allows you

15  to position other features in space in proximity to the model.

16  Q.  Now, there are two circles, one behind the image's right

17  forearm and one in front of the image's left shin.  Do you see

18  those two circles?

19  A.  I do.

20  Q.  What are they representing?

21  A.  Those represent the outer circumference, the same 10-inch

22  diameter that we talked about earlier, of the pipes and are to

23  scale.

24  Q.  Oh, that was to be my -- they are to scale in reference to

25  the individual and the saw?

 1   A.  Yes.

 2   Q.  And are they --

 3   A.  And the ground.

 4   Q.  That was my next.  Are they appropriately oriented in

 5   terms of their relative heights off the ground and to each

 6   other?

 7   A.  Yes.

 8   Q.  Are they spaced apart proportioned or scaled to the 18

 9   inches?

10   A.  They are.

11   Q.  What is represented by the red outlined device that the

12   model is holding?

13   A.  That is the saw in cross section that is taken as

14   perpendicular to the lower or the pipe that Mr. McGee was

15   cutting and was injured on.

16   Q.  Is the saw represented in the image in scale in relation

17   to the individual and the pipes?

18   A.  It is.

19   Q.  Now, how did you do that?  What data did you have

20   regarding the saw?

21   A.  I had both photographs of the saw, as well as information

22   on saw weight, on saw length, saw width from both photographic

23   evidence and from the --

24          THE COURT:  Specs?  Specifications also, right?

25   A.  Thank you.  From specifications taken from the website.

Hayes - Direct                           117

1    BY MR. PACKIN:

2    Q.  And when you say photographic evidence, did you do any

3    photogrammetric measurements of the saw?

4    A.  I did not.

5    Q.  And why was that?

6    A.  Because I had accurate measurements directly from the saw.

7    Q.  Now, if you --

8            THE COURT:  You measured the actual saw?

9    A.  No, I --

10           THE COURT:  You got it from the record that you

11   reviewed?

12   A.  Yes.

13   BY MR. PACKIN:

14   Q.  Now, you have a slide that you've created showing how you

15   created the anthropometric model of the individual not placed

16   between the pipes, correct?

17   A.  This one?

18   Q.  Yes.

19           MR. PACKIN:  I'd offer that as P-19.

20        (Plaintiff's Exhibit-19 marked for identification)

21   BY MR. PACKIN:

22   Q.  Can you just explain to us briefly what that represents?

23           THE COURT:  All right, okay, P-19, is that all

24   right, Mr. Walsh?

25           MR. WALSH:  No objection for purposes of this

 1    hearing, Your Honor.

 2                THE COURT:   P-19 is a slide showing a figure

 3    standing facing height location, right?

 4    A.   Yes.

 5                THE COURT:   Okay.

 6        (Plaintiff's Exhibit-19 admitted into evidence)

 7    A.   And you could qualify that by a wire frame figure, just to

 8    distinguish it from the colored in shaded version.

 9    BY MR. PACKIN:

10    Q.   Okay, and what are you demonstrating in that slide?

11    A.   Just to make the point that we take a representative

12    figure for Mr. McGee, put him within the pipes, and determine

13    whether the cuts can be made and whether he can be set and

14    steady or suitably balanced.

15    Q.   Now, tell us the process of placing that figure, if you go

16    back to P-18 or ahead, tell us the process that's involved in

17    placing the figure between the pipes and holding the saw and

18    then making the determination as to whether the individual

19    fit, whether the individual could be properly balanced, and

20    whether the individual could complete the cut and sustain the

21    resulting injuries with the signature pattern.  How do you go

22    about doing that, or did you go about in this case?

23    A.   You simply take the figure and can move -- you grab onto a

24    knee for instance, or you grab onto the center, you move him

25    to between the pipes.  You then bend him over, position his

1    knees in space, bend his knee to a suitable range until he

2    fits between the two.  You add, then, the saw both in

3    representative outline as you see here and its analog in the

4    physics of the weight of the saw.  And then the program

5    basically calculates the center of gravity of the entire

6    system, human and saw, and indicates whether he can be

7    balanced.  And it also helps tell us if he might be leaning or

8    contacting one or both of the pipes.

9    Q.  Now, so the CAD program was given his body weight?

10   A.  It was given his body weight, yes, and his height.

11   Q.  And was it given the weight of the machine?

12   A.  Yes.

13   Q.  And then it yielded some calculation as to center of

14   gravity and balance?

15   A.  Yes.

16   Q.  Was your first positioning of him the one you went with,

17   so to speak, or did it require adjustments and modifications

18   of positioning until you were able to arrive at a position

19   that met those several parameters?

20   A.  It is, as you suggested, an iterative process in that you

21   can't just position him there and you have to move him in

22   order to, in a sense, align the cuts made on the pipe with the

23   injuries that were sustained to the face and neck.

24   Q.  Okay.

25   A.  So short answer, no, we moved him around until he could

1   fit comfortably, until he was sufficiently balanced that only

2   a small force was being exerted against one of the pipes, and

3   that was essentially the process.

4   Q.  All right.  And then I take it there was some evaluation

5   made as to whether that positioning could result in injuries

6   that fit the signature, is that correct?

7   A.  Yes, if you have the face and neck directly above this

8   process, you can see that it produces the injuries.

9   Q.  So there were iterative positionings of this model in that

10  space between the pipes that were rejected as not fitting

11  those various criteria, correct?

12  A.  Yes, and much of it is not all that complicated.  If his

13  knee is, for instance, being shown as within the pipe, that

14  obviously violates constraints on reality, and we have to make

15  him positioned in such a way that he does fit.

16          THE COURT:  So you can't stuff him in there, right?

17  A.  I can't stuff him in there such that he violates the outer

18  integrity of the pipe, for instance.

19          THE COURT:  So you can't force a fit such that it

20  violates the other constants?

21  A.  The integrity of the environment.

22  BY MR. PACKIN:

23  Q.  So if I understand correctly, Dr. Hayes, it is possible

24  that using this program, together with the photogrammetric

25  conclusions that you reached, that it could have been possible

1   that Mr. McGee could not have fit in between the pipes,

2   correct?  That was one possibility.

3   A.  Yes.  If I'm understanding your double negative correctly,

4   yes, this could have come out that he couldn't fit and

5   couldn't achieve a balanced, or what he called a set and

6   steady, position before he initiated the second set of cuts.

7   Q.  Okay.  And it could have come out that he could fit and

8   could get balance but would not have enough room to make the

9   cut, correct?

10  A.  That too.

11  Q.  And finally, that he could have had all those criteria met

12  but not be able to produce the injury signature that was

13  involved here, correct?

14  A.  Also correct.

15  Q.  Were you able, using the photogrammetric analysis, the

16  anthropometry through the HumanCAD program, and applying your

17  education, training, and experience in injury biomechanics,

18  were you able to reach a conclusion to a reasonable degree of

19  biometric -- biomechanical, rather, and engineering certainty

20  as to what was the most likely position of Mr. McGee at the

21  time this event initiated?

22  A.  I believe to a reasonable degree of engineering and

23  biomechanical certainty that this, or close to this, is the

24  most likely position that met all the constraints of the case

25  or the facts of the case.

1    Q.  And those --

2              THE COURT:  Figure 3 is the what?  Best or closest

3    to the best, right?

4    A.  Yes.

5              THE COURT:  Best what?

6    A.  The representation --

7              THE COURT:  Yes, representation.

8    A.  -- of his position when his injury occurred.

9    BY MR. PACKIN:

10   Q.  Did that positioning comport with his height and weight

11   and relative size and positioning of the pipes?

12   A.  Yes.

13   Q.  Did it, from the HumanCAD program, produce a result

14   indicating that he could have appropriate balance?

15   A.  Yes, along with a small addition to balance by his hip or

16   back to the upper pipe.

17             THE COURT:  Hip or back slightly raised?

18   A.  Slightly in contact with the upper pipe, with the pipe

19   behind him.

20             THE COURT:  In contact with second pipe is part of

21   that figure, right?

22   A.  Yes.

23   BY MR. PACKIN:

24   Q.  The CAD program itself gives you feedback as to balance?

25   A.  Yes.

1  Q.  And did it comport with the cut that was being made on the

2  inner side of the pipe as shown in the photographic evidence

3  from the accident scene?

4  A.  Yes.  It was made to be constrained to a vertical cut or

5  approximately vertical cut through the pipe, what we've called

6  in here the second cut.

7  Q.  Now, what is the -- who is the manufacturer of the

8  HumanCAD program?

9  A.  NexGen, that's one word, N-E-X capital G-E-N, Ergonomics.

10          THE COURT:  It's available on the open market?

11  A.  It is.

12  BY MR. PACKIN:

13  Q.  Now, in reaching your conclusion that this was the most

14  likely or close to most likely positioning of Mr. McGee at the

15  time the incident was initiated, you relied on this HumanCAD

16  program, correct?

17  A.  Yes.

18  Q.  Is HumanCAD -- and was there a certain iteration of this

19  HumanCAD program?  You know how we get the iPhone 3, iPhone 4,

20  iPhone 5?

21  A.  Yes, there was an iteration of HumanCAD, it was 1.1, but

22  this had a long history and differently named programs.  It

23  used to be called MannequinPRO, all one word with the last

24  three letters, P-R-O, capitalized.  So that program had been

25  around for a decade or so.

1   Q.  Is HumanCAD a technology that is used in injury

2   biomechanics in accident reconstruction?

3   A.  It is, yes.

4   Q.  And is it a technology that is generally accepted in the

5   field of injury biomechanics and accident reconstruction as

6   being reliable?

7   A.  Yes, both from the perspective of the program itself, as

8   well as the general use of digital modeling of humans to

9   design environments for humans to interact with machines or

10  environments.

11  Q.  Did you bring with you a slide or slides of some examples

12  of how HumanCAD is used to create and position models?

13  A.  Yes.

14          THE COURT:  You're marking a slide?

15          MR. PACKIN:  Yes, as soon as I locate it online.  I

16  would offer this slide as P-20, obviously subject to the same

17  conditions as counsel has iterated before.

18          MR. WALSH:  I'm sorry?

19          MR. PACKIN:  P-20.

20          MR. WALSH:  Again, for the purposes of this hearing

21  I have no objection.

22          THE COURT:  Thank you, Counsel.  P-20 in evidence.

23      (Plaintiff's Exhibit-20 marked for identification)

24      (Plaintiff's Exhibit-20 admitted into evidence)

25  BY MR. PACKIN:

1   Q.   What does P-20 show, Dr. Hayes?

2   A.   These are some examples of fits that have been tested,

3   published in the peer reviewed literature.  The upper left is

4   the use of these kinds of digital anthropometric modeling to

5   design a helicopter cockpit.  The picture in the upper right

6   is a set of working positions determined with the same kind of

7   software.  The third example is an example of the use of

8   anthropometric models to meet the constraints of the Federal

9   Motor Vehicle Safety Codes in the design of trucks, a study of

10  a person's ability to reach the sun visor, to reach the

11  various controls, to get down out of the truck cab and be

12  balanced with the three point stance.

13          THE COURT:  What's the upper right item?

14  A.   That's a gentleman crawling in a narrow enclosure to

15  perform work in two positions.

16          THE COURT:  Yes.

17  BY MR. PACKIN:

18  Q.   And these images have, underneath them, indications of a

19  name and date; Porter, 1995; McDaniel, 1990; Bowman, 2001.

20  What do they represent, Dr. Hayes?

21  A.   They represent peer reviewed publications, copies of which

22  I have with me, that demonstrate use of these in peer reviewed

23  publications outside of litigation.

24  Q.   Okay.  And do those years reflect that this was being used

25  as far back as 1990?

1  A.  It was used long before that, but yes, these techniques

2  were used for decades.

3  Q.  And these are headed "Space Balance Examples."  Could you

4  explain what that means?

5  A.  I meant space just to reflect constrained space, or tight

6  fits, or to characterize the fit of a person in an environment

7  and to characterize them.

8  Q.  Did you bring a slide or slides of additional examples of

9  use of HumanCAD to position models in space?

10 A.  I did.

11        MR. PACKIN:  And I'd offer this one as P-21, subject

12 to the same conditions, qualifications.

13     (Plaintiff's Exhibit-21 marked for identification)

14 BY MR. PACKIN:

15 Q.  What is shown in that?

16        THE COURT:  The same offer?

17        MR. PACKIN:  Yes, Ma'am.

18        THE COURT:  Same ruling, P-21 in evidence.  Thank

19 you.

20     (Plaintiff's Exhibit-21 admitted into evidence)

21 A.  So every time we sit at a desk, every time we sit in a

22 vehicle, every time we work on a machine in an assembly line

23 or a manufacturing facility, when we ride a motorcycle or a

24 three-wheeled conveyance that we see there, or every time you

25 sit at a desk at an ergonomic -- at a work station in front of

1    the computer, you are taking advantage of these kinds of

2    anthropometric and ergonomic analysis techniques.

3    BY MR. PACKIN:

4    Q.  And what are the references under each of those set of

5    pictures with a name and a date?

6    A.  These are, again, peer reviewed publications with figures

7    taken from those particular publications.

8    Q.  And do you have another slide, sir?

9            MR. PACKIN:  We offer that subject to the same

10   limitations as P-22.

11        (Plaintiff's Exhibit-22 marked for identification)

12            MR. WALSH:  No objection.

13            THE COURT:  Thank you.  P-22 in evidence.

14        (Plaintiff's Exhibit-22 admitted into evidence)

15   BY MR. PACKIN:

16   Q.  What is shown in P-22, Dr. Hayes?

17   A.  A helicopter example, a work station example, a grocery

18   checkout counter example to reduce the stresses on workers at

19   checkout stands, chairs, if you have an ergonomic chair, those

20   are based on anthropometry.  Every bus that travels, every

21   school bus are all reflective of fitting people to their work

22   or transportation environment.

23   Q.  What are the names and dates under each of those images on

24   P-22?

25   A.  Same as the others.

1   Q.  Peer reviewed references?

2   A.  Peer reviewed publications, yes, or chapters, in some

3   instances.

4   Q.  Did you bring any slides --

5           THE COURT:  Now, anthropometry, would the people

6   writing these articles and presenting these illustrations use

7   the term anthropometry or might they use other terms

8   interchangeably?  Ergonomics?

9   A.  Perfect.  They would use ergonomics and anthropometry as a

10  subset of ergonomics.  So to do ergonomics, we have to have

11  the environment, like our pipes, and then to do the fit we

12  have to have the anthropometry.

13          THE COURT:  Okay.

14  A.  And so there are international standards for ergonomics

15  that include subsections on anthropometry and biomechanics,

16  for instance.

17          THE COURT:  These figures involve ergonomics and

18  anthropometry, right?

19  A.  Yes.

20  BY MR. PACKIN:

21  Q.  Did you bring slides reflecting publications regarding the

22  accuracy of the anthropometric modeling program?

23  A.  Yes.

24          MR. PACKIN:  I'll offer this as P-23, subject to the

25  same limitations.

1        (Plaintiff's Exhibit-23 marked for identification)

2            MR. WALSH:  And subject to the same limitations, I

3   have no objection.

4        (Plaintiff's Exhibit-23 admitted into evidence)

5            THE COURT:  This excerpt of article --

6            MR. PACKIN:  It's an article called "Verification

7   and Validation of Human Modeling Systems."

8   BY MR. PACKIN:

9   Q.  Can you tell us briefly what this reflects, Doctor,

10  please?

11  A.  These are a series of reach measurements that have been

12  obtained using anthropometric models and then tested for

13  accuracy and repeatability in direct studies with humans

14  asking the question, "Can you reach from here?" and the answer

15  is basically yes to a high degree of reliability.

16  Q.  Does that apply to the HumanCAD program as well as other

17  anthropometric programs?

18  A.  The error rates and ranges based on our experience with

19  using a number of them is that they are all comparable.

20  Q.  Okay.  And do you have another slide regarding the

21  accuracy?

22  A.  Yes.

23            MR. PACKIN:  I'll ask to mark that and offer that as

24  P-24, subject to the same conditions and limitations.

25        (Plaintiff's Exhibit-24 marked for identification)

1           MR. WALSH:  No objection.

2           THE COURT:  P-24 in evidence.

3      (Plaintiff's Exhibit-24 admitted into evidence)

4           MR. PACKIN:  And that one, for the record, is called

5    "Anthropometric Analyses of Crew Interfaces and Component

6    Accessibility for the International Space Station."

7    BY MR. PACKIN:

8    Q.  What does that one depict, sir?

9    A.  It simply is another error rate and demonstrates the

10   validity and accuracy of these approaches in something that is

11   as life critical as space transport, the space station, as

12   well as lots and lots of vehicles of all sorts.

13          THE COURT:  Just a thought that emerges.  These

14   digital models, they do a snapshot in time, right?

15   A.  Yes.

16          THE COURT:  We're not yet into flow dynamics of

17   human beings moving?

18   A.  Correct.

19          THE COURT:  Right?

20   A.  In what I've shown here?

21          THE COURT:  That's right.

22   A.  That's correct.

23          THE COURT:  In at least the anthropometric modeling

24   systems that you are describing here.

25   A.  Yes.

1              THE COURT:  Okay, fine.

2              MR. PACKIN:  Thank you.

3    BY MR. PACKIN:

4    Q.  The example of the space program, would it be correct that

5    in terms of determining anthropometry and fit of humans within

6    a space vehicle, you can't test that in reality?  You can't

7    send them up and then test it, correct?

8    A.  Well, you can create a mockup.

9    Q.  Right.

10   A.  But no, one would want to test it before one sent someone

11   into space to live there for any period of time.

12   Q.  Is anthropometry used before that is done or even before

13   mockups such as that are built to determine sizes and shapes

14   and configurations?

15   A.  Oh, yes.

16   Q.  And did you -- and so I take it from these peer reviewed

17   articles that the technology of the HumanCAD program has been

18   tested?

19   A.  It has.

20   Q.  And it has been accepted, received general acceptance in

21   your scientific community of injury biomechanics and accident

22   reconstruction, is that correct?

23   A.  It has.

24   Q.  Or have there been error calculations made with regard to

25   the anthropometry program such as this?

1    A.  Yes.  They are published in the literature.  They're

2    certainly acceptable, realizing that we have -- we're not

3    perfectly rigid and there are situations where our soft

4    tissues come into contact, but these error rates are within a

5    range of a few percent, depending on whether you're talking

6    about reach or balance.

7    Q.  Are there standards in existence controlling the

8    application of HumanCAD program to a given scenario?

9    A.  Again, having made no attempt to be complete in looking at

10   these standards, I simply picked one.  There is the

11   International Standard ISO9241 entitled "The Ergonomics of

12   Human System Interaction."  That is the responsibility of the

13   ISO Technical Committee 159, and one of the subcommittees,

14   Subcommittee 3, of that standards group is entitled

15   "Anthropometry and Biomechanics."

16   Q.  What does ISO stand for?

17   A.  International Standards Organization.

18   Q.  Is that a recognized standards making body?

19   A.  It is.  A whole series of bodies.

20   Q.  I'm sorry?

21   A.  A whole series of bodies.

22          THE COURT:  Subcommittee is entitled --

23   A.  Anthropometry and Biomechanics.  It's Subcommittee 3.

24   BY MR. PACKIN:

25   Q.  Did you prepare a slide depicting now the interface

1    between your photogrammetric analysis and your anthropometric

2    analysis?

3    A.  Other than the Figure 3 we're talking about?

4    Q.  The one that showed -- you have a slide that shows

5    photogrammetry on one side and anthropometry on the other.

6    Can you put that up?

7    A.  Oh, sorry.

8         MR. PACKIN:  There you go.  I would ask that we mark

9    that as P-25, subject to the same criteria.

10        (Plaintiff's Exhibit-25 marked for identification)

11        THE COURT:  Oh, okay.  A slide showing comparison of

12   photogrammetry and anthropometry as --

13        (Plaintiff's Exhibit-25 admitted into evidence)

14   A.  Anthropometry.

15        THE COURT:  Yes, right.  Thank you.  As used in the

16   Hayes expert report in this case, right?

17   A.  Yes.

18   BY MR. PACKIN:

19   Q.  I would actually -- I think it's more the progression than

20   a comparison.  Would it be fair to say, Doctor, that on the

21   left you've represented the data you took from photogrammetric

22   analysis?

23   A.  Of the scene, yes.

24   Q.  And then to the right we see that used together with the

25   anthropometric, correct?

1   A.  Yes.

2   Q.  When the photogrammetry and the anthropometry revealed the

3   image that's shown in the upper right corner of P-25, which is

4   also represented as Figure 3 in your report, did you test it

5   against your own evaluation as an injury biomechanics expert

6   and as an engineer as to whether it, in fact, as represented

7   by these programs, was a fair and realistic representation?

8   A.  I did, yes.  I asked the question fundamentally, "Does

9   this produce the injuries from this position?"  From my

10  understanding of the physics of reactive forces on rotating

11  saws, my understanding of human anatomy and these analyses of

12  the scene, I reached a conclusion and an opinion on the

13  fundamental question of "Could he fit?"

14  Q.  All right.  And based on the photogrammetry, the

15  anthropometry and the application of your education, training

16  and experience did you reach the conclusion that Figure 3 was

17  a fair -- Figure 3 was the best representation, or close to

18  it, of his positioning as it would have been just prior to the

19  incident which would have produced the injury signature that

20  we see and allowed him to make the cut?

21  A.  Yes --

22          MR. WALSH:  Objection, Your Honor.  Again, that's

23  not the question the witness was asked to do.  He just

24  testified to the question that he was asked, which was to see

25  if he could fit.

1          THE COURT:  No, I think Question #1 in the expert

2    report is a multi-part question.  "Was there sufficient space

3    between the two pipes such that Plaintiff could position

4    himself between them, be properly balanced, and complete the

5    second cut in a biomechanically safe manner?"

6          MR. WALSH:  That's correct, and that's a very

7    different question from, "Is this the position you believe he

8    was in just at the moment of the accident?"

9          THE COURT:  Well, I --

10          MR. WALSH:  That's not the question asked.  The

11    question asked of the witness is, "Can you fit him in and give

12    us a way of saying that he could have been balanced and

13    completed the cut?"  There's nothing there about timing or

14    whether this was the position immediately prior to the cut or

15    anything else.  That's not in that question.  That's not the

16    question that's answered.  It's not the question the witness

17    answered on his deposition.

18          THE COURT:  I'm sorry, I lost you.  Let me hear your

19    question, Mr. Packin.

20    BY MR. PACKIN:

21    Q.  Did you reach the opinion to a reasonable degree of injury

22    biomechanical and engineering certainty that the position as

23    shown in Figure 3 is the position that -- rather -- withdrawn.

24    Based upon the photogrammetric and anthropometric tools that

25    you used as you've described them, and applying your

1    engineering and injury biomechanics education, experience, and

2    expertise, did you reach an opinion to a reasonable degree of

3    engineering biomechanical -- injury biomechanical and

4    engineering certainty as to whether there was sufficient space

5    between the two pipes such that Mr. McGee could position

6    himself between them, be properly balanced, and complete the

7    second cut in a biomechanically safe manner?

8    A.  I did.

9    Q.  And is Figure 3 the result -- does Figure 3 represent that

10   opinion?

11   A.  Yes, it represents that opinion that, yes, he could fit,

12   be properly balanced, and be set and steady in that position.

13   Q.  Did you reach an opinion as to whether that positioning

14   was capable of producing the injury signature that we see in

15   this case?

16   A.  It did produce the --

17            MR. WALSH:  Objection.  That, again, is outside the

18   scope of the report.

19            MR. PACKIN:  It's all over his deposition, Your

20   Honor.

21            THE COURT:  Mr. Walsh, your objection I do not agree

22   with because we just dealt with the first question pretty

23   much.  And the next question is, "Does the evidence in this

24   case support a scenario with Mr. McGee losing his balance,

25   falling to the ground, and then being struck in the face by

 1    the machine while on the ground?"  The necessary predicate of

 2    deciding whether it happened the way described in the police

 3    report is to try to figure out how it did happen.

 4           MR. WALSH:  Or as the case law holds, doing a

 5    differential diagnosis and eliminating other possibilities,

 6    which has not been done.  And there's been no attempt to

 7    eliminate alternative possibilities of this accident

 8    happening.  And that's -- one of the issues we have here is in

 9    a report in a Federal Court a witness, as Your Honor well

10    knows, a witness is required to produce his opinions and

11    everything he relies upon for those opinions.  There is no

12    discussion in this report of the nature we've had today

13    anywhere close to it.  The witness is expanding his testimony

14    well beyond the three questions that were asked and the

15    answers that he gave in the report, and even as expanded to an

16    extent in the deposition.  We're well beyond any point where

17    this witness is answering the questions could he fit.  Is

18    there anything supporting?  What he talks about in his report

19    and what he talks about in his deposition is, well, nobody

20    said, no eyewitness said he fell other than the policemen

21    reporting it.  And, you know, I don't see any loose ground

22    here.  And he's got a scar that runs in a particular way, but

23    we don't have any of the medicine at all discussed in the

24    report except for the summaries of a couple of people,

25    treating physicians, as part of the basic facts.  But when we

1    get to the analysis section, which is really the opinions,

2    really the opinion is none of that's here.

3            THE COURT:  Well, in his deposition he testified, "I

4    think that second cut as described by Mr. McGee probably

5    happened the way Mr. McGee said on the down stroke, and then

6    the blade was coming up in the kerf, maybe slightly not as far

7    into the kerf as when the cut was made, and that's when the

8    kickback happened, and that's consistent with the injuries

9    that we see," and he explained it in his deposition.  Mr.

10   Packin, am I missing something?

11           MR. PACKIN:  Your Honor is right on target.

12           THE COURT:  He says that in his deposition.

13           MR. PACKIN:  This was covered in the deposition.  It

14   was the natural corollary of point #2.  He said in his

15   deposition that the injury pattern is inconsistent with

16   falling and being struck by the saw and totally consistent

17   with what happened here.  What Counsel is presenting is

18   argument that I think is inconsistent with the record and also

19   espousing a standard that I haven't heard of before, and that

20   is that the expert has to eliminate every other possibility

21   and configuration, which could include some quite bizarre

22   ones.

23           THE COURT:  Mr. Walsh, I just don't see it the way

24   you do.  Differential diagnosis is used for doctors who are

25   trying to diagnose patients where they have to look at

1   clinical data and eliminate enough diseases so that they can

2   zero in on what the problem probably is.  This is a

3   biomechanical report seeking to determine the parameters and

4   the physics of what resulted in this accident, and I see it as

5   a biometric analysis.

6           MR. WALSH:  Well, I'll just leave the Court with

7   this one thought.  Has there been -- have you heard a single

8   word today, single word, about this witness having any

9   knowledge what a saw wound to the face with a 14-inch carbide-

10  tipped saw blade would look like from multiple other sources?

11  Has there been a single piece of testimony that the witness

12  has even a passing familiarity with what those wounds would

13  look like?

14          THE COURT:  Well, this is a Daubert Hearing, and all

15  I'm ruling right now is that the testimony that's being

16  offered here is, I believe, consistent with and not extended

17  beyond his expert report, coupled with his supplemental expert

18  report and what was elicited mostly by you in the deposition.

19          MR. WALSH:  I didn't take the deposition but I --

20          THE COURT:  Your colleague.

21          MR. WALSH:  -- but I read it, and with all due

22  respect, Your Honor, we did not elicit medical testimony in

23  the deposition because there was no cause to do that based on

24  the report that we were given.

25          MR. PACKIN:  That issue, by the way, has --

1          THE COURT:  Well, and the other thing is that you

2    did not elicit testimony concerning his rebuttal of your

3    experts, and that was on purpose, but that didn't mean that

4    Mr. Packin could not elicit such testimony at a hearing like

5    this, even in Federal Court which is, I'm very well aware,

6    where we're at.

7          MR. PACKIN:  And my position would be also that the

8    other argue about whether he's ever seen a cut-off saw's 14-

9    inch blade injury to somebody's face is totally irrelevant to

10   the analysis he's done here.  In part because there's no

11   dispute that this injury came from an individual using a Stihl

12   TS 400 cut-off saw with a 14-inch carbide-tipped 24 tooth oval

13   blade.  So there's no dispute over that issue.  He didn't

14   incidentally get these lacerations in some other fashion.

15         THE COURT:  Please go on.

16   BY MR. PACKIN:

17   Q.  Dr. Hayes, you did conclude in your report that while

18   making the second cut, the one that was being made at the time

19   the incident was initiated, Mr. McGee needed to squat down

20   further than he demonstrated at his deposition, is that

21   correct?

22   A.  Yes.

23   Q.  Did you reach any conclusions as to why there was that

24   difference between his demonstration at his deposition and

25   your biomechanical reconstruction of his position?

1   A.  Because I believe that the demonstration that was elicited

2   from him in his deposition was fundamentally and fatally

3   flawed for a couple of reasons.  First, I don't believe it was

4   positioned correctly above the ground in terms of the

5   photogrammetric measurements, the single pipe that was

6   provided.  And secondly, the problem was incorrectly bounded

7   by the absence of the second pipe, the pipe behind him, the

8   higher pipe.  He wasn't afforded an opportunity to put himself

9   in the same environment that he was at the scene.

10  Q.  Were there any other issues that you considered as to what

11  accounted for that difference?

12  A.  As I recall, the deposition did not include a blade on the

13  saw, if I remember correctly.  I'm trying to think if there

14  are other issues.  Those are the two that I think were most

15  important and obvious to me.

16  Q.  Was there anything about the trauma sustained in itself

17  that would bear upon your conclusion?

18  A.  Yes.  It is my experience, having seen literally hundreds,

19  if not thousands, of cases in which testimony is elicited from

20  involved parties or eyewitnesses in which the event is

21  sufficiently traumatic that their recall of the event is

22  imperfect.  And I believe his traumatized situation and what

23  has happened to him subsequently likely impaired his recall.

24  Q.  Was there any material difference between the positioning

25  that he showed and what you were able to reconstruct?

1   A.  Define material.

2   Q.  Significant in terms of the outcome.  It's an awkward

3   question, I'll withdraw it.  You concluded that the weight of

4   the saw which was being held to his right side had a tendency

5   to shift his body weight to his right.  On what did you base

6   that conclusion?

7   A.  That's simple -- the most simple of physics.  If I hold

8   something close to the center of gravity of my body, hug it to

9   my chest, that simply increases my weight but doesn't change

10  my balance.  If I take that same weight and hold it out to my

11  far right side, that tends to shift the center of gravity of

12  my body and the weight outside and tends to decrease balance.

13  Q.  And did that tendency to shift his body weight to the

14  right affect in any way either positively or negatively his

15  stability while making the second cut?

16  A.  It had a tendency, and of course we weren't there, and he

17  couldn't recall about his left leg and its contact with the

18  front pipe.  But the use of the saw to his right would tend to

19  pull his left leg from the lower pipe he was cutting and would

20  tend to be resisted by his hip and potentially his arm contact

21  with the higher --

22          THE COURT:  Pull left leg toward where?  I've heard

23  this it just -- it's hard for me to capture.

24  A.  So if you look at --

25          THE COURT:  Had a tendency to pull his left leg

1   toward --

2   A.  Away from the front pipe towards the saw and tended to

3   move him in a direction that would be back into the pipe

4   behind him.

5   BY MR. PACKIN:

6   Q.  And how, if at all, would that affect stability, in your

7   opinion?

8   A.  Gives you additional stability from the contact behind

9   him.

10  Q.  Now, you were asked a second question in this case and

11  that was, as you recited before --

12          THE COURT:  The contact being that rear pipe?

13  A.  Yes.  It's a little like leaning against a wall.

14          THE COURT:  Yes, sure.

15  BY MR. PACKIN:

16  Q.  You were asked a second question which you read into the

17  record before, "Does the evidence in this case support a

18  scenario with Mr. McGee losing his balance, falling to the

19  ground, and then being struck in the face by the cut-off

20  machine while on the ground as indicated in the Falls Township

21  Police incident report?"  Did you reach a conclusion to a

22  reasonable degree of engineering -- I'm sorry, injury

23  biomechanical and engineering certainty as to that question?

24  A.  I did.

25  Q.  What was your conclusion as to that question?

1    A.   My conclusion as to that question was based in part on the

2    absolute uniformity from eyewitnesses or peripheral vision

3    witnesses that nothing of the sort happened.  That version of

4    the event was also directly contradicted by the Plaintiff

5    himself who said that isn't what happened.  And secondly, it

6    strains credibility to imagine that this saw, if he fell, was

7    carried with him in such a way that it could produce these

8    injuries and not produce any other injuries to his body.

9    Q.   Could -- strike that.  Could it have produced the injuries

10   in those two different directions from falling with the saw?

11   A.   At that point we're talking about a relatively random

12   event.  We can't know precisely beyond what we can know from

13   his positioning and the actual injuries, which is a relatively

14   short distance.  If he were to fall in some way, the only

15   falling we hear is towards the back, although we also hear

16   that at some point he went into the ditch itself before he was

17   stopped and constrained, restrained in some way.

18            THE COURT:  The ditch was over forward of the cut

19   pipe?

20   A.   It was forward of the cut pipe, and there is some

21   testimony indicating he went into the ditch and came out of it

22   again.  There is contradictory testimony about whether he fell

23   back over the pipe behind him.  I think the event became

24   fairly chaotic after this injury occurred.

25   BY MR. PACKIN:

1   Q.  You wrote in your report on page 7 in paragraph 17 that

2   the pattern of injuries to the right side of his face and neck

3   were consistent with the body position shown in Figure 3 and

4   not with falling to the ground and then being struck by the

5   cut-off machine in the face.  What about the pattern of

6   injuries was not consistent with falling to the ground and

7   then being struck?

8   A.  That it would hit him in precisely that position would

9   produce the second cut, which we can explain in the other

10  scenario.  We have no idea the path of the saw as he was -- as

11  he would have been falling if he fell.  I think it becomes

12  speculative and completely contradictory to what I believe is

13  compelling unanimity of the eyewitness testimony and his own.

14  Q.  You also wrote in that paragraph that the witnesses who

15  testified did not document or establish that -- they said they

16  did not feel any softness, looseness, or instability in the

17  ground and nothing slippery.  Did that in any way play a part

18  in your conclusion?

19  A.  Well, to the extent that is going to be argued that he

20  slipped or that it was uncertain footing or that he couldn't

21  have been balanced and the slip caused this injury, Mr.

22  Caldwell, in his deposition, basically contradicted that

23  notion.  Mr. Rivera also said there was no problem with the

24  footing.  And we know that heavy equipment was -- had its

25  tracks running over this region.  I didn't see from

 1   photographs any substantial evidence of wetness in the region

 2   where this occurred.

 3   Q.  And have you prepared a slide showing the pattern of

 4   injuries versus the positioning in connection with Question 2?

 5   A.  Well, it mostly is a summary of the eyewitness testimony.

 6   Is that the slide you mean, loss of balance?

 7   Q.  The one that shows Figure 3 and Mr. McGee's face.

 8   A.  Oh, sure.

 9   Q.  The one you just passed.

10   A.  I know.

11           MR. PACKIN:  I'd offer that as P-26, subject to the

12   same limitations.

13       (Plaintiff's Exhibit-26 marked for identification)

14           MR. WALSH:  No objection.

15           THE COURT:  Thank you.  P-26 in evidence.

16       (Plaintiff's Exhibit-26 admitted into evidence)

17   BY MR. PACKIN:

18   Q.  And then you made a chart.  I think that you just showed

19   us the criteria you used in addressing and answering Question

20   2 as well, in addition to that.

21   A.  Sorry.

22           MR. PACKIN:  I would offer that as P-27.  Those are

23   corroborating criteria in addition to the pattern of injury.

24       (Plaintiff's Exhibit-27 marked for identification)

25           THE COURT:  Is that a fair summary of some of that

1  corroboration, as counsel calls it?

2  A.  It is, Your Honor, with citations to deposition testimony

3  by the involved witnesses.

4           THE COURT:  Okay, so that's P-27?

5           MR. PACKIN:  Yes, Ma'am.

6           THE COURT:  Any objection, Counsel?

7           MR. WALSH:  I guess there's no objection, Your

8  Honor.  I mean, these are little teeny excerpts --

9           THE COURT:  Sure.

10          MR. WALSH:  -- taken out of very, very lengthy

11 depositions, and what they're worth is what they're worth, I

12 suppose.

13          THE COURT:  Thank you.  P-27 in evidence.

14     (Plaintiff's Exhibit-27 admitted into evidence)

15 BY MR. PACKIN:

16 Q.  And you were asked to address a third question which you

17 read to us before, "Could the accident have been prevented by

18 supporting the pipe with a strap configuration attached to a

19 crane or forklift?"  Did you reach an opinion to a reasonable

20 degree of engineering biomechanic -- I keep saying that.  I'm

21 sorry.  Withdrawn.  Did you reach an opinion to a reasonable

22 degree of injury biomechanical certainty and engineering

23 certainty as to whether -- as to that question?

24 A.  I did.

25 Q.  What was your opinion, sir?

1  A.  I believe that a strap used in anticipation -- I believe a

2  strap could not have been used to prevent this accident

3  because a strap -- well, that's what I concluded is that a

4  strap would not have helped, in all likelihood would have made

5  it worse.

6  Q.  And on what did you base that conclusion?

7  A.  I based that conclusion on my understanding of the run of

8  this pipe, generally a curved run coming from around the

9  spoils pile and descending into the trench.  So it was a pipe

10  that was in fact bent to --

11          THE COURT:  Now, this is both pipes, right?

12  A.  Both pipes, yes.  This is both pipes.

13          THE COURT:  Actually both pipes.

14  A.  Curve around the spoils pile and come into the ditch.

15  That means that that pipe is subjected to bending, in addition

16  to a small amount of sagging.  The strap will help with the

17  sagging and the response to gravity, gravitation, but it can't

18  deal with the sideways bending.  That's the consequence of it

19  curving.

20          THE COURT:  So it's exposed to sagging, right?

21  A.  A little bit.

22          THE COURT:  When you say exposed to sagging --

23  A.  It is --

24          THE COURT:  -- it's going to experience that, right?

25  A.  It did experience sagging because gravity works on any

1    object between -- this was supported on the spoils pile away

2    from the trench and on the edge of the trench.

3              THE COURT:  Right.

4    A.  Gravity will tend to cause that to bow down a small

5    amount.  More importantly, this pipe was bent around the

6    corner, and the strap won't help you with that.

7              THE COURT:  Around the corner into the trench.

8    A.  Around the spoils pile and into the trench.

9              THE COURT:  Around the spoils pile and into the

10   trench.  So it's bent and bent.  It's in a long curve?

11   A.  It's bent like this if I come around the curve.  And by

12   this, I'm taking my thumbs and pressing on one side and

13   creating that bending curvature.  And we have direct evidence

14   that that was, in fact, so because we see a small buckling of

15   the pipe.

16             THE COURT:  You got ahead of me.  It's bent around

17   the spoils pile and into the trench causing what kind of

18   tension?  Sideway?  What kind of pressure?

19   A.  It causes on --

20             THE COURT:  You talked about sagging.

21   A.  Yeah.

22             THE COURT:  So what is this bending doing?

23   A.  This bending, if you could imagine, if I can -- let's see,

24   let me grab --

25             THE COURT:  Just what's the word?

Hayes - Direct                         150

1    A.  It is called --

2              THE COURT:  It's a sideways type of tension?

3    A.  It is tension on the inside of the pipe where Mr. McGee is

4    positioned, and it's compression on the other side before it's

5    cut.

6    BY MR. PACKIN:

7    Q.  Do you have a picture showing that, a slide showing that?

8              MR. PACKIN:  We'll offer this as P-28, subject to

9    the same limitations.

10       (Plaintiff's Exhibit-28 marked for identification)

11             MR. WALSH:  No objection.

12             THE COURT:  Thank you.  In evidence.

13       (Plaintiff's Exhibit-28 admitted into evidence)

14   BY MR. PACKIN:

15   Q.  And will you explain to us in that lower left image what

16   you're -- the compression tension issue?

17   A.  Yes.  And this shows the compression and tension after the

18   cut is made.  But here is the pipe behind him coming around

19   the spoils pile and down into the trench.  So it's supported

20   between here and here.  Here's the pipe of interest coming

21   around, bent around the spoils pile down into the trench.  And

22   before it was cut, because it's on the outside of the curve,

23   that means --

24             THE COURT:  The cut is on the outside of the curve?

25   A.  Well, even before the cut, as it's coming around the curve

1   before it's cut, the side where Mr. McGee was positioned

2   before he started to do either cut was in tension on the

3   inside and compression on the outside just because it's bent

4   the way we see it.

5           THE COURT:  I lost you there.

6   A.  Okay.

7           THE COURT:  Okay, we're looking at the bottom photo

8   on the slide.

9   A.  On the left.

10           THE COURT:  Which is a different view of these two

11   pipes than we've been using up until now.

12   A.  No, it's the same view.

13           THE COURT:  Oh, okay, it's just closer up.

14   A.  Yes.

15           THE COURT:  And so the cut, I call it the cut pipe,

16   is still on the right.

17   A.  It is.

18           THE COURT:  Yes.  And the second pipe is on the

19   left.  And the basic curve of both pipes goes from, as you

20   say, around the spoils pile where the pipes are coming from.

21   A.  Yes.

22           THE COURT:  And downward toward the edge of the

23   trench, and then the pipes go into the trench.

24   A.  They do.

25           THE COURT:  And obviously the first cut was on the

1   exterior side of the pipe on the right.

2   A.  Yes.

3            THE COURT:  And the photo we're looking at is after

4   that exterior cut has been made.

5   A.  Yes.

6            THE COURT:  Yes.

7   A.  And after the --

8            THE COURT:  And after the second cut has been made -

9   -

10  A.  Part, yes.

11           THE COURT:  -- as well.

12  A.  Yes.

13           THE COURT:  And there's kind of a little snaking

14  effect right at that location.

15  A.  You call that buckling.  There has been -- that's a

16  release of the internal stresses there, sometimes in this case

17  have been referred to as residual stresses.  They're internal

18  stresses that are created that are then released and produce

19  the figure you see there with the open kerf on the tension

20  side and the closed kerf on the compression side.

21           THE COURT:  Okay, and those are the terms that you

22  use for the outer side of the curve and the inner side of the

23  curve.  Outer side would be tension and the inner side would

24  be compression.

25  A.  Yes, exactly.

1          THE COURT:  You see, I would have thought the outer

2     side you would call it like the stretch part and the inner

3     would be the compressed part, but the outer part you're

4     calling --

5     A.  We're talking about two points in time.  You are actually

6     right.  The curvature of that pipe before it's cut at all has

7     tension on what is now the compression side.  And I'm sorry

8     that that's so confusing because it's a different point in

9     time.  But before this pipe is cut it has tension between the

10    two pipes and compression on the outside of the cut pipe.  And

11    now after those two cuts are made, that reverses.  We get that

12    little notch, that little buckle, and now we have tension

13    opening.  We used to call this, when we were talking about

14    treating bones, bending open or bending closed, and that's

15    exactly the situation that we see here.  And the point is that

16    the strap helps you to the extent that sagging is important.

17    The strap does nothing to help you with all this bending and

18    redistribution of stresses.

19    BY MR. PACKIN:

20    Q.  Dr. Hayes, if I understand correctly, then, there were

21    stresses in two directions, vertically from gravity causing

22    sag --

23    A.  Yes.

24    Q.  -- and horizontally from tension and compression because

25    of the bending in the way the pipe was laid down, correct?

1  A.  Yes, and I believe the latter are much higher stresses.

2  Q.  Thank you.  Now, you indicate in paragraph 18 of your

3  report that the only way to prevent a pinch from occurring at

4  some point in this cut would not be by suspending the pipe

5  from a strap but by positively securing the pipe by some

6  mechanisms on both sides of the cut so the pipe could not move

7  as the cut was being made.  On what do you base that

8  conclusion?

9  A.  My understanding of these stresses and how they relate to

10  the physics of both bending and gravitational sagging.  So in

11  order to prevent any kind of motion of either fragment, either

12  half of this pipe where the cut is made, you have to

13  positively resist both sagging tendency and the bending

14  tendency.  You have to lock both of those out.  And then you

15  can have a kerf that won't even move at all.

16  Q.  Was it -- in your -- you reached a conclusion --

17           THE COURT:  To fix the tension?  To balance the

18  tension?

19  A.  Yes.

20           THE COURT:  To balance the stresses or to eliminate

21  the stresses?

22  A.  To eliminate the tendency for that pipe to move and create

23  the bending open kerf and the bending closed kerf, which is a

24  sideways effect, not an up and down effect.

25  BY MR. PACKIN:

Hayes - Direct                                        155

1   Q.  You rendered an opinion that it would not have been

2   practical or possible to secure the pipe in that way in the

3   field, is that true?  That was your opinion?

4   A.  I can see no way to do it without creating some sort of an

5   enormous vice that would allow you to lock it down in all

6   directions such that you could cut it without any motion of

7   either end of the cut surface.

8            THE COURT:  Have you seen such a machine?

9   A.  I never have.

10  BY MR. PACKIN:

11  Q.  You indicate in that same paragraph in your report that

12  you believe that the kickback was caused by a combination of

13  the pipe bowing with some small amount of sagging and the

14  aggressive tooth blade.  If the bowing would not have --

15           THE COURT:  What page are you on, Counsel?

16           MR. PACKIN:  Page 8, the last part of paragraph 18.

17           THE COURT:  Just a second, please.  Counsel, I'm

18  sorry, but I'm being distracted by the work that you're doing

19  at counsel table, even though you're very quiet.  If you would

20  like to, you know, do it, we'll give you a spot.

21           MR. RUDOLPH:  Sorry about that, Your Honor.

22           THE COURT:  Thank you.  Okay, we're on page 8.

23           MR. PACKIN:  The last half of paragraph 18, about

24  four lines down it says, "The kickback in this case was

25  caused" --

1            THE COURT:  "Was caused by," okay.

2   BY MR. PACKIN:

3   Q.  Would the supporting of the strap have prevented the

4   kickback under such a scenario?

5   A.  No, I believe not.

6   Q.  And what was your reasoning as -- strike that, strike it.

7   Before we get to that --

8            MR. WALSH:  Your Honor, may I have an inquiry again

9   as to what we're doing time-wise here because --

10           THE COURT:  Sure.

11           MR. PACKIN:  I'm just about at the end.

12           MR. WALSH:  -- we've been going for hours.  There's

13  -- is this witness going to be available tomorrow?

14           MR. PACKIN:  Probably, and we're only back, save for

15  the interruptions, about an hour since lunchtime.  We started

16  at 1:30, we're at 10 of 3.  We had a few colloquy but other

17  than that, as I said --

18           THE COURT:  I think that's not Mr. Walsh's concern.

19  It's just how to plan his time.  Is Dr. Hayes available

20  tomorrow?  Because obviously we can't get through a cross

21  examination now that it's 10 of 3 --

22           MR. PACKIN:  Probably.

23           THE COURT:  -- despite best efforts.

24           MR. PACKIN:  Can I have a moment to talk to him?

25           THE COURT:  Sure.  Why don't you take 5 anyway.

1       (Court in recess)

2              THE COURT:  Okay, back on the record.

3                     DIRECT EXAMINATION (CONT'D)

4    BY MR. PACKIN:

5    Q.  Referring, Dr. Hayes, to P-28 that's up on the screen,

6    what is being shown in the right side of that image, the

7    graphic?

8    A.  That a strap can be used to address the issue of sagging

9    or help with the issue of stabilization against gravity but --

10             THE COURT:  It's the same as -- okay, sagging and

11   stable.  So if you push on it, that's another thing.

12   A.  Its weight pushes on itself --

13             THE COURT:  Right.

14   A.  -- down towards the ground.  And I could hold that up the

15   way we hold the board when we're cutting it so that we won't

16   get a pinching or a kickback.  But the strap, since it is free

17   to swing, doesn't apply a positive restraint for the bending

18   part of this, which I believe is the more important of the

19   environmental influences that influence this event.

20   BY MR. PACKIN:

21   Q.  Do you have another slide showing the gentleman, showing

22   the same image that's on the top left, I believe, and the two

23   runs of pipe?  Can you put that next to light up?

24             MR. PACKIN:  Can we mark that as P-29, subject to

25   the same limitations?  And Your Honor, in P-5 that's #37.

1   It's got the second yellow tab on it.

2       (Plaintiff's Exhibit-29 marked for identification)

3   BY MR. PACKIN:

4   Q.  What is being shown in that --

5           THE COURT:  Are you offering --

6           MR. PACKIN:  Yes, Ma'am.

7           THE COURT:  Where are we?  P-29?

8           MR. PACKIN:  P-29.

9           THE COURT:  Slide.  Any objection?

10          MR. WALSH:  No objection, Your Honor.

11          THE COURT:  Okay, thank you.  In evidence.

12      (Plaintiff's Exhibit-29 admitted into evidence)

13  BY MR. PACKIN:

14  Q.  What is being depicted in that slide?

15  A.  We are seeing a situation where an eyewitness to this

16  event, a Mr. Caldwell, who after the event was over, after Mr.

17  McGee had made those first two cuts and after removing one of

18  the pipes, completed a cut across the remaining two to four-

19  inch ligament or so that was testified about, and successfully

20  cut the pipe that Mr. -- completed the cut that Mr. McGee had

21  started.  And it shows that a crane and a strap is being used

22  around the pipe.  Remember at this point that buckling process

23  that occurred has released those internal tensions and largely

24  released the bending stresses such that in this configuration,

25  the pipe is -- the sagging of the pipe is helped.  But that

1    certainly wouldn't be the case for the first situation.

2              THE COURT:  For the first two cuts?

3    A.  For the first two cuts.

4              THE COURT:  Is that what you're saying?

5    A.  Yes, it is.

6    BY MR. PACKIN:

7    Q.  Now, the photograph that you had on one of your very first

8    slides showing the open kerf and the closed kerf, if you could

9    go back to that?  That's P-8, for the record.

10        (Plaintiff's Exhibit-8 previously marked for

11   identification)

12             THE COURT:  Just a second.

13             MR. PACKIN:  There we go.

14             THE COURT:  Counsel, I'm not with you yet.

15             MR. PACKIN:  P-8 was the slide that's --

16             THE COURT:  Sure.  Are we at P-8?

17             MR. PACKIN:  Yes, Ma'am.

18             THE COURT:  Okay, fine.  Go ahead.

19             MR. PACKIN:  And I'm referring to the image on the

20   right which is photograph #36 contained within P-5.

21   It's P-5(36).

22   BY MR. PACKIN:

23   Q.  You told us before, Dr. Hayes, that that's a photograph

24   representing what the pipe that Mr. McGee had been attempting

25   to cut looked like after his accident, correct?

1   A.  Yes.

2   Q.  And you've labeled the outer side "first cut open kerf"

3   and the inner side "second cut closed kerf"?

4   A.  Yes.

5   Q.  Do those represent the effect of that bowing or lateral

6   movement or lateral stress that was on the pipe as

7   differentiated from the gravity or sagging?

8   A.  It does, as long as we understand it is after the initial

9   bending has been released, creating a bending open situation

10  on the first cut and a bending closed situation on the second.

11  Q.  And you wrote in your report that the kickback was caused

12  by a combination of that pinch and the aggressive tooth blade.

13  What role did the aggressive tooth saw blade play in that?

14  A.  Based on the advice and warnings provided in the Stihl

15  manual that cutting with a so-called aggressive or tooth

16  blade, one that creates a higher friction between the cut

17  material and the saw blade, can contribute to pinching.  It

18  likely contributed at the point where the cutting was

19  occurring.  So that's one factor.  And secondly, the pinching

20  by the pipe now as we have released those internal stresses

21  and the pipe starts to buckle is moving to the side and

22  causing closure as he comes up towards the end of trying to

23  complete his cut with the second cut.

24          THE COURT:  That was a very long sentence.

25  A.  My apology.

1          THE COURT:  I'm trying to decipher it.

2  BY MR. PACKIN:

3  Q.  Well, initially you said that the teeth increase the

4  chance of pinching.  Was that a misspeak?

5  A.  It was a misspeak.

6  Q.  Okay.

7  A.  It increases the chance of kickback or of motion of the

8  saw because of the more aggressive nature of the interaction

9  at the cutting point of the saw.

10          THE COURT:  And motion of the saw?

11  A.  The motion of the teeth, if you will, of the blade.

12          THE COURT:  Sir, I'm not following.  The teeth of

13  the saw, the toothed saw --

14  A.  Yes.

15          THE COURT:  -- increases the chance of kickback as

16  stated in the manual.  That is all I've got so far.

17  A.  So that's one factor that likely played a role here.  A

18  second factor is the release of these internal bending

19  stresses by the process of the first cut and starting to

20  complete the cut with what he called -- we've called the

21  second cut.

22          THE COURT:  Let me just get that.  Starting to

23  perform second cut, right?

24  A.  He's almost done so --

25          THE COURT:  Okay.  By completing first cut and

Hayes - Direct                            162

1   working on second cut.

2   A.  Yes.  Or attempting to complete the second cut.

3            THE COURT:  Making second cut.

4   A.  Yes.

5            THE COURT:  Okay, so that's the release of the

6   internal bending forces.

7   A.  Yes.

8            THE COURT:  Okay, that's the second factor.  And

9   then you were saying, because as you assess it -- and then you

10  were saying how you think that the second cut progressed, the

11  direction of the second cut progressed.  I didn't let you

12  finish that.

13  A.  Okay.  So the direction of the second cut, as Mr. McGee

14  testified, is he did a plunge cut essentially horizontally

15  into the pipe, went down in order to complete the connection

16  to what was the first cut, now started to come up, as you said

17  earlier, and was proceeding up towards completing.  He was

18  within that ligament distance of completing the second cut

19  when the kickback occurred.

20           THE COURT:  Ligament.  Ligament is the space between

21  the two cuts --

22  A.  Yes.

23           THE COURT:  -- that has not been cut, right?

24  A.  It is the remaining material still connecting the two

25  cuts.

1          THE COURT:  And do you have an estimate of how wide

2   that ligament is based upon your review of these records?  It

3   doesn't have to be precise.  You haven't pixeled it?

4   A.  I have not pixeled it.  His testimony was 2 to 4 inches.

5   I think on observing this photograph, and that would, just by

6   rough estimation, would comport with our understanding of its

7   10-inch diameter.

8          THE COURT:  Because its circumference would be more

9   than 10 inches, would go all the way around.

10  A.  I was thinking more if we know the 10-inch diameter and we

11  know we're a little out of plane, that probably fits.

12         THE COURT:  Okay, thank you.  And so making all

13  these cuts and leaving only a 2 to 4-inch ligament you're

14  saying most of the bending tension in the pipe is being

15  released at that moment.  Is that what you're saying?

16  A.  That's exactly what I'm saying.

17         MR. PACKIN:  Thank you, Your Honor.

18  BY MR. PACKIN:

19  Q.  You issued a supplemental report in this case, which we

20  marked, dated January 15, 2010, is that correct?

21  A.  Yes.

22  Q.  What additional materials did you review in connection

23  with that supplemental report?

24  A.  As noted in paragraph 2, since completing my first report,

25  I have reviewed additional materials, including the report of

1   Harry L. Smith, PhD., MD and the report of Vincent Morabit, M-

2   O-R-A-B-I-T.

3   Q.  And what was your understanding as to what role those two

4   individuals play in this case?

5   A.  I believe they are experts retained by the Defense in this

6   matter.

7   Q.  And what was your understanding as to the purported areas

8   of expertise of those individuals respectively?

9   A.  I believe that Mr. Smith is going to testify about

10  mechanism and biomechanics of injury, as best I understand it,

11  and Mr. Morabit as an engineering expert.

12  Q.  What was the purpose of --

13          THE COURT:  Smith is a doctor, right?

14  A.  He is both an --

15          THE COURT:  He's listed there as an MD and you think

16  he's testifying about what?

17  A.  I believe injury biomechanics.

18          THE COURT:  Injury biomechanics.  Okay, fine.  And

19  then Morabit is an engineer, right?

20  A.  Yes.

21  BY MR. PACKIN:

22  Q.  What was the purpose of your supplemental report?

23  A.  To call attention to what I believe is a flawed

24  understanding on the part of both experts to the physics -- of

25  the physics of the so-called kickback process, as well as to

1   the flawed nature of Dr. Smith's recreation of the event as is

2   shown in Figure 1 on the left of my supplemental report.

3   Q.  And after reading the Smith and Morabit reports, did you

4   reach any conclusions to a reasonable degree of injury

5   biomechanical and engineering certainty regarding the opinions

6   expressed on those issues?

7   A.  Did I reach an opinion?

8   Q.  Yes, as to the opinions they expressed regarding kickback,

9   which you mentioned, and Dr. Smith's reconstruction.

10          THE COURT:  That's kind of a long question.  The

11   report is short.  Why don't we just look at what his opinions

12   are?

13   BY MR. PACKIN:

14   Q.  In paragraph #3 where you conducted your discussion of the

15   Defense expert's report, what is the issue that you addressed

16   there, sir?

17   A.  In paragraph 3 I'm talking about the physics of kickback

18   and -- that's your question.

19   Q.  Could you explain to us what conclusions you reached

20   regarding the physics of kickback and on what you base those

21   conclusions?

22   A.  My conclusions are based on a fundamental understanding of

23   engineering physics, and put simply, Drs. Smith and Morabit

24   assert that the only way that kickback can occur is if there

25   is a pinching or stopping or reactive force applied in the

1   upper right quadrant of the saw blade as viewed from the side.

2   And so if I imagine a saw blade viewed from the right-hand

3   side of the saw, superimpose a clock face, the upper quadrant

4   goes of course from 12 o'clock noon to 3 in the afternoon.

5   They assert that you can only get kickback if, in fact, it

6   pinches there.  I believe that is a flawed understanding

7   because it does not consider anything beyond the reactive

8   force applied to the blade.  And if one considers the

9   interaction of the saw with the human being operating the saw,

10  I can show enumerable examples of kickback occurring when the

11  contact with the blade is in the lower right quadrant from 3

12  to 6 o'clock or additional potential positions even.

13  Q.  Can you explain how kickback can occur when the saw is not

14  in the upper quadrant only?

15          THE COURT:  When the pinch is not only --

16          MR. PACKIN:  Right --

17          THE COURT:  -- in the upper quadrant.

18          MR. PACKIN:  -- I'm sorry.

19  BY MR. PACKIN:

20  Q.  When there's a pinch in the lower quadrant.

21  A.  Your Honor, if I could draw on the --

22          THE COURT:  Sure.

23  A.  -- easel there?

24          MR. PACKIN:  I think you're going to need the

25  Lavalier microphone.

1          THE CLERK:  You can either use that one and wear it

2     or we can put the hand held one on.

3     A.  Whichever is easier.

4          THE CLERK:  Whichever is easier.

5     A.  Can you hear me?  Testing, testing.  Maybe I don't have it

6     on.

7          THE CLERK:  It's on.

8     A.  Now it may be on.  Here's our saw, roughly represented

9     with the saw blade to the right.  Let's say the guard is

10    roughly like this.  I put it on the left-hand side from the 12

11    o'clock noon roughly to the 6 p.m. position.  And now let's

12    think about kickback as it is commonly assumed and is being

13    asserted by Dr. Smith and Morabit.  If there is a pinching in

14    the 3 to 12 o'clock position, the Stihl manual states and

15    physics would agree that the force that is applied to the

16    overall saw from the pinching -- remember that the saw blade's

17    going like this --

18          THE COURT:  It's traveling -- on your picture, it's

19    traveling in a clockwise direction.

20    A.  It is traveling in a clockwise direction.  And to get an

21    intuitive sense of what this force means, this kickback force

22    that I've shown on the circumference of the saw blade

23    tangential to the edge of the saw blade is the force necessary

24    to stop that blade cold from going roughly 5,000 rpm to

25    something very close to zero rpm if it's a severe kickback.

1   That's the severity and instantaneous nature of that force

2   that occurs.

3           THE COURT:  So if you were a giant and you would not

4   hurt yourself and just touch down with your fingers and pinch

5   as hard as you could that clockwise spinning blade in the

6   upper right quadrant, then the whole machine is going to move?

7   A.  Yes.  The first point is under these conditions I've only

8   showed the giant pinching and stopping it.  And I made some

9   simple physics calculation of these kinds of forces and they

10  can be in the nature of thousands of pounds, big force.

11  That's as far as the discussion of kickback in the Stihl

12  manual gets is that this --

13          THE COURT:  Just a minute.  That arrow, your

14  tangential arrow up toward noon on the clock of the blade,

15  represents, what do you call it, force?

16  A.  It is exactly a force.  It's generally referred to in the

17  manual and in the literature physical reactive force --

18          THE COURT:  Okay.

19  A.  -- that occurs at the periphery.  And it's fairly obvious

20  to see that if you don't think about what else is going on

21  with this machine, this would tend -- this force, tangential

22  force, would tend to drive it back up towards the operator's

23  face.  That's the --

24          THE COURT:  Drive the whole setup.

25  A.  Saw.

1              THE COURT:  The whole rig.

2      A.  The whole rig back towards the operator's face.  And

3      again, if I drew a second arrow where I've got kickback or

4      I've got a reactive force that occurs at the bottom, at 6

5      o'clock, and I put that force on the blade, now I've got my

6      giant pinching at 6 o'clock, it's going to stop it cold, and

7      that's generally referred to in the manual and elsewhere as

8      pull-away.  If you think only about the blade and --

9              THE COURT:  You know, I don't know anything about

10     physics.  I can't absorb it other than as necessary to do this

11     job.  When you showed the top pinch, you've got your rotation

12     going in the clockwise direction.  When the pinch occurs, the

13     opposite force is exerted, an opposite force, in the

14     counterclockwise and upward direction, right?

15     A.  In order to stop the rotation, yes.

16             THE COURT:  When you're describing the bottom pinch,

17     yes --

18     A.  Same thing.

19             THE COURT:  -- they are going opposite.

20     A.  Same thing.

21             THE COURT:  Your arrows are going opposite there.

22     Okay, that makes sense.

23     A.  And then a third example also as I recall shown in the

24     manual is if we get a pinch at 3 o'clock, that's called

25     climbing upward.  All of those only consider what happens to

1    the periphery of the blade.  The flaw in that, and this is a

2    flaw that we start trying to drum into engineering students

3    the first week they are in mechanical engineering, is that

4    it's not enough to show the force on only part of the system.

5    You have to show all of the forces on the system.  That's

6    called creating a free body diagram.  So I can turn this

7    diagram into a more complete representation if I include a

8    force applied by the hand of the operator, a force applied by

9    the hand of the operator, and they can go in either direction,

10   so I'll make -- depending on the situation.  And there is a

11   force of gravity acting down.  Now --

12             THE COURT:  Because this is not a table saw.

13   A.  This is not a table saw.  This is handheld.  It has a

14   weight and you are holding it.  The situation that is not

15   being considered is if I have a saw that is pinched in any one

16   of these ways, the force applied by the pinching process goes

17   around one of your hands, causes the saw to go up in,

18   depending, this direction, go out and around in this direction

19   if I hold on here.  So I can have a --

20             THE COURT:  Referring to the left hand.

21   A.  If I hold -- if the saw is pulled out of my right hand,

22   rotates around and up, I can get kickback if kickback is used

23   to define coming up toward and hitting the operator.  Under a

24   condition like this, a condition like --

25             THE COURT:  A condition like your bottom pinch.

1   A.  A condition like the 6 o'clock pinch or the 3 o'clock

2   pinch.  If I have my hand braced against the top handle, it

3   comes out of my other hand, I can with the 6 o'clock, a 3

4   o'clock or virtually any other pinching that occurs on the

5   blade, get what ultimately results in a potentially

6   devastating injury to the operator.  That's simple physics use

7   of free body diagram.  And so if I have a situation where I'm

8   perhaps using my saw in a roughly vertically oriented

9   position, handle, handle, I've got a hand force of some sort,

10  I've got another hand force, I get a pinch at let's say 6

11  o'clock, my hand stays attached, the saw comes around and can

12  hit me in the face.  And so this is a perfect example, I wish

13  I'd used it in teaching, to show that you must consider all

14  the forces on the system, you must consider the interaction

15  between the human and the saw.  You can't just rely on where

16  the pinch occurs and its direction.

17          THE COURT:  When you say free body diagram, free

18  body refers to the fact that the saw is a free body and human

19  is a free body, or that the whole man and machine, you know,

20  connection is a free body?

21  A.  A free body diagram is --

22          THE COURT:  Is it one word?

23  A.  Free body is generally hyphenated, or sometimes two words,

24  free body diagram would be three words.  A free body diagram

25  is defined as removing the object from its environment in a

1    drawing and replacing that environment by the forces that the

2    environment imposes on the object.

3              THE COURT:  And replacing that environment in a

4    diagram by the forces that the object --

5    A.  The environment imposes on the object.

6              THE COURT:  This is just a sketch, but since it's

7    been drawn this afternoon during the hearing I think we should

8    mark that.

9              MR. PACKIN:  I agree.

10             THE COURT:  That will be P-30.  Is that all right?

11             MR. PACKIN:  Yes, Ma'am.  Should the witness mark

12   it?

13             THE COURT:  Well, we'll put a sticker on it.  If you

14   would just lightly write P-30 somewhere so I'll remember.

15   A.  What's the number?

16             THE COURT:  P-30.

17   A.  P-30?

18             THE COURT:  And it's at my suggestion.  Any

19   objection, Counsel?

20             MR. WALSH:  No.

21             THE COURT:  Thank you, sir.

22        (Plaintiff's Exhibit-30 marked for identification)

23   A.  So I don't think I had finished answering your question --

24             MR. PACKIN:  Okay.

25   A.  -- which also included, perhaps it didn't, my discussion

1   of Mr. -- Dr. Smith's recreation.

2   BY MR. PACKIN:

3   Q.  Yes, it did, but we divided them out, so now address that,

4   please.

5   A.  And so I have placed in Figure 1 on the left Dr. Smith's

6   recreation, the use of the surrogate, and what certainly

7   appears to be a positioning of the two pipes that is at

8   variance from what we found from photogrammetry with one pipe

9   22 inches above the ground at its bottom most surface, and the

10  other 10 inches off the ground or a 12-inch differential.  And

11  if we realize that the pipes shown here are expected to be 10

12  inches in diameter, he has what we've called the back pipe far

13  too low to appropriately recreate the scene.

14  Q.  Was that the purpose in putting that photograph there?

15  A.  Yes.

16  Q.  Now, you also indicate in that supplemental report that

17  the potential for a reactive force to cause injury regardless

18  of how or where on a blade it occurs depends on the magnitude

19  of the reactive force itself, as well as how the operator

20  responds to the reactive force.  Could you explain what you

21  meant by that opinion and on what you based it?

22          THE COURT:  Where are we now?  What page?

23          MR. PACKIN:  That would start on -- it's on page 2,

24  the top paragraph.  It's about five, six lines down.  It

25  starts the last three words in the sixth line, "The potential

1   for."

2           THE COURT:  I think he just got done explaining

3   that.

4   BY MR. PACKIN:

5   Q.  Was that covered by that answer, sir?

6   A.  As long as we are aware that pinching can occur not only

7   at the periphery of the blade, but also interior to that as a

8   bending closed configuration is created as occurred here.

9   Q.  Okay.  Now, when you're cutting an object such as HDPE

10  pipe, which is not solid, points of the blade that are inside

11  that cut are not in contact with anything on either side, is

12  that correct?

13  A.  Yes.

14  Q.  And points deeper into the cut or closer to the spindle,

15  so to speak, or the axis of the blade are potentially in

16  contact with the sides of the pipe, correct?

17  A.  Yes, as is shown in the same Figure 1 to my supplemental

18  report, Part B, you can see an overlap between the 10-inch

19  pipe and the 14-inch saw blade.

20  Q.  So if, for example, as shown in Dr. Smith's photograph,

21  which is figure 1A on page 2 of your report, if a pinch were

22  to occur at that point, the pinch would be interior to

23  potentially the periphery or the outer circumference of the

24  blade, correct?

25  A.  That's exactly right.  If you think about our top view and

1   the bending closed or the closing kerf occurring interior to

2   the blade, and you can see from that figure the two

3   contributions, the presumably cutting interaction that's

4   occurring at the periphery of the blade towards the top of the

5   second kerf towards the -- at the ligament junction, as well

6   as the contribution on the interior as this pinching occurs.

7   A.  All right.  Now --

8           THE COURT:  Okay, just a minute.  Cutting is

9   happening at like 1 o'clock, right?

10  A.  Cutting from my Figure --

11          THE COURT:  On the top of the blade.

12  A.  -- 1B is likely occurring from that figure around -- well,

13  it's about 11 o'clock on the pipe and about 2 o'clock

14  somewhere, 2 to 3 o'clock on the saw blade.

15          THE COURT:  Oh, okay.  I know what you mean by 11

16  o'clock on the pipe.  Just a second.  So that's toward the

17  very -- it is toward the top of the pipe.

18  A.  In terms of the figure that, and I don't remember the

19  exhibit, but the figure --

20          THE COURT:  It's Figure 3, your Figure 3 in P-3,

21  your report.

22  A.  It's there, too?

23          THE COURT:  My question is you've got it here as

24  your Figure --

25  A.  B.

1             THE COURT:  -- B.

2    A.  Yes.

3             THE COURT:  And it's the exact same thing that you

4    had in your earlier report.

5    A.  Also yes.

6             THE COURT:  I'm just trying to, for the record, get

7    the reference you're making.  So the cut pipe is being

8    contacted by the blade in this figure at approximately the 11

9    o'clock location on the circumference of the pipe as we look

10   straight at this diagram, right?

11   A.  Yes.

12            THE COURT:  And then to determine what point on the

13   blade you've got going, the blade is attached to the machine,

14   and you're saying the guard would be basically parallel to the

15   face of the machine itself.

16   A.  Yes, the --

17            THE COURT:  That's running basically parallel to the

18   right knee of the figure.  I'm calling that the face of the

19   machine, the front surface of the machine.

20   A.  Okay.

21            THE COURT:  So you got the blade is out from there.

22   A.  Correct.  The guard is shown.

23            THE COURT:  Is the guard shown?

24            MR. PACKIN:  Yes.  If you look, Your Honor, it's

25   parallel to -- it's almost over the front line of the left

1    shin.

2            THE COURT:  Oh, okay.  That's the guard right here.

3    And so you're going to get your clock face on the blade by

4    calling the deepest point on the guard --

5    A.  I'm going --

6            THE COURT:  -- 6 o'clock on the blade?  No.

7    A.  No.  Run a line from the back of the machine, kind of

8    bisect that line at the very back of the saw.

9            THE COURT:  Right.

10   A.  Run it out through the center of the blade, and that'll

11   give me 3 o'clock roughly.

12           THE COURT:  Only if I know where to start on the

13   blade.  That's what I'm trying to figure out.

14   A.  The arbor of the blade, or the center of the circle that's

15   representing the blade, is hidden behind his leg.  But if you

16   just roughly estimate it from top to bottom of the circle of

17   the blade --

18           THE COURT:  No, no, you're not understanding.  I'm

19   not adequately conveying what my question is.  It's a very

20   simple question when we look at your sketch, P-30, because the

21   way you drew the sketch you can say, you know, the bottom

22   curve of a blade is 6 o'clock and it intersects on a

23   perpendicular with the bottom straight edge of the guard.

24   A.  And that was only happenstance.

25           THE COURT:  Schematic, right.  So but what I'm

 1   trying to find out is in what I'm calling your Figure 3, where

 2   the high noon position is on the blade so that we can figure

 3   out what all the other positions are on the blade.

 4   A.  So run a line from the back, roughly the back of the saw

 5   towards the center of the circle of the blade,

 6           THE COURT:  Right.

 7   A.  And that gives me 3 o'clock.

 8           MR. PACKIN:  Your Honor, if I may?

 9           THE COURT:  Just a minute.  If you run a straight

10   line through the middle of the back of the saw in Figure 3 and

11   through what appears to be the middle of the front of the saw,

12   and then straight on the same line through the blade, and you

13   say that line is at about the 3 o'clock place --

14   A.  Yes.

15           THE COURT:  -- on the blade?  Okay, just a second.

16   So the top of the guard as shown in Figure 3 does not coincide

17   with high noon.

18   A.  Correct.  It looks more -- and the figures from the scene

19   make it look a little more like 1 o'clock or so.

20           THE COURT:  Okay.

21   A.  And you can test yourself by looking at the intersection

22   with the most advanced portion of the saw blade and where it

23   intersects with the pipe, 11 o'clock on the pipe.  That's just

24   about 3 o'clock on the blade, which was precisely Mr. McGee's

25   testimony as to about where he was cutting when it occurred.

1            THE COURT:  Okay.  Thank you.  I'll be right with

2    you.

3        (Pause in proceedings)

4            THE COURT:  I guess I stopped you when you stated in

5    your testimony before we went into trying to find words to

6    describe what we're looking at in your Figure 3 is I had you

7    down in my notes as saying in Figure 3, the cutting at this

8    moment as described in Figure 3, is happening at approximately

9    1 o'clock on the blade, and I think you're saying it's really

10   3 o'clock on the blade.

11   A.  I don't recall saying 1 o'clock if I did, but it looks to

12   me like it's 3 o'clock if you do that drawing, 11 o'clock on

13   the pipe.

14           THE COURT:  Okay, okay, thank you.

15   A.  And pinching that could occur interior.

16           THE COURT:  3 o'clock on the blade and 11 o'clock on

17   the pipe, and I think you said you saw the potential for

18   pinching at the top of the cut because of the bending, the

19   internal bending compression?

20   A.  No.

21           THE COURT:  No.  At the top of the pipe because

22   you're meeting resistance as you go up?  Just because you're

23   cutting.

24   A.  If I'm cutting where the saw teeth are, there's a

25   potential for resistance from the fact that it is a toothed

1   carbide-tipped blade at that point.

2           THE COURT:  At the top of the second cut kerf?

3   A.  Yes, exactly that point.

4           THE COURT:  Okay.  So the toothed blade up there has

5   an effect.

6   A.  Is actually cutting at that point.

7           THE COURT:  Has effect because cutting at top of

8   second kerf.  Also what you're saying is internal pinching is

9   happening to the blade where the blade and the saw are

10  overlapping in Figure 3 --

11  A.  Where the blade and --

12          THE COURT:  -- which is interior of the -- is on the

13  interior of the blade.

14  A.  Blade and the pipe are overlapping.

15          THE COURT:  Yes, the blade and the pipe.

16  A.  Yeah, you said blade and -- blade and the pipe and that's

17  because of the pinching from bending sideways.

18          THE COURT:  Just a second.  It's clear.

19          MR. PACKIN:  Thank you, Your Honor.

20  BY MR. PACKIN:

21  Q.  In your Figure 3 --

22          THE COURT:  But Mr. Walsh, I'm sorry to say, even

23  though you're ready to go, I think that the bench and maybe

24  even the witness are going to want to knock off when we finish

25  with today's testimony.  We'll start as early as you want

1   tomorrow.

2   BY MR. PACKIN:

3   Q.  In your Figure 3, Dr. Hayes, just to go a little further

4   with what the Court had been asking you, in your Figure 3 we

5   see sort of what used to be called a Venn Diagram, the

6   overlapping of the blade circle with the pipe circle, correct?

7   A.  Yes.

8   Q.  The blade is solid and the pipe is hollow, correct?

9   A.  Yes.

10  Q.  The portion of the pipe that overlaps onto the blade in

11  that diagram, the outer outline would be in contact

12  theoretically with the blade surface, correct?

13  A.  Or certainly close to it.

14  Q.  Right.  And the portion of the blade that is forward of

15  that would be in, for lack of a better word, free space within

16  the open interior of the pipe, correct?

17  A.  Yes.

18  Q.  And is it correct that as the blade moves into the pipe

19  those clock face points converge towards the center of the

20  blade?  In other words, they're radial, they're not linear,

21  correct?

22  A.  I'm not understanding the last part.  I thought I --

23  Q.  Well, as you move the blade into the cut, the pipe is

24  getting closer to the spindle.

25  A.  Yes.

1   Q.  Correct?  So it's -- the vector is narrowing, correct?

2   A.  I don't know, again, about vector, but the edge of the

3   pipe is getting closer and closer to the spindle.  Think of it

4   from the other perspective, plunging in.  You're taking it up

5   to the spindle of the saw blade.

6   Q.  And were -- are those the opinions you reached in the

7   supplemental report based upon your analysis of the Smith and

8   Morabit reports?

9   A.  Yes, those are my opinions, and to the extent that it's in

10  my purview to say anything about reliability, I believe that's

11  flawed analysis and would be flawed and confusing testimony to

12  the jury.

13  Q.  Now, and those opinions that you expressed regarding -- in

14  your supplemental report, are they held by you to a reasonable

15  degree of injury biomechanical and engineering certainty?

16  A.  Yes.

17  Q.  Now, I want to shift gears for a moment.  Actually, hold

18  on one second, please.  Did you find any support in the Stihl

19  owner's manual for your conclusions regarding kickback in

20  general and kickback in particular when involving a carbide

21  tipped toothed saw blade?

22  A.  I find statements in the Stihl manual that certainly are

23  consistent with this science-based analysis in that the Stihl

24  manual, and I quote, says "Reactive forces may occur at any

25  time the cutting wheel on a cut-off machine is rotated."  They

1    further say, "If the wheel is slowed or stopped by frictional

2    contact with any solid object or by a pinch, reactive forces

3    may occur instantly and with great force."  They tend to focus

4    -- the manual doesn't use the term, as far as I recall,

5    "kickback."  It talks about reactive forces on the blade and

6    thus really doesn't address the issue of whether that reactive

7    force can produce a motion back towards the operator.

8    Q.  And does the manual address any issues as to reactive

9    forces in relation to the toothed saw blade?

10   A.  It does say in a number of places that more aggressive or

11   toothed saw blades should never be used because they can

12   increase the propensity for reactive forces and cause injury

13   and death.  I'm not quoting that well, but that's basically

14   the idea.

15   Q.  Now, shifting gears, do you use others in your company to

16   assist you in evaluating cases in general, and did you use

17   them in this case specifically?

18   A.  Yes and yes.

19   Q.  Now, who did you use to assist you in the evaluation in

20   this case?

21   A.  People who worked under my direction, supervision, and

22   control.  In my evaluation of the case, there are other people

23   involved that I'll mention very briefly, but I had three

24   professionals.  The first is Erik, that's E-R-I-K, Power who

25   has a Master's in Mechanical Engineering and Injury

1    Biomechanics and is working under me on his Ph.D. in Injury

2    Biomechanics.  Secondly, I used Dr. Bauer that I've spoken

3    about before.  And thirdly, I used a registered nurse by the

4    name of Gina, with a G, Carter, who's been with us for 15

5    years, I guess, or 12, 14 years, to do first summaries of the

6    medical records.

7    Q.  And you mentioned there were some non-professional or --

8    strike that -- non-evaluating personnel that you used?

9    A.  Yes, and if I can, in two or three sentences, describe the

10   process?

11   Q.  Yes.

12   A.  Materials come in, let's say it is a deposition.  If it's

13   a deposition of a treating physician, that's reviewed first by

14   the nurse.  It is highlighted.  A summary is created from that

15   set of highlights.  I then go over the summary, along with the

16   deposition itself at my side.  If there are areas of further

17   inquiry that I believe need to be explored in that deposition

18   as I look at the deposition itself, I note that, sticky note

19   it, and we get further information in that area.  If it is a

20   deposition, let's say, of an engineering expert, same process

21   is followed by -- in highlighting reports, highlighting

22   deposition testimony.  I look at the raw record, the raw

23   report.  I then look for more highlighting if it's not there

24   or I put it in myself.

25   Q.  Who does it if it's an engineering deposition or report?

1              THE COURT:  Does what?

2    BY MR. PACKIN:

3    Q.  Who does that highlighting?

4    A.  Erik Power or Jeremy Bauer or one of the professional

5    engineering associates that are in my firm.  That highlighted

6    material, let's say it's a deposition, is then transcribed by

7    a production staff who create a case summary with citations to

8    the text changing the question and answer format of a

9    deposition to simple declarative sentences with citations.  We

10   call that a case summary, and it is what I use to study and

11   prepare for a deposition or a trial testimony.  So it is not

12   that I have deposition summaries that are my only contact with

13   the materials.  I've looked through the medical records, I've

14   looked through those depositions, I have read the reports of

15   opposing experts as part of our standard operating procedures.

16   Q.  Now, what functions generally did Erik Power -- you said

17   he has a Master's in Mechanical Engineering and Injury

18   Biomechanics, correct?

19   A.  Yes.

20   Q.  And he's currently a PhD. candidate?

21   A.  He is.

22   Q.  In what field?

23   A.  Injury biomechanics.  Mechanical engineering at Oregon

24   State under the biomechanics rubric of that department.

25   Q.  And what functions did Mr. Power serve in the process that

1    was used in this case?

2    A.  He did this reviewing process.  We meet at the outset.

3    When we understand some of the facts of the case, we jointly

4    plan strategy and analysis approaches we will take,

5    technologies we will use.  We meet constantly along the way.

6    He's a particularly demanding associate in terms of

7    interaction, and he's the person who sits at the computer

8    terminal implementing HumanCAD, for instance.  He may do

9    physics calculations, again under my direction, supervision,

10   and control and interaction throughout.  He often drafts first

11   drafts of parts of reports.  The nurse does the same for the

12   medical record summaries, et cetera.

13   Q.  And did the nurse perform that function in this case?

14   A.  She did, again with my oversight and interaction.

15   Q.  And did you receive the case summary as to the medical

16   issues and the medical documents themselves?

17   A.  Yes.

18   Q.  And the same with the depositions?  Did you receive a case

19   summary as to each deposition and the depositions themselves?

20   A.  Yes, and I have those highlighted records here with me

21   today.

22   Q.  And Jeremy Bauer, what role did he play in this case?

23   You've already told us what he did I believe was some

24   photogrammetry, correct?

25   A.  He did the photogrammetry analysis that was done here.  He

1   also performed -- he did some background review on the

2   accepted use of photogrammetry in a wide variety of issues.

3   Mr. Power did the same thing with the anthropometry methods we

4   used.

5   Q.  Now, did you discuss and/or meet with these individuals as

6   this process was going on to direct or supervise their work?

7   A.  I did on a frequent, at least weekly basis.

8   Q.  Why do you use that process -- strike that.  Was that

9   unique to this case or is that the process you follow in your

10  office in working up and performing the evaluation of a case?

11  A.  That's a process that we uniformly use in all of our cases

12  under a set of standard operating -- explicit standard

13  operating procedures, or SOPs, that control the tracking of

14  all of these documents, the analytical work, to make sure we

15  meet the case deadline.

16  Q.  Now, when you say explicit processes, are there any

17  protocols, written protocols, in place in your office for this

18  procedure and this process?

19  A.  Yes.

20  Q.  When individuals come to your office, are they trained in

21  that process, that protocol?

22  A.  Yes.

23  Q.  How many years did you say that Gina Carter has been with

24  you?

25  A.  I think it's probably now 13 now.  '98.  Yeah, something

 1   like that, 13 years.

 2   Q.  And has her ability to follow those protocols been -- have

 3   you had an opportunity to observe her ability to follow those

 4   protocols?

 5   A.  Yes, on literally hundreds, if not thousands, of cases,

 6   yes.

 7   Q.  And has she done so appropriately?

 8   A.  Yes.

 9   Q.  How about Erik Power?  How long has he worked in your

10   company?

11   A.  Eight or nine years approximately.

12   Q.  And does he follow those protocols as well?

13   A.  They do.  He does, yes.

14   Q.  Jeremy Bauer, same?

15   A.  Yes.

16   Q.  How long has Jeremy Bauer been associated with Hayes and

17   Associates?

18   A.  Almost as long as Gina Carter.

19   Q.  And how many total employees does your company have?

20   A.  I think it's 21 at the moment.

21   Q.  Now, why do you use the process of having these other

22   professionals do some of that initial work and outlining and

23   highlighting for you, and then that -- followed by that

24   collaborative process?

25   A.  It is, I believe, the most cost-effective, most accurate

1    process.  It also tracks the same kind of processes I used

2    with graduate and undergraduate students in my academic

3    positions at Stanford, Harvard and University of Pennsylvania.

4    I have always worked that way with others in a collaborative,

5    interactive, checks-and-balances sort of way.

6    Q.  How long have you employed that type of process in your

7    work -- in your consulting work?

8    A.  I've done it as long as I have been doing this kind of

9    work.  I think the first time I was ever deposed was in 1978.

10   I have always had assistants.  I have always worked with

11   someone under my direction.

12   Q.  When you have the collaborative discussions with these

13   individuals, either in person or by phone, or how -- by

14   whatever means of communication, do they provide you with

15   input and feedback as well, as part of the collaborative

16   process?

17   A.  Of course.

18   Q.  Now, in this case, did you check the work that -- and the

19   processes that these individuals followed in this case?

20   A.  Yes.

21   Q.  Do you do that in every case?

22   A.  I do.

23   Q.  Were you satisfied that their work had been properly

24   performed and that the information and materials that were

25   presented to you were presented to you properly?

1    A.  Yes.  To the best of my ability, yes.

2    Q.  Who was responsible for reaching the ultimate conclusions

3    in this case?

4    A.  I am.

5    Q.  And you are the signatory on the report of November 3,

6    2009, correct?

7    A.  I have signed both of my reports and list Erik Power as

8    the primary responsible associate also on both of those

9    reports.

10   Q.  Now, Erik Power has signed both reports, correct?

11   A.  He has.

12   Q.  And why did you do that, sir?  Why did you have him do

13   that?

14   A.  I always have.  I think it important to give credit where

15   credit is due.  He makes a significant contribution to this

16   work and it's a way to recognize him.

17   Q.  Okay.  The conclusions, though, although it's signed by

18   Erik Power, the conclusions are yours?

19   A.  Yes, and I'm the one responsible for testifying about

20   them.

21          THE COURT:  Do you ever bring Mr. Power to testify?

22   A.  I have never been in a situation where I had an

23   opportunity to bring him.  He does, in fact, testify.  He is

24   increasingly getting his own, independent --

25          THE COURT:  He's building.  Right?  A practice?

1   A.  He's building a practice and testifies on his own, and I

2   do everything I can to encourage clients to retain these

3   people independently of me.

4   BY MR. PACKIN:

5   Q.  When you were doing your work in the medical field, in

6   Harvard Medical School and other places, did you go into

7   operating rooms with surgeons?

8   A.  I did.

9   Q.  Did you observe residents doing portions of surgery?

10  A.  I did.

11  Q.  Is that a common practice as well, that kind of

12  collaborative effort during a surgery?

13  A.  Yes.

14  Q.  I'd like to shift gears again.  You've seen, I take it,

15  the papers that have been filed here on the Daubert Motion by

16  the Stihl Defendants?

17  A.  Yes.

18  Q.  I'd like to ask you some questions arising under those

19  papers.  Now, you do not own a gasoline-powered, hand-held

20  power saw, correct?

21  A.  I do not.

22  Q.  You've never used one to cut anything?

23  A.  Not that I can recall.

24  Q.  Did that, in any way, bear upon your ability to reach the

25  conclusions that you've reached in this case on the questions

1    that were presented to you?

2              MR. WALSH:  Your Honor, I've got to object.  This is

3    an absurd line of questioning, asking the witness of things he

4    doesn't know and hasn't done, whether that somehow, would have

5    affected his ability to give an opinion.  I mean that's an

6    inherently foolish question.

7              MR. PACKIN:  Well, the only thing that might --

8              THE COURT:  Just a minute.

9              MR. PACKIN:  -- be absurd and foolish is that

10   objection.  Clearly, somebody who has a expertise and a

11   scientific background, knows what information is and is not

12   necessary to conduct their analysis.  If that were -- and

13   these are points taken --

14             THE COURT:  I'm listening.

15             MR. PACKIN:  -- directly from their papers,

16   certainly if the doctor -- Doctor Hayes would be the person in

17   the best position to tell us whether he needed to own or

18   operate a cut-off saw to reach the conclusions he reached in

19   this case.  It was part of our argument here, Your Honor, as

20   set forth in our papers is, they set up this whole laundry

21   list of completely irrelevant and useless issues relating to

22   what this witness did, because he was not offered as a design

23   expert.  He was not offered as the product defect.  He wasn't

24   offered as the warning defect.  He was offered in, on some

25   very focused issues.  So, there are probably thousands of more

1    things that they could have listed in their motion papers,

2    that he didn't familiarize himself with for the reason that

3    they were not necessary.  Now, they've raised the issue and

4    I've got a right to address the issue.  This is our Daubert

5    Hearing.

6              MR. WALSH:  Your Honor, He's asking the witness,

7    effectively, to opine on what is a matter of law.  That what

8    is relevant to the witness' preparation and background is not

9    for the witness to say.  The law specifies what the witness is

10   required to do or not required to do.  The witness can't

11   possibly, I mean if every witness would come in here,

12   obviously, and say, "Oh, I didn't need to do anything."

13             THE COURT:  Okay.  The Judge will determine what is

14   necessary to support an admissible body of expert opinion.

15   However, I cannot exclude, at this Daubert Hearing,

16   Plaintiff's counsel to have the opportunity to explore the

17   very questions that are briefed against admissibility of this

18   opinion testimony.  And also, to have their opportunity to

19   inquire of the witness about the very questions that were

20   asked on these topics, at his deposition, by defense counsel.

21   The rule is that the procedure should be defense counsel,

22   whoever is there to depose the witness gets to explore

23   whatever questions they want in discovery, but the offering

24   party does not have to, and generally, doesn't even have the

25   opportunity to go back around and ask their questions about

1    those lines of questioning.  By deposition, page 44:

2    "Have you ever used a gasoline-powered, handheld cut-off

3    machine?  Have you ever purchased a gasoline-powered, cut-off

4    --" and it goes on for pages.  I don't need to hear a great

5    deal about this but, nor am I going to sustain that objection.

6              MR. PACKIN:  Thank you, Your Honor.

7    BY MR. PACKIN:

8    Q.  As an engineer, and as somebody who does injury bio-

9    mechanics, did you need to own or have operated a gasoline-

10   powered, handheld cut-off saw to reach the conclusion or

11   evaluate the issues you evaluated in this case?

12   A.  I believe I did not because they were peripheral to the

13   central methodologies that I employed, which required knowing

14   the weight of the object, knowing its physical dimensions,

15   understanding the physics of both a rotating saw and the rest

16   of the saw, and understanding the stresses associated with a

17   bent and cut piece of pipe.

18   Q.  Did you have pictures of the actual accident saw?

19   A.  I had pictures of the saw as well as its dimensions.

20   Q.  And in the Stout matter, I believe you testified you

21   actually saw one and picked one up, is that correct?

22   A.  I did.

23   Q.  Having done so in the Stout case, did that lead you to

24   reach any conclusion that you needed to own one or operate one

25   to make an evaluation and render opinions in the McGee case?

1    A.   It did not, in terms of the scientific basis for my

2    opinions.

3    Q.   It is stated that you have never adjusted the guard on a

4    cut-ff saw or removed or installed the cutting attachment.  Is

5    that correct?

6    A.   Yes.

7    Q.   Did you need to, in your opinion from -- you've been

8    conducting the evaluation in this case, did you need to do

9    either of those things to evaluate the issues in this case and

10   reach your conclusions?

11   A.   I -- No.  I did not.  I had a picture of the saw that gave

12   me, and testimony about lack of anyone moving the guard on the

13   saw, to reliably base my opinions on the guard position,

14   roughly, and the rest of the information was quite

15   straightforward, in terms of its weight, its external

16   dimensions, and I didn't need to go beyond that to

17   understanding whether it's two-cycle or four-cycle or the

18   details of -- I have read the manuals, immediately forgot most

19   of the instructions in terms of how to move the guard and how

20   to reattach a blade.

21   Q.   All those operational -- all that operational, all of that

22   operational information was in the manual?  Is that correct?

23   A.    There, there was -- I don't know about all, but there was

24   certainly a lot of operational information that I simply found

25   not on point, and wasn't cost-effective or time-effective to

1    address the questions I was asked.

2    Q.  So you were aware of those issues, and determined that

3    they weren't necessary to?

4    A.  I did.  I was.

5    Q.  It has been indicated that you have no experience working

6    in construction.  Is that accurate?

7    A.  Well, I think the rest of my answer at my deposition was

8    that I spent summers working construction and I certainly did

9    that.  I put my time in.

10   Q.  It's indicated in the papers that you didn't obtain any

11   HDPE (High-Density Polyethylene) pipe for the purpose of your

12   analysis in this case.  Is that true?

13   A.  That is true.

14   Q.  Why is that, sir?

15   A.  Because I believed I had reliable methodology.  Sometimes,

16   it's, as we saw in at least some instances, can be more

17   reliable than a recreation with physical objects.

18   Q.  You had photographs of the pipe?

19   A.  I did.

20   Q.  Did you understand what HDPE material was?

21   A.  I work on a kind of polyethylene that's called high-

22   density polyethylene.  I work on what's called ultra-high-

23   molecular-weight polyethylene and I have over the course of my

24   career, since that kind of material, referring to the pipes,

25   has been tried in orthopaedic implants, I'm aware of some of

1    its limitations in that setting and its properties when used

2    in others.

3    Q.  Did you understand what the geometry and dimensions of

4    this HDPE pipe were, from the materials you had?

5    A.  Yes.

6    Q.  Okay.

7            THE COURT:  Did you know the interior diameter of

8    this pipe, sir?

9    A.  I didn't, as far as I can recall.  I was focusing on the

10   external diameter.

11   BY MR. PACKIN:

12   Q.  It's indicated in the papers that you've never seen HDPE

13   pipe that has been cut, other than in the photographs in this

14   case.  Is that true?

15   A.  I think that's true, at least as far as I know.

16   Q.  And did you feel you needed to see HDPE pipe that had been

17   cut by some means in order to make your evaluation in this

18   case?

19   A.  No.

20   Q.  Why is that, sir?

21   A.  It wouldn't have added anything material or substantial to

22   the bases for my opinions.  I mean if we're interested in

23   whether he can fit in a certain space, we need to define the

24   external geometries of that space and relate it to his body.

25   I wasn't attempting to calculate the reactive forces, to

1    determine the numbers associated with pinching forces or with

2    the aggressivity of the blade.  If I had been focused on that

3    kind of issue, it would have been more important to know the

4    internal dimensions.

5    Q.  And why were you not focused on those kinds of issues?

6    Why were they not germane to what you were doing in this case?

7    A.  Because, in fact, those weren't the questions I was asked,

8    nor do we have sufficient information.  With all of the input

9    variables that would be necessary to actually calculate the

10   pinching forces that -- it wasn't worth the time.  As long as

11   we understand the physics correctly, it wasn't worth the time.

12   Q.  It is indicated you never actually saw the TS 400 that was

13   involved in this accident or the blade that was on it.  Is

14   that correct --?

15   A.  It is.

16   Q.  -- in terms of seeing them in person.

17   A.  It is.  The blade was destroyed, I believe, that same day,

18   as far as I know, or thrown away.  The saw, again, I didn't

19   need any additional information.

20   Q.  Okay.  It is indicated you are not a design engineer and

21   have never designed a cut-off saw or any of its components.

22   Are those statements correct?

23   A.  The second of those statements is certainly true.  I have

24   never designed a cut-off saw.  I have, in fact, designed small

25   gasoline-powered tools, as I recall at General Motors Research

1    Laboratory, and it's not correct that I'm not a design

2    engineer.  In fact, I have a master's degree in mechanical

3    engineering design from Stanford, and have designed things

4    over the course of my career.

5    Q.  It is indicated that you don't know whether the TS 400 has

6    a two- or four-stroke engine, what type of drive mechanism it

7    uses, how its cylinder is ported, whether the fuel tank is

8    vented or un-vented, and a number of other, similar issues.

9    Did you need to know in order to, from an injury bio-mechanics

10   and engineering standpoint, did you need to know any of that

11   information in order to address the issues you addressed in

12   this case?

13   A.  I don't believe so.

14   Q.  Why is that?

15   A.  Again, they weren't germane to my analysis.

16   Q.  Would the fact -- would the nature of the drive mechanism

17   change any of the evaluative process?

18   A.  Not that I can see.

19   Q.  It is indicated that you have not participated in any

20   standards-making organizations relations related to design or

21   safety of cut-off saws or other handheld power equipment.  Is

22   that correct?

23   A.  Yes.

24   Q.  Did that have any -- does that have any bearing on your

25   ability to perform the biomechanical and engineering

1   evaluations you've performed in this case?

2   A.   I don't believe it's material.   I don't believe that

3   qualification is necessary to perform the work that I did

4   here.

5   Q.   You -- it's indicated you didn't review the standards

6   governing design and use of cut-off saws.   Is that correct?

7   A.   Well, I certainly reviewed them.   In the Stout matter, had

8   reviewed them within six months or something like that, prior

9   to being deposed in this proceedings.   And having read those

10  standards, and I did look at them again recently, they weren't

11  informative about the aspects of this case that I was asked to

12  address.

13  Q.   It is indicated you haven't authored anything regarding

14  the design, use, or safety of a cut-off saw.   Is that correct?

15  Other than the reports in this case, and in Stout.

16  A. I thought of a correction to the previous answer, if I

17  could and I --

18  Q.   Sure.

19  A.   -- missed your last question.   I believe that those

20  standards, as they are promulgated in Australia, and I'm

21  forgetting exactly where else, there are some descriptions of

22  procedures that have been used to investigate kickback and

23  I've looked at those, thought about them, and they were as

24  background informative for me, but not sufficiently reflective

25  of a situation where the saw is handheld and there's an

1   interaction between a human being and the saw.  So I'm aware

2   of those from those standards, or that line of information,

3   but didn't employ it.

4   Q.  It's indicated that you have not authored anything

5   regarding design, use, or safety of a cut-off saw.  Is that

6   correct?

7   A.  Yes.

8   Q.  -- other than the reports in Stout and McGee.

9   A.  That's true.

10  Q.  Did the -- did that, in any way, impair your ability to

11  conduct the engineering and biomechanical analysis in this

12  case?

13  A.  I don't believe so.

14  Q.  Why not, sir?

15  A.  Not on point.

16  Q.  It's indicated in the papers that you, yourself, spent

17  only 5.6 hours working on this case prior to writing your main

18  report and .6 hours drafting and editing the main report,

19  based upon your time records.  Is that accurate?

20  A.  As I recall, we had a relatively short timeline for

21  producing our report.  That does not sound, for that stage of

22  an analysis, very much out of line.  Those 5.6 hours are

23  spent, in part, with review of materials, I think under the

24  heading of "Case Summary."  There are also a series of case

25  conferences that reflect interaction with my staff.

1   Q.  It's indicated that your associate drafted most of the

2   main report.  Is that accurate?

3   A.  I don't know what we mean by "most" or how, exactly, that

4   question was asked, if it was, at my deposition.  That

5   typically, Gina Carter would do the medical synopsis as well

6   as the case summary timeline.  And they are charged, yes, with

7   first drafts of much of that report.

8   Q.  And then you bring to bear your expertise upon that

9   collaborative process?

10  A.  Edit and rewrite and that sort of activity.

11  Q.  It's indicated that you did not read any of the deposition

12  transcripts from cover-to-cover, including Mr. McGee's.  Is

13  that accurate?

14  A.  I believe it's fair to say that I haven't read them cover-

15  to-cover.  If there is a long question and answer session on

16  something that is totally irrelevant to my opinions,

17  background information for the case, I page through it until I

18  get to a section that there is, again, something relevant that

19  has been flagged by staff.

20  Q.  Would things such as Mr. McGee's employment history or

21  educational history be of relevance to you?

22  A.  Not in this case.  In an ergonomics case, for instance,

23  that was about cumulative trauma over a lifetime, that's

24  important, but in this case, no.

25  Q.  Would the employment or educational history of Mr. Rivera

1   or Mr. Caldwell or Mr. Kuhn, or any of the other witnesses be

2   of any significance to you in this case?

3   A.  No.

4   Q.  Would the depositions of witnesses who never used a cut-

5   off saw and didn't witness this accident be of any use to you

6   in the evaluation you made in this case?

7   A.  Not that I can think of.

8   Q.  It is indicated that you did not visit the accident site

9   in this case.  Why is that, sir?

10  A.  My understanding was they were trying to get the pipe in

11  the ground, buried, fused, and that the trench was refilled,

12  presumably that there would be nothing to see or anything of

13  relevance to the scene as it was when this occurred left on

14  that scene.  So it made no sense to go there.

15  Q.  Was it your understanding that the pipes that had been

16  worked on, pipe that had been worked on by Mr. McGee had been

17  cut, fused, and buried underground?

18  A.  That was my understanding, yes.

19  Q.  That the trench had been filled and the landfill was being

20  used?

21          MR. WALSH:  I think Im going to object to the

22  leading.  We're totally leading now, as opposed to just asking

23  questions.

24          THE COURT:  We're almost done, I would think.

25          MR. PACKIN:  Yes.

1    BY MR. PACKIN:

2    Q.  It's indicated that you did not evaluate, and I'm going to

3    quote this from the papers because I'm not sure I understand

4    it.  "The difference" -- what the difference in injury would

5    be between contact with the saw blade resulting from kickback

6    versus incidental contact."  Do you understand what that

7    criticism means?  That's my first question.  Do you understand

8    what "incidental contact" means?

9    A.  Well, I can tell you how I took it.

10   Q.  Yes.

11   A.  I'm going to imagine that the kickback scenario that, I

12   believe is accurately described by Mr. McGee himself, could be

13   distinguished from a situation where he slowly pulled the saw

14   out of the -- under his own power, without a kickback process

15   occurring and it superficially sliced his face.  I don't think

16   it's accurate, however, to say I didn't compare the two.  Or I

17   certainly have compared the two, reading that kind of a

18   criticism, in that we have evidence of a high-energy event

19   that went deep into the face, and if it's something where he's

20   lifting the machine towards his face, he has time to avoid,

21   create an avoidance maneuver and it wouldn't create the high-

22   energy, comminuted fractures that we actually see, and the

23   second set of injuries that we also have seen.

24   Q.  It is indicated that neither you nor anyone at your

25   company has performed any physical experimentation or testing

1   with cut-off saws to observe kickback or other reactive

2   forces.  Is that correct?

3   A.  That is true.

4   Q.  Why was that not done, sir?

5   A.  Because I believe the standards that are used, that look

6   at the issue of kickback related to what's happening to the

7   blade are only part of the picture.  And to set up a safe,

8   experimental situation that would, in fact, involve a live

9   human that could recreate this would never be allowed by any

10  human subjects committee, because of the dangers associated.

11  Q.  If such an experiment --

12          THE COURT:  Even if you use a paper plate instead of

13  a drill saw, drill wheel?

14  A.  Yes.  I'd be scared having any piece of rotating, anything

15  rotating.  And that's why I believe, in fact, if we've got an

16  accurate and reliable methodology that's done in the computer,

17  and it's used in so many situations in the design world and

18  humans interacting with inanimate objects and engineered and

19  designed objects that that is the most reliable way to go.

20  BY MR. PACKIN:

21  Q.  And addressing that issue, seriously, the -- in measuring

22  or attempting to measure or evaluate reactive forces, there's

23  a difference between a paper plate and a steel blade, a 14-

24  inch blade and a 7-inch blade, correct?  In terms of mass and

25  its --

1    A.   Its mass is different.  Most importantly, its rotational

2    inertia is different, if you think of a spinning speed skater

3    changing her rotational inertia by changing the geometry and

4    the position of parts of the body, yes, that's an important

5    part.

6    Q.   If a safe and ethical, in terms of the subjects involved,

7    experiment could be set up to test and observe reactive

8    forces, would that type of testing inform you, in any way, as

9    to the specific events that happened in this case, and

10   particularly, the issues you had to address in this case?

11   A.   Well, it wouldn't -- it certainly would not be needed in

12   order to support my opinions and analyses in this case.  This

13   case was not, for me, focused on calculating those forces or

14   relating the forces of the rotating saw to his injuries.  We

15   don't have a way to do that.  What we needed to do was line

16   them up and show that when a kickback occurred, as he

17   described it, it put his face in the position that would

18   create these injuries.

19   Q.   And why do we not have the ability to do that?

20   A.   Because we have -- if you think of a counter-example, we

21   know a lot about the tolerance limits of the skull, when you

22   drop a baby on the floor or when you, when a football player

23   gets hit in the head, to create a concussion.  We know about

24   the injury thresholds for the neck because of motor vehicle

25   interaction.  We have no tolerance criteria for rotating,

1    carbide-toothed saw blades going through someone's face.

2    Q.  There is criticism set forth that there were no

3    calculations made of the forces Mr. McGee was exerting on the

4    machine at the time of the incident or any resistance provided

5    by him or the deceleration rate of the blade.  Were any of

6    those calculations that you needed to do to address the issues

7    you've reached in this case?

8    A.  I believe not.

9    Q.  Were some of those -- were any of those possible to do?

10   A.  I believe the assumptions are so broad and so many to

11   actually, reliably calculate those beyond understanding the

12   general physics and directions of motion, that it would not

13   have added materially.

14   Q.  It's been indicated that you cannot say what portion of

15   the blade was pinched in the cut.  Is that an accurate

16   statement?

17   A.  I believe we can make a reliable estimate of where they

18   occurred, both based on testimony and direction of the

19   resulting motion of the saw and the blade, but the combination

20   or the relative weight, if you will, of pinching from the

21   closing kerf, from the bending of the pipe, and the aggressive

22   nature of the toothed, carbide-tipped saw blade, we can't

23   apportion or parse out.  Similarly, we can't say how much of

24   this is coming from the, what we talked about earlier, the

25   part of the pipe that is interior to the edge of the blade and

1   how much is coming from the cutting surface.  Both, certainly,

2   contributed.

3   Q.  The -- it's indicated that you don't know the rotational

4   speed of the blade or the energy in the saw at the moment the

5   incident was initiated.  Is that correct?

6   A.  I haven't tried to calculate it.  I am aware of the

7   testimony that nobody knows exactly what, whether it was being

8   operated at highest speed.  I know they typically operate it

9   at highest speed, but in terms of actually basing any

10  testimony on it being at that speed, I wouldn't want to do it.

11  Q.  Did you need to do it to reach your conclusions?

12  A.  I did not.

13  Q.  Did you know what the maximum rotational, or spindle

14  speed, was for this tool?

15  A.  It -- I'm not going to pick it off of the top of my head.

16  It's in the range of 5,000 rpm.  I can tell you the spindle,

17  maximum spindle speed is 5,350 rpm.

18  Q.  It's been stated in the defense papers that the HumanCAD

19  program you used has no protocol for measuring reactive forces

20  with a cut-off saw to determine positions it would have been

21  physically possible for Mr. McGee to have been in when the

22  accident occurred.  And that, I'm taking verbatim from their

23  papers.  Do you understand that criticism?  And how do you

24  respond to it?

25  A.  It has no protocol for that and these kinds of general

1   purpose software tools aren't designed specifically for each

2   and every potential application.  They are designed for a

3   broad range of situations in which -- and remember, we're

4   addressing the question of "Could he fit and be balanced?"

5   That's what they're designed to do, whether his holding in his

6   hand a 22-plus-pound object that is a saw is a piece of

7   luggage, is it anything -- is it a tool that -- of some other

8   sort, is all represented by its effect on the hands and how

9   much force are on the hands.

10  Q.  The papers also indicate that the HumanCAD program is not,

11  "validated for use with cut-off machine accidents."  Do you

12  know what that means?  Are these programs validated for use

13  with particular types of accidents?

14  A.  They are not.  They are validated in terms of their

15  ability to represent fit, balance, reach, much more general

16  purpose, objectives, broader questions than that.

17  Q.  It's stated that you did not set up a surrogate study or

18  demonstration of how the accident occurred using the cut-off

19  saw and HDPE pipe.  Is that correct?

20  A.  Yes.

21  Q.  Why did you not do that?

22  A.  Because I believe there are inaccuracies that invariably

23  creep into these attempts to do recreations and that this was

24  a more reliable approach.

25  Q.  Were there any factors that occurred in the field, in this

1    case, that couldn't be reproduced in a surrogate study?

2    A.  For instance, we have no idea as to the slope or pitch of

3    these pipes from the spoils pile down to the trench, that

4    angle.  That's, and no one could recall in terms of testimony.

5    We weren't in a position to recreate that.  So that's a kind

6    of example.  We can't recreate, at least, in most

7    circumstances, the potential for increased security due to the

8    fact that we have a dirt environment.  That can cut both ways,

9    of course, but it also can be used to brace oneself, if you

10   will.

11   Q.  To conduct an accurate surrogate study, would you need a

12   trench, a spoils pile, a several-hundred-feet-long run of

13   pipe, the same ground surface, all that, those kind of

14   variables, to get it accurate?

15   A.  I'm not sure under those circumstances if you could

16   precisely recreate that, even doing all of that.

17   Q.  Okay.  Is the -- are the computer software programs that

18   you used, basing them from the actual, accident scene

19   pictures, able to do that with a reasonable degree of

20   accuracy?

21   A.  Yes.  I believe so.

22   Q.  Is that -- that's as testified to you -- by you earlier

23   today, correct?

24   A.  Yes.

25   Q.  It's stated in the papers that the data inputted by you

1    into the HumanCAD program was limited to the pipe dimensions,

2    blade dimensions, guard geometry and Mr. McGee's height and

3    weight.  Is that accurate?

4    A.  Yes.

5    Q.  Was that sufficient information to yield the result that

6    you showed us here in the Courtroom?

7    A.  I believe so, yes.

8    Q.  It's stated in the papers that you testified that Figure

9    Three was not meant to be "perfectly accurate."  Is that

10   correct?

11   A.  Yes.  These are meant to be representative, to capture the

12   major important aspects of, to address the questions I've been

13   asked to address.  Whether he has toes pointed, whether he has

14   a -- ankle turned outward by forty degrees as opposed to ten

15   degrees, those are incidental findings.

16   Q.  And lastly, it's stated in the papers that your conclusion

17   regarding his, Mr. McGee's positioning at the time of the

18   accident is, "simply one of a constellation of alternative

19   positions he could have been in."  Is that an accurate

20   statement?

21   A.  I believe when I was asked a question like that at my

22   deposition, I stated that I have not looked at a constellation

23   of many other positions.  Let's take a ridiculous example of

24   him standing on one leg and reaching, you know, ways that this

25   possibly could have been done.  I did not do that.  I

1   believed, on the basis of the testimony, on the basis of the

2   injuries and the physics of the saw and what we see as

3   objective evidence on the pipe, that I have reasonably,

4   reliably recreated the best fit for all of that information,

5   and used that to base my opinions.  And so testified, I

6   believe, several times in my deposition.

7   Q.  And here, today, as well, you believe, to a reasonable

8   degree of engineering and biomechanical certainty and

9   engineering certainty, that what you showed in Figure 3 is the

10  most likely position that Mr. McGee was in at the time this

11  incident occurred.  Is that correct?

12          MR. WALSH:  Objection, Your Honor.  Again, we're

13  back to the -- Mr. Packin changing the question.  The witness

14  has testified about 10 times during this little soliloquy that

15  he was asked to make him fit between the pipes and not, and he

16  didn't, and now, he's being asked if he has a position on the

17  position he was in when the accident occurred.

18          MR. PACKIN:  That's just --

19          THE COURT:  I understand.  I understand the

20  testimony.  It's been explored in deposition.  It's set forth

21  in the report --

22          MR. PACKIN:  Okay.

23          THE COURT:  -- we don't have to pursue this further.

24          MR. PACKIN:  And just to address, this is about the

25  fourth time he said he was told to just make him fit, and

1    that's just a bogus statement.

2              THE COURT:  That's not how it's understood by the

3    Court.

4              MR. PACKIN:  Thank you.  I have no further

5    questions.

6              THE COURT:  All right.  Are we ready to recess for

7    the evening?

8              MR. PACKIN:  I am.

9              THE COURT:  Time is 20 of 5.  You have the services

10   of the hall tomorrow.  What time would you like to start?

11             MR. WALSH:  Your Honor, because, hopefully tomorrow

12   will be a travel day home, if we could start at 9, it would be

13   good to --

14             THE COURT:  9 o'clock.

15             MR. WALSH:  9 o'clock.  Thank you.

16             THE COURT:  Thank you.

17        (Court adjourned)

18

19                         CERTIFICATION
20   I certify that the foregoing is a correct transcript from the
21   electronic sound recording of the proceedings in the above-
22   entitled matter.
23
24   S/Lewis Parham                        8/7/12
25   _____        _____
26   Signature of Transcriber              Date